# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| STATE OF MINNESOTA, *by and through its Attorney General Keith Ellison*, CITY OF MINNEAPOLIS, and CITY OF ST. PAUL, | |
| Plaintiffs, | |
| v. | Civ. No.: _____ |
| KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; JOHN CONDON, *in his official capacity as Acting Executive Associate Director of Homeland Security Investigations*; U.S. Department of Homeland Security; TODD LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; MARCOS CHARLES, *in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations;* U.S. Immigration and Customs Enforcement; RODNEY SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection;* U.S. Customs and Border Protection; GREGORY BOVINO, *in his official capacity as Commander of the U.S. Border Patrol*; U.S. Border Patrol; DAVID EASTERWOOD, *in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement*, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Defendants. | |

## INTRODUCTION

1.      In December 2025, the federal government initiated "Operation Metro Surge," an unprecedented deployment of federal immigration enforcement agents from numerous agencies of Defendant U.S. Department of Homeland Security ("DHS") to the State of Minnesota, including into the cities of Saint Paul and Minneapolis. Operation Metro Surge has instilled fear among people living, working and visiting the Minneapolis-Saint Paul metro area (the "Twin Cities"). Thousands of armed and masked DHS agents have stormed the Twin Cities to conduct militarized raids and carry out dangerous, illegal, and unconstitutional stops and arrests in sensitive public places, including schools and hospitals—all under the guise of lawful immigration enforcement.

2.      Defendants claim this unprecedented surge of immigration agents is necessary to fight fraud. In reality, the massive deployment of armed agents to Minnesota bears no connection to that stated objective and instead reflects an alarming escalation of the Trump Administration's retaliatory actions towards the state.

3.      Defendants claim to have deployed over 2,000 DHS agents to the Twin Cities—a number that greatly exceeds the number of sworn police officers that Minneapolis and Saint Paul have, combined. Operation Metro Surge is, in essence, a federal invasion of the Twin Cities.

4.      This operation is driven by nothing more than the Trump Administration's desire to punish political opponents and score partisan points—at the direct expense of Plaintiffs' residents. Defendants' actions appear designed to provoke community outrage, sow fear, and inflict emotional distress, and they are interfering with the ability of state and

2

local officials to protect and care for their residents. After weeks of escalation, including a DHS agent shooting into an occupied vehicle on December 21, 2025, in Saint Paul, a U.S. Immigration and Customs Enforcement ("ICE") agent shot and killed a Minneapolis resident on January 7, 2026.

5.      The Tenth Amendment gives the State of Minnesota and its subdivisions, including the Cities of Minneapolis and Saint Paul, inviolable sovereign authority to protect the health and wellbeing of all those who reside, work, or visit within their borders. The people of Minnesota are entitled to basic safety and dignity in their communities. They have the right to move about their daily lives confident that their constitutional rights and civil liberties will remain intact and will not be infringed. They have the right to go to work, take their children to school, and move through public and private spaces free from fear of violence against themselves or their loved ones by their federal government. They are entitled to access city services and use city facilities without being harassed by federal agents in parking lots. They expect that law enforcement, whether federal, state, or local, will follow the law, avoid creating dangerous and chaotic circumstances, and conduct itself in a manner that distinguishes officers from masked criminals. Indeed, being free from unlawful seizures, excessive force and retaliation are not a list of aspirations Minnesotans deserve; these are rights enshrined within state and federal laws.

6.      When the federal government itself violates legal rights and civic norms on such a broad scale and public panic is high, state and city governments bear the costs— both tangible and intangible.  Defendants' agents' reckless tactics endanger the public safety, health, and welfare of all Minnesotans. Additionally, Defendants' agents'

3

inflammatory and unlawful policing tactics provoke the protests the federal government seeks to suppress.

7.    The unlawful tactics used by Defendants' agents have left members of Plaintiffs' communities afraid to shop, go to work, attend school, access basic government services, or otherwise live their lives.  They have also resulted in school closures across the Twin Cities due to safety concerns.

8.    The unlawful tactics used by Defendants' agents also undermine public trust in state and local law enforcement because individuals confuse Defendants with local police. Deteriorating public trust in local law enforcement has serious consequences: it suppresses the reporting and prosecution of crime, especially for immigrant populations. Defendants' agents' tactics also sap state and local resources when local law enforcement officers are called away from their important work to respond to avoidable incidents Defendants' agents cause.

9.    Plaintiffs bring this suit asking the Court to enjoin further legal violations and unlawful escalations by Defendants and prevent further harms to Plaintiffs.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this Complaint under 28 U.S.C. §§ 1331. The Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

11.    Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities.  Plaintiffs

are governments within this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within this district.

12.    Defendants are not entitled to immunity from Plaintiffs' claims.

## PARTIES

### I.    PLAINTIFFS

13.    Plaintiff State of Minnesota is a sovereign state of the United States of America. Minnesota is represented by and through its chief legal officer, Attorney General Keith Ellison, who is authorized to sue on the State's behalf, including on behalf of its public schools and its citizens. Minn. Stat. § 8.01.

14.    Plaintiff City of Minneapolis ("Minneapolis") is a municipal corporation organized and existing under and by virtue of the laws of the State of Minnesota. It is a home rule charter city. Minneapolis is the largest city in Minnesota and one of its most diverse.

15.    Plaintiff City of Saint Paul ("Saint Paul") is a municipal corporation organized and existing under and by virtue of the laws of the State of Minnesota. It is a home rule charter city. Saint Paul is a first-class city, the second-largest city in Minnesota, and the capital of the State of Minnesota. Saint Paul is highly diverse and is home to the largest urban Hmong population in the country.

### II.    DEFENDANTS

16.    Defendant Kristi Noem is Secretary of DHS and is charged with the supervision and management of all decisions and actions of that agency.

5

17.    Defendant John Condon is the Acting Executive Associate Director of Homeland Security Investigations ("HIS"), an agency within DHS.

18.    Defendant U.S. Department of Homeland Security is a cabinet agency within the executive branch of the United States government.  28 U.S.C. § 501.

19.    Defendant Todd M. Lyons is the Acting Director and the senior official currently performing the duties of the Director of the United States Immigration and Customs Enforcement ("ICE") agency. ICE is an agency within DHS. Its stated purpose is to "[p]rotect America through criminal investigations and enforcing immigration laws to preserve national security and public safety."

20.    Defendant Marcos Charles is Acting Executive Associate Director of Enforcement and Removal Operations within ICE.

21.    Defendant U.S. Immigration and Customs Enforcement is an agency of DHS.

22.    Defendant Rodney Scott is the Commissioner of the U.S. Customs and Border Protection ("CBP"). CBP is an agency within DHS. Its stated mission is to "[p]rotect the American people, safeguard our borders, and enhance the nation's economic prosperity."

23.    Defendant U.S. Customs and Border Protection is an agency of the Department of Homeland Security.

24.    Defendant Gregory Bovino is the "Chief Patrol Agent" of CBP's El Centro Sector. Defendant Noem has named Defendant Bovino, "Commander-at-Large." On

information and belief, Defendant Bovino has direct responsibility for DHS activities in the Twin Cities.

25.     Defendant U.S. Border Patrol is a federal law enforcement agency under the U.S. Customs and Border Protection.

26.     Defendant David Easterwood is the Saint Paul Field Office Acting Director of Enforcement and Removal Operations for ICE. The Saint Paul Field Office is responsible for ICE activities in Minnesota, Iowa, Nebraska, North Dakota, and South Dakota.

27.     Each individual Defendant is sued in their official capacity.

## FACTUAL ALLEGATIONS

**I.   THE TRUMP ADMINISTRATION HAS TARGETED MINNESOTA BECAUSE OF ANIMUS.**

28.     President Trump and others within the Trump Administration, including Defendants, have repeatedly used their public platforms to attack Plaintiffs, their people, and their elected officials, both within the context of immigration and beyond.

29.     On information and belief, Defendants' decision to target the Twin Cities with an unprecedent surge of federal agents has been motivated by a desire to retaliate against perceived political enemies rather than good faith immigration enforcement, public safety, or law enforcement concerns.

30.     On Friday January 9, 2026, President Trump expressed the root of his displeasure in plain terms during a recorded interview: he essentially claimed that

Minnesota is "corrupt" and "crooked" because its officials accurately reported election results and those results did not declare him the winner.[1]

31.    President Trump did not win the majority of votes cast in Minnesota in 2016, 2020, or 2024. His claims to the contrary, in the context of being asked to explain actions his administration is taking in Minnesota, suggests a desire to punish the State for voting for his opponents. Even before the January 9, 2026, interview spelled this connection out so explicitly, President Trump repeatedly demonstrated personal animosity toward Minnesota Governor Tim Walz, the Democratic vice-presidential nominee in the 2024 election.

32.    For example, in the wake of the assassination of former State Speaker of the House Melissa Hortman and her husband Mark Hortman, President Trump said that Governor Walz is "so whacked out, I'm not calling him."[2]

33.    President Trump has called Governor Walz a "dangerously liberal extremist," and recently called him "the seriously retarded Governor of Minnesota, Tim Walz."[3]

---

[1] *President Trump Participates in a Meeting with Oil and Gas Executives,* The White House (Youtube, Jan. 9, 2026), https://www.youtube.com/watch?v=iaE8lw8_x30&t=30s (relevant portion beginning at 54:14 and ending at 56:05.)

[2] Cheyanne M. Daniels, *Trump won't call 'whacked out' Walz after Minnesota shooter charged*, Politico, June 17, 2025, https://www.politico.com/news/2025/06/17/trump-walz-phone-call-00410141.

[3] Zak Failla, *Trump Uses Slur Against Gov. Tim Walz in Thanksgiving Truth Social Tirade; Walz Fires Back*, Msn.com, Nov. 28, 2025, https://perma.cc/XG2R-QDWL

34.    President Trump has also called Minneapolis Mayor Jacob Frey a "fool."[4]

## II.    THE TRUMP ADMINISTRATION HAS A PATTERN OF TARGETING DEMOCRAT-LED JURISDICTIONS WITH IMMIGRATION ENFORCEMENT, RATHER THAN REGIONS WITH HIGHER NUMBERS OF NONCITIZEN IMMIGRANTS.

35.    Minneapolis and Saint Paul are now the latest of the cities widely considered to be Democratic cities with elected leaders who do not politically align with Trump to be flooded with federal agents. Los Angeles, Portland, Chicago, and Washington, D.C., have experienced their own influxes of federal agents, and Defendant DHS has made clear that ICE "will continue to surge into sanctuary jurisdictions nationwide."[5]

36.    Since retaking office on January 20, 2025, President Trump issued several executive orders intended to deter states and localities from implementing or keeping so-called "sanctuary" policies or laws—laws that preclude components of state or local governments from participating in federal civil immigration enforcement in various ways.

---

[4] Howard Thompson, *Pres. Trump rails against Somalis: 'They've destroyed Minnesota'*, Fox 9, Dec. 3, 2025, https://www.fox9.com/news/pres-trump-rails-against-somalis-destroyed-minnesota-dec-2025.

[5] DHS (@DHSgov), X (Jan. 8, 2026 9:28 AM CT), https://perma.cc/84T8-B5VZ

37.     The Trump Administration, including Defendants DHS and Noem, also repeatedly criticized Minnesota and elected leaders Governor Tim Walz and Mayor Jacob Frey for being "sanctuary politicians"[6] with "sanctuary policies."[7]

38.     In accordance with the President's effort to defund "sanctuary cities," the Trump administration, acting through various federal agencies, has sought to assert a sweeping entitlement to use state law enforcement officers for federal immigration enforcement. It has done so by requiring Minnesota and other states to agree to cooperate with federal immigration enforcement activities as a condition for receiving billions of dollars in federal funding.

39.     For example, beginning in March 2025, DHS and its sub-agencies, including Federal Emergency Management Agency ("FEMA"), sought to upend the state-federal emergency management system, holding critical emergency preparedness and response funding hostage unless Minnesota and other states promised to devote their criminal enforcement and other state agency resources to the federal government's civil immigration enforcement.

40.     Forced to choose between foregoing federal funds or facing compulsory diversion of limited law enforcement resources to enforce federal immigration law beyond

---

[6] DHS (@DHSgov), X (Oct. 27, 2025 8:57 AM CT), https://perma.cc/8H4T-KZD4; Secretary Kristi Noem (@KristiNoem), X (Oct. 24, 2025 5:16 PM CT), https://x.com/KristiNoem/status/1981847364827746413; Secretary DHS (@DHSgov), X (July 9, 2025 11:48 AM CT), https://x.com/DHSgov/status/1942989123544924541.

[7] DHS (@DHSgov), X (Dec. 5, 2025 9:50 AM CT), https://x.com/DHSgov/status/1996970373078720774.

what Minnesota law allows, Minnesota, with other states, brought suit to challenge those coercive conditions. *State of Illinois v. Federal Emergency Management Agency*, 25-cv-00206 (D.R.I.) (filed May 13, 2025). In September 2025, the court granted summary judgment to the states, holding among other things that those conditions violated the Constitution and were tantamount to "economic dragooning." *Illinois v. Fed. Emergency Mgmt. Agency*, No. CV 25-206 WES, 2025 WL 2716277, at *14 (D.R.I. Sept. 24, 2025).

41.    Minnesota and other states have similarly challenged coercive immigration-enforcement conditions by the U.S. Department of Transportation, *California v. U.S. Dept. of Transportation*, 25-cv-00208 (D.R.I.) (filed May 13, 2025) and the U.S. Department of Justice ("DOJ"), *New Jersey v. U.S. Dept. of Justice*, 25-cv-00404 (D.R.I.) (filed August 18, 2025).

42.    The funding for Minnesota jeopardized by these coercive actions by the Trump administration totals over $2 billion. Those funds are critical to the state's services to its residents and used by Minnesota to maintain state and local roads and bridges, protect against and respond to natural disasters, and provide emergency shelter to crime victims and conduct sexual assault forensic exams, among other things.

43.    In the midst of these immigration-related federal defunding actions and responsive lawsuits, DHS published, on May 29, 2025, a list of 500 purported "sanctuary jurisdictions" around the country. It accused them of "shamefully obstructing" the Trump administration's deportation plans and "shielding dangerous criminal aliens."

44.    However, days later, based on widespread news reporting as early as June 1, that first sanctuary jurisdiction list was gone. As reported, very soon after publishing the

list, the Trump Administration faced objections from Republican stronghold jurisdictions that found themselves on the list. DHS quickly and quietly removed the list from the website where it had been posted.

45.    Less than two weeks later, the Trump Administration posted a new version of its sanctuary jurisdiction target list. That August 5, 2025, publication shortened the list from about 500 to just 35 jurisdictions. The new sanctuary "jurisdiction" list targeted twelve states (including Illinois, California, Oregon, and Minnesota), and the District of Columbia.

46.    Although DOJ stated its intention in pressuring "sanctuary jurisdictions" was to "compel compliance with federal law," in reality, the Administration's efforts sought to impermissibly force sovereign states like Minnesota to disavow their own laws and subjugate to the political whim of the Trump Administration. The August 5, 2025, publication specifically bragged about the success of a "threatening" letter that coerced Louisville, Kentucky to revoke its "sanctuary policies."

47.    In September 2025, the Administration went so far as to sue Plaintiffs in federal court for these so-called "sanctuary policies."[8]

48.    In addition, and shortly after issuing the "sanctuary jurisdictions" list, Defendants mobilized National Guard troops in California, Illinois and Oregon. Multiple courts enjoined these mobilizations as unlawful.  Defendants pivoted resources and efforts to Minnesota after the Supreme Court blocked the Trump Administration from deploying

---

[8] *United States v. State of Minnesota et al.*, Case No. 0:25-cv-03798 (D. Minn. 2025)

the National Guard in Illinois, *Trump v. Illinois*, No. 25A443, 2025 WL 3715211 (Dec. 23, 2025) (mem.).   On December 31, 2025, President Trump announced that he was withdrawing the National Guard from Chicago, Los Angeles and Portland but left the door open to sending federal forces "in a much different and stronger form." A few days later, on January 4, 2026, Defendants singled out Minnesota for its largest ever immigration operation.

49.     Defendants have targeted Minnesota for the latest unprecedented surge not based on any real or legitimate concern for the enforcement of immigration laws or promotion of public safety, but rather in service of Defendants' goal to score political points.

50.     If the Defendants' true goal was to detain and deport dangerous individuals, they would not accomplish it through what DHS describes as "consensual" (namely: random) encounters with people on the street. And if the Defendants' true goal was to prioritize detaining and deporting the highest number of immigrants with no legal right to remain in the U.S., they would not be targeting Minnesota for what Defendants refer to as the largest ever immigration operation. Data suggests that just over 1.5% of Minnesota's total population are noncitizen immigrants without legal status, less than half the national average rate.[9] On information and belief, that small percentage includes individuals whose presence has been long known to DHS and who have kept regularly scheduled

---

[9] Cameron Macht, *The Role of Undocumented Immigrants in Minnesota's Workforce*, MN Department of Employment and Economic Development (March 2025), https://mn.gov/deed/newscenter/publications/trends/mar-2025/immigrants.jsp

appointments with DHS. Many states have higher rates of reported non-citizens relative to their populations, including Utah, Texas, and Florida. The administration has made no similar efforts to surge federal immigration agent deployments into cities in Utah, Texas, or Florida.  Incredibly, the reported non-citizen population of Utah, Florida, and Texas (combined together) is nearly the size of the entire population of Minnesota.[10]

51.     Available public reporting also contradicts DHS's public claims that Operation Metro Surge is focused on apprehending "the worst of the worst" or known targets of fraud investigations. Many of DHS' arrestees in Minnesota lack any criminal conviction history. Indeed, for many of DHS' arrestees in Minnesota, the only laws they are alleged to have violated are the underlying immigration laws DHS seeks to enforce.

## III.   THE TRUMP ADMINISTRATION IS USING "FRAUD" AS PRETEXT FOR ITS UNLAWFUL ACTIONS IN MINNESOTA.

52.     At some point in or around November 2025, President Trump recognized an opportunity to exploit a high-profile COVID-19 era fraud scheme that has been investigated and prosecuted in Minnesota to exact retribution on perceived political enemies and more aggressively pursue his immigration policies.

53.     The case in question is generally referred to as the "Feeding Our Future" fraud. The fraud was perpetrated between 2020 and early 2022 and targeted a USDA-funded child nutrition program during the COVID-19 pandemic. In January 2022, the Federal Bureau of Investigation ("FBI") stated in a sworn search warrant affidavit that it

---

[10]     *State Immigration Data Profiles,* Migration Policy Institute, https://www.migrationpolicy.org/programs/data-hub/state-immigration-data-profiles

was the Minnesota Department of Education ("MDE") (the state agency administering the USDA funds) that affirmatively brought the State's concerns to the FBI in April 2021 and ultimately provided documents and testimony to support federal investigation and prosecution.[11] MDE had also referred the matter to USDA-OIG even earlier, seeking federal assistance by the fall of 2020, but MDE escalated its referral to the FBI when the USDA-OIG took no action. In September 2022, DOJ ultimately announced federal charges against 47 defendants for their alleged roles in the fraud scheme, many of whom pled guilty or were later convicted at trial, and additional charging and convictions have followed.[12] Far from a scenario where a state agency hid fraud or obstructed investigations, this case actually shows a reasonable partnership between state and federal investigative resources.

54.    Yet, while the "Feeding our Future" fraud case was in no way new, and in fact was a case involving collaboration between state and federal resources to bring perpetrators to justice, President Trump and others in his Administration have repurposed the case in recent months in order to use the pretext of "fraud" concerns as an excuse to engage in all manner of unlawful actions. Pertinent to this lawsuit, the Trump Administration recognized that the Feeding our Future scheme involved a large number of

---

[11] *See* Affidavit in Support of Search Warrant, Case No. 22-MJ-040 TNL (D. Minn. Jan. 20, 2022) at ¶¶ 51-54

[12] *U.S. Attorney Announces Federal Charges Against 47 Defendants in $250 Million Feeding Our Future Fraud Scheme*, U.S. Department of Justice, September 20, 2022, https://perma.cc/A9FN-55GS; *see also* Katrina Pross, Here's everyone who's been sentenced in the Feeding Our Future fraud, Sahan Journal, Jan. 24, 2025, https://perma.cc/5MQ5-K6DE

Somali immigrants, and since then, have used the case to disparage the entire Somali community, and Minnesota's Democratic politicians and policies.

55.     On November 21, 2025, President Trump posted on social media that Minnesota "is a hub of fraudulent money laundering activity," and that he was therefore "terminating, effective immediately, the Temporary Protected Status (TPS Program) for Somalis in Minnesota."[13] Then, on Thanksgiving Day, President Trump posted a lengthy screed, falsely claiming that "Hundreds of thousands of refugees from Somalia are completely taking over the once great State of Minnesota. Somalian gangs are roving the streets looking for 'prey' as our wonderful people stay locked in their apartments and houses hoping against hope that they will be left alone . . . ." [14]

56.     Several days later, Vice President J.D. Vance posted on social media that "A welfare fraud scandal in Minnesota reveals that large numbers of new arrivals aren't assimilating and are funneling our tax dollars to literal terrorist groups."[15]

57.     Then, on December 6, 2025, Homeland Security Advisor Stephen Miller stated explicitly that the fraud case would be a pivotal talking point in the Trump Administration's effort to reduce the number of immigrants within the United States.

---

[13] Ryan Mancini, *Trump to end legal protections for Somalis in Minnesota*, The Hill Nov. 22, 2025, https://thehill.com/homenews/administration/5618582-donald-trump-legal-protections-somalia-minnesota/

[14] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 27, 2025, 10:27 PM CT), https://truthsocial.com/@realDonaldTrump/posts/115625429081411360

[15] Sean Hannity Show, *Stephen Miller: This scandal will 'rock the CORE' of politics*, Fox News (Dec. 6, 2025) (available at https://www.youtube.com/watch?v=9tps5OvCkfw) (relevant portion beginning at 2:20 time stamp and ending at 6:47.)

Specifically, Miller stated in an interview that the Feeding our Future fraud case showed that the Democratic party had used migration as a weapon against the American people and proved that this country should stop "third world migration."

58.    On January 5, 2026, President Trump reacted to Governor Walz's announcement that he would not seek reelection with a social media post that accused the governor—without any support—of being "caught, REDHANDED, along with Ilhan Omar, and others of his Somali friends, stealing Tens of Billions of Taxpayer Dollars."[16] The post also criticized Democratic governors of other states.

59.    The Trump Administration's new focus on "fraud" in Minnesota is just its latest attempt to attack Democratic politicians and more aggressively and recklessly implement their immigration enforcement agenda. Even Defendant Noem has admitted that DHS is solely aiming the pretextual spear of fighting fraud at states led by Democratic governors, posting on X that "[w]e will root out every case of fraud we find from Minneapolis to California to New York."[17]

IV.    **"OPERATION METRO SURGE."**

60.    On December 6, 2025, Defendant Noem posted on the social media platform, X, the following: "DHS has surged law enforcement to Minneapolis and has already arrested more than 1,500 crooks and creeps: murderers, rapists, pedophiles, and gang

---

[16] Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 5, 2026, 1:13 PM CT), https://truthsocial.com/@realDonaldTrump/posts/115844083693194821.

[17] Secretary Kristi Noem @KristiNoem, X (Jan. 6, 2026 6:05 PM CT), https://x.com/Sec_Noem/status/2008691367375982905

members. We will continue to fulfill @POTUS Trump's promise to Make America Safe Again."[18]

61.    Defendant DHS similarly posted the following on X, which Defendant Noem reposted: "The largest DHS operation is happening right now in Minnesota. @POTUS Trump and @Sec_Noem have rallied DHS law enforcement personnel to keep Americans safe and ERADICATE fraud. We're not leaving until the problem is solved."[19]

62.    To initiate the "operation," Defendants deployed at least 100 ICE and HSI agents from across the country to the Twin Cities. Since then, public reporting has indicated that Defendant Noem has deployed as many as 2,000 DHS agents to the Twin Cities alone.

63.    Defendants acknowledge that the operation is the largest of its kind. On January 6, 2026, DHS posted on the social media platform X a clip from a television interview of Defendant Lyons in which he describes ICE's operation in Minnesota and states, "We have the largest immigration operation ever taking place right now." Defendants acknowledged that these agents were "taking the fight to these sanctuary jurisdictions . . . ."[20]

64.    Defendant Bovino and additional CBP agents have now also been deployed to Minneapolis to assist in the expanded Operation Metro Surge. And on January 8, 2026,

---

[18] Secretary Kristi Noem (@Sec_Noem), X, (Jan. 6, 2026 7:52 PM CT) https://x.com/Sec_Noem/status/2008718230039450008.

[19] DHS (@DHSgov), X, (Jan. 6, 2026 3:21 PM CT) https://x.com/DHSgov/status/2008650038847959106

[20] DHS (@DHSgov), X, (Jan. 6, 2026, 12:02 PM CT) https://x.com/DHSgov/status/2008600031620952221

the Trump Administration reportedly deployed more than 100 additional CBP agents to Minnesota from operations in Chicago and New Orleans after an ICE agent shot and killed a Minnesotan woman in Minneapolis.[21]

65.    Since the beginning days of Operation Metro Surge, the increased presence of Defendants' agents has been marked by increasingly inflammatory rhetoric from President Trump and others within the Administration about people of Somali heritage. These range from direct comments in interviews and speeches, to juvenile memes posted on official social media accounts:

> a.    The day after Operation Metro Surge commenced, President Trump called Somali Americans "garbage" stating that he did not want them in the country.[22]
>
> b.    Several days later, on December 6, 2025, Deputy Director of ICE Madison Sheahan described "Operation Metro Surge" as "cleaning up Governor Walz's mess."[23]
>
> c.    Also in December 2025, Homeland Security Advisor Stephen Miller made disparaging remarks about Somali people during a television interview, stating, "We should not be shocked, when you import a population whose primary occupation is pirate, that they are going to come here and steal

---

[21] Hamed Aleaziz and Madelein Ngo, *Trump Administration Deploying More Border Patrol Agents to Minnesota*, N.Y. Times (Jan. 8, 2026), https://www.nytimes.com/2026/01/08/us/politics/border-patrol-minnesota-trump.html.

[22] N'dea Yancey-Bragg, A 'volcano' of controversy has hit the Minnesota Somali community, USA Today Dec. 7, 2025, https://perma.cc/4BFE-QEL4

[23] Madison Sheahan (@ICEDeputy) X, (Dec. 6, 2025, 4:55 PM CT), https://perma.cc/3QPL-MZ6K|

everything we have."[24]

d.    On December 31, 2025, President Trump and the White House's social media accounts both shared a claim that "Much of the Minnesota Fraud, up to 90%, is caused by people that came into our Country, Illegally, from Somalia. 'Congresswoman' Omar, an ungrateful loser who only complains and never contributes, is one of the many scammers. Did she really marry her brother? Lowlifes like this can only be a liability to our Country's greatness. Send them back from where they came, Somalia..."[25] |

e.    Also on December 31, 2025, Defendant DHS posted on social media, "We will not live like this anymore," accompanied by a meme depicting Minneapolis Mayor Jacob Frey standing in front of a pile of garbage with a speech bubble containing Somali script. [26]

66.    Defendants Noem, DHS, and ICE have claimed that the expanded deployment is aimed at rooting out fraud in Minnesota.[27]  Defendant Noem has claimed that "the amount of fraud in Minnesota is unprecedented" and the additional 2000 DHS agents that have been deployed to Minnesota are to "help get to the bottom of it."[28] And

---

[24]  Jesse Waters Primetime, *'GO HOME': Stephen Miller decries 'pirate' Somalis amid alleged fraud scandal,* Fox News (Dec. 19, 2025 (available at https://www.youtube.com/watch?v=Eqs42DviZ3Q) (relevant portion beginning at 0:01 and ending at 0:36.)

[25]  Donald J. Trump (@realDonaldTrump) Truth Social, (Dec. 31, 2025, 9:55 AM CT), https://truthsocial.com/@realDonaldTrump/posts/115814993074933464; White House (@WhiteHouse), X, (Dec. 31, 2025, 10:10 AM CT), https://perma.cc/SYE3-TAQT

[26] Homeland Security (@DHSgov), X (Dec. 31, 2025, 12:55 PM CT), https://x.com/DHSgov/status/2006439129291304998.

[27]  Secretary Kristi Noem (@Sec_Noem), X (Jan. 6, 2026, 1:26 PM CT), https://x.com/Sec_Noem/status/2008621337678586036?s=20; Newsmax, Acting ICE Director: We are being threatened by criminals National Report (YouTube, Jan. 6, 2026), https://www.youtube.com/watch?v=EvaI4TfLq0w.

[28] Jesse Waters Primetime, *Minnesota whistleblowers ignored or bullied into silence: Kristi Noem*, Fox News (Jan. 6, 2026), https://www.foxnews.com/video/6387328026112.

the expansion comes just days after the U.S. Department of Health and Human Services announced a pause in all federal child care funding to Minnesota and the Small Business Administration announced a freeze on funding to Small Business Development Centers.

67.    The White House has similarly expressed that the 2,000 deployed DHS agents have been sent to Minnesota to help with "targeted, door-to-door investigations at locations of suspected fraud."[29]

68.    But Defendants' investigations have not been "targeted." DHS agents have been conducting raids at job sites and businesses, detaining and deporting individuals while they perform essential work that directly benefits Plaintiffs' communities. DHS agents also appear to be conducting general sweeps and detaining people within their path based on their race and ethnicity.  Defendants' conduct further undermines the notion that they are focusing efforts on individuals with violent criminal histories or known targets in fraud investigations—particularly where fraud allegations are primarily investigated via reviewing documents, not by roving groups of DHS agents dressed in riot gear and military fatigues.

69.    By way of one example, public reporting indicates that on December 13, 2025, DHS agents surrounded a Minnesota residence where a roofing crew was at work, and without appearing to know the names or identities of the laborers on the roof, engaged in a multi-hour standoff in freezing temperatures demanding that the laborers come down.

---

[29] *Fact Sheet: President Donald J. Trump Establishes New Department of Justice Division for National Fraud Enforcement*, The White House (Jan. 8, 2026), https://www.whitehouse.gov/fact-sheets/2026/01/fact-sheet-president-donald-j-trump-establishes-new-department-of-justice-division-for-national-fraud-enforcement/.

In recent days there are also reports of blockades at shopping areas where roving groups of DHS agents block all traffic and demand the citizenship of riders in every car—far away from where border checkpoints could be lawful.

## V. UNLAWFUL, AGGRESSIVE TACTICS CHARACTERIZING "OPERATION METRO SURGE."

70.    Defendants' agents carrying out immigration enforcement in Minnesota and the Twin Cities are engaging in widespread unlawful conduct, as they have in other cities like Chicago and Los Angeles where they have surged federal agents. *See, e.g., Chicago Headline Club v. Noem*, No. 25C12173, 2025 WL 3240782 *4-6 (N.D. Ill. Nov. 20, 2025); *L.A. Press Club v. Noem*, 799 F. Supp. 3d 1036, 1045 (C.D. Cal. 2025).

71.    As part of Operation Metro Surge, Defendants' agents have racially profiled Minnesotans, resulting in unconstitutional and unlawful detentions of Minnesotans.

72.    For example: on December 10, 2025, two masked DHS agents tackled and arrested Mubashir, a Somali American man; one agent put him in a choke hold. [30]  DHS agents arrested Mubashir despite Mubashir repeatedly asking that he be allowed to show them his legal identification.  DHS agents then detained Mubashir for two hours for no apparent reason other than his perceived national origin.

73.    A similar incident appears to have occurred on January 8, 2026. Current reporting indicates DHS agents took two young Hispanic men to the ground and handcuffed them after DHS agents observed them working at the front of a Target retail

---

[30] Katelyn Vue, *U.S. citizen offered to show I.D. but was arrested by immigration officers in Cedar-Riverside*, Sahan Journal (Dec. 9, 2025), https://perma.cc/TTM9-AZVA

store. Video from the scene shows agents forcing one of the men into a DHS vehicle *after* the man yells that he is a U.S. citizen. Public reporting also indicates that family members of one of the men placed calls to ICE offices reiterating that he was a U.S. citizen but that DHS agents nonetheless took and held him for hours at an unknown location, with no notice to the family of where he had been taken or when he would return.[31]

74.    Also on January 8, 2026, CBP agents surrounded and questioned a driver at the Minneapolis-St. Paul airport and asked him if he is a U.S. Citizen. A CBP agent is heard on the video stating, "I can hear you don't have the same accent as me, that's why I'm asking" and "I want to know where you were born."[32]

75.    Also on January 8, 2026, DHS agents arrested a 20-year-old man in Robbinsdale, Minnesota, for seemingly no other reason than his perceived national origin.[33] The man, whose father was born in Mexico, was himself born in Minnesota. DHS agents held the man in federal custody for over six hours before releasing him.

---

[31] *See* Felicity Dachel, *Federal agents take 2 into custody at Richfield Target*, Kare 11 (Jan. 8, 2026) (available at https://www.kare11.com/article/news/local/ice-in-minnesota/federal-agents-richfield-target/89-074f28c7-c04f-4392-9165-08ca304b0f39 ("the men told witnesses they were U.S. citizens").

[32] FREEDOMNEWS TV – NATIONAL / SCOOTERCASTER, *"You want my ID??" Bovino and CBP Checks Citizenship at Minneapolis Airport* (YouTube Jan. 7, 2026),                                    https://www.youtube.com/watch?v=5QM2hqcfOis.

[33] Kim Hyatt and Sofia Barnett, *U.S. citizen swept up in ICE enforcement as Twin Cities operation continues*, The Minnesota Star Tribune (Jan. 8, 2026), https://www.startribune.com/us-citizen-arrested-ice-day-after-fatal-shooting-renee-good-twin-cities-immigration-operation/601560460.

76.    In another incident of racial profiling, DHS agents approached a team of four Minneapolis Public Works employees, working in Minneapolis and wearing City uniforms and badges. The agents asked the three nonwhite City employees for identification and asked them each questions about their citizenship and place of birth. The agents did not ask to see any identification or ask any questions of the fourth employee, who was white.

77.    Additional public reporting from this week describes separate instances in which Native Americans have been detained or taken into DHS custody, including: four individuals reported to be members of the Oglala Sioux Tribe who DHS agents apparently accosted on a public roadway.[34]

78.    Of course, the full scale to which citizens are being detained or taken into custody based on race and ethnicity is difficult to track given the scope of Operation Metro Surge and the absence of any obvious centralized, trustworthy place for victims of profiling to report.

79.    As of December 13, 2025, the ACLU of Minnesota reported that it knew of "at least a dozen" U.S. citizens of Somali descent being detained as part of Operation Metro Surge—a pattern highlighting unlawful racial profiling practices have been terrorizing the Twin Cities for weeks.[35]

---

[34] Nick Lentz, *4 members of Oglala Sioux Tribe detained by ICE in Minneapolis, president says,* CBS News (Jan. 9, 2026), https://www.cbsnews.com/minnesota/news/oglala-sioux-tribe-members-detained-ice-minneapolis/

[35] Emmy Martin, *As ICE activity intensifies, some Somali students lower their profile*, The Minnesota Star Tribune (Dec. 13, 2025), https://www.startribune.com/as-ice-activity-intensifies-some-somali-students-lower-their-profile/601542204.

80.     Plaintiffs have also received reports of DHS agents using their vehicles in unsafe, aggressive ways that either intentionally or recklessly risk injury to others or actively cause collisions. For example, in Minneapolis, there have been multiple calls related to DHS agents violating traffic laws, driving dangerously, ramming vehicles, and getting into traffic accidents.

81.     DHS agents have also conducted (or attempted to conduct) warrantless arrests. On December 5, 2025, DHS agents entered a south Minneapolis restaurant, Hola Arepa, without a warrant. When asked specifically by the restaurant's general manager to present their judicial warrant, the agents attempted to intimidate the restaurant's employees by asserting "We don't need one."[36]

82.     In another example of unlawful behavior, DHS agents have been observed changing the license plates on their vehicles. Vehicles associated with federal immigration efforts have also been spotted by legal observers with different front and back license plates.

83.     Defendants' agents have also conducted their unlawful acts in ways which spark public outrage. On December 15, 2025, DHS agents in Minneapolis detained a woman, and dragged her handcuffed across a frozen road, despite being repeatedly told by bystanders that she was pregnant.

---

[36] Raya Quttaineh, *Owner of Minneapolis restaurant says ICE entered without a warrant, staff pushed back* (Dec. 5, 2025 7:17 AM CT), https://www.kare11.com/article/news/local/south-minneapolis-restaurant-ice-entered-without-warrant-staff-push-back/89-7af99452-0ed8-4de5-9a27-6cb74cdc3e07.

84.     On December 21, 2025, a DHS agent shot at a man in his car in Saint Paul.

85.     The foregoing tactics—racial profiling, forceful arrests, warrantless entries, and aggressive enforcement at sensitive locations—have understandably led to protests.

86.     Minnesota is full of civically engaged people, across the political spectrum— it has one of the highest rates of volunteerism in the country,[37] one of the highest rates of voter turnout, and a documented ethos for civic engagement and neighbors helping neighbors that exceeds the national average.[38]

87.     Faced with concern that state-sanctioned illegal conduct may go unchecked and that race and national origin discrimination is harming their neighbors, Minnesotans have hit the streets to exercise their First Amendment rights to speak out, observe, and record.

88.     Defendants have engaged in unlawful conduct towards protestors and legal observers too.

89.     On December 6, 2025, a Minneapolis woman volunteering as an observer followed a DHS vehicle. When she parked, she was boxed in by other DHS vehicles and

---

[37]     Sarah Ritter, *Minnesota ranks No. 3 in volunteerism nation as nonprofits see rebound*, The Star Tribune, November 29, 2024 (available at: https://www.startribune.com/minnesota-ranks-third-volunteering-report/601188453)
[38]     Mary Murphy, *Why does Minnesota lead the country in voter turnout -- and which areas lead Minnesota?* Inforum (Oct. 26, 2024) https://www.inforum.com/news/minnesota/why-does-minnesota-lead-the-country-in-voter-turnout-and-which-areas-lead-minnesota); *see also* U.S. Census, New U.S. Census Bureau and Americorps Research Tracks Virtual Volunteering for First Time, (Nov. 19, 2024) https://www.census.gov/library/stories/2024/11/civic-engagement-and-volunteerism.html

confronted. In the recorded interaction that followed, a DHS agent told her she was breaking the law and threatened to arrest her if she continued.[39]

90.     On December 9, 2025, a Minneapolis woman who heard DHS was patrolling her community went to the impacted area and stood on a public sidewalk. While at a safe distance, she asked, "Are you ICE?" Seconds later, she was forced to the ground, handcuffed, detained, shackled, and left in a cell for hours, after having her wedding ring cut off.[40]

91.     Shortly before Renee Good was shot and killed on January 7, 2026, a different scene unfolded less than a mile away. An attorney for the State of Minnesota with expertise in civil rights law witnessed an apparent DHS arrest unfolding, and she approached the scene in order to act as a witness. She identified herself as an attorney and stood a safe distance from the arrest. A DHS agent jumped out of his vehicle, unloaded entire canisters of pepper spray on her at point blank range, causing such irritation that she had to strip her clothing off on the scene to reduce the effect.

92.     On January 9, 2026, a white pastor of a Minneapolis church has described seeing DHS agents approach a Hispanic woman. The pastor reports that when he told DHS they should take him instead and that he was not afraid, DHS pointed a gun in his face,

---

[39]     Jon Collins, '*Tinted windows and out-of-state plates': How ICE watchers look for agents in their neighborhoods*, MPR News (Dec. 5, 2025) https://www.mprnews.org/story/2025/12/05/twin-cities-ice-watchers-keep-tabs-for-agents-in-their-neighborhoods).
[40] Christopher Magan, *ACLU of Minnesota sues ICE over alleged mistreatment of observers* (Dec. 17, 2025), https://www.startribune.com/aclu-of-minnesota-sues-ice-over-alleged-mistreatment-of-observers/601548112.

handcuffed him, placed him in the back of a vehicle, and released him after purportedly saying, "you're White. You wouldn't be fun anyway." [41]

93.    In addition to the foregoing specific examples, Minneapolis has received at least eleven 911 calls related to DHS agents engaging in inappropriate force or threats of force including brandishing guns, pepper spraying, shoving, and using tear gas.

94.    DHS, ICE, and CBP have placed a significant public image emphasis on their aggressive immigration enforcement actions in Minnesota since the scope of Operation Metro Surge expanded.

95.    For example: on January 5, 2026, Defendant Noem herself participated in a heavily propagandized, videotaped immigration raid in Saint Paul, Minnesota. [42]

96.    Also on January 5, 2026, the White House posted on its official X account indicating that "President Donald J. Trump and his Administration are UNLEASHING a relentless assault to dismantle the massive fraud empires built in Minnesota under the watch of incompetent Democrats like Tim Walz and his Radical Left enablers." [43]

97.    And on January 6, 2026, DHS, on its official X account, posted simply: "GOOD MORNING MINNEAPOLIS!" This post was reposted by the official X accounts of The White House, ICE, and U.S. Citizenship and Immigration Services. The increase in

---

[41] Jessica Hart, *Detained pastor says ICE let him go because he's White*, KARE11 (Jan. 9, 2026) (available at https://www.kare11.com/article/news/local/detained-pastor-says-ice-let-him-go-because-hes-white-mn/89-00df6b90-bae8-49b8-b980-941a4ba6ee8b)

[42] Homeland Security (@DHSgov), X (Jan. 6, 2026, 3:21 PM), https://x.com/DHSgov/status/2008650038847959106.

[43] The White House (@WhiteHouse), X (Jan. 5, 2026 3:54 PM CT) https://x.com/WhiteHouse/status/2008296166773948523.

Defendants' agents and immigration enforcement actions across the immigrant-populated neighborhoods of the Twin Cities has caused widespread fear amongst Minnesotans.

## VI.   JANUARY 7, 2026, ICE FATAL SHOOTING.

98.   On January 7, 2026, Jonathan Ross, an ICE agent, shot and killed a Minnesota resident, Renee Good.

99.   The fatal shooting of Renee Good forced the lockdown of Green Central Elementary School, which was just a few blocks away.[44]

100.   Following the January 7, 2026, fatal shooting, the Trump Administration, including at least some of Defendants, repeatedly issued statements to create false narratives of lawlessness in Minnesota and to accuse the victim of "domestic terrorism."[45]

101.   The Trump Administration also used the horrific events as yet another opportunity to attack Democrats and Minnesota's "sanctuary politicians." President Trump called Good—without evidence—a "professional agitator" and claimed that she "violently, willfully, and viciously ran over the ICE Officer." The President also blamed the "Radical

---

[44] *No school for MPS rest of the week; Apparent ICE presence at Roosevelt High School causes chaotic scene*, KSTP (Jan. 8, 2026, 9:31 AM), https://kstp.com/kstp-news/top-news/apparent-ice-presence-at-roosevelt-high-school-causes-chaotic-scene/.

[45] *See, e.g.,* Kristi Noem calls actions leading up to fatal ICE shooting 'act of domestic terrorism', Fox 9 Minneapolis-St. Paul (YouTube, Jan. 7, 2026), https://www.youtube.com/watch?v=GPVpHDyOXCM; *see also* Homeland Security (@DHSgov), X (Jan. 7, 2026) https://x.com/DHSgov/status/2008958123092979817; *see also* Acting Ice Director comments on Minneapolis shooting, Newsmax (Youtube Jan. 9, 2026) https://www.youtube.com/watch?v=3wERJwNfTQA (relevant portion beginning at 2:11 and ending at 3:57).

Left" for "threatening, assaulting, and targeting our Law Enforcement Offices and ICE Agents on a daily basis" —again without evidence.[46]

102.    In a social media post, Defendant DHS accused Good of an act of "domestic terrorism" and blamed "[s]anctuary politicians" for "creat[ing] an environment that encourages rampant assaults on law enforcement."[47] Defendant Noem reposted this statement on her social media.

103.    Despite Good's killing, DHS agents continued to unlawfully terrorize the Twin Cities community throughout the day.  At around 11:45 a.m. Minneapolis received 911 calls regarding DHS agent activity at a dollar store on Lake Street.  DHS agents were met with unsurprising protests after the fatal shooting two hours earlier but used pepper spray and rammed vehicles when leaving.

104.    Later that same day, community reports and videos posted to social media show a chaotic scene on Roosevelt High School grounds in Minneapolis when class was dismissed for the day, and DHS agents dressed in fatigues and riot helmets were firing pepper spray at individuals in a crowd that included high school students, teachers and school administrators.  Minneapolis Public Schools cancelled school on January 8 and 9, 2026, "due to safety concerns related to [January 7] incidents around the city."[48] These

---

[46] Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 7, 2026, 2:28 PM CT), https://truthsocial.com/@realDonaldTrump/posts/115855701696773990.

[47] Homeland Security (@DHSgov), X (Jan. 7, 2026, 6:23 PM CT), https://x.com/DHSgov/status/2009058387418562922.

[48] *No school Jan. 8-9 due to safety concerns,* Minneapolis Public Schools (Jan. 7, 2026), https://www.mpschools.org/about-mps/news/news-details/~board/minneapolis-public-schools-news/post/no-school-jan-8-9-due-to-safety-concerns.

cancellations impacted around 100 schools and 30,000 students. And multiple other schools cancelled classed or shifted to remote learning on January 9, 2026, amid DHS activity. Following the January 7 incident, Saint Paul Public Schools canceled field trips and sports-related events in Minneapolis as well as any events requiring travel through Minneapolis.[49]

105.    Defendants' conduct in Minnesota and the Twin Cities is consistent with abuses in other jurisdictions around the country.  On December 9, 2025, U.S. Senator Richard Blumenthal, ranking member of the Permanent Subcommittee on Investigations, released a minority staff report highlighting firsthand accounts of Americans who were unlawfully assaulted and detained by federal immigration agents.[50]  The report details routine unlawful seizures and excessive force resulting in injuries. This national trend is paired with national reporting and further contributes to Minnesotans' perceptions and fears.  Locally, Defendants' unlawful conduct is also reflected in the allegations in the lawsuit and motion for injunctive relief in *Tincher v Noem*, which seeks to vindicate the rights of the Minnesotans who have been unlawfully seized and been the victims of excessive force by federal immigration agents for exercising their First Amendment rights

---

[49] Imani Cruzen, "St. Paul Public Schools shares federal activity procedures, cancels events in Minneapolis," *Pioneer Press*, January 8, 2026 (available at https://www.twincities.com/2026/01/08/spps-district-shares-procedures-in-case-of-federal-activity/).

[50] Sen. Richard Blumenthal, "Unchecked Authority: Examining the Trump Administration's Extrajudicial Immigration Detentions of U.S. Citizens," https://www.hsgac.senate.gov/wp-content/uploads/2025.12.8_ICE-Report-revised-FINAL.pdf

to observe or protest federal government conduct. Complaint, *Tincher v Noem*, No. 25-cv-04669 (D. Minn. Dec. 17, 2025), Dkt. No. 1.

106.   According to libertarian think-tank Cato Institute's analysis of ICE data, as of June 14, of the more than 200,000 individuals who had been arrested by ICE at that point in fiscal year 2025, 65% had no criminal convictions and more than 93% had no violent convictions. Even if Defendants were indeed focusing on the "worst of the worst," all law enforcement, including DHS agents, must abide by the Constitution regardless of investigative targets' suspected offenses.

## VII.   IMPACT ON STATE AND LOCAL LAW ENFORCEMENT.

107.   The culture of fear and unrest caused by Defendants' actions has resulted in obvious negative impacts to state and local law enforcement.

### Impact on Minneapolis

108.   Since December 9, 2025, (a week into Operation Metro Surge) when Minneapolis began tracking the relevant data, there have been over eighty 911 calls related to Defendants' immigration enforcement actions.  Each call takes time and resources of Minneapolis law enforcement to deal with because each call must be assessed and may need to be investigated.

109.   Since December 18, 2025, the Minneapolis Police Department has had one or more supervisors dedicated to monitoring public safety needs due to Defendants' immigration enforcement activities during the daytime hours.  Since the January 7 fatal ICE shooting, an additional lieutenant has been assigned during nighttime hours.

110.    Operation Metro Surge has resulted in MPD needing to send officers to respond to public safety needs caused by twenty-four ICE-related incidents between December 9, 2025, and January 7, 2026.  The incidents requiring officer assistance include calls from concerned citizens who have seen individuals being kidnapped by unidentified people or people callers were not sure were federal immigration agents.  Incidents also include ICE abandoning vehicles on the public right of way after detaining the individuals in the car.  By way of example, on January 8, 2026, DHS agents pulled someone out of a vehicle, in the middle of the road, and departed the scene leaving that vehicle in the middle of the street. The vehicle, which was abandoned by the agents, was not even placed in park. Local law enforcement responded after reports the vehicle had rolled and blocked traffic.

111.    Officers have also responded to multiple incidents to maintain public safety where there is a tense protest situation caused by Defendants' aggressive and reckless actions.

112.    Responding to calls where there is tension between community and federal immigration enforcement authorities presents many complexities and concerns for local law enforcement.  Officers must respond to calls where tensions are high due. This is particularly concerning given the reported shortened training period for recently-hired agents.

113.    On January 7, 2026, the Minneapolis Police Department began separately tracking overtime for public safety responses related to Defendants' immigration enforcement activities. To be clear: these hours do not reflect time spent *assisting* Defendants in immigration enforcement, but rather, represent hours spent ensuring general

public safety in the face of Defendants' surge in forces and reckless and aggressive immigration enforcement tactics and public reactions to the same. Preliminary accounting shows that from January 7 to January 9, 2026, Minneapolis Police officers had already worked more than 3,000 hours of overtime related to Defendants' activities. The overtime is paid at 1.5 times the rate of each officer's regular wage. As of January 9, 2026, the estimated overtime cost for MPD officers for between January 8 and January 11, 2026, was more than $2 million.

114.   Due to the need to be available to respond to deescalate tensions around Defendants' immigration enforcement activities, the Minneapolis Police Department informed all sworn staff on January 7, 2026, that any scheduled days off would be cancelled through at least January 11, 2026. The Minneapolis Police Department canceled approximately 983 scheduled days off.  For the same reasons, officers are working longer shifts, extending past their 8- or 10-hour shifts.  These changes have impacted officers' personal lives and leave them exhausted.

115.   In addition, Minneapolis SWAT personnel and Strike Team personnel have been on paid on-call status since December 19, 2025, prepared to respond to public needs due to Defendants' immigration enforcement activities. MPD also placed its Unmanned Aerial Vehicle Team on paid on-call status on January 7, 2026.

116.   The surge, and the events surrounding the January 7 fatal ICE shooting, have taken a toll on the mental health of MPD officers as well. MPD has observed a marked increase in the utilization of health and wellness resources by officers, with officers accessing contracted therapeutic services at higher-than-normal rates and reporting

34

heightened hypervigilance and fear. For officers present during the 2020 unrest, the incident has triggered traumatic memories as the officers resume operational duties amid concerns of potential instability. Officers who joined the department after 2020 report similar emotional impacts, having experienced prior unrest as community members. While comprehensive data is not yet available, there is a legitimate concern that the cumulative psychological impact of responding to Operation Metro Surge may contribute to increased attrition from the department, as officers confront the destabilizing effects of actions by Defendants on the community they are sworn to protect.

117.    Another impact is that MPD officers responding to public needs caused by Defendants' Operation Metro Surge activities prevents those officers from responding to other 911 calls from the communities MPD serves.  On January 7, shortly after 10:00 am, all priority-2 and priority-3 911 calls were put into "pending" status because MPD officers were responding to activities following the fatal shooting of a Minneapolis resident by an ICE agent in Minneapolis. Ultimately, nearly ninety-five MPD officers responded to the scene on January 7 to deal with the aftermath of the fatal shooting, and while they were doing so, they were not responding to 911 calls, investigating reports of crimes, or fulfilling other law enforcement obligations for the benefit of the communities that MPD serves. Similarly, MPD administration has devoted considerable time to planning around the impacts of the way Defendants are conducting immigration enforcement in Minneapolis, and that is time and attention that would otherwise be spent on making Minneapolis a safer place for people to live, work and visit.

118.   The impacts on the operations of Plaintiff Minneapolis have been far-reaching. Since the tragic January 7 fatal shooting in Minneapolis, and due to Defendants' continuing inflammatory tactics, the City has initiated and continues its emergency preparedness protocols, which means significant additional work for numerous City departments, from the Emergency Management Department, to Police, Fire, Public Works, Finance, Communications, the Mayor's Cabinet, Mayor's staff and the Mayor, and many more, taking them all away from pressing City priorities.

**Impact on Saint Paul**

119.   The Saint Paul Police Department ("SPPD") has responded to multiple incidents involving Defendants' agents.

120.   On November 25, 2025, SPPD received several calls and responded to the scene at 609 Rose Avenue E. where DHS agents were conducting an immigration enforcement operation.

121.   On December 21, 2025, SPPD received a call to report shots fired shortly before 8:30 a.m. SPPD officers responded to the scene. Once on the scene officers learned that a federal agent was involved in a use of force incident. SPPD completed a state accident report.

122.   On November 18, 2025, SPPD received a call regarding DHS agents present at Bro-Tex, Inc., a paper manufacturing company in Saint Paul, and related protest activity.

123.   On December 11, 2025, SPPD received multiple calls regarding DHS agents present in the area of Arcade Street and 7th Street E. near Centromex Supermercado and the Mexican Consulate Building.

124.    On January 11, 2026, SPPD responded to an incident in Saint Paul where a vehicle crashed into a sign pole on a busy intersection as a result of DHS agents' actions, in which the driver was then taken into custody by DHS agents. The vehicle required towing services after the crash.

125.    Each call takes time and resources of SPPD, because each call must be assessed and may need to be investigated. Responding to calls relating to activities of DHS agents diverts time and resources from other policing needs.

126.    SPPD has also had to devote time and resources to developing guidance and communicating with residents regarding the differences between DHS agents and SPPD officers. For example, SPPD issued a public statement reminding residents that "SPPD officers are required to be in uniform or have clear SPPD markings on them when engaged in arrest activities. This means if you see a SPPD officer or our markings (i.e. squad, vest, jacket) in the community, it is not an immigration detail."

127.    Operation Metro Surge has also needlessly flooded Saint Paul with DHS agents despite Saint Paul's reduced crime rates.

128.    SPPD is a national leader in utilizing community-oriented policing to reduce crime and solve cases.

129.    In 2025, SPPD solved more than 70% of crimes and between 2020 and 2025 the clearance rate (how often police close a case through an arrest or an exceptional reason such as a suspect dying) for homicides ranged from 89% to 93%.

130.   Between 2022 and 2025 violent crime in Saint Paul decreased significantly. For example, murder rates decreased 44%, robberies decreased 56%, aggravated assaults decreased 70%, shots fired decreased 45%.

131.   Community trust has been and continues to be of paramount importance to SPPD's ability to successfully maintaining low crime rates and high case solve rates.

132.   Defendants' agents practice of concealing their identity, failing to identify themselves, masking, and wearing inconsistent uniforms with inconsistent identification creates confusion for Saint Paul residents. On information and belief, residents have had trouble distinguishing Defendants' agents from SPPD officers.

133.   This confusion leads to decreased community trust in SPPD. When trust decreases, residents are less likely to call SPPD to report crimes or cooperate in investigations. This harms SPPD's ability to effectively protect public safety in Saint Paul.

**Impact on State Agencies**

134.   The State of Minnesota has also already felt impacts on state law enforcement resources, public trust, and operations. Minnesota's Department of Public Safety recognized that the January 7 fatal shooting had created a particularly heightened risk of escalating tension and public response. Based on that heightened need, the Minnesota Department of Public Safety ("DPS") has deemed it necessary to direct expenditure of additional resources to run the State's Emergency Operations Center ("SEOC") in the days that followed. The SEOC serves as a unified command center to ensure that various state and local agencies can make timely and efficient responses to different types of emergencies. Operating the SEOC twelve hours a day for five consecutive days has

required at least seven senior leadership officials, and other state personnel, to redeploy from their usual duties, and in at least one instance, requiring a contractor be hired at extra cost (projected to be $65,000) to complete work the redeployed personnel would have otherwise performed in their ordinary course of duties.

135.   DPS has also found it necessary to have State Patrol resources in order to stay prepared for the perceived risks associated with current DHS activities and public unrest they have the potential to cause.

136.   On January 8, 2026, also due to the very real public safety and public order concerns created by Defendants' intentional attempt to sow unrest, Governor Walz issued an executive order activating the Minnesota State National Guard so that they would be ready to help law enforcement maintain peace. The Executive Order states that the extent of costs associated with that activation will be paid from the State's general fund, pursuant to Minn. Stat. Section 192.52 (2025).

137.   Additionally, the Minnesota Department of Transportation (MnDOT) has had to divert personnel and fleet vehicles since January 8, 2026. This includes at least one instance of requested assistance with closing highway ramps in response to public safety concerns, and other expenditure of personnel and fleet resources for emergency preparation.

138.   Although the full scope of impact is not yet known on either an economic or operational level, DHS activities have also necessitated diversion or interruption of State resources in other measurable ways. By way of example, MnDOT's Fort Snelling location, known as the "Central Shop" where certain electrical and fabrication services take place,

has been impacted due to its immediate proximity to DHS' Whipple Building location. The Central Shop turned off its HVAC systems due to DHS' use of chemical irritants against protestors on January 8, 2026. The overall interruption to the Central Shop left MnDOT unable to perform work necessary to repair a traffic signal in its usual timeframe, requiring at least one known intersection to remain on a four-way stop setting for hours longer than typical (which risks both delays in traffic flow and higher risk of collision.) MnDOT was also unable to perform scheduled work on snow plow fabrication scheduled for January 8, 2026, at the Central Shop, and has had other heightened personnel demands related to snow plow relocation and staging.

### Other Impacts

139.    Defendants' unlawful tactics also undermine public trust in state and local law enforcement because individuals cannot distinguish between ICE activities and local police actions. Deteriorating public trust has consequences: it suppresses the reporting and prosecuting of serious crimes, especially those that affect the immigrant population. Public trust in local law enforcement is paramount to effective community policing—including trust between law enforcement and immigrant communities.

140.    Defendants' tactics undermine public trust in local law enforcement because Defendants' agents are engaging in unnecessarily provocative and at times unlawful behavior while clothed in garb and using resources that make them look like local law enforcement.  For example, DHS agents have used tactics to resemble local police, like using vests that say "POLICE," vehicles with police lights, and yellow police tape.

141.    DHS agents conceal their faces with masks which increases the distrust and fear provoked by Defendants' actions. Minnesota law makes it a crime for a person to conceal their identity by means of a mask in a public place. Minn. Stat. § 609.735. Even if it were not a violation of state law, the FBI itself has reportedly issued a law enforcement bulletin to DHS identifying at least five instances in 2025 involving kidnappings, attempted rapes, and robberies which were effectuated by masked men claiming to be immigration officers.[51] The FBI bulletin reportedly acknowledges the rise in impersonation crimes linked to the recent increase in ICE enforcement actions is further eroding trust between communities and police.

142.    Because Defendants' agents are not clearly identifying themselves as federal agents, community members frequently cannot distinguish between immigration enforcement activities, possible criminal activities, and local law enforcement officers. Local law enforcement has been working for years to improve police-community relations, and the intentional lack of agency identification by DHS agents sets back that progress and confuses the public.

143.    This is particularly problematic as Minnesota recovers from the shared distress associated with political assassinations which were perpetrated in Minnesota in June 2025 by a man who posed as a police officer to induce his victims to open their doors.

---

[51]    Dell Cameron and Caroline Haskins, *FBI Warns of Criminals Posing as ICE, Urges Agents to ID Themselves*, Wired (Nov. 4, 2025) https://www.wired.com/story/fbi-warns-of-criminals-posing-as-ice-urges-agents-to-id-themselves/

144.    Hidden identities combined with the apparently unlawful tactics makes it difficult for community members to know what agency the agents represent, which in turn erodes hard-earned community trust being rebuilt by local law enforcement day by day—particularly where the tactics being used by DHS agents are at odds with the carefully developed, trained, and enforced local policies designed to increase that trust.  The impact is not unnoticed. After the fatal January 7 shooting a crowd in Minneapolis could be heard chanting, "M-P-D, K-K-K, I-C-E, THEY'RE ALL THE SAME!"[52]

145.    Decreased trust in law enforcement also erodes public safety because the community is less likely to report criminal activity, and less likely to cooperate as witnesses.   For example, in Hennepin County there has been a marked decrease in individuals who are cooperating in prosecution of violent crimes.

## VIII.    COMMANDEERING STATE AND LOCAL PROPERTY IN VIOLATION OF LOCAL LAW TO STAGE IMMIGRATION ENFORCEMENT ACTIONS.

146.    Defendants have also commandeered Plaintiffs' property during their recent immigration enforcement efforts.

147.    Under Saint Paul's Charter, for example, public parking lots in or adjacent to public parks may only be used for "[p]arking of vehicles while utilizing park facilities;" "[w]alking to and from lawfully parked vehicles without delay;" and "[o]ther uses as authorized by city permit." Saint Paul Legislative Code Sec. 170.07 (h)(1)(a)-(c).

---

[52] Eric Roper, *ICE tactics threaten to unravel trust with local law enforcement*, Star Tribune (Jan. 11, 2026) https://www.startribune.com/ice-mpd-law-enforcement-minnesota/601560440

148.   It is "unlawful to use a public parking lot in or adjacent to a public park in the city for any purpose other than enumerated above." *Id.* Sec. 170.07(h)(2).

149.   On November 18, 2025, however, DHS agents commandeered the City-owned parking lot at Newell Park (900 Fairview Avenue N., Saint Paul, MN 55104) without authorization from the City to stage immigration enforcement actions.

150.   On information and belief, this staging was to conduct an enforcement raid at Bro-Tex Inc., a nearby paper manufacturing company, where Defendants detained 14 individuals.

151.   DHS agents positioned at least 30 vehicles in the Newell Park parking lot, severely limiting the City's ability to provide parking for recreation in the park.

152.   Similarly, on November 25, 2025, DHS agents commandeered the City-owned parking lot at Arlington Hills Community Center (1200 Payne Avenue, Saint Paul, MN 55130) without authorization from the City to stage immigration enforcement actions.

153.   And on December 13-16, 2025, DHS agents commandeered the City-owned parking lot at Conway Recreation Center (2090 Conway Street, Saint Paul, MN 55119) without authorization from the City to stage immigration enforcement actions.

154.   On December 23, 2025, Saint Paul sent a Cease-and-Desist letter to Defendant Easterwood, ordering DHS to "immediately cease and desist from any further use of these parking lots as well as any other Saint Paul Park parking lot."

155.   Defendants have not responded to Saint Paul's letter and continue to commandeer City property.

43

156.   On January 3, 2026, Defendants again commandeered the Arlington Hills Community Center parking lot to, on information and belief, stage for immigration enforcement action nearby.

157.   On January 6, 2026, Defendants commandeered the City-owned Phalen Recreation Center parking lot to, on information and belief, stage for immigration enforcement action nearby.

158.   DHS agents can be seen on City property surveillance footage unlawfully loitering in City-owned parking lots. The presence of DHS agents in these parking lots both practically restricts residents from using the commandeered space for lawful parking, and on information and belief, quells residents' desire to recreate in City parks and recreation centers. Defendants' continued commandeering of Saint Paul property prevents the City from offering recreational services to the Saint Paul community and directly violates City ordinances, which expressly reserve the use of park property for park purposes.

159.   Defendants' commandeering of City property has caused fear and intimidation amongst City employees.

160.   Not only are employees afraid while at work, which affects their ability to do their jobs effectively, but City employees are afraid to come to work, which has caused staffing shortages and recreation program cancellations.

161.   This disruption to the City's ability to provide services harms Saint Paul and its residents.

162.   The City has also had to expend resources, such as employee time, to respond to the emergency situations Defendants are creating on or near City property.

163.   The City has and will suffer irreparable harm, including continued inability to offer essential City services, and continued unnecessary expenditure of City resources, if Defendants continue to commandeer City-owned property.

## IX.   IMPACT ON PLAINTIFFS' REVENUE STREAMS.

164.   Plaintiffs' operating budgets depend heavily on revenue collected through state and local taxes, including income tax, property tax, and sales tax. In Minnesota, a wide range of sales and services are taxable.[53] The Twin Cities Metro area accounts for over half of Minnesota's total population,[54] and over half of the overall jobs in Minnesota.[55] That population and employment density corresponds with a higher density of businesses that bring in tax revenue to the Plaintiffs,[56] and the Twin Cities Metro has historically been

---

[53]   *Taxable Sales,* Minnesota Department of Revenue, https://perma.cc/E423-C5M7

[54] *Recent Population Growth in the Metro Area*, Minnesota Department of Employment and Economic Development, https://mn.gov/deed/data/locallook/metro/metro-blog.jsp?id=1045-680261

[55]   Tim O'Neil, *The Same Old Story? Labor Market Trends in the Metro Area,* Minnesota Department of Employment and Economic Development (June 2025) https://mn.gov/deed/newscenter/publications/trends/june-2025/metro.jsp

[56]   *See, e.g., Metro Area Industry Statistics*, Minnesota Department of Employment and Economic Development (2024) https://mn.gov/deed/newscenter/publications/trends/june-2025/metro.jsp ); *Location Patterns of Restaurants*, Minnesota Department of Employment and Economic Development (August 2019) https://mn.gov/deed/newscenter/publications/review/august-2019/locations-restaurants.jsp

the State's biggest driver of tax revenue.[57] Retail and service industries are particularly important to the Twin Cities Metro revenue stream: retail trade is the third highest employment sector in the region, and the service industry is the fifth highest.[58] Together, retail sectors and service sectors alone account for nearly 300,000 jobs in the region.[59]

165.    Saint Paul has a local sales tax rate of 1.5%, which businesses collect from customers and remit to the State of Minnesota, which then distributes the funds to the City of Saint Paul. Within this 1.5%, 0.5% sales tax funds the Sales Tax Revitalization ("STAR") Program for economic development and capital projects. The remaining 1% sales tax is dedicated to repairs and improvements of streets, bridges, parks, and recreational facilities. Saint Paul relies on this revenue to support City services.

166.    Significant public reporting reflects that Operation Metro Surge has reduced customer traffic and has, particularly in recent days, caused some local businesses to close their doors altogether based on the perceived risk of violence by DHS and concerns for employee and customer safety.[60] Small business owners in Minneapolis (particularly along

---

[57]    McVan, *Twin Cities metro sends money to rural counties*, Minnesota Reformer (Dec. 4, 2023) https://minnesotareformer.com/2023/12/04/twin-cities-metro-sends-money-to-rural-counties/

[58]    O'Neil, *supra,* at https://mn.gov/deed/newscenter/publications/trends/june-2025/metro.jsp

[59]    *Id.*

[60]    *See, e.g.*, *How ICE raids are threatening Twin Cities small businesses*, WCCO-CBS (Dec. 16, 2025) https://www.youtube.com/watch?v=DjOZsPaHKIU); *see also* Dee Depass, *ICE crackdown chills sales at immigrant-owned businesses*, The Star (Footnote Continues on Next Page)

targeted areas of East Lake Street and Cedar Riverside) and in Saint Paul (particularly along targeted areas of Midway and the East Side) are reporting decreases in customer traffic and the need to reduce business hours and stock.

167.    Customer-facing businesses in Minneapolis are reporting decreases in revenues of 50-80% because their customer base was not comfortable to patronize the businesses due to the increased immigration enforcement.

168.    Employees of small businesses in the region have also been requesting reduced hours or did not feel comfortable coming to work altogether at the risk of being stopped by DHS. This impacts the business' ability to operate and is an income loss for the employees.

169.    Businesses within Saint Paul have lost revenue, decreased hours, or closed altogether due to ongoing and increasing immigration enforcement operations.

170.    The CEO of a prominent, immigrant-owned restaurant and grocery store located on the west side of Saint Paul, stated that its newly-reduced hours of operation are because of increased federal immigration enforcement activity.

---

Tribune (Dec. 24, 2025) https://www.startribune.com/garbage-somali-protest-spend-st-joan-of-arc-trinity-church-raids-ice-minneapolis-st/601546734; *see also* Dustin Nelson, *Twin Cities businesses close in response to ICE presence,* Bring Me The News (Jan. 8, 2026) https://www.startribune.com/garbage-somali-protest-spend-st-joan-of-arc-trinity-church-raids-ice-minneapolis-st/601546734; *see also* Dustin Nelson, *List of Twin Cities events cancelled and businesses closed in response to ongoing ICE presence*, Bring Me The News (Jan. 10, 2026) https://bringmethenews.com/minnesota-lifestyle/list-of-twin-cities-events-canceled-and-businesses-closed-in-response-to-ongoing-ice-presence)

171.    Store employees at another immigrant-owned grocery store located in Saint Paul, have noticed a sharp decline in foot traffic since December 5, 2025. A store employee has stated that only "a quarter of people came out to shop," demonstrating a dramatic decrease in business.

172.    DHS consistently has a presence of vehicles and agents in the parking lot of a Karen-owned market in Saint Paul. Saint Paul has a large Karen population, and that population has reported that having DHS vehicles parked in that specific parking lot interferes with their ability to feel safe to purchase their culturally specific food which in turn harms the revenue of those local businesses.

173.    The Saint Paul business community has reported that since the initial increase of DHS agents in the City in November, immigrant-owned businesses in the City have lost approximately 25-30 percent of revenue.

174.    The reason reported for loss of revenue is that customers fear the presence of DHS agents at area businesses.

175.    Some Twin Cities businesses have already said that they risk permanent closure if the Defendants' tactics do not end. Because those fears impact business operations and ultimately sales, property, and income taxes, Plaintiffs' operating budgets will suffer.

176.    This past week, reports indicate that a number of retail stores, daycares, and restaurants have announced closures, some of which indicate they will remain closed "until further notice." Event venues have cancelled scheduled events, including three shows by a nationally-recognized comedian at a venue in Minneapolis with an approximately 8,400

48

person capacity.[61] Immigrant-owned or immigrant-serving businesses that have remained open have experienced an uptick in harassment and threats.[62] These impacts are not limited to the Twin Cities; businesses in other regions of Minnesota have reported negative business impacts associated with DHS activities.[63]

177.    Businesses that shutter their doors and customers that choose to stay home out of fear reduce revenue. These revenue-reducing measures are reasonably foreseeable steps taken in direct response to the safety concerns Defendants have cultivated. Daycare and school closures also require Minnesotans to use leave or be absent from work to supervise their children at home.

178.    To be clear: the impacts Plaintiffs describe herein are not limited to noncitizen immigrants staying home due to fears, or noncitizens being removed and therefore unable to patronize or work at businesses. Certainly, noncitizen immigrants

---

[61]    Dustin Nelson, *John Mulaney cancels three night stand in Minneapolis*, Bring Me The News, (Jan. 8, 2026) https://bringmethenews.com/minnesota-lifestyle/john-mulaney-cancels-three-night-stand-in-minneapolis; *see also* Dustin Nelson, *List of Twin Cities events cancelled and businesses closed in response to ongoing ICE presence*, Bring Me The News (Jan. 10, 2026) https://bringmethenews.com/minnesota-lifestyle/list-of-twin-cities-events-canceled-and-businesses-closed-in-response-to-ongoing-ice-presence)

[62]    Carson Hartzog, *Harassment toward Somali businesses surges after viral video*, The Star Tribune (Jan. 9, 2026) https://www.startribune.com/harassment-toward-somali-businesses-surges-after-viral-video/601555420

[63]    *Local immigrant businesses struggling amid ICE activity*, ABC 6 News-KAAL TV, January 9, 2026 (available at https://www.youtube.com/watch?v=_oB2Xp_uqig) (describing similar fears and negative business impacts in Rochester.)

comprise a small, but important, part of Minnesota's economic landscape. Data suggests that noncitizen immigrants without legal status comprise just over 1.5% of Minnesota's total population (less than half the national average of 3.3%) and account for 2.2% of Minnesota's total labor force.[64]

179.    But Defendants have created such a scope of fear, including for native-born citizens, naturalized citizens, and legally present immigrants, that those groups also report staying home, fearing that even carrying their passports and other forms of identification will be insufficient to protect them from the risk of illegal detainer, arrest, deportation, or other abusive deprivation of rights without due process.

180.    These fears have been bolstered and exacerbated by Defendants. Widely circulated videos, both within Minnesota and beyond, show individuals pleading with DHS that they are United States citizens or legally present during chaotic, violent arrests, to no apparent impact. These fears are also borne out in Defendants' own apparent policy to initiate contact with random people within their line of sight based on race and ethnicity. Moreover, the Trump Administration has also publicly announced a desire to "de-naturalize" or deport American citizens and meet peaceful protestors with retaliation and force, further contributing to the strongly held impression that interactions with Defendants are inherently risky, even for law-abiding people.

---

[64]    Cameron Macht, *The Role of Undocumented Immigrants in Minnesota's Workforce*, Minnesota Department of Employment and Economic Development (March 2025) https://mn.gov/deed/newscenter/publications/trends/mar-2025/immigrants.jsp; *see also 50 States: Immigrants by Number and Share*, Immigration Research Initiative (Jan. 24, 2025) https://immresearch.org/publications/50-states-immigrants-by-number-and-share/

181.   Other jurisdictions that have recently faced surges of militarized forces (either by DHS or by federalized National Guard troops) confirm economic harms are a natural consequence. For example, in November 2025, Chicago business owners reported "pandemic-era" drops in sales amidst DHS' "Operation Midway Blitz."[65] In Washington, D.C., when the Trump Administration federalized National Guard troops with the supposed purpose of cutting down on violent crime rates, data revealed that out-of-town visitor spending was not negatively impacted, but resident spending fell dramatically: those who lived there and were invested in their community were "turned off" from spending in the region.[66]

## X.   DEFENDANTS' ARBITRARY AND CAPRICIOUS TERMINATION OF SENSITIVE LOCATIONS POLICY AND SUBSEQUENT, RECURRING, VIOLENT ENFORCEMENT ACTIVITY IN SENSITIVE LOCATIONS.

182.   Defendants have had a long-standing policy and practice, that dates back to at least the early 1990s, of immigration authorities avoiding immigration enforcement in or near certain locations known as "sensitive" or "protected" locations.

---

[65]   Joanna Hernandez, *In Chicago, Some Businesses Report Pandemic Era Drop in Sales Amid Immigration Raids*, WTTW, (Nov. 6, 2025) https://news.wttw.com/2025/11/06/chicago-some-businesses-report-pandemic-era-drop-sales-amid-immigration-raids); *see also* Nathaniel Meyersohn, *Trump's mass deportation push is crushing local economies,* CNN (Oct. 16, 2025)https://greatcities.uic.edu/2025/10/16/its-killing-business-trumps-mass-deportation-push-is-crushing-local-economies/

[66]   Tracy Hadden Loh and Glencora Haskins, *Consumer Spending and visitor demand in the Washington, DC region are dropping,* Brookings, (Dec. 12, 2025) https://www.brookings.edu/articles/consumer-spending-and-visitor-demand-in-the-washington-dc-region-are-dropping/

183.    With a dozen memoranda from 1993 to 2016, Defendants established a longstanding policy of avoiding immigration enforcement activities in sensitive locations, such as schools, churches, hospitals, and courthouses.

184.    In 2018, ICE issued Directive No. 11072.1 (the "Directive"), explicitly authorizing civil immigration arrests inside federal, state, and local courthouses.[67]

185.    Following the change in administrations, DHS issued a Memorandum on April 27, 2021, revoking the 2018 ICE Directive and replacing it with guidance limiting the conduct of civil courthouse arrests. Then, on October 27, 2021, DHS issued a memorandum entitled "Guidance for Enforcement Actions in or Near Protected Areas" that superseded the 2011 memorandum and further strengthened the sensitive locations policy.[68] The 2021 Memorandum prohibits enforcement action, to the fullest extent possible, "in or near a location that would restrain people's access to essential services or engagement in essential activities."   The 2021 Memorandum also set forth a more expansive list of sensitive locations. The list includes but is not limited to: schools, medical care facilities, places of worship, daycare, and funeral homes.

---

[67]    ICE, *Directive Number 11072.1: Civil Immigration Enforcement Actions Inside Courthouses* (Jan. 10, 2018) (available at https://www.ice.gov/sites/default/files/documents/Document/2018/ciEnforcementActions Courthouses.pdf.)

[68] *Memorandum from Alejandro N. Mayorkas, Guidelines for Enforcement Actions in or Near Protected Areas,* Department of Homeland Security (Oct. 27, 2021) (available at https://www.dhs.gov/sites/default/files/publications/21_1027_opa_guidelines-enforcement-actions-in-near-protected-areas.pdf.)

186. On January 20, 2025, DHS under the Trump Administration revoked the 2021 policy prohibiting immigration arrests in sensitive locations such as schools, courthouses, and hospitals.

187. As set forth above, and on information and belief, Defendants have targeted Minnesota residents at these sensitive locations.

## CAUSES OF ACTION

## COUNT I

### Tenth Amendment of the U.S. Constitution
### (brought by all Plaintiffs)

*Infringement on Plaintiffs' Police Power*

188. Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

189. Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

190. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." *See Printz v. United States*, 521 U.S. 898, 935 (1997).

191. As set forth above, Defendants have sent an unprecedented number of federal law enforcement officers to the Twin Cities and Defendants' agents have engaged in unlawful conduct that harms Plaintiffs' residents, infringes on Plaintiffs' police powers, and violates state sovereignty.

192.    Under our system of federalism, policing and crime control remain one of the most basic rights reserved to the States and their municipalities. "Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). "[T]he power to establish the ordinary regulations of police has been left with the individual States and cannot be assumed by the national government." *Patterson v. State of Kentucky*, 97 U.S. 501, 503 (1878).

193.    Local control of law enforcement is also essential to the protection of liberty and government accountability. "Because the police power is controlled by 50 different States instead of one national sovereign, the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed. The Framers thus ensured that powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' were held by governments more local and more accountable than a distant federal bureaucracy." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) (quoting The Federalist No. 45, at 293 (J. Madison)).

194.    Defendants' aggressive and militarized surge interferes with the ability of state and local law enforcement to address crime and protect residents' health, welfare and safety. As set forth above, for example, MPD officers have been forced to work overtime and expend additional resources to ensure general public safety and maintain order because of Defendants' actions.

195.   In addition to infringing upon Plaintiffs' ability to ensure the safety of their residents, Defendants' actions also infringe upon Plaintiffs' other "vital functions of modern government," including "running public schools." *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 535–36. "[I]t is well established that education is a traditional concern of the States" and their instrumentalities. *United States v. Lopez*, 514 U.S. 549, 580-81 (1995) (Kennedy, J., concurring).

196.   The State of Minnesota guarantees a right to public education. *J.K. ex rel. Kaplan v. Minneapolis Pub. Schs. (Special Sch. Dist. No. 1)*, 849 F. Supp. 2d 865, 871 (D. Minn. 2011). The Minnesota Constitution requires the state to maintain a system of public schools that is "general and uniform" as well as "thorough and efficient." Minn. Const. art. XIII, § 1. And under state law, children between the ages of 7 and 17 are required to attend school. Minn. Stat. § 120A.22 subd. 5.

197.   Defendants' actions also interfere with this guarantee. As set forth above, Minneapolis Public Schools cancelled classes for multiple days due to safety concerns after an ICE agent shot and killed an innocent bystander and then—later that same day—DHS agents conducted an enforcement action at a Minneapolis high school. Multiple other schools cancelled classes as well amid overwhelming activity by Defendants' agents.

### *Unlawful Coercion and Commandeering*

198.   In addition to infringing upon the Plaintiffs' police powers, Defendants' actions are designed to coerce Plaintiffs into adopting and enforcing President Trump's policy priorities.

199. "The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz*, 521 U.S. at 935.

200. Similarly, the federal government "may not simply 'commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'" *New York v. United States*, 505 U.S. 144, 161 (1992) (quoting *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981)). Such impermissible pressure can occur "whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 578.

201. Defendants' actions force such an impermissible "choice": use state and local law enforcement resources to carry out the federal government's civil immigration priorities or accept occupation by federal troops. This is particularly true in light of threats by President Trump that he has "the absolute right" to invoke the Insurrection Act to deploy the military, even though there has been no legal basis to do so. These threats suggest that the federal government is attempting to create a pretext for military deployment by provoking civil unrest. Given the need to avoid further escalation to protect public safety and in light of the threats of military deployment, Defendants' actions amount to coercion and commandeering in violation of Plaintiffs' rights under the Tenth Amendment. Defendants' Tenth Amendment violation causes ongoing harm to Plaintiffs.

202. Additionally, in violation of the Tenth Amendment, Defendants' unlawful actions and the manner in which Defendants are enforcing federal immigration law in the Twin Cities is an unlawful attempt to commandeer state and local law enforcement to assist federal agents in carrying out federal immigration laws.

203. Defendants' actions have forced local law enforcement to respond to public safety incidents caused by Defendants' conduct to ensure the safety of residents and federal agents, and to deal with the fallout, including upset family members, outraged witnesses, children, animals and vehicles left behind, and agents facing crowds of protesters.

204. Similarly, on January 8, 2026, Governor Walz issued an executive order activating the Minnesota State National Guard—at the State's expense—to address public safety risks associated with Defendants' actions.

205. Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants' actions are unconstitutional and violate all Plaintiffs' rights under the Tenth Amendment and that Defendants may not prevent the State from exercising sovereign authority reserved for the States by the Constitution. Plaintiffs are also entitled to injunctive relief preventing Defendants from interfering with Plaintiffs' ability to ensure the health, education, and safety of their residents with their reserved police powers. Finally, Plaintiffs are entitled to an injunction preventing Defendants from coercing state and local officials into carrying out their enforcement efforts.

## COUNT II

**Violation of Equal Sovereignty Under the U.S. Constitution
(brought by Plaintiff State of Minnesota)**

206.    Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

207.    Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27.

208.    "Not only do States retain sovereignty under the Constitution, there is also a 'fundamental principle of equal sovereignty' among States." *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 544 (2013) (citation omitted). The Supreme Court has long recognized that our nation "was and is a nation of States, equal in power, dignity, and authority," and that this "constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized." *Coyle v. Smith*, 221 U.S. 559, 567, 580 (1911).

209.    This "fundamental principle of equal sovereignty remains highly pertinent in assessing subsequent disparate treatment of States" by the federal government. *Shelby Cnty*, 570 U.S. at 544 (citation omitted).

210.    As set forth above, Defendants have targeted Minnesota for disparate treatment relative to other states based not on any real or legitimate concern for public safety or fraud. Rather, Defendants have repeatedly made statements that reflect their true intent—to punish Minnesota's elected officials and residents for their perceived political leanings, to target so-called "sanctuary" jurisdictions, to create false political narratives of

58

lawlessness in Minnesota, and to incite flashpoints between Minnesota residents and immigration agents.

211. Defendants' actions in other states further demonstrate the disingenuous nature of these immigration and law enforcement surges. The Trump Administration's actions to mobilize National Guard troops in California, Illinois, and Oregon were enjoined as unlawful. Defendants pivoted to Minnesota after the Supreme Court blocked the Trump Administration from deploying the National Guard in Illinois, *Trump v. Illinois*, No. 25A443, 2025 WL 3715211 (U.S. Dec. 23, 2025) (mem.). Defendants decided to single out Minnesota—another politically disfavored "sanctuary" jurisdiction—for their largest ever immigration operation, even though Minnesota has a fraction of the undocumented population of other states. "[D]espite the tradition of equal sovereignty," Defendants have applied this harsh infringement on state sovereignty "to only [four] states" and the District of Columbia. *Id.* at 544.

212. Maintaining the peace and reducing crime are core state and local governmental functions, and Defendants' surge in immigration enforcement in Minnesota has had significant impacts on the ability of state and local law enforcement to perform their normal duties. As set forth above, officers who would be deployed to crime prevention and investigation efforts are instead being called upon to respond to incidents where tensions have been escalated by Defendants' agents roaming the streets wearing masks, raiding schools, harassing lawful protestors, and shooting unarmed citizens.

213. Our Constitutional structure does not contemplate or allow the executive branch of the federal government to punish Minnesota for political differences or

disfavored policies with unasked-for and unwelcome federal law enforcement "surges." An "extraordinary departure from the traditional course of relations between the States and the Federal Government" in the form of a militarized law enforcement response can only be justified by dire and "unique circumstances," and must be limited to "areas where immediate action" is truly necessary. *Id.* at 546.

214.    Pursuant to 28 U.S.C. § 2201, Plaintiff State of Minnesota is entitled to a declaration that Defendants' actions based on Minnesota's lawful exercise of its core sovereign powers are unconstitutional and that Defendants may not single out Minnesota for disparate treatment based on its exercise of core sovereign power reserved for the States by the Constitution. Plaintiff State of Minnesota is also entitled to injunctive relief preventing Defendants from implementing or effectuating retaliatory actions and threats or from engaging in future retaliatory conduct based on Minnesota's lawful exercise of its sovereign authority.

## COUNT III

### Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C) – Contrary to Law: Violation of State Law and City Ordinances (Brought by all Plaintiffs)

215.    Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

216.    On information and belief, Defendants and the federal agents discussed in this complaint are operating pursuant to a final federal policy, approved by responsible

60

federal agency heads with final policymaking authority, of violating state law and city ordinances.

217.    Based on information and belief, Defendants have enacted a policy decision that represents the consummation of Defendants' decision-making process to utilize tactics and conduct that violate DHS policy and state and federal laws based on Defendants' assertion that they and their agents are absolutely immune from legal consequences.

218.    For example, Defendants have intentionally violated Minnesota's masking law, which prohibits anyone from concealing their identity by wearing masks in public places. *Minnesota Voters All. v. Walz*, 492 F. Supp. 3d 822, 835 (D. Minn. 2020) (citing Minn. Stat. § 609.735).

219.    Wearing a mask in violation of Minnesota law is neither necessary nor proper to the discharge of Defendants' agents' duties.

220.    Defendants' policy and practice of wearing masks so that their agents can conceal their identities amounts to a final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A).

221.    Defendants have intentionally violated a state law that prohibits anyone from displaying a Minnesota license plate other than the license plate assigned to that vehicle. Minn. Stat. § 168.36, subd. 2. Minnesota's Department of Public Safety has received numerous reports from concerned citizens that Defendants' agents are swapping license plates between DHS unmarked vehicles.

222.    Misusing license plates in violation of Minnesota law is neither necessary nor proper to the discharge of Defendants' agents' duties.

223.     Defendants' policy and practice of swapping or otherwise misusing license plates amounts to a final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A).

224.     As set forth above, Defendants have also intentionally violated Saint Paul Legislative Code Section 170.07(h).

225.     Defendants' policy and practice of commandeering Saint Paul property to unlawfully park and stage for federal immigration enforcement activity is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A).

226.     As a result of Defendants' actions, Plaintiffs are suffering harm and will continue to suffer harm.

227.     Plaintiff State of Minnesota has a paramount sovereign interest in enforcing its own laws and Defendants' actions are unlawfully interfering with that sovereign authority. Defendants' disregard for state law will make it harder for state and local law enforcement to identify, investigate, and prosecute DHS agents who are acting unlawfully, including the agents involved in the recent killing of an unarmed woman in Minneapolis. Defendants' actions also undermine public trust in law enforcement, which further undermines public safety efforts by state and local law enforcement officials.

228.     As set forth above, Plaintiff Saint Paul is suffering harm from Defendants' unlawful use of its property.

229.     In the absence of an injunction, Defendants will continue to engage in their unlawful policies and practices against Plaintiffs, as described herein.

230.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to all appropriate preliminary relief under 5 U.S.C. § 705; and a preliminary and permanent injunction preventing Defendants from violating state law and city ordinances.

## COUNT IV

**Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C) – Contrary to Law:**
**Excessive Force**
**(Brought by all Plaintiffs)**

231.    Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

232.    Defendants and their agents discussed in this complaint are operating pursuant to a final federal policy, approved by responsible federal agency heads with final policymaking authority, of targeting Plaintiffs' residents with unjustified violence.

233.    As set forth above, Defendants intentionally applied physical force, including use of projectiles and chemical weapons, on Plaintiffs' residents. They also restricted Plaintiffs' residents' freedom of movement through a show of authority.

234.    The force Defendants used was unreasonable.

235.    Federal law provides for the publication of regulations that "prescribe the categories of officers and employees . . . who may use force (including deadly force) and the circumstances under which such force may be used." 8 U.S.C. § 1357(a).

236.    Federal regulation provides that "Non-deadly force may be used only when a designated immigration officer . . . has reasonable grounds to believe that such force is necessary." 8 C.F.R. § 287.8(a)(ii).

237.   Federal regulation further provides that "A designated immigration officer shall always use the minimum non-deadly force necessary to accomplish the officer's mission and shall escalate to a higher level of non-deadly force only when such higher level of force is warranted by the actions, apparent intentions, and apparent capabilities of the suspect, prisoner, or assailant." 8 C.F.R. § 287.8(a)(iii).

238.   Federal regulation further provides that "Deadly force is any use of force that is likely to cause death or serious physical injury" and that "Deadly force may be used only when a designated immigration officer . . . has reasonable grounds to believe that such force is necessary to protect the designated immigration officer or other persons from the imminent danger of death or serious physical injury." 8 C.F.R. § 287.8(a)(2)(i)-(ii).

239.   Defendants' policy and practice of using force against Plaintiffs' residents fails to take into consideration the risk of harm associated with each weapon used, and permits uses of force that, in violation of 8 C.F.R. § 287.8(a): (1) do not further any legitimate mission assigned to Defendants by law; (2) target the general public; (3) are not based on reasonable grounds to believe such force is necessary; and/or (4) deploy gratuitous violence exceeding the minimum necessary to accomplish any legitimate aims.

240.   Defendants' policy and practice of using excessive force against Plaintiffs' residents is "final agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A), and violates the elementary principle of administrative law that agencies are required to follow their own regulations, *see United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).

241.    As a result of Defendants' unlawful policy and practice, both Plaintiffs and Plaintiffs' residents are suffering and will continue to suffer harm. As set forth, Plaintiffs have been forced to divert resources and expend additional resources to maintain public safety and order because of Defendants' unlawful immigration enforcement tactics. Plaintiffs are also suffering harm because Defendants' actions undermine public trust in state and local law enforcement.

242.    In the absence of an injunction, Defendants will continue to engage in their unlawful policies and practices against Plaintiffs' residents, described herein.

243.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to all appropriate preliminary relief under 5 U.S.C. § 705; and a preliminary and permanent injunction preventing Defendants from using unreasonable and unjustifiable force against Plaintiffs' residents.

## COUNT V

### Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C) – Contrary to Law: Warrantless Arrests Without Individualized Assessment of Immigration Status (Brought by all Plaintiffs)

244.    Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

245.    Defendants and the federal agents discussed in this complaint are operating pursuant to a final federal policy, approved by responsible federal agency heads with final policymaking authority, of making warrantless arrests in Minnesota without making individualized determinations of immigration status.

246.   As set forth above, Defendants' agents are stopping people while they are walking and driving in Minnesota simply based on perceived race or national origin because the agents perceive them to be of Latino, Somali, or some other targeted ethnicity.

247.   Under 8 U.S.C. § 1357(a)(2), an agent may make an immigration arrest without a warrant only if they have "reason to believe" that (1) the individual "is in the United States in violation of any [immigration] law or regulation," and (2) the individual "is likely to escape before a warrant can be obtained for his arrest." *See also* 8 C.F.R. § 287.8(c)(2)(i), (ii) (same). "Reason to believe" is "considered the equivalent of probable cause," *Lau v. U.S. Immigr. & Naturalization Serv.*, 445 F.2d 217, 222 (D.C. Cir. 1971), which "must be particularized with respect to the person to be searched or seized," *Barham v. Ramsey*, 434 F.3d 565, 573 (D.C. Cir. 2006) (quoting *Maryland v. Pringle*, 540 U.S. 366 (2003)).

248.   Defendants' policy and practice of making warrantless arrests in Minnesota without making individualized determinations of immigration status as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i) is a final agency action that is "arbitrary, capricious, . . . or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(A), (C), and violates the *Accardi* principle, *see Accardi*, 347 U.S. at 268.

249.   As a result of Defendants' unlawful policy and practice, both Plaintiffs and Plaintiffs' residents are suffering and will continue to suffer harm. Plaintiffs are suffering harm because, as a direct result of Defendants' actions, Plaintiffs' residents have stayed home out of fear that they will be unlawfully targeted and detained on their way to work

or school. This has led to business and school closures and decreased commercial foot traffic in the Twin Cities. Plaintiffs are also suffering harm because Defendants' actions undermine public trust in state and local law enforcement.

250.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to all appropriate preliminary relief under 5 U.S.C. § 705; and a preliminary and permanent injunction preventing Defendants from making warrantless arrests in without individualized determinations of immigration status.

## COUNT VI

**Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C) – Contrary to Law: Defendants' Decision to Conduct Border Patrol Enforcement Action as if the Agents Are Near the Border
(Brought by all Plaintiffs)**

251.     Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

252.     Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," that is "contrary to constitutional right [or] power," that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

253.     8 U.S.C. § 1357(a)(3) directs that "[a]ny officer . . . shall have power without warrant . . . within a reasonable distance from any external boundary of the United States . . . to board and search for aliens . . . any railway car, aircraft, conveyance, or vehicle . . . for the purpose of patrolling the border to prevent the illegal entry of aliens into the United

States." 8 U.S.C. § 1357(a)(3). The statute also provides that officers can only "access to private lands" without a warrant within 25 miles from the border and prohibits warrantless access to dwellings under any circumstance. *Id.* The regulations define "reasonable distance" to mean within 100 air miles from the U.S. border. 8 C.F.R. § 287.1. The regulations further state that, to expand the 100-mile distance, the chief patrol agent "shall forward a complete report" to the CBP Commissioner or the Assistant Secretary for ICE to justify such action and declare such distance to be reasonable. 8 CFR § 287.1(b).

254.   Defendants' policy and practice of conducting border enforcement activity more than 100 miles from the border, including but not limited to setting up checkpoints, conducting stops, detentions, and searches, entering private land, and entering residences, all without the requisite legal authority, is a final agency action that is "arbitrary, capricious, . . . or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(A), (C).

255.   Minneapolis and Saint Paul are at least 200 miles away from the closest international border, and that border is with Canada. On information and belief, Plaintiffs are not aware of any report that has been submitted to justify Defendants' policy and practice of border enforcement more than 100 miles of the border.

256.   Plaintiffs are suffering harm because of Defendants' actions.

257.   For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants' policy and practice of conducting Border Patrol enforcement action as if the agents are near the border (including setting up checkpoints, conducting stops, detentions, and searches, entering private land, and entering

residences, without the requisite legal basis) is in excess of the agency's statutory jurisdiction and is contrary to law and regulation.

258.   Plaintiffs are also entitled to vacatur of Defendants' decision and its implementation pursuant to 5 U.S.C. § 706; all appropriate preliminary relief under 5 U.S.C. § 705; and a preliminary and permanent injunction preventing Defendants from implementing or enforcing the decision.

<u>**COUNT VII**</u>

**Administrative Procedure Act, 5 U.S.C. § 706(2)(A) – Arbitrary and Capricious: Revocation of 2021 Sensitive Locations Policy (Brought by all Plaintiffs)**

259.   Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

260.   The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

261.   An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

262.   Defendants' revocation of the 2021 Sensitive Locations Policy and its implementation are final agency actions subject to the APA.

263.   Defendants' actions violate the APA because they are arbitrary and capricious, for reasons including: (1) the decision was motivated by animosity and discriminatory attitude toward immigrants; (2) Defendants failed to offer adequate explanation for their departure from the long-standing policy to limit enforcement actions in or near sensitive locations; (3) they failed to grapple with important health, education, and public safety repercussions of federal immigration enforcement in or near sensitive locations; (4) they failed to explain prioritizing civil arrests in or near sensitive locations over those harms and repercussions; (5) they failed to apply reasoned analysis regarding alternatives to civil arrests in or near sensitive locations; (6) they failed to examine relevant data and articulate a satisfactory explanation for agency actions; (7) they failed to consider availability of alternative measures which would achieve the enforcement objective (e.g., making the arrest off and a reasonable distance from the premises); (8) they failed to articulate the importance of the enforcement objective in the context of priorities; (9) they failed to describe measures which can be taken to minimize the impact on the operation of the hospital or school or place of worship; and (10) the revocation of the 2021 Sensitive Location Policy violates the Tenth Amendment.

264.   Defendants have not provided a rational basis for the revocation of the 2021 Sensitive Locations Policy.

265.   Defendants departed significantly from their normal procedures.

266.   Defendants did not take into account Plaintiffs' reliance interests in immigration enforcement policy for sensitive locations.

267.   Plaintiffs are harmed by the revocation.

70

268.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the revocation of the 2021 Sensitive Locations Policy and the implementation of that revocation violate the APA because they are arbitrary and capricious.

269.    Plaintiffs are also entitled to vacatur of the revocation of the 2021 Sensitive Locations Policy and the implementation of that revocation pursuant to 5 U.S.C. § 706; all appropriate preliminary relief under 5 U.S.C. § 705; and a preliminary and permanent injunction preventing Defendants from implementing or enforcing the revocation of the 2021 Sensitive Locations Policy.

## COUNT VIII

### Unconstitutional Retaliation in Violation of the First Amendment
### (Brought by all Plaintiffs)

270.    Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

271.    The Supreme Court has repeatedly held that "the First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018); *see, e.g., Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022); *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Because a state or municipality "is the voice of its residents," "a curtailment of its right to speak might be thought a curtailment of the unquestioned First Amendment right of those residents." *Creek v. Vill. of Westhaven*, 80 F.3d 186, 193 (7th Cir. 1996).

272.    The State's voters elected a Democratic governor; indeed, Minnesota's voters elected Democrats to all of Minnesota's statewide offices.  Additionally, Plaintiff Cities are widely considered to be Democratic cities with elected leaders who identify as Democrats.  The State's Governor and Plaintiff Cities' elected leaders are vocally opposed to the Trump Administration's agenda and have repeatedly criticized the President and his Administration on behalf of their constituents. This political speech is constitutionally protected activity.

273.    As set forth above, Defendants have been open about the fact that they are retaliating against Plaintiffs because of these political differences and this protected First Amendment activity. As set forth above, Defendants DHS and Noem have labeled Governor Walz and Mayor Frey "sanctuary politicians." Similarly, after Governor Walz criticized the fact that it took "50 ICE agents to arrest one guy in a library," Defendant Noem responded on social media: "yes, there's strength in law enforcement numbers to remove these violent criminals from the communities you refuse to protect."

274.    Other statements by the President reinforce this retaliatory motive. As set forth above, President Trump's criticism of Governor Walz intensified after his 2024 Vice Presidential campaign and President Trump has repeatedly attacked him.

275.    Defendants' actions also "constitute[] a sufficiently adverse action" against the state and municipalities "to give rise to an actionable First Amendment claim," *Wilson*, 595 U.S. at 477. Defendants have "threatened to wield [their] power" against the State for opposing the President's agenda. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 194 (2024). Defendants have not just made threats at this point. Defendants have opened

investigations, ordered funding freezes, and issued large penalties against the State. And, most importantly in this case, Defendants have sent an unprecedented number of federal law enforcement officials to the State and into Plaintiff Cities, causing harm and disruption to residents. And, on the heels of nationally publicized criticism by Governor Walz and Mayor Frey directed at the Trump Administration over the January 7 fatal ICE shooting, Defendant Noem announced an even larger deployment of DHS agents into Operation Metro Surge.

276.    These draconian punishments easily meet the standard for an "adverse action . . . that would chill a person of ordinary firmness from continuing in the activity." *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014).

277.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants' actions violate the First Amendment and that Defendants may not retaliate against the Plaintiffs for First Amendment-protected activity. Plaintiffs are also entitled to injunctive relief preventing Defendants from implementing or effectuating retaliatory actions and threats or from engaging in future retaliatory conduct based on First Amendment-protected activity.

## COUNT IX

### Violation of the First Amendment – Viewpoint Discrimination
### (Brought by all Plaintiffs)

278.    Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

279.    Defendants violate another core First Amendment principle: the prohibition on viewpoint discrimination. The Supreme Court has long held that "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 829 (1995). While "[a] government official can share her views freely and criticize particular beliefs," the First Amendment forbids "us[ing] the power of the State to punish or suppress disfavored expression." *Vullo*, 602 U.S. at 188.

280.    Defendants are targeting Minnesota, Minneapolis, and Saint Paul because Defendants disagree with certain viewpoints expressed by and policies adopted by Plaintiffs' elected leaders. As set forth above, Defendants have repeatedly criticized and targeted Plaintiffs because they have adopted so-called "sanctuary" laws and policies.

281.    While the President may disagree with some of the viewpoints that he attributes to Plaintiffs' elected leaders, the First Amendment does not allow him to punish Plaintiffs—or their residents—based on those viewpoints.

282.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants' actions targeting Minnesota, Minneapolis, and Saint Paul based on viewpoints expressed and adopted by their elected leaders are unconstitutional and that Defendants may not retaliate against the State and Plaintiff Cities for the viewpoints of their elected leaders. Plaintiffs are also entitled to injunctive relief preventing Defendants from implementing or effectuating the retaliatory actions and threats or from engaging in future retaliatory conduct based on viewpoint discrimination.

## COUNT XI

**Ultra Vires Executive Action in Excess of Constitutional and Statutory Authority
Conferred on the Executive
(Brought by all Plaintiffs)**

283.    Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

284.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

285.    The Tenth Amendment protects state sovereignty. The Tenth Amendment prohibits the Federal Government from intruding on Plaintiffs' police powers and from "issu[ing] directives requiring the States to address particular problems" or "command[ing] the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz*, 521 U.S. at 935.

286.    Defendants' unprecedented and disruptive law enforcement surge has infringed on Plaintiffs' police powers. Defendants' actions also force state and local law enforcement to either expend resources to carry out the federal government's civil immigration priorities or risk further intentional escalation by federal immigration agents and deployment of federal troops. Defendants' actions have forced Plaintiffs to respond to public safety incidents caused by Defendants' conduct to ensure the safety of residents and federal agents, and to deal with the fallout from Defendants' unlawful and disruptive tactics.

287.   Federal courts possess the power to grant declaratory and injunctive relief "with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326-27. Defendants' actions as described above go beyond mere legal or factual errors and amount to a clear departure by Defendants from their statutory powers and violate federal laws and are therefore ultra vires.

288.   Plaintiffs are thus entitled to a declaration that Defendants' actions violate the Tenth Amendment. Plaintiffs are further entitled to a preliminary and permanent injunction preventing Defendants from interfering with Plaintiffs' ability to ensure the health, education, and safety of their residents with their reserved police powers and preventing Defendants from coercing state and local officials into carrying out their enforcement efforts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask that the Court grant the following relief:

1.  Declare that Defendants' unprecedented surge of Defendants' agents in Minnesota is unconstitutional and unlawful.

2.  Hold unlawful and enjoin Defendants' unprecedented surge of Defendants' agents in Minnesota or any other similar action in Minnesota, over the objection of the Governor of Minnesota and Mayors of Minneapolis and Saint Paul.

3.  Preliminarily and permanently enjoin Defendants from implementing the unprecedented surge in Minnesota or any other similar action in Minnesota.

4.  Preliminarily and permanently enjoin Defendants from implementing the unprecedented surge in Minnesota at sensitive locations and in other unlawful ways that interfere with Plaintiffs' ability to ensure the health, education, and safety of their residents with their reserved police powers, that coerce state and local officials into carrying out Defendants' enforcement efforts, and that violate state law and city ordinances.

5. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2202, vacate and set aside the agency actions set forth in Counts III-VII, including the decision to conduct border patrol enforcement action as if the agents are near the border, and the revocation of the 2021 Sensitive Locations Policy.

6. Preliminarily and permanently enjoin Defendants from engaging in the unlawful actions described in this Complaint, specifically prohibiting Defendants, their officers, agents, assigns, and all persons acting in concert with them from:

   a. Arresting or threatening to arrest any person who is not subject to a lawful immigration arrest unless there is probable cause to believe the individual has committed a crime;

   b. Threatening or using physical force, including brandishing weapons, against any person who is not subject to a lawful immigration arrest where such threat or force is not reasonably necessary to stop an immediate and serious threat of physical harm to a law enforcement officer or another person and there is not reasonable suspicion or probable cause that the person subject to force or threatened with force has committed a crime;

   c. Dispersing individuals engaged in First Amendment-protected activity with physical force. Defendants may ask an individual engaged in First Amendment-protected activity to change location to avoid disrupting law enforcement, as long as the instructions are clear and the individual has time to comply and sufficient opportunity to observe and exercise his or her First Amendment rights;

   d. Pointing firearms at individuals who are not posing an immediate threat of death or serious bodily injury to another person;

   e. Using hands-on physical force such as pulling or shoving to the ground, tackling, or body slamming any person who is not causing an immediate threat of physical harm to others, unless objectively necessary and proportional to effectuate an apprehension and arrest;

   f. Using chokeholds, carotid restraints, or any other restraint technique that applies prolonged pressure to the neck and may restrict blood flow or air passage against any person, unless such force is objectively necessary to stop an immediate threat of the person causing serious bodily injury or death to another person;

   g. Seizing or arresting any person who is complying with a lawful and authorized crowd dispersal order, unless there is specific probable cause to believe that the

person has committed a crime for which a custodial arrest is warranted and for which the Federal Agent has lawful authority to make an arrest;

    h.   Concealing his or her identity by means of mask or other disguise in a public place.

    i.   Further requiring Defendants' agents to:

    j.   Wear visible identification of a unique, personally assigned, and recognizable alphanumeric identifier sequence affixed to their uniforms and conspicuously displayed in two separate places. The same unique and personally assigned identifier sequence must remain conspicuously displayed in two separate places despite changes to the agent's uniform or tactical gear;

    k.   Wear and activate body worn cameras ("BWCs") when engaged in enforcement activities unless expressly exempted by CBP, ICE, or DHS policy.

7.   Award the Plaintiffs their costs and reasonable attorneys' fees; and

8.   Order such other and further relief as this Court deems just and appropriate.


                        Respectfully submitted,

Dated: <u>January 12, 2026</u>          KEITH ELLISON
                        Attorney General
                        State of Minnesota

                        *s/ Liz Kramer*
                        LIZ KRAMER (#0325089)
                        Solicitor General
                        PETER J. FARRELL (#0393071)
                        Deputy Solicitor General
                        KATHERINE BIES (#0401675)
                        BRIAN S. CARTER (#0390613)
                        LINDSEY MIDDLECAMP (#0392589)
                        JOSEPH RICHIE (#0400615)
                        Special Counsel

                        445 Minnesota Street, Suite 600
                        St. Paul, Minnesota 55101-2125
                        (651) 757-1010 (Voice)
                        (651) 282-5832 (Fax)

liz.kramer@ag.state.mn.us
peter.farrell@ag.state.mn.us
brian.carter@ag.state.mn.us
katherine.bies@ag.state.mn.us
joseph.richie@ag.state.mn.us
lindsey.middlecamp@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

Dated: <u>January 12, 2026</u>

KRISTYN ANDERSON
City Attorney
<u>*/s/ Kristyn Anderson*</u>
KRISTYN ANDERSON (0267752)
HEATHER P. ROBERTSON (0390470)
Assistant City Attorney
SARA J. LATHROP (0310232)
Assistant City Attorney
KIRSTEN H. PAGEL (0399114)
Assistant City Attorney
350 South Fifth Street
Minneapolis, MN 55415
Tel: 612-673-3000
kristyn.anderson@minneapolismn.gov
sara.lathrop@minneapolismn.gov
heather.robertson@minneapolismn.gov
kirsten.pagel@minneapolismn.gov

*Attorneys for Plaintiff City of Minneapolis*

Dated: <u>January 12, 2026</u>

IRENE KAO
City Attorney
<u>*By: /s/ Kelsey McElveen*</u>
PORTIA HAMPTON-FLOWERS
(0210869)
Deputy City Attorney
KELSEY MCELVEEN (0396744)
Assistant City Attorney
ALEXANDER HSU (0399275)
Assistant City Attorney
15 W. Kellogg Blvd., #400
Saint Paul, MN 55102

79

Tel: 651-266-8710
Portia.flowers@ci.stpaul.mn.us
Kelsey.mcelveen@ci.stpaul.mn.us
Alexander.hsu@ci.stpaul.mn.us

*Attorneys for Plaintiff City of Saint Paul*

|#6273534-v2