**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| STATE OF MINNESOTA, *by and through its Attorney General Keith Ellison*, CITY OF MINNEAPOLIS, and CITY OF ST. PAUL,<br><br>    Plaintiffs,<br><br>    v.<br><br>KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; JOHN CONDON, *in his official capacity as Acting Executive Associate Director of Homeland Security Investigations*; U.S. Department of Homeland Security; TODD LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; MARCOS CHARLES, *in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations;* U.S. Immigration and Customs Enforcement; RODNEY SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection;* U.S. Customs and Border Protection; GREGORY BOVINO, *in his official capacity as Commander of the U.S. Border Patrol*; U.S. Border Patrol; DAVID EASTERWOOD, *in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement*,<br><br>    Defendants. | Case No. 0:26-cv-00190-KMM-DJF<br><br><br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER** |

**INTRODUCTION**

With "Operation Metro Surge," Defendants have flooded Plaintiffs' streets with some 2,000 immigration enforcement agents under the guise of a crackdown on removable immigrants and have threatened an even larger deployment. This massive deployment is shocking and unprecedented, completely disproportional to the problem faced, and by its size and character unlawfully impinges on Plaintiffs' sovereignty. In addition, Defendants are employing a range of unlawful tactics that are also harming Plaintiffs' inviolable sovereignty to provide for the public safety, health, welfare, and education of their residents. Specifically, Defendants are engaged in a campaign of racial profiling, excessive force, retaliation, enforcement at sensitive locations, open disregard for and violations of Defendants' own policies, and open disregard for and violations of state law.

The damage to public safety, health, welfare, and education of Plaintiffs' residents is immediate, irreparable, and can hardly be overstated. The same is true for the damage to and interference with Plaintiffs' sovereign authority to regulate the public safety, health, and welfare of their residents. Defendants' conduct has also harmed Plaintiffs by commandeering state and local resources, because Plaintiffs must clean up the public safety messes left in Defendants' wake, and by increasing the costs of Plaintiffs' provision of public services. Plaintiffs are therefore likely to succeed on their Tenth Amendment and equal sovereignty claims and without an injunction will continue to suffer irreparable harm.

Accordingly, Plaintiffs respectfully request the Court enter a temporary restraining order to stop Defendants' conduct causing Plaintiffs harm by: (1) ordering Defendants to cease Operation Metro Surge; and (2) ordering the agents that may lawfully remain in

Minnesota to cease their unlawful conduct, which includes, but is not limited to, prohibiting racial profiling, the use of excessive force, retaliation, and enforcement at sensitive locations; requiring that Defendants equip their agents with body-worn cameras; and requiring that state law and Defendants' own policies be followed.

## BACKGROUND

I. **THE TRUMP ADMINISTRATION'S IMMIGRATION ENFORCEMENT STRATEGY IS AIMED AT INCREASING FEAR AND UNCERTAINTY AMONG ALL MINNESOTANS, PARTICULARLY MINNESOTANS OF COLOR, REGARDLESS OF WHETHER THEY ARE HERE LAWFULLY OR LAW ABIDING.**

On January 20, 2025, President Trump was sworn into office. Since then, the Trump Administration has waged an aggressive enforcement campaign against immigrants. Through a series of Executive Orders, President Trump purported to end birthright citizenship;[1] prohibit the entry of asylum seekers at the southern border;[2] and implement "enhanced vetting" of visa applicants.[3] President Trump also declared that the United States needed to combat an "invasion" by "illegal aliens."[4] He claimed that many immigrants "present significant threats to national security and public safety, committing

---

[1] https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-meaning-and-value-of-american-citizenship/

[2] https://www.whitehouse.gov/presidential-actions/2025/01/guaranteeing-the-states-protection-against-invasion/

[3] https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-united-states-from-foreign-terrorists-and-othernational-security-and-public-safety-threats/

[4] https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/

vile and heinous acts against innocent Americans."[5] And he asserted that "others are engaged in hostile activities," like "economic espionage" and "terror-related" actions.[6]

President Trump bolstered this initial wave of Executive Orders with other maneuvers designed to create a deportation system like "[Amazon] Prime, but with human beings."[7] For example, DHS revoked a longstanding policy prohibiting immigration enforcement at "sensitive places," including schools, hospitals, places of worship, courthouses, playgrounds, funerals, and weddings.[8] In another example, President Trump invoked the Alien Enemy Act of 1798—a wartime statute used only three times in the nation's history—to deport alleged members of a Venezuelan gang to a notorious foreign prison in El Salvador.[9] *See Trump v. v. J.G.G.*, 604 U.S. 670, 671 (2025). In May 2025, Stephen Miller confirmed during a recorded interview that the Trump Administration was

---

[5]    *Id.*

[6]    *Id.*

[7]    https://www.theguardian.com/us-news/2025/apr/09/ice-todd-lyons-deporation-amazon

[8]    *Compare* Mem. from Alejandro N. Mayorkas, Secretary, Department of Homeland Security, *Guidelines for Enforcement Actions in or Near Protected Areas* (Oct. 27, 2021) https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw10272021.pdf, *with* Mem. from Benjamine C. Huffman, Acting Secretary, Department of Homeland Security, *Enforcement Actions in or Near Protected Areas* (Jan. 20, 2025), https://www.dhs.gov/sites/default/files/2025-03/25_0120_S1_enforcement-actions-in-near-protected-areas.pdf.

[9]    https://www.axios.com/2025/04/09/kristi-noem-migrants-trump-ice-prison

aspiring for a *minimum* of 3,000 arrests per day.[10] Public reporting indicated that Miller berated DHS officials for not arresting enough people, with one unidentified official quoting Miller as asking, "Why aren't you at Home Depot? Why aren't you at 7-eleven?"[11]

The dramatic rhetoric has resulted in dramatic impacts: the Administration's actions have changed "nearly every aspect of immigration policy in the anti-immigrant direction."[12] Experts have observed that the enforcement is "aimed at reducing the number of immigrants in the U.S. overall, regardless of legal status and or criminal history."[13] It is also aimed at "increasing fear and uncertainty among those who remain."[14]

## II.     DEFENDANTS ENGAGE IN A CAMPAIGN OF IMMIGRATION ENFORCEMENT CHARACTERIZED BY VIOLENCE AND INTIMIDATION.

That increased fear and uncertainty are well-founded. Throughout 2025, the Trump Administration ramped up domestic immigration enforcement, targeting so-called "sanctuary jurisdictions" like Los Angeles, Portland, and Chicago. In these enforcement efforts, the Trump Administration has deployed thousands of federal officers to disfavored jurisdictions and engaged in widespread violations of constitutional rights.

---

[10]     https://www.youtube.com/watch?v=MJNXsOqFSZs

[11]     https://www.forbes.com/sites/stuartanderson/2025/06/09/stephen-millers-order-likely-sparked-immigration-arrests-and-protests/

[12]     https://www.brookings.edu/articles/100-days-of-immigration-under-the-second-trump-administration/

[13]     *Id.*

[14]     *Id.*

Los Angeles is representative. Over the summer, federal officers executed "immigration raids across Southern California." *L.A. Press Club v. Noem*, 799 F. Supp. 3d 1036, 1045 (C.D. Cal. 2025). Those raids led to "escalating tensions," and federal officers "unleashed crowd control weapons indiscriminately and with surprising savagery." *Id.* Federal officers shot journalists with pepper balls; teargassed protesters; and used rubber bullets, smoke bombs, and other weapons "on family members of detained farm workers" and "concerned public officials." *Id.* The federal officers' misconduct was "not isolated," as dozens of journalists, legal observers and protesters documented. *Id.*

The same was true in Chicago. There, video evidence showed federal officers throwing "flashbang grenades, tear gas, and pepper balls" at a group of quiet protesters, yelling "fuck yea!" while they did so. *Chicago Headline Club v. Noem*, No. 25C12173, 2025 WL 3240782, at *4 (N.D. Ill. Nov. 20, 2025).[15] In other incidents, federal officers pushed protestors to the ground and used less-lethal munitions without justification. *Id.* *4-5. Federal officers' explanations for these incidents were not credible. *Id.* One high-ranking federal official, Defendant Gregory Bovino, even "admitted in his deposition that he lied

---

[15]     The Seventh Circuit stayed the district court's preliminary injunction pending appeal as overbroad. *Chicago Headline Club v. Noem*, Order Granting Stay Pending Appeal, ECF No. 28, No. 25-3023 (7th Cir. Nov. 19, 2025). But the Seventh Circuit emphasized that it had "not concluded that preliminary relief is precluded." *Id.* It concluded: the district court's "voluminous and robust factual findings . . . may support entry of a more tailored and appropriate preliminary injunction that directly addresses the First and Fourth Amendment claims raised by these plaintiffs." *Id.* Similarly, the Ninth Circuit partially stayed the injunction in *Los Angeles Press Club*, but only "as to the injunctive provisions that by their terms apply to protesters who are not party to this litigation." *Los Angeles Press Club v. Noem*, Order, ECF No. 66.1, No. 25-5975 (9th Cir. Dec. 18, 2025).

multiple times about the events that prompted him to throw tear gas at protesters." *Id.* at *6.

President Trump reinforced these domestic operations with a military presence. In California, Illinois, and Oregon, President Trump federalized and deployed state National Guards to enforce federal immigration law. *E.g.*, *Illinois v. Trump*, 155 F.4th 929, 935 (7th Cir. 2025) (describing Illinois deployment). Some deployments dragged on for months, "despite no evidence that execution of federal law is impeded in any way—let alone significantly." *Newsom v. Trump*, No. 25-cv-04870, 2025 WL 3533818, at *1 (N.D. Cal. Dec. 10, 2025). And the federal government sent National Guard troops from one state into others, "effectively creating a national police force made up of state troops." *Id.* The strategy decision to use federalized troops to advance mass deportations was developed by Trump Administration advisors even before he took office for his second term.[16]

## III. DEFENDANTS, MOTIVATED BY PREJUDICE AND A DESIRE FOR RETRIBUTION, TARGET MINNESOTA, ITS MUNICIPALITIES, ITS POLITICIANS, ITS SOMALI COMMUNITY, AND ITS LARGER IMMIGRANT COMMUNITIES WITH "OPERATION METRO SURGE."

What started in Los Angeles, Portland, and Chicago, has now come to Minnesota. President Trump has made his disdain for Minnesota, its municipalities, its politicians, and its immigrant communities well known. Over the last month, the Trump Administration has issued a constant stream of unprecedented federal actions against Minnesota. From attempting to cancel the State's food stamp funding, to threats of general funding freezes,

---

[16] https://www.npr.org/2025/11/03/nx-s1-5593112/national-guard-mass-deportations-trump-2026)

to the deployment of more than 2,000 masked immigration agents, President Trump's and Defendants' motives are clear: a desire to punish a State electorate that did not vote for him; a desire to punish politicians who stand up to him; and a desire to punish immigrants because of their race and national origin. What is equally clear is that Defendants are not motivated by a good faith desire to improve public safety.

On January 9, 2026, President Trump expressed the root of his displeasure in plain terms: he claimed in essence that Minnesota is "corrupt" and "crooked" because its officials accurately reported election results and those results did not declare him the winner. "[T]hey're crooked officials. . . . I feel that I won Minnesota all three times. I think I won it all three times . . . I won it all three times in my opinion . . . . It's a corrupt voter state . . . I won Minnesota three times and I didn't get credit for it. That's a crooked state." Compl. ¶ 36. This is, of course, untrue. President Trump never won Minnesota, Minnesota's elections are free and fair, and our State and local governments are characterized, first and foremost, by decent civil servants who are serving their State, cities, and communities.

President Trump has repeatedly demonstrated personal animosity toward Minnesota Governor Tim Walz, the Democratic vice-presidential nominee in the 2024 election. For example, in the wake of the assassination of former State Speaker of the House Melissa Hortman and her husband Mark Hortman, President Trump said that Governor Walz is "so whacked out, I'm not calling him."[17] President Trump has called Governor Walz a "dangerously liberal extremist," and recently used a slur to call him "the seriously re----ed

[17]    https://www.politico.com/news/2025/06/17/trump-walz-phone-call-00410141

Governor of Minnesota, Tim Walz."[18] Likewise, President Trump has attacked Minneapolis Mayor Jacob Frey, calling him a "fool."[19] On December 31, 2025, DHS posted on social media, "We will not live like this anymore," accompanied by a meme depicting Mayor Frey standing in front of a pile of garbage with a speech bubble containing Somali script.

President Trump and Defendants have also targeted Minnesota because Minnesotans welcome and value immigrants. Since retaking office on January 20, 2025, Trump issued several executive orders intended to deter states and localities from implementing or keeping so-called "sanctuary" policies or laws—laws that preclude components of state or local governments from participating in federal civil immigration enforcement in various ways.[20] The Trump Administration, including Defendants DHS and

---

[18]    https://www.msn.com/en-us/news/politics/trump-uses-slur-against-gov-tim-walz-in-thanksgiving-truth-social-tirade-walz-fires-back/ar-AA1RllEY

[19]    https://www.fox9.com/news/pres-trump-rails-against-somalis-destroyed-minnesota-dec-2025

[20]    In their motion to dismiss a recent lawsuit filed by the United States against Plaintiffs, et al., Plaintiffs State of Minnesota and City of Saint Paul explain why the United States has no authority to compel Plaintiffs to abandon such laws. *United States v. Minnesota*, Civ. No. 25-3798 (ECT/JFD) (D. Minn.).

Noem, also repeatedly criticized the State and political leaders Governor Walz and Mayor Frey for being "sanctuary politicians"[21] with "sanctuary policies."[22]

Beginning in late November 2025, the Trump Administration began signaling that it had found a new vehicle to achieve several goals at once (namely, attacking political opponents and maligning immigrants): a high-profile COVID-19 era fraud scheme that has already been investigated and prosecuted in Minnesota. Defendants, President Trump, and others within the Administration have repeatedly used pretextual concern about fraud to justify a number of unlawful actions against Minnesota, and have attacked Minnesota residents of Somali heritage, calling them "garbage," and casting other gross aspersions and generalizations. *See, e.g.,* Compl. ¶ 65.

## IV. DEFENDANTS SOW CHAOS AND VIOLENCE ON THE STREETS WITH "OPERATION METRO SURGE."

### A. Defendants Launch and Continuously Expand Operation Metro Surge.

Against this backdrop, around the beginning of December 2025, Defendants began to threaten an enforcement action in the Twin Cities area dubbed "Operation Metro Surge." The operation began with 100 U.S. Immigration and Customs Enforcement ("ICE") and

---

[21]     DHS (@DHSgov), X (Oct. 27, 2025 at 8:57 ET), https://x.com/DHSgov/status/1982808956289376455; Secretary Kristi Noem (@KristiNoem), X (Oct. 24, 2025 5:16 ET), https://x.com/KristiNoem/status/1981847364827746413Secretary DHS (@DHSgov), X (July 9, 2025 11:48 ET), https://x.com/DHSgov/status/1942989123544924541.

[22]     DHS (@DHSgov), X (Dec. 5, 2025 9:50 ET), https://x.com/DHSgov/status/1996970373078720774.

Homeland Security Investigations ("HSI") agents from across the country being sent to the Minneapolis and Saint Paul (the "Twin Cities"), and, since then, public reporting has indicated that Defendant Noem has deployed as many as 2,000 U.S. Department of Homeland Security ("DHS") agents to the Twin Cities alone. Defendants acknowledge that the operation is the largest of its kind. On January 6, 2026, Defendant Lyons described ICE's operation in Minnesota: "We have the largest immigration operation ever taking place right now." He added that Defendants were "taking the fight to these sanctuary jurisdictions."[23] In other words, they are here to fight the *jurisdictions they do not like*. They are not here to make Minnesotans safer.

Defendant Bovino and additional U.S. Customs and Border Protection ("CBP") and U.S. Border Patrol agents have also been deployed to the Twin Cities to assist what appears to be an ever-expanding Operation Metro Surge. On January 8, 2026, the *New York Times* reported that the Trump Administration will be deploying more than 100 additional CBP and Border Patrol agents to Minnesota from operations in Chicago and New Orleans.[24] Then, on January 11, 2026, Defendant Noem announced that hundreds more agents would be sent to Minnesota.[25]

### B. Defendants Engage in Lawlessness and Intentional Interference with Minnesotans' Safety, Health, and Welfare.

---

[23] https://www.newsmax.com/newsmax-tv/todd-lyons-ice-minnesota/2026/01/06/id/1240996/

[24] https://www.nytimes.com/2026/01/08/us/politics/border-patrol-minnesota-trump.html

[25] https://www.reuters.com/world/us/homeland-security-send-hundreds-more-officers-minnesota-noem-says-2026-01-11/

In the face of Defendants' unlawful and reckless conduct, Minnesota and its local government partners are keeping the peace and will continue to do so, regardless of the chaos Defendants cause. In other jurisdictions, Defendants have incited unrest with the same unlawful tactics used in Minnesota, and President Trump has used that unrest (caused by Defendants) to falsely justify a domestic military deployment. To be clear, this Motion is not saying that Plaintiffs are unable to execute their police powers and maintain public safety in the wake of Defendants' antics, but that Defendants' intentionally incendiary and unlawful tactics are causing harm to Plaintiffs and their residents and are a drain on Plaintiffs' resources.

There is no doubt that Defendants and their agents are engaged in a pattern of behavior that is *res ipsa loquitor* designed to create fear, disturb the peace, and inflame, and is targeted to harm the public safety, health and welfare of Minnesota residents.

### 1. Stops and arrests based on racial profiling.

First, Defendants employ racial profiling in their enforcement efforts. Each day, Minnesotans point to yet more instances of racial profiling by Defendants' agents; what follows are just a few examples:

- On December 10, 2025, two masked DHS agents tackled and arrested Mubashir, a Somali American man; one agent put him in a choke hold.[26] DHS agents arrested Mubashir despite Mubashir repeatedly asking that he be allowed to show them his legal identification. DHS agents then detained Mubashir for two hours for no apparent reason other than his ethnicity.

- On January 8, 2026, reporting indicates that DHS agents arrested two young Hispanic men who were working at a Target retail store. The agents took the two men to the ground and handcuffed them. Video from the scene shows agents

---

[26]     https://perma.cc/TTM9-AZVA

forcing one of the men into a DHS vehicle after the man yells that he is a U.S. citizen. Witnesses reported that the individuals were U.S. citizens.[27]

- On January 8, 2026, CBP agents surrounded and questioned a driver at the Minneapolis-St. Paul airport and asked him if he is a U.S. Citizen. A CBP agent is heard on the video stating, "I can hear you don't have the same accent as me, that's why I'm asking" and "I want to know where you were born."[28]

- Again, on January 8, DHS agents arrested a 20-year-old man in Robbinsdale, Minnesota, for seemingly no other reason than his ethnicity.[29] The man, whose father was born in Mexico, was himself born in Minnesota. DHS agents held the man in federal custody for over six hours before releasing him.

Of course, the full scale of illegal detentions based on race, ethnicity, or perceived national origin is difficult to track given the scope of Operation Metro Surge and the absence of any obvious centralized, trustworthy place for victims of racial profiling to report. Nor do Defendants themselves make local data on detention or arrests publicly available in a timely manner. As of December 13, 2025, the ACLU of Minnesota reported that it had knowledge of "at least a dozen" U.S. citizens of Somali descent being detained

---

[27]     https://www.kare11.com/article/news/local/ice-in-minnesota/federal-agents-richfield-target/89-074f28c7-c04f-4392-9165-08ca304b0f39

[28]     https://www.youtube.com/watch?v=5QM2hqcfOis.

[29]     https://www.startribune.com/us-citizen-arrested-ice-day-after-fatal-shooting-renee-good-twin-cities-immigration-operation/601560460

as part of Operation Metro Surge[30] —a pattern highlighting unlawful racial profiling practices have been terrorizing the Twin Cities for weeks.[31]

## 2. Violations of state and local law.

Operation Metro Surge has also been characterized by frequent violations of state and local laws. Defendants' agents are almost always masked to conceal their identities, in violation of state law. Minn. Stat. § 609.735. Minneapolis has received multiple calls related to Defendants' agents violating traffic laws, driving dangerously, ramming vehicles, and getting into traffic accidents. In addition to reckless driving, Defendants' agents have been observed regularly switching license plates on their vehicles. Minn. Stat. § 168.36. Contrary to the assertions of Defendants and others in the Administration, ICE and CBP agents do not have "absolute immunity" from state laws.

## 3. Sensitive locations and warrantless entries.

Compounding community concerns, Defendants' agents have engaged in aggressive and unlawful conduct at sensitive locations, like schools, daycares, and hospitals. For example, the same day that an agent shot and killed Renee Good, Defendants' agents appeared at Roosevelt High School, just as classes finished.[32] Armed

---

[30]    https://kstp.com/kstp-news/top-news/majority-of-somali-immigrants-in-minnesota-are-us-citizens/

[31]    https://www.startribune.com/as-ice-activity-intensifies-some-somali-students-lower-their-profile/601542204

[32]    https://www.startribune.com/what-happened-when-border-patrol-agents-showed-up-at-minneapolis-roosevelt-high-school/601561137

DHS agents dressed in fatigues, body armor, and riot helmets pepper-sprayed into a crowd that included high school students, teachers, and school administrators.[33] Defendants' agents have also conducted enforcement operations at hospitals, near daycares, and have attempted to bully their way into private businesses or residences without warrants.[34]

As detailed below, the dynamic is taking its toll. Minneapolis Public Schools cancelled school on January 8 and 9, 2026, "due to safety concerns related to [January 7] incidents around the city."[35] These cancellations impacted around 100 schools and 30,000 students. And multiple other schools cancelled classes or shifted to remote learning on January 9, 2026, amid Defendants' activity. Following the January 7 incident, St. Paul Public Schools cancelled field trips and sports-related events in Minneapolis as well as any events requiring travel through Minneapolis.[36]

Further, Defendants' decision to conduct enforcement actions at sensitive locations weaponizes the harm caused by their illegal seizures. Kids must go to school. Parents need to take their toddlers to daycares so that they can work. The sick and injured need medical

---

[33]    *Id.*

[34]    https://www.cbsnews.com/minnesota/news/hcmc-hennepin-healthcare-ice-patient-handcuffed/; https://www.kare11.com/article/news/local/south-minneapolis-restaurant-ice-entered-without-warrant-staff-push-back/89-7af99452-0ed8-4de5-9a27-6cb74cdc3e07; https://www.mprnews.org/story/2025/12/18/ice-enforcement-affecting-child-care-5-questions-answered

[35]    https://www.mpschools.org/about-mps/news/news-details/~board/minneapolis-public-schools-news/post/no-school-jan-8-9-due-to-safety-concerns

[36]    https://www.twincities.com/2026/01/08/spps-district-shares-procedures-in-case-of-federal-activity/

care. The public needs to travel on public roads and sidewalks to get to work. But Minnesotans of color and Minnesotans who speak with an accent or in a foreign language, find themselves unable to do these things right now without fear of being detained by one of Defendants' masked agents and potentially physically harmed or deprived of their legal rights.

### 4. Retaliation against concerned bystanders and witnesses.

The foregoing tactics—racial profiling, forceful arrests, warrantless entries, and aggressive enforcement at sensitive locations—have distressed and shocked many Minnesotans. Minnesotans have hit the streets to exercise their First Amendment rights to object, observe, and record.

Here, too, Defendants' agents choose retaliation over de-escalation:

- On December 6, 2025, a Minneapolis woman volunteering as an observer followed a DHS vehicle. When she parked, she was boxed in by other DHS vehicles. In the recorded interaction that followed, a DHS agent told her she was breaking the law and threatened to arrest her if she continued.[37]

- On December 9, 2025, a Minneapolis woman who heard DHS was patrolling her community went to the impacted area and stood on a public sidewalk. While at a safe distance, she asked, "Are you ICE?" Seconds later, she was forced to the ground, handcuffed, detained, shackled, and left in a cell for hours, after having her wedding ring cut off.[38]

- Shortly before Renee Good was shot and killed on January 7, 2025, a different scene unfolded less than a mile away. An attorney for the State of Minnesota with expertise in civil rights law witnessed an apparent DHS arrest unfolding,

---

[37] https://www.mprnews.org/story/2025/12/05/twin-cities-ice-watchers-keep-tabs-for-agents-in-their-neighborhoods.

[38] Complaint, *Tincher v Noem*, No. 25-cv-04669 (D. Minn. Dec. 17 2025), Dkt. No. 1.

and she approached the scene to act as a witness.[39] She identified herself as an attorney and stood a safe distance from the arrest. A DHS agent jumped out of his vehicle, unloaded entire canisters of pepper spray on her at point blank range, causing such irritation that she had to strip her clothing off on the scene to reduce the effect.[40]

- On January 9, 2026, a white pastor of a Minneapolis church described seeing DHS agents approach a Hispanic woman. The pastor reports that when he told DHS they should take him instead, DHS pointed a gun in his face, handcuffed him, placed him in the back of a vehicle, and released him after purportedly saying, "you're White. You wouldn't be fun anyway." [41]

## V. DEFENDANTS UNLAWFULLY INTERFERE WITH PLAINTIFFS' AUTHORITY TO PROVIDE FOR PUBLIC SAFETY, HEALTH, AND WELFARE.

The fear and unrest caused by Defendants' massive-scale, disproportionate deployment and tactics are resulting in obvious negative impacts to state and local law enforcement. These impacts will continue to become clearer as more evidence comes to light, but already include certain early measures:

- Since December 9, 2025, (a week into Operation Metro Surge) when Minneapolis began tracking the relevant data, there have been over eighty 911 calls related to Defendants' immigration enforcement actions. Each call takes time and resources of Minneapolis law enforcement to deal with because each call must be assessed and may need to be investigated. (Robertson Decl. ¶ 2.)

- Since December 18, 2025, the Minneapolis Police Department ("MPD") has had one or more supervisors dedicated to monitoring public safety needs due to Defendants' immigration enforcement activities during the daytime hours. Since the January 7 fatal shooting by ICE, an additional lieutenant has been assigned during nighttime hours. (Frey Decl. ¶ 11.)

---

[39]    Compl. ¶ 91.

[40]    *Id.*

[41]    https://www.kare11.com/article/news/local/detained-pastor-says-ice-let-him-go-because-hes-white-mn/89-00df6b90-bae8-49b8-b980-941a4ba6ee8b

- Operation Metro Surge has also resulted in Minneapolis Police needing to send officers to respond to multiple calls from concerned citizens who have seen individuals being kidnapped by unidentified people or people callers were not sure were federal immigration agents. (Robertson Decl. ¶ 11.)

- Minneapolis Police have also had to respond to multiple incidents of Defendants' agents abandoning vehicles on the public right of way after detaining the individuals in the car. (Robertson Decl. ¶¶ 12-13.)

- Saint Paul Police ("SPPD") have also had to respond to multiple incidents involving Defendants' agents. For example, on November 25, 2025, SPPD had to respond to a tense situation between DHS agents and protesters. On December 21, 2025, SPPD had to respond to an incident involving a DHS agent shooting at a man in his car. SPPD has received several other calls from concerned citizens relating to DHS agents' conduct. Each call takes time and resources of SPPD because each call must be assessed and may need to be investigated. Responding to calls relating to activities of DHS agents diverts time and resources from other policing needs. (Her Decl. ¶¶ 39-40.)

- SPPD has also had to devote time and resources to developing guidance and communicating with residents regarding the differences between DHS agents and SPPD officers. (Her Decl. ¶ 37-38)

- Local law enforcement has also responded to multiple incidents to maintain public safety where there is a tense protest situation caused by Defendants' aggressive and reckless actions. (Robertson Decl. ¶ 10.)

Responding to calls where there is tension between community and federal immigration enforcement authorities presents many complexities and concerns for local and state law enforcement officers. Officers must respond to calls where tensions are high due to Defendants' immigration enforcement actions, and people on the scene, including DHS agents, are armed—which is particularly concerning in light of the reported shortened training period for recently-hired agents.[42]

---

[42]    https://www.npr.org/2026/01/09/nx-s1-5671120/homeland-security-expert-talks-about-ices-truncated-training-after-hiring-blitz

Since the January 7, 2026, fatal shooting, MPD has observed a marked increase in officers' use of health and wellness resources, including increased engagement with contracted therapeutic services, and heightened officer hypervigilance and fear. For officers present during the 2020 unrest, the January 7 incident has triggered traumatic memories as they resume operational duties amid concerns of potential instability. Officers who joined the department after 2020 report similar emotional impacts, having experienced prior unrest as community members. While comprehensive data is not yet available, there is a legitimate concern that the cumulative psychological impact of responding to Operation Metro Surge may contribute to increased attrition from the department, as officers confront the harm caused by Defendants' actions on the community they are sworn to protect. (Frey Decl. ¶ 13.)

Defendants are also preventing MPD from responding to 911 calls unrelated to Defendants' conduct. For example, on January 7, shortly after 10:00 am, all priority-2 and priority-3 911 calls were put into "pending" status because MPD officers needed to respond to the January 7 fatal shooting. (Frey Decl. ¶ 15.) Ultimately, approximately 95 MPD officers responded to the scene on January 7 to deal with the aftermath, and while they were doing so, they could not respond to other 911 calls, investigate reports of crimes, or fulfill other law enforcement duties for the communities MPD serves. Similarly, MPD administration has devoted considerable time to planning around the impacts of the way Defendants are conducting immigration enforcement in Minneapolis, and that is time and attention that would otherwise be spent on making Minneapolis a safer place for people to live, work and visit. *Id.*

The impacts on the operations of Plaintiff Minneapolis have been far-reaching. Since the tragic January 7 fatal shooting, and due to Defendants' continuing inflammatory tactics, Minneapolis has initiated and continues its emergency preparedness protocols, which means significant additional work for numerous City departments, from the Emergency Management Department, to Police, Fire, Public Works, Finance, Communications, the Mayor's Cabinet, Mayor's staff and the Mayor, and many more, taking them all away from pressing City priorities. (Frey Decl. ¶ 16.)

Defendants' conduct has also harmed Saint Paul law enforcement by needlessly flooding Saint Paul with DHS agents despite Saint Paul's reduced crime rates. Saint Paul is a national leader in utilizing community-oriented policing to reduce crime and solve cases. (Her Decl. ¶ 33-34.) In 2025, SPPD solved more than 70% of crimes and between 2020 and 2025, had a clearance rate for homicides ranging from 89% to 93%. (Her Decl. ¶ 34.) Between 2022 and 2025, violent crime in Saint Paul decreased significantly. For example, murder rates decreased 44%, robberies decreased 56%, aggravated assaults decreased 70%, shots fired decreased 45%. (Her Decl. ¶ 33.) Much of this success is based on the community trust SPPD has persistently built. Defendants' agents practice of concealing their identity, failing to identify themselves, masking, and wearing inconsistent uniforms with inconsistent identification creates confusion for Saint Paul residents. Residents have had trouble distinguishing Defendants' agents from SPPD officers. (Her Decl. ¶ 37-38.) This confusion leads to decreased community trust in SPPD. (*Id.*) When trust decreases, residents are less likely to call SPPD to report crimes or cooperate in

investigations. This harms SPPD's ability to effectively protect public safety in Saint Paul. (Her Decl. ¶ 36-40.)

Defendants' conduct has also harmed Minnesota's law enforcement resources and the public trust therein. Minnesota's Department of Public Safety ("DPS") identified that the January 7 fatal shooting had created a particularly heightened risk of escalating tension and public response. Based on that heightened need, DPS deemed it necessary to direct expenditure of additional resources to run the State's Emergency Operations Center ("SEOC"). (Jacobson Decl. ¶ 5.) The SEOC serves as a unified command center to ensure that various state and local agencies can make timely and efficient responses to different types of emergencies. (Jacobson Decl. ¶ 4.) Pulling public safety personnel to the SEOC diverts them from ordinary duties. (Jacobson Decl. ¶ 7.) DPS has also found it necessary to have State Patrol resources designated to stay prepared for the possible risks associated with current DHS activities and public unrest they have the potential to cause, diverting them from ordinary duties as well. (Jacobson Decl. ¶ 7(d).)

The Minnesota Department of Transportation's ("MNDOT") ability to carry out its responsibilities has also been impacted. In recent days, MNDOT has been compelled to allocate its resources, divert personnel from ordinary duties, and otherwise adjust its duties in response to DHS's actions. (Dodds Decl. ¶¶ 12-15, 16-20, 27-28.) That means MNDOT's ability to perform regular duties impacting public safety, such as patching potholes, repairing guardrails, and necessary repair or replacement of traffic signal cabinets, have been impacted. (Dodds Decl. ¶¶ 6, 21, 26.) This means hazardous conditions on Minnesota roadways have been left unattended for longer than they otherwise would

have been, increasing the risks of accidents. (Dodds Decl. ¶ 26.) In addition to general operational impacts involving MNDOT's resources, MNDOT has had unique impacts at its Fort Snelling facility, which is adjacent to DHS's regional headquarters known as the Whipple Building, including interruption of important work that is only performed at that facility. (Dodds Decl. ¶ 21-26.)

Applicable to Plaintiffs' role in ensuring public safety: Defendants' unlawful tactics also undermine public trust in state and local law enforcement. Defendants' agents are engaging in unnecessarily provocative and at times unlawful behavior while clothed in garb and using resources that make them look like local law enforcement. For example, DHS agents have used tactics to resemble local police, like using vests that say "POLICE," vehicles with police lights, and yellow police tape.[43] The agents cover their faces, which increases the distrust and fear provoked by Defendants' actions and is a crime.

Because Defendants' agents are not clearly identifying themselves as federal agents, community members frequently cannot distinguish between immigration enforcement activities, possible criminal activities, and local law enforcement activities. Local law enforcement has been working for years to improve police-community relations, and the, presumably intentional, lack of agency identification by DHS agents sets back that progress and confuses the public.[44] This is particularly problematic as Minnesota recovers from

---

[43]     https://www.startribune.com/ice-mpd-law-enforcement-minnesota/601560440

[44]     *See id.; see also* Her Decl., ¶ 37.

recent political assassinations perpetrated by a man who posed as a police officer to induce his victims to open their doors.

Decreased trust in law enforcement also erodes public safety because the community is less likely to report criminal activity, and less likely to cooperate as witnesses.[45]

Furthermore, Defendant DHS has repeatedly and unlawfully commandeered Saint Paul City property for use in the staging and execution of DHS operations throughout Saint Paul. (Her Decl. ¶¶ 10-18.) Despite explicit communications from Saint Paul to cease and desist its unlawful use of City property, DHS has continued to commandeer parking lots owned by the City of Saint Paul and operated by the Department of Parks and Recreation for parks and recreation purposes. (*Id.* ¶¶ 10, 14-18; *id.*, Ex. 5.) Under Saint Paul Legislative Code and the Saint Paul City Charter, Parks and Recreation's parkland and parking lots are expressly reserved for parks and recreation purposes. (*Id.* ¶ 9; *id.*, Ex. 2.) The presence of DHS agents at and near City Parks and Recreation facilities has caused fear among employees and residents to come to work or to attend programs hosted at City Parks and Recreation owned facilities. (*Id.* ¶¶ 20-21.) The unauthorized use of City property by DHS agents also raises significant concerns that City residents may become confused as to the City's level of involvement and responsibility for the DHS operations being unlawfully staged from City property. (*Id.* ¶ 22.) Indeed, following several of DHS's

<hr>

[45]    *See* https://www.npr.org/2025/03/30/nx-s1-5304236/police-say-ice-tactics-are-eroding-public-trust-in-local-law-enforcement; *see also* (Lathrop Decl., Ex. 15.)

unauthorized uses of City property, Saint Paul received numerous communications from its residents questioning the City's involvement in the identified operations. (*Id.*)

## VI. PLAINTIFFS SUFFER ECONOMIC HARM.

Defendants' conduct has carried costs not only to State sovereignty and human life and dignity, but to Plaintiffs' economic interests, as well. When people are too afraid to go about their daily lives, they decrease their participation in the economy and resulting revenue generation. And, when Plaintiffs' sovereign role in ensuring public safety is strained by Defendants' actions, operational costs are increased.

### A. Increased Cost and Strain on Public Services.

State and local agencies have already noted operational impacts and measurable costs attributable to Operation Metro Surge and, in particular, the heightened risk of unrest their actions present.

On January 7, 2026, MPD began separately tracking overtime for public safety responses related to Defendants' immigration enforcement activities. To be clear: these hours do not reflect time spent assisting Defendants in immigration enforcement, but rather, represent hours spent ensuring general public safety in the face of Defendants' "surge" and reckless and aggressive immigration enforcement tactics and public reactions to the same. Preliminary accounting shows that from January 7 to January 9, 2026, MPD officers had already worked more than 3,000 hours of overtime related to Defendants' activities. The overtime is paid at 1.5 times the rate of each officer's regular wage. As of January 9, the estimated overtime cost for MPD officers for between January 8 and January 11, 2026, was more than $2 million. (Frey Decl. ¶ 10.)

Due to the need to be available to respond to deescalate tensions around Defendants' immigration enforcement activities, MPD informed all sworn staff on January 7, 2026, that any scheduled days off would be cancelled through at least January 11, 2026. MPD canceled approximately 983 scheduled days off. For the same reasons, officers are working longer shifts, extending past their 8- or 10-hour shifts. These changes have impacted officers' personal lives and leave them exhausted. (Frey Decl. ¶ 9.)

In addition, Minneapolis SWAT personnel and Strike Team personnel have been on paid on-call status since December 19, 2025, prepared to respond to public safety needs due to Defendants' immigration enforcement activities. MPD also placed its Unmanned Aerial Vehicle Team on paid on-call status on January 7, 2026. (*Id.* ¶ 12.)

Executive agencies of the State of Minnesota have also had to incur economic harms. On January 8, 2026, also due to the very real public safety concerns created by Defendants' intentional attempt to sow unrest, Governor Walz issued an executive order activating the Minnesota State National Guard so that it would be ready to help law enforcement maintain peace.[46] The Executive Order states that the extent of costs associated with that activation will be paid from the State's general fund, pursuant to Minn. Stat. Section 192.52 (2025).

Furthermore, activating and staffing the Emergency Operations Center means personnel from multiple state agencies are either required to put in additional hours they would not have otherwise worked, or divert their hours away from other work that may in

---

[46]    https://mn.gov/governor/newsroom/press-releases/?id=1055-719092

turn call upon the need for other personnel. The Minnesota Department of Transportation has also identified its own economic impacts including overtime and extended-hour staffing by MNDOT personnel for emergency preparedness regarding the potential need to close or block highways in the face of unrest. Any time a roadway may need to be blocked to protect anticipated protestors from injury or otherwise manage public safety, MNDOT personnel are required to be available to move MNDOT vehicles into place and stage them closer to where they may be needed, perform maintenance on the vehicles to make them safe to use as road closure barriers (namely, remove snow plow attachments and install energy-absorbing crash cushions) and respond to dispatch as the situation is monitored. Although the full extent of staffing costs is not yet known, since January 8, 2026, MNDOT crews have, in some instances, been held for hours past the expected ends of their shifts, both during day shifts and night shifts.

### B. Decreased Revenue Streams.

Plaintiffs' operating budgets depend heavily on revenue collected through state and local taxes, including income tax, property tax, and sales tax. (*See, e.g.,* Her Decl. ¶ 24.) In Minnesota, a wide range of sales and services are taxable.[47] The Twin Cities Metro area accounts for over half of Minnesota's total population,[48] and over half of the overall jobs

---

[47]    https://www.revenue.state.mn.us/guide/taxable-sales

[48]    Recent Population Growth in the Metro Area, https://mn.gov/deed/data/locallook/metro/metro-blog.jsp?id=1045-680261

in Minnesota.[49] That population and employment density corresponds with a higher density of businesses that bring in tax revenue to the Plaintiffs,[50] and the Twin Cities Metro has historically been the State's biggest driver of tax revenue.[51] Retail and service industries are particularly important to the Twin Cities Metro revenue stream: retail trade is the third highest employment sector in the region, and the service industry is the fifth highest.[52] Together, retail sectors and service sectors alone account for nearly 300,000 jobs in the region.[53]

Significant public reporting reflects that Operation Metro Surge has reduced customer traffic and has, particularly in recent days, caused some local businesses to close their doors altogether based on the perceived risk of violence by Defendants' agents and concerns for employee and customer safety.[54] Small business owners in Minneapolis

---

[49]     https://mn.gov/deed/newscenter/publications/trends/june-2025/metro.jsp

[50]     *See, e.g.,* https://mn.gov/deed/newscenter/publications/trends/june-2025/metro.jsp; *https://mn.gov/deed/newscenter/publications/review/august-2019/locations-restaurants.jsp*

[51]     https://minnesotareformer.com/2023/12/04/twin-cities-metro-sends-money-to-rural-counties/

[52]     https://mn.gov/deed/newscenter/publications/trends/june-2025/metro.jsp

[53]     *Id.*

[54]     *See, e.g., How ICE raids are threatening Twin Cities small businesses*, WCCO-CBS,         December         16,         2025         (available         at https://www.youtube.com/watch?v=DjOZsPaHKIU); *https://bringmethenews.com/minnesota-lifestyle/list-of-twin-cities-events-canceled-and-businesses-closed-in-response-to-ongoing-ice-presence);* https://www.startribune.com/garbage-somali-protest-spend-st-joan-of-arc-trinity-church-

(particularly along targeted areas of East Lake Street and Cedar Riverside) and in Saint Paul are reporting decreases in customer traffic and the need to reduce business hours and stock. (Her Decl. ¶ 25-30.) Customer-facing businesses in Minneapolis are reporting decreases in revenues of 50-80% because their customer base is not comfortable patronizing the businesses due to the increased immigration enforcement. (Thiel Decl. ¶ 4.) Immigrant-owned businesses in Saint Paul have identified similar negative impacts resulting from DHS activity, reporting lost revenues of approximately 25-30%. (Her Decl. ¶ 30.) Employees of small businesses in the region are also requesting reduced hours or do not feel comfortable coming to work altogether at the risk of being stopped by DHS. (Thiel Decl. ¶ 5.) This impacts the business' ability to operate and is an income loss for the employees. (*Id.*) Some Twin Cities businesses have already said that they risk permanent closure if Defendants' activities do not end. Because customer and employee fear impacts business operations and ultimately sales, property, and income taxes, Plaintiffs' operating budgets will suffer. (*See* Thiel Decl. ¶¶ 9-10; Discenza Decl. ¶ 6.)

More drastic than reduced hours or foot traffic, a number of retail stores, daycares, and restaurants have announced closures, some of which indicate they will remain closed "until further notice."[55] Venues have cancelled scheduled events, including three shows by

---

raids-ice-minneapolis-st/601546734; *https://bringmethenews.com/minnesota-lifestyle/list-of-twin-cities-events-canceled-and-businesses-closed-in-response-to-ongoing-ice-presence)*

[55] https://bringmethenews.com/minnesota-lifestyle/list-of-twin-cities-events-canceled-and-businesses-closed-in-response-to-ongoing-ice-presence

a nationally-recognized comedian at a venue in Minneapolis with an approximately 8,400 person capacity.[56] Immigrant-owned or immigrant-serving businesses that have remained open have experienced an uptick in harassment and threats.[57] (Thiel Decl. ¶ 7.) These impacts are not limited to the Twin Cities; businesses in other regions of Minnesota have reported negative business impacts associated with DHS activities.[58]

To be clear: the impacts Plaintiffs describe herein are not limited to immigrants without legal status staying home due to fears, or noncitizens being removed and therefore unable to patronize or work at businesses. Certainly, immigrants without legal status comprise a small, but important, part of Minnesota's economic landscape. Data suggests that noncitizen immigrants without legal status comprise just over 1.5% of Minnesota's total population (less than half the national average of 3.3%) and account for 2.2% of Minnesota's total labor force.[59]

But Defendants have created such a scope of fear, including for native-born citizens, naturalized citizens, and legally present immigrants, that those groups also report staying home, fearing that even carrying their passports and other forms of identification will be

---

[56]    https://bringmethenews.com/minnesota-lifestyle/john-mulaney-cancels-three-night-stand-in-minneapolis;

[57]    https://www.startribune.com/harassment-toward-somali-businesses-surges-after-viral-video/601555420

[58]    https://www.youtube.com/watch?v=_oB2Xp_uqig

[59]    https://mn.gov/deed/newscenter/publications/trends/mar-2025/immigrants.jsp; *State Immigration Data Profiles,* Migration Policy Institute, https://www.migrationpolicy.org/programs/data-hub/state-immigration-data-profiles

insufficient to protect them from the risk of illegal detainer, arrest, deportation, or other abusive deprivation of rights without due process.

These fears have been created, bolstered and exacerbated by Defendants. Widely circulated videos, both within Minnesota and beyond, show individuals pleading with DHS, explaining that they are United States citizens or legally present during chaotic, violent arrests, to no apparent impact. These fears are also borne out in Defendants' own demonstrated policy to initiate contact with random people within their line of sight based on race and national origin. Moreover, the Trump Administration has also publicly announced a desire to "de-naturalize" or deport American citizens and end birthright citizenship. They meet peaceful protestors with retaliation and force, further contributing to the strongly held impression that interactions with Defendants are inherently risky, even for law-abiding people. If Defendants' expressed intention was to target "the worst of the worst" with violent criminal backgrounds, their rhetoric tactics, and actions have long since expanded well beyond that scope.

Other jurisdictions that have recently faced surges of militarized forces (either by DHS or by federalized National Guard troops) confirm economic harms are a natural consequence of such a federal presence. For example, in November 2025, Chicago business owners reported "pandemic-era" drops in sales amidst DHS's "Operation Midway Blitz."[60] In Washington, D.C., when the Trump Administration federalized National Guard troops

---

[60]     https://news.wttw.com/2025/11/06/chicago-some-businesses-report-pandemic-era-drop-sales-amid-immigration-raids);     https://greatcities.uic.edu/2025/10/16/its-killing-business-trumps-mass-deportation-push-is-crushing-local-economies/

with the supposed purpose of cutting down on violent crime rates, data revealed that out-of-town visitor spending was not negatively impacted, but resident spending fell dramatically: those who lived there and were invested in their community were "turned off" from spending in the region.[61]

## LEGAL STANDARD

In deciding whether to issue a temporary restraining order, the Court must consider four factors: "'(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other party; (3) the probability that movant will succeed on the merits; and (4) the public interest.'" *Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889, 893 (8th Cir. 2024) (quoting *Dataphase Sys., Inc. v. C.L. Sys, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)).[62]

While no factor is determinative, the probability of success is the most significant. *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citation modified). Generally, a movant must show it has a "fair chance of prevailing" on the merits of a claim. *Planned Parenthood Minn. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). A movant "need not show that it has a greater than fifty per cent likelihood of success." *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1017 (8th Cir. 2022) (citation modified).

---

[61]     https://www.brookings.edu/articles/consumer-spending-and-visitor-demand-in-the-washington-dc-region-are-dropping/)

[62]     The factors for a temporary restraining order are the same as a preliminary injunction.

**ARGUMENT**

**I.    PLAINTIFFS HAVE MORE THAN A FAIR CHANCE OF PREVAILING ON THEIR CLAIMS.**

**A.    Plaintiffs Have Standing.**

For standing to exist, a plaintiff must allege (1) an injury in fact, (2) causation, and (3) redressability. *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 602 (8th Cir. 2022). States and cities have standing to sue in their sovereign capacity for injuries to their own interests. *See,* e.g., *Biden v. Nebraska,* 600 U.S. 477 (2023); s*ee als*o *Massachusetts v. EPA,* 549 U.S. 497, 516-20 (2007); *Wyoming v. Oklahoma*, 502 U.S. 437, 440, 451 (1992).

States and cities can suffer a wide range of threatened injuries sufficient to confer standing. The three principal categories are injuries to (1) non-sovereign interests, (2) sovereign interests, and (3) quasi-sovereign interests. *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, *ex rel. Barenz*, 458 U.S. 592, 601-02 (1982). Non-sovereign interests include harm to state entities and the state's pocketbook. *See id.* Sovereign interests include the state's power to create and enforce its own legal code. *Id.* at 601. Quasi-sovereign interests include the health and well-being of the state's residents, plus "not being discriminatorily denied [the state's] rightful status within the federal system." *Id.* at 607.  Here, Plaintiffs assert and satisfy all three forms of standing. *See also City of Kennett, Missouri v. Env't Prot. Agency*, 887 F.3d 424, 431 (8th Cir. 2018).

**B.    Plaintiffs have more than a Fair Chance of Succeeding on Their Tenth Amendment Claims.**

The Tenth Amendment to the United States Constitution guarantees that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by the States,

are reserved to the States respectively, or to the people." U.S. Const. amend. X. "The amendment states but a truism that all is retained which has not been surrendered." *United States v. Darby*, 312 U.S. 100, 123-24 (1941); *see also United States v. Comstock*, 560 U.S. 126, 152 (2010) (Kennedy, J., concurring) ("[T]he powers reserved to the States are so broad that they remain undefined. Residual power, sometimes referred to (perhaps imperfectly) as the police power, belongs to the States and the States alone."). It likewise imposes a structural check—rooted in federalism—on the federal government's power to coerce the States, political subdivisions, and their officials to administer or enforce federal initiatives. *See Printz v. United States*, 521 U.S. 898, 935 (1997); *New York v. United States*, 505 U.S. 144, 161 (1992); *see also Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018) (observing that the anticommandeering doctrine "is simply the expression of a fundamental structural decision incorporated into the Constitution").

Plaintiffs will more likely than not prevail under both Tenth Amendment doctrines. Defendants have commandeered local law enforcement resources and flagrantly expropriated Plaintiffs' police powers.

> 1. **Defendants violated the anticommandeering doctrine by coercing Plaintiffs in their allocation of scarce government resources and creating a public safety crisis to which Plaintiffs must respond.**

Defendants' conduct and any federal law that Defendants might cite as a basis for their conduct is being used or relied on in a manner that violates the anticommandeering doctrine.

Under the anticommandeering doctrine, the federal government cannot conscript, impress, or otherwise commandeer a State like Minnesota or its instrumentalities. *See New*

*York*, 505 U.S. at 145; *Printz*, 521 U.S. at 935, 931, n.15. In practice, this doctrine prevents the federal government from forcing states and cities into disfavored courses of conduct. *See New York*, 505 U.S. at 175 (explaining that in addition to outright directives, anticommandeering doctrine also prohibits federal government from compelling states to choose between "two unconstitutionally coercive" options). It "reflects a legitimate concern about federal government interference with state government functions." *Oklahoma ex rel. Okla. Dep't of Pub. Safety v. United States*, 161 F.3d 1266, 1271 (10th Cir. 1998); *see also City & Cnty. of San Francisco v. Trump,* 783 F. Supp. 3d 1148, 1184 (N.D. Cal. 2025) (discussing local governments' Tenth Amendment claims).

This structural doctrine is one of the Constitution's foundational bulwarks of liberty. *See Printz*, 521 U.S. at 921-22. It springs from the Tenth Amendment[63] and the heart of our constitutional compact. *See id.* at 935 (quoting The Federalist No. 52, at 323 (J. Madison)) ("In the compound republic of America, the power surrendered by the people is first divided between two distinct governments . . . ."); *New York*, 504 U.S. at 155-57. Like other structural features of the Constitution, this doctrine protects individual liberty and prevents tyranny. *See Murphy*, 584 U.S. at 473; *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) (noting that federalist system is structured to check "abuses of government power").

Defendants' conduct is unlawful for many reasons. As it relates to the anticommandeering doctrine, their conduct flagrantly violates Minnesota's sovereignty

---

[63]    The Tenth Amendment does not stop at Congress; its text proceeds in terms of "powers [] delegated to the United States by the Constitution," thereby limiting executive power as well. U.S. Const. amend. X. *See, e.g.*, *New York*, 505 U.S. at 160-61.

This is because Defendants' conduct has and will continue to require Minnesota and its political subdivisions to take actions they would not take but for Defendants' conduct. Defendants' conduct includes, but is not limited to, a disproportionate and overwhelming surge of forces into Plaintiffs' jurisdictions, excessive force, retaliation, racial profiling, enforcement actions at sensitive locations, openly violating state and local law, openly violating DHS policies, and a pattern of inflaming and escalating tensions to provoke unrest. Compl. ¶¶ 35-243.

Defendants' conduct forces Minnesota and its political subdivisions to respond in predictable ways. Compl. ¶¶ 107-163. For example, Minneapolis Police Officers have been forced to work more than 3,000 hours of overtime since January 7, 2026, due to the need to be available to respond to deescalate tensions around Defendants' immigration enforcement activities. (Frey Decl. ¶ 10.) State agencies similarly divert personnel and resources towards emergency preparedness, and away from their ordinary but critical duties. (Jacobsen Decl. ¶ 7; Dodds Decl. ¶¶ 16-21.) Local law enforcement responded to 911 calls from concerned citizens about the actions of masked and unidentifiable federal agents, intervened after federal agents abandoned vehicles (and dogs in vehicles) in public rights of way, and maintained order in the face of civil unrest. (Her Decl. ¶¶ 39-40; Robertson Decl. ¶¶ 7, 10-12.) In these and all the other instances in which state and local officials have had to respond to DHS and the violent messes its agents are creating, Plaintiffs' sovereignty has been violated. In terms of its effects on Plaintiffs, Defendants' conduct amounts to "outright coercion." *New York*, 505 U.S. at 166; *see also id.* at 175 (describing spectrum of federal power from "encouragement to coercion").

The obligations that Defendants have foisted on Plaintiffs are precisely the type of coercion that the anticommandeering doctrine prohibits. Defendants' conduct leaves Plaintiffs no choice about how to spend their time and resources or go about the normal business of running a state or city. Because of the need to divert resources to clean up Defendants' messes, local law enforcement officials have been prevented from responding to other 911 calls and taking other actions to protect and care for the communities and roadways they serve. (Her Decl. ¶¶ 39-40; Frey Decl. ¶ 15.) Instead, Plaintiffs are faced with two "unconstitutionally coercive choices." *New York*, 505 U.S. at 176. Either Plaintiffs and their elected officials can attend to the myriad pressing matters of state government already on their plates, many of which pertain to urgent issues of health, safety, and welfare; or they can respond to the federal government's illegal incursion and campaign against public safety in Twin Cities. A choice of this nature is "no choice at all." *Id.*; *cf. South Dakota v. Dole*, 483 U.S. 203, 211 (1987) (discussing point at which "pressure turns into compulsion" (citation omitted)).

To say that Plaintiffs are "free, as a matter of law," to decline to respond to Defendants' conduct "pays lipservice to the anticoercion principle" and "ignores reality." *NFIB v. Sebelius*, 567 U.S. 519, 679-80 (2012) (Scalia, J., dissenting). Plaintiffs have the authority to respond and are also proud that they have responded in service of safety and community, in contrast to the fear and violence that Defendants have sown. But the price of this choice—the day-to-day work and service that Plaintiffs must sacrifice to address Defendants' conduct—is intolerably high. *See Sebelius*, 567 U.S. at 679-80; *see also New York*, 505 U.S. at 182 (stating that federal government's "departure from the constitutional

plan cannot be ratified by the 'consent' of state officials"). Neither this choice nor its price is what the Constitution contemplates. The anticommandeering doctrine exists to protect states and cities from precisely this sort of situation.

In addition to this false choice presented by Defendants' misconduct, DHS has repeatedly commandeered numerous parking lots owned by Saint Paul for use in staging DHS operations. *Supra* 24. This unlawful use of Saint Paul resources is in direct violation of Plaintiff Saint Paul's legislative code, city charter, and explicit communications to DHS demanding they cease and desist any such use of City property. By actively commandeering City resources to their own ends, DHS deprives Saint Paul of use of the commandeered parking lots for their intended purpose in facilitating parks and recreation activities, generate fear and distrust within parks and recreation facilities due to DHS's unlawful presence, and raise significant concerns about conflating DHS's operations with implied cooperation from Saint Paul.

Defendants' conduct has been, is, and will continue to be illegal. It is "fundamentally incompatible with our constitutional system of dual sovereignty." *Printz*, 521 U.S. at 935. As such, Plaintiffs are more likely than not to prevail on their Tenth Amendment claims by virtue of the anticommandeering doctrine.

> **2. Defendants also violated the Tenth Amendment by infringing on Plaintiffs' police powers.**

In addition to violating the anticommandeering doctrine, Defendants have also violated the Tenth Amendment by infringing on Plaintiffs' police powers. The coercive diversion of Plaintiffs' time and resources has injured Plaintiffs and continues to do so by

disrupting their sovereignty. While related to the anticommandeering issue, this aspect of Defendants' conduct gives rise to a separate and additional Tenth Amendment violation.

The police powers reserved to Plaintiffs under the Tenth Amendment are vast and include, without limitation, such critical functions as public health and safety, *R.J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170, 1176 (8th Cir. 2023); law enforcement, *United States v. Morrison*, 529 U.S. 598, 618 (2000); education, *United States v. Lopez*, 514 U.S. 549, 580 (1995) (Kennedy, J., concurring); and the general power of governing. *NFIB*, 567 U.S. at 535-36 ("[T]he facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed.").

Defendants have infringed on each of these core police powers, and their infringement will continue unabated unless enjoined. For starters, Defendants are interfering with Plaintiffs' public safety powers by diverting state and local law enforcement personnel from fighting crime and protecting residents while also alienating immigrant communities. *See Oregon v. Trump*, ___ F. Supp. 3d ___, 2025 WL 2817646, at *14 (D. Or. Oct. 4, 2025) (concluding that federalizing national guard members "diverts them from their state responsibilities, which impairs the State's ability . . . to respond to emergencies"); *see also City of Alburquerque v. Barr*, 515 F. Supp. 3d 1163, 1775 (D. N.M. 2021) (collecting cases concluding that harm caused by the collapse of trust between local law enforcement and immigrant communities is irreparable). In Minneapolis alone, the City must pay millions of dollars in overtime just to keep the peace in Defendants' wake, to a police force which—because of Defendants' activities—is suffering psychological trauma and were delayed in keeping up with their core duties. (Frey Decl. ¶¶ 10, 13.). The

Saint Paul Police Department has had to devote time and resources to developing guidance and communicating with residents regarding the differences between DHS agents and SPPD officers. (Her Decl. ¶ 37.) DPS has been compelled to stand up and staff the State Emergency Operations Center for a prolonged duration and bring in additional resources to ameliorate risk and calm the public. (Jacobsen Decl. ¶¶ 6-7.) And Governor Walz mobilized Minnesota National Guard members to protect Minnesotans' right to peaceful assembly, which mobilization will be paid from the State's general fund.[64] Most significantly, Defendants' overwhelming, militarized "warrior" approach to immigration enforcement unnecessarily puts Minnesota law enforcement officers in harm's way. (Frey Decl. ¶ 14.)

Then there is the educational impact of Defendants' militarization of immigration enforcement. Public schools were forced to cancel school over multiple days for thousands of students due to safety concerns because of Defendants' "surge" and tactics. Compl. ¶ 104. And school leaders say that absenteeism is climbing because families and students are too scared to come to school.[65] These concerns are the predictable result of Defendants' conduct. At Minneapolis Roosevelt High School, armed agents tackled people, handcuffed two staff members, and released chemical weapons on bystanders on school property during dismissal.[66] Children from immigrant communities are afraid to attend school

---

[64]https://content.govdelivery.com/attachments/MNGOV/2026/01/08/file_attachments/3515363/Executive%20Order%202026-01.pdf

[65]  https://www.mprnews.org/story/2026/01/09/ice-presence-sparks-fear-for-minnesota-familes-students-schools

because federal agents could pluck them from class irrespective of their legal status.[67] The State's sovereign interest in educating Minnesota youth stands to be irreparably harmed as a result. *E.g.*, *Phila. Yearly Meeting of Religious Soc. of Friends v. U.S. Dep't of Homeland Sec.*, 767 F. Supp. 3d 293, 322-26 (D. Md. 2025) (concluding that faith communities were likely to succeed on merits of claim that permitting immigration enforcement actions in a designated "sensitive location" violated right to free association).[68]

Finally, Defendants' actions encroach on the Attorney General's authority as "chief law officer of the state." *State v. Robinson*, 112 N.W. 269, 272 (1907). Defendants have usurped this authority by forcing a de facto partnership: Defendants wreak havoc and incite panic; state and local law enforcement officers are left to clean up Defendants' mess. *See City of Los Angeles v. Sessions*, No. CV 18-7347-R, 2019 WL 1957966, at *4 (C.D. Cal. Feb. 15, 2019) (forcing state and local law enforcement to partner with federal immigration authorities "infringes[s] upon the state police power" and "upset[s] the constitutional balance"); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 873 (N.D. Ill. 2018) (requiring local authorities "to stand aside and allow the federal government to conscript the time and cooperation of local employees . . . robs the local executive of its autonomy"); *see also*

---

[67] *See also* Thomas S. Dee, *Recent Immigration Raids Increased Student Absences*, Proceedings of the Nat'l Academy of Sciences of the United States of Am., Vol. 122, No. 45 (Oct. 4, 2025) (finding that ICE raids coincided with a 22 percent increase in daily student absences with particularly large increases among the youngest students).

[68] For over thirty years, the federal government maintained a consistent immigration nonenforcement policy at or near sensitive locations like schools and churches. Compl. ¶¶ 182-85. The federal government reversed course abruptly, without prior notice, in January 2025. *See* Memorandum from Benjamin C. Huffman, Acting Sec'y, Dep't of Homeland Sec., "Enforcement Actions in or Near Protected Areas" (Jan. 20, 2025).

*NFIB*, 567 U.S. at 579 (recognizing states' prerogative to "not yield[ ] to federal blandishments when they do not want to embrace the federal policies as their own") (internal quotation marks and citation omitted).

Whether viewed under the anticommandeering doctrine or as an assault on Plaintiffs' police powers, the result is the same: Defendants are brazenly violating Plaintiffs' sovereignty. Plaintiffs' Tenth Amendment claim will likely prevail.

**C.      Minnesota Has More than a Fair Chance of Prevailing on Their Equal Sovereignty Claim.**

Defendants first sent military troops under federal control to other politically disfavored jurisdictions, and the Supreme Court blocked the deployment of the National Guard in Illinois. *Trump v. Illinois*, No. 25A443, 2024 WL 3715211 (2025) (mem.). Now, Defendants single out Minnesota (another politically disfavored jurisdiction) for their purported immigration enforcement operation, "Operation Metro Surge." Defendants cannot provide a sufficient or even a reasonable explanation for this differential treatment of a State. These actions eviscerate the constitutional principle of equal sovereignty.

***The Fundamental Principle of Equal Sovereignty.*** In addition to a State's sovereignty under the Constitution, "there is also a 'fundamental principle of *equal* sovereignty' among the States." *Shelby Cnty. v. Holder*, 570 U.S. 529, 544 (2013) (citation omitted). These facts and circumstances illustrate that the principle of equal sovereignty must apply here to protect the "power, dignity, and authority" of state sovereignty. *Id.*

The Supreme Court has long recognized "that our Nation 'was and is a union of States, ***equal*** in power, dignity and authority.'" *Id.* (quoting *Coyle v. Smith*, 221 U.S. 559,

567 (1911)) (emphasis added). The "constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized." *Coyle*, 221 U.S. at 580. "The fundamental principle of equal sovereignty remains highly pertinent in assessing subsequent disparate treatment of States" by the Federal Government. *Shelby Cnty.*, 570 U.S. at 544.

Any intrusion by the Federal Government that infringes on the principle of equal sovereignty is an "extraordinary departure from the traditional course of relations between the States and the Federal Government." *Id.* at 545 (quoting *Presley v. Etowah County Comm'n*, 502 U.S. 491, 500-01 (1992)). Such a significant act is justified only "under the compulsion" of especially "unique circumstances" where "immediate action" is necessary. *Id.*at 546 (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 309 (1966)). Even then, the unequal infringement upon a state's sovereignty must be "sufficiently related to the problem that it targets." *Id.* at 550-51 (quoting *Northwest Austin Mun. Utility Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009)).

***Defendants' Selective Treatment of Minnesota Is Unrelated to the Alleged Problem Purportedly Targeted.*** Defendants' differential infringement on Minnesota's sovereignty, including its State and local police powers, is not at all related to the problem purportedly targeted and thus does not withstand scrutiny pursuant to *Shelby Cnty, Ala.*. On its face, the surge of immigration enforcement agents suggests that Defendants' purpose is to detain and deport immigrants with no legal right to remain in the country. However, if the Defendants' actions were truly for this purpose, it would not be focused on Minnesota. *See* Compl. ¶ 50.

***Defendants Have Telegraphed Their True Intent as Politically Motivated.***

Defendants' decision to target the Twin Cities has been motivated by a desire to retaliate against perceived political enemies and disfavored policies rather than good faith immigration enforcement or public safety concerns. Compl. ¶¶ 28-48. The Trump Administration found an opportunity to retaliate by exploiting the "Feeding Our Future" fraud scheme that Minnesota authorities had previously investigated and prosecuted. Jumping on this perceived opportunity, President Trump falsely stated through social media posts that Minnesota "is a hub of fraudulent money laundering activity."[69] Homeland Security Advisor Stephen Miller later confirmed that the previously investigated and prosecuted fraud scheme would "be the case in point for the argument that President Trump has made about why we must stop mass third world migration into this country." Compl. ¶ 57.

But Operation Metro Surge is a flood of armed DHS agents rounding up suspected immigrants (citizens and noncitizens alike). It is decidedly ***not*** a surge of experienced fraud investigators, as would be expected if Defendants' true aim was to investigate fraud. Not only is the previously prosecuted fraud scheme, discovered almost five years ago, not evidence of a "unique circumstance" requiring "immediate action," Compl. ¶ 53, but also the operation is simply not targeted to root out fraud.

Defendants' further public statements reveal the true intent of the surge into Minnesota, and these statements have repeatedly shown Defendants' political motivations.

---

[69]    https://thehill.com/homenews/administration/5618582-donald-trump-legal-protections-somalia-minnesota/

Compl. ¶¶ 28-59. For example, President Trump's social media posts also included the false allegation that "Somalian gangs are roving the streets looking for 'prey' as our wonderful people stay locked in their apartments and houses hoping against hope that they will be left alone." *Id.* ¶ 55. In the same post, the President personally disparaged Governor Walz and Representative Ilhan Omar. *Id.* In another post, President Trump called Somali Americans "garbage" and ranted, "I don't want them in our country, to be honest." *Id.* ¶ 65. Deputy Director of ICE Madison Sheehan described "Operation Metro Surge" as "cleaning up Governor Walz' mess," barely attempting to hide that the operation is politically motivated. *Id.*

*"Operation Metro Surge" Has Drained State and Local Police Resources and Made Minnesota Less Safe.* The flood of armed DHS agents into Minnesota has caused chaos for state and local police. This has had a negative impact on the ability of local law enforcement to maintain the peace and reduce crime, which are core state and local police functions. *See Morrison*, 529 U.S. at 618.

Officers who would otherwise be deployed for crime prevention and investigation are instead being called upon to respond to abandoned vehicles left behind after DHS apprehensions; reports of kidnapping resulting from masked men taking people off the street and into unmarked vehicles at gunpoint; and crowd control related to DHS activities. *Supra* 18-24. As officers are forced to respond to DHS-related activities, they are prevented from responding to other emergency calls. This was illustrated on January 7, when in Minneapolis, all priority-2 and -3 911 calls had to be placed in "pending" status because MPD officers and resources were responding to activities following the fatal shooting of a

Minneapolis resident by an ICE agent. Frey Decl. ¶ 15. This incident occurred only a few blocks from Green Central Elementary School, which went into lockdown.[70] This drain on police resources undoubtedly makes Minneapolis less safe.

The principle of equal sovereignty prohibits Defendants' unjustifiable acts. Our Constitution does not allow the Federal Government to single out a politically disfavored state–especially not in such a belligerent manner as here.

## II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT EMERGENCY RELIEF.

Plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). As discussed above, Plaintiffs are suffering multiple, ongoing, and imminent injuries. These injuries are irreparable.

First, Plaintiffs face irreparable harm to their sovereign interests. Defendants' activities interfere with the ability of state and local law enforcement to address crime and protect their residents' health, welfare, and safety. (Her Decl. ¶¶ 32-40; Frey Decl. ¶¶ 8-16.) Defendants' activities have also forced Plaintiffs to divert resources away from their day-to-day public safety and other governmental responsibilities, and Defendants' activities have led to widespread school closures due to public safety concerns *about Defendants' agents*. *Supra* 16-27. Additionally, Defendants have openly flouted a state law

---

[70] https://kstp.com/kstp-news/top-news/apparent-ice-presence-at-roosevelt-high-school-causes-chaotic-scene/

that prohibits people from wearing masks in public places for the purpose of concealing their identities, which undermines Plaintiffs' ability to hold Defendants' agents accountable for unlawful actions and further undermines public trust in law enforcement. Compl. ¶¶ 72, 132, 141, 218-19.

Defendants' encroachment on Plaintiffs' police power is an intangible harm that cannot be remedied by damages. *Oregon*, 2025 WL 2817646, at *14; *see also Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) ("'[I]nvasions of state sovereignty . . . likely cannot be economically quantified, and thus cannot be monetarily redressed,' and as such constitute irreparable harm." (quoting *Kentucky v. Biden*, 23 F.4th 585, 611 n.19 (6th Cir. 2022)); *cf. Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020) (finding irreparable harm to state if "precluded from applying its duly enacted legislation"). Because Plaintiffs are likely to succeed on their Tenth Amendment claim, they will also likely suffer irreparable harm absent a temporary restraining order. *Illinois v. Trump*, 155 F.4th 929, 940 (7th Cir. 2025) ("[T]he administration's likely violation of Illinois's Tenth Amendment rights by deploying Guard troops in the state over the state's objection 'constitutes proof of an irreparable harm'" (quoting *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978)).

Second, the "ongoing and concrete harm[s]" to Plaintiffs' "law enforcement and public safety interests" are irreparable. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012). These harms include the fact that state and local law enforcement agencies have been forced to divert resources and expend additional resources to deescalate tensions around Defendants' immigration enforcement activities and maintain order. (Her Decl. ¶¶ 32-40;

Frey Decl. ¶¶ 10-12, 15-16.); *Illinois v. Trump*, No. 25-CV-12174, 2025 WL 2886645, at *23 (N.D. Ill. Oct. 10, 2025) ("This diversion of limited state and local resources is an irreparable harm for which Plaintiffs have no adequate remedy at law."); *cf. E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 678 (9th Cir. 2021) ("divert[ing] significant resources" constitutes irreparable injury).

Third, Defendants' activities threaten irreparable economic and financial harms to Plaintiffs. Defendants' activities have led to business closures and decreased foot traffic, which threatens to harm the economic well-being of Minnesota, Minneapolis, and Saint Paul residents and decreases State and City tax revenues. *Supra* 25-31. These financial harms are irreparable because the United States has sovereign immunity. *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (finding that non-recoverable costs traced to federal action are sufficient to show irreparable harm).

### III. THE BALANCE OF HARMS AND PUBLIC INTEREST SUPPORT EMERGENCY RELIEF.

Finally, the third and fourth factors—harm to the opposing party and the public interest—merge when the government opposes preliminary relief. *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1018 (8th Cir. 2023).

The balance of the equities tips sharply in Plaintiffs' favor. Plaintiffs seek to protect their sovereignty as well as their residents' health, welfare, and safety. Plaintiffs also seek to retain control over local law enforcement, education, and public safety. At bottom, Plaintiffs seek to protect fundamental principles of American federalism from Defendants'

unprecedented intrusion. The public is in no way benefited from such unlawful or unconstitutional activity and there is substantial public interest in "Americans trusting their own government to follow the rule of law." *Shaik v. Noem*, No. 25-cv-1584, 2025 WL 1170447, at *3 (D. Minn. Apr. 22, 2025).

On the other hand, the federal government faces no harm from an injunction. The federal government has enforced federal law in Minnesota for decades without the support of thousands of federal agents roving the streets and making illegal stops. Defendants may continue to enforce such laws even with Plaintiffs' requested injunction in place.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court grant their motion and issue a temporary restraining order against Defendants.

Dated:  January 12, 2026                   Respectfully submitted,

                                           KEITH ELLISON
                                           Attorney General
                                           State of Minnesota

                                           ***/s/ Brian S. Carter***
                                           BRIAN S. CARTER
                                           Special Counsel
                                           Atty. Reg. No. 0390613

                                           LIZ KRAMER
                                           Solicitor General
                                           Atty. Reg. No. 0325089
                                           PETER J. FARRELL
                                           Deputy Solicitor General
                                           Atty. Reg. No. 0393071
                                           KATHERINE BIES
                                           Special Counsel

Atty. Reg. No. 0401675
LINDSEY MIDDLECAMP
Special Counsel
Atty. Reg. No. 0392589
JOSEPH RICHIE
Special Counsel
Atty. Reg. No. 0400615

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 757-1424 (Voice)
(651) 297-4139 (Fax)
brian.carter@ag.state.mn.us
liz.kramer@ag.state.mn.us
peter.farrell@ag.state.mn.us
katherine.bies@ag.state.mn.us
lindsey.middlecamp@ag.state.mn.us
joseph.richie@ag.state.mn.us

*Attorneys For Plaintiff State of Minnesota*


KRISTYN ANDERSON
City Attorney

By: */s/ Kristyn Anderson*
KRISTYN ANDERSON (0267752)
HEATHER P. ROBERTSON (0390470)
Assistant City Attorney
SARA J. LATHROP (0310232)
Assistant City Attorney
KIRSTEN H. PAGEL (0399114)
Assistant City Attorney
350 South Fifth Street
Minneapolis, MN 55415
Tel: 612-673-3000
kristyn.anderson@minneapolismn.gov
sara.lathrop@minneapolismn.gov
heather.robertson@minneapolismn.gov
kirsten.pagel@minneapolismn.gov

*Attorneys for Plaintiff City of Minneapolis*

IRENE KAO
City Attorney

By: */s/Kelsey McElveen*
PORTIA HAMPTON-FLOWERS (0210869)
Deputy City Attorney
KELSEY MCELVEEN (0396744)
Assistant City Attorney
ALEXANDER HSU (0399275)
Assistant City Attorney
15 W. Kellogg Blvd., #400
Saint Paul, MN 55102
Tel: 651-266-8710
Portia.flowers@ci.stpaul.mn.us
Kelsey.mcelveen@ci.stpaul.mn.us
Alexander.hsu@ci.stpaul.mn.us

*Attorneys for Plaintiff City of Saint Paul*

|#6274457-v1