UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

STATE OF MINNESOTA, *by and
through its Attorney General Keith Ellison*,
CITY OF MINNEAPOLIS, and
CITY OF ST. PAUL

      Plaintiffs,

v.

      Case No. 0:26-cv-00190-KMM-DJF

KRISTI NOEM, *in her official capacity as
Secretary of the U.S. Department of
Homeland Security*; JOHN CONDON, *in his
official capacity as Acting Executive Associate
Director of Homeland Security Investigations*;
U.S. Department of Homeland Security;
TODD LYONS, *in his official capacity as Acting
Director of U.S. Immigration and Customs
Enforcement*; MARCOS CHARLES, *in his
official capacity as Acting Executive Associate
Director, Enforcement and Removal Operations;*
U.S. Immigration and Customs Enforcement;
RODNEY SCOTT, *in his official capacity as
Commissioner of U.S. Customs and Border
Protection;* U.S. Customs and Border Protection;
GREGORY BOVINO, *in his official capacity
as Commander of the U.S. Border Patrol*; U.S. Border
Patrol; DAVID EASTERWOOD, *in his official
capacity as Acting Director, Saint Paul Field Office,
U.S. Immigration and Customs Enforcement*,
*in their official capacities,*

      Defendants.

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER / PRELIMINARY INJUNCTION**

_____

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................ 3

    I.      Constitutional and Statutory Background ................................................. 3

    II.     Factual Background .................................................................................. 5

          A.      The President's Response to the Problems of Illegal Immigration............ 5

          B.      The Success of Operation Metro Surge ......................................... 7

          C.      Violence and Threats Against Federal Immigration Officers in the Field ................................................................................................. 8

    III.    Procedural Background.......................................................................... 10

LEGAL STANDARD.................................................................................................... 10

ARGUMENT ................................................................................................................ 11

    I.      Plaintiffs' Claims are Legally Frivolous................................................ 11

          A.      The Anticommandeering Doctrine is Inapposite ...................................... 12

          B.      Defendants Have Not Infringed on Plaintiffs' Police Powers. ................. 17

          C.      Defendants' Enforcement Actions Do Not Violate Equal Sovereignty. .................................................................................. 19

    II.     The Remaining Equitable Factors Also Disfavor Injunctive Relief. ................... 22

    III.    Plaintiffs' Proposed Order Is Overbroad and Unworkable................................ 25

    IV.    The Court Should Stay Any Injunction Pending Appeal...................................... 27

CONCLUSION.............................................................................................................. 28

## INTRODUCTION

The basic concept of our system of federalism is simple.  The federal government is entrusted with a series of enumerated powers, within which federal law reigns supreme.  All other powers are reserved to the States.  In this case, the State of Minnesota and certain of its political subdivisions seek to turn that system upside down.  They invoke principles of federalism to demand an unprecedented injunction against a federal law-enforcement operation, effectively seeking a state veto over the enforcement of *federal* law by *federal* officers.  Nothing in the Constitution remotely countenances this absurdity, which would render the supremacy of federal law an afterthought to local preferences.

Plaintiffs principally point to the Tenth Amendment to support their remarkable request to expel federal law-enforcement from their State.  But the Tenth Amendment "is a mere affirmation of what, upon any just reasoning, is a necessary rule of interpreting the constitution.  Being an instrument of limited and enumerated powers, it follows irresistibly, that what is not conferred, is withheld, and belongs to the state authorities."  *New York v. United States*, 505 U.S. 144, 156 (1992) (quoting 3 Joseph Story, Commentaries on the Constitution of the United States 752 (1833)).  In other words, with respect to the limited and enumerated powers conferred on the federal government, the Tenth Amendment offers no limitation.  Rather, for over two centuries, the Supreme Court has been clear that "the states have no power . . . to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the [federal] government."  *McCulloch v. Maryland*, 17 U.S. 316, 436 (1819).  That controlling principle exposes Plaintiffs' claims as frivolous.

1

Indeed, each of Plaintiffs' three theories collapses with the slightest scrutiny. *First*, Plaintiffs contend that Defendants violate the anticommandeering principle because Plaintiffs have chosen to respond to federal law enforcement's presence in Minnesota by expending resources. That is not commandeering; if it were, the federal government would never be able to do *anything* domestically. The anticommandeering principle merely forbids federal efforts to control state legislative processes or conscript state officials. *See Haaland v. Brackeen*, 599 U.S. 255, 283 (2023). Neither is happening here. *Second*, Plaintiffs claim an infringement on their police powers. Nonsense. Defendants are enforcing federal law—the constitutionality of which is undisputed—and federal law alone. *Third*, Plaintiffs claim a violation of "equal sovereignty." But the President holds "conclusive and preclusive" authority over enforcement of federal law. *Trump v. United States*, 603 U.S. 593, 620 (2024). The Tenth Amendment does not require the federal government to enforce federal law to the same degree in each State at any time. Plaintiffs do not, and cannot, cite a *single* authority that *remotely* supports *any* of their three theories.

The balance of harms and public interest also favors Defendants, because Plaintiffs' proposed preliminary injunction—expelling federal officers from Minnesota—would constitute an unprecedented act of judicial overreach. Plaintiffs alternatively urge the Court to micromanage federal officials as they carry out immigration enforcement, but they provide no legal argument whatsoever in support of those demands. Any such relief would exceed the Court's power under Article III, impose highly reticulated constraints found nowhere in federal law, and threaten public safety while offending the separation of powers. The Court should deny the motion for a preliminary injunction.

2

# BACKGROUND

## I.    Constitutional and Statutory Background

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012); *see also* U.S. Const. art. I, § 8, cl. 4 (granting Congress the power to "establish an uniform Rule of Naturalization"). The federal government's role is "preeminent . . . with respect to the regulation of aliens." *Toll v. Moreno*, 458 U.S. 1, 10 (1982). "Decisions about the removal of illegal aliens 'touch on foreign relations and must be made with one voice.'" *Iowa Migrant Movement for Justice v. Bird*, 157 F.4th 904, 919-20 (8th Cir. 2025) (quoting *Arizona*, 567 U.S. at 409). Through the Immigration and Nationality Act (INA) and related statutes, Congress has established an "extensive and complex" framework for the "governance of immigration and alien status." *Arizona*, 567 U.S. at 395. Under this framework, the Executive Branch—not any State—is tasked with enforcing the Nation's immigration laws. *See* 8 U.S.C. § 1103(a)(1).

To facilitate enforcement of the immigration laws, Congress vested the Executive Branch with broad authority to inspect, investigate, arrest, detain, and remove aliens who are unlawfully in the United States. *See, e.g.*, 8 U.S.C. § 1226(a) (permitting arrest and detention upon warrant issued by Secretary of Homeland Security), § 1226(c)(1) (Secretary "shall take into custody" aliens who have committed certain crimes), § 1231(a)(1)(A), (2) (authorizing detention of aliens with final removal orders and mandating it for certain criminal aliens), § 1357(a)(1), (2) (listing powers of DHS that may be exercised without warrant, including interrogation of "any alien or person believed to be an alien as to his

3

right to be or remain in the United States" and arrest in certain circumstances). Illegal aliens may be detained pending removal. 8 U.S.C. §§ 1225(b)(1), 1226. And illegal aliens may also be subject to federal criminal prosecution. *See, e.g.*, 8 U.S.C. §§ 1325, 1326. "A principal feature of [this]" congressionally established "removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396.

The President has a constitutional duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The authority to discharge that duty "extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States." *Tennessee v. Davis*, 100 U.S. 257, 263 (1879). Because "no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203–04 (2020). Congress has vested the Secretary of Homeland Security with the power to "control, direct[], and supervis[e]" all DHS employees. 8 U.S.C. § 1103(a)(2). In executing the laws, DHS "can act only through [those] officers and agents," who must in turn "act within the States." *Davis*, 100 U.S. at 263.

The Supremacy Clause makes federal law "the supreme Law of the Land," U.S. Const. art. VI, cl. 2. It has been firmly established for over two centuries that state law cannot be applied to restrain federal agents from carrying out their federally authorized activities. That conclusion follows from centuries of Supreme Court precedent: Maryland could not tax the Bank of the United States (*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819)), or enforce its driver's license laws against federal Post Office workers delivering mail (*Johnson v. Maryland*, 254 U.S. 51 (1920)); California could not bring

4

criminal charges against a Deputy U.S. Marshal for his actions to protect a Supreme Court Justice (*In re Neagle*, 135 U.S. 1, 75 (1890)); and Arizona could not superimpose its own approval process on a congressionally authorized dam-construction project (*Arizona v. California*, 283 U.S. 423 (1931)); *see also Mayo v. United States*, 319 U.S. 441, 445 (1943) (holding that "activities of the Federal Government are free from regulation by any state"). As the Supreme Court more recently reiterated, the Supremacy Clause "prohibit[s] States from interfering with or controlling the operations of the Federal Government." *United States v. Washington*, 596 U.S. 832, 838 (2022).

## II.    Factual Background

President Trump campaigned and won election on a promise to enforce immigration laws enacted by Congress.  For the last year, DHS has delivered on that promise by surging resources to the removal of aliens who entered this country illegally.  This includes specific operations in some of the country's most densely populated areas.  The recent Minneapolis-focused effort, titled Operation Metro Surge, has already succeeded in arresting more than 3,000 illegal aliens.  *See* Declaration of Samuel Olson (ICE) ¶ 16.  Minnesota is safer because of this project; persons convicted of murder, aggravated assault, domestic abuse, drug trafficking, and other serious crimes have been arrested through this effort.  *See* Declaration of Kyle Harvik (CBP) ¶ 9; Olson Decl. ¶ 18.

### A.    The President's Response to the Problems of Illegal Immigration

Within hours of assuming the Presidency, President Trump declared that a "national emergency exists at the southern border of the United States" from the unprecedented "illegal entry of aliens."  Proclamation 10,886, *Declaring a National Emergency at the*

*Southern Border of the United States*, 90 Fed. Reg. 8327, 8327 (Jan. 20, 2025). This declaration was necessary given the "unprecedented flood of illegal immigration" into our Nation. Exec. Order No. 14,159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443 (Jan. 20, 2025). Millions of illegal aliens settled in American communities in flagrant violation of federal law. *Id.*; *see Noem v. Vasquez Perdomo*, 2025 WL 2585637, at *1 (Sept. 8, 2025) (Kavanaugh, J. concurring) ("The Government estimates that at least 15 million people are in the United States illegally.").

This massive increase in illegal immigration has significantly harmed the American people. The recent influx has "cost taxpayers billions of dollars at the Federal, State, and local levels." Exec. Order No. 14159, 90 Fed. Reg. at 8443. "Deadly narcotics and other illicit materials have flowed across the border[.]" Exec. Order No. 14165, 90 Fed. Reg. at 8467; *see Hernandez v. Mesa*, 589 U.S. 93 (2020) ("During the last fiscal year, approximately 850,000 persons were apprehended attempting to enter the United States illegally from Mexico, and large quantities of drugs were smuggled across the border."). "Foreign criminal gangs and cartels" have extended their influence beyond the southern border into American cities. Proclamation 10886, 90 Fed. Reg. at 832. "Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans." Exec. Order No. 14,159, 90 Fed. Reg. at 8443. To counter these harms, the Government must take appropriate action to "protect[] the American people by faithfully executing the immigration laws of the United States." *Id.*; *see* Exec. Order No. 14,165, 90 Fed. Reg. 8467; Proclamation No. 10,886, 90 Fed. Reg. 8327.

B.      **The Success of Operation Metro Surge**

In December 2025, DHS launched Operation Metro Surge to address the dangers arising from the presence of illegal aliens in the Minneapolis area, including dangerous criminal aliens engaged in violent crimes and drug trafficking.  *See* Olson Decl. ¶¶ 14-18. Minnesota, Minneapolis, and St. Paul have sanctuary laws and policies that limit the cooperation of some state and local officials with federal immigration officials, which has hindered the federal government's ability to enforce immigration laws in Minnesota, and has exacerbated the dangers posed by certain illegal aliens. *See id.* ¶¶ 8-13.[1]  Consequently, Operation Metro Surge is an exclusive federal mission to enforce federal immigration law led by officers and agents with U.S. Immigration and Customs Enforcement (ICE) and United States Customs and Bordr Protection (CBP).  *See* Olson Decl. ¶ 14; Harvick Decl. ¶ 7.  No state, county, or municipal officials from Minnesota participate.  *See* Olson Decl. ¶ 14; Harvick Decl. ¶ 7.  Nor has ICE or CBP coerced, conscripted, or commandeered any state, county, or municipal officials from Minnesota to participate in the Operation.  *See* Olson Decl. ¶ 14; Harvick Decl. ¶ 7.

Operation Metro Surge had led to the successful arrest of more than 3,000 illegal aliens, including aliens with criminal convictions for murder, aggravated assaults, domestic

---

[1] In separate litigation, the United States has sued Minnesota, Minneapolis, St. Paul, and Hennepin County to enjoin them from enforcing state and local laws that impede the Executive Branch from enforcing federal immigration law. *See United States v. Minnesota*, Case No. 25-cv-03798 (D. Minn.).

abuse/violence, drug trafficking, counterfeiting, identity theft, robbery with a dangerous weapon, sexual assault, and rape. *See* Olson Decl. ¶ 18; Harvick Decl. ¶ 9.[2]

### C.    Violence and Threats Against Federal Immigration Officers in the Field

Unfortunately, the success of Operation Metro Surge has come with enormous risk to federal law enforcement personnel and repeated attacks against them. Violence against federal law enforcement officers and agents has increased approximately 1,300 percent.[3] The attacks against immigration enforcement personnel are widespread, take on many forms, and are occurring across the United States. An "Anti-ICE" sniper attempted to assassinate ICE officers in the Dallas, Texas area by shooting indiscriminately into an ICE

---

[2] DHS has issued regular public updates about the criminal illegal aliens arrested in Minnesota during the operation. *See, e.g.*, https://www.ice.gov/news/releases/under-president-trumps-leadership-ice-has-arrested-members-some-worlds-most-dangerous; https://www.dhs.gov/news/2026/01/08/dhs-highlights-worst-worst-criminal-illegal-aliens-including-rapists-pedophiles-and; https://www.dhs.gov/news/2026/01/13/dhs-highlights-worst-worst-criminal-illegal-aliens-arrested-yesterday-during; https://www.dhs.gov/news/2026/01/12/ice-removed-heinous-criminals-minnesota-streets-over-weekend-including-child; https://www.dhs.gov/news/2026/01/14/dhs-highlights-worst-worst-criminal-illegal-aliens-arrested-yesterday-minneapolis.

[3] DHS, Press Release, Three Violent Criminal Illegal Aliens Who Violently Beat a Law Enforcement Officer with Weapons (Jan. 15, 2026), https://www.dhs.gov/news/2026/01/15/dhs-releases-more-details-about-three-violent-criminal-illegal-aliens-who-violently; DHS, Press Release, Radical Rhetoric by Sanctuary Politicians Leads to an Unprecedented 1,300% Increase in Assaults Against ICE Officers and a 3,200% Increase in Vehicular Attacks, https://www.dhs.gov/news/2026/01/08/radical-rhetoric-sanctuary-politicians-leads-unprecedented-1300-increase-assaults

facility, leading to the deaths of multiple detainees.[4]  ICE facilities have faced multiple

bomb threats.[5]  Federal officers and agents face violent attacks at federal buildings,[6] at

immigration processing facilities, and while in the field conducting enforcement

operations.  Foreign criminal organizations have offered thousands of dollars as bounties

for the murder of federal immigration enforcement officers and agents.[7]  Because federal

immigration officers and agents have faced doxing, including revelation of their home

addresses, these threats extend to their families.[8]

---

[4] DHS, Press Release, DHS Issues Statement on Targeted Attack on Dallas ICE Facility (Sept. 24, 2025), https://www.dhs.gov/news/2025/09/24/dhs-issues-statement-targeted-attack-dallas-ice-facility.

[5] *See, e.g.*, DHS, Press Release, Law Enforcement Arrests Suspect Who Made Bomb Threat on ICE Dallas Facility (Aug. 26, 2025), https://www.dhs.gov/news/2025/08/26/law-enforcement-arrests-suspect-who-made-bomb-threat-ice-dallas-facility; DHS Statement on Sanctuary Politicians' Obstruction of Law Enforcement and Bomb Threat at 26 Federal Plaza in New York City (September 18, 2025), https://www.dhs.gov/news/2025/09/18/dhs-statement-sanctuary-politicians-obstruction-law-enforcement-and-bomb-threat-26.

[6] DHS Press Release, DHS Releases Statement on Violent Rioters Assaulting ICE Officers in Los Angeles, CA and Calls on Democrat Politicians to Tone Down Dangerous Rhetoric About ICE (June 7, 2025), https://www.dhs.gov/news/2025/06/07/dhs-releases-statement-violent-rioters-assaulting-ice-officers-los-angeles-ca-and.

[7] DHS, Press Release, Bounties Originating From Mexico Offered to Shoot ICE and CBP Officers in Chicago (Oct. 14, 2025), https://www.dhs.gov/news/2025/10/14/bounties-originating-mexico-offered-shoot-ice-and-cbp-officers-chicago.

[8] *See, e.g.*, DHS, Press Release, DHS Condemns Dangerous Doxxing and Escalating Threats Against Federal Law Enforcement Officers (Oct. 9, 2025), https://www.dhs.gov/news/2025/10/09/dhs-condemns-dangerous-doxxing-and-escalating-threats-against-federal-law; ABC News, 33/40, Report: Whistleblower leaks personal data of 4,500 DHS and ICE agents to doxxing website, (Jan. 13, 2026), https://abc3340.com/news/nation-world/report-whistleblower-leaks-personal-data-of-4500-dhs-and-ice-agents-to-doxxing-website-anti-ice-prtotesters.

In and around Minneapolis, ICE officers operating out of the St. Paul Office have been confronted with increased threats, violence, aggression, attacks, vehicle block-ins, and obstruction of immigration enforcement operations. Olson Decl. ¶ 19. The increase in these types of incidents has obstructed enforcement operations, interfered with officers' official duties, and posed significant safety risks to not only ICE officers but also the public. *Id.* These incidents have further increased since Operation Metro Surge launched in early December 2025. *Id.*; *see* Harvick Decl. ¶¶ 10-12.

### III.    Procedural Background

Plaintiffs State of Minnesota, City of Minneapolis, and City of St. Paul filed a complaint on January 12, which includes eleven constitutional and statutory claims. Dkt. No. 1. Plaintiffs then moved for a temporary restraining order, Dkt Nos. 5, 8, which the Court converted into a motion for a preliminary injunction, *see* Dkt. 21. Plaintiffs' motion seeks relief only based on their Tenth Amendment and "Equal Sovereignty" claims. Dkt. 8.

## LEGAL STANDARD

In evaluating a motion for a preliminary injunction, a court must consider "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). The movant has the burden on each factor. *See id.*

With respect to the first factor, which is the "most important," *Missouri v. Trump*, 128 F.4th 979, 991 (8th Cir. 2025), Plaintiffs claim that they must demonstrate only a "fair

chance of prevailing," Pls.' Mot. at 31. This is the wrong standard. When a plaintiff seeks to enjoin "the enforcement of federal statutes," he must demonstrate that he is "likely to prevail on the merits." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 731-32 (8th Cir. 2008) (en banc) (citation omitted); *see id.* at 732 n.6.[9]

## ARGUMENT

Plaintiffs' Tenth Amendment and related claims have not a shred of legal support. Their motion should therefore be denied. Plaintiffs also fail to show irreparable harm, and the equities cut in Defendants' favor. Finally, all else aside, Plaintiffs' proposed injunction micromanaging all federal law enforcement officers in Minnesota is untethered to their claims, legally unjustified, and anathema to the separation of powers.

### I.    Plaintiffs' Claims are Legally Frivolous.

Although Plaintiffs plead additional claims in their complaint, Plaintiffs move for temporary injunctive relief based solely on their Tenth Amendment and related claims. *See* Pls.' Mot. at 32–45; *see* Compl. ¶¶ 188-214. Accordingly, the Court should consider only those claims in adjudicating the motion. *See Hard & Rand v. Biston Coffee Co.*, 41 F.2d 625, 626 (8th Cir. 1930) ("[T]his court only considers questions which are argued in the brief."); *reVamped LLC v. City of Pipestone*, 760 F. Supp. 3d 855, 868 (D. Minn. 2024) ("The Court is limited to the arguments presented."); *Allan Block Corp. v. Cnty. Materials Corp.*, No. 05-2879 JNEJJG, 2006 WL 3307619, at *3 (D. Minn. Oct. 30, 2006) ("Because Allan Block's motion for preliminary injunction does not address the patent infringement

---

[9] Even if Plaintiffs were correct on the standard, their motion would still fail, given the complete absence of any legal support for their claims.

claims, the Court will consider only Allan Block's contract claims as a basis for injunctive relief.").[10]

The Tenth Amendment at the heart of Plaintiffs' claims is far different from the Tenth Amendment in the Constitution, which states only a "truism that all is retained which has not been surrendered." *United States v. Darby*, 312 U.S. 100, 124 (1941). Among the powers the States did *not* retain at ratification is the power to veto federal action justified under one of the federal government's enumerated powers. *See Fernandez v. Wiener*, 326 U.S. 340, 362 (1945) ("The Tenth Amendment does not operate as a limitation upon the powers, express or implied, delegated to the national government."). Indeed, this was very much the issue the Constitution was ratified to correct. *See New York*, 505 U.S. at 163 ("Under the Articles of Confederation, Congress lacked the authority in most respects to govern the people directly."). Yet, without any legal support, Plaintiffs seek to exercise a veto through this litigation. That effort has no hope of success.

### A.     The Anticommandeering Doctrine is Inapposite

Plaintiffs first argue that Defendants are applying federal law "in a manner that violates the anticommandeering doctrine." Pls.' Mot. at 33; *see* Comp. ¶¶ 198-204. Plaintiffs fundamentally misunderstand that doctrine. Plaintiffs point primarily to three cases that supposedly support their theory. None comes anywhere close. Plaintiffs bring an anticommandeering claim in the absence of any actual commandeering.

---

[10] For the avoidance of doubt, Plaintiffs' other claims are also legally and factually meritless, but for reasons not addressed in this motion.

First, in *New York v. United States*, the Supreme Court addressed three provisions of the Low-Level Radioactive Waste Policy Amendments Act of 1985 designed "to encourage the States to comply with their statutory obligation to provide for the disposal of waste generated within their borders." 505 U.S. at 152-54. The third provision offered States, "as an alternative to regulating pursuant to Congress' direction, the option of taking title to and possession of the low level radioactive waste generated within their borders and becoming liable for all damages waste generators suffer as a result of the States' failure to do so promptly." *Id.* at 174-75. Both options, the Court concluded, were unconstitutionally coercive; either way, a State was required to "implement[] legislation enacted by Congress." *Id.* at 177. "[T]he Constitution simply does not give Congress the authority to require the States to regulate." *Id.* at 178; *see also id.* at 188 ("The Federal Government may not compel the States to enact or administer a federal regulatory program.").

Second, in *Printz v. New York*, the Supreme Court considered the constitutionality of a federal statute that imposed on state law enforcement officers the temporary obligation "to perform background checks on prospective handgun purchasers." 521 U.S. 898, 904, 933 (1997). After a thorough examination of history, structure, and caselaw, the Court concluded that this legislation—which operated to "conscript[]" State officers to execute federal law—was "fundamentally incompatible with our constitutional system of dual sovereignty." *Id.* at 904-35; *see also id.* at 925 ("[Federal] laws conscripting state officers violate state sovereignty and are thus not in accord with the Constitution.").

Third, in *Murphy v. National Collegiate Athletic Association*, the Supreme Court ruled that a provision of the Professional and Amateur Sports Protection Act ran afoul of

13

the anticommandeering principle.  584 U.S. 453, 486 (2018).  This was because the provision—which prohibited a State from "authoriz[ing]" sports gambling—"dictate[d] what a state legislature may and may not do."  *Id.* at 474; *see also id.* at 475 (articulating the "basic principle" that "Congress cannot issue direct orders to state legislatures").

The difference between this case and those three "is stark."  *Minnesota ex rel. Hatch v. United States*, 102 F. Supp. 2d 1115, 1121 (D. Minn. 2000), *aff'd sub nom. Minn. Senior Fed'n, Metro. Region v. United States*, 273 F.3d 805 (8th Cir. 2001).  Plaintiffs fail to cite in this case any federal action that "require[s] [Plaintiffs] in their sovereign capacity to regulate their own citizens."  *Reno v. Condon*, 528 U.S. 141, 151 (2000).  Defendants have not required Plaintiffs "to enact any laws or regulations," nor have Defendants "require[d] state officials to assist in the enforcement of federal statutes."  *Id.*; *see also id.* (concluding that Driver's Privacy Protection Act of 1994 did not violate anticommandeering principle because it lacked these features).  The Tenth Amendment's anticommandeering principle "prohibits only *direct* federal compulsion," and there is simply no such compulsion here.  *Hatch*, 102 F. Supp. 2d at 1121; *see* Harvick Decl. ¶ 7; Olson Decl. ¶ 14.  Indeed, Plaintiffs admit that they have not spent any time "assisting Defendants in immigration enforcement."  Compl. ¶ 113 (emphasis omitted); *cf. Dakota, Minn. & E. R.R. Corp. v. South Dakota*, 362 F.3d 512, 518 (8th Cir. 2004) ("[T]he federal statutes in question leave South Dakota free to decide whether federally regulated railroads should be delegated the State's eminent domain power.  Thus, Congress has done no commandeering.").  Because there is no commandeering, the anticommandeering principle cannot apply.  Plaintiffs have no likelihood of success.

14

Plaintiffs nonetheless argue that Defendants are engaged in unconstitutional commandeering because Minnesota and its subdivisions are "respond[ing] in predictable ways" to the presence of federal law enforcement, such as by answering more 911 calls. Pls.' Mot. at 35-36. Plaintiffs claim that Defendants' enforcement activity yields "two unconstitutionally coercive choices": (1) attending "to the myriad pressing matters of state government already on their plates" or (2) responding "to the federal government's illegal incursion and campaign against public safety in Twin Cities." *Id.* at 36.

Plaintiffs' view of the Tenth Amendment is not, and has never been, the law. The federal government's "authority extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States." *Davis*, 100 U.S. at 263. A State, within constitutional bounds, can respond as it wishes to the exercise of federal authority in its jurisdiction. But that response, absent any sort of "direct federal compulsion," *Hatch*, 102 F. Supp. 2d at 1121 (emphasis omitted), is a *feature* of our "system of 'dual sovereignty,'" *Murphy*, 584 U.S. at 458—not indicative of a *violation* of it.

If a State's diversion of resources in response to federal action itself amounted to unconstitutional coercion, the federal government would be paralyzed. Visits by the President and other high-ranking federal officials often result in temporary closure of state-owned roads and divert state law enforcement resources. A federal indictment of a person held in state custody may have the predictable effect of local authorities taking action to facilitate that person's federal prosecution. But the Tenth Amendment does not give a state or a city a veto power over those federal activities. Rather, "in our system of dual federal

and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending." *United States v. Texas*, 599 U.S. 670, 674, 680 n.3 (2023).

Indeed, in many cases, such downstream costs of federal action do not even give rise to an Article III "case or controversy," let alone a Tenth Amendment violation. Just three years ago, the Supreme Court rejected by an 8-1 vote the reverse of this lawsuit—a suit brought by two states to compel *more* immigration enforcement. *Id.* at 674, 679. The states claimed the federal government's immigration enforcement policy injured them because "they must continue to incarcerate or supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government." *Id.* at 674. That "extraordinarily unusual lawsuit" failed on standing grounds, in part because of the Executive's substantial enforcement discretion. *Id.* at 679-80, 686. "[C]ourts generally lack meaningful standards for assessing the propriety of enforcement choices in this area." *Id.* at 680. "In light of inevitable resource constraints and regularly changing public-safety and public-welfare needs, the Executive Branch must balance many factors when devising arrest and prosecution policies." *Id.*; *see also Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (rejecting the position that "all peripheral costs imposed on States by actions of the President create a cognizable Article III injury"). If these downstream costs of federal action are insufficient to create standing, they certainly do not constitute an *ipso facto* violation of the Tenth Amendment.

"The anticommandeering doctrine exists to protect states and cities from" being compelled by the federal government to enact, administer, or enforce a federal program.

Pls.' Mot. at 37; *see Murphy*, 584 U.S. at 470.  It does not serve as a trump card for States that disagree with federal enforcement of federal law.  Plaintiffs' claim legally fails.[11]

### B.    Defendants Have Not Infringed on Plaintiffs' Police Powers.

Equally unavailing is Plaintiffs' claim that Defendants' enforcement efforts infringe on their "core police powers," including "public health and safety," "law enforcement," "education," and "the general power of governing."  Pls.' Mot. at 38.  For example, Plaintiffs claim that Defendants' presence in Minnesota has resulted in diversion of state and local law enforcement personnel, temporary closure of schools, and usurpation of the Minnesota Attorney General's authority.  *See id.* at 38-40.

Rhetoric is no substitute for law.  Plaintiffs have only the former.  Defendants are in Minnesota to enforce federal immigration law, not to run (or close) schools or enforce Minnesota state law.  And Plaintiffs do not contest that the immigration statutes Defendants enforce are "valid exercise[s]" of powers delegated to Congress.  *United States v. Louper-Morris*, 672 F.3d 539, 563 (8th Cir. 2012).  Therefore, Plaintiffs' Tenth Amendment challenge "necessarily fails."  *Id.* (quotation omitted)).

Tellingly, Plaintiffs rely on a smattering of irrelevant district court orders.  The cited portions of two cases—*Oregon v. Trump*, No. 3:25-CV-1756, 2025 WL 2817646, at *14 (D. Or. Oct. 4, 2025), and *City of Albuquerque v. Barr*, 515 F. Supp. 3d 1163, 1175 (D.N.M.

---

[11] Plaintiffs close this subsection of their motion with a brief argument that Defendants violate the Tenth Amendment by "commandeer[ing] numerous parking lots owned by Saint Paul for use in staging DHS operations."  Pls.' Mot. at 37.  Plaintiffs provide no legal authority to support the proposition that federal officers, while enforcing federal law, violate the Tenth Amendment when they temporarily park in city-owned public parking lots.

2021)—concern irreparable harm, not the merits of a Tenth Amendment claim like Plaintiffs'. Another case concerns the First Amendment. *Phila. Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, 767 F. Supp. 3d 293, 322–26 (D. Md. 2025). And the other two are equally irrelevant. *See City of Los Angeles v. Sessions*, No. CV 18-7347, 2019 WL 1957966, at *4 (C.D. Cal. Feb. 15, 2019) (holding unconstitutional grant conditions that "require[ed] state and local law enforcement to partner with federal authorities"); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 862, 873 (N.D. Ill. 2018) (holding unconstitutional "a federal statute that bars local governments from restricting the sharing of immigration status information with federal law enforcement"). None of these cases supports Plaintiffs' claim that—by sending federal law enforcement to enforce federal law in Minnesota—Defendants are violating the Tenth Amendment.

The only "brazen[]" violation of sovereignty, Pls.' Mot. at 41, or at least an attempt at one, is this lawsuit. "[I]mmigration is not a traditional subject of state regulation." *Iowa Migrant Movement*, 157 F.4th at 919. And "the activities of the Federal Government are free from regulation by any state." *Mayo*, 319 U.S. at 445; *Union Pac. R.R. Co. v. Peniston*, 85 U.S. 5, 30 (1873) ("The Constitution contemplates that none of [the] powers [which belong to the federal government] may be restrained by State legislation."); *Trump v. Vance*, 591 U.S. 786, 800 (2020) ("[T]he Constitution guarantees the entire independence of the General Government from any control by the respective States." (quotation omitted)). Here too, Plaintiffs have no chance of success on the merits.

18

### C.    Defendants' Enforcement Actions Do Not Violate Equal Sovereignty.

Lastly, Plaintiffs contend that the federal government violates the Tenth Amendment when it prioritizes law enforcement in some States over others. Pls.' Mot. at 41-45; Compl. ¶¶ 206-14. Again, Supreme Court precedent says nothing of the sort.

The case at the heart of Plaintiffs' argument is *Shelby County v. Holder*, 570 U.S. 529 (2013). There, the Supreme Court addressed whether provisions of the Voting Rights Act—which required some parts of the country, but not others, to seek federal preclearance for changes to state election law—departed from our "tradition of equal sovereignty." *Id.* at 544; *see id*. at 550 ("The provisions of § 5 apply only to those jurisdictions singled out by § 4. We now consider whether that coverage formula is constitutional in light of current conditions."). Because the Act's distinctions in coverage were based on "decades-old data and eradicated practices," the Court declared that § 4(b)—the subsection that set out the coverage formula—was unconstitutional. *Id.* at 551; *cf. Gregory v. Ashcroft*, 501 U.S. 452, 461-62 (1991) ("The Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections.").

*Shelby County* has zero relevance here. Unlike in *Shelby County*, this case does not involve any statute that unevenly intrudes, or even intrudes in any way, on the States' powers. The Constitution confers on the federal government the authority over immigration. *See Arizona*, 567 U.S. at 416; *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government."). And Congress, through the INA, has placed broad discretion in

the federal government to enforce the Nation's immigrations laws.  *See Arizona*, 567 U.S. at 396.

Indeed, viewed properly, Plaintiffs are challenging the Executive Branch's exercise of that enforcement discretion.  *See* Pls.' Mot. at 41.  But Article II gives the President "conclusive and preclusive" authority in this regard.  *Trump*, 603 U.S. at 620 ("[T]he Executive Branch has "exclusive authority and absolute discretion" to decide which crimes to investigate and prosecute." (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)); *Texas*, 599 U.S. at 678 ("Under Article II, the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.").  This "principle of enforcement discretion" not only "extends to the immigration context," it also has special purchase here given the associated "foreign-policy objectives."  *Texas*, 599 U.S. at 679 (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999)).

Nor do Plaintiffs explain how they are similarly situated to other states that are not being treated equally or what equality in immigration enforcement would look like.  On the one hand, Minnesota is not the only state that has seen an increase in immigration enforcement, as Plaintiffs admit. Pls.' Mot. 5-7.  On the other hand, those states have "sanctuary" policies that make it harder to enforce immigration law safely in coordination with local authorities.  This, in turn, requires more public and direct enforcement actions than in states that cooperate, such as Texas.  And Minnesota has a substantial number of illegal immigrants, including criminals, that Plaintiffs have allowed to evade federal enforcement.  *See* Olson Decl. ¶¶ 16-18.  Under these circumstances, prioritizing

immigration enforcement in Minnesota—a state with approximately 66,000 people potentially subject to enforcement actions under the INA—makes eminent sense. *See* Olson Decl. ¶ 17. In any event, equality in law enforcement makes little sense between states. Plaintiffs do not provide any evidence that Minnesota is being treated unequally, instead claiming that the surge is "politically motivated" and thus somehow inherently unequal. Plaintiffs cite no case law for this novel position.

Given the clear inapplicability of its cornerstone, Plaintiffs' argument crumbles. The pages of rhetoric and hyperbole, *see* Pls.' Mot at 42–45, do not help matters. Plaintiffs fail to connect any of their contestable musings—which arise from Plaintiffs' own "political motivations," Pls.' Mot. at 43—to the key inquiry: whether Plaintiffs have a likelihood of success on the merits of their Tenth Amendment challenge to the Executive Branch's enforcement priorities. Because such a likelihood is entirely absent, the Court should deny Plaintiffs' motion. The Tenth Amendment does not afford an ejectment action for States who are dissatisfied with the federal government's enforcement of federal law.

\*    \*    \*

Put simply, Minnesota wants a veto over federal law enforcement. Our Constitution does not "contemplate[]" such an arrangement, which is "fundamentally incompatible" with basic tents of federalism, Pls.' Mot. at 37, when the federal government exercises its delegated powers, *see Fernandez*, 326 U.S. at 362 ("The Tenth Amendment does not operate as a limitation upon the powers, express or implied, delegated to the national government."). As a matter of black-letter law, Plaintiffs therefore lack a likelihood of success on the merits.

**II.     The Remaining Equitable Factors Also Disfavor Injunctive Relief.**

Although the Court can and should deny the injunction solely on the ground that Plaintiffs' claims are legally groundless, the motion also fails because the balance of the equities decisively favors the federal government, and Plaintiffs have not established any irreparable harm.

The Supreme Court has repeatedly signaled that judicial orders unduly interfering with federal immigration enforcement are disfavored. *See, e.g.*, *Vasquez Perdomo*, 2025 WL 2585637 (2025), at *1 (granting stay of district court order enjoining federal immigration operation in Los Angeles area); *Noem v. Doe*, 145 S. Ct. 1524 (2025) (granting stay of district-court order enjoining categorical revocation of parole for aliens); *Noem v. National TPS Alliance*, No. 24A1059, 2025 WL 1427560 (May 19, 2025) (granting stay of district-court order barring partial termination of temporary protected status for Venezuelan nationals); *Trump v. Sierra Club*, 140 S. Ct. 1 (2019) (granting stay of district court order enjoining the Department of Defense from undertaking any border wall construction using funding the Acting Secretary transferred pursuant to statutory authority); *see also INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-1306 (1993) (O'Connor, J., in chambers) (granting stay of district court order requiring the Immigration and Naturalization Service (INS) to engage in certain immigration procedures, as "an improper intrusion by a federal court into the workings of a coordinate branch of the Government").

Any injunction here would unduly interfere with federal immigration enforcement. Minnesota is a crucial priority for immigration enforcement, as there are approximately

66,000 aliens that appear to be or may be subject to enforcement actions under the INA, including criminal aliens with convictions for murder and other violent crimes. *See* Olson ¶¶ 16-18. In the face of considerable Supreme Court authority to the contrary, Plaintiffs ask this Court to enjoin Defendants from (among other things) "[c]ontinuing Operation Metro Surge or any other similar action in Minnesota, over the objection of the Governor of Minnesota and Mayors of Minneapolis and Saint Paul." Dkt. 17 (Plaintiffs' Proposed Order, ¶ 2a.). This relief, if granted, would effectively give Minnesota state and local officials veto power over federal immigration enforcement within the borders of Minnesota.

In view of the breadth of federal power over immigration, such drastic interference with the federal government's authority could never be warranted, let alone on the record here. To demonstrate irreparable harm, Plaintiffs rely on an array of alleged downstream harms collateral to Operation Metro Surge. *See, e.g.*, Frey Decl. ¶ 9; Her Decl. ¶ 38 (erosion of community trust in police); Frey Decl. ¶¶ 9-10, 13 (increased burden on police and local social service agencies); Robertson Decl. ¶ 9 (increased burden on 911 operators); Jacobson Decl. ¶¶ 6-7; Dodds Decl. ¶¶ 16-21 (increased burden and costs on state/local public safety resources). In *United States v. Texas*, Texas asserted that it was forced to incur additional costs attendant to illegal immigration because, in its view, the federal government had failed to arrest a sufficient number of aliens. In rejecting Texas's challenge, the Supreme Court ruled that these injuries were neither "legally [nor] judicially cognizable." *United States v. Texas*, 599 U.S. at 676. Whereas in *Texas* the state claimed injury from insufficiently vigorous immigration enforcement, here the claim is the

23

opposite.   Minnesota claims that it is harmed by overly vigorous enforcement.   But enforcement discretion lies within Article II, not all fifty states.   And a harm that is not even *legally cognizable* certainly cannot constitute *irreparable* harm.

Meanwhile, Plaintiffs' requested relief would inflict irreparable harm on Defendants and the public, whose interests "merge" here.  *Nken* v. *Holder*, 556 U.S. 418, 435 (2009). Most immediately, the requested relief would irreparably harm the federal government by thwarting enforcement of the immigration laws in a critically important region with significant numbers of illegal aliens.  Olson Decl. ¶¶ 16-18, 30; Harvick Decl. ¶¶ 8-9, 15-16.   Operation Metro Surge has been successful in arresting dangerous criminal illegal aliens in the Twin Cities area.  Olson Decl. ¶ 18; Harvick ¶ 9; *see supra* note 2.  Since commencement of the operation, ICE has arrested more than 3,000 illegal aliens.  Olson Decl. ¶ 17.   An injunction stopping this critical law enforcement effort would have profound harms on public safety and the federal government's ability to enforce federal law. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").  If anything, such an injunction would violate the Supremacy Clause, which is itself an irreparable harm to the federal government.

"The problems posed . . . by illegal immigration"—from "crime" and "safety risks" to the consumption of limited public resources—"must not be underestimated."  *Arizona*, 567 U.S. at 398 (citation omitted).  Because illegal aliens "create significant economic and social problems" and are "themselves vulnerable to exploitation because they cannot

complain of substandard working conditions without risking deportation," "the public interest demands effective measures to prevent the illegal entry of aliens." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878-879 (1975). "To implement its immigration policy, the Government must be able to decide (1) who may enter the country and (2) who may stay here after entering." *Jennings* v. *Rodriguez*, 583 U.S. 281, 286 (2018). Preventing the Executive Branch from implementing a major enforcement priority and effectuating the immigration laws Congress enacted constitutes irreparable harm.

## III.    Plaintiffs' Proposed Order Is Overbroad and Unworkable.

Even apart from all of the legal defects discussed above, Plaintiffs' proposed injunction, *see* Dkt. 17 (Proposed Order), suffers from two additional, fatal flaws.

*First*, the proposed injunction is grossly overbroad and not tailored to the few claims on which Plaintiffs seek preliminary relief. As noted above, Plaintiffs move for preliminary relief based only on their Tenth Amendment and related claims. *See* Pls.' Mot. at 2, 32–45. But the content of Plaintiffs' requested relief goes far beyond the relief Plaintiffs seek in their Complaint for these claims. *Compare* Compl. ¶¶ 205, 214, *with* Pls.' Mot. at 2–3; Dkt. No. 17 (Proposed Order). For example, paragraph two of the proposed order includes a host of alleged practices Plaintiffs wish to enjoin, *see, e.g.*, Proposed Order ¶ 2(d), but Plaintiffs do not, in their motion, explain why they have a likelihood of success in challenging these supposed policies or practices. Indeed, many appear to be premised on alleged violations of the First and Fourth Amendments, but Plaintiffs have not asserted those claims here. Similarly, in paragraph 3, Plaintiffs request that the Court order Defendants and federal agents to wear specific identification and body

worn cameras.  Proposed Order ¶ 3.  Again, Plaintiffs never bother to explain what in the Tenth Amendment demands that.

As the Supreme Court has emphasized, "the scope of injunctive relief is dictated by the extent of the violation established."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). A "remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018), and "fit specific legal violations," *Patsy's Italian Res. Inc. v. Banas*, 658 F.3d 254, 272 (2d Cir. 2011).  The "settled rule" is that "the nature of the violation determines the scope of the remedy."  *Rizzo v. Goode*, 423 U.S. 362 (1976) (internal quotations omitted); *see Horne v. Flores*, 557 U.S. 433, 450 (2009) ("[C]ourts must remain attentive to the fact that federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate federal law or does not flow from such a violation.") (internal quotations omitted).  Here, Plaintiffs make no effort to tailor their overbroad injunction to anything in the Tenth Amendment.  Nor can Plaintiffs smuggle other legal claims not asserted in their motion into their requested injunction.

*Second*, compounding these errors, the proposed injunction places the Court in the untenable position of superintending officers' day-to-day decision-making, "impermissibly infringing on principles of separation of powers."  *See Chicago Headline Club v. Noem*, No. 25-3023, Dkt. No. 28 (7th Cir. Nov. 19, 2025).  That principle applies with special force to law-enforcement activities responding to safety risks, which inevitably involve "split-second judgments" and a balancing of factors in "tense, uncertain, and rapidly evolving situations."  *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam).

Plaintiffs' proposed injunction is a highly reticulated yet hopelessly vague series of commands that is "too prescriptive" and "resembles a federal regulation," not a proper exercise of a court's equitable authority. Order, *Chicago Headline Club* at 2. Indeed, the injunction is so granular it governs everything from when officers may use physical force or display their firearms, to the circumstance under which custodial arrests are permitted, to when officers may deploy riot control measures. There is no basis—and certainly no basis in this motion—for this Court to establish itself as overseer of federal law enforcement operations across Minnesota through compliance monitoring and enforcement of vague and unworkable regulations for arrests, use of force, crowd-control devices, use of body-worn cameras, and uniform identifications. *See* Olson Decl. ¶¶ 20-37; Harvick Decl. ¶¶ 13-24. "[T]he scope of federal equity power" cannot "be extended to the fashioning of prophylactic procedures for a [government] agency designed to minimize this kind of [alleged] misconduct on the part of a handful of its employees." *Rizzo*, 423 U.S. at 378. The separation of powers and the impropriety of subjecting law-enforcement officers' decisions to judicial second-guessing on pain of contempt weighs heavily against the kind of injunction that Plaintiffs seek here.

## IV. The Court Should Stay Any Injunction Pending Appeal

Finally, to the extent the Court issues any injunctive relief, Defendants request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum, administratively stayed for seven days to allow the United States to seek emergency relief if appeal is authorized. For all of the reasons Plaintiffs cannot establish an entitlement to a preliminary injunction, Defendants have, at

a minimum, satisfied the requirements for a stay of any injunction pending appeal. *See*

*Nken*, 556 U.S. at 434; Order, *Chicago Headline Club* at 1.

## **CONCLUSION**

For the reasons set forth above, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: January 19, 2026                          Respectfully submitted,

                                                  BRETT A. SHUMATE
                                                  Assistant Attorney General
                                                  Civil Division

                                                  BRANTLEY T. MAYERS
                                                  Counsel to the Assistant Attorney
                                                       General

                                                   */s/ Andrew I. Warden*
                                                  ANDREW WARDEN (IN #23840-49)
                                                  Assistant Branch Director
                                                  LEE REEVES
                                                  Trial Attorney
                                                  U.S. Department of Justice
                                                  Civil Division, Federal Programs Branch
                                                  1100 L Street, N.W.
                                                  Washington, D.C. 20005
                                                  Telephone: (202) 616-5084
                                                  Fax: (202) 616-8470
                                                  Andrew.Warden@usdoj.gov

                                                  *Counsel for Defendants*