UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

STATE OF MINNESOTA, *by and
through its Attorney General Keith Ellison*,
CITY OF MINNEAPOLIS, and
CITY OF ST. PAUL

      Plaintiffs,

v.

 KRISTI NOEM, *in her official capacity as
Secretary of the U.S. Department of
Homeland Security*; JOHN CONDON, *in his
official capacity as Acting Executive Associate
Director of Homeland Security Investigations*;
U.S. Department of Homeland Security;
TODD LYONS, *in his official capacity as Acting
Director of U.S. Immigration and Customs
Enforcement*; MARCOS CHARLES, *in his
official capacity as Acting Executive Associate
Director, Enforcement and Removal Operations;*
U.S. Immigration and Customs Enforcement;
RODNEY SCOTT, *in his official capacity as
Commissioner of U.S. Customs and Border
Protection;* U.S. Customs and Border Protection;
GREGORY BOVINO, *in his official capacity
as Commander of the U.S. Border Patrol*; U.S. Border
Patrol; DAVID EASTERWOOD, *in his official
capacity as Acting Director, Saint Paul Field Office,
U.S. Immigration and Customs Enforcement*,
*in their official capacities,*

      Defendants.

Case No. 0:26-cv-00190-KMM-DJF

**DECLARATION OF KYLE C.
HARVICK**

---

I, Kyle C. Harvick, hereby declare as follows:

1.      I am employed by U.S. Customs and Border Protection (CBP or the "Agency").  CBP is charged with enforcing the Nation's immigration laws in order to protect national security and uphold the integrity of the immigration system.  As part of this mission, CBP Border Patrol agents and officers are responsible for preventing the unlawful entry of individuals into the United States and apprehending those who attempt to enter illegally or who have violated the immigration laws.. Through these activities, CBP seeks to secure the border, disrupt human smuggling and trafficking networks, and ensure consistent enforcement of the immigration laws of the United States.

2.      I am the Patrol Agent in Charge, El Centro Station.  In this role, I oversee Border Patrol Operations for the El Centro Station, with responsibility for 35 miles of land border; a permanent traffic checkpoint; 320 employees; a fleet of 160 government vehicles; and an annual budget of approximately $800,000.00.  I have been in this position since 2023.

3.      I entered on duty with the U.S. Border Patrol on September 10, 2000, with my first duty assignment in the El Paso Sector.  In 2015-2016, I served as Acting Assistant Chief within the Strategic Planning and Analysis Directorate, Operational Requirements Management Division in Washington, D.C.  I have also served as the Deputy Patrol Agent in Charge of the Yuma Sector Border Patrol Station and the first Customs and Border Protection Advisor to Israel, where I was responsible for facilitating in-country liaison with various Israeli Law Enforcement entities and Ministry of Defense agencies.  I have served in the El Centro Sector since 2021, including service as the Professional Standards Assistant Chief Patrol Agent.

4.      Currently, for the Minneapolis operation ("Operation Metro Surge"), I am Deputy Incident Commander, and I operate out of the Border Patrol Incident Command Post (ICP).  In this position, I have operational oversight and am responsible for all U.S. Border Patrol assets and operations in the

greater Minneapolis area.  I ensure the Border Patrol agents have all the proper equipment and supplies to do their job.  I oversee personnel, logistics, referrals for criminal prosecutions, the execution of the Agency's use of force policy, and tactical information gathering.  I report to the Incident Commander or act as the Incident Commander in his absence.  The ICP is the lowest level operational headquarters for CBP personnel in support of Operation Metro Surge.

5.      The statements contained in this declaration are based upon my personal knowledge and information made available to me in the course of my official duties.

6.      In early January, in support of U.S. Immigration and Customs Enforcement (ICE), CBP personnel began deploying to Minneapolis to assist ICE Enforcement and Removal Operations (ERO).  As part of Operation Metro Surge, CBP personnel, along with personnel from partner federal agencies, participate in a variety of different law enforcement actions in and around Minneapolis.  These enforcement actions primarily revolve around immigration enforcement authorities granted under Title 8 of the U.S. Code but may also involve enforcement of certain portions of the U.S. criminal code under Title 18.  Officers and agents regularly engage in consensual encounters, investigative detentions, warrantless arrests, and arrests pursuant to both immigration and criminal judicial warrants.

7.      Operation Metro Surge is an exclusive federal mission.  CBP executes federal law through immigration enforcement actions by federal officers.  No state, county, or municipal officials from Minnesota participate in Operation Metro Surge.  CBP has not coerced, conscripted, or commandeered any state, county, or municipal officials from Minnesota to participate in support of Operation Metro Surge.

8.      CBP deployed to Minnesota in early January. Between January 7, 2026 and January 17, 2026, CBP has recorded 197 apprehensions including 49 arrests for assault and/or impeding a federal officer engaged in their official duties.

9.      Apprehensions during Operation Metro Surge include criminal illegal aliens convicted of violent/dangerous offenses including murder, domestic violence, theft, forgery, identity theft, counterfeiting, driving under the influence, and drug trafficking.

10.     Since arriving in Minnesota, CBP Border Patrol agents have been confronted with threats, violence, aggression, attacks, vehicle block-ins, and obstruction of immigration enforcement operations. The incidents have obstructed enforcement operations, interfered with officers' official duties, and posed significant safety risks to agents.   Two recent incidents illustrate the harassment officers have faced.

11.     On January 14, 2026, at approximately 1450 CST, off-duty Border Patrol agents, deployed to support Operation Metro Surge, were at a Wendy's fast-food restaurant.  While at Wendy's, the agents were approached by an individual who began verbally assaulting them.  A group of approximately 10 hostile individuals then gathered at the scene.  The agents requested backup, prompting a Strike Team response.  The agents exited the restaurant and entered their unmarked rental vehicle.  The crowd of agitators surrounded the vehicle to prevent their departure.  To de-escalate the situation, the agents exited their vehicle and walked away from the crowd.  The agents were safely picked up by a Strike Team.  The Strike Team later returned to retrieve the vehicle and discovered that the tire-valve stem had been removed, rendering the vehicle immobile.

12.     On January 16, 2026, at approximately 0650 CST., agents supporting Operation Metro Surge reported overnight vandalism at the Marriott Residence Inn in Eagan, Minnesota.  Multiple vehicles were targeted; vandals spray-painted the word ICE on the hoods, windows, and sides of several vehicles.  Additionally, several vehicles sustained slashed tires.

13.      Unless engaged in plain clothes operations, CBP personnel are instructed to wear rough duty uniforms, with duty belt and body armor, each having a visible badge.  As a best practice, CBP personnel have been instructed to wear two separate identifiers in conspicuous places that provide the agent's or officer's unique alphanumeric identifier.  The alphanumeric identifier appropriately protects the agent's

or officer's name from public disclosure while allowing for identification in a particular incident.  CBP personnel operating in plain clothes wear body armor with front and back police patches.

14.    CBP Directive No. 4320-030B sets out Agency policy regarding the responsibilities and procedures for the use of Incident-Driven Video Recording Systems (IDVRS), or body-worn cameras, for use by CBP Officers, Border Patrol Agents, and Air and Marine Agents.  As stated in Section 8.3, IDVRS will be used to record official law enforcement encounters, except when doing so may jeopardize agents and officers or public safety.  Per Section 6.4, enforcement encounters means those actions taken by Agency personnel to carry out their mission, and include but are not limited to:

- Use of force incidents as defined in the CBP Use of Force Policy, Guidelines, and Procedures    Handbook, HB 4500-01C, a publicly available document;

- Other enforcement activities in which a video recording would assist the investigation or prosecution of a crime or when a recording of an encounter would assist in documenting the incident for further law enforcement purposes; and

- Observed suspicious or possible illegal activity.

The policy contemplates that there are situations in which system operation is impractical and may be an impediment to public and agent/officer safety, as well as human performance limitations during particularly stressful, critical situations.  The safety of CBP personnel as well as members of the public, and the safe operation of government vehicles are always the primary considerations when using a body worn camera (BWC).  For purposes of Operation Metro Surge, CBP personnel who are equipped with and trained in IDVRS, have been instructed to have their body-worn camera on their person for use in operations.

**Impact of Plaintiffs' Proposed Injunction**

15.    If the Court grants Plaintiffs' motion for a temporary restraining order/preliminary injunction, the injunction would be unworkable, unnecessary, and endanger the safety of CBP personnel and the public.

16.     The proposed injunction would unlawfully enjoin Operation Metro Surge and prohibit a "surge" of CBP personnel from enforcing federal immigration law in Minnesota, which is well within the Agency's authority to enforce.  A court order removing CBP officers from Minnesota would harm the ability to arrest and detain criminal aliens.  As noted above, since arriving in Minnesota, CBP has recorded 197 apprehensions, including dangerous criminal illegal aliens.   An injunction prohibiting CBP from continuing this mission in Minnesota would harm enforcement of federal immigration law and public safety.

17.     The injunction would prohibit federal officers from concealing their identities by means of mask or other disguise in a public place.  Also, the weather in and around the Minneapolis area has an average high temperature of 23 degrees and lows of 8 degrees for the month of January. A reasonable person may wear a face covering to protect from the extreme cold.

18.

19.     CBP permits its officers or agents to wear facial masks or eyewear where it is necessary to protect their individual safety and privacy interests, their safety as Agency personnel in the conduct of their assigned duties, and the operational efficacy of the organization in carrying out its mission. Keeping officers and agents safe is a key priority for CBP.  If agents are not safe, CBP cannot accomplish its missions.  Modern technology and the current political environment have made it easier for bad actors to find and widely distribute personal information about officers and agents conducting their assigned duties, using this information or encouraging others to use it to target the individuals. These actors seek to intimidate officers and agents and interfere with their ability to carry out the Agency's mission.  CBP agents and officers reasonably their fear that exposing their identities would put themselves and their families at risk.

20.     CBP personnel are accustomed to performing their assigned duties in a public setting, which sometimes means facing public scrutiny. However, the rise of doxxing, the advancement of facial

recognition technologies, and the proliferation of bad actors on social media, has created an unprecedented operational risk for federal law enforcement officers that necessitates appropriate protective steps such as wearing masks in public to protect their identities.

21.     The proposed injunction would impose a series of broad and restrictive constraints on both CBP's ability to disperse crowds that have become violent or interfere with law enforcement operations, and its ability to respond to members of the public actively interfering, assaulting, or impeding agents in an effort to prevent them from executing lawful enforcement actions.

22.     At various locations throughout Minneapolis, CBP officers have faced on a routine, if not daily, basis gatherings that spring up around agents conducting enforcement operations, targeted arrests of illegal immigrants, and operations involving the execution of criminal warrants. This type of *ad hoc* protest typically involves active public interference, where crowds quickly grow, often outnumbering and surrounding agents, in an effort to impede agents carrying out their lawful enforcement actions. These interferences can range from direct confrontation to people physically blocking, grabbing, or assaulting agents, blocking or pulling on subjects, blocking or sabotaging law enforcement vehicles, or preventing the egress of law enforcement vehicles from the location. This type of public interference escalates the risk of harm to CBP officers/agents and the public as it creates an even more chaotic and rapidly evolving threat environment in which officers/agents must monitor multiple potential risks, respond to those actively interfering or attacking, all while trying to complete their enforcement action safely and protect themselves and others. It is a very challenging and dangerous environment to operate in, and agents must rely on their years of training and experience to respond reasonably with only what force is necessary to get their job done. Limitations on the CBP officers/agents' ability to use appropriate force or less-lethal devices in these types of chaotic, dynamic, and rapidly changing environments, whether confronting a large scale violent protest or an *ad hoc* crowd enforcement actions may cause them to hesitate to use appropriate measures that they are trained to use and place the

officers/agents and the public at greater risk of harm.

23.     For example, the proposed injunction would allow observers to disobey orders to disperse even when the orders are issued for officer or public safety reasons.  While the order would permit CBP officer/agents to request that observers change their location to avoid disrupting law enforcement operations, it does not set forth any rules or requirement for the observers to comply with law enforcement orders, regardless of the amount of interference or disruption being caused by their location in front of, adjacent to, or behind the CBP officers/agents.  The lack of clear guidance poses a likelihood of harm to the CBP officers/agents.

24.     The proposed order imposes subjective standards and ambiguous requirements that create officer safety concerns for CBP officers/agents when they are engaged in immigration enforcement activities.  CBP officers/agents' inability to use an appropriate degree of "hands-on physical force" or less-lethal measures on individuals obstructing enforcement operations but not imminently threatening harm may escalate the risks of injury to law enforcement officers and the public by causing the CBP officers/agents to hesitate to respond effectively to increasing threats.


Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.


Executed this 19th day of January, 2026.


_Kyle Harvick_
_____
Kyle C. Harvick