IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| State of MINNESOTA, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> Kristi NOEM, et al. <br><br> *Defendants*. | Case No. 26-cv-190 <br><br> **DECLARATION OF SAMUEL J. OLSON** |

### DECLARATION OF SAMUEL J. OLSON

I, Samuel J. Olson, hereby declare as follows:

1.  I am employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as Field Office Director (FOD) with the St. Paul Field Office. I have held this position since October 5, 2025.

2.  I have been employed by ICE since July 2006. Since that time, I have held several positions with ICE: Immigration Enforcement Agent (2006-2007); Deportation Officer (2007-2016) with experience in all aspects of the identification, arrest, case management, and removal of aliens present in the United States in violation of law; Supervisory Detention and Deportation Officer (2016-2020) responsible for first-line supervision of Criminal Alien Program (CAP) and fugitive operations teams; Assistant Field Office Director (2020-2021) managing a portfolio of programs that included the fugitive operations teams, criminal alien program, criminal prosecutions, intelligence, special response team, and sub-offices in South Dakota and North Dakota.; Deputy Field Office Director with programmatic oversight over all enforcement and removal operations for the St. Paul Area of Responsibility; and Field Office Director (2024-2025) for ERO Chicago

with oversight over all ERO operations within the six-state Chicago Area of Responsibility.

3. This declaration is submitted in support of Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order, which the Court converted into a Motion for Preliminary Injunction.

4. The statements contained in this declaration are based upon my personal knowledge, reasonable inquiry, and information made available to me in the course of my official duties from information obtained from records, systems, databases, other DHS employees, and/or information portals maintained and relied upon by DHS.

**Background**

5. ICE is the largest investigative branch of DHS and is charged with enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001, terrorist attacks, by combining components of the former Immigration and Naturalization Service and the former U.S. Customs Service, among other agencies, to more effectively enforce federal immigration and customs laws and to protect the United States against terrorist attacks. The mission of ICE is to protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which includes 25 field offices led by FODs; (2) Homeland Security Investigations (HSI), which includes 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which includes 25 field locations led by Chief Counsel.

6. ERO deportation officers are immigration officers under 8 U.S.C. § 1357 and customs officers under 19 U.S.C. § 1589a. It is the mission of ERO to identify, arrest, and remove aliens

who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally—including those who cross the border illegally, which is a federal misdemeanor, 8 U.S.C. § 1325, and those who illegally reenter after having been removed, which is a federal felony, 8 U.S.C. § 1326—or otherwise undermine the integrity of our immigration laws and our border control efforts.

7.     The majority of ERO's immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the course of immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at-large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

**Restrictions on Minnesota's State and Local Cooperation with Federal Officials**

8.     Many Minnesotan municipalities and counties no longer cooperate with ICE or honor ICE's immigration detainers.

9.     On February 6, 2025, the Office of the Minnesota Attorney General issued an opinion concluding that Minnesota law prohibits state and local law enforcement agencies from holding someone based on an immigration detainer if the person would otherwise be released from custody.[1] The Minnesota Attorney General's opinion explicitly details that (1) the continued detention of a person who would otherwise be released from custody is an arrest, (2) neither

---

[1] Opinion available at https://www.ag.state.mn.us/office/Opinions/3a-20250206.pdf (last visited Jan. 15, 2026).

Minnesota law nor federal law gives state and local officials the authority to arrest someone based on an immigration detainer, and (3) Minnesota law enforcement agencies risk significant civil liability if they enforce immigration detainers.

10.     On December 3, 2025, the Mayor of the City of Minneapolis signed Executive Order 2025-02, Refusing Authorization for City Parking Lots, Parking Ramps, Vacant Lots, and Garages To Be Used for Civil Immigration Enforcement Activities.[2] The Executive Order explicitly prohibits any government entity from using a city-owned or city-controlled parking lot, ramp, vacant lot, or garage for civil immigration enforcement purposes.

11.     On December 19, 2025, the City Attorney for the City of St. Paul sent a cease-and-desist letter to the ERO St. Paul Office advising that DHS's use of parking lots for law enforcement reasons at St. Paul parks is unlawful and constitutes as encroachment.[3] The City Attorney's letter orders the ERO St. Paul Office to immediately cease and desist further use of parks' parking lots.

12.     On December 23, 2025, the Minnesota Department of Public Safety sent a letter to DHS advising that DHS's participation with Minnesota's undercover vehicle registration program was at risk due to alleged reports of DHS agents swapping license plates between DHS unmarked vehicles. Minnesota's undercover vehicle registration program allows participants to preserve anonymity of law enforcement personnel performing sensitive work in unmarked vehicles.[4]

13.     Further, Minnesota's Driver's License for All Initiative, passed in 2023, allows for a standard driver's license to be issued without proof of immigration status.[5] The Initiative further

---

[2] Signed copy available at https://www.minneapolismn.gov/government/mayor/executive-orders/executive-order-2025-02/ (last visited Jan. 15, 2026).
[3] Copy of letter available at https://www.stpaul.gov/sites/default/files/city-attorney/cease-and-desist-federal-immigration-enforcement-use-park-parking-lots.pdf (last visited Jan. 15, 2026).
[4] Copy of letter available at https://kstp.com/wp-content/uploads/2025/12/DVS-Letter-to-DHS-re-use-of-license-plates-12.23.25.pdf (last visited Jan. 15, 2026).
[5] Driver's License for All, Minnesota Department of Public Safety, Driver & Vehicle Services, https://dps.mn.gov/divisions/dvs/license-and-id/dl-all (last visited Jan. 15, 2026).

prohibits Minnesota's Department of Transportation from sharing information provided on license and ID card applications with state or federal agencies that primarily enforce immigration laws. Providing such information to state or federal agencies that primarily enforce immigration laws could lead to criminal penalties. *See* MINN. STAT. *§* 171.12. In the City of Minneapolis, city employees are prohibited from questioning, arresting, detaining, or undertaking any law enforcement action for the purpose of detecting violations of federal civil immigration laws and verifying immigration status. MINNEAPOLIS CODE OF ORDINANCES, Title 2, Ch. 19.30. The City of St. Paul likewise enforces similar prohibitions on its public safety officials. *See* ST. PAUL CODE OF ORDINANCES, Part III, Title III, Ch. 44.03.

**Operation Metro Surge**

14.    Operation Metro Surge is an exclusive federal operation. ICE executes federal law through immigration enforcement by its federal officers and agents. No State, County, or Municipal officials from Minnesota participate in Operation Metro Surge. ICE has not coerced, conscripted or commandeered any State, County, or Municipal officials from Minnesota participate in Operation Metro Surge.

15.    During Operation Metro Surge, approximately 2,000 additional ERO officers and HSI agents were detailed to the St. Paul Field Office. These details have come at different times and for varying lengths of time. Typically, the ERO St. Paul Office is staffed with approximately 190 officers covering the five states of Minnesota, North Dakota, South Dakota, Nebraska, and Iowa. In the Twin Cities of St. Paul and Minneapolis, ERO has approximately 80 officers.

16.    The mission of Operation Metro Surge is to significantly increase "at-large" arrests of illegal aliens in the Twin Cities metropolitan area, focusing on individuals with executable final orders. This effort is a joint effort between ICE ERO and ICE HSI, with assistance from other

federal components. Since commencement of Operation Metro Surge, ICE has arrested more than 3,000 illegal aliens.

17. Based on available data, approximately 66,000 aliens in Minnesota appear to be or may be subject to enforcement actions under the Immigration and Nationality Act (INA).

18. Operation Metro Surge has led to the successful arrest and apprehension of criminal aliens, including aliens with convictions for murder, aggravated assaults, domestic abuse/violence, drug trafficking, counterfeiting, identity theft, robbery with a dangerous weapon, sexual assault and rape convictions.

19. For the past year, ICE officers operating out of the ERO St. Paul Office have been confronted with increased threats, violence, aggression, attacks, vehicle block-ins, and obstruction of immigration enforcement operations from members of the public. The increase in these types of incidents has obstructed enforcement operations, interfered with officers' official duties, and posed significant safety risks to not only ICE officers but also the public. These incidents have further increased since Operation Metro Surge launched in early December 2025.

**Body Worn Cameras at the St. Paul Office**

20. At this time, body worn cameras (BWCs) have not been implemented for ICE officers out of the ERO St. Paul Office. No permanently assigned ICE law enforcement personnel, defined generally as officers and agents assigned to the St. Paul Office for Enforcement and Removal Operations (ERO) or Homeland Security Investigations (HSI), are currently equipped as either BWC Coordinators or end users as defined further below.

21. As of January 18, 2026, there are approximately 2,000 ICE law enforcement personnel deployed to or operating out of Minnesota. This number can significantly fluctuate due to operational reasons, and individual officers and agents may be rotated in and out.

22. To equip every ICE law enforcement personnel operating out of Minnesota with a BWC device will require approximately 2,000 devices. If all ICE law enforcement personnel deployed to or operating out of Minnesota were required to use BWC devices, ICE would need approximately 180 days to evaluate and complete the required improvements to the network; ship, install, and test the necessary equipment; and train hundreds of law enforcement personnel on proper usage, maintenance, and storage.

23. Importantly, there are no BWC devices physically located in the ERO St. Paul Office. ICE would have to physically transport the devices from their current locations in other parts of the country to Minnesota. If the number of officers and agents in the ERO St. Paul Office exceeds the number of physical devices currently in the agency's possession, ICE would need to procure additional devices, the process by which must comport with federal law. In such an instance, the minimum estimated 180-day timeline would no longer be feasible.

24. Generally, BWC devices may only record up to ten hours of continuous footage before the device must be exchanged for charging. This limits ICE's ability to have officers and agents perform law enforcement duties for extended periods of time if continuous recording is mandated.

25. If the network infrastructure is not compatible and/or properly supports the BWC program, this will cause delays in the upload and retrieval of the video footage, as well as disrupt ICE systems which operate on the same network.

26. Deployment of BWC devices requires the initial and continued training of BWC Coordinators, individuals selected at each field office to primarily be responsible for administering and monitoring BWC equipment and evidence management in accordance with ICE Directive 19010.3 and to train end users, i.e., ICE law enforcement officers.

27. When BWC devices are implemented at a specific field office, all ICE law enforcement

officers (including both Enforcement and Removal Operations officers and Homeland Security Investigations agents) within that field office are equipped and trained with a BWC device. Additional pre-deployment activities also include, but are not limited to, communicating with local management to outline requirements and identify secure storage capability, engaging with local IT site managers to assess network capability of handling additional requirements and availability of required network ports, upgrading hardware and infrastructure, configuring BWC docking stations to function on the ICE network, and identifying personnel who will act as coordinators managing hardware, device accountability, and digital evidence management functions locally. Upon completion of these tasks, coordination of training for coordinators and law enforcement officers must be scheduled, individual devices must be assigned within the property management system, user accounts must be created within the evidence management system, and testing of the functionality of all aspects of the hardware and software must be performed. Lastly, training is delivered to the relevant personnel to enable operational capability. The training of end user law enforcement personnel by BWC Coordinators may take several months based on office size and personnel availability.

28. All aforementioned steps must be taken before ICE deploys BWCs to a field office to ensure the program's efficacy and officer safety. If required to immediately equip personnel in the ERO St. Paul Office, ICE would have to divert personnel and multiple support staff officials to address the technological demands and procurement procedures for BWC-related equipment. In other words, other ICE operations would be impacted in order to effectuate a deployment of this magnitude of BWC devices at the ERO St. Paul Office.

29. At this time, the ERO St. Paul Office is not scheduled or funded for BWC deployment. ICE law enforcement personnel out of the ERO St. Paul Office are not properly prepared, trained, or

equipped for an immediate deployment of BWC use. Even during the 2021-2023 congressionally mandated BWC pilot program, the ERO St. Paul Office was not one of the pilot field offices that partook in the program.

**Impact of Plaintiffs' Requested Relief**

30.     An injunction prohibiting Operation Metro Surge and any "surge" or detail of ICE officials to assist in the enforcement of federal immigration laws in Minnesota would harm public safety and law enforcement operations. Any large-scale operation would in part be because of the lack of cooperation such as honoring ICE detainers, because ICE is not able to arrest individuals in a safe custodial setting and must conduct the at-large arrests.

31.     ICE law enforcement officers only use force that is necessary and reasonable based on the totality of the circumstances. ICE law enforcement officers are trained to engage those individuals who pose the greatest threat based on the reasonableness standard. ICE law enforcement officers are trained to give verbal commands, and individuals who do not comply with these commands may be perceived as potential threats. ICE law enforcement officers' responsibility is to ensure the scene is safe for law enforcement personnel and the community, and anyone who does not comply with lawful dispersal commands may be considered a potential threat to law enforcement depending on subsequent actions and continued refusal to leave a restricted area. If a dispersal order is given and subjects do not comply with this directive, they may be subject to necessary and reasonable uses of force to include physical force and/or the utilization of kinetic impact or chemical munitions and/or diversionary devices. ICE law enforcement officers are trained to give dispersal orders prior to the utilization of any of the aforementioned law enforcement tools when operationally feasible, and those individuals who do not heed these orders may be exposed to any or all of these. In short, those individuals who do not disperse when receiving the command to do

so, identify themselves as a potential threat to law enforcement.

32. ICE law enforcement officers are trained to give warnings when operationally feasible. Any restriction on federal officers facing exigent circumstances from utilizing their law enforcement tools can further endanger the federal officers and the public. Oftentimes, it is the subject's behavior that dictates the timeline of the utilization of these tools and, if the subject or crowd behavior requires a more immediate response, officers cannot and should not have to compromise their own safety based on arbitrary standards. In short, ICE law enforcement officers will give commands and warnings to avoid unnecessary exposure; however, ICE law enforcement officers are permitted to use necessary force as appropriate based on the totality of circumstances.

33. Plaintiffs' request to enjoin DHS from using hands-on physical force on people who are not posing an imminent threat to law enforcement or another person ignores the realities of protecting officers and the public from violent protestors who use the anonymity of crowds to assault law enforcement officers. Physical force is a law enforcement technique used after crowds have already been ordered to disperse (often, multiple times), fail to do so, and/or engage in criminal and assaultive behavior towards law enforcement officers and the public. Enjoining ICE from using, or even threatening to use, physical force would significantly compromise ICE officer safety and leave them vulnerable to harm.

34. The same mindset follows with Plaintiffs' request to enjoin DHS from brandishing or pointing weapons. This law enforcement technique can help deescalate situations and obtain compliance over resistant subjects without the need for actual discharge of the weapon. Plaintiffs' requests to enjoin DHS from using many of its law enforcement tools and deescalation techniques would further endanger ICE officers and the public's safety as that would leave ICE officers having to respond only when there is an immediate harm of serious bodily injury or death on an individual.

35. Only ICE officers who have been provided with the proper training and successfully demonstrated proficiency are permitted to carry ICE firearms and other authorized weapons (e.g., batons, OC sprays, CS sprays). The requisite training includes, but is not limited to, guidance over the issuance, use, safeguarding, and maintenance of ICE firearms, other authorized weapons, and related use of force equipment; scenario-based simulations; overview of related legal updates; medical aid training; as well as overview of de-escalation techniques. As indicated above, ICE officers only use force that is necessary and reasonable based on the totality of the circumstances confronting the officer at the time. Based on the totality of the facts and circumstances, two ICE officers may have two different responses to the same situation, any of which may be considered both reasonable and necessary. When carrying out their duties, ICE officers are often met with fast-evolving scenarios in which they may have to rapidly increase or decrease use of force and employ varying use of force options depending on the totality of the circumstances. In short, a restriction that regulates how ICE officers should carry and handle their firearms and other authorized weapons would cause great operational confusion as such a regulation would conflict with ICE guidelines and trainings and potentially create dangerous scenarios for ICE officers.

36. ICE officers are already required to carry their ICE metal badges and credentials when carrying an ICE-issued firearm, except for officers involved in undercover operations. ICE metal badges display a unique badge number allowing easy identification of officers. ICE Special Response Team (SRT) uniforms are affixed with large, discernible identifier patches unique to each agent or officer that allow for identification, as needed. These SRT identifiers balance between the need to protect the officers' safety while also ensuring that officers can be individually identified while on duty.

37. The injunction would prohibit ICE officials from concealing their identities by means of

wearing a mask in a public place. ICE officers and agents have a legitimate concern regarding doxxing and receiving threats due to their work as ICE officers. Since the beginning of 2025, ICE officers and agents have experienced a substantial increase in death threats made against themselves and their families. Permitting protesters to more easily dox ICE employees (by allowing them to identify ICE officers and agents using social media) will inevitably lead to further threats and possible violence due to doxxing websites providing a repository of personal information accessible to protesters, agitators, and domestic terrorists.[6]

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 19th day of January 2026.

                                                                                 _____
Samuel J. Olson
Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

---

[6] *See, e.g.*, *ICE List Wiki*, https://wiki.icelist.is/index.php/Main_Page (last visited Jan. 17, 2025) (doxxing website containing user-submitted names, pictures, and other information of ICE employees, including support staff and staff in non-public roles).

12