## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| STATE OF MINNESOTA, by and through its Attorney General Keith Ellison, CITY OF MINNEAPOLIS, and CITY OF SAINT PAUL, | Court File No. 0:26-cv-00190-KMM-DJF |
| Plaintiffs, | |
| v. | |
| KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; JOHN CONDON, *in his official capacity as Acting Executive Associate Director of Homeland Security Investigations; U.S. Department of Homeland Security*; TODD LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; MARCOS CHARLES, *in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations; U.S. Immigration and Customs Enforcement*; RODNEY SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. Customs and Border Protection*; GREGORY BOVINO, *in his official capacity as Commander of the U.S. Border Patrol; U.S. Border Patrol*; DAVID EASTERWOOD, *in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement*, | **AMICUS CURIAE BRIEF OF MINNESOTA STATE BAR ASSOCIATION, HENNEPIN COUNTY BAR ASSOCIATION, RAMSEY COUNTY BAR ASSOCIATION, MINNESOTA WOMEN LAWYERS, MINNESOTA ASIAN PACIFIC AMERICAN BAR ASSOCIATION, MINNESOTA ASSOCIATION OF BLACK LAWYERS, MINNESOTA HISPANIC BAR ASSOCIATION, AND THE SOMALI AMERICAN BAR ASSOCIATION IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| Defendants. | |

EXHIBIT A

## INTRODUCTION

*"[T]he world no longer has a choice between force and law. If civilization is to survive, it must choose the rule of law."*

*President Dwight D. Eisenhower[1]*

This case implicates access to justice and the rule of law, core principles at the heart of America's democratic ideals and the legal profession. The unprecedented surge of federal immigration enforcement activity challenged in this action continues to run roughshod over the rule of law and has a chilling effect on Minnesotans' ability to seek protection from the courts, report crimes, and engage in constitutionally protected activity. These harms are not speculative. They are already occurring, as reflected in the evidence submitted with Plaintiffs' motion, as well as this Court's recent order granting class-wide preliminary injunctive relief. *See Tincher v. Noem*, No. 25-cv-4669 (KMM/DTS), slip op. at 69 (D. Minn. Jan. 16, 2026) ("The Court finds that Plaintiffs have demonstrated a threat of irreparable harm sufficient to support a preliminary injunction … .").

Amici Bar Associations[2] here focus on why the equities and the public interests discussed below support a preliminary injunction.[3] This Court has recently recognized that

---

[1] Statement by the President on the Observance of Law Day, 1 PUB. PAPERS 363 (Apr. 30, 1958) ("But the rule of law does more than ensure freedom from high-handed action by rulers. It ensures justice between man and man however humble the one and however powerful the other.").

[2] Amici include the Minnesota State Bar Association, Hennepin County Bar Association, Ramsey County Bar Association, Minnesota Women Lawyers, Minnesota Asian Pacific American Bar Association, Minnesota Association of Black Lawyers, Minnesota Hispanic Bar Association, and the Somali American Bar Association (collectively the "Bar Associations").

[3] To be clear, Amici support in full Plaintiffs' request for injunctive relief. Amici refer to Plaintiffs' request as one seeking a Preliminary Injunction pursuant to this Court's January

those elements of the *Dataphase* analysis are closely intertwined with irreparable harm where governmental action threatens constitutional rights, the orderly administration of justice, and the rule of law. *See Tincher,* slip op. at 35. Granting the relief requested will advance, not hinder, these public interests. It will preserve access to justice and promote the rule of law—core missions of the Bar Associations—by further protecting First Amendment activity and ensuring that government authority is exercised within constitutional and statutory limits.

## IDENTITY OF *AMICI CURIAE* AND STATEMENT OF PUBLIC INTEREST

The Bar Associations collectively include over thirteen thousand Minnesota attorneys and judges from diverse backgrounds and lived experiences. (Declaration of Cheryl Dalby in Support of *Amicus Curiae* Brief (hereinafter, "Dalby Decl.") ¶ 2 (Jan. 19, 2026).) Upon admission to the Minnesota bar, all lawyers admitted to practice in Minnesota, many of whom are now members of the Bar Associations, take an oath to uphold the Constitutions of the United States and the State of Minnesota. *See* Minn. Stat. § 358.07(9). That oath is more than ceremonial. For generations, the Bar Associations have remained committed to improving accessibility, fairness, and trust in Minnesota's legal system.

Amici members include, and amici regularly work with, judges, prosecutors, criminal defense attorneys, legal aid providers, attorneys in the full range of private

---

14, 2026 Order (ECF No. 21). This brief focuses on the equities and the public interest in the rule of law because that is an area where Amici's memberships' daily experience is of particular relevance to the issues now before the Court.

practice, and community organizations committed to reducing barriers to justice and to upholding the rule of law. Plaintiffs' requested relief directly implicates these institutional and professional interests by seeking to require Defendants and their agents to abide by the U.S. and Minnesota Constitutions and applicable statutory law. In short, amici are before this Court seeking unimpeded access to justice and advocating on behalf of the rule of law.

## ARGUMENT

I.   **JUSTICE REQUIRES MAINTAINING THE STATUS QUO WHERE THE EQUITIES OVERWHELMINGLY FAVOR RELIEF**

As this Court observed just days ago, "protection of constitutional rights is afforded significant deference in case law addressing the balance of harms factor." *Tincher,* slip op. at 72 (citing *Rodgers v. Bryant,* 942 F. 3d 451, 456 (8th Cir. 2019)). "The balance of the equities and the public interest . . . merge [when] the federal government is the party opposing the injunction." *Missouri v. Trump*, 128 F.4th 979, 996–997 (8th Cir. 2025). Under circumstances like those presented in the Plaintiffs' lawsuit, this Court may give greater primacy to this merged equitable factor even as compared to other factors like the likelihood of success on the merits.

In every request for an injunction, the question "[a]t base . . . is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo." *Dataphase Systems, Inc., v. C.L. Systems*, *Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (*en banc*). Indeed, the Supreme Court has held that the equities can matter as much as the merits when granting an injunction. *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017) ("Crafting a preliminary injunction is an exercise of discretion and

4

judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."); *Winter v. Nat. Resource Def. Couns.*, 555 U.S. 7, 26 (2008) (stressing "the importance of assessing the balance of equities and the public interest in determining whether to grant a preliminary injunction … .").

The unprecedented and disruptive actions described in the Complaint and detailed in sworn declarations of city officials implicate the Bar Associations' core missions to: promote access to justice, advocate for the rule of law, and ensure the professional excellence and wellbeing of those in the legal profession. Every day the Government's alleged conduct is permitted to continue further undermines these equitable interests. Accordingly, "justice requires the court to intervene to preserve the status quo until the merits [can be] determined." *Dataphase*, 640 F.2d at 113.

## II.  INJUNCTIVE RELIEF IS NECESSARY TO ENSURE ACCESS TO JUSTICE, A CORE ASPECT OF THE BAR ASSOCIATIONS' MISSIONS

Accessing justice means that individuals can safely report crimes, interact with counsel, attend hearings, provide information to investigators, testify in court, and seek legal redress. "At its core, the right to due process reflects a fundamental value in our American constitutional system": the right of "all individuals [to] a meaningful opportunity to be heard." *Boddie v. Connecticut*, 401 U.S. 371, 374, 379 (1971). Fear of accessing or utilizing the legal system because the risk that doing so will expose a person to unrelated consequences, including unlawful detention and violence, is incompatible with the orderly administration of justice.

The injunctive relief sought here, including curbing unlawful enforcement practices, requiring transparency and accountability of law enforcement, and ensuring the protection of constitutional rights in public and sensitive locations, promotes access to justice in a number of ways while causing no harm to any governmental interest. That means the equities weigh heavily in favor of granting the requested injunctive relief.

*First*, the ubiquitous presence of masked, heavily armed federal immigration officials as part of Operation Metro Surge erodes public trust, magnifying the existing risk that residents will not report crimes, participate as witnesses in prosecutions, or seek legal redress for harms they have suffered. City leaders have highlighted this problem, noting that the "tactics [ICE is employing] erode hard-earned community trust being rebuilt by Minneapolis police day by day—particularly where the tactics being used by Defendants' agents are at odds with the carefully developed, trained, and enforced policies designed to increase that trust, like impartial policing and de-escalation." (Declaration of Jacob Frey (hereinafter, "Frey Decl.") ¶ 5, (ECF No. 9); *see also* Declaration of Sara Lathrop (hereinafter, "Lathrop Decl."), ¶ 15 (ECF No. 6).) Echoing Mayor Frey's concerns, Minneapolis Police Chief Brian O'Hara recently noted that "[p]ublic safety suffers when people are afraid to leave their homes, attend worship, go grocery shopping, or contact the police when they are victims of crime. Violence goes unreported, victims remain isolated while offenders remain free. This reality has a compounding effect that will increasingly affect levels of crime in every community, making Minneapolis less safe."[4] When victims

---

[4] Minneapolis Police Department Chief Brian O'Hara, *Fear undermines public safety – naming it is not politics*, The Hill (Dec. 30, 2025),

and witnesses are afraid to report crimes or participate in criminal prosecutions, the justice system is effectively closed for those people and the community is less safe. Lawyers and judges cannot help. The harm is immediate and irreparable.

*Second,* even if a person calls to report a crime in Minneapolis today, access to justice is impaired by overstrained police resources responding to situations involving federal immigration enforcement actions. Federal operations are forcing Plaintiffs to divert public safety resources. The Minneapolis police department has been required to "devot[e] considerable time to planning around the impacts of the way Defendants are conducting immigration enforcement in Minneapolis, and that is time and attention that would otherwise be spent on making Minneapolis a safer place." (Compl. for Declaratory and Injunctive Relief (hereinafter, "Compl.") ¶ 117, (ECF No. 1).) In Minneapolis, police officers are "called too often to respond to situations related to Defendants' immigration enforcement activities," when tensions are already high. (Frey Decl. ¶ 7.) As only one example of the severe impact Operation Metro Surge is having on access to justice in Minnesota, "[o]n January 7, shortly after 10:00am, all priority-2 and priority-3 911 calls *were put into 'pending' status* because MPD officers were responding to activities following the ICE fatal shooting of Ms. Good." (Frey Decl. ¶ 15 (emphasis added); *see also* Declaration of Heather Robertson (hereinafter, "Robertson Decl.") ¶ ¶ 2–15 (ECF No. 11) (detailing the volume and severity of 911 calls relating to federal immigration agent activities in Minneapolis alone).)

---

https://thehill.com/opinion/immigration/5665347-fear-undermines-public-safety-naming-it-is-not-politics/.

Saint Paul has experienced similar challenges. Police resources in Saint Paul have been diverted from ordinary public safety tasks by the need to respond to unrest generated by Defendants' enforcement actions. (Compl. ¶ 125; Declaration of Kaohly Her (hereinafter, "Her Decl.") ¶¶ 39–40.) State agencies have also diverted resources to respond to Defendants' conduct. (Compl. ¶¶ 134–138.)

Diverting public resources from their intended purpose to address situations created by federal operations was core to the harm/public interest analysis in several recent cases granting injunctive relief. For example, in *Oregon v. Trump*, the Court recognized that the National Guard deployment caused unrest and had therefore necessitated an "increased need for state and local law enforcement." *Oregon v. Trump*, -- F.Supp.3d. --, 2025 WL 2817646, at *14 (D. Or. Oct. 4, 2025). Likewise, the deployment of federal law enforcement officers to Portland in 2020 "reignited" protests and riots that had "largely self-extinguished." *Id.* (internal citations omitted)*; see also Newsom v. Trump*, 786 F. Supp. 3d 1235, 1261–62 (N.D. Cal. 2025) (by inflaming unrest, the federal government's deployments had "create[d] the very emergency conditions that it then relie[d] on to justify federal intervention"); *Illinois v. Trump*, No. 25-CV-12174, 2025 WL 2886645, at *23 (N.D. Ill. Oct. 10, 2025) ("that deployment . . . is likely to lead to civil unrest, requiring deployment of state and local resources to maintain order. … This diversion of limited state and local resources is an irreparable harm for which Plaintiffs have no adequate remedy at law.").

*Third*, Bar Association members report that as a result of the recent unprecedented immigration enforcement actions, their clients fear that appearing in a public courthouse,

where their presence can be noted on a public docket, may lead to detention or arrest. (Dalby Decl. ¶ 6.) This undermines the justice system, impedes residents from availing themselves of legal recourse for harm, and subverts the constitution's promise of equal access to justice under law. Equally chilling, reports are now emerging that attorneys are being denied access to their clients at the Bishop Henry Whipple Federal Building in Minneapolis, further eroding constitutional protections and blocking justice for the most vulnerable Minnesotans. (Dalby Decl.¶ 7, Ex. 1 (news article)[5].)

Further, immigration and criminal cases are not the only legal proceedings impacted when vulnerable populations fear retribution for accessing justice – abused people may be deterred from requesting civil orders for protection, forgoing their safety rather than risk detention or deportation. Renters are forced to choose between enduring dangerous and uninhabitable housing conditions and availing themselves of legal remedies. Those with civil claims, child custody, family, or public benefits issues likewise may abandon those claims or resort to self help.

Taken together, the actions alleged in Plaintiffs' complaint, local officials' sworn statements, and the ongoing federal enforcement activity documented extensively by the media and public, directly impact the public's willingness and ability to access our system of justice. There can be no greater impediment to justice than to be literally and practically

---

[5] Matt Rivers, et al., *Lawyers allege Dept. of Homeland Security is denying legal counsel to Minnesota detainees*, ABC News (Jan. 18, 2026), https://abcnews.go.com/US/lawyers-allege-dept-homeland-security-denying-legal-counsel/story?id=129335914).

prohibited from accessing attorneys and the courts. The injunctive relief sought by Plaintiffs would address that harm.

*Finally*, and of just as great concern to the Bar Associations, is the effect of the conduct alleged in Plaintiffs' complaint on the Bar Associations' members. Attorneys should be free to perform their jobs without fear of harassment, detention, or arrest. The environment created by Operation Metro Surge negatively impacts some amici members' ability to represent clients and has detrimental personal and professional impacts. (Dalby Decl. ¶¶ 3–6.) For example, Bar Associations' member attorneys report "experiencing increased mental health challenges associated with living and working under the current conditions," including "heightened anxiety, depression, fear, and feelings of hopelessness" affecting their personal and professional lives. (*Id.* at ¶ 5.) Moreover, attorneys of color have reported that, despite being United States citizens, they are taking additional steps to protect themselves and their families because of fear arising from the current immigration enforcement environment, increasing the difficulty of representing their clients and placing them at personal and professional peril. (*Id.* at ¶¶ 4, 6.) Minneapolis Police Chief O'Hara recently commented on these racial profiling concerns, noting on 60 Minutes that "people have been stopped for simply appearing to be Somali or appearing to be Latino or appearing to be foreign . . . we're not getting these stories from Irish folks and Norwegian folks here."[6]

---

[6] Cecilia Vega, et al., *Minneapolis' police chief fears possible "moment where it all explodes" as ICE operation continues*, 60 Minutes – CBS News (Jan. 18, 2026), https://www.cbsnews.com/news/minneapolis-police-chief-worries-about-escalating-tensions-with-ice-60-minutes-transcript/.

When the people making up the legal community themselves are afraid to participate in the system through which they serve as officers of the Court, access to justice is extinguished. Granting Plaintiffs' requested relief will assist in restoring and preserving that access for Minnesotans.

## III.    THE PUBLIC INTEREST IN THE RULE OF LAW STRONGLY FAVORS INJUNCTIVE RELIEF

The rule of law depends on the transparent and constrained exercise of governmental power. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 655 (1952) (Jackson, J., concurring) ("With all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law[.]"). "In a democracy, power implies responsibility." *U. S. v. United Mine Workers of Am.*, 330 U.S. 258, 312 (1947) (Frankfurter, J., concurring). Where law enforcement actions depart from settled constitutional norms—particularly those governing First Amendment freedoms, arrest authority, use of force, public accountability, and respect for state and local law—the resulting harm is systemic. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)) (policies that threaten or impede First Amendment freedoms, "for even minimal periods of time, unquestionably [cause] irreparable injury."); *see also Ziliang J. v. Noem*, No. 25-cv-1391 (PJS/DLM), 2025 WL 1358665, at *2 (D. Minn. Apr. 17, 2025) ("[T]here is a substantial public interest in ensuring that government agencies comply with federal law," and the public interest is not served "by permitting federal officials to flaunt the very laws that they have sworn to enforce."); *Shaik v. Noem*, 801 F.Supp.3d 825, 847 (D. Minn. 2025)

(finding that there is a substantial public interest "in Americans trusting their own government to follow the rule of law" (quoting *Shaik v. Noem*, No. 25-1584 (JRT/DJF), 2025 WL 1170447, at \*3 (D. Minn. Apr. 22, 2025))).

Advocating for the rule of law is a core function of the Bar Associations. Yet the current environment of unlawful arrests and intimidation by government agents suggests a breakdown in the rule of law because individuals do not know how to conform their conduct to the law, lawyers cannot reliably advise clients, and courts cannot ensure compliance with their orders. As this Court has recognized, such conditions constitute irreparable harm and weigh decisively in favor of injunctive relief. *See Tincher*, slip op. at 60–63.

Minnesota has been challenged by rule of law problems like this in the recent past. Following the murder of George Floyd and the public reckoning with unlawful police tactics, in 2022 the City of Minneapolis settled a consolidated pair of class action lawsuits brought by protestors who alleged that the protest-policing tactics used by Minneapolis Police Department officers had violated their First and Fourth Amendment rights.

In settling the lawsuit, the City stipulated to an injunction prohibiting Minneapolis Police Officers from "arresting, threatening to arrest, or using physical force … against persons engaging in lawful protests, lawful public assemblies, or lawful demonstrations who are not posing an immediate threat to the safety of others, officers, or the public safety." Order for Inj. at 2, *Samaha v. City of Minneapolis,* 20-cv-01715 (KMM/DTS) (D. Minn. Nov. 22, 2022) (ECF No. 145). The settlement also required the use of body-worn cameras and imposed limitations on the use of chemical agents on protestors, while also

providing mechanisms by which such tactics could be used in appropriate circumstances and with appropriate limitations. *Id.* at 3. Similarly, in *Goyette v. Harrington*, the State of Minnesota consented to a permanent injunction requiring that "State Defendants' agents and employees responding to civil unrest or protests … shall prominently display their agency name and badge number readable from a distance of twenty feet" and "State Defendants shall maintain a record of all agents or employees deployed to respond to civil unrest or protests." Order Granting Pls.' Mot. for Monitored Inj. at 9, 20-cv-01302 (WMW/DTS) (D. Minn. Feb. 8, 2022) (ECF No. 316).

Against this backdrop of Minnesota's efforts to improve historically "strained police-community relations," adding "militarized actors unfamiliar with local history and context whose goal is 'vigorous enforcement' of the law" plainly "is not in the community's interest." *Illinois v. Trump*, 2025 WL 2886645, at \*24. To the contrary, the balance of harms and public interest in this case clearly favor Plaintiffs, as its law enforcement agencies have previously adopted many of the very measures now sought as terms of the proposed injunction. (*See, e.g.*, Compl., Prayer for Relief ¶ ¶ 4, 6(a), (c), (g), (h), (j), (k).) Granting such relief would ensure both actual adherence to standards and laws, as well as demonstrate to the public that limits on governmental authority exist and will be followed.

Moreover, even if Defendants' "surge" was designed to promote public safety by enforcing immigration laws consistent with established state and federal law–a claim

contradicted by much of the record evidence[7]–that interest would not outweigh the public's interest in "bodily integrity, the right to peaceful protest, the right to assemble, the right to a free press, and the right to a peaceful free exercise of religion," which Defendants' alleged actions inhibit. *Chicago Headline Club v. Noem*, – F.Supp.3d –, 2025 WL 3240782, at *88 (N.D. Ill. Nov. 20, 2025). Indeed, even the Government's interest "in ensuring that [it] can enforce the law . . . might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with the Government." *Heckler v. Cmty. Health Serv. of Crawford Cnty.*, 467 U.S. 51, 60-61 (1984).

Nor does the requested injunction impede Defendants' ability to execute the law. To the contrary: an injunction would "simply require[] Defendants to comply with the Constitution and their own stated policies, which Defendants can—and should—do during the implementation and enforcement of immigration laws. This does not constitute irreparable harm." *Chicago Headline Club*, 2025 WL 3240782, at *88. There is no harm in an injunction "requiring [a party] to comply with the Constitution." *Exodus Refugee Immigr., Inc. v. Pence*, 165 F. Supp. 3d 718, 739 (S.D. Ind.), *aff'd*, 838 F.3d 902 (7th Cir. 2016). "[T]he public has a clear interest in ensuring that Defendants implement and enforce immigration laws in a manner that complies with the Constitution." *Chicago Headline Club*, 2025 WL 3240782, at *88 (citing *Mehrdad v. Noem*, No. 3:25-CV-337, 2025 WL 2497988, at *4 (N.D. Ind. Apr. 24, 2025)). "It is in the public interest that federal agencies comply with their own policies and with federal statutes." *Eight N. Indian Pueblos Council,*

---

[7] (*See, e.g.,* Frey Decl. ¶¶ 4, 5, 8; Her Decl. ¶¶ 10–11, 16, 36–37.)

*Inc. v. Kempthorne*, No. CV-06-745 WJ/ACT, 2006 WL 8443876, at *5 (D.N.M. Sept. 15, 2006).

Finally, the use of face coverings for the purpose of concealing officer identity in public spaces is unlawful in Minnesota, undermines accountability, and escalates fear. *See* Minn. Stat. §609.735. Saint Paul Mayor Kaohly Her attests that residents could not distinguish masked federal agents from local police, resulting in widespread avoidance of all law enforcement. (Her Decl. ¶ 36–38.) For these reasons Plaintiffs have requested an injunction prohibiting Defendants and their agents from violating Minnesota law by concealing their identities by a mask or other means of disguise, and requiring Defendants and their agents to wear visible identification. ([Proposed] Order ¶ ¶ 2(d)(viii), 3(a), (ECF No. 17)). Requiring officers to be identifiable promotes lawful compliance, enables accountability for misconduct, and reduces the risk of escalation. These interests are central to democratic policing and the rule of law. They are also entirely consistent with requirements already agreed to by Minnesota state officials in prior settlements. *See* Order for Inj. at 2, *Samaha,* 20-cv-01715; Order Granting Pls.' Mot. for Monitored Inj. at 9, *Goyette,* 20-cv-01302 (WMW/DTS).

## CONCLUSION

Injunctive relief is required to protect the rights of the people of Minnesota to access attorneys and courts, and to enforce existing guardrails on the use of governmental power. The rule of law requires no less than that those sworn to uphold the law are also held to account by it.

"Certain other societies may respect the rule of force—we respect the rule of law."

President John F. Kennedy, 90th Anniversary Convocation Address at Vanderbilt University, (May 18, 1963). What was true in 1963 remains true today.

Dated:  January 19, 2026          **MASLON LLP**

By: */s/Peter C. Hennigan*
    William Z. Pentelovitch (#85078)
    Anna Petosky (#388163)
    Peter C. Hennigan (#031089X)
225 South Sixth Street, Suite 2900
Minneapolis, MN  55402
(612) 672-8200
Email:  bill.pentelovitch@maslon.com
       anna.petosky@maslon.com
       peter.hennigan@maslon.com

**ATTORNEYS FOR AMICUS CURIAE MINNESOTA STATE BAR ASSOCIATION, HENNEPIN COUNTY BAR ASSOCIATION, RAMSEY COUNTY BAR ASSOCIATION, MINNESOTA WOMEN LAWYERS, MINNESOTA ASIAN PACIFIC AMERICAN BAR ASSOCIATION, MINNESOTA ASSOCIATION OF BLACK LAWYERS, MINNESOTA HISPANIC BAR ASSOCIATION, AND THE SOMALI AMERICA BAR ASSOCIATION**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| STATE OF MINNESOTA, by and through its Attorney General Keith Ellison, CITY OF MINNEAPOLIS, and CITY OF ST. PAUL, | Court File No.  0:26-cv-00190-KMM-DJF |

Plaintiffs,

v.

KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; JOHN CONDON, *in his official capacity as Acting Executive Associate Director of Homeland Security Investigations; U.S. Department of Homeland Security*; TODD LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; MARCOS CHARLES, *in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations; U.S. Immigration and Customs Enforcemen*t; RODNEY SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. Customs and Border Protection*; GREGORY BOVINO, *in his official capacity as Commander of the U.S. Border Patrol; U.S. Border Patrol*; DAVID EASTERWOOD, i*n his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement,*

Defendants.

**COMPLIANCE CERTIFICATE FOR *AMICUS CURIAE* BRIEF MINNESOTA STATE BAR ASSOCIATION, HENNEPIN COUNTY BAR ASSOCIATION, RAMSEY COUNTY BAR ASSOCIATION, MINNESOTA WOMEN LAWYERS, MINNESOTA ASIAN PACIFIC AMERICAN BAR ASSOCIATION, MINNESOTA ASSOCIATION OF BLACK LAWYERS, MINNESOTA HISPANIC BAR ASSOCIATION, AND THE SOMALI AMERICAN BAR ASSOCIATION**

**EXHIBIT B**

I hereby certify that the Amicus Curiae Brief of the Minnesota State Bar Association, Hennepin County Bar Association, Ramsey County Bar Association, Minnesota Women Lawyers, Minnesota Asian Pacific American Bar Association, Minnesota Association of Black Lawyers, Minnesota Hispanic Bar Association, and the Somali American Bar Association in Support of Plaintiffs' Motion for Preliminary Injunction complies with the word limit imposed by Local Rule 7.1(f), with a total word count of 3,795 words, including headings, footnotes and quotations.

I further certify that the accompanying document was created in Microsoft® Word for Microsoft 365, and that this word processing program has been applied specifically to include all text, including headings, footnotes, and quotations. Any text in images not counted by the word processing program has been counted manually and added in to arrive at the above-stated total word count.

**[rest of page intentionally blank; signature follows]**

Dated:  January 19, 2026          **MASLON LLP**


By: */s/ Peter C. Hennigan*
    William Z. Pentelovitch (#85078)
    Anna Petosky (#388163)
    Peter C. Hennigan (#031089X)
225 South Sixth Street, Suite 2900
Minneapolis, MN  55402
(612) 672-8200
Email:  bill.pentelovitch@maslon.com
       anna.petosky@maslon.com
       peter.hennigan@maslon.com

**ATTORNEYS FOR AMICUS CURIAE
MINNESOTA STATE BAR ASSOCIATION,
HENNEPIN COUNTY BAR ASSOCIATION,
RAMSEY COUNTY BAR ASSOCIATION,
MINNESOTA WOMEN LAWYERS,
MINNESOTA ASIAN PACIFIC AMERICAN
BAR ASSOCIATION, MINNESOTA
ASSOCIATION OF BLACK LAWYERS,
MINNESOTA HISPANIC BAR ASSOCIATION,
AND THE SOMALI AMERICAN BAR
ASSOCIATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| STATE OF MINNESOTA, by and through its Attorney General Keith Ellison, CITY OF MINNEAPOLIS, and CITY OF SAINT PAUL, | Court File No. 0:26-cv-00190-KMM-DJF |
| Plaintiffs, | |
| v. | **DECLARATION OF CHERYL DALBY IN SUPPORT OF AMICUS CURIAE BRIEF** |
| KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; JOHN CONDON, *in his official capacity as Acting Executive Associate Director of Homeland Security Investigations; U.S. Department of Homeland Security*; TODD LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; MARCOS CHARLES, *in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations; U.S. Immigration and Customs Enforcemen*t; RODNEY SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. Customs and Border Protection*; GREGORY BOVINO, *in his official capacity as Commander of the U.S. Border Patrol; U.S. Border Patrol*; DAVID EASTERWOOD, *in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement,* | |
| Defendants. | |

**EXHIBIT C**

I, Cheryl Dalby, declare as follows:

1. I am the Chief Executive Officer of the Minnesota State Bar Association, the Hennepin County Bar Association, and the Ramsey County Bar Association (collectively, the "Bar Associations"). I submit this declaration based on my personal knowledge and in support of the Amicus Curiae Brief filed in support of Plaintiffs.

2. Collectively, the Bar Associations represent approximately 13,000 attorneys who practice throughout Minnesota in a wide range of legal settings, including private practice, government service, nonprofit organizations, and the judiciary, and who come from a wide range of racial, ethnic, religious, cultural, and professional backgrounds.

3. Since Immigration and Customs Enforcement ("ICE") increased its enforcement activities in Minnesota, I have heard directly from numerous attorneys and judges expressing concern for their personal safety and for the safety of their clients.

4. Attorneys of color have reported to me that, despite being United States citizens, recent federal immigration enforcement actions have led them to take additional steps to protect themselves and their families because of fear arising from the current immigration enforcement environment.

5. I have also heard from many attorneys who report experiencing increased mental health challenges associated with living and working under the current conditions. These attorneys have described heightened anxiety, depression, fear, and feelings of hopelessness that are affecting both their professional and personal lives.

6. In addition, attorneys have reported difficulty representing their clients because clients are afraid to come to law offices, attend court proceedings, or leave their homes as a result of the current immigration enforcement environment. Some attorneys, particularly attorneys of color, have expressed fear about leaving their own homes, further limiting their ability to represent their clients. Some legal employers have permitted attorneys and staff to work remotely in response to safety concerns. Many of the affected clients are United States citizens or individuals who are actively engaged in lawful immigration processes.

7. Furthermore, reports are now emerging that attorneys are being denied access to their clients at the Bishop Henry Whipple Federal Building in Minneapolis. Attached hereto as **Exhibit 1** is a true and correct copy of a news article written by Matt Rivers, Janice McDonald, and Armando Garcia titled "Lawyers allege Dept.

of Homeland Security is denying legal counsel to Minnesota detainees," published by ABC News at 7:22pm on January 18, 2026 at the following website: https://abcnews.go.com/US/lawyers-allege-dept-homeland-security-denying-legal-counsel/story?id=129335914.

8. Based on my experience communicating regularly with attorneys across Minnesota, these concerns are widespread and ongoing. In my 25 years of service as an executive director of a bar association, I have not previously encountered this level of fear or disruption affecting attorneys' ability to practice law and clients' ability to access legal representation.

9. This declaration is offered to provide the Court with information regarding the effects of the challenged conduct on attorneys, their clients, and the administration of justice in Minnesota, from the perspective of the professional organizations that serve those attorneys.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 19th day of January, 2026, in Minneapolis, Minnesota.


_____

Cheryl Dalby
Chief Executive Officer
Minnesota State Bar Association
Hennepin County Bar Association
Ramsey County Bar Association

Live    Video    Shows ⌄    Shop      🔔 👤    Stream on

# Lawyers allege Dept. of Homeland Security is denying legal counsel to Minnesota detainees

Detainees are being held at the Whipple Federal Building in Minneapolis.

By **Matt Rivers**, **Janice McDonald**, and **Armando Garcia**
January 18, 2026, 7:22 PM

   



**Unprecedented standoff between state and federal officials in Minnesota**   ABC News' Chief Washington Correspondent Jonathan Karl discusses the intensifying situation in Minnesota after the fatal ICE shooting of Renee Good.

Yuki Iwamura/AP

EXHIBIT 1

Thousands of people have been arrested during ICE operations in Minneapolis over the past two weeks. Multiple attorneys allege that for some of those detained, including at least one U.S. citizen, the Department of Homeland Security is denying their constitutional right to see an attorney.

Four attorneys told ABC News they have been denied access to their clients at the Bishop Henry Whipple Federal Building in Minneapolis, where they are being held, which they say would violate 5th and 6th Amendment rights to due process and the right to consult with counsel.

"ICE agents were physically restricting me from seeing them," said one immigration attorney, who asked not to be identified. "I stood outside the attorney visitation room for about four hours on Thursday, trying to see one of my clients who had been there for multiple days. I kept saying, you got to let me see my client. And they just kept repeating, we don't do attorney visitation."



A man is detained by Immigration and Customs Enforcement agents during an immigration raid in Minneapolis on Jan. 18, 2026. REUTERS/Leah Millis

Leah Millis/Reuters

The Department of Homeland Security denied that any constitutional violations are taking place at the Whipple Federal Building.

In a statement, a spokesperson for DHS denied the attorneys' claims, adding that all detainees "have opportunities to communicate with their family members and lawyers."

"The facts are illegal aliens in detention have access to phones they can use to contact their families and lawyers. Additionally, ICE gives all illegal aliens arrested a court-approved list of free

or low-cost attorneys. All detainees receive full due process," the spokesperson said in part.

---

**Minneapolis Mayor Frey defends himself amid reports of DOJ probe, says 'of course' he will comply**   →

---

The immigration attorney told ABC News they have visited clients held on similar immigration charges at the Whipple building for the last decade without issue.  The visitation denials of the past week, they said, are new and unprecedented.

The Whipple building has been a primary facility where people detained during DHS' "Operation Metro Surge" are being temporarily held. Most are eventually processed and sent to detention facilities across the country.

The building has also been the epicenter of clashes between anti-ICE protesters and federal agents since an ICE agent shot and killed 37-year-old Renee Good on Jan. 7.

The attorneys who spoke to ABC News work independently of one another. ABC News is withholding the identity of three of them due to fears that federal agents could retaliate against their clients still in custody.



Federal immigration officers outside Bishop Henry Whipple Federal Building, Jan. 15, 2026, in Minneapolis.
John Locher/AP

Attorneys say they have received a variety of explanations for why they cannot see their clients, including claims that they did not have appointments, that their clients did not ask for them by name, and that the Whipple building cannot accommodate attorney-client visits. None of those reasons is legally valid, according to the attorneys.

"There's nothing in the Constitution that talks about accommodating the government," said Attorney Robert Sicoli, who told ABC News he was denied access to his client at the building last Wednesday. "It is a violation of constitutional rights."

---

**Minneapolis ICE shooting live updates: Active-duty soldiers on standby, sources say→**

---

"One ICE agent said if we let you see your clients, we would have to let all the attorneys see their clients, and imagine the chaos," said another attorney who asked not to be named. "And I said to that person, yeah, you do have to let all the attorneys see their clients. You do have to accommodate that. That's the Constitution. You chose to put them here. I didn't bring this guy here, you did."

Another attorney described going to the Whipple building to try to see his client, a U.S. citizen and an Iraq War veteran, who he says was a bystander to an immigration enforcement operation near his home.

"They told me that because my client had not requested me by name, that I could not see him," the prominent local criminal defense attorney told ABC News. "I've been practicing law in Minnesota for almost 20 years, and I have never been denied access to a client."

The immigration attorney agreed.

"We've got blatant constitutional violations and they're intentional, it's not accidental, but nobody cares and they're doubling down."



People protest against the fatal shooting of Renee Nicole Good by a U.S. Immigration and Customs Enforcement agent, during a rally outside the Whipple Building in Minneapolis, January 8, 2026.
Tim Evans/Reuters

That attorney described another example, trying to see a detained client who has severe medical concerns and needs specific medications.

"His family had been trying to drop off medications, and his family had not confirmed that he had received the medications that he needs for his life," said the attorney. "So, I specifically told ICE that I need to talk to this guy to make sure he got his medications. And they wouldn't let me see him."

---

**2nd federal officer shooting in Minneapolis prompts protests, calls for calm→**

---

All attorneys ABC News spoke to called the DHS denial a blatant lie, citing their own personal experiences as proof.

The immigration attorney also said access to an attorney by phone is different from access to an attorney in person.

"If ICE is trying to say, 'Oh, it's fine, you can just have your client call you and you can talk and discuss their case over the phone,' that's absolutely unacceptable from an attorney-client

standpoint. [Federal authorities] can and likely are listening in to those phone calls."



Federal officers stand outside the Bishop Henry Whipple Federal Building during a protest on Saturday, Jan. 17, 2026, in Minneapolis.

Yuki Iwamura/AP

In recent months, other attorneys have raised similar claims in cities also grappling with a surge of immigration enforcement under the Trump administration. In September in New York City, a federal judge ordered that DHS provide detainees a way to make confidential calls to their lawyers within 24 hours of being detained at a holding facility at 26 Federal Plaza.

In October, detainees at the ICE facility in Broadview, Illinois, filed a lawsuit claiming they were being held in overcrowded and unsanitary conditions as well as being denied confidential and efficient access to counsel.

"It hurts your head the types of legal violations they are engaging in and the games they're playing," said the criminal defense attorney. "It's disgusting.  This is not the America I love."

## Related Topics

**Immigration**



## Sponsored Content by Taboola



Skip

Super Saving Online

Seniors Born 1939-1969 Receive 11 Benefits This Month If They Ask

Read More

**Who Charges The Most For Auto Insurance In Minnesota? (Check Zip Code)**

Sponsored / OTTO Insurance

Learn More

**St Paul: How Much Should New Windows Cost For a 2500 Sq Ft Home?**

Sponsored / Modern Energy-Saving Windows

Learn More

**Who Charges The Most For Car Insurance In Minnesota? (Check Zip Codes)**

Sponsored / OTTO Insurance

Click Here

**This 250th Anniversary Flag Wreath Is Being Snapped up in St Paul.**

Sponsored / Glosritystore

Learn More

**Replace Your Entire Roof in as Little as 1 Day!**

Sponsored / Metal Roofing Innovations

Learn More

ABC News Network   Privacy Policy   Your US State Privacy Rights   Children's Online Privacy Policy   Interest-Based Ads

About Nielsen Measurement   Terms of Use   Your Privacy Choices   Contact Us

© 2026 ABC News