# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| STATE OF MINNESOTA, *by and through its Attorney General Keith Ellison*, CITY OF MINNEAPOLIS, and CITY OF ST. PAUL, | |
| Plaintiffs, | |
| v. | Civ. No.: 0:26-cv-00190-KMM-DJF |
| KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; JOHN CONDON, *in his official capacity as Acting Executive Associate Director of Homeland Security Investigations*; U.S. Department of Homeland Security; TODD LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; MARCOS CHARLES, *in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations;* U.S. Immigration and Customs Enforcement; RODNEY SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection;* U.S. Customs and Border Protection; GREGORY BOVINO, *in his official capacity as Commander of the U.S. Border Patrol*; U.S. Border Patrol; DAVID EASTERWOOD, *in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement*, | **PLAINTIFFS' REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER** |
| Defendants. | |

## INTRODUCTION

Over a month ago, Defendants launched their lawless Operation Metro Surge—the largest immigration enforcement operation in U.S. history. Defendants publicly admit that the purpose of the invasion is to bully Plaintiffs into abandoning their laws that protect the dignity of their immigrant residents. That admission is all this Court needs to conclude that Plaintiffs have established a likelihood of success on this motion; the Tenth Amendment prohibits the federal government from sending an essentially militarized force to a jurisdiction to coerce the jurisdiction to change its laws and policies.

Not only do Defendants concede that Operation Metro Surge has an unconstitutional purpose, but by their silence they concede both the unconstitutional methods the operation has employed and the profound impact it has had on Plaintiffs. Defendants dispute none of the extensive evidence of lawless conduct that Plaintiffs submitted or the evidence of harm flowing to Plaintiffs from Defendants' conduct. The record makes clear that Operation Metro Surge impacts nearly every aspect of life in the Twin Cities metro, having shuttered schools, day cares, and businesses; impeded the delivery of health care; infringed the constitutional rights of many individual residents; required extensive resources from local law enforcement; and created such an atmosphere of chaos and lawlessness by agents that many residents fear leaving their homes, even to buy groceries or worship. That is irreparable harm, and the public interest necessitates court intervention.

Plaintiffs ask the Court to act—now—to restore Minnesota to the status quo that existed before Operation Metro Surge.[1]

## FACTUAL DEVELOPMENTS

I. **DEFENDANTS DISPUTE NONE OF THE EVIDENCE OF THEIR PATTERN AND PRACTICE OF LAWLESS CONDUCT.**

### A. Defendants Do Not Contest They Are Engaging in a Pattern and Practice of Lawless Conduct That is Impeding Plaintiffs' Ability to Provide Services.

Defendants have not contested a single fact alleged in Plaintiffs' Complaint or TRO. They do not deny that Operation Metro Surge ("OMS") has been characterized by chaos and needless force. They do not deny evidence of widespread racial profiling, excessive force, or retaliatory arrests rising to levels of systemic impact. They do not contest the veracity of public reporting on OMS. Nor do they dispute that Plaintiffs have had to expend additional State and City resources in response to DHS' unlawful strategies, that businesses have been compelled to close while employees and customers alike fear leaving their homes, and that OMS has impacted Plaintiffs' sovereign interest in providing education and ensuring public health and safety.

Instead, Defendants' brief discusses President Trump's immigration priorities, the "success" of OMS, and alleged violence and threats against Defendants' agents from other

---

[1] The Court converted Plaintiffs' request for a TRO into one for a preliminary injunction. Plaintiffs argued that a TRO remains appropriate (ECF 31), and Defendants have responded. Because Plaintiffs' position is unchanged, this brief refers to the requested relief as a TRO. If the Court proceeds with this motion as one for a preliminary injunction and declines to enter an injunction based on Plaintiffs' Tenth Amendment and Equal Sovereignty claims, Plaintiffs reserve the right to seek emergency relief on other claims in their Complaint.

jurisdictions. ECF 33 at 5-10. In Defendants' view, all that matters is that (i) President Trump wants to enforce immigration law, and (ii) there are *no* limits on how that enforcement occurs.

Defendants' own declarations demonstrate the excess of OMS. According to Samuel Olson, OMS added 2,000 ICE agents to a region that typically has 80. Olson Decl. (ECF 35-2) at ¶ 15. More recently, Defendant Lyons stated that between all cooperating agencies there are now about 4,000 agents in Minnesota doing immigration enforcement.[2] In comparison, Border Patrol's operations at Centro station near the international border in California have only 320 employees. Harvick Decl. (ECF 35-1) at ¶ 2. Reports on the recent Operation Midway Blitz in the Chicago metro area—a metro area twice the size of the Twin Cities—indicate only 300 immigration agents were deployed.[3]

The Court should decide this motion on those uncontested facts. *See, e.g., W. Watersheds Project v. Bernhardt*, 391 F. Supp. 3d 1002, 1007 (D. Or. 2019) (granting TRO where defendants did not dispute most facts presented by plaintiffs); *Brandt v. Burwell*, 43 F. Supp. 3d 462, 481 (W.D. Pa. 2014) (motion for injunction decided on uncontested facts).

---

[2] https://x.com/JenningsShow/status/2013745476206490013; *see also* the Scott Jennings Show, *The Truth About Ice Operations – Straight from the Director*, YouTube (Jan. 21, 2026), https://youtu.be/h3m0SeRHVIs?si=HCNZAhOSdBh48Fhh.

[3] *Chicago federal intervention: Tracking surge in immigration enforcement operations,* ABC7 Chicago (Nov. 9, 2025) https://abc7chicago.com/live-updates/chicago-immigration-customs-enforcement-news-latest-trump-admin-ice-surge-national-guard-deployment-illinois-live/18087310/.

## B. Defendants' Pattern and Practice of Lawless Conduct Has Mushroomed Since Plaintiffs First Moved for Emergency Relief.

The facts in this case are fundamental to the legal relief sought. Plaintiffs have shown that Defendants' unprecedented, unlawful actions have undermined our system of federalism. And in the past week, the situation within Minnesota has worsened, with new incidents emerging daily and previously alleged facts coming into clearer focus.[4]

Sworn declarations confirm Plaintiffs' racial profiling allegations.[5] The experiences described in Plaintiffs' motion have been joined and bolstered by others: DHS agents intentionally rammed and boxed in a truck parked on a residential street just so they could confront the Latino driver, but not the white passenger, for proof of citizenship;[6] a U.S. citizen was ambushed by ICE while he took out the trash on a cold morning because he looked Mexican;[7] a Somali woman was pulled over and badgered for proof of citizenship

---

[4] Public reporting has captured many impactful stories about OMS. Plaintiffs have preserved all media referenced in their Complaint and TRO, and additional relevant media, and will include the collection with this reply to ensure media links used throughout Plaintiffs' pleadings do not degrade or disappear. (Second Boschee Decl., Ex. 1.) Cases from other jurisdictions support the notion that local reporting can and should inform an early motion for injunctive relief. *See, e.g.*, *Havens v. James,* 76 F.4th 103, 123 (2d Cir. 2023) (reversing denial of preliminary injunction and instructing the district court to consider news reports as evidence on remand); *see also Flathead-Lolo-Bitterroot Citizen Task Force v. Montana,* 98 F.4th 1180, 1189-90 (9th Cir. 2024) (stating district court could consider news article for purposes of preliminary injunction; the rules of evidence do not strictly apply given the haste necessary to preserve positions of parties). The same preservation approach has been taken regarding Trump officials' social media posts relevant to Plaintiffs' motion. (Marvine Decl., Ex. 1.)

[5] Middlecamp Decl. Exs. 1-3, 49-63.

[6] *Id.*, Exs. 3, 3a.

[7] *Id.*, Ex. 59.

on her way to work;[8] and amid many reported stories of "door to door" or "checkpoint" activities, at least one woman has personally attested to observing this type of behavior in a Target parking lot.[9] DHS agents have dragged one woman out of her car on her way to a medical appointment and have caused other patients to cancel crucial appointments altogether at a measurable rate;[10] they have targeted school bus routes and areas near schools to such a degree that it has profoundly impacted attendance, stooping so low as to target vans carrying children;[11] and they have disrupted houses of worship to the point of forcing ministry into virtual spaces, or no spaces at all.[12]

These direct narratives are a snapshot: they cannot capture the full scope of public reporting or videos on social media, which includes more stories of ongoing racial profiling.[13] For example, on the day Plaintiffs sued, a local Somali woman recorded a scene in which multiple ICE agents badgered her for information and claimed they were doing a "citizen check."[14]  Two days later, a naturalized citizen with an accent was told he needed to provide proof of his citizenship in the parking lot of his apartment building "because of

---

[8] *Id.*, Ex. 2.

[9] Middlecamp Decl., Ex. 13.

[10] *Id.,* Ex. 7; First Boschee Decl., ¶¶ 6-14; Cunningham Decl., ¶ 11(c)

[11] Cienian Decl. ¶8a; Graff Decl., ¶ 19; Middlecamp Decl., Ex. 34.

[12] First Boschee Decl., ¶¶ 16-23.

[13] Sovia Barnett and Rohan Preston, *Allegations of racial profiling of US citizens on the rise as ICE surge expands in Minnesota,* The Star Tribune (Jan. 18, 2026) at https://www.startribune.com/allegations-of-racial-profiling-of-us-citizens-on-the-rise-as-ice-surge-expands-in-minnesota/601564653

[14] Middlecamp Decl., Ex. 12.

your accent," and was detained when he challenged agents' authority to demand it.[15] And
at a press conference on January 20, 2026, law enforcement leaders from around the Twin
Cities metro area shared concerns about "endless complaints" regarding racial profiling,
with one police chief highlighting how his own agency's officer was subjected to racial
profiling while she was off duty.[16]

Despite this body of evidence, DHS officials have brazenly insisted that every single
interaction between Defendants' agents and Minnesotans begins with a targeted
enforcement or a known-subject operation, and that if DHS agents encounter anybody "in
the area" of the known target, they are allowed to ask them about their citizenship.[17]

---

[15] Middlecamp Decl., Exs. 1, 1a.

[16] *Twin Cities law enforcement raises concerns about ICE agents racially profiling citizens,* Kare 11 (Jan. 20, 2026), https://www.kare11.com/article/news/local/ice-in-minnesota/twin-cities-law-enforcement-raises-concerns-about-ice-agents-racially-profiling-citizens/89-80f7b210-df6f-4516-9c05-20cf8890c7bb; *see also St. Paul police chief: Even off-duty cops are being stopped by ICE agents,* https://www.yahoo.com/news/articles/st-paul-police-chief-even-190400806.html

[17] On January 15, 2026, Defendant Noem was asked whether people within Minnesota who were being asked for their proof of citizenship were, in every instance, subjects of targeted enforcement, and Noem confidently responded, "In every situation, we're doing targeted enforcement. If we are on a target, and doing an operation, there may be individuals surrounding that criminal, we may be asking them who they are and why they're there." https://www.c-span.org/program/white-house-event/secretary-noem-speaks-to-reporters-at-the-white-house/671720 (at 2:50-3:15; 4:42-5:16).
On January 19, 2026, Defendant Charles repeated this claim when he was interviewed in *Minneapolis' police chief fears possible "moment where it all explodes" as ICE operation continues,* 60 Minutes (Jan. 18, 2026), https://www.youtube.com/watch?v=5O9QcbmG2mE&t=316s. During that interview, at 11:50-12:45, he stated that DHS agents have been told they can engage with anyone in the area of targeted enforcement, or whom they encounter on their way to or from a targeted operation and "establish citizenship"—including those they "encounter" while driving to and from a scene, or walking to or from a building. Charles confirmed that during these stops, "nobody is under suspicion." *Id.*

Incidents of excessive force and retaliation against protestors, observers, and others in the vicinity of DHS operations have likewise accrued.[18] One legal observer was told he was engaging in "domestic terrorism" simply for following ICE vehicles from a safe distance.[19] A family with six children driving home from basketball practice found themselves in the path of DHS agents who threw an explosive cannister of chemical irritants under their truck, causing terror and risking serious injury to the children inside.[20] Even after DHS agents have moved locations, they continue to leave safety threats in their path, with residents finding undetonated pepper balls, cannisters, and even a magazine of live ammunition left where any child could find them.[21]

And Defendants have turned their retaliation towards the Plaintiffs, serving criminal grand jury subpoenas on each Plaintiff, and transmitting a letter to Plaintiffs' counsel threatening judicial sanctions.[22]

The cumulative effect of the racial profiling, excessive force, and retaliation by Defendants' agents in Minnesota has been to create a generalized climate of fear. People of faith are staying away from houses of worship.[23] People who need health care are forgoing it.[24] St. Paul Public Schools closed for two days this week to create a virtual

---

[18] Middlecamp Decl., Exs. 4-8, 10, 14-48.

[19] Middlecamp Decl., Ex. 6, 6b.

[20] *Id.,* Ex. 8.

[21] *Id.*, Exs. 11, 64.

[22] Middlecamp Decl., ¶¶ 66, 66.

[23] First Boschee Decl., ¶¶ 16-23

[24] *Id.*, ¶¶ 6-14

option.[25] As the harmful tactics persist, so do the harms to Plaintiffs' sovereign interests. Decreased school attendance, student and staff exposure to chemical irritants, DHS agents pulling over school transport vehicles, and reduced hours and closures, all impact Plaintiffs' sovereign interests and the State's constitutional obligation to ensure public education.[26] Similarly, Plaintiffs' sovereign stake in administering public health has been thwarted not only by trends of cancelled appointments, but interruptions to critical vaccine prevention work, food inspections, and blood lead level, cervical cancer, and HIV screenings that depend on public trust, public safety, and active field work which is being impeded by OMS.[27]

Meanwhile, concerns for public safety and increased burdens on local law enforcement and emergency services continue to rise.[28]

### C. The Purpose of OMS Is to Punish Plaintiffs For Adopting Sanctuary Laws and Policies.

Minneapolis and Saint Paul have ordinances that generally prohibit their participation in federal immigration enforcement, and both cities have successfully enjoined the Trump Administration from withholding federal funds based on those so

---

[25] Suppl. Her Decl., ¶ 13.

[26] *See generally* Graff Decl.

[27] *See generally* Cunningham Decl.

[28] Barnette Decl. ¶¶ 4-10; Sayre Decl., ¶¶ 8-10; Her Suppl. Decl., ¶¶ 5-8, 10-11; *see also* Middlecamp Decl., Ex. 11.

called "sanctuary" ordinances.[29] The administration lists Minnesota as a "sanctuary jurisdiction," without identifying why.[30]

Since this lawsuit began, Defendants have repeatedly characterized OMS as the unavoidable consequence of Plaintiffs' refusal to "work with" them. Shortly after the lawsuit was announced, on January 12, 2026, ICE said they have not surged resources to states with higher rates of noncitizens because, "unlike Minnesota, these states work WITH ICE to detain and deport illegal aliens."[31] Defendants do not dispute that OMS is not based on the prevalence or criminal records of immigration targets, but is based on ways they allege Minnesota should do more to help federal immigration enforcement:



For example, DHS Assistant Secretary Tricia McLaughlin said on January 12, there would be no surge if Minnesota "worked with" the federal government.[32]  The next day,

---

[29]     https://www.minneapolismn.gov/news/2025/december/fed-activity-updates-resources/; *see also infra* at 13 (collecting cases).

[30]      https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions; *see also* https://www.whitehouse.gov/articles/2026/01/minnesotas-sanctuary-defiance-has-consequences/.

[31] https://x.com/DHSgov/status/2010762818522435739 (Marvine Decl., Ex. 1 at 47. Defendants repeat the claim that jurisdictions that "cooperate" with federal law enforcement require less surging in their responsive brief (ECF 33 at 22).

[32]  https://x.com/TriciaOhio/status/2010851137705164935 (Marvine  Decl.,  Ex.  1 at 43).

DHS stated: "DHS law enforcement is in Minneapolis and cities nationwide because sanctuary politicians REFUSE to hand over the criminal illegal aliens in their custody . . . . "[33] DHS Assistant Secretary McLaughlin also wrote: "Important question; WHY are DHS law enforcement surging to Minneapolis and other sanctuary cities? It's because Minnesota law enforcement won't let us in their jails . . . ."

Then, on January 14, 2026, DHS posted a Fox News clip with an accompanying caption, "Why are DHS law enforcement surging to sanctuary cities? Because sanctuary jurisdictions won't let us in their jails."[34] Border Czar Tom Homan has repeated that same talking point, stating, "If you want less officers on the street, then let us in the jail."[35] Defendant Charles (executive director for ICE removals) repeated this theme again on January 20, 2026, stating, "If we had cooperation with local jurisdictions in the state of Minnesota, we wouldn't have to be out there hunting these people down . . . ."[36] And on January 20, 2026, Defendant Lyons agreed that if "Minnesota officials, Governor Walz

---

[33] https://x.com/DHSgov/status/2011174665574875199\ (Marvine Decl., Ex. 1, 49). [34] https://x.com/DHSgov/status/2011480946172707117 (*Id.* at 53).

[35] *Extended Interview: Border Czar Tom Homan on Minneapolis Ice Shooting, more,* CBS Evening News (Jan. 7, 2026) https://www.youtube.com/watch?v=FfNyXDupcDs&t=2s (relevant portions at 12:47-13:12.) A week later, Homan stated, "Minneapolis, you're a sanctuary city, if they'd let us in their damn jail, and stop being a sanctuary city, we could arrest the bad guy in the safety and security of a jail." PBS Newshour (Jan. 14, 2026) https://www.youtube.com/watch?v=VZPn1moAqNA; *see also* Barnette Decl., ¶ 17.

[36] https://x.com/ICEgov/status/2013796743884714022 (Marvine Decl., 75.)

and Mayor Frey and the police there . . . would cooperate with ICE", "we wouldn't see as many [of Defendants' agents] up there."[37]

Defendants' interest in coercion as opposed to legitimate immigration enforcement is also revealed by the sheer volume of untargeted detentions outlined above. Defendants claim that "Operation Metro Surge has led to the successful arrest of 3,000 illegal aliens, including aliens with criminal convictions." ECF 33 at 9-10. But Defendants produced no data, and that figure is attributed to DHS press releases that contain inaccurate or misleading data.[38] Behind these inflated numbers, individual cases where long-established immigrants with little-to-no criminal history, who have kept regular appointments with DHS for years, have been targeted by unlawful and aggressive arrest tactics in OMS,[39] further demonstrate that the refrains of "worst of the worst" and "let us in your jails" are inaccurate.

Taking Defendants at their word that making "sanctuary" jurisdictions "work with them" is the genuine reason for OMS, those are significant admissions. What Defendants actually mean by "work with us" and "let us in the jails" is: change state and local law, direct state and local resources to facilitate more information sharing to aid federal immigration enforcement, and direct more state and local resources towards holding

---

[37] The Scott Jennings Show, *The Truth About Ice Operations – Straight from the Director*, YouTube (Jan. 21, 2026), https://youtu.be/h3m0SeRHVIs?si=HCNZAhOSdBh48Fhh (relevant portion at 9:50.)

[38] *See generally* Vega Decl.

[39] Middlecamp Dec., Ex. 9.

immigration targets in detention for longer periods of time than otherwise allowed, *for the federal government's benefit*. Such coercion is plainly unlawful.

## II.    PLAINTIFFS HAVE A FAIR CHANCE OF PREVAILING ON THE MERITS OF THEIR CONSTITUTIONAL CLAIMS.

Plaintiffs' Tenth Amendment and Equal Sovereignty claims rest on undisputed evidence that Defendants are punishing Plaintiffs for not using their scarce resources to assist the federal government with immigration enforcement. First, Defendants attempted to coerce Plaintiffs "the easy way" by trying to tie all federal funding—even for roads and bridges—to an agreement to assist in immigration enforcement. Such strong-arm tactics have been enjoined in several cases in which Plaintiffs are parties, including *California v. U.S. Dep't of Transp.*, 788 F. Supp. 3d 316 (D.R.I. 2025); *City and County of San Francisco v. Trump*, 779 F. Supp. 3d 1077 (N.D. Cal. 2025); *Martin Luther King Cnty. v. Turner*, 798 F.Supp.3d 1224 (W.D. Wash 2025); *Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75 (D.R.I. 2025); and *Chicago v. U.S. Dep't of Just.*, 2026 WL 114294 (N.D. Ill. Jan. 15, 2026). That tactic having failed, Defendants are trying to coerce Plaintiffs "the hard way" by occupying Plaintiffs with 4,000 heavily armed immigration agents conducting unlawful stops and arrests. Moreover, amid all of Defendants' intentionally provoking conduct, the federal government has threatened to deploy active military troops to Minnesota.[40] Defendants' conduct is patently coercive, and it clearly violates Plaintiffs' rights.

---

[40] Kim Hyatt, *A state and city on edge faces another threat from Trump to send in 1,500 troops,* The Minnesota Star Tribune (Jan. 18, 2026) https://www.startribune.com/a-
(Footnote Continues on Next Page)

As an initial matter, Defendants mischaracterize Plaintiffs' claims to get the more favorable likelihood-of-success standard that applies when statutes are challenged. ECF 33 at 12-13. Contrary to Defendants' mischaracterization, Plaintiffs challenge neither the Immigration and Nationality Act nor Defendants' discretionary authority to enforce that Act. Instead, this lawsuit challenges executive action: specifically, Defendants' pattern of law enforcement misconduct to coerce Plaintiffs into enforcing federal immigration law. Plaintiffs do not challenge a statute or regulation. *Contra Planned Parenthood of Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 726 (8th Cir. 2008) (constitutional challenge to South Dakota law). The fair-chance-of-prevailing standard therefore applies because Plaintiffs "simply seek to enjoin one project," i.e., OMS, "undertaken pursuant to statutory authorization." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 279 F. Supp. 3d 846, 870 n.12 (D. Minn. 2017).[41]

## A.    OMS Violates the Tenth Amendment.

Defendants are correct on one point: that "the basic concept of our system of federalism is simple." ECF 33 at 1. "The Framers split the atom of sovereignty. It was the genius of their idea that our citizens would have two political capacities, one state and one federal, each protected from incursion by the other." *U.S. Term Limits, Inc. v. Thornton*,

---

state-and-city-on-edge-faces-another-threat-from-trump-to-send-in-1500-troops/601566481.

[41] Regardless, the facts and law here are sufficient to meet the fair chance or likelihood-of-success standards.

514 U.S. 779, 838 (1995) (Kennedy, J., concurring). This system is a necessary bulwark to protect the people against tyranny:

> The Constitution does not protect the sovereignty of States for the benefit of the States or state governments as abstract political entities, or even for the benefit of the public officials governing the States. To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals. State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.

*New York v. United States*, 505 U.S. 144, 181 (1992) (citation modified). The federal government cannot, consistent with the Tenth Amendment, use unlawful, violent conduct to coerce states and localities to abandon laws and policies that they have a right to adopt. The overwhelming weight of the evidence shows that is what Defendants are doing, and Defendants have not contested that evidence.

To be sure, no case is on all fours with these facts. But that is not because Defendants' conduct does not violate the Tenth Amendment. It is because Defendants' lawless incursion into Minnesota with thousands of heavily armed federal immigration agents is inconsistent with our Constitutional tradition. The novelty of Defendants' actions is no barrier to the Court in finding a violation here. *See Printz v. United States*, 521 U.S. 898, 925 (1997) (applying anticommandeering doctrine to "novel" statutory schemes unaddressed by "prior jurisprudence").

Indeed, two lines of Tenth Amendment cases compel the conclusion that Plaintiffs are likely to prevail on their Tenth Amendment and Equal Sovereignty claims.

1.      **OMS seeks to coerce Plaintiffs—through force—into abandoning policies they have a Tenth Amendment right to adopt.**

The first line of cases is about coercion. The federal government cannot compel Plaintiffs to enforce federal immigration laws. Yet OMS is designed to do exactly that. While the federal government may pressure States into "taking certain actions," when federal "pressure turns into compulsion," the federal government violates "our system of federalism." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576-78 (2012) ("*NFIB*") (citation modified). This principle has led courts across the country to hold that the federal government cannot compel state and local governments to enforce federal immigration laws. *See, e.g.*, *San Francisco*, 779 F. Supp. 3d at 1082 (holding executive orders freezing funding to so-called sanctuary jurisdictions "violate the Tenth Amendment because they impose coercive condition intended to commandeer local officials into enforcing federal immigration practices and law").

Under our government of dual sovereignty both the federal government and the States wield sovereign powers. The federal government's powers are enumerated; all other powers are reserved to the States. *Murphy v. NCAA*, 584 U.S. 453, 470-71 (2018). The anticommandeering doctrine prohibits the federal government from "compel[ling] the States to enact or administer a federal regulatory program." *New York*, 505 U.S. at 188. Nor can it conscript state or local officers directly, *Printz*, 521 U.S. at 935, or coerce States to action through improper influence, *NFIB*, 567 U.S. at 578. These principles apply no matter how strong the federal interest. *New York*, 505 U.S. at 178.

In other lawsuits, including one against Plaintiffs, the United States has argued that preemption requires State and local governments to assist with immigration enforcement activities, such as data sharing, executing detainers, etc. Courts have uniformly rejected these claims, holding that requiring States to assist the federal government in executing its immigration regulatory scheme would unconstitutionally commandeer state resources or, at minimum, raise serious Tenth Amendment problems. *See, e.g.*, *United States v. California*, 921 F.3d 865, 888-91 (9th Cir. 2019); *United States v. Illinois*, 796 F. Supp. 3d 494, 522-23 (N.D. Ill. 2025); *Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 376-79 (D.N.J. 2020), *aff'd on other grounds*, 8 F.4th 176 (3d Cir. 2021); *Colorado v. U.S. Dep't of Just.*, 455 F. Supp. 3d 1034, 1059-60 (D. Colo. 2020).

OMS is unlawful for the same reason—what the United States cannot do through preemption, it surely cannot do through force. Defendants are trying (i) to bully Plaintiffs into repealing their separation laws (referred to as "sanctuary" laws by Defendants) and (ii) to force Plaintiffs to administer the United States' immigration regulatory scheme.

The second and related line of cases is about Congress's spending power. While Congress may incentivize States to act in accordance with federal policies, when "pressure turns into compulsion," then Congressional action violates federalism principles. *NFIB*, 567 at 577-78.

OMS runs contrary to our system of federalism because it exceeds the federal government's authority and furthers no legitimate purpose. In *South Dakota v. Dole*, the Court considered whether "the financial inducement offered by Congress" was "so coercive as to pass the point at which 'pressure turns into compulsion.'" 483 U.S. 203, 207

17

(1987) (quoting *Stewart Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)). *Dole* defined a framework for evaluating whether Congress had engaged in impermissible coercion: courts should examine (1) the purpose of Congress's exercise of power; (2) whether the condition is clear; (3) whether it is germane to the particular federal program; and (4) an "independent constitutional bar" that is triggered when the condition is so coercive such that "pressure turns into compulsion." *Id.* at 207, 211. Although this framework examines Congress's spending authority to exert coercive pressure on sovereign States, the *Dole* elements map onto the problem here, which is the Executive Branch's exercise of immigration enforcement authority to exert coercive pressure on Plaintiffs.

Defendants' early claims regarding their purposes in conducting OMS (political retribution or fighting fraud) have largely given way to the purpose of compelling Plaintiffs to abandon their separation laws. As argued above, neither retribution nor forced legislation is a legitimate purpose to support Defendants' actions. As to the purposes of fighting fraud and crime, OMS is not "germane to" either purpose. Defendants did not send 4,000 forensic accountants and white-collar crime investigators to Minnesota. They sent 4,000 armed, poorly trained agents to racially profile Minnesotans. The operation and the tactics employed have nothing to do with fraud. Likewise, the operation is not directed at getting violent offenders off the street and has accomplished little in terms of criminal or

immigration enforcement,[42] beyond creating the very context that may be used as a basis to bring charges against protestors.

Finally, OMS is unlawful because the coercive effect on Plaintiffs goes far beyond mere pressure. In *NFIB*, the Court explained that while the federal government may offer "relatively mild encouragement to the States" the choice to act must "remain the prerogative of the States not merely in theory but in fact." *NFIB*, 567 U.S. at 581 (citation modified). The Court held that the threat of withholding all further Medicaid payments was "much more than 'relatively mild encouragement'—it is a gun to the head." *Id.* Here, Plaintiffs are suffering more than just a proverbial gun-to-the-head: the federal government has deployed 4,000 agents with actual guns, and those agents are engaged in a pattern of lawlessness, including excessive force, racial profiling, retaliation, and reckless driving, to name a few. This lawless conduct is more than mere pressure; it is duress.

What the federal government cannot do with threats of withholding money, surely it cannot do through a coercive invasion of a State. This Court must restrain it.

> **2.    Plaintiffs are required to respond to the public-safety mess created by Defendants' lawlessness.**

In response to Plaintiffs' anticommandeering claims, Defendants minimize the effect of their illegal conduct and assert that they are only "indirectly" compelling Plaintiffs to respond to the public safety crisis they created. Defendants assert that the

---

[42] If the Court would like a more fully developed record on this issue (and any others), Plaintiffs have already served discovery on Defendants with the goal of presenting a fuller record at a later stage, whether that be a preliminary injunction or otherwise.

anticommandeering doctrine "prohibits only direct federal compulsion" and therefore it is inapplicable here. ECF 33 at 14. Defendants' argument fails on both facts and law.

On the facts, Defendants do not contest that they came to Minnesota with thousands of masked and heavily armed agents; do not contest that they have engaged in a pattern of illegal conduct designed to create a public safety crisis; and do not contest that they are creating a public safety crisis. In the face of these facts, how can Defendants credibly maintain that Plaintiffs are not "directly compelled" to use their resources to clean up the public-safety mess left by Defendants? As a factual matter, they cannot. It is as if Defendants threw a party in Plaintiffs' home, trashed it, and are now saying: "Well, you don't *have to* clean up the mess . . ." And what a violent, dangerous mess it is that Defendants have intentionally created. It goes far beyond the non-commandeering burdens cited in Defendants' Response, such as facilitating a federal prosecution, or road closures from a presidential visit.

On the law, Defendants are also wrong. Defendants cite *Minnesota ex rel. Hatch v. United States* for the proposition that the anticommandeering doctrine does not prohibit the federal government from intentionally inciting a public safety crisis with a pattern of illegal conduct. 102 F. Supp. 2d 1115 (D. Minn. 2000). But *Hatch* is completely distinguishable. *Hatch* addressed the State's theory that geographic disparities in federal Medicare funding were "compelling" Minnesota to spend more state dollars to make up for the fact that it was getting less Medicare funding than, say, New York or Florida. *Id.* at 1120-21. That relative financial burden was the kind of compulsion this Court considered "indirect" and

thus not subject to anticommandeering principles. To extend *Hatch's* holding to this situation would bend it past the breaking pointing.

Defendants' reliance on *United States v. Texas* is also misplaced. 599 U.S. 670, 677-78 (2023). The Court's ruling turned on the fact that "lawsuits alleging that the Executive Branch has made an insufficient number of arrests or brought an insufficient number of prosecutions run up against the Executive's Article II authority to enforce federal law." *Id.* Here, Plaintiffs allege injury from an illegal enforcement rather than discretionary decisions *not* to enforce. Challenges to illegal enforcement actions are, of course, something Article III courts entertain regularly. This Court should not hesitate to rule here where Defendants do not contest that they are engaged in a pattern of illegal conduct intended to coerce and punish Plaintiffs.

### 3. Defendants' commandeering of Plaintiffs' property is also unconstitutional.

With a single footnote, Defendants assert that their continued commandeering of Saint Paul City property for use in ICE and DHS operations is permissible because officers only "temporarily park in city-owned public parking lots." ECF 33 at 17 n.11. Not so. Defendants' flippant dismissal disregards the application of the anticommandeering doctrine to Defendants' exploitation of Saint Paul's resources. For example, in *Printz,* the Court held that coopting state resources for use in a federally enacted regulatory scheme, "albeit only temporarily," still violates the "constitutional system of dual sovereignty" and is barred under the Tenth Amendment. *Printz*, 521 U.S. at 904, 935.

While *Printz* involved the conscription of state officials into implementing a federal scheme, the analysis applies equally to Defendants' nonconsensual requisition of city-owned property for federal operations. Multiple significant costs flow from Defendants' continued commandeering of city property, in violation of city ordinance, for their federal actions.[43] Additionally, it forces Saint Paul into an appearance of complicity with Defendants' unconstitutional and heavy-handed enforcement operations, and obfuscates political accountability. *See Murphy*, 584 U.S. at 474.

### 4.  OMS interferes with Plaintiffs' exercise of their powers.

Defendants do not dispute that some of Plaintiffs' most fundamental obligations and sovereign powers—ensuring public safety, ensuring safe roadways, ensuring public education, ensuring public health—have all been adversely impacted by OMS.[44] The impacts felt within each of these sovereign functions are not "choices" made by Plaintiffs. To the contrary, Plaintiffs have been forced to expend additional resources and reallocate core personnel to continue exercising their powers and satisfying their obligations, under dramatically worsened circumstances.

### B.  OMS Violates the Equal Sovereignty Doctrine.

Minnesota has also shown at least a fair chance of prevailing on their Equal Sovereignty claim. As Plaintiffs' opening brief explained, the Supreme Court recognizes a "'fundamental principle of *equal* sovereignty' among the States." *Shelby Cnty. v. Holder*,

---

[43] Her Decl., ¶¶ 8-22; Her Suppl. Decl., ¶¶ 16-24.

[44] *See, e.g.,* Cunningham Decl.; Graff Decl.; *see also* Jacobson Decl., ECF 14; Dodds Decl., ECF 15.

570 U.S. 529, 544 (2013) (quoting *Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009)). This principle is "highly pertinent" to "assessing disparate treatment of States." *Id.* And under this principle, the federal government can treat States differently, but such disparate treatment must be "'sufficiently related to the problem that it targets.'" *Id.* at 542 (quoting *Northwest Austin*, 557 U.S. at 203).

Operation Metro Surge fails that test, and none of Defendants' contrary arguments are persuasive. Defendants principally argue that the most recent Equal Sovereignty precedent, *Shelby County*, is irrelevant because it concerned the Voting Rights Act, and this case does not involve a statute that treats States differently. ECF 33 at 19. But *Shelby County's* reasoning applies with equal force: it teaches that the federal government cannot single out States for disparate treatment without a strong and narrowly tailored justification. *See* 570 U.S. at 542. Here, Defendants claim to be "prioritizing" Minnesota for immigration enforcement because it has "66,000 people potentially subject to enforcement actions under the INA." ECF 33 at 21. But other states have immigrant populations that dwarf Minnesota's.[45] And Defendants' own statements and actions confirm that they are targeting Minnesota not for immigration enforcement, but to punish political enemies and to force Minnesota to abandon separation policies it has the right to adopt. *See supra* at 9-13.

Nor are Defendants right when they claim that Plaintiffs are challenging the Executive Branch's enforcement discretion. ECF 33 at 20. The Executive Branch has broad leeway to enforce immigration laws, just as Congress has broad leeway to treat States

---

[45] *State Immigration Data Profiles,* Migration Policy Institute, https://www.migrationpolicy.org/programs/data-hub/state-immigration-data-profiles

differently when justified by current evidence. But the federal government cannot impose different burdens on States absent "compelling evidence" that the different treatment is warranted.[46] *See Shelby Cnty.*, 570 U.S. at 550-56. Or, put differently, the federal government has no authority to treat States differently for pretextual reasons. *Cf. Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (holding agency action unlawful because courts "cannot ignore the disconnect between the decision made and the explanation given"). And Defendants' justifications for OMS are just that—pretextual. Effective immigration enforcement is an afterthought. Punishing Minnesota and other disfavored jurisdictions through brute force is the point.

Finally, Defendants decry Minnesota's theory as "novel." ECF 33 at 21. But it is akin to the recent conclusion that sending out-of-state National Guard troops to Oregon violated the Equal Sovereignty principle. *See Oregon v. Trump*, 2025 WL 3126773, at*48 (D. Or. Nov. 7, 2025). And if Minnesota's Equal Sovereignty claim is novel, it is only because Defendants' actions are unprecedented.

---

[46]    Defendants rely on *Trump v. United States*, 603 U.S. 593 (2024), for the claim that the Executive Branch's enforcement discretion is boundless. ECF 33 at 20. But under *Trump*, the President has absolute immunity from criminal prosecution for acts within his exclusive authority. This is a civil case, not a criminal one, and the President isn't a defendant anyway.

III.    **THE REMAINING EQUITABLE FACTORS OVERWHELMINGLY SUPPORT RELIEF.**

A.  **The Undisputed Facts Show That OMS Is Causing Irreparable Harm.**[47]

The ongoing violation of Plaintiffs' constitutional rights under the Tenth Amendment is itself "a cognizable injury and an irreparable harm." *See Ng v. Bd. of Regents of Univ. of Minnesota*, 64 F.4th 992, 998 (8th Cir. 2023). But in case there were any doubt, as detailed at length above and in Plaintiffs' accompanying declarations, OMS continues to cause incalculable harm to Plaintiffs' communities and sovereign interests. These harms are irreparable and continue to accrue, impeding Plaintiffs' ability to ensure the public health, safety, and welfare of their residents as well as support the local economy. *See, e.g.*, Pingol Decl. ¶ 18 ("The cumulative impact of these conditions poses a significant threat to the economic health of the City of Saint Paul."); Sayre Decl. ¶ 10 ("In addition, having to continue to operate the City's response protocols due to Operation Metro Surge significantly decreases our readiness and ability to adequately respond to new and emergent threats."); *id.* ¶ 16 ("Due to Operation Metro Surge, businesses across the City have reported significant impacts to operations and hours, including closing completely."); Johnson Decl. ¶¶ 6-7 and Hansen Decl. ¶¶ 13-16 (event cancellations impact on Minneapolis); Barnette Decl. ¶¶ 3-11 (impacts on Minneapolis 911, Fire, and Police); Phelps Dec. ¶¶ 5-11 (impacts on Minneapolis 311); Suppl. Her Decl. ¶¶ 5-9 (impacts on

---

[47] Defendants make no argument that Plaintiffs lack standing and thus have conceded the issue. Their passing references to Article III's case-or-controversy requirement and related concepts (e.g., "predictable effects") also miss the mark. ECF 33 at 17-18. Plaintiffs have necessarily diverted resources to respond to Defendants' actions, such as when DHS pulled an individual from a car in the middle of the street and abandoned the car there, but such incidents are far from the only harms.

SPPD), 10-11 (impacts on SPFD), 12-24 (impacts on Saint Paul Parks & Recreation), 25-29 (impacts on Saint Paul DSI), 30-33 (impacts on Saint Paul Libraries), 34 (impacts on Saint Paul Public Works), 35 (impacts on Saint Paul OFE), 36-57 (impacts on Saint Paul businesses); Graff Decl.*,* ¶ 9 ("missing even a small amount of school has a significant impact on learning"); Cunningham Decl. ¶¶ 9-11 (listing numerous state-run health initiatives including cancer screening, lead level testing, and one metric reflecting a 40% increase in rate of no-shows);   *See also Oregon v. Trump*, 2025 WL 2817646, at *14 (D. Or. Oct. 4, 2025) (concluding that federalizing national guard members "diverts them from their state responsibilities, which impairs the State's ability. . . to respond to emergencies"); *City of Albuquerque v. Barr,* 515 F. Supp. 3d 1163, 1175 (D. N.M. 2021) (collecting cases concluding harm caused by the collapse of trust between local law enforcement and immigrant communities is irreparable).

The irreparable harm suffered by Plaintiffs weighs in favor of granting Plaintiffs' requested relief.

### B.  The Balance of Harms and Public Interest Support Relief.

The balance of harms and the public interest do not tip in Defendants' favor simply because Defendants seek to enforce federal immigration law. Under Defendants' conception of the equities and the public interest, all other interests—including the public and Plaintiffs' interests in public safety, health, welfare, education, and federalism—must yield to the Executive's enforcement of immigration law, no matter how disruptive, harmful, or disproportionate that enforcement may be. That is not, and cannot be, the law.

To start, courts do not, as Defendants suggest, give the Executive special dispensation for immigration enforcement. ECF 33 at 24-25. On the contrary, the Supreme Court has repeatedly and recently affirmed the judiciary's role in ensuring the Executive does not exceed its discretion in the immigration context. *See, e.g.*, *Trump v. Illinois*, 2025 WL 3715211 (U.S. Dec. 23, 2025) (denying stay of order restraining President from federalizing Illinois National Guard in conjunction with immigration enforcement efforts); *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025) (denying stay of order requiring Government to facilitate and effectuate return of erroneously deported alien); *A.A.R.P. v. Trump*, 145 S. Ct. 1034 (2025) (mem.) (directing Government not to remove to any member of a putative class of detainees set to be deported under the Alien Enemies Act). While courts must always take care to avoid improperly intruding on a coordinate branch of government, nothing in the largely unreasoned orders cited by Defendants suggests that this Court should give the Executive unusual deference in enforcing immigration law. *See* ECF 33 at 24 (citing cases).

Nor would "[a]ny injunction here . . . unduly interfere with federal immigration enforcement." ECF 33 at 22. Plaintiffs do not seek a veto of Defendants' immigration enforcement—Plaintiffs merely seek, in this preliminary posture, a return to the status quo enforcement levels before OMS. Those levels were far from impotent. In an October 2025 press conference in Minneapolis touting the "incredible work" performed by Defendants, Defendant Noem stated that Defendants had "removed over 4,300 individuals" from the

streets of Minnesota in the preceding ten months.[48] Further, in a press release issued this week, DHS suggested that last year it arrested over 7,000 "criminal illegal aliens" in Minnesota *before* the Surge.[49]

Defendants' own numbers, moreover, belie their claim that Minnesota is a "crucial priority for immigration enforcement." ECF 33 at 24. According to Defendants, only 66,000, or 0.44%, of the approximately 15 million illegal aliens in the United States are believed to be present in Minnesota. ECF 33 at 8, 25. And yet, Defendants have devoted more than 9% of all ICE officers and agents in the nation to Operation Metro Surge (to say nothing of the CBP officers and agents also detailed).[50] An injunction here, in other words, would not interfere with federal immigration enforcement but would ensure that federal immigration enforcement itself does not swallow Plaintiffs' sovereign prerogatives in our federal system.

Indeed, Defendants do not have a monopoly on the public interest. Though the interests of Defendants, as the federal government, "merge" with public interests, *see Nken*

---

[48] *Secretary Noem to Hold Press Conference in Minneapolis,* Department of Homeland Security (Oct. 24, 2025) https://www.youtube.com/live/1jcQl3lyUFE?si=r2WVheeJupn8TQfr (comments begin at 4:16).

[49] *ICE continues to remove the worst of the worst from Minneapolis streets as DHS law enforcement marks 3,000 arrests during operation metro surge,* Department of Homeland Security (Jan. 19, 2026) https://www.dhs.gov/news/2026/01/19/ice-continues-remove-worst-worst-minneapolis-streets-dhs-law-enforcement-marks-3000.

[50] *ICE announces historic 120% manpower increase, thanks to recruitment campaign that brought in 12,000 officers and agents,* Department of Homeland Security (Jan. 3, 2026) https://www.dhs.gov/news/2026/01/03/ice-announces-historic-120-manpower-increase-thanks-recruitment-campaign-brought.

*v. Holder*, 556 U.S. 418, 435 (2009), Plaintiffs also represent public interests as state and local governments. The public may have an interest in immigration enforcement, but the public has an even weightier interest in a "healthy balance of power between the States and the Federal Government," which "[reduces] the risk of tyranny and abuse from either front.'" *Murphy*, 584 U.S. at 473 (quoting *New York*, 505 U.S. at 181-82). The Supremacy Clause does not negate federalism. *See id.* at 477 ("[P]ointing to the Supremacy Clause will not do."). The public's interest in maintaining our federal system remains paramount, "[n]o matter how powerful the federal interest involved." *See New York*, 505 U.S. at 178. The balance of the harms and the public interest weigh in favor of Plaintiffs.

## IV.    THE PROPOSED INJUNCTION RESTORES MINNESOTA TO THE STATUS QUO.

Defendants argue that Plaintiffs' proposed order ending Operation Metro Surge would "constitute an unprecedented act of judicial overreach." ECF 33 at 4. But a TRO is intended to preserve the status quo until the merits are determined. *Dataphase Sys., Inc. v. C.L. Sys, Inc*., 640 F.2d 109, 114 (8th Cir. 1981). The status quo is the "last uncontested status which *preceded the pending controversy*." *Minn. Mining & Mfg. Co. v. Meter ex rel. NLRB*, 385 F.2d 265, 273 (8th Cir. 1967) (citation modified) (emphasis added); *accord Gabriel v. Bondi*, No. 25-CV-4298 (KMM/EMB), 2025 WL 3443584, at *8 (D. Minn. Dec. 1, 2025); *Snap Fitness, Inc. v. Scenic City Fitness, Inc*., No. 24-CV-2803 (NEB/DTS), 2024 WL 4528877, at *4 (D. Minn. Oct. 18, 2024) (defendant cannot race to establish a new normal and then describe it as the status quo); *see also Aggarao v. MOL Ship Mgmt. Co*., 675 F.3d 355, 378 (4th Cir. 2012) ("[I]t is sometimes necessary to require a party who

has recently disturbed the status quo to reverse its actions" because "such an injunction restores, rather than disturbs, the status quo ante." (citation modified)).

Here, the status quo ante is ICE's immigration enforcement operations before its unprecedented invasion of Minnesota. An order enjoining OMS would simply restore, while the litigation proceeds, the parties to where they were on November 30, 2025, to stop the irreparable harms from continuing.

The other relief requested in Plaintiffs' Amended Proposed Temporary Restraining Order is appropriate because it will require Defendants to act lawfully in Minnesota and to create and retain documentation that will permit accountability and transparency about their activities in Minnesota. "The public has a strong interest in having a [government] that conducts itself fairly and according to its stated regulations and policies." *Doe 4 v. Lyons*, 783 F. Supp. 3d 1281, 1298 (W.D. Wash. 2025). Importantly, ICE has been documenting its enforcement activities and providing them to plaintiffs in other cases since 2021. *Castanon Nava v. DHS*, 1:18-cv-03757, ECF 146-1 (N.D. Ill. Nov. 30, 2021); *see also Escobar Molina v. DHS*, 2025 WL 3465518, at*39 (D.D.C. Dec. 2, 2025); *Ramirez Ovando v. Noem*, No. 25-3183-RBJ, 2025 WL 3293467, at*23-24 (D. Colo. Nov. 25, 2025).

## V.    NO STAY OR BOND IS NECESSARY.

Defendants make a premature request for a stay. Such a motion must come after any injunction is ordered; Defendants may not skip the line and go straight to the appellate court should they lose. *See* Fed. R. App. P. 8. Even if timely, Defendants fail to meet their burden. *Kansas v. United States*, 124 F.4th 529, 533 (8th Cir. 2024) (setting out four stay

factors and placing the burden on the party moving for a stay). Defendants rely completely on their preliminary injunction arguments which, for the reasons already stated above, fail. The Court should refuse to entertain Defendants' request for a stay pending appeal.

As to a bond, courts in the Eighth Circuit recognize that "a district court is not required to impose one." *Goyette v. City of Minneapolis*, 338 F.R.D. 109, 121 (D. Minn. 2021) (citing *Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991)); *see also Richland/Wilkin Joint Powers Auth*, 826 F.3d at 1043. Because Plaintiffs' case centers on the public interest in preventing violations of Plaintiffs' constitutional rights, a bond is inappropriate. *Goyette*, 338 F.R.D. at 120-21; *Bukaka, Inc. v. Cnty. of Benton*, 852 F. Supp. 807, 813 (D. Minn. 1993). Requiring a bond would chill litigation seeking to vindicate constitutional and other federal rights. *Id*. Moreover, Defendants have neither requested a bond nor identified any likely costs or damages from an erroneously issued injunction.

## CONCLUSION

Operation Metro Surge is an unprecedented and unconstitutional invasion of Minnesota by thousands of heavily armed federal officers. It has negatively impacted nearly every aspect of life in the Twin Cities metro and violates the Tenth Amendment. Emergency relief is urgently needed to restore the status quo and prevent irreparable harm.

Plaintiffs ask the Court to enter a temporary restraining order of up to 14 days while the parties engage in targeted discovery and prepare for a preliminary injunction hearing.

Respectfully submitted,

Dated: <u>January 22, 2026</u>

KEITH ELLISON
Attorney General
State of Minnesota

<u>/s/ Lindsey E. Middlecamp</u>
LIZ KRAMER (#0325089)
Solicitor General
PETER J. FARRELL (#0393071)
Deputy Solicitor General
KATHERINE BIES (#0401675)
BRIAN S. CARTER (#0390613)
LINDSEY MIDDLECAMP (#0392589)
JOSEPH RICHIE (#0400615)
Special Counsel

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1010 (Voice)
(651) 282-5832 (Fax)
liz.kramer@ag.state.mn.us
peter.farrell@ag.state.mn.us
katherine.bies@ag.state.mn.us
brian.carter@ag.state.mn.us
lindsey.middlecamp@ag.state.mn.us
joseph.richie@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

Dated: <u>January 22, 2026</u>

KRISTYN ANDERSON
City Attorney
<u>/s/ Kristyn Anderson</u>
KRISTYN ANDERSON (#0267752)
HEATHER P. ROBERTSON (#0390470)
Assistant City Attorney
SARA J. LATHROP (#0310232)
Assistant City Attorney
KIRSTEN H. PAGEL (#0399114)
Assistant City Attorney

ADAM SYZMANSKI (#0397704)
Assistant City Attorney
MICHAEL A. BREY (#0398620)
350 South Fifth Street
Minneapolis, MN 55415
Tel: 612-673-3000
kristyn.anderson@minneapolismn.gov
sara.lathrop@minneapolismn.gov
heather.robertson@minneapolismn.gov
kirsten.pagel@minneapolismn.gov
adam.szymanski@minneapolismn.gov
michael.brey@minneapolismn.gov

*Attorneys for Plaintiff City of Minneapolis*


Dated: <u>January 22, 2026</u>

IRENE KAO
City Attorney
*By: /s/ Kelsey McElveen*
IRENE KAO (#0392282)
City Attorney
PORTIA HAMPTON-FLOWERS
(#0210869)
Deputy City Attorney
KELSEY MCELVEEN (#0396744)
Assistant City Attorney
ALEXANDER HSU (#0399275)
Assistant City Attorney
15 W. Kellogg Blvd., #400
Saint Paul, MN 55102
Tel: 651-266-8710
Irene.kao@ci.stpaul.mn.us
Portia.flowers@ci.stpaul.mn.us
Kelsey.mcelveen@ci.stpaul.mn.us
Alexander.hsu@ci.stpaul.mn.us

*Attorneys for Plaintiff City of Saint Paul*