# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| STATE OF MINNESOTA, *by and through its Attorney General Keith Ellison*, CITY OF MINNEAPOLIS, and CITY OF ST. PAUL,<br><br>      Plaintiffs,<br><br>      v.<br><br>KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; JOHN CONDON, *in his official capacity as Acting Executive Associate Director of Homeland Security Investigations;* U.S. Department of Homeland Security; TODD LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; MARCOS CHARLES, *in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations; U.S. Immigration and Customs Enforcement;* RODNEY SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. Customs and Border Protection*; GREGORY BOVINO, *in his official capacity as Commander of the U.S. Border Patrol; U.S. Border Patrol*; DAVID EASTERWOOD, *in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement*,<br><br>      Defendants. | Court File No. 0:26-cv-00190-KMM-DJF<br><br><br><br><br><br><br><br>***AMICUS CURIAE* BRIEF OF CHILDREN'S DEFENSE FUND MINNESOTA IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

# INTERESTS OF *AMICUS CURIAE*

Children's Defense Fund Minnesota ("CDF-MN") is a statewide, nonprofit child advocacy organization with more than forty years of experience advancing the health, safety, and well-being of Minnesota's children. CDF-MN's mission is to build community so that young people grow up with dignity, hope, and joy. Operating at the intersection of child well-being and racial justice, CDF-MN envisions a Minnesota in which marginalized children flourish, public leaders prioritize children's needs, and communities wield their collective power to ensure all children thrive.

CDF-MN works to improve policies and programs affecting children through research, advocacy, economic justice outreach, community organizing and engagement, and youth development. It conducts and disseminates research on issues affecting children across racial and income groups and analyzes the impacts of federal and state policies on children, families, and communities. CDF-MN leads statewide advocacy on child-centered policies and provides direct programming for youth and families, primarily in the Minneapolis and St. Paul metropolitan area.

Central to CDF-MN's work is ensuring that children grow up in safe, stable, and nurturing environments - conditions essential for healthy development. This includes advocating for policies and practices that protect children's physical safety, emotional well-being, and developmental health, particularly for children exposed to adversity, trauma, or instability. CDF-MN has longstanding expertise in child development, the potential impact of Adverse Childhood Experiences ("ACEs"), and effects of toxic stress,

community violence, and threats to children's development, learning, and long-term health.

CDF-MN submits this brief on behalf of Minnesota's children, all of whom deserve safety, stability, and the unimpeded opportunity to thrive. CDF-MN is deeply concerned about the ongoing, large-scale, and militarized Immigration and Customs Enforcement ("ICE") operations in Minneapolis and St. Paul and the cumulative harm that such an overbearing federal presence inflicts on children living in affected communities.

The evidence is overwhelming: ICE's enforcement activities create environments of fear, trauma, and disruption, with measurable and lasting impacts on children's brain development, emotional regulation, learning, and physical and mental health. These harms fall disproportionately on children of color and are intensified for children already exposed to community violence and structural inequities. CDF-MN offers this brief to assist the Court in understanding the urgent, irreparable, and constitutionally significant harms these conditions impose on Minnesota's children.

**SUMMARY OF ARGUMENT**

Children do not experience immigration enforcement as policy or process. They experience it as fear. In Minneapolis and St. Paul, children are growing up amid a sustained, militarized federal enforcement presence in the very places that should anchor safety and stability: homes, child care centers, schools, libraries, and neighborhoods. Masked and armed agents, unmarked vehicles, public arrests, and the use of chemical

agents have transformed ordinary childhood spaces into environments of perceived threat. Children are missing school and extracurricular activities, withdrawing from play, outdoor exploration, and time with friends, and living with daily anxiety that parents or caregivers may not return home. And some children worry they won't return home.

Child development research is unequivocal: prolonged exposure to fear, unpredictability, and perceived danger cause toxic stress, a condition that permanently alters brain architecture, disrupts emotional regulation, and increases the risk of lifelong mental and physical illness.[1] These harms are not speculative. They are foreseeable, measurable, and enduring. Some impacts may be mitigated with timely, intensive intervention, but missed developmental windows cannot be fully restored, and harm cannot simply be undone by later care.

*Operation Metro Surge* has created precisely the conditions that produce toxic stress, and it has done so knowingly and disproportionately in communities of color. Federal enforcement actions that affirmatively and foreseeably expose children to developmental harm raise grave constitutional concerns under substantive due process, the Fourth Amendment, and equal protection principles.

This case arises at the precise moment preliminary injunctive relief is designed to address: where constitutional violations are ongoing, where harm is irreparable, and

---

[1] Jack P. Shonkoff, MD and Andrew S. Garner, MD, PhD, *The Lifelong Effects of Early Childhood Adversity and Toxic Stress*, 129 *Pediatrics* 232 (2012).

where delay itself compounds injury. Under the Eighth Circuit's *Dataphase Systems, Inc.* standard,[2] the threat to children's health and development weighs heavily in favor of immediate relief. Children cannot wait for final judgment. Their harm is happening now.

## STATEMENT OF FACTS

**I.  CHILDREN'S EXPOSURE TO IMMIGRATION ENFORCEMENT IN MINNEAPOLIS AND SAINT PAUL**

Since December 2025, federal immigration enforcement has been highly visible and sustained across residential and commercial areas of Minneapolis and St. Paul. Federal agencies have deployed approximately 3,000 agents as part of *Operation Metro Surge*, described as one of the largest immigration enforcement operations in U.S. history. Reports from educators, families, advocates, local officials, and media describe a continuous presence of masked agents in tactical gear, unmarked vehicles, and coordinated street-level operations occurring near homes, child care facilities, schools, transit corridors, libraries, and places of worship. There have been reports of school buses being pulled over while transporting students, and school buses being followed, stop after stop, to and from school.[3]

Children are exposed not only by witnessing arrests, but by observing armed strangers patrolling familiar spaces, sensing caregiver fear, overhearing urgent

---

[2] *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109 (8th Cir. 1981)(en banc).
[3] Nick Longworth. *St Paul Schools van full of teachers, students pulled over by ICE agents*. FOX 9. January 15, 2026.

5

conversations, and experiencing abrupt disruptions to daily routines. Developmentally, children cannot distinguish among law enforcement agencies or assess legal justification. What registers instead is force, fear, urgency, and danger.[4]

Families report keeping children home from child care and school, avoiding public spaces, and altering work schedules due to fear that their children could be harmed, exposed to dangerous enforcement encounters, or separated from caregivers through direct or witnessed interactions with ICE.[5] Minneapolis Public Schools and Saint Paul Public Schools implemented temporary virtual learning options as attendance declined amid enforcement activity. Child care providers reported closures and disruptions when agents operated nearby. These conditions communicate to children that routines are unreliable, spaces are unsafe, and caregivers' presence is uncertain, thereby directly undermining children's sense of security.[6]

## II. TOXIC STRESS AND FORESEEABLE HARM

Decades of research confirm that chronic exposure to fear and perceived threat in childhood causes toxic stress, which is defined as the prolonged activation of the stress

---

[4] Child Welfare League of America, *Children Exposed to Trauma: Implications for Policy and Practice* (2024).
[5] Meg Anderson. The ICE Surge is Fueling Fear and Anxiety Among Twin Cities Children, NPR (January 22, 2026).
[6] Mara Klecker and Anthony Lonetree. Attendance Drops at Minnesota Schools as Federal Immigration Enforcement Intensifies Anxieties, Star. Trib., January 15, 2026.

response system without adequate buffering supports.[7] Toxic stress is closely linked to Adverse Childhood Experiences ("ACEs"), a widely accepted public health framework that captures cumulative exposure to adversity such as chronic fear, caregiver distress, household instability, and exposure to violence. A substantial body of research demonstrates that ACEs exert their harmful effects primarily through toxic stress, which disrupts the hypothalamic-pituitary-adrenal axis,[8] alters cortisol regulation, and affects brain regions responsible for learning, memory, and emotional regulation.[9] These stress-related changes become biologically embedded in developing children and persist into adulthood, increasing the risk of depression, cardiovascular disease, substance use disorder, educational failure, and other long-term health and well-being consequences.[10]

Physical violence is not required to produce these effects. Perceived threat, unpredictability, and caregiver distress - hallmarks of sustained enforcement presence - are sufficient to trigger toxic stress responses and to elevate children's exposure to ACEs.[11] Minnesota-based researchers and public health data have repeatedly documented these effects in children exposed to chronic environmental stress, confirming the

---

[7] National Scientific Council on the Developing Child, *Excessive Stress Disrupts the Architecture of the Developing Brain* (2005).
[8] Megan Gunnar & Karina Quevedo, *The Neurobiology of Stress and Development*, 58 Ann. Rev. Psychol. 145, 145-47 (2007) (explaining that the HPA axis regulates the body's stress response through the release of hormones such as cortisol).
[9] Shonkoff & Garner, supra note 1, at 236.
[10] Center on the Developing Child, Harvard University, *Toxic Stress* (2021).
[11] Vincent J. Felitti, MD, FACP et al., *Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults*, 14 Am. J. of Prev. Med. 245, 245-58 (1998).

foreseeable and lasting developmental harm associated with prolonged conditions of fear and instability.[12]

The risk is compounded by recent acts of community violence in and around Minneapolis, including: the shooting of Renee Good - a mother of three who had recently dropped her young son off at a local elementary school - by a masked, uniformed ICE agent in South Minneapolis; the mass shooting at Annunciation Catholic Church and School in South Minneapolis that killed two young children and injured many more; the assassinations of Speaker Emerita Melissa Hortman and her husband, Mark Hortman, in their Brooklyn Park home, a suburb of Minneapolis; and the shooting death of 11-year-old Amir Atkins in North Minneapolis. Layered exposure to community violence and militarized enforcement dramatically increases the likelihood of developmental harm.[13]

### III. CHILDREN AT RISK: SCOPE AND DISPROPORTIONATE HARM

More than 150,000 children live in Minneapolis and St. Paul. Nearly one-third of Minneapolis children and one-quarter of St. Paul children are under age five - a stage when their brains are developing rapidly, and they are especially sensitive to stress. Children of color comprise approximately 40% of children in Minneapolis and over 50% of children in St. Paul, and they are more likely to live in neighborhoods targeted for

---

[12] Minnesota Department of Health, *ACEs, Trauma, and Stress*. January 22, 2024.
[13] Patrick Fowler et al., *Community Violence: A Meta-Analysis on the Effect of Exposure and Mental Health Outcomes of Children and Adolescents*. 21 Dev. and Psychopathol. 227, 227-59 (2009).

enforcement activity.[14] All children in affected neighborhoods face significant disruption and stress due to federal enforcement. While these harms affect every child, Indigenous children and children of color may experience additional burdens because the operations often occur in communities already facing systemic inequities.

IV. **FORESEEABLE PHYSICAL ENDANGERMENT AND HARM TO CHILDREN RESULTING FROM ICE ENFORCEMENT PRACTICES**

On January 14, 2026, six children in one family - ranging from six months old to eleven years old - were trapped inside their SUV when a tear gas canister deployed during federal enforcement activity rolled beneath their vehicle. Smoke filled the car, airbags deployed, and doors locked. A six-month-old infant stopped breathing and had to be resuscitated by his mother. Many of the children required hospital treatment. This incident demonstrates that the risk to children is immediate, not hypothetical, when chemical agents and militarized tactics are deployed in civilian environments.[15]

Local reporting confirms that ICE enforcement activities in Minnesota have directly involved the detention of minor children, causing trauma and risk to children, students and families in the Columbia Heights area (a suburb of Minneapolis. On January 20, 2026, Columbia Heights Public Schools officials publicly stated that at least four

---

[14] U.S. Census Bureau, *American Community Survey* (2025)
[15] Reg Chapman. *Minneapolis Couple Says ICE Released Tear Gas Under Their Family Vehicle With 6 Children Inside*. CBS Minn. (January 16, 2026), https://www.cbsnews.com/minnesota/news/ice-tear-gassed-family-vehicle-with-6-children-inside/ (reporting that an infant in the vehicle stopped breathing and was resuscitated).

9

students were detained by ICE agents during a surge of immigration enforcement. Among those detained was a 5-year-old boy. The preschooler was apprehended with his father in the driveway of their home shortly after returning from preschool. According to the district superintendent, agents removed the child from a still-running vehicle and directed him to knock on his front door to check for others inside - a tactic described by officials as using the child as "bait" before transporting both father and son to a detention center in Texas.[16]

During the same time period, school leaders reported that a 10-year-old fourth-grade student was taken by ICE agents while on her way to elementary school with her mother, with the child calling her father during the arrest; by the time he arrived, both his daughter and wife had been removed from the area and were *en route* to Texas detention facilities. Additionally, 17-year-old high school students were detained in separate incidents, including one who was removed from a vehicle by agents without a parent present and another who was detained with her mother at their residence. School officials reported that the aggressive presence of federal agents near schools, buses, and neighborhoods has shaken the community's sense of safety and led to heightened fear among students and families.[17]

---

[16] Mara Klecker. *Preschooler and Three Other Students Detained by ICE,* Star Trib. (January 21, 2026), https://www.startribune.com/preschooler-and-three-other-students-detained-by-ice-school-district-leader-says/601568045 (noting that a teacher said "He's a bright young student … and he's so kind and loving. His classmates miss him").
[17] Joe Nelson. *ICE Detains 4 Columbia Heights Students, Including 5- and 10- Year-Olds Sent to Texas*, Bring Me the News (January 21, 2026),

Families and school communities have also described incidents in which ICE apprehended a parent while they were waiting at a school bus stop with their child. According to statements from Robbinsdale Area Schools, a parent was detained by ICE agents while waiting with their child at a bus stop in Crystal, a suburb of Minneapolis. School officials noted that such encounters created fear and anxiety among students and families, prompting the district to offer psychological support and adjust transportation protocols in response.[18]

These horrifying enforcement actions have occurred alongside broader deployments of federal immigration agents in the Twin Cities area, with significant concern expressed by educators, local officials, and community members about the impact of such operations on public safety and on children's sense of security.

Taken together, these documented incidents show that ICE enforcement actions in Minnesota have repeatedly placed children in situations of direct physical and emotional danger. Whether through the detention of children, the public apprehension of parents while children watch, or enforcement visibility around schools and bus transit routes, these practices create environments in which children are unnecessarily exposed to trauma and risk. The cumulative evidence demonstrates that ICE's tactics foreseeably and repeatedly result in physical and psychological harm to children, warranting urgent judicial scrutiny.

---

https://bringmethenews.com/minnesota-news/ice-detains-4-columbia-heights-students-including-5-and-10-year-olds-sent-to-texas.
[18] Klecker & Lonetree, supra note 6.

# ARGUMENT

## I. PRELIMINARY INJUNCTION STANDARD

In the Eighth Circuit, courts evaluate requests for preliminary injunctions under the four *Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109 (8th Cir. 1981)(en banc) factors: (1) Threat of irreparable harm; (2) Likelihood of success on the merits; (3) Balance of harms; and (4) The public interest.[19] Where constitutional rights are implicated, and harm cannot later be remedied, preliminary injunctive relief is particularly appropriate.

### A. CHILDREN FACE IMMEDIATE AND IRREPARABLE HARM

*Irreparable harm is the core of this case*. Children in Minneapolis and St. Paul are being subjected daily to chronic fear and instability. Child development research establishes that toxic stress causes permanent changes to brain structure and stress-response systems.[20] Once experienced, these harms cannot be undone by monetary damages or remedies applied after the fact.

Courts consistently recognize that the loss of constitutional rights constitutes irreparable harm. See *Powell v. Noble*, 798 F.3d 690 (8th Cir. 2015). That principle applies with particular force when the injury affects children's development. Missed school, disrupted routines, and exposure to toxic stress each interfere with critical periods of

---

[19] *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109 (8th Cir. 1981) (en banc).
[20] Shonkoff et al., supra note 1.

learning, emotional growth, and neurological development - damage that cannot be undone. While therapeutic interventions and educational support can help children recover and cope, they cannot erase the harm that has already occurred. Just as an infant cannot retroactively recover from oxygen deprivation, a child cannot regain lost opportunities for learning, safety, and healthy brain development. Delay itself inflicts lasting harm.

The federal government itself has recognized the severity of childhood stress and its impact on health and development. Under Secretary of Health and Human Services Robert F. Kennedy Jr.'s leadership, the *Make America Healthy Again Commission* identified chronic stress as a key contributor to the nationwide epidemic of childhood health problems, including impacts on emotional well-being, learning, and overall development.[21] This acknowledgment underscores that the harms children experience from prolonged fear and instability are not only real but also foreseeable to government actors.

### B. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

#### 1. State-Created Danger

---

[21] U.S. Dep't of Health & Hum. Servs., *Make America Healthy Again Commission Report* (2025).

Under *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989), the government may be liable where it affirmatively creates or increases danger and acts with deliberate indifference to foreseeable harm. The Eighth Circuit recognizes this doctrine.[22]

Here, the federal government affirmatively introduced a sustained, militarized enforcement presence into residential neighborhoods and near child care facilities and schools. The resulting harms - chronic fear, toxic stress, disrupted education, missed developmental opportunities, family instability, social and emotional trauma, and even physical injury - are foreseeable and well-documented. Deliberate indifference arises when government actors are aware of a substantial risk of serious harm but fail to take reasonable steps to prevent it.[23] By deploying enforcement operations that predictably expose children to these harms, while failing to implement safeguards or avoid unnecessary risk, the government knowingly disregards the well-being of children.[24] Ignoring this evidence, particularly as it relates to children, supports a finding of deliberate indifference.[25]

### 2. Unreasonable Intrusions in Child-Centered Spaces

The Fourth Amendment requires that government searches and seizures be reasonable under all circumstances. U.S. Const. amend. IV; *Graham v. Connor*, 490 U.S. 386, 395 (1989). What may be lawful in a routine criminal investigation becomes constitutionally suspect when conducted where children live, learn, and play - homes,

---

[22] See *Doe v. Nebraska Dept. of Social Servs.*, 345 F.3d 593 (8th Cir. 2003).
[23] *DeShaney*, 489 U.S. at 197-98.
[24] Id.
[25] Shonkoff et al., supra note 1.

child care facilities, and schools. Children are uniquely susceptible: fear, disruption, and exposure to armed enforcement can cause lasting psychological, emotional, and developmental harm. *Graham* instructs that such conduct must be judged "from the perspective of a reasonable officer on the scene" considering the totality of circumstances.[26] That totality should account for the foreseeable impacts on children, whose developing brains and bodies are acutely sensitive to threat and stress. By deploying enforcement operations that predictably expose children to these harms, while failing to implement safeguards or avoid unnecessary risk, the government knowingly disregards the well-being of children.[27] When heavily armed officers conduct raids, patrol residential streets, or deploy chemical agents in child-populated areas, the risk of physical and psychological injury is not just real—it is predictable, making such operations unreasonable under the Fourth Amendment.

---

[26] *Graham v. Connor*, 490 U.S. 386, 396 (1989) (explaining that police conduct must be judged "from the perspective of a reasonable officer on the scene" considering the totality of circumstances).

[27] *DeShaney*, 489 U.S. at 197–98; *Doe v. Neb. Dep't of Soc. Servs.*, 345 F.3d 593, 598–99 (8th Cir. 2003) (recognizing that a state may be liable when it "affirmatively acts to increase the danger" to a child);, 439 F.3d 1055, 1062–63 (8th Cir. 2006) (affirming state-created *Kennedy v. City of Ridgefield* danger liability when government action foreseeably endangered children); *M.L. v. Smith*, 845 F.3d 1138, 1143–44 (8th Cir. 2017) (government may be liable for deliberate indifference to foreseeable harm to minors); *Graham v. Connor*, 490 U.S. 386, 396 (1989) (reasonableness of government conduct must be evaluated "from the perspective of a reasonable officer on the scene," considering the totality of circumstances).

### 3. Incorporating Child-Centered Harms into Constitutional Analysis

The Eighth Circuit's analyses of state-created danger and equal protection principles support explicit recognition of child-centered harms. Courts routinely consider the totality of circumstances in Fourth Amendment cases, including the foreseeable consequences of government action. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Children are uniquely susceptible to lasting harm from fear, disruption, and toxic stress - harms that are predictable when heavily armed officers conduct sustained enforcement operations in residential neighborhoods, and around schools or child care facilities. Such foreseeable risks can render otherwise routine operations unreasonable under the Fourth Amendment.

Similarly, in equal protection analysis, government actions that foreseeably impose disproportionate burdens on protected classes - including children of color - raise constitutional concerns.[28] By explicitly incorporating child-centered harms into legal analysis, courts ensure that enforcement operations are evaluated not only for immediate objectives, but also for their predictable impact on children's health, development, and emotional well-being. Recognizing these harms aligns with established principles that children constitute a protected class deserving heightened consideration and ensures that constitutional rights are meaningful for those most at risk. This approach does not prevent

---

[28] *Brown v. Bd. of Educ.*, 347 U.S. 483, 494–95 (1954) (children are a protected class under the Equal Protection Clause); see supra notes [X], [Y] (citing *M.L. v. Smith*, 845 F.3d 1138, 1143–44 (8th Cir. 2017); *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197–98 (1989)) (recognizing government liability for foreseeable harms to children).

immigration enforcement; it requires that enforcement be conducted in a manner that minimizes foreseeable, preventable harm to children.

### 4. Disproportionate Harm to Children of Color

Children of color bear a disproportionate share of the harm caused by militarized enforcement practices concentrated in targeted neighborhoods. In Minneapolis, of approximately 82,000 children under the age of 18, roughly 31,000-35,000 are children of color. In St. Paul, of approximately 73,000 children under the age of 18, roughly 30,000-35,000 are children of color.[29] These neighborhoods are the focus of sustained federal enforcement operations. Activities include heavy ICE patrols, raids near homes, schools, and child care facilities, and the use of chemical agents in public spaces. Children in these communities are more likely to experience chronic fear, toxic stress, disruptions to school attendance, missed developmental opportunities, family instability, and exposure to community violence - all of which have long-term consequences for cognitive, emotional, and physical health.[30]

These children are legally and constitutionally protected for multiple reasons. First, as minors, they are entitled to special consideration under the law because their developing brains and bodies make them uniquely susceptible to harm and less able to protect themselves or advocate for their interests. See *DeShaney*, supra note 23, at 197-98 (recognizing that government may be liable when it knowingly exposes children to

---

[29] U.S. Census Bureau, supra note 14.
[30] Shonkoff et al., supra note 1.

foreseeable harm). Second, children of color in targeted communities are protected under the Equal Protection Clause, U.S. Const. amend. XIV, because government actions that foreseeably impose disproportionate burdens on protected classes raise serious constitutional concerns. See *Brown*, supra note 28, at 494-95 (recognizing children as a protected class under the Equal Protection Clause). Third, children have recognized rights to education, safety, and family integrity, all of which are disrupted when militarized enforcement operations invade their daily environments.

By concentrating enforcement in communities of color, federal operations exacerbate pre-existing inequities, heighten stress and trauma, and place these legally protected children at heightened risk of preventable harm, reinforcing both constitutional and child welfare concerns.

### C. WEIGHING THE HARMS

On one side of the scale are children and their childhoods - their safety, their trust, and their opportunity to grow, learn, and thrive. Daily exposure to fear, disruption, and toxic stress undermines their sense of security and can leave lasting developmental and emotional effects. On the other side is the government's interest in conducting enforcement operations without modification based on harm to the community - an approach that knowingly risks predictable and profound harm to the youngest and most susceptible members of our communities. Children must be shielded from harm, nurtured with stability, and given every opportunity to develop to their full potential.

The government retains ample ability to enforce immigration law while avoiding residential neighborhoods, child care settings, schools, and public spaces where children are present. Children, by contrast, experience lasting developmental setbacks when exposed to chronic fear, interrupted routines, missed school, and social and emotional disruption.[31]

### D. THE PUBLIC INTEREST

The public has a compelling interest in ensuring that children can play outside, attend school, and travel safely without fear of armed confrontation, chemical exposure, or the threat of losing a caregiver. Under the *Dataphase* standard, the public-interest factor weighs in favor of protecting children from foreseeable harm. Large-scale ICE enforcement in residential neighborhoods and near child-focused spaces has caused fear among students, parents, and educators, prompting districts to adjust school operations and provide psychological support. Reports of terrifying incidents, including the fatal shooting of a mother, the detention of children, and arrests of caregivers during federal operations, illustrate the real harms to children and families. Children across the Twin Cities have witnessed enforcement actions – including agents surrounding cars at bus stops and homes with visible force – contributing to pervasive fear, emotional distress, and trauma. Protecting children in these spaces is not only a legal requirement under

---

[31] Shonkoff et al., supra note 1; Minnesota Department of Health, supra note 12.

established constitutional principles - it is a moral imperative. The public benefits when children can fully participate in daily life and enjoy the wonders of childhood.

## **CONCLUSION**

This Court is being asked to act while its intervention can still prevent harm. Children cannot wait for discovery or final judgment. Their injury is unfolding in real time – shaping their developing minds and physical health and bodies. When classrooms empty because children are afraid to attend school, when an infant stops breathing after being exposed to tear gas, when a preschooler is detained, when a 10-year-old witnesses the detention of a caregiver, when a 6-year-old's mother is killed, childhood becomes defined by vigilance rather than safety.

The physical and psychological harms to Minnesota children are real and ongoing. *Amicus* CDF-MN respectfully urges the Court to grant preliminary injunctive relief to halt *Operation Metro Surge*, recognizing that the Constitution does not allow federal enforcement to proceed at the cost of children's lives, health, and future well-being.

Dated: January 22, 2026          **CHILDREN'S DEFENSE FUND MINNESOTA**

By:   /s/ *Alexandra Fitzsimmons*
          Alexandra Fitzsimmons (#0332501)
85 East Seventh Place
Suite 120
Saint Paul, Minnesota 55101
(651) 855-1182
Email: afitzsimmons@childrensdefense.org

20