## DECLARATION OF R█████ E████████

I, R███ E██████ declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I am over the age of 18 years old and I am a resident of the State of Minnesota. Because my family has expressed concerns regarding retaliation, I ask that this declaration be submitted with my name redacted, but if necessary, I would be available to testify to the facts described below.

2. On the morning of Monday, January 12, 2026, I dropped my child off at school and stopped at a local grocery store, where I saw what I believed to be ICE agents in the parking lot (no front plate, a Texas plate in the back, and a driver in tactical gear and face covering.)

3. Up until that point I had heard rumors of increased ICE presence in the Woodbury area, but this was the first time I had witnessed firsthand that they were present in our community. Both in order to document that they had, in fact, expanded operations to our area, and to ensure there was a witness present to either deter or document constitutional violations, I followed the ICE agents at a safe distance. At no point did I blow a whistle, honk, wave, or shout at their vehicle. My intention was merely to document and observe and serve as a witness.

4. Approximately 60 to 90 seconds after I first began following them through the parking lot, the ICE vehicle stopped, and I pulled into a nearby parking spot. The ICE vehicle then drove over and parked immediately behind me to prevent my backing out of the parking spot. An ICE agent came up to the driver's side window and held his phone up to my face. He did not give me any verbal instructions at that time. I believe he either took my picture, or ran my license plate, or both, based on what happened soon thereafter.

5.  The ICE vehicle left the shopping area, and I followed from a safe distance. They drove immediately to my neighborhood, and into the cul de sac I live on. We passed my residence so closely that my wife's phone connected to my vehicle's Bluetooth. My wife called me just long enough for me to relay that I was attempting to observe and record ICE activities in our area. The ICE vehicle did not stop or do any apparent business in the area, suggesting to me that they were merely driving past my home to signal to me that they knew who I was and where I lived.

6.  At that point, the ICE vehicle returned to the shopping center and I again followed at a safe distance. The ICE vehicle stopped in the middle of the roadway serving as an entrance and exit to the shopping center, and an ICE agent approached my driver's side window and indicated he was giving me a warning to stop following, claiming that if I continued to do so, I would be arrested.

7.  I held (and continue to hold) the genuine belief that following from a safe distance was constitutionally protected activity. If anything, the threat to arrest me made me more concerned that the ICE agents may commit constitutional violations without any witnesses or observers, so I continued to follow from a safe distance.

8.  Several minutes later, the ICE vehicle turned into a residential neighborhood, joined by a second ICE vehicle. Approximately 100 feet into the neighborhood, their vehicles came to a stop, and I stopped my vehicle as well. One of the ICE vehicles backed up tight against my front bumper, the other reversed past me and then advanced tight against my rear bumper, boxing my vehicle in.

9.  Some of what followed is captured on a recording I made on my phone. I remained parked in my vehicle. ICE agents approached my vehicle and one said I was "breaking a lot of laws." Without giving any verbal instructions to exit my vehicle, or any verbal indication that I

was being placed under arrest, the agent opened my car door as I said, "Oh, no, no, no, no." They also never identified themselves.

10. What transpired next happened quickly and without any verbal instructions or warnings. One ICE agent went into the back seat, and from behind the driver's seat, placed one arm around my neck and shoulders to restrain me against my chair, and used the other hand to unbuckle my seat belt. Other ICE agents pulled me out of the car, and pushed me face down onto the pavement.

11. Multiple officers held me down onto the pavement, and I could feel a knee being pressed into my back as they pulled my arms behind me to handcuff me. At some point while ICE agents were kneeling on me, they slid forward and caused my face to be scraped against the pavement. I sustained abrasions to the face and bruising and scrapes on my back, my ankles, and my hands.

12. I was put in an unmarked white passenger van and driven to the Whipple Building. I repeatedly told the ICE agents, "I am a U.S. Citizen and you are illegally detaining a U.S. Citizen."

13. During the transport, I heard an ICE agent defend their actions with a statement that, "Listen, Trump is the boss and we're just doing our jobs." Also during the ride, one ICE agent observed a bald eagle flying near the entrance to 494 southbound. Referring to the eagle, one of the ICE agents remarked "You know what that means? God is on our side."

14. Once at the Whipple Building, I was taken inside for processing. I was still not told why I was being arrested. However, I was led to a table which was marked with a cardboard sign, "USC – 111." I understand that to be a reference to 18 U.S.C. 111, a federal code being used to

justify detentions of United States citizens. I was asked for basic identifying information, and then brought fully inside.

15. While at the Whipple building, I witnessed a high degree of disorganization. Many agents seemed to lack keys to doors they wanted to open, and some secured doors were propped open with three-hole punches. Eventually I was brought to a holding room. When I was first placed in the room, I was the only one present. By thirty minutes later, another young man was brought in. By the time I left that cell at the end of the day, there had been approximately 8 individuals in the same holding area, all of whom were United States citizens. I know that both based on conversations we had while being held together, and by my observation that the room we were in was labeled with a sign that said "USC- Males."

16. Although I was not in that holding cell continuously (I was, for instance, taken for a brief mirandized interview with HSI agents, and permitted a brief discussion with family and attorneys at some point after that) it was not until approximately 7:30 PM that I was released without charges. This was approximately nine hours after I was first taken into custody.

17. My wife was able to take me home after I was released. I understand from speaking with her that for the first several hours after falling out of contact, she thought of Renee Good and did not know whether I was alive or dead. Although I have tried to remain as stoic as possible during interviews and statements related to this incident, the reality is it has disturbed my family a great deal, and my wife has expressed concern for our safety in public and in our home.

18. Beginning on the evening of Wednesday, January 14, 2026, both my wife and I began receiving threatening phone calls to our personal cell phones in which a menacing voice asked why we were impeding law enforcement, called us troublemakers, and threatened that they would find us and come to our house. The calls continued the next day. We do not know who is

responsible for these calls, but it has been very distressing to my family's sense of safety and wellbeing.

Dated: January ____, 2026
01/19/2026


Signed on Click by:
CLXFoZcfdcssXtY...
R█████ E█████