## DECLARATION OF P███ W███

I, P███ W███, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I am over the age of 18 years old and I am a resident of the State of Minnesota. Because my family and I are concerned about additional retaliation, I ask that this declaration be submitted with my name redacted, but if necessary, I would be available to testify to the facts described below.

2. On Friday, January 9, 2026, around 12:30 PM, I was in a vehicle with my friend. I was in the passenger seat, and my friend was in the driver's seat. We observed what we believed to be a vehicle with ICE agents on Lake Street (there were agents inside wearing face coverings) and we decided to follow the vehicle at a safe distance.

3. In recent weeks, I had become increasingly concerned that ICE agents were detaining people without warrants, using excessive force, and behaving in a dangerous manner in my community through reckless driving and other violations, and I wanted to observe and document their activities to be a witness to their behavior. However, at no point in the moments that followed did I pull close to the ICE vehicle, drive dangerously, or engage with them in a manner that impeded or obstructed their movements.

4. After some distance, the ICE vehicle we were following pulled to the right of the roadway, and we did the same, a safe distance behind them. It became clear that another car behind us was also a vehicle containing federal agents, which made us fearful about the risk of excessive force being used against us.

5. At this point, I began taking a video recording. A true and correct copy of the video is attached as Exhibit A, however, to protect my friend's privacy and safety I am asking that it be submitted to the Court under seal.

6. A masked ICE agent who appeared to be a woman approached the car and asked why we were following her and claimed we were impeding their investigation. Other masked agents approached the car, including one on the passenger side who tapped on the windows. We could hear him say, "Whoever the registered owner is is going to have a fun time trying to travel after this." We understood this to be a threat that the ICE agents would look up the information associated with the vehicle we were in and use it to retaliate against us, potentially with travel restrictions.

7. I felt scared but remained calm. Masked agents put their cell phones up to the windows of our car and took photos of us. They said again something along the lines of, "They won't be able to travel anywhere without being scrutinized anymore." The agents returned to their vehicles and pulled back out into the driveway, without giving us any further verbal instructions.

8. This experience made me more concerned than ever that they were on the streets behaving in an unaccountable, intimidating manner, so although we were fearful, we continued to follow their vehicles from a safe distance after they pulled away. This time, there appeared to be another car between us and the ICE agents, which we believed may have been another legal observer.

9. A short distance later, both ICE vehicles abruptly stopped in the left lane, and another ICE vehicle was now present. We pulled over to the right to observe. I began another video recording, which I will submit under seal as Exhibit B both for safety reasons and because it contains audio of me shouting the phone number of an emergency contact.

10. My friend began honking the horn to alert bystanders to also observe whatever followed in the event of additional unconstitutional activity.

11. One agent rushed over to our car, tapped on the window, and waved us forward repeatedly, signaling that we should move the car forward. My friend began to comply and slowly pull forward as instructed. As he did that, another agent came across the roadway, in front of our car, touched his weapon, and ordered us to stop and get out. This incident felt frighteningly reminiscent of what I had seen happen to Renee Good—with an officer seeming to intentionally place himself in the path of the car but signal he was ready to pull his gun.

12. I said "Stop!" and my friend stopped the car. Before I could even process what was happening, agents began trying to break the driver's side window. Realizing we were being detained, I continued to record but put my hands up, repeatedly saying "I'm not resisting," again and again and again.

13. My friend and I were detained and our belongings searched. One agent asked me, "Do you guys understand what you did wrong?" Another said, "Listen, what you're doing is domestic terrorism. Now you're going to be treated as a domestic terrorism, do you know what that entails, Sir? You're going to speak to the JTTF… you're going to be on all kinds of… you're doing this to yourself."

14. The vehicle my friend and I were traveling in was left abandoned in the roadway. I was placed in the backseat of a vehicle and driven at high-speed to the Whipple Building. I was able to observe the movement of our vehicle compared to others on the road and it seemed that we were going substantially above the posted speed limit. The audio of the car ride is mostly uneventful but at times you can hear the acceleration of the engine driving at high speeds. On the way there, the ICE agent driving the vehicle I was in nearly collided with a line of cars stopped at a red light in

front of him, and had to slam hard on the brakes to prevent it. The near-collision was a point of discussion among the agents—the agent sitting in the front passenger seat appeared to attend to a minor scrape on his left knuckles caused by the sudden stop and the driver audibly apologized to the two other agents in the car.

15. Once at the Whipple Building, other than providing my name and date of birth, the only response I gave to questions was, "I want a lawyer."

16. While at the Whipple Building I witnessed difficult scenes to retell, especially of people who seemed to be preparing for deportation. Some holding cells appeared to be holding 30-40 people at a time. The entire operation seemed chaotic and disorganized.

17. After several hours, I was interviewed by Homeland Security Investigations and provided with my *Miranda* warnings. I said that I wanted a lawyer. After another hour or so, I was released.

18. My property bag was returned to me in the lobby of the Whipple Building. Although I did not notice it right away as I was shaken by the whole ordeal, I believe they confiscated my MN driver's license and did not return it to me.

19. It is my hope and intention to continue observing federal law enforcement in our community, particularly now that I have experienced the illegal ways in which they are behaving. But, this experience frightened me and the prospect of telling it publicly makes me fearful as well.

Dated: January 21, 2026

