## DECLARATION OF GARRISON GIBSON

I, Garrison Gibson, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I am 38 years old and I am a resident of the State of Minnesota. I make this declaration under penalty of perjury based on personal knowledge of the facts contained herein, except where otherwise noted, and would be able to testify to these facts if required to testify.

2. Before coming to the United States, I lived in Liberia. I came to the United States after my family fled Liberia's civil war when I was six years old (over thirty years ago.)

3. Based on my own immigration proceedings and discussions with others, I understand the following general history relevant to Liberian status in the United States: between 1991 and 2007, the United States provided a safe haven for Liberians, including through Temporary Protected Status, due to armed conflict and widespread civil strife within Liberia. When Temporary Protective Status ended for Liberians in 2007, then-president George Bush deferred the enforced departure of Liberians through March 2009. In March of 2009, then-president Obama extended that deferred enforcement even further, and extended authorization for employment, for certain qualified Liberian nationals for an additional twelve months.

4. In terms of my own personal history, in 2009, an administrative immigration judge issued an order for removal based on a now-expunged minor marijuana conviction. However, I was not removed from the United States at that time, and with DHS' knowledge, I continued to live and work in the United States. Instead, I was placed on an Order of Supervision. That remained the case continuously from 2009 through 2020 (including the entire duration of President Trump's first administration). I did spend part of 2020 detained as DHS did try to remove me at that time, but they were unsuccessful, and they released me again.

5. Most recently, in July 2021, DHS issued another "Order of Supervision" describing the conditions on which I was permitted to live and work within the United States rather than being immediately removed or detained.

6. Based on my immigration proceedings and discussions with others, I understand that this type of order is issued under 8. C.F.R. § 241.4(e), and required a determination by DHS that a number of factors were met, namely: (1) that removal was not practicable or not in the public interest, (2) that I was not a violent person; (3) that I was likely to remain nonviolent; (4) that I was not likely to pose a threat to the community; (5) that I was not likely to violate conditions of release; and (6) that I did not pose a significant flight risk. The regulations also spell out what factors DHS needed to weigh to make that determination, and that includes any criminal history, favorable factors including ties to the United States, evidence related to my work, educational, and vocational activities, and my prior immigration history. On information and belief, DHS weighed all of those factors as required by law, and determined an "Order of Supervision," rather than immediate removal or detention, was appropriate in 2009 and again in 2021.

7. As part of the Order of Supervision, I had regular appointments with DHS beginning in October 2021 and continuing on an ongoing basis every three to six months. I was also required to wear an ICE GPS ankle monitor. My most recent appointment, which went without incident, was on December 29, 2025.

8. While on that Order of Supervision, I have continued to build a life for myself in Minnesota. I have a wife and a ten year old daughter here. While on that Order of Supervision, I have continued to build a life for myself in Minnesota. I have a wife, a ten year old daughter, and 2 adult sons. I have built a strong community around my graphic and fashion business – creating merchandise for various events within our community. All of my nuclear and extended family are

between Minnesota and the DMV area – I have enjoyed getting to see them at various family functions over the years.

9. On January 11, 2026, after years of consistent compliance with my conditions and less than two weeks after my last regular appointment with DHS, I was violently removed from my home and detained by ICE.

10. The circumstances of my January 11, 2026 arrest and detention were both traumatizing and illegal. ICE agents pounded on the door while my family slept inside (including my wife, my ten year old daughter, my young niece, and an additional relative.)

11. I came to the door and demanded to see a warrant before I opened the door. The agents left but returned later with a larger group.

12. Some agents sprayed pepper spray at my neighbors who had gathered around my residence blowing whistles and banging drums. Others came onto my porch, and smashed open the door with a battering ram. At this point, my wife began filming on her cell phone. Multiple agents holding rifles stood in the doorway as my wife asserted her rights and repeatedly told law enforcement there were children inside.

13. One agent repeatedly claimed "we're getting the papers" in response to her demand to see the warrant. But without showing a warrant, and apparently without having one, five to six agents moved in as if they were entering a war zone.

14. After placing me in handcuffs, ICE agents eventually showed my wife an administrative warrant, not a judicial warrant. It is my understanding that the administrative warrant only permitted arresting me if I was encountered in public, but did not give them a right to enter my phone.

15. ICE agents did not permit me to change into warmer clothing or put on a coat before taking me out into the 16-degree air. At the time of my arrest, I was wearing shorts and slippers.

16. I was brought to the Whipple Building detention facility.

17. Once there, agents posed with their personal cell phones taking selfies standing on either side of me with their thumbs up. I observed them take similar photos with other detainees. This, to me, seemed designed to humiliate the detainees and create "trophy" photos.

18. Based on the illegal manner of my arrest, an attorney working on my behalf filed a petition for habeus corpus at approximately 8:43 AM on January 12, 2026. At 10:27am, a judge ordered I not be removed from Minnesota away from my family and attorney. But later that day, around 12:30 or so, I was placed on an airplane shackled and flown to El Paso, Texas. It was only after my attorney confronted DHS that they acknowledged the "error" and flew me back to Minnesota on January 13, 2026.

19. On January 15, 2026, a federal judge ordered my immediate release from detention. I was released without my ICE GPS ankle monitor, since ICE agents had cut it off. They asked me to come back the following morning to restart my Order of Supervision.

20. At my follow up appointment the next morning, I went to the Whipple Building with my wife and my attorney. I was detained a second time, during which time DHS indicated they wanted to start getting a travel document for Liberia. I heard my attorney challenge this action, and heard someone say something along the lines of it coming from the White House. A few hours later, my family received communication from DHS indicating my re-detention had been a mistake, and I was being re-released. I have since had an ICE ankle monitor placed back on me.

21. To date, I have never been given an explanation of what circumstances had changed justifying my detention. The experience has been painful and traumatizing, and incredibly

high stakes as I pursue my legal options to prevent forced, chaotic deportation to a country I have not visited since I was six years old.

Dated: January 19, 2026                                          _/s/ Garrison Gibson_

                                                                                     Garrison Gibson