UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| MUBASHIR KHALIF HUSSEN, MAHAMED EYDARUS, and JAVIER DOE *on behalf of themselves and others similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; DAVID EASTERWOOD, *in his official capacity as U.S. Immigration and Customs Enforcement Field Office Director for St. Paul, Minnesota*; U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection*; U.S. BORDER PATROL; MICHAEL W. BANKS, *in his official capacity as Chief of U.S. Border Patrol*; and GREGORY BOVINO, *in his official capacity as Commander-at-Large of U.S. Border Patrol,*<br><br>Defendants. | Case No. 0:26-CV-00324-ECT-ECW<br><br>**DECLARATION OF JULIO DOE** |

# DECLARATION OF JULIO DOE

I, Julio Doe, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Julio Doe. I am 19 years old. I have lived in Minnesota and the United States for about two years, since around June 2024. I am from El Salvador, and I am Latino. I entered the United States when I was under 18 years old, and I have an Unaccompanied Alien Child/Trafficking Victims Protection Reauthorization Act asylum application pending with USCIS.

2. I currently live in Burnsville, Minnesota, with my two older brothers, who are both seeking asylum. I go to church every week: it is a Catholic church that one of my brothers and I go to together.

3. I am a construction worker. I do taping work: after the sheet rock is installed, one has to install the tape, after which the painting happens. As part of my job, I frequently travel throughout the Twin Cities metro area to different construction sites.

4. On Christmas Eve, December 24, 2025, around 10 a.m., I was working at a construction site at a house in Rosemount, Minnesota.

5. After I finished my taping work at the house, four of us workers, including me and my employer, got into a car and began driving to the next house that we were scheduled to work on. All of us were Latino. The car belonged to my employer and, to my knowledge, had valid license plates and a current registration. I was not driving the car; one of the other workers was. We were obeying all traffic laws and were not speeding.

6. Still, an unmarked car behind us put its lights on. Immediately, the driver complied and pulled our car over. Another unmarked car came in and parked in front of us.

7. Two officers dressed in vests and masks came out of the car in front of us. One of these

officers pulled out his gun and pointed it at the window in the front of the car. It was shocking and terrifying. While the officers from the car in front were coming toward the car, two more officers, also dressed in vests and masks, exited the car behind us that had pulled us over, and those officers began aggressively knocking on our windows.

8. We realized that the officers were ICE officers because of their clothes, their vests, and their masks. You could read the word "ICE" all over their uniforms.

9. The officers were telling us to get out of the car. When we realized it was ICE, we opened the door. They said that we should give them our documents. It was clear that they did not know our names. At no point did they say any of our names. While we were getting our documents together, one of the officers asked why we had left the other jobsite so quickly. The driver of the car explained that we had finished that job and were going to the next jobsite.

10. From inside the car, we handed over our documents. I gave them a document that I was instructed to give to people if immigration authorities ever stopped me, when I was let go from the Office of Refugee Resettlement shelter in Chicago, Illinois. The officers looked at the document. They asked me how long I had been in the country and how many years I had lived here. I answered them truthfully. I explained them to that I was legally in the country and I was validly seeking asylum. They did not respond to me and instead instructed me to get out of the car.

11. They instructed me to give them any belongings that I had in my pockets. None of us made any attempt to resist arrest or run away. We complied immediately from the second we saw the lights on the ICE car. Still, the officers patted me down and then handcuffed me. The handcuffs were very tight. They hurt me, and they left red marks.

12. The officers ended up arresting three of the four people in the car, including myself and my employer. I do not exactly know why the fourth person was not arrested. They put two of us in one car, and they put my employer in another car.

13. They took all three of us to another place, where they transferred us to a van. We waited there for a while, and then we were taken to an ICE office in Bloomington. At no point did the ICE officers speak to me during these drives. The ICE officers were just talking among themselves.

14. At the ICE office in Bloomington, the ICE officers processed us, taking our fingerprints. I was then interviewed by an officer who spoke Spanish. He asked me if I was working at the time of my arrest. He showed me other documents and asked me questions about my immigration case. He asked me if I wanted to accept voluntary departure or if I wanted to fight my immigration case. I replied that I wanted to fight my immigration case.

15. I recall that they took us to the ICE office in Bloomington around 11 a.m. At some point, I called one of my brothers and told him what had happened. Around 5 p.m., they then took us to Freeborn County Jail in Albert Lea. When taking us to Freeborn County Jail, I was handcuffed again. The other worker (not my employer) was taken to Freeborn County Jail. I do not know what happened to my employer.

16. At Freeborn County Jail I am kept in a room with 18 other people, all detained for immigration violations. I have never been in a place or situation like this. It is so cold here inside the jail. My lips are dry and bleeding.

17. I am currently still detained at Freeborn County Jail. I have still not received an explanation as to why I was arrested. Nor have I received any kind of representation that I will not be subject to arrest or detention by ICE or other law enforcement officials for immigration

purposes in the future.

18. Since 2024 when I entered this country, this is the first and only time I was stopped by law enforcement. I have not had any other interactions with law enforcement, I have never been convicted of any crime or offense, and I had no issues with meeting deadlines or appearing in court in relation to my immigration case. Before this arrest, my immigration court proceedings were administratively closed because I have a pending application for asylum before USCIS.

19. I am deeply concerned and scared by this incident. I am concerned that they might try to send me back to El Salvador and away from my brothers despite my pending asylum claim. I felt like they disrespected my rights.

20. I believe I was stopped and arrested solely because of the color of my skin, my appearance, and my presence near a construction site. I cannot find any other reason that they would have stopped me otherwise. It was clear that the arresting officers did not know who I was, did not present any warrant, and did not say why I was stopped or why I was being arrested. I live and work in Minnesota and drive throughout Minnesota. I am very scared that I may be arrested and detained again.

21. Due to my pending asylum application, I fear I would face retaliation if my persecutors in El Salvador were to learn of my asylum claims through this lawsuit. I am also afraid of retaliation that my family and I may face if my identity were to become public as a result of my participation in this lawsuit. I am afraid that my family members and I will be retaliated against and harassed by members of the public on social media because of recent reports about people harassing noncitizens online.

22. This declaration was read to me in full in Spanish on January 12, 2026, by Ana Veblen, a

4

certified Spanish-language interpreter. I completely understand the content of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 12, 2026.

<i>s/Julio Doe</i><br>Julio Doe

I, Derartu A. Ansha, a case manager at Greene Espel, affirm Julio Doe gave me permission to sign this declaration on his behalf because he is currently detained. At 2:18 p.m. on January 12, 2026, attorney Michelle Morrow read the above Declaration back to Julio Doe word for word to confirm its accuracy, translated into Spanish by Ana Veblen. Julio Doe stated that it was accurate.

Executed on January 13, 2026.

Derartu A. Ansha