UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| STATE OF MINNESOTA, by and through its Attorney General Keith Ellison, CITY OF MINNEAPOLIS, and CITY OF ST. PAUL,<br><br>Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; JOHN CONDON, in his official capacity as Acting Executive Associate Director of Homeland Security Investigations; U.S. Department of Homeland Security; TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; MARCOS CHARLES, in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations; U.S. Immigration and Customs Enforcement; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. Customs and Border Protection; GREGORY BOVINO, in his official capacity as Commander of the U.S. Border Patrol; U.S. Border Patrol; DAVID EASTERWOOD, in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement,<br><br>Defendants. | Case No.: 0:26-cv-00190-KMM-DJF<br><br><br><br><br><br>***AMICUS CURIAE* BRIEF BY THE ADVOCATES FOR HUMAN RIGHTS** |

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

ARGUMENT .................................................................................................................. 2

I.   FEDERAL AUTHORITIES ARE VIOLATING INTERNATIONAL HUMAN
     RIGHTS LAW ......................................................................................................... 2

     A. Federal Authorities Violate the Right to Life ...................................................... 4

     B. Federal Authorities Engage in Arbitrary Detention ............................................. 5

     C. Federal Authorities Subject People in Detention to Cruel, Inhuman, and
        Degrading Treatment ........................................................................................... 7

     D. Federal Authorities Violate the Right to Freedom of Movement ......................... 8

     E. Federal Authorities Violate the Right to Privacy ................................................. 9

     F. Federal Authorities Violate the Rights of Children ........................................... 11

     G. Federal Authorities Violate the Right to Health ................................................ 16

     H. Federal Authorities Exacerbate the Risk of *Refoulment* .................................... 17

II.  FEDERAL AUTHORITIES' KILLING OF RENEE GOOD ON JANUARY 7, 2026,
     AND SUBSEQUENT REFUSAL TO INVESTIGATE VIOLATES THE UNITED
     STATES' OBLIGATIONS UNDER INTERNATIONAL HUMAN RIGHTS LAW
     19

     A. On January 7, a Federal Agent Carried Out the Extrajudicial and Arbitrary
        Killing of Renee Good. .................................................................................... 19

     B. Federal Authorities' Failure to Render Emergency Medical Care Violated
        International Human Rights Law ...................................................................... 20

     C. Federal Authorities Are Obstructing Efforts to Comply with the Minnesota
        Protocol .......................................................................................................... 21

CONCLUSION ........................................................................................................... 28

## INTRODUCTION

The Advocates for Human Rights ("The Advocates") respectfully submits this *amicus curiae* brief to assist the Court in evaluating the international human rights violations arising from Defendants' immigration enforcement actions in Minnesota.

The Advocates' position is straightforward: the federal government's current immigration enforcement practices in Minnesota violate international human rights obligations that the United States has undertaken, including under the International Covenant on Civil and Political Rights, the Convention Against Torture, and the International Convention on the Elimination of All Forms of Racial Discrimination.

As set out in this *amicus* brief, federal authorities are engaging in arbitrary detention; discriminatory policing based on race, ethnicity, and accent; warrantless home entries; cruel, inhuman, and degrading treatment in detention; interference with access to courts; and conduct that places children, families, and medically vulnerable individuals at acute risk. These violations are not abstract or speculative: new violations of international human rights laws are being documented every day. Nor are the violations limited to non-citizens or to the incidents identified in this brief.

International human rights laws obligate the United States government to respect, protect, and fulfill human rights of persons within its borders, regardless of their citizenship or immigration status. When federal authorities contravene these obligations, they violate individual rights to life and liberty, and they impede the ability of the State of Minnesota and local governments to meet their own human rights responsibilities. The killing of Renee Good and the refusal of federal authorities to conduct an independent,

impartial investigation—and in fact, to investigate the federal administration's political opponents—starkly illustrates the urgent need for judicial intervention.

The Advocates submits this brief to provide the Court with the applicable international legal framework, demonstrate how Defendants' conduct violates that framework, and underscore that these violations reinforce, rather than diminish, the immediate need for the injunctive relief sought by Plaintiffs.

## ARGUMENT

## I.   FEDERAL AUTHORITIES ARE VIOLATING INTERNATIONAL HUMAN RIGHTS LAW

Federal authorities executing Operation Metro Surge have violated and are continuing to violate the human rights of people in Minnesota as reflected in international treaties such as the International Convention on the Elimination of All Forms of Racial Discrimination ("ICERD"), 660 U.N.T.S. 195, the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), 1465 U.N.T.S. 85, and the International Covenant on Civil and Political Rights ("ICCPR"), 999 U.N.T.S. 171, all of which the United States has signed and ratified and by which it is bound. The United States is "legally obligated to uphold the principles embodied in" international treaties that it has ratified. *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 256 (2d Cir. 2003).

The ICERD is the principal international treaty for the elimination of racism, racial discrimination, and other forms of intolerance. The ICERD defines discrimination as "distinction, exclusion, restriction or preference based on race, colour, descent, or

2

national or ethnic origin which has the purpose or effect of nullifying or impairing the recognition, enjoyment or exercise, on an equal footing, of human rights and fundamental freedoms in the political, economic, social, cultural or any other field of public life." ICERD art. 1.1. The United States ratified the ICERD in 1994.

The CAT is an international human rights treaty aimed at preventing torture and other acts of cruel, inhuman, or degrading treatment or punishment around the world. It requires signatory countries to take effective measures to prevent torture and other ill-treatment within their borders and prohibits them from returning individuals to countries where they may face torture. The United States ratified the CAT in 1994.

The ICCPR is a multilateral treaty that commits its parties to respect the civil and political rights of individuals, including the right to life, freedom of speech, religion, and assembly. The treaty serves as a framework for evaluating and improving human rights practices both domestically and internationally. The United States ratified the ICCPR in 1992.

The ICCPR enshrines the principle of non-discrimination with respect to these rights. Parties to the ICCPR undertake to "respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status." ICCPR art. 2.1. Article 14 establishes that "all persons shall be equal before the courts." ICCPR art. 14.1. Last, Article 26 of ICCPR declares that "all persons are equal before the law and are entitled without any discrimination to the equal protection of the law." ICCPR art. 26.

3

The law therefore must "prohibit any discrimination and guarantee to all persons equal and effective protection against discrimination on any ground such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status." *Id.*

## A. Federal Authorities Violate the Right to Life

Article 6 of the ICCPR provides, "Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of [their] life." ICCPR, art. 6.1. The ICCPR establishes the United Nations Human Rights Committee as the authoritative body of experts and empowers it to publish General Comments interpreting and clarifying treaty provisions; the Committee's General Comments on Article 6 open by recognizing: "The right to life is the supreme right from which no derogation is permitted, even in situations of armed conflict and other public emergencies that threaten the life of the nation."[1]

Operation Metro Surge has already violated the right to life, and specifically the life of Renee Nicole Macklin Good. On January 7, 2026, ICE agent Jonathan Ross fatally shot Good, a U.S. citizen and Minnesota resident, while she was attempting to drive away from an ICE-related encounter on Portland Avenue in south Minneapolis.[2] A second

---

[1] UN Office of the High Commissioner, Human Rights Committee, General Comment No. 36 on Article 6: Right to Life, CCPR/C/GC/36, Sept. 3, 2019 ("OHCHR General Comment No. 36") (Supalla Decl. Exh. 1).

[2] *See* Sofia Barnett and Jeff Day, *How a 40-Second Encounter Led an ICE Agent To Shoot and Kill a Twin Cities Resident*, THE MINNESOTA STAR TRIBUNE (Jan. 10, 2026),

person, Victor Manuel Diaz, died at Camp East Montana on January 14 of a "presumed suicide" after being detained by ICE earlier this month in Minneapolis.[3] 2025 was ICE's "deadliest year in more than two decades"; by one account, 32 people died in ICE custody last year.[4]

As described in greater detail in Part II, federal authorities are refusing to investigate Ross's killing of Good, failing to allow for an independent investigation into the death of Diaz, and are impeding state and local investigation efforts in violation of the United States' ICCPR obligations.

### B. Federal Authorities Engage in Arbitrary Detention

Federal authorities are arbitrarily detaining people in Minnesota, in violation of international law. In addition to the foregoing non-discrimination provisions, the ICCPR recognizes that everyone has the "right to liberty and security of person" and "no one shall be subjected to arbitrary arrest or detention." ICCPR art. 9.1. "Anyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings before a court, in order that that court may decide without delay on the lawfulness of his detention

---

*available at* https://www.startribune.com/how-a-40-second-encounter-led-an-ice-agent-to-shoot-and-kill-a-twin-cities-resident/601560223 (Supalla Decl. Exh. 2).

[3] *See* Michael Biesecker and Ryan J. Foley, *Autopsy Finds Cuban Immigrant in ICE Custody Died of Homicide Due to Asphyxia*, THE ASSOCIATED PRESS (Jan. 21, 2026), *available at* https://www.npr.org/2026/01/22/g-s1-106773/cuban-immigrant-ice-custody-died-homicide (Supalla Decl. Exh. 3).

[4] *See* Maanvi Singh, Coral Murphy Marcos, and Charlotte Simmonds, *2025 Was ICE's Deadliest Year in Two Decades. Here Are the 32 People Who Died in Custody*, THE GUARDIAN (Jan. 4, 2026), *available at* https://www.theguardian.com/us-news/ng-interactive/2026/jan/04/ice-2025-deaths-timeline (Supalla Decl. 4).

and order his release if the detention is not lawful." ICCPR art. 9.4. As it relates to non-citizens, the ICCPR provides non-citizens the right to be allowed to submit the reasons against their expulsion and to have their case reviewed by competent authority. ICCPR at. 13. Finally, Article 23 of the ICCPR recognizes the importance of family and states that family "is entitled to protection by society and the State." ICCPR art. 23.1.

Federal authorities are violating ICCPR Articles 9.1 and 9.4 because they are arbitrarily detaining people who are, or are suspected of being, non-citizens, even if the individuals are lawfully present in the United States. Authorities are subjecting people to arbitrary detentions based on the person's perceived race or ethnicity (non-white) and based on whether the individual has an accent.[5] Arrest and/or detention based on an individual's "race, colour, [or] national or social origin" is arbitrary and violates ICCPR's prohibitions against non-discrimination. Federal authorities are further violating ICCPR Articles 9.1 and 9.4 by arresting and detaining people far beyond the scope of the legal authority outlined by statute, including people who are U.S. citizens, lawful permanent resident aliens, refugees, and others who are present in lawful immigration status.[6] Detention without any legal basis is per se arbitrary detention. Federal authorities are

---

[5] *See* Sofia Barnett and Rohan Preston, *Allegations of Racial Profiling of U.S. Citizens on the Rise as ICE Surge Expands in Minnesota*, THE MINNESOTA STAR TRIBUNE (Jan. 18, 2026), *available at* https://www.startribune.com/allegations-of-racial-profiling-of-us-citizens-on-the-rise-as-ice-surge-expands-in-minnesota/601564653 (Supalla Decl. Exh. 5).

[6] Federal law expressly grants arrest and detention authority to federal immigration officials in limited circumstances as outlined in 8 U.S.C. §§ 1226, 1231, and 1357.

further arbitrarily detaining bystanders, observers, and protesters without legal authority and without charge.

Once arbitrarily detained, individuals are quickly sent to other jurisdictions before they can retain counsel or contact family. These enforced disappearances violate Articles 9.4 and 13 because they prevent individuals from proceeding before a court and seeking a court order on the lawfulness of their detention. Enforced disappearances also violate Article 23.1 because they split up families.

## C. Federal Authorities Subject People in Detention to Cruel, Inhuman, and Degrading Treatment

Federal authorities subject people in detention to cruel, inhuman, and degrading treatment, in violation of the ICCPR's and the CAT's prohibitions against such treatment. Article 7 of the ICCPR prohibits torture and cruel, inhuman, or degrading treatment or punishment, and Article 10.1 of the ICCPR states that "all persons deprived of liberty shall be treated with humanity and with respect for the inherent dignity of the person." Article 2 of the CAT requires authorities to "take effective . . . measures to prevent acts of torture," and Article 16 of the CAT requires authorities "to prevent . . . other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture." People in detention report overcrowding, lack of medical care, inadequate food or water, physical violence, and other forms of humiliation.[7]

---

[7] *See* Hibah Ansari, *Inside an ICE Detention Center: Detained People Describe Severe Medical Neglect, Harrowing Conditions*, AMERICAN CIVIL LIBERTIES UNION (Dec. 17, 2025), *available at* https://www.aclu.org/news/immigrants-rights/inside-an-ice-

Federal authorities reportedly transferred one man to a hospital "for head trauma within four hours of his arrest," and his lawsuit alleges "he has life-threatening brain injuries, including multiple cranial fractures[,] hemorrhaging in his brain[,] and swelling and bruising around his eye."[8]  Federal authorities asserted that the injuries were the result of self-harm, shackled his legs together while he was in the hospital, and refused to leave his bedside while he remained hospitalized.[9]

One person who had been detained reported that ICE agents used their personal phones to take "trophy" photographs posing with him. The detainee described ICE agents standing on either side of him and making a thumbs up gesture while another agent took pictures with a personal phone. The person reported that he saw agents take similar photos with other people whom ICE agents were processing.[10]

### D.  Federal Authorities Violate the Right to Freedom of Movement

The immigration enforcement surge violates the right to freedom of movement and the prohibition against imposing discriminatory restrictions on that right, as

---

detention-center-detained-people-describe-severe-medical-neglect-harrowing-conditions (Supalla Decl. Exh. 6).

[8] *See*  Katrina Pross, *Minnesota Man Hospitalized with Life-Threatening Injuries After ICE Arrest*, SAHAN JOURNAL (Jan. 20, 2026) *available at* https://sahanjournal.com/health/ice-detainee-hospitalized-head-injury-lawsuit/ (Supalla Decl. Exh. 7).

[9] *See id.*

[10] *See* Feven Gerezgiher and Matt Sepic, *Minneapolis Man Says ICE Agents Took 'Trophy' Photos, Locked Him in Overcrowded Cell*, MPR NEWS (Jan. 18, 2026), *available at* https://www.mprnews.org/story/2026/01/18/garrison-gibson-says-ice-agents-took-trophy-photos-locked-in-overcrowded-cell (Supalla Decl. Exh. 8).

recognized in the ICERD and the ICCPR. This guarantee of equal rights includes the right to freedom of movement and residence within the United States. ICERD art. 5(d)(i).

The ICCPR recognizes that all individuals lawfully present in the United States (regardless of citizenship) "have the right to liberty of movement." ICCPR art. 12.1.

Because of the threat of arbitrary arrest and detention, individuals, including citizens and other people lawfully authorized to reside in the United States (e.g., green card holders, refugees, and asylum-seekers), fear leaving their home and as a result, cannot engage in everyday life. They cannot go to work, purchase groceries, take children to school or daycare, or frequent any public spaces such as restaurants or parks. These restrictions on freedom of movement affect not only non-citizens, but citizens residing in their households. If parents are afraid to leave their house for fear the government will arbitrarily arrest and detain them, they cannot take their children (who may be U.S. citizens) to school, thus depriving them of their right to education. And even if children are able to access school despite restrictions on their parents' freedom of movement, they may fear leaving home and the risk that federal authorities will arbitrarily arrest and detain their parents while they are at school or elsewhere.

The ICCPR allows exceptions to the liberty of movement; any restrictions, however, must be "consistent with the other rights recognized in the [ICCPR]." ICCPR art. 12.3. In other words, any restrictions must be non-discriminatory.

### E. Federal Authorities Violate the Right to Privacy

Federal authorities' forcible entries into private homes without judicial authorization violate the right to privacy under international human rights law. Article 17

9

of the ICCPR protects individuals from "arbitrary or unlawful interference with [their] privacy, family, home, or correspondence." ICCPR art. 17.1. The Article emphasizes that "[e]veryone has the right to the protection of the law against such interferences . . . ." ICCPR art. 17.2.

Federal authorities violate Article 17 by engaging in forcible entry into private homes, without judicial warrants.

For example, on January 11, 2026, armed federal agents used a battering ram to break through the front door of a north Minneapolis home.[11] Upon entry, the agents arrested a Liberian-born man who is in the United States legally under an order of supervision. Four days later, the U.S. District Court ordered the man's release, concluding the agents violated the Fourth Amendment's prohibition against unreasonable searches and seizures."[12]

On January 19, 2026, federal agents forcibly entered a home in St. Paul without a warrant and detained an elderly man.[13] Photos and videos show agents escorting the man

---

[11] *See* Rebecca Santana, Mike Householder, and Mark Vancleave, *Video Captures Minneapolis Immigration Arrest in a City on Edge After Shooting of Renee Good*, AP NEWS (Jan. 11, 2026), *available at* https://apnews.com/article/ice-protests-shootings-minneapolis-portland-3f9db36657dda5bfebf9c240b6011ee5 (Supalla Decl. Exh. 9).

[12] Order, ECF No. 6 at 8, *Gibson v. Bondi et al.*, No. 26-CV-172 (JMB/DJF) (D. Minn. Jan. 15, 2026) (Supalla Decl. Exh. 10).

[13] *See* Jack Brook, *US Citizen Says ICE Took Him at Gunpoint in Only Underwear Despite Frigid Cold and No Warrant,* AP NEWS (Jan. 20, 2026), *available at* https://apnews.com/article/minnesota-immigration-us-citizen-detained-hmong-d009590a491c0c8243ef21ef24db7182 (Supalla Decl. Exh. 11).

out of the house and into sub-freezing temperatures, handcuffed and wearing only underwear, sandals, and a blanket tossed over his shoulders. Authorities held the man for at least an hour, then returned him to his home after determining that he was a U.S. citizen.

An internal ICE memo now purports to authorize use of force to enter homes without a judicial warrant.[14]

There are widespread allegations that federal authorities are violating the right to privacy. Three individuals have sued the same Defendants involved in this action challenging "unlawful policies and practices," including "arresting people for immigration reasons without warrants and without probable cause to believe that they are removable, outrageously including U.S. citizens (who plainly cannot be detained for civil immigration purposes) and individuals with immigration status" and "making warrantless arrests without probable cause to believe the person is a flight risk."[15]

**F.  Federal Authorities Violate the Rights of Children**

Federal authorities endanger the rights of children to be free from discrimination and to enjoy the rights to education by depriving them of their liberty and impeding their access to schools, in violation of international human rights law. International human

---

[14] *See* Billal Rahman, *ICE Allowed To Enter Homes Without Warrant: Read Full Memo*, NEWSWEEK (Jan. 22, 2026), *available at* https://www.newsweek.com/ice-allowed-to-enter-homes-without-warrant-read-full-memo-11398706 (Supalla Decl. Exh. 12).

[15] *See* Compl., *Hussein et al. v. Noem*, No. 26:CV-00324 (ECF/ECW) (D. Minn. Jan. 15, 2026) (Supalla Decl. Exh. 13).

rights law recognizes special protections for the rights of children (defined as people under the age of 18). Article 24 of the ICCPR recognizes that "Every child shall have, without any discrimination as to race, colour, sex, language, religion, national or social origin, property or birth, the right to such measures of protection as are required by his status as a minor, on the part of his family, society and the State."

The Human Rights Committee has explained that under the ICCPR, "[c]hildren should not be deprived of liberty, except as a measure of last resort and for the shortest appropriate period of time, taking into account their best interests as a primary consideration with regard to the duration and conditions of detention, and also taking into account the extreme vulnerability and need for care of unaccompanied minors."[16]

Federal authorities have detained children and separated them from their families and caregivers. On January 15, 2026, federal agents armed with assault rifles forcibly entered a private residence in St. Paul and detained six family members including a 12-year-old boy.[17] On review of a petition for habeas corpus, the U.S. District Court ordered

---

[16] UN Office of the High Commissioner, Human Rights Committee, General Comment No. 35 on Article 9, Liberty and Security of Person, CCPR/C/GC/35, Oct. 31, 2014 ("OHCHR General Comment No. 35") (Supalla Decl. Exh. 14).

[17] *See*  Howard Thompson, Nick Longworth, and Mike Manzoni, *Judge Orders DHS, ICE To Release Detained Venezuelan Family After Failing To Produce Warrant,* FOX 9 KMSP (Jan. 19, 2026), *available at* https://www.fox9.com/news/judge-orders-ice-produce-warrant-release-venezuelan-family-detained-st-paul-jan-2026 (Supalla Decl. Exh. 15).

the family's release after DHS attorneys failed to produce a judicial warrant for their arrest.[18]

Federal authorities reportedly took a five-year-old boy from his family's car in the driveway of his home, detained him and his father, and transported them from Minnesota to Texas.[19] The authorities reportedly used the boy as "bait" to draw family members out of their home.[20] The school district where the boy attends elementary school reports that federal agents have detained three other students in the district over the past two weeks.[21]

Operation Metro Surge also interferes with children's right to education and care outside the home, in violation of Article 5(e)(v) of the ICERD, which recognizes that governments have the obligation "to guarantee the right of everyone, without distinction as to race, colour, or national or ethnic origin, to equality before the law, notably in the enjoyment of . . . "[t]he right to education." In January 2025, the Department of Homeland Security revoked a long-standing policy to refrain from conducting immigration enforcement in "sensitive locations," including schools. The policy shift, along with escalating immigration activities, has increased fear and decreased school attendance among immigrant communities, demonstrating that federal authorities are

---

[18] *See id.*

[19] *See* Elizabeth Shockman, *ICE Detains 5-year old Minnesota Boy; Lawyer Says Agents Used Him as 'Bait,'* MPR NEWS (Jan. 21, 2026), *available at* https://www.mprnews.org/story/2026/01/21/ice-detains-5year-old-minnesota-boy-lawyer-says-agents-used-him-as-bait. (Supalla Decl. Exh. 16).

[20] *Id.*

[21] *Id.*

creating discriminatory barriers to the rights of children to education in violation of the ICERD.

Federal agents have targeted schools for immigration enforcement.[22] On January 7, 2026, federal agents came onto school property at Roosevelt High School in south Minneapolis, handcuffed two educators, and released pepper spray into a crowd of students, school staff, and families.[23] One school reported that federal agents detained a student attempting to board a city bus.[24] A school district reported that federal agents detained a parent at a school bus stop.[25] Another district reported federal agents pulled over two vans transporting students and staff to school.[26] Yet another district reported that

[22] *See* Brad Brooks, *Whistles and Walkie-Talkies: Minneapolis Keeps Guard Over Schools Amid ICE Arrests*, REUTERS (Jan. 17, 2026), *available at* https://www.reuters.com/world/us/whistles-walkie-talkies-minneapolis-keeps-guard-over-schools-amid-ice-arrests-2026-01-17/ (Supalla Decl. Exh. 17).

[23] *See* Elizabeth Shockman, *Minneapolis Schools Cancel Classes After Border Patrol Clash Disrupts Dismissal at Roosevelt*, MPR NEWS (Jan. 8, 2026), *available at* https://www.mprnews.org/story/2026/01/08/after-border-patrol-clash-at-roosevelt-minneapolis-schools-cancel-classes (Supalla Decl. Exh. 18).

[24] *See* Lydia Morrell, *Minneapolis Student Detained by Federal Officers at Bus Stop*, KARE 11 (Jan. 15, 2026), *available at* https://www.kare11.com/article/news/local/ice-in-minnesota/minneapolis-student-detained-by-federal-officers-at-bus-stop/89-29352662-cb85-4249-b69b-2e85aaae7a8a (Supalla Decl. Exh. 19).

[25] *See* Dr. Teri Staloch, Superintendent, *Update: Federal ICE Activity Within the District*, ROBBINSDALE AREA SCHOOLS (Jan. 14, 2026), *available at* https://www.rdale.org/discover/news/article/~board/district-news/post/update-federal-ice-activity-within-the-district (Supalla Decl. Exh. 20).

[26] *See* Nick Longworth, *St. Paul Schools Van Full of Teachers, Students Pulled Over by ICE Agents*, FOX 9 KMSP (Jan. 15, 2026), *available at* https://www.fox9.com/news/st-paul-schools-van-pulled-over-ice-agents-jan-2026 (Supalla Decl. Exh. 21).

federal authorities had been "staging" immigration enforcement activities in school parking lots during school hours.[27] The increased presence of federal agents in the Twin Cities has led Minneapolis Public Schools and St. Paul Public Schools—which together serve over 62,000 students—as well as other school districts in the Twin Cities to offer online learning options for students who do not feel safe coming to school.

Federal immigration enforcement also has targeted childcare centers in the Twin Cities. Several daycares have reported that federal authorities have detained child-care staff whom they contend are legally authorized to work in the United States.[28] Other childcare centers have reported that federal authorities have visited their facilities and demanded access to employment records without first presenting a warrant.[29] Day care attendance similarly has dropped as a result of increased immigration enforcement.[30]

---

[27] *See* David Griswold, *Little Canada Elementary Implements "Secure" Protocol While ICE Agents Were in Parking Lot During School Hours*, KARE 11 (Jan. 21, 2026), *available at* https://www.kare11.com/article/news/local/ice-in-minnesota/little-canada-elementary-secure-protocol-ice-agents-in-parking-lot-during-school-hours/89-92cdb60d-18f9-48b0-96df-6a75a839a477 (Supalla Decl. Exh. 22).

[28] *See* Susan Du, *ICE Operations Are Encroaching on Schools and Day Cares*, THE MINNESOTA STAR TRIBUNE (Jan. 16, 2026), *available at* https://www.startribune.com/minnesota-daycares-say-ice-is-targeting-its-workers/601560204 (Supalla Decl. Exh. 23).

[29] *See* Samie Solina, *Local Child Care Centers Report ICE Detentions, Federal Visits Amid Rising Concerns*," KARE 11 (Jan. 13, 2026), *available at* https://www.kare11.com/article/news/politics/immigration-news/local-child-care-centers-report-ice-detentions-federal-visits/89-2dc1ce9e-8b8a-4964-81c0-b52715e98b8e (Supalla Decl. Exh. 24).

[30] *See supra* n. 22 (Supalla Decl. Exh. 17).

### G. Federal Authorities Violate the Right to Health

Federal authorities are violating the right of people to health and access to health care. The ICERD guarantees "the right of everyone, without distinction as to race, colour, or national or ethnic origin, to . . . public health [and] medical care." ICERD art. 5.e.iv. The Human Rights Committee has explained that under the ICCPR, "[d]ecisions regarding the detention of migrants must . . . take into account the effect of the detention on their physical or mental health."[31]

Healthcare facilities previously considered "sensitive locations" where immigration enforcement was discouraged are now subject to targeted immigration enforcement. According to one report, federal authorities shackled a patient to his bed in the emergency room at Hennepin County Medical Center and stayed by the patient's bedside for more than 24 hours, all without a judicial warrant.[32]

The uptick in immigration enforcement is adversely affecting persons with disabilities and medical conditions. In one instance, authorities detained an asylum seeker with a severe skin disease was detained at the Whipple Building, where he experienced malnourishment and wounds caused by restraints on his legs; authorities eventually

---

[31] *See supra* n. 16, OHCHR General Comment No. 35, ¶ 18 (Supalla Decl. Exh. 14).

[32] *See* Jason Rantala, *ICE Entered Minneapolis Hospital Without Warrant, Handcuffed Patient to Bed, Community Organizers Say*, CBS NEWS (Jan. 7, 2026), *available at* https://www.cbsnews.com/minnesota/news/hcmc-hennepin-healthcare-ice-patient-handcuffed/ (Supalla Decl. Exh. 25).

transferred the man to a local hospital for care and treatment.[33] The Advocates is aware of detention authorities denying other people in immigration detention access to medical care.

Federal immigration enforcement actions against individuals with serious medical conditions—including encounters in hospitals—raise acute concerns about access to essential medical care. The resulting fear of detention or removal is causing people to delay or forgo needed treatment, avoid emergency rooms and clinics, and disengage from routine medical services.[34]

### H. Federal Authorities Exacerbate the Risk of *Refoulment*

Federal authorities' expanded and expedited immigration enforcement activity in Minnesota violates the obligation to protect people from refoulement. *Refoulement* is the removal of an individual to a country where they face threats of torture, persecution, or death on account of a protected characteristic. International law categorically prohibits *refoulement*. The CAT specifically provides in Article 3, "No State Party shall expel, return ("*refouler*") or extradite a person to another State where there are substantial

---

[33] *See* Jeremy Olson, *ICE Detainee With Severe Skin Disorder Is Going Home*, THE MINNESOTA STAR TRIBUNE (Jan. 15, 2026), *available at* https://www.startribune.com/ice-detainee-with-severe-skin-disorder-going-home/601564192 (Supalla Decl. Exh. 26).

[34] *See* Erica Zurek, *Health Needs, Insurance Woes Compound Fears For Minnesota Families Amid ICE Operations*, MPR NEWS (Jan. 16, 2026), *available at* https://www.mprnews.org/story/2026/01/16/ice-operations-add-to-health-concerns-for-some-minnesotans (Supalla Decl. Exh. 27).

grounds for believing that he would be in danger of being subjected to torture." CAT art. 3.1.

Federal authorities are leveraging the surge in immigration enforcement activities to circumvent these protections against *refoulement*. There is no evidence that officials are conducting screenings in Minnesota to assess whether individuals would face persecution in the receiving country or whether the receiving country might subsequently return them to danger in the individual's home country. The absence of such due diligence heightens the likelihood of *refoulement*.

Federal authorities engaging in immigration enforcement actions in Minnesota are also leveraging Asylum Cooperative Agreements (ACAs) to externalize immigration governance to countries such as Honduras, Guatemala, and El Salvador, among others. This sleight of hand attempts to circumvent international human rights law.

Federal authorities target asylum-seekers for third-country removals through policies allowing immigration authorities to "pretermit" asylum applications without a hearing. Under this strategy, the presence of an agreement with another country can result in immigration courts denying asylum cases without a hearing. Immigration courts do not require the government to show that the third country will respect its non-*refoulment* obligations. Such practices create an imminent risk of irreparable harm, including arbitrary detention in third countries, where people face significant barriers to accessing the U.S. legal system and challenging their detention. These third countries have detained people removed from the United States without providing access to asylum procedures and have threatened to return them to their countries of origin. Moreover, the coercive

18

threat of deportation to third countries effectively denies people the ability to present

legitimate asylum claims, leading to *refoulement*.

II.    **FEDERAL AUTHORITIES' KILLING OF RENEE GOOD ON JANUARY 7, 2026, AND SUBSEQUENT REFUSAL TO INVESTIGATE VIOLATES THE UNITED STATES' OBLIGATIONS UNDER INTERNATIONAL HUMAN RIGHTS LAW**

A.    **On January 7, a Federal Agent Carried Out the Extrajudicial and Arbitrary Killing of Renee Good.**

Jonathan Ross's killing of Renee Good on January 7, 2026, was an extrajudicial

and arbitrary deprivation of life in violation of the ICCPR.

Every human being has the inherent right to life and no person shall be "arbitrarily

deprived of his life." ICCPR, art. 6; *see also* ICCPR, art. 6.2 (a state may only impose

death pursuant to a final judgment rendered by a competent court). Under the ICCPR,

governments have a duty to "refrain from engaging in conduct resulting in arbitrary

deprivation of life." OHCHR General Comment No. 36 ¶ 7. Any deprivation of life that

lacks a legal basis is, by definition, arbitrary. *Id.* ¶ 11.

The use of lethal force by law enforcement is "extreme" and may only be used

when "strictly necessary." *Id.* ¶ 12. "The intentional taking of life by any means is

permissible *only* if it is strictly necessary in order to protect life from an imminent

threat." *Id.* (emphasis added). Governments must take all necessary measures to prevent

arbitrary deprivation of life, including through legislation, training, review and

investigation of deaths, and implementing the use of less-lethal means to conduct law

enforcement activities. ¶ 13; *see also id.* ¶ 14 (additional discussion of the use of less-

lethal means by law enforcement). Firearms may be used to prevent only "imminent threat of death" and only when less extreme measures are insufficient.[35]

It is undisputed that Ross's killing of Renee Good on January 7, 2026, occurred outside any legal process or procedure. Ross also lacked any authority under international law to use lethal force against Good. Review of available video further reveals that federal authorities made no attempts to use less-lethal methods to address concerns about the location of Good's vehicle. Good's family's lawyers commissioned an independent autopsy, which concluded that the lethal gunshot wound struck her on the left side of her head near her temple, showing that Ross was beside the car when he fired the fatal shot.[36]

**B. Federal Authorities' Failure to Render Emergency Medical Care Violated International Human Rights Law**

When law enforcement uses force or firearms against a person, international law requires law enforcement to "[e]nsure assistance and medical aid are rendered to any injured or affected persons *at the earliest possible moment*." Firearms Principes ¶ 5(c) (italics added).

---

[35] *See* United Nations Office of the High Commissioner, *Basic Principles on the Use of Force and Firearms by Law Enforcement Officials*, ¶ 9 (Sept. 7, 1990), *available at* https://www.ohchr.org/en/instruments-mechanisms/instruments/basic-principles-use-force-and-firearms-law-enforcement ("Firearms Principles") (Supalla Decl. Exh. 28).

[36] *See* Richard Luscombe, *Renee Good Was Shot Three Times, Autopsy into Minneapolis ICE Killing Finds*, THE GUARDIAN (Jan. 22, 2026), *available at* https://www.theguardian.com/us-news/2026/jan/22/renee-good-autopsy-ice-minneapolis (Supalla Decl. Exh. 29).

After Ross shot Good, federal authorities waited three minutes before they called emergency services.[37] They waited another seven minutes before initiating CPR and denied a bystander and physician's offer to check her pulse.

Although federal authorities called EMS, witnesses reported that federal authorities did not clear obstructions and EMS personnel were not able to reach Good as quickly as they otherwise may have.[38] Despite federal authorities' delays in rendering medical aid, EMS detected a pulse, demonstrating that she was not deceased and federal authorities had shirked their obligation to render prompt medical aid.[39]

By these accounts, ICE violated international human rights standards by failing to act at the earliest possible moment to render medical aid to Good.

### C. Federal Authorities Are Obstructing Efforts to Comply with the Minnesota Protocol

Federal authorities are refusing to investigate Ross and are impeding state and local investigation efforts, in violation of the right to life in Article 6.1 of the ICCPR and of the United States' obligation to investigate potentially unlawful deaths. Federal authorities are also failing to conduct an independent investigation into Diaz's death in

---

[37] *See* Cait Kelley, *ICE Agents Are Trained in CPR. They Didn't Use It on Renee Macklin Good*, MPR NEWS, (Jan 17, 2026), *available at* https://www.mprnews.org/story/2026/01/17/ice-agents-are-trained-in-cpr-they-didnt-use-it-on-renee-macklin-good (Supalla Decl. Exh. 30).

[38] *See* Jeremy Olson, *'I'm a Physician,' He Said. 'Don't Care' Was the Reply.*, MINNESOTA STAR TRIBUNE (Jan 12, 2026), *available at* https://www.startribune.com/should-ice-agents-have-refused-bystander-medical-help-at-shooting-scene/601560462 (Supalla Decl. Exh. 31).

[39] *See supra* n. 37 (Supalla Decl. Exh. 30).

custody. According to the UN Special Rapporteur on extrajudicial, summary or arbitrary executions, "[t]he duty to investigate an unlawful death has assumed customary status in international law."[40]

In 1983, as its very first project, The Advocates (then known as the Minnesota Lawyers International Human Rights Committee) and a team of volunteers from Minnesota's legal and medical communities undertook a project to develop international standards regarding death investigations. They crafted what came to be known as the "Minnesota Protocol." The UN formally adopted the standards in 1991 as the United Nations Manual on the Effective Prevention and Investigation of Extra-Legal, Arbitrary, and Summary Executions, and revised and updated them in 2016, giving formal recognition to The Advocates' and Minnesota's role by renaming them The Minnesota Protocol on the Investigation of Potentially Unlawful Death.[41]

The Protocol proceeds in two general parts: one, international legal standards detailing the duty of governments to prevent, investigate, and initiate legal proceedings after a suspicious and unlawful death; and two, guidelines for how to conduct effective investigations. The Protocol "aims to protect the right to life and advance justice,

---

[40] Special Rapporteur on extrajudicial, summary or arbitrary executions, Report of the Special Rapporteur on extrajudicial, summary or arbitrary executions, Morris Tidball-Binz, UN Doc. A/78/254 (28 July 2023), ¶ 13, available at https://documents.un.org/doc/undoc/gen/n23/223/44/pdf/n2322344.pdf.

[41] *See The Minnesota Protocol on the Investigation of Potentially Unlawful Death* (2016), Office of the United Nations High Commissioner for Human Rights, New York / Geneva (2017) ("Minnesota Protocol") (Supalla Decl. Exh. 32).

accountability and the right to a remedy, by promoting the effective investigation of potentially unlawful death or suspected enforced disappearance." It recognizes that "[a] failure to respect the duty to investigate is a breach of the right to life."

The Minnesota Protocol applies to the investigation of all "potentially unlawful death," which includes when a death occurs at the hands of government agents. *Id.* at 1, ¶ 2(a); *see also id. at* 5, ¶¶ 15-16. Without question, Good's death occurred at the hands of government agents. The duty to investigate potential unlawful deaths is an "essential part of upholding the right to life." *Id.* Federal authorities therefore must investigate Good's death.

Investigations into potentially unlawful deaths must be prompt, effective and thorough, independent and impartial, and transparent. *Id.* at 7-8, ¶¶ 23-33. Less than two weeks after Good's death, Deputy Attorney General Todd Blanche announced on Fox News that federal authorities would not investigate the killing.[42] Rather, the Justice Department is investigating Good's wife, who was present at the killing.[43] The Justice Department's refusal to conduct any investigation into the killing, and its probe into

---

[42] Sydney Kashiwagi, *Justice Department Says It Has No Plans To Investigate ICE Agent Who Killed Renee Good and Confirms Walz, Frey Probe*, MINNESOTA STAR TRIBUNE (Jan 18, 2026), *available at* https://www.startribune.com/justice-department-says-it-has-no-plans-to-investigate-ice-agent-who-killed-renee-good-and-confirms-walz-frey-probe/601566499 (Supalla Decl. Exh. 33).

[43] *See* Ernesto Londoño, *Six Prosecutors Quit Over Push to Investigate ICE Shooting Victim's Widow*, N.Y. TIMES (Jan. 13, 2026), *available at* https://www.nytimes.com/2026/01/13/us/prosecutors-doj-resignation-ice-shooting.html (Supalla Decl. Exh. 34).

Good's widow, is wholly inconsistent with the United States' duty to investigate Good's killing, as well as the Minnesota Protocol's requirement that authorities take "[a]ppropriate measures . . . to ensure the[] safety, physical and psychological well-being, and privacy" of the decedent's family members.[44]

Federal authorities have publicly pre-judged the facts surrounding the killing and have thereby precluded an independent and impartial federal investigation, in violation of the Minnesota Protocol. The Minnesota Protocol requires that "Investigations must be free from undue external influence, such as the interests of political parties and powerful social groups." *Id.* at 8, ¶ 28. Investigators must also be impartial and act without bias. *Id.* ¶ 31. Within days of Good's killing, Defendant Secretary of DHS Kristi Noem asserted Good was "stalking and impeding" federal agents and using her car as a "weapon."[45] Assistant DHS Secretary, Tricia McLaughlin posted on X that Good was a violent rioter and domestic terrorist.[46] President Trump posted on Truth Social that Good "was very disorderly obstructing and resisting, who then violently, willfully and viciously ran over the ICE officer."[47] Days later, President Trump told reporters that Good's alleged "disrespect" toward Ross somehow justified his conduct, while Vice President Vance

---

[44] *See supra* n. 41, Minnesota Protocol ¶ 36 (Supalla Decl. Exh. 32).

[45] Richard Luscombe, *Trump Administration Unleashes Torrent of Untruths After Woman Shot Dead by ICE*, THE GUARDIAN (Jan 9, 2026), *available at* https://www.theguardian.com/us-news/2026/jan/09/white-house-minneapolis-ice-killing (Supalla Decl. Exh. 35).

[46] *Id.*

[47] *Id.*

asserted, wrongly, that ICE offers have "absolute immunity" for their conduct.[48] The administration's demands that the U.S. Attorneys' Office investigate Good's wife for possible involvement in anti-ICE activities resulted in the resignation of several prosecutors.[49]

Because federal authorities have prejudged the outcome, there can be no reasonable expectation that federal authorities can or will conduct the independent and impartial investigation that the Minnesota Protocol requires.

Federal authorities' refusal to cooperate with state and local authorities further violates the Minnesota Protocol. The Minnesota Protocol states that investigations should be open to scrutiny of the general public and the victim's family, which ensures adherence to the rule of law and builds public confidence in the investigators' work. Minnesota Protocol at 8, ¶ 32. The federal government's refusal to cooperate with the Minnesota Bureau of Criminal Apprehension is contrary to and incompatible with the Minnesota Protocol's call for transparency in investigations.[50] Moreover, this refusal impedes state and local governmental efforts to comply with their own obligations under the Minnesota Protocol.

---

[48] Luke Broadwater and Katie Rogers, *Trump Has Another Justification for the Shooting of Renee Good: Disrespect*, NEW YORK TIMES (Jan. 12, 2026), https://www.nytimes.com/2026/01/12/us/politics/trump-shooting-renee-good-ice.html (Supalla Decl. Exh. 36).

[49] *See supra* n. 42 (Supalla Decl. Exh. 34).

[50] *See supra* n. 41 (Supalla Decl. Exh. 33).

As noted in section I.A. above, federal authorities are violating the Minnesota Protocol regarding the death of a second person, Victor Manuel Diaz, who died at Camp East Montana on January 14 of a "presumed suicide" after ICE apprehended him earlier this month in Minneapolis.[51] Unlike two earlier deaths at Camp East Montana, ICE failed to send Diaz's body to the county medical examiner in El Paso and instead plans to conduct the autopsy at the Army medical center at Fort Bliss. The county medical examiner determined that the January 3 death of another migrant in the same facility was a homicide, not a suicide as federal authorities had alleged.[52]

Federal authorities have also refused to investigate the killing of Renee Good as a femicide, even though the federal government has a duty under customary international law to conduct such an investigation, which must include the context of the killing.[53] The United Nations defines femicide as "an intentional killing with a gender-related motivation."[54]

---

[51] *See* Michael Biesecker and Ryan J. Foley, *Autopsy Finds Cuban Immigrant in ICE Custody Died of Homicide Due to Asphyxia*, THE ASSOCIATED PRESS (Jan. 21, 2026), *available at* https://www.npr.org/2026/01/22/g-s1-106773/cuban-immigrant-ice-custody-died-homicide (Supalla Decl. Exh. 3).

[52] *See id.*

[53] *See id.*

[54] *See* UN Women, *Five Essential Facts To Know About Femicide* (Nov. 25, 2025), *available at* https://www.unwomen.org/en/articles/explainer/five-essential-facts-to-know-about-femicide (Supalla Decl. Exh. 37).

The duty to investigate includes the duty to conduct a "thorough investigation of all potentially unlawful deaths, including femicides."[55] The investigating body must "consider[] . . . all violent deaths of women as probable femicides" and in conducting the investigation must "assess[] . . . the context of the offence and the perpetrator's prior violence."[56] The context of Jonathan Ross's killing of Renee Good includes his encounters with Good and her wife immediately prior to the shooting, as well as the gendered expletives he uttered immediately after he killed her. The context also includes federal authorities escalating their use of gendered rhetoric targeting of women observing federal immigration enforcement actions.[57] Moreover, federal agents have subsequently attempted to leverage this killing to intimidate women observing the conduct of federal agents, asking observers "Have y'all not learned" and have you "learned [your] lesson" since Ross killed Good.[58] This broader context shows that government actors target

---

[55] Morris Tidball-Binz (Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions), *Report of the Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions*, U.N. Doc. A/78/254, at 6, ¶ 13 (July 28, 2023) (Supalla Decl. Exh. 38).

[56] *Id.* ¶ 21.

[57] *See* Clyde McGrady, *After Renee Good Killing, Derisive Term for White Women Spreads on the Far Right*, NEW YORK TIMES (Jan. 17, 2026), *available at* https://www.nytimes.com/2026/01/17/us/politics/white-women-conservatives.html (Supalla Decl. Exh. 39).

[58] Janelle Griffith, *ICE Agent Captured in Video Asking Woman Following Him 'Have Y'all Not Learned' Since Renee Good's Fatal Shooting*, PEOPLE (Jan. 14, 2026), *available at* https://people.com/ice-agent-captured-asking-have-yall-not-learned-after-renee-good-death-11885415 (Supalla Decl. Exh. 40); Noah Hurowitz, *Federal agents keep invoking killing of Renee Good to Threaten Protesters in Minnesota*, THE INTERCEPT (Jan. 14, 2026), *available at* https://theintercept.com/2026/01/14/ice-minneapolis-protests-renee-good (Supalla Decl. Exh. 41).

certain groups of women—particularly women who are human rights defenders, protestors, and legal observers—with violence and threats of violence.[59] It is further emblematic of a broader pattern of reports of federal immigration authorities subjecting women, transgender people, gender-nonconforming people, and LGBQ+ people, including migrants, to harassment, intimidation, and violence.[60]

## <u>CONCLUSION</u>

The evidence demonstrates that Defendants' immigration enforcement actions are inflicting immediate and irreparable harm on individuals and communities in Minnesota, while placing the United States in ongoing breach of its international human rights commitments. These actions undermine accountability, obstruct access to justice, and erode fundamental protections that international law requires governments to uphold. For these reasons, The Advocates supports the Plaintiffs' request to issue a preliminary injunction.

---

[59] *See supra* n. 52 (Supalla Decl. Exh. 37).

[60] *See* Siena Iwasaki Milbauer, Gender Justice To Investigate Gender-Based & Sexual Violence by Federal Immigration Agents in Minnesota, GENDER JUSTICE (Jan. 16, 2026), *available at*  https://www.genderjustice.us/gender-justice-to-investigate-ice-violence/ (Supalla Decl. Exh. 42); Immigrant & Refugee Law Center, *ICE Agent Charged with Sexual Abuse of Two Immigrants as Investigators Search for More Victims* (Dec. 9, 2022), *available at* https://www.irlawcenter.org/news-media/ice-agent-charged-with-sexual-abuse-of-two-immigrants-as-investigators-search-for-more-victims *see also* Brian Hamrick, *ICE agent charged with sexual abuse of two immigrants as investigators search for more victims*, (Dec. 9, 2022), *available at* https://www.wlwt.com/article/ice-agent-charged-with-sexual-abuse-of-two-immigrants/42203418#. (Supalla Decl. Exh. 43).

Dated:  January 23, 2026

**NILAN JOHNSON LEWIS PA**

By:  *s/Daniel J. Supalla* _____
    Daniel J. Supalla (#0387064)
    Allison M. Lange Garrison (#391433)
    Sara L. Lewenstein (#0400160)
250 Marquette Avenue South, Suite 800
Minneapolis, MN 55401
Telephone: 612-305-7500
Fax: 612-305-7501
Email: dsupalla@nilanjohnson.com
    alangegarrisonnilanjohnson.com
    slewenstein@nilanjohnson.com

and

**THE ADVOCATES FOR HUMAN RIGHTS**

Amy L. Bergquist (#0388728)
330 2nd Avenue South, Suite 800
Minneapolis, MN 55401
Telephone: 612-341-3302
Email: abergquist@advrights.org

**ATTORNEYS FOR THE ADVOCATES FOR HUMAN RIGHTS**

29