*State of Minnesota et al. v. Noem et al.*
No. 26-CV-00190-KMM-DJF (D. Minn.)

Amicus Curiae Brief of the Advocates for Human Rights

**Exhibit No. 1**

United Nations

*CCPR*/C/GC/36



**International Covenant on
Civil and Political Rights**

Distr.: General
3 September 2019

Original: English

**Human Rights Committee**

## General comment No. 36

### Article 6: right to life*, **

## I.    General remarks

1.      This general comment replaces general comments No. 6, adopted by the Committee at its sixteenth session (1982), and No. 14, adopted by the Committee at its twenty-third session (1984).

2.      Article 6 of the International Covenant on Civil and Political Rights recognizes and protects the right to life of all human beings. The right to life is the supreme right from which no derogation is permitted, even in situations of armed conflict and other public emergencies that threaten the life of the nation.[1] The right to life has crucial importance both for individuals and for society as a whole. It is most precious for its own sake as a right that inheres in every human being, but it also constitutes a fundamental right,[2] the effective protection of which is the prerequisite for the enjoyment of all other human rights and the content of which can be informed by other human rights.

3.      The right to life is a right that should not be interpreted narrowly. It concerns the entitlement of individuals to be free from acts and omissions that are intended or may be expected to cause their unnatural or premature death, as well as to enjoy a life with dignity. Article 6 of the Covenant guarantees this right for all human beings, without distinction of any kind, including for persons suspected or convicted of even the most serious crimes.

4.      Paragraph 1 of article 6 of the Covenant provides that no one shall be arbitrarily deprived of life and that this right shall be protected by law. It lays the foundation for the obligation of States parties to respect and ensure the right to life, to give effect to it through legislative and other measures, and to provide effective remedies and reparation to all victims of violations of the right to life.

5.      Paragraphs 2, 4, 5 and 6 of article 6 of the Covenant set out specific safeguards to ensure that in States parties that have not yet abolished the death penalty, death sentences are not applied except for the most serious crimes, and then only in the most exceptional cases and under the strictest limits (see part IV below). The prohibition on arbitrary deprivation of life contained in article 6 (1) further limits the ability of States parties to apply the death penalty. The provisions in paragraph 3 regulate specifically the relationship between article 6 of the Covenant and the Convention on the Prevention and Punishment of the Crime of Genocide.

---

    *   Adopted by the Committee at its 124th session (8 October–2 November 2018).
   **   The endnotes are reproduced in the language of submission only.





Please recycle



6.    Deprivation of life involves intentional[3] or otherwise foreseeable and preventable life-terminating harm or injury, caused by an act or omission. It goes beyond injury to bodily or mental integrity or a threat thereto.[4]

7.    States parties must respect the right to life. This entails the duty to refrain from engaging in conduct resulting in arbitrary deprivation of life. States parties must also ensure the right to life and exercise due diligence to protect the lives of individuals against deprivations caused by persons or entities whose conduct is not attributable to the State.[5] The obligation of States parties to respect and ensure the right to life extends to reasonably foreseeable threats and life-threatening situations that can result in loss of life. States parties may be in violation of article 6 even if such threats and situations do not result in loss of life.[6]

8.    Although States parties may adopt measures designed to regulate voluntary termination of pregnancy, those measures must not result in violation of the right to life of a pregnant woman or girl, or her other rights under the Covenant. Thus, restrictions on the ability of women or girls to seek abortion must not, inter alia, jeopardize their lives, subject them to physical or mental pain or suffering that violates article 7 of the Covenant, discriminate against them or arbitrarily interfere with their privacy. States parties must provide safe, legal and effective access to abortion where the life and health of the pregnant woman or girl is at risk, or where carrying a pregnancy to term would cause the pregnant woman or girl substantial pain or suffering, most notably where the pregnancy is the result of rape or incest or where the pregnancy is not viable.[7] In addition, States parties may not regulate pregnancy or abortion in all other cases in a manner that runs contrary to their duty to ensure that women and girls do not have to resort to unsafe abortions, and they should revise their abortion laws accordingly.[8] For example, they should not take measures such as criminalizing pregnancy of unmarried women or applying criminal sanctions to women and girls who undergo abortion[9] or to medical service providers who assist them in doing so, since taking such measures compels women and girls to resort to unsafe abortion. States parties should remove existing barriers[10] to effective access by women and girls to safe and legal abortion,[11] including barriers caused as a result of the exercise of conscientious objection by individual medical providers,[12] and should not introduce new barriers. States parties should also effectively protect the lives of women and girls against the mental and physical health risks associated with unsafe abortions. In particular, they should ensure access for women and men, and especially girls and boys,[13] to quality and evidence-based information and education on sexual and reproductive health[14] and to a wide range of affordable contraceptive methods,[15] and prevent the stigmatization of women and girls who seek abortion.[16] States parties should ensure the availability of, and effective access to, quality prenatal and post-abortion health care for women and girls,[17] in all circumstances and on a confidential basis.[18]

9.    While acknowledging the central importance to human dignity of personal autonomy, States should take adequate measures, without violating their other Covenant obligations, to prevent suicides, especially among individuals in particularly vulnerable situations,[19] including individuals deprived of their liberty. States parties that allow medical professionals to provide medical treatment or the medical means to facilitate the termination of life of afflicted adults, such as the terminally ill, who experience severe physical or mental pain and suffering and wish to die with dignity,[20] must ensure the existence of robust legal and institutional safeguards to verify that medical professionals are complying with the free, informed, explicit and unambiguous decision of their patients, with a view to protecting patients from pressure and abuse.[21]

## II.    Prohibition against arbitrary deprivation of life

10.    Although it inheres in every human being,[22] the right to life is not absolute. While the Covenant does not enumerate the permissible grounds for deprivation of life, by requiring that deprivations of life must not be arbitrary, article 6 (1) implicitly recognizes that some deprivations of life may be non-arbitrary. For example, the use of lethal force in self-defence, under the conditions specified in paragraph 12 below, would not constitute an arbitrary deprivation of life. Even those exceptional measures leading to deprivations of life that are not arbitrary per se must be applied in a manner that is not arbitrary in fact. Such exceptional

measures should be established by law and accompanied by effective institutional safeguards designed to prevent arbitrary deprivations of life. Furthermore, States that have not abolished the death penalty and that are not parties to the Second Optional Protocol to the Covenant, aiming at the abolition of the death penalty, or other treaties providing for the abolition of the death penalty can apply the death penalty only in a non-arbitrary manner, for the most serious crimes and subject to a number of strict conditions elaborated in part IV below.

11.     The second sentence of article 6 (1) requires that the right to life be protected by law, while the third sentence requires that no one be arbitrarily deprived of life. The two requirements partly overlap in that a deprivation of life that lacks a legal basis or is otherwise inconsistent with life-protecting laws and procedures is, as a rule, arbitrary in nature. For example, a death sentence issued following legal proceedings conducted in violation of domestic laws of criminal procedure or evidence will generally be both unlawful and arbitrary.

12.     Deprivation of life is, as a rule, arbitrary if it is inconsistent with international law or domestic law.[23] A deprivation of life may, nevertheless, be authorized by domestic law and still be arbitrary. The notion of "arbitrariness" is not to be fully equated with "against the law", but must be interpreted more broadly to include elements of inappropriateness, injustice, lack of predictability and due process of law,[24] as well as elements of reasonableness, necessity and proportionality. In order not to be qualified as arbitrary under article 6, the application of potentially lethal force by a private person acting in self-defence, or by another person coming to his or her defence, must be strictly necessary in view of the threat posed by the attacker; it must represent a method of last resort after other alternatives have been exhausted or deemed inadequate;[25] the amount of force applied cannot exceed the amount strictly needed for responding to the threat;[26] the force applied must be carefully directed, only against the attacker; and the threat responded to must involve imminent death or serious injury.[27] The use of potentially lethal force for law enforcement purposes is an extreme measure[28] that should be resorted to only when strictly necessary in order to protect life or prevent serious injury from an imminent threat.[29] It cannot be used, for example, in order to prevent the escape from custody of a suspected criminal or a convict who does not pose a serious and imminent threat to the lives or bodily integrity of others.[30] The intentional taking of life by any means is permissible only if it is strictly necessary in order to protect life from an imminent threat.[31]

13.     States parties are expected to take all necessary measures to prevent arbitrary deprivation of life by their law enforcement officials, including soldiers charged with law enforcement missions. These measures include putting in place appropriate legislation controlling the use of lethal force by law enforcement officials, procedures designed to ensure that law enforcement actions are adequately planned in a manner consistent with the need to minimize the risk they pose to human life,[32] mandatory reporting, review and investigation of lethal incidents and other life-threatening incidents, and supplying forces responsible for crowd control with effective, less-lethal means and adequate protective equipment in order to obviate their need to resort to lethal force (see also para. 14 below).[33] In particular, all operations of law enforcement officials should comply with relevant international standards, including the Code of Conduct for Law Enforcement Officials and the Basic Principles on the Use of Force and Firearms by Law Enforcement Officials,[34] and law enforcement officials should undergo appropriate training designed to inculcate these standards[35] so as to ensure, in all circumstances, the fullest respect for the right to life.

14.     While preferable to more lethal weapons, States parties should ensure that less-lethal weapons are subject to strict independent testing and evaluate and monitor the impact on the right to life of weapons such as electro-muscular disruption devices (Tasers),[36] rubber or foam bullets, and other attenuating energy projectiles,[37] which are designed for use or are actually used by law enforcement officials, including soldiers charged with law enforcement missions.[38] The use of such weapons must be restricted to law enforcement officials who have undergone appropriate training, and must be strictly regulated in accordance with applicable international standards, including the Basic Principles on the Use of Force and Firearms by Law Enforcement Officials.[39] Furthermore, less-lethal weapons must be employed only subject to strict requirements of necessity and proportionality, in situations in which other less harmful measures have proven to be or clearly are ineffective to address the

3

threat.[40] States parties should not resort to less-lethal weapons in situations of crowd control that can be addressed through less harmful means,[41] especially situations involving the exercise of the right to peaceful assembly.

15.     When private individuals or entities are empowered or authorized by a State party to employ force with potentially lethal consequences, the State party is under an obligation to ensure that such employment of force actually complies with article 6 and the State party remains responsible for any failure to comply.[42] Among other things, a State party must rigorously limit the powers afforded to private actors and ensure that strict and effective measures of monitoring and control, as well as adequate training, are in place in order to guarantee, inter alia, that the powers granted are not misused and do not lead to arbitrary deprivation of life. For example, a State party must take adequate measures to ensure that persons who were involved or are currently involved in serious human rights violations or abuses are excluded from private security entities empowered or authorized to employ force.[43] It must also ensure that victims of arbitrary deprivation of life by private individuals or entities empowered or authorized by the State party are granted an effective remedy.[44]

16.     Paragraphs 2, 4 and 5 of article 6 implicitly recognize that countries that have not abolished the death penalty and have not ratified the Second Optional Protocol to the Covenant, aiming at the abolition of the death penalty, are not legally barred under the Covenant from applying the death penalty with regard to the most serious crimes, subject to a number of strict conditions. Other procedures regulating activity that may result in deprivation of life, such as protocols for administering new drugs, must be established by law, accompanied by effective institutional safeguards designed to prevent arbitrary deprivation of life, and must be compatible with other provisions of the Covenant.

17.     The deprivation of life of individuals through acts or omissions that violate provisions of the Covenant other than article 6 is, as a rule, arbitrary in nature. This includes, for example, the use of force resulting in the death of demonstrators exercising their right to freedom of assembly[45] and the passing of a death sentence following a trial that failed to meet the due process requirements of article 14 of the Covenant.[46]

## III.    Duty to protect life

18.     The second sentence of article 6 (1) provides that the right to life "shall be protected by law". This implies that States parties must establish a legal framework to ensure the full enjoyment of the right to life by all individuals as may be necessary to give effect to the right to life. The duty to protect the right to life by law also includes an obligation for States parties to adopt any appropriate laws or other measures in order to protect life from all reasonably foreseeable threats, including from threats emanating from private persons and entities.

19.     The duty to protect by law the right to life requires that any substantive ground for deprivation of life must be prescribed by law and must be defined with sufficient precision to avoid overly broad or arbitrary interpretation or application.[47] Since deprivation of life by the authorities of the State is a matter of the utmost gravity, the law must strictly control and limit the circumstances in which a person may be deprived of his or her life by those authorities,[48] and States parties must ensure full compliance with all of the relevant legal provisions. The duty to protect by law the right to life also requires States parties to organize all State organs and governance structures through which public authority is exercised in a manner consistent with the need to respect and ensure the right to life,[49] including establishing by law adequate institutions and procedures for preventing deprivation of life, investigating and prosecuting potential cases of unlawful deprivation of life, meting out punishment and providing full reparation.

20.     States parties must enact a protective legal framework that includes effective criminal prohibitions on all manifestations of violence or incitement to violence that are likely to result in deprivation of life, such as intentional and negligent homicide, unnecessary or disproportionate use of firearms,[50] infanticide,[51] "honour" killings,[52] lynching,[53] violent hate crimes,[54] blood feuds,[55] ritual killings,[56] death threats and terrorist attacks. The criminal sanctions attached to these crimes must be commensurate with their gravity,[57] while remaining compatible with all the provisions of the Covenant.

21.     The duty to take positive measures to protect the right to life derives from the general duty to ensure the rights recognized in the Covenant, which is articulated in article 2 (1) when read in conjunction with article 6, as well as from the specific duty to protect the right to life by law, which is articulated in the second sentence of article 6. States parties are thus under a due diligence obligation to take reasonable, positive measures that do not impose disproportionate burdens on them[58] in response to reasonably foreseeable threats to life originating from private persons and entities whose conduct is not attributable to the State.[59] Hence, States parties are obliged to take adequate preventive measures in order to protect individuals against reasonably foreseen threats of being murdered or killed by criminals and organized crime or militia groups, including armed or terrorist groups (see also para. 23 below).[60] States parties should also disband irregular armed groups, such as private armies and vigilante groups, that are responsible for deprivations of life[61] and reduce the proliferation of potentially lethal weapons to unauthorized individuals.[62] States parties must further take adequate measures of protection, including continuous supervision,[63] in order to prevent, investigate, punish and remedy arbitrary deprivation of life by private entities, such as private transportation companies, private hospitals[64] and private security firms.

22.     States parties must take appropriate measures to protect individuals against deprivation of life by other States, international organizations and foreign corporations operating within their territory[65] or in other areas subject to their jurisdiction. They must also take appropriate legislative and other measures to ensure that all activities taking place in whole or in part within their territory and in other places subject to their jurisdiction, but having a direct and reasonably foreseeable impact on the right to life of individuals outside their territory, including activities undertaken by corporate entities based in their territory or subject to their jurisdiction,[66] are consistent with article 6, taking due account of related international standards of corporate responsibility[67] and of the right of victims to obtain an effective remedy.

23.     The duty to protect the right to life requires States parties to take special measures of protection towards persons in vulnerable situations whose lives have been placed at particular risk because of specific threats[68] or pre-existing patterns of violence. Such persons include human rights defenders (see also para. 53 below),[69] officials fighting corruption and organized crime, humanitarian workers, journalists,[70] prominent public figures, witnesses to crime[71] and victims of domestic and gender-based violence and human trafficking. They may also include children,[72] especially children in street situations, unaccompanied migrant children and children in situations of armed conflict, members of ethnic and religious minorities,[73] indigenous peoples,[74] lesbian, gay, bisexual, transgender and intersex persons,[75] persons with albinism,[76] alleged witches,[77] displaced persons, asylum seekers, refugees[78] and stateless persons. States parties must respond urgently and effectively in order to protect individuals who find themselves under a specific threat, by adopting special measures such as the assignment of around-the-clock police protection, the issuance of protection and restraining orders against potential aggressors and, in exceptional cases, and only with the free and informed consent of the threatened individual, protective custody.

24.     Persons with disabilities, including psychosocial or intellectual disabilities, are also entitled to specific measures of protection so as to ensure their effective enjoyment of the right to life on an equal basis with others.[79] Such measures of protection must include the provision of reasonable accommodation when necessary to ensure the right to life, such as ensuring access of persons with disabilities to essential facilities and services,[80] and specific measures designed to prevent unwarranted use of force by law enforcement agents against persons with disabilities.[81]

25.     States parties also have a heightened duty of care to take any necessary measures to protect the lives of individuals deprived of their liberty by the State,[82] since by arresting, detaining, imprisoning or otherwise depriving individuals of their liberty, States parties assume the responsibility to care for their lives[83] and bodily integrity, and they may not rely on lack of financial resources or other logistical problems to reduce this responsibility.[84] The same heightened duty of care attaches to individuals held in private incarceration facilities operating pursuant to an authorization by the State. The duty to protect the life of all detained individuals includes providing them with the necessary medical care and appropriate regular monitoring of their health,[85] shielding them from inter-prisoner violence,[86] preventing

suicides and providing reasonable accommodation for persons with disabilities.[87] A heightened duty to protect the right to life also applies to individuals quartered in liberty-restricting State-run facilities, such as mental health facilities,[88] military camps,[89] refugee camps and camps for internally displaced persons,[90] juvenile institutions and orphanages.

26.    The duty to protect life also implies that States parties should take appropriate measures to address the general conditions in society that may give rise to direct threats to life or prevent individuals from enjoying their right to life with dignity. These general conditions may include high levels of criminal and gun violence,[91] pervasive traffic and industrial accidents,[92] degradation of the environment (see also para. 62 below),[93] deprivation of indigenous peoples' land, territories and resources,[94] the prevalence of life-threatening diseases, such as AIDS, tuberculosis and malaria,[95] extensive substance abuse, widespread hunger and malnutrition and extreme poverty and homelessness.[96] The measures called for to address adequate conditions for protecting the right to life include, where necessary, measures designed to ensure access without delay by individuals to essential goods and services such as food,[97] water, shelter, health care,[98] electricity and sanitation, and other measures designed to promote and facilitate adequate general conditions, such as the bolstering of effective emergency health services, emergency response operations (including firefighters, ambulance services and police forces) and social housing programmes. States parties should also develop strategic plans for advancing the enjoyment of the right to life, which may comprise measures to fight the stigmatization associated with disabilities and diseases, including sexually transmitted diseases, which hamper access to medical care;[99] detailed plans to promote education for non-violence; and campaigns for raising awareness of gender-based violence[100] and harmful practices,[101] and for improving access to medical examinations and treatments designed to reduce maternal and infant mortality.[102] Furthermore, States parties should also develop, when necessary, contingency plans and disaster management plans designed to increase preparedness and address natural and man-made disasters that may adversely affect enjoyment of the right to life, such as hurricanes, tsunamis, earthquakes, radioactive accidents and massive cyberattacks resulting in disruption of essential services.

27.    An important element of the protection afforded to the right to life by the Covenant is the obligation on the States parties, where they know or should have known of potentially unlawful deprivations of life, to investigate and, where appropriate, prosecute the perpetrators of such incidents, including incidents involving allegations of excessive use of force with lethal consequences (see also para. 64 below).[103] The duty to investigate also arises in circumstances in which a serious risk of deprivation of life was caused by the use of potentially lethal force, even if the risk did not materialize (see also para. 7 above). This obligation is implicit in the obligation to protect and is reinforced by the general duty to ensure the rights recognized in the Covenant, which is articulated in article 2 (1), when read in conjunction with article 6 (1), and the duty to provide an effective remedy to victims of human rights violations[104] and their relatives,[105] which is articulated in article 2 (3) of the Covenant, when read in conjunction with article 6 (1). Investigations and prosecutions of potentially unlawful deprivations of life should be undertaken in accordance with relevant international standards, including the Minnesota Protocol on the Investigation of Potentially Unlawful Death, and must be aimed at ensuring that those responsible are brought to justice,[106] at promoting accountability and preventing impunity,[107] at avoiding denial of justice[108] and at drawing necessary lessons for revising practices and policies with a view to avoiding repeated violations.[109] Investigations should explore, inter alia, the legal responsibility of superior officials with regard to violations of the right to life committed by their subordinates.[110] Given the importance of the right to life, States parties must generally refrain from addressing violations of article 6 merely through administrative or disciplinary measures, and a criminal investigation is normally required, which should lead, if enough incriminating evidence is gathered, to a criminal prosecution.[111] Immunities and amnesties provided to perpetrators of intentional killings and to their superiors, and comparable measures leading to de facto or de jure impunity, are, as a rule, incompatible with the duty to respect and ensure the right to life, and to provide victims with an effective remedy.[112]

28.    Investigations into allegations of violations of article 6 must always be independent,[113] impartial,[114] prompt,[115] thorough,[116] effective,[117] credible[118] and transparent (see also para. 64 below).[119] In the event that a violation is found, full reparation must be provided, including,

in view of the particular circumstances of the case, adequate measures of compensation, rehabilitation and satisfaction.[120] States parties are also under an obligation to take steps to prevent the occurrence of similar violations in the future.[121] Where relevant, the investigation should include an autopsy of the victim's body,[122] whenever possible, in the presence of a representative of the victim's relatives.[123] States parties need to take, among other things, appropriate measures to establish the truth relating to the events leading to the deprivation of life, including the reasons and legal basis for targeting certain individuals and the procedures employed by State forces before, during and after the time at which the deprivation occurred,[124] and identify the bodies of the individuals who have lost their lives.[125] States parties should also disclose relevant details about the investigation to the victim's next of kin,[126] allow the next of kin to present new evidence, afford the next of kin legal standing in the investigation,[127] and make public information about the investigative steps taken and the findings, conclusions and recommendations emanating from the investigation,[128] subject to absolutely necessary redactions justified by a compelling need to protect the public interest or the privacy and other legal rights of directly affected individuals. States parties must also take the necessary steps to protect witnesses, victims and their relatives and persons conducting the investigation from threats, attacks and any act of retaliation. An investigation into violations of the right to life should commence when appropriate ex officio.[129] States should support and cooperate in good faith with international mechanisms of investigation and prosecutions addressing possible violations of article 6.[130]

29.    Loss of life occurring in custody, in unnatural circumstances, creates a presumption of arbitrary deprivation of life by State authorities, which can only be rebutted on the basis of a proper investigation that establishes the State's compliance with its obligations under article 6.[131] States parties also have a particular duty to investigate allegations of violations of article 6 whenever State authorities have used or appear to have used firearms or other potentially lethal force outside the immediate context of an armed conflict, for example, when live fire has been used against demonstrators,[132] or when civilians have been found dead in circumstances fitting a pattern of alleged violations of the right to life by State authorities.[133]

30.    The duty to respect and ensure the right to life requires States parties to refrain from deporting, extraditing or otherwise transferring individuals to countries in which there are substantial grounds for believing that a real risk exists that their right to life under article 6 of the Covenant would be violated.[134] Such a risk must be personal in nature[135] and cannot derive merely from the general conditions in the receiving State, except in the most extreme cases.[136] For example, as explained in paragraph 34 below, it would be contrary to article 6 to extradite an individual from a country that had abolished the death penalty to a country in which he or she might face the death penalty.[137] Similarly, it would be inconsistent with article 6 to deport an individual to a country in which a fatwa had been issued against him or her by local religious authorities, without verifying that the fatwa was not likely to be followed;[138] or to deport an individual to an extremely violent country in which he or she had never lived, had no social or family contacts and could not speak the local language.[139] In cases involving allegations of risk to the life of the removed individual emanating from the authorities of the receiving State, the situation of the removed individual and the conditions in the receiving States need to be assessed, inter alia, based on the intent of the authorities of the receiving State, the pattern of conduct they have shown in similar cases,[140] and the availability of credible and effective assurances about their intentions. When the alleged risk to life emanates from non-State actors or foreign States operating in the territory of the receiving State, credible and effective assurances for protection by the authorities of the receiving State may be sought and internal flight options could be explored. When relying upon assurances from the receiving State of treatment upon removal, the removing State should put in place adequate mechanisms for ensuring compliance with the issued assurances from the moment of removal onwards.[141]

31.    The obligation not to extradite, deport or otherwise transfer, pursuant to article 6 of the Covenant, may be broader than the scope of the principle of non-refoulement under international refugee law, since it may also require the protection of aliens not entitled to refugee status. States parties must, however, allow all asylum seekers claiming a real risk of a violation of their right to life in the State of origin access to refugee or other individualized or group status determination procedures that could offer them protection against refoulement.[142]

## IV.  Imposition of the death penalty

32.  Paragraphs 2, 4, 5 and 6 of article 6 regulate the imposition of the death penalty by those countries that have not yet abolished it.

33.  Paragraph 2 of article 6 strictly limits the application of the death penalty, firstly, to States parties that have not abolished the death penalty, and secondly, to the most serious crimes. Given the anomalous nature of regulating the application of the death penalty in an instrument enshrining the right to life, the contents of paragraph 2 have to be narrowly construed.[143]

34.  States parties to the Covenant that have abolished the death penalty, through amending their domestic laws, becoming parties to the Second Optional Protocol to the Covenant, aiming at the abolition of the death penalty, or adopting another international instrument obligating them to abolish the death penalty, are barred from reintroducing it. Like the Covenant, the Second Optional Protocol does not contain termination provisions and States parties cannot denounce it. Abolition of the death penalty is therefore legally irrevocable. Furthermore, States parties may not transform into a capital offence any offence that, upon ratification of the Covenant or at any time thereafter, did not entail the death penalty. Nor can they remove legal conditions from an existing offence with the result of permitting the imposition of the death penalty in circumstances in which it was not possible to impose it before. States parties that have abolished the death penalty cannot deport, extradite or otherwise transfer persons to a country in which they are facing criminal charges that carry the death penalty, unless credible and effective assurances against the imposition of the death penalty have been obtained.[144] In the same vein, the obligation not to reintroduce the death penalty for any specific crime requires States parties not to deport, extradite or otherwise transfer an individual to a country in which he or she is expected to stand trial for a capital offence, if the same offence does not carry the death penalty in the removing State, unless credible and effective assurances against exposing the individual to the death penalty have been obtained.

35.  The term "the most serious crimes" must be read restrictively[145] and appertain only to crimes of extreme gravity[146] involving intentional killing.[147] Crimes not resulting directly and intentionally in death,[148] such as attempted murder,[149] corruption and other economic and political crimes,[150] armed robbery,[151] piracy,[152] abduction,[153] drug[154] and sexual offences, although serious in nature, can never serve as the basis, within the framework of article 6, for the imposition of the death penalty. In the same vein, a limited degree of involvement or of complicity in the commission of even the most serious crimes, such as providing the physical means for the commission of murder, cannot justify the imposition of the death penalty. States parties are under an obligation to review their criminal laws so as to ensure that the death penalty is not imposed for crimes that do not qualify as the most serious crimes.[155] They should also revoke death sentences issued for crimes not qualifying as the most serious crimes and pursue the necessary legal procedures to resentence those convicted for such crimes.

36.  Under no circumstances can the death penalty ever be applied as a sanction against conduct the very criminalization of which violates the Covenant, including adultery, homosexuality, apostasy,[156] establishing political opposition groups[157] or offending a head of State.[158] States parties that retain the death penalty for such offences commit a violation of their obligations under article 6, read alone and in conjunction with article 2 (2) of the Covenant, as well as of other provisions of the Covenant.

37.  In all cases involving the application of the death penalty, the personal circumstances of the offender and the particular circumstances of the offence, including its specific attenuating elements,[159] must be considered by the sentencing court. Hence, mandatory death sentences that leave domestic courts with no discretion as to whether to designate the offence as a crime warranting the death penalty, and whether to issue the death sentence in the particular circumstances of the offender, are arbitrary in nature.[160] The availability of a right to seek pardon or commutation on the basis of the special circumstances of the case or the accused is not an adequate substitute for the need for judicial discretion in the application of the death penalty.[161]

38.    Article 6 (2) also requires States parties to ensure that any death sentence would be "in accordance with the law in force at the time of the commission of the crime". This application of the principle of legality complements and reaffirms the application of principle of *mulla poena sine lege* found in article 15 (1) of the Covenant. As a result, the death penalty can never be imposed if it was not provided by law for the offence at the time of its commission. Nor can the imposition of the death penalty be based on vaguely defined criminal provisions,[162] whose application to the convicted individual depend on subjective or discretionary considerations,[163] the application of which is not reasonably foreseeable.[164] On the other hand, the abolition of the death penalty should apply retroactively to individuals charged or convicted of a capital offence in accordance with the retroactive leniency (*lex mitior*) principle, which finds partial expression in the third sentence of article 15 (1), requiring States parties to grant offenders the benefit of lighter penalties adopted after the commission of the offence. The retroactive application of the abolition of the death penalty to all individuals charged or convicted of a capital crime also derives from the fact that the need for applying the death penalty cannot be justified once it has been abolished.

39.    Article 6 (3) reminds all States parties that are also parties to the Convention on the Prevention and Punishment of the Crime of Genocide of their obligations to prevent and punish the crime of genocide, which include the obligation to prevent and punish all deprivations of life, which constitute part of a crime of genocide. Under no circumstances can the death penalty be imposed as part of a policy of genocide against members of a national, ethnic, racial or religious group.

40.    States parties that have not abolished the death penalty must respect article 7 of the Covenant, which prohibits certain methods of execution. Failure to respect article 7 would inevitably render the execution arbitrary in nature and thus also in violation of article 6. The Committee has already opined that stoning,[165] injection of untested lethal drugs,[166] gas chambers,[167] burning and burying alive[168] and public executions[169] are contrary to article 7. For similar reasons, other painful and humiliating methods of execution are also unlawful under the Covenant. Failure to provide individuals on death row with timely notification about the date of their execution constitutes, as a rule, a form of ill-treatment, which renders the subsequent execution contrary to article 7 of the Covenant.[170] Extreme delays in the implementation of a death penalty sentence that exceed any reasonable period of time necessary to exhaust all legal remedies[171] may also entail the violation of article 7 of the Covenant, especially when the long time on death row exposes sentenced persons to harsh[172] or stressful conditions, including solitary confinement,[173] and when sentenced persons are particularly vulnerable due to factors such as age, health or mental state.[174]

41.    Violation of the fair trial guarantees provided for in article 14 of the Covenant in proceedings resulting in the imposition of the death penalty would render the sentence arbitrary in nature, and in violation of article 6 of the Covenant.[175] Such violations might involve the use of forced confessions;[176] the inability of the accused to question relevant witnesses;[177] lack of effective representation involving confidential attorney-client meetings during all stages of the criminal proceedings,[178] including criminal interrogation,[179] preliminary hearings,[180] trial[181] and appeal;[182] failure to respect the presumption of innocence, which may manifest itself in the accused being placed in a cage or being handcuffed during the trial;[183] lack of an effective right of appeal;[184] lack of adequate time and facilities for the preparation of the defence, including the inability to access legal documents essential for conducting the legal defence or appeal, such as official prosecutorial applications to the court,[185] the court's judgment[186] or the trial transcript; lack of suitable interpretation;[187] failure to provide accessible documents and procedural accommodation for persons with disabilities; excessive and unjustified delays in the trial[188] or the appeal process;[189] and general lack of fairness of the criminal process,[190] or lack of independence or impartiality of the trial or appeal court.

42.    Other serious procedural flaws not explicitly covered by article 14 of the Covenant may nonetheless render the imposition of the death penalty contrary to article 6. For example, a failure to promptly inform detained foreign nationals of their right to consular notification pursuant to the Vienna Convention on Consular Relations, resulting in the imposition of the death penalty,[191] and failure to afford individuals about to be deported to a country in which

their lives are claimed to be at real risk the opportunity to avail themselves of available appeal procedures[192] would violate article 6 (1) of the Covenant.

43.    The execution of sentenced persons whose guilt has not been established beyond reasonable doubt also constitutes an arbitrary deprivation of life. States parties must therefore take all feasible measures in order to avoid wrongful convictions in death penalty cases,[193] to review procedural barriers to reconsideration of convictions and to re-examine past convictions on the basis of new evidence, including new DNA evidence. States parties should also consider the implications for the evaluation of evidence presented in capital cases of new reliable studies, including studies suggesting the prevalence of false confessions and the unreliability of eyewitness testimony.

44.    The death penalty must not be imposed in a discriminatory manner contrary to the requirements of articles 2 (1) and 26 of the Covenant. Data suggesting that members of religious, racial or ethnic minorities, indigent persons or foreign nationals are disproportionately likely to face the death penalty may indicate an unequal application of the death penalty, which raises concerns under article 2 (1) read in conjunction with article 6, as well as under article 26.[194]

45.    According to the last sentence of article 6 (2), the death penalty can only be carried out pursuant to a judgment of a competent court. Such a court must be established by law within the judiciary, be independent of the executive and legislative branches and be impartial.[195] It should be established before the commission of the offence. As a rule, civilians must not be tried for capital crimes before military tribunals[196] and military personnel can be tried for offences carrying the death penalty only before a tribunal affording all fair trial guarantees. Furthermore, the Committee does not consider courts of customary justice to constitute judicial institutions offering sufficient fair trial guarantees to enable them to try capital crimes. The issuance of a death penalty without any trial, for example in the form of a religious edict[197] or military order that the State plans to carry out or allows to be carried out, violates both articles 6 and 14 of the Covenant.

46.    Any penalty of death can be carried out only pursuant to a final judgment, after an opportunity to resort to all judicial appeal procedures has been provided to the sentenced person, and after petitions to all other available non-judicial avenues have been resolved, including supervisory review by prosecutors or courts, and consideration of requests for official or private pardon. Furthermore, death sentences must not be carried out as long as international interim measures requiring a stay of execution are in place. Such interim measures are designed to allow review of the sentence before international courts, human rights courts and commissions, and international monitoring bodies, such as the United Nations treaty bodies. Failure to implement such interim measures is incompatible with the obligation to respect in good faith the procedures established under the specific treaties governing the work of the relevant international bodies.[198]

47.    States parties are required pursuant to article 6 (4) to allow individuals sentenced to death to seek pardon or commutation, to ensure that amnesties, pardons and commutation can be granted to them in appropriate circumstances, and to ensure that sentences are not carried out before requests for pardon or commutation have been meaningfully considered and conclusively decided upon according to applicable procedures.[199] No category of sentenced persons can be a priori excluded from such measures of relief, nor should the conditions for attainment of relief be ineffective, unnecessarily burdensome, discriminatory in nature or applied in an arbitrary manner.[200] Article 6 (4) does not prescribe a particular procedure for the exercise of the right to seek pardon or commutation and States parties consequently retain discretion in spelling out the relevant procedures.[201] Still, such procedures should be specified in domestic legislation,[202] and they should not afford the families of victims of crime a preponderant role in determining whether the death sentence should be carried out.[203] Furthermore, pardon or commutation procedures must offer certain essential guarantees, including certainty about the processes followed and the substantive criteria applied and the rights for individuals sentenced to death to initiate pardon or commutation procedures and to make representations about their personal or other relevant circumstances, to be informed in advance when the request will be considered, and to be informed promptly about the outcome of the procedure.[204]

48.    Article 6 (5) prohibits the imposition of the death penalty for crimes committed by persons below the age of 18 at the time of the offence.[205] This necessarily implies that such persons can never face the death penalty for that offence, regardless of their age at the time of sentencing or at the time foreseen for carrying out the sentence.[206] If there is no reliable and conclusive proof that the person was not below the age of 18 at the time the crime was committed, he or she will have the right to the benefit of the doubt and the death penalty cannot be imposed.[207] Article 6 (5) also prohibits States parties from carrying out the death penalty on pregnant women.

49.    States parties must refrain from imposing the death penalty on individuals who face special barriers in defending themselves on an equal basis with others, such as persons whose serious psychosocial or intellectual disabilities impede their effective defence,[208] and on persons who have limited moral culpability. They should also refrain from executing persons who have a diminished ability to understand the reasons for their sentence, and persons whose execution would be exceptionally cruel or would lead to exceptionally harsh results for them and their families, such as persons of advanced age,[209] parents of very young or dependent children, and individuals who have suffered serious human rights violations in the past.[210]

50.    Article 6 (6) reaffirms the position that States parties that are not yet totally abolitionist should be on an irrevocable path towards complete eradication of the death penalty, de facto and de jure, in the foreseeable future. The death penalty cannot be reconciled with full respect for the right to life, and abolition of the death penalty is both desirable[211] and necessary for the enhancement of human dignity and progressive development of human rights.[212] It is contrary to the object and purpose of article 6 for States parties to take steps to increase de facto the rate of use of and the extent to which they resort to the death penalty,[213] or to reduce the number of pardons and commutations they grant.

51.    Although the allusion to the conditions for application of the death penalty in article 6 (2) suggests that when drafting the Covenant, the States parties did not universally regard the death penalty as a cruel, inhuman or degrading punishment per se,[214] subsequent agreements by the States parties or subsequent practice establishing such agreements may ultimately lead to the conclusion that the death penalty is contrary to article 7 of the Covenant under all circumstances.[215] The increasing number of States parties to the Second Optional Protocol to the Covenant, aiming at the abolition of the death penalty, other international instruments prohibiting the imposition or carrying out of the death penalty, and the growing number of non-abolitionist States that have nonetheless introduced a de facto moratorium on the exercise of the death penalty, suggest that considerable progress may have been made towards establishing an agreement among the States parties to consider the death penalty as a cruel, inhuman or degrading form of punishment.[216] Such a legal development is consistent with the pro-abolitionist spirit of the Covenant, which manifests itself, inter alia, in the texts of article 6 (6) and the Second Optional Protocol.

## V.    Relationship of article 6 with other articles of the Covenant and other legal regimes

52.    The standards and guarantees of article 6 both overlap and interact with other provisions of the Covenant. Some forms of conduct simultaneously violate both article 6 and another article. For example, applying the death penalty in response to a crime that does not constitute a most serious crime (see also para. 35 above) would violate both article 6 (2) and, in light of the extreme nature of the punishment, article 7.[217] At other times, the contents of article 6 (1) are informed by the contents of other articles. For example, application of the death penalty may amount to an arbitrary deprivation of life under article 6 by virtue of the fact that it represents a punishment for exercising freedom of expression, in violation of article 19.

53.    Article 6 also reinforces the obligations of States parties under the Covenant and the Optional Protocol to protect individuals against reprisals for promoting and striving to protect and realize human rights, including through cooperation or communication with the Committee.[218] States parties must take the necessary measures to respond to death threats and

to provide adequate protection to human rights defenders,[219] including the creation and maintenance of a safe and enabling environment for defending human rights.

54.    Torture and ill-treatment, which may seriously affect the physical and mental health of the mistreated individual, could also generate the risk of deprivation of life. Furthermore, criminal convictions resulting in the death penalty that are based on information procured by torture or cruel, inhuman or degrading treatment of interrogated persons would violate articles 7 and 14 (3) (g) of the Covenant, as well as article 6 (see also para. 41 above).[220]

55.    Returning individuals to countries where there are substantial grounds for believing that they face a real risk to their lives violates articles 6 and 7 of the Covenant (see also para. 31 above).[221] In addition, making an individual who has been sentenced to death believe that the sentence has been commuted only to inform him or her later that it has not,[222] and placing an individual on death row pursuant to a death sentence that is void ab initio,[223] would run contrary to both articles 6 and 7.

56.    The arbitrary deprivation of life of an individual may cause his or her relatives mental suffering, which could amount to a violation of their own rights under article 7 of the Covenant. Furthermore, even when the deprivation of life is not arbitrary, failure to provide relatives with information on the circumstances of the death of an individual may violate their rights under article 7,[224] as could failure to inform them of the location of the body,[225] and, where the death penalty is applied, of the date on which the State party plans to carry out the death penalty.[226] Relatives of individuals deprived of their life by the State must be able to receive the remains, if they so wish.[227]

57.    The right to life guaranteed by article 6 of the Covenant, including the right to protection of life under article 6 (1), may overlap with the right to security of person guaranteed by article 9 (1). Extreme forms of arbitrary detention that are themselves life-threatening, in particular enforced disappearances, violate the right to personal liberty and personal security and are incompatible with the right to life (see also para. 58 below).[228] Failure to respect the procedural guarantees found in article 9 (3) and (4), designed inter alia to prevent disappearances, could also result in a violation of article 6.[229]

58.    Enforced disappearance constitutes a unique and integrated series of acts and omissions representing a grave threat to life.[230] The deprivation of liberty, followed by a refusal to acknowledge that deprivation of liberty or by concealment of the fate of the disappeared person, in effect removes that person from the protection of the law and places his or her life at serious and constant risk, for which the State is accountable.[231] It thus results in a violation of the right to life as well as other rights recognized in the Covenant, in particular, article 7 (prohibition of torture or cruel, inhuman or degrading treatment or punishment), article 9 (liberty and security of person) and article 16 (right to recognition as a person before the law). States parties must take adequate measures to prevent the enforced disappearance of individuals, and conduct an effective and speedy inquiry to establish the fate and whereabouts of persons who may have been subject to enforced disappearance. States parties should also ensure that the enforced disappearance of persons is punished with appropriate criminal sanctions, and introduce prompt and effective procedures for cases of disappearance to be investigated thoroughly by independent and impartial bodies[232] that operate, as a rule, within the ordinary criminal justice system. They should bring to justice the perpetrators of such acts and omissions and ensure that victims of enforced disappearance and their relatives are informed about the outcome of the investigation and are provided with full reparation.[233] Under no circumstances should families of victims of enforced disappearance be obliged to declare them dead in order to be eligible for reparation.[234] States parties should also provide families of victims of disappeared persons with the means to regularize their legal status in relation to the disappeared persons after an appropriate period of time.[235]

59.    A particular connection exists between article 6 and article 20, which prohibits any propaganda for war and certain forms of advocacy constituting incitement to discrimination, hostility or violence. Failure to comply with these obligations under article 20 may also constitute a failure to take the necessary measures to protect the right to life under article 6.[236]

60.    Article 24 (1) of the Covenant entitles every child to such measures of protection as are required by his or her status as a minor, on the part of his or her family, society and the

State. This article requires adoption of special measures designed to protect the life of every child, in addition to the general measures required by article 6 for protecting the lives of all individuals.[237] When taking special measures of protection, States parties should be guided by the best interests of the child,[238] and by the need to ensure all children's survival, development[239] and well-being.[240]

61.    The right to life must be respected and ensured without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth, or any other status, including caste,[241] ethnicity, membership of an indigenous group, sexual orientation or gender identity,[242] socioeconomic status,[243] disability,[243] albinism[245] and age.[246] Legal protections for the right to life must apply equally to all individuals and provide them with effective guarantees against all forms of discrimination, including multiple and intersectional forms of discrimination.[247] Any deprivation of life based on discrimination in law or in fact is ipso facto arbitrary in nature. Femicide, which constitutes an extreme form of gender-based violence that is directed against girls and women, is a particularly grave form of assault on the right to life.[248]

62.    Environmental degradation, climate change and unsustainable development constitute some of the most pressing and serious threats to the ability of present and future generations to enjoy the right to life.[249] The obligations of States parties under international environmental law should thus inform the content of article 6 of the Covenant, and the obligation of States parties to respect and ensure the right to life should also inform their relevant obligations under international environmental law.[250] Implementation of the obligation to respect and ensure the right to life, and in particular life with dignity, depends, inter alia, on measures taken by States parties to preserve the environment and protect it against harm, pollution and climate change caused by public and private actors. States parties should therefore ensure sustainable use of natural resources, develop and implement substantive environmental standards, conduct environmental impact assessments and consult with relevant States about activities likely to have a significant impact on the environment, provide notification to other States concerned about natural disasters and emergencies and cooperate with them, provide appropriate access to information on environmental hazards and pay due regard to the precautionary approach.[251]

63.    In light of article 2 (1) of the Covenant, a State party has an obligation to respect and ensure the rights under article 6 of all persons who are within its territory and all persons subject to its jurisdiction, that is, all persons over whose enjoyment of the right to life it exercises power or effective control.[252] This includes persons located outside any territory effectively controlled by the State whose right to life is nonetheless affected by its military or other activities in a direct and reasonably foreseeable manner (see para. 22 above).[253] States also have obligations under international law not to aid or assist activities undertaken by other States and non-State actors that violate the right to life.[254] Furthermore, States parties must respect and protect the lives of individuals located in places that are under their effective control, such as occupied territories, and in territories over which they have assumed an international obligation to apply the Covenant. States parties are also required to respect and protect the lives of all individuals located on marine vessels and aircraft registered by them or flying their flag, and of those individuals who find themselves in a situation of distress at sea, in accordance with their international obligations on rescue at sea.[255] Given that the deprivation of liberty brings a person within a State's effective control, States parties must respect and protect the right to life of all individuals arrested or detained by them, even if held outside their territory.[256]

64.    Like the rest of the Covenant, article 6 continues to apply also in situations of armed conflict to which the rules of international humanitarian law are applicable, including to the conduct of hostilities.[257] While rules of international humanitarian law may be relevant for the interpretation and application of article 6 when the situation calls for their application, both spheres of law are complementary, not mutually exclusive.[258] Use of lethal force consistent with international humanitarian law and other applicable international law norms is, in general, not arbitrary. By contrast, practices inconsistent with international humanitarian law, entailing a risk to the lives of civilians and other persons protected by international humanitarian law, including the targeting of civilians, civilian objects and objects indispensable to the survival of the civilian population, indiscriminate attacks, failure

to apply the principles of precaution and proportionality, and the use of human shields would also violate article 6 of the Covenant.[259] States parties should, in general, disclose the criteria for attacking with lethal force individuals or objects whose targeting is expected to result in deprivation of life, including the legal basis for specific attacks, the process of identification of military targets and combatants or persons taking a direct part in hostilities, the circumstances in which relevant means and methods of warfare have been used,[260] and whether less harmful alternatives were considered. They must also investigate alleged or suspected violations of article 6 in situations of armed conflict in accordance with the relevant international standards (see paras. 27–28 above).[261]

65.     States parties engaged in the deployment, use, sale or purchase of existing weapons and in the study, development, acquisition or adoption of weapons, and means or methods of warfare, must always consider their impact on the right to life.[262] For example, the development of autonomous weapon systems lacking in human compassion and judgment raises difficult legal and ethical questions concerning the right to life, including questions relating to legal responsibility for their use. The Committee is therefore of the view that such weapon systems should not be developed and put into operation, either in times of war or in times of peace, unless it has been established that their use conforms with article 6 and other relevant norms of international law.[263]

66.     The threat or use of weapons of mass destruction, in particular nuclear weapons, which are indiscriminate in effect and are of a nature to cause destruction of human life on a catastrophic scale, is incompatible with respect for the right to life and may amount to a crime under international law. States parties must take all necessary measures to stop the proliferation of weapons of mass destruction, including measures to prevent their acquisition by non-State actors, to refrain from developing, producing, testing, acquiring, stockpiling, selling, transferring and using them, to destroy existing stockpiles, and to take adequate measures of protection against accidental use, all in accordance with their international obligations.[264] They must also respect their international obligations to pursue in good faith negotiations in order to achieve the aim of nuclear disarmament under strict and effective international control,[265] and to afford adequate reparation to victims whose right to life has been or is being adversely affected by the testing or use of weapons of mass destruction, in accordance with principles of international responsibility.[266]

67.     Article 6 is included in the list of non-derogable rights in article 4 (2) of the Covenant. Hence, the guarantees against arbitrary deprivation of life contained in article 6 continue to apply in all circumstances, including in situations of armed conflict and other public emergencies.[267] The existence and nature of a public emergency that threatens the life of the nation may, however, be relevant to a determination of whether a particular act or omission leading to deprivation of life is arbitrary and to a determination of the scope of the positive measures that States parties must take. Although some Covenant rights other than the right to life may be subject to derogation, derogable rights that support the application of article 6 must not be diminished by measures of derogation.[268] Such rights include procedural guarantees, such as the right to fair trial in death penalty cases, and accessible and effective measures to vindicate rights, such as the duty to take appropriate measures to investigate, prosecute, punish and remedy violations of the right to life.

68.     Reservations with respect to the peremptory and non-derogable obligations set out in article 6 are incompatible with the object and purpose of the Covenant. In particular, no reservation is permitted to the prohibition against arbitrary deprivation of life of persons and to the strict limits provided in article 6 with respect to the application of the death penalty.[269]

69.     Wars and other acts of mass violence continue to be a scourge of humanity resulting in the loss of many thousands of lives every year.[270] Efforts to avert the risks of war and any other armed conflict, and to strengthen international peace and security, are among the most important safeguards of the right to life.[271]

70.     States parties engaged in acts of aggression as defined in international law, resulting in deprivation of life, violate ipso facto article 6 of the Covenant. At the same time, all States are reminded of their responsibility as members of the international community to protect lives and to oppose widespread or systematic attacks on the right to life,[272] including acts of aggression, international terrorism, genocide, crimes against humanity and war crimes, while

respecting all of their obligations under international law. States parties that fail to take all reasonable measures to settle their international disputes by peaceful means might fall short of complying with their positive obligation to ensure the right to life.

*Notes*

[1] International Covenant on Civil and Political Rights, art. 4; Human Rights Committee, general comment No. 6 (1982) on the right to life, para. 1; general comment No. 14 (1984) on the right to life, para. 1; *Camargo v. Colombia*, communication No. 45/1979, para. 13.1; *Baboeram-Adhin et al. v. Suriname*, communications Nos. 146/1983 and 148–154/1983, para. 14.3.

[2] Universal Declaration of Human Rights, preamble.

[3] *Camargo v. Colombia*, para. 13.2.

[4] Human Rights Committee, general comment No. 35 (2014) on liberty and security of person, paras. 9 and 55.

[5] Human Rights Committee, general comment No. 31 (2004) on the nature of the general legal obligation imposed on States parties to the Covenant, para. 8. See also European Court of Human Rights, *Osman v. United Kingdom* (case No. 87/1997/871/1083), judgment of 28 October 1998, para. 116.

[6] *Chongwe v. Zambia* (CCPR/C/70/D/821/1998), para. 5.2. See also European Court of Human Rights, *Ilhan v. Turkey* (application No. 22277/93), judgment of 27 June 2000, para. 76; Inter-American Court of Human Rights, *Rochela massacre v. Colombia*, judgment of 11 May 2007, para. 127.

[7] *Mellet v. Ireland* (CCPR/C/116/D/2324/2013), paras. 7.4–7.8; CCPR/C/IRL/CO/4, para. 9.

[8] Human Rights Committee, general comment No. 28 (2000) on the equality of rights between men and women, para. 10. See also, e.g., CCPR/C/ARG/CO/4, para. 13; CCPR/C/JAM/CO/3, para. 14; CCPR/C/MDG/CO/3, para. 14.

[9] CCPR/C/79/Add.97, para. 15.

[10] See, e.g., CCPR/CO/79/GNQ, para. 9; CCPR/C/ZMB/CO/3, para. 18; CCPR/C/COL/CO/7, para. 21; CCPR/C/MAR/CO/6, para. 22; CCPR/C/CMR/CO/5, para. 22.

[11] See, e.g., CCPR/C/PAN/CO/3, para. 9; CCPR/C/MKD/CO/3, para. 11. See also World Health Organization, *Safe abortion: technical and policy guidance for health systems*, 2nd ed. (Geneva, 2012), pp. 96–97.

[12] CCPR/C/POL/CO/7, para. 24; CCPR/C/COL/CO/7, para. 21.

[13] CCPR/C/CHL/CO/6, para. 15; CCPR/C/KAZ/CO/1, para. 11; CCPR/C/ROU/CO/5, para. 26.

[14] CCPR/C/LKA/CO/5, para. 10; CCPR/C/MWI/CO/1/Add.1, para. 9; CCPR/C/ARG/CO/5, para. 12.

[15] CCPR/C/POL/CO/6, para. 12; CCPR/C/COD/CO/4, para. 22.

[16] CCPR/C/PAK/CO/1, para. 16; CCPR/C/BFA/CO/1, para. 20; CCPR/C/NAM/CO/2, para. 16.

[17] CCPR/C/PAK/CO/1, para. 16.

[18] Committee on the Rights of the Child, general comment No. 4 (2003) on adolescent health and development in the context of the Convention, para. 11.

[19] CCPR/C/79/Add.92, para. 11.

[20] Committee on Economic, Social and Cultural Rights' general comment No. 14 (2000) on the right to the highest attainable standard of health, para. 25.

[21] CCPR/C/NLD/CO/4, para. 7.

[22] Universal Declaration of Human Rights, preamble.

[23] African Commission on Human and Peoples' Rights, *General Comment No. 3 on the African Charter on Human and Peoples' Rights: The Right to Life (Article 4)* (2015), para. 12.

[24] *Gorji-Dinka v. Cameroon* (CCPR/C/83/D/1134/2002), para. 5.1; *Van Alphen v. Netherlands*, communication No. 305/1988, para. 5.8.

[25] *Camargo v. Colombia*, para. 13.2.

[26] Ibid., paras. 13.2–13.3.

[27] A/HRC/17/28, para. 60.

[28] Code of Conduct for Law Enforcement Officials, commentary to art. 3.

[29] Basic Principles on the Use of Force and Firearms by Law Enforcement Officials, para. 9.

[30] African Commission on Human and Peoples' Rights, *Kazingachire et al v. Zimbabwe* (communication No. 295/04), decision of 12 October 2013, paras. 118–120.

[31] Basic Principles on the Use of Force and Firearms by Law Enforcement Officials, para. 9.

[32] European Court of Human Rights, *McCann and others v. United Kingdom* (application No. 18984/91), judgment of 27 September 1995, para. 150.

[33] A/HRC/31/66, para. 54.

[34] CCPR/C/NPL/CO/2, para. 10; CCPR/CO/81/LIE, para. 10.

[35] CCPR/C/KEN/CO/3, para. 11; CCPR/C/CAF/CO/2, para. 12.

[36] CCPR/C/USA/CO/4, para. 11; CCPR/C/USA/CO/3/Rev.1, para. 30.

[37] CCPR/C/GBR/CO/6, para. 11.

[38] Code of Conduct for Law Enforcement Officials, commentary to art. 1.

[39] A/HRC/31/66, para. 55.
[40] Basic Principles on the Use of Force and Firearms by Law Enforcement Officials (1990), para. 14.
[41] CCPR/CO/74/SWE, para. 10.
[42] See, in the context of armed conflicts, the Montreux Document on pertinent international legal obligations and good practices for States related to operations of private military and security companies during armed conflict (A/63/467-S/2008/636, annex).
[43] CCPR/C/GTM/CO/3, para. 16.
[44] Ibid.; Human Rights Committee, general comment No. 31, para. 15.
[45] A/HRC/26/36, para. 75.
[46] See, e.g., *Burdyko v. Belarus* (CCPR/C/114/D/2017/2010), para. 8.6.
[47] Human Rights Committee, general comment No. 35, para. 22.
[48] Human Rights Committee, general comment No. 6, para. 3; *Camargo v. Colombia*, para. 13.1.
[49] Inter-American Court of Human Rights, *González et al. ("Cotton Field") v. Mexico*, judgment of 16 November 2009, para. 236.
[50] CCPR/CO/81/LIE, para. 10.
[51] CCPR/C/MDG/CO/3, para. 17.
[52] CCPR/C/TUR/CO/1, para. 13.
[53] CCPR/C/MOZ/CO/1, para. 12; CCPR/C/GTM/CO/3, para. 18.
[54] CCPR/C/IDN/CO/1, para. 17; CCPR/C/RUS/CO/6 and Corr.1, para. 11.
[55] CCPR/C/ALB/CO/2, para. 10.
[56] A/HRC/24/57, para. 31.
[57] CCPR/C/RUS/CO/6 and Corr.1, para. 14.
[58] Inter-American Court of Human Rights, *Sawhoyamaxa Indigenous Community v. Paraguay*, judgment of 29 March 2006, para. 155.
[59] *Peiris et al. v. Sri Lanka* (CCPR/C/103/D/1862/2009), para. 7.2.
[60] CCPR/C/79/Add.93, para. 17.
[61] CCPR/C/PHL/CO/4, para. 14.
[62] CCPR/C/AGO/CO/1, para. 12; CCPR/C/USA/CO/4, para. 10.
[63] Inter-American Court of Human Rights, *Ximenes-Lopes v. Brazil*, judgment of 4 July 2006, para. 96.
[64] *Da Silva Pimentel v. Brazil* (CEDAW/C/49/D/17/2008), para. 7.5; European Court of Human Rights, *Nitecki v. Poland* (application No. 65653/01), admissibility decision of 21 March 2002, and *Calvelli and Ciglio v. Italy* (application No. 32967/96), judgment of 17 January 2002, para. 49.
[65] CCPR/C/POL/CO/6, para. 15.
[66] *Yassin et al. v. Canada* (CCPR/C/120/D/2285/2013), para. 6.5; CCPR/C/CAN/CO/6, para. 6; CCPR/C/DEU/CO/6, para. 16; CCPR/C/KOR/CO/4, para. 10.
[67] Guiding Principles on Business and Human Rights, principle 2.
[68] Inter-American Court of Human Rights, *Barrios Family v. Venezuela*, judgment of 24 November 2011, para. 124.
[69] CCPR/C/PRY/CO/3, para. 15.
[70] CCPR/C/SRB/CO/2, para. 21; A/HRC/20/22 and Corr.1, para. 105.
[71] CCPR/C/COL/CO/6, para. 14.
[72] CCPR/C/HND/CO/1, para. 9.
[73] CCPR/C/FRA/CO/4, para. 24.
[74] Inter-American Court of Human Rights, *Yakye Axa Indigenous Community v. Paraguay*, judgment of 17 June 2005, para. 167.
[75] CCPR/C/COL/CO/6, para. 12.
[76] CCPR/C/TZA/CO/4, para. 15.
[77] A/HRC/11/2, para. 68.
[78] CCPR/C/KEN/CO/3, para. 12.
[79] Convention on the Rights of Persons with Disabilities, art. 10.
[80] Ibid., arts. 5 (3) and 9.
[81] CCPR/C/AUS/CO/5, para. 21.
[82] *Leach v. Jamaica* (CCPR/C/57/D/546/1993), para. 9.5.
[83] *Zhumbaeva v. Kyrgyzstan* (CCPR/C/102/D/1756/2008), para. 8.6; Human Rights Committee, *Dermit Barbato v. Uruguay*, communication No. 84/1981, para. 9.2.
[84] *Lantsova v. Russian Federation* (CCPR/C/74/D/763/1997), para. 9.2.
[85] Ibid.
[86] European Court of Human Rights, *Edwards v. United Kingdom* (application No. 46477/99), judgment of 14 June 2002, para. 60.
[87] Convention on the Rights of Persons with Disabilities, art. 14.
[88] European Court of Human Rights, *Câmpeanu v. Romania* (application No. 47848/08), judgment of 17 July 2014, para. 131.
[89] CCPR/C/ARM/CO/2, para. 15.
[90] CCPR/C/UNK/CO/1, para. 14.

[91] CCPR/C/USA/CO/4, para. 10.

[92] European Court of Human Rights, *Öneryildiz v. Turkey* (application No. 48939/00), judgment of 30 November 2004, para. 71.

[93] African Commission on Human and Peoples' Rights, *Social and Economic Rights Centre (SERAC) and Centre for Economic and Social Rights (CESR) v. Nigeria* (communication No. 155/96), decision of 27 October 2001, para. 67.

[94] Inter-Agency Support Group on Indigenous Peoples' Issues, "Lands, territories and resources", thematic paper towards the preparation of the 2014 World Conference on Indigenous Peoples, 22–23 September 2014, p. 4.

[95] CCPR/C/KEN/CO/3, para. 9.

[96] Human Rights Committee, general comment No. 6, para. 5; CCPR/C/79/Add.105, para. 12.

[97] CCPR/CO/72/PRK, para. 12.

[98] *Toussaint v. Canada* (CCPR/C/123/D/2348/2014), para. 11.3. See also CCPR/C/ISR/CO/4, para. 12.

[99] CCPR/C/JAM/CO/3, para. 9.

[100] CCPR/CO/71/UZB, para. 19.

[101] Joint general recommendation No. 31 of the Committee on the Elimination of Discrimination against Women/general comment No. 18 of the Committee on the Rights of the Child (2014) on harmful practices, para. 56.

[102] Human Rights Committee, general comment No. 6, para. 5; CCPR/C/COD/CO/3, para. 14.

[103] CCPR/C/KGZ/CO/2, para. 13.

[104] Human Rights Committee, general comment No. 31, paras. 15 and 19; *Pestaño and Pestaño v. Philippines* (CCPR/C/98/D/1619/2007), para. 7.2; *González v. Argentina* (CCPR/C/101/D/1458/2006), para. 9.4; CCPR/C/JAM/CO/3, para. 16. See also European Court of Human Rights, *Calvelli and Ciglio v. Italy*, para. 51.

[105] CCPR/C/ISR/CO/3, para. 12.

[106] *Sathasivam and Saraswathi v. Sri Lanka* (CCPR/C/93/D/1436/2005), para. 6.4; *Amirov v. Russian Federation* (CCPR/C/95/D/1447/2006), para. 11.2. See also Human Rights Committee, general comment No. 31, paras. 16 and 18.

[107] CCPR/C/AGO/CO/1, para. 14.

[108] *Marcellana and Gumanjoy v. Philippines* (CCPR/C/94/D/1560/2007), para. 7.4.

[109] E/CN.4/2006/53, para. 41.

[110] A/HRC/26/36, para. 81.

[111] *Andreu v. Colombia* (CCPR/C/55/D/563/1993), para. 8.2; *Marcellana and Gumanjoy v. Philippines*, para. 7.2.

[112] Human Rights Committee, general comment No. 31, para. 18; Inter-American Court of Human Rights, *Barrios Altos v. Peru*, judgment of 14 March 2001, para. 43.

[113] CCPR/C/CMR/CO/4, para. 15.

[114] CCPR/C/BOL/CO/3, para. 15.

[115] *Novaković and Novaković v. Serbia* (CCPR/C/100/D/1556/2007), para. 7.3; CCPR/C/RUS/CO/6 and Corr.1, para. 14.

[116] CCPR/C/MRT/CO/1, para. 13.

[117] CCPR/C/GBR/CO/7, para. 8.

[118] CCPR/C/ISR/CO/3, para. 9.

[119] CCPR/C/GBR/CO/7, para. 8.

[120] *The Minnesota Protocol on the Investigation of Potentially Unlawful Death (2016)* (United Nations publication, Sales No. E.17.XIV.3), para. 10.

[121] *Camargo v. Colombia*, para. 15.

[122] *The Minnesota Protocol on the Investigation of Potentially Unlawful Death (2016)*, para. 25; Inter-American Court of Human Rights, *Kawas-Fernández v. Honduras*, judgment of 3 April 2009, para. 102.

[123] *The Minnesota Protocol on the Investigation of Potentially Unlawful Death (2016)*, para. 37.

[124] A/HRC/14/24/Add.6, para. 93.

[125] A/HRC/19/58/Rev.1, para. 59.

[126] European Court of Human Rights, *Oğur v. Turkey* (application No. 21594/93), judgment of 20 May 1999, para. 92.

[127] *The Minnesota Protocol on the Investigation of Potentially Unlawful Death (2016)*, para. 35.

[128] Ibid., para. 13; European Court of Human Rights, *Ramsahai and others v. Netherlands* (application No. 52391/99), judgment of 15 May 2007, para. 353 (requiring sufficient public scrutiny of inquiry proceedings).

[129] European Court of Human Rights, *Tanrikulu v. Turkey* (application No. 23763/94), judgment of 8 July 1999, para. 103.

[130] CCPR/C/KEN/CO/3, para. 13.

[131] *Eshonov v. Uzbekistan* (CCPR/C/99/D/1225/2003), para. 9.2; *Zhumbaeva v. Kyrgyzstan*, para. 8.8; *Khadzhiyev v. Turkmenistan* (CCPR/C/122/D/2252/2013), para. 7.3.

[132] *Umetaliev and Tashtanbekova v. Kyrgyzstan* (CCPR/C/94/D/1275/2004), para. 9.4; *Olmedo v. Paraguay* (CCPR/C/104/D/1828/2008), para. 7.5.
[133] *Amirov v. Russian Federation*, para. 11.4.
[134] *Kindler v. Canada* (CCPR/C/48/D/470/1991), paras. 13.1–13.2.
[135] *Dauphin v. Canada* (CCPR/C/96/D/1792/2008), para. 7.4.
[136] European Court of Human Rights, *N.A. v. United Kingdom* (application No. 25904/07), judgment of 17 July 2008, para. 115.
[137] *Yin Fong v. Australia* (CCPR/C/97/D/1442/2005), para. 9.7.
[138] *Shakeel v. Canada* (CCPR/C/108/D/1881/2009), para. 8.5.
[139] *Warsame v. Canada* (CCPR/C/102/D/1959/2010), para. 8.3.
[140] *T. v. Australia* (CCPR/C/61/D/706/1996), para. 8.4; *A.R.J. v. Australia* (CCPR/C/60/D/692/1996), para. 6.12; *Israil v. Kazakhstan* (CCPR/C/103/D/2024/2011), para. 9.5.
[141] CCPR/CO/74/SWE, para. 12; *Alzery v. Sweden* (CCPR/C/88/D/1416/2005), para. 11.5.
[142] CCPR/C/TJK/CO/2, para. 11; CCPR/CO/77/EST, para. 13.
[143] *Judge v. Canada* (CCPR/C/78/D/829/1998), para. 10.5.
[144] Ibid., para. 10.6; *Yin Fong v. Australia*, para. 9.7.
[145] *Chisanga v. Zambia* (CCPR/C/85/D/1132/2002), para. 7.4.
[146] Safeguards guaranteeing protection of the rights of those facing the death penalty, para. 1.
[147] *Kindler v. Canada*, para. 14.3; A/67/275, para. 35.
[148] CCPR/C/79/Add.25, para. 8.
[149] *Chisanga v. Zambia*, paras. 2.2 and 7.4.
[150] CCPR/C/79/Add.101, para. 8; CCPR/C/79/Add.25, para. 8; CCPR/C/79/Add.85, para. 8.
[151] *Chisanga v. Zambia*, para. 7.4; *Lubuto v. Zambia* (CCPR/C/55/D/390/1990/Rev.1), para. 7.2; *Johnson v. Ghana* (CCPR/C/110/D/2177/2012), para. 7.3.
[152] CCPR/CO/73/UK-CCPR/CO/73/UKOT, para. 37.
[153] CCPR/CO/72/GTM, para. 17.
[154] CCPR/CO/84/THA, para. 14.
[155] Human Rights Committee, general comment No. 6, para. 6.
[156] CCPR/C/MRT/CO/1, para. 21.
[157] CCPR/C/LBY/CO/4, para. 24.
[158] CCPR/C/79/Add.84, para. 16.
[159] *Lubuto v. Zambia*, para. 7.2.
[160] *Chisanga v. Zambia*, para. 7.4; *Larrañaga v. Philippines* (CCPR/C/87/D/1421/2005), para. 7.2; *Carpo et al. v. Philippines* (CCPR/C/77/D/1077/2002), para. 8.3.
[161] *Thompson v. Saint Vincent and the Grenadines* (CCPR/C/70/D/806/1998), para. 8.2; *Kennedy v. Trinidad and Tobago* (CCPR/C/74/D/845/1998), para. 7.3.
[162] CCPR/C/DZA/CO/3, para. 17; CCPR/C/79/Add.116, para. 14.
[163] CCPR/CO/72/PRK, para. 13.
[164] European Court of Human Rights, *S.W. v. United Kingdom* (application No. 20166/92), judgment of 22 November 1995, para. 36.
[165] CCPR/C/IRN/CO/3, para. 12.
[166] CCPR/C/USA/CO/4, para. 8.
[167] *Ng v. Canada* (CCPR/C/49/D/469/1991), para. 16.4.
[168] African Commission on Human and Peoples' Rights, *Malawi African Association and others v. Mauritania*, 11 May 2000, para. 120.
[169] CCPR/CO/72/PRK, para. 13.
[170] CCPR/C/JPN/CO/6, para. 13.
[171] *Johnson v. Jamaica* (CCPR/C/56/D/588/1994), para. 8.5; *Kindler v. Canada*, para. 15.2; *Martin v. Jamaica* (CCPR/C/47/D/317/1988), para. 12.2.
[172] *Brown v. Jamaica* (CCPR/C/65/D/775/1997), para. 6.13.
[173] CCPR/C/JPN/CO/6, para. 13.
[174] *Kindler v. Canada*, para. 15.3.
[175] *Kurbanov v. Tajikistan* (CCPR/C/79/D/1096/2002), para. 7.7.
[176] *Gunan v. Kyrgyzstan* (CCPR/C/102/D/1545/2007), para. 6.2; *Chikunova v. Uzbekistan* (CCPR/C/89/D/1043/2002), paras. 7.2 and 7.5; *Yuzepchuk v. Belarus* (CCPR/C/112/D/1906/2009), paras. 8.2 and 8.6.
[177] *Yuzepchuk v. Belarus*, paras. 8.4 and 8.6.
[178] *Chikunova v. Uzbekistan*, paras. 7.4 and 7.5.
[179] *Gunan v. Kyrgyzstan*, para. 6.3.
[180] *Levy v. Jamaica* (CCPR/C/64/D/719/1996), paras. 7.2–7.3.
[181] *Brown v. Jamaica*, para. 6.15.
[182] *Leach v. Jamaica*, para. 9.4.
[183] *Kovaleva and Kozyar v. Belarus* (CCPR/C/106/D/2120/2011), para. 11.4; *Grishkovtsov v. Belarus* (CCPR/C/113/D/2013/2010), para. 8.4.

184  *Judge v. Canada*, paras. 10.8–10.9.

185  *Gunan v. Kyrgyzstan*, para. 6.3.

186  *Champagnie et al. v. Jamaica* (CCPR/C/51/D/445/1991), paras. 7.3–7.4.

187  Safeguards guaranteeing protection of the rights of those facing the death penalty, para. 4; *Ambaryan v. Kyrgyzstan* (CCPR/C/120/D/2162/2012), para. 9.2.

188  *Francis v. Jamaica* (CCPR/C/54/D/606/1994), para. 9.3.

189  *Kamoyo v. Zambia* (CCPR/C/104/D/1859/2009), paras. 6.3–6.4.

190  *Yuzepchuk v. Belarus*, paras. 8.5–8.6.

191  Vienna Convention on Consular Relations, art. 36 (1) (b). See also Inter-American Court of Human Rights, The Right to Information on Consular Assistance in the Framework of the Guarantees of the Due Process of Law, Advisory Opinion OC-16/99, 1 October 1999, para. 137.

192  *Judge v. Canada*, para. 10.9.

193  CCPR/C/USA/CO/4, para. 8.

194  Ibid.

195  African Commission on Human and Peoples' Rights, *Egyptian Initiative for Personal Rights and Interights v. Egypt* (communication No. 334/06), decision of 1 March 2011, para. 204; International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia since 1991, *Prosecutor v. Furundžija* (case No. IT-95-17/1-A), Appeals Chamber, judgment of 21 July 2000, para. 189.

196  Human Rights Committee, general comment No. 35, para. 45.

197  Human Rights Committee, general comment No. 32 (2007) on the right to equality before courts and tribunals and to a fair trial, para. 22; CCPR/C/MDG/CO/3, para. 16; CCPR/C/79/Add.25, para. 9.

198  Human Rights Committee, general comment No. 33 (2008) on the obligations of States parties under the Optional Protocol to the International Covenant on Civil and Political Rights, para. 19.

199  *Chikunova v. Uzbekistan*, para. 7.6.

200  *Chisanga v. Zambia*, para. 7.5.

201  *Kennedy v. Trinidad and Tobago*, para. 7.4.

202  CCPR/CO/72/GTM, para. 18.

203  CCPR/CO/84/YEM, para. 15.

204  A/HRC/8/3 and Corr.1, para. 67.

205  CCPR/C/YEM/CO/5, para. 14.

206  Committee on the Rights of the Child, general comment No. 10 (2007) on children's rights in juvenile justice, para. 75.

207  Ibid., paras. 35 and 39.

208  CCPR/C/JPN/CO/6, para. 13. See also *R.S. v. Trinidad and Tobago* (CCPR/C/74/D/684/1996), para. 7.2.

209  CCPR/C/JPN/CO/5, para. 16.

210  CCPR/C/35/D/210/1986, para. 15.

211  Human Rights Committee, general comment No. 6, para. 6.

212  Second Additional Protocol to the Covenant, aiming at the abolition of the death penalty, preamble.

213  CCPR/C/TCD/CO/1, para. 19.

214  *Kindler v. Canada*, para. 15.1.

215  *Ng v. Canada*, para. 16.2; European Court of Human Rights, *Öcalan v. Turkey* (application No. 46221/99), judgment of 12 May 2005, paras. 163–165.

216  *Judge v. Canada*, para. 10.3; A/HRC/36/27, para. 48; African Commission on Human and Peoples' Rights, *General Comment No. 3 on the African Charter on Human and Peoples' Rights: The Right to Life (Article 4)*, para. 22.

217  Human Rights Committee, general comment No. 20 (1992) on the prohibition of torture or other cruel, inhuman or degrading treatment or punishment, para. 5; European Court of Human Rights, *Gatt v. Malta* (application No. 28221/09), judgment of 27 July 2010, para. 29.

218  Human Rights Committee, general comment No. 33, para. 4; *Birindwa and Tshisekedi v. Zaire*, communications Nos. 241 and 242/1987, para. 12.5; CCPR/C/MDV/CO/1, para. 26; Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms, art. 9 (4).

219  Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms, art. 12 (2).

220  *Aboufaied v. Libya* (CCPR/C/104/D/1782/2008), paras. 7.4 and 7.6; *El-Megreisi v. Libyan Arab Jamahiriya* (CCPR/C/50/D/440/1990), para. 5.4.

221  Human Rights Committee, general comment No. 31, para. 12.

222  *Chisanga v. Zambia*, para. 7.3.

223  *Johnson v. Jamaica* (CCPR/C/64/D/592/1994), para. 10.4.

224  *Eshonov v. Uzbekistan*, para. 9.10.

225  *Kovaleva and Kozyar v. Belarus*, para. 11.10.

226  CCPR/C/JPN/CO/6, para. 13.

[227] CCPR/C/BWA/CO/1, para. 13.

[228] *Mojica v. Dominican Republic* (CCPR/C/51/D/449/1991), para. 5.4; *Guezout et al. v. Algeria* (CCPR/C/105/D/1753/2008), paras. 8.4 and 8.7.

[229] Human Rights Committee, general comment No. 35, para. 58.

[230] *Bousroual v. Algeria* (CCPR/C/86/D/992/2001), para. 9.2; *Katwal v. Nepal* (CCPR/C/113/D/2000/2010), para. 11.3.

[231] *El Boathi v. Algeria* (CCPR/C/119/D/2259/2013), para. 7.5.

[232] Human Rights Committee, *Herrera Rubio v. Colombia*, communication No. 161/1983, para. 10.3; general comment No. 6, para. 4.

[233] International Convention for the Protection of All Persons from Enforced Disappearance, art. 24.

[234] *Prutina et al. v. Bosnia and Herzegovina* (CCPR/C/107/D/1917/2009,1918/2009,1925/2009 and 1953/2010), para. 9.6.

[235] International Convention for the Protection of All Persons from Enforced Disappearance, art. 24.

[236] International Criminal Tribunal for Rwanda, *Prosecutor v. Ruggiu* (case No. ICTR-97-32-1), Trial Chamber, judgment of 1 June 2000, para. 22.

[237] See Human Rights Committee, general comments No. 17 (1989) on the rights of the child, para. 1, and No. 32, paras. 42–44; *Prutina et al. v. Bosnia and Herzegovina*, para. 9.8.

[238] Convention on the Rights of the Child, art. 3 (1).

[239] Ibid., art. 6 (2).

[240] Ibid., art. 3 (2).

[241] CCPR/C/79/Add.81, para. 15.

[242] CCPR/C/IRN/CO/3, para. 10.

[243] CCPR/CO/72/NET, para. 6.

[244] *Whelan v. Ireland* (CCPR/C/119/D/2425/2014), para. 7.12.

[245] E/C.12/COD/CO/4, para. 19.

[246] Inter-American Court of Human Rights, *Yakye Axa Indigenous Community v. Paraguay*, para. 175.

[247] CCPR/C/USA/CO/4, para. 8.

[248] A/HRC/20/16, para. 21.

[249] Declaration of the United Nations Conference on the Human Environment, para. 1; Rio Declaration on Environment and Development, principle 1; United Nations Framework Convention on Climate Change, preamble.

[250] Paris Agreement, preamble.

[251] Rio Declaration on Environment and Development, principles 1–2, 11, 15 and 17–18; Convention on Access to Information, Public Participation in Decision-Making and Access to Justice in Environmental Matters.

[252] Human Rights Committee, general comment No. 31, para. 10; CCPR/C/GBR/CO/6, para. 14.

[253] CCPR/C/USA/CO/4, para. 9.

[254] Responsibility of States for internationally wrongful acts, art. 16; International Court of Justice, *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia and Herzegovina v. Serbia and Montenegro)*, judgment of 26 February 2007, para. 420.

[255] CCPR/C/MLT/CO/2, para. 17; United Nations Convention on the Law of the Sea, art. 98; International Convention for the Safety of Life at Sea, chap. V, regulation 10.

[256] Human Rights Committee, general comment No. 31, para. 10; *Saldías de López v. Uruguay*, communication No. R.12/52, paras. 12.1–13; *Celiberti de Casariego v. Uruguay*, communication No. R.13/56, paras. 10.1–11; *Domukovsky v. Georgia* (CCPR/C/62/D/623/1995, 624/1995, 626/1995 and 627/1995), para. 18.2.

[257] Human Rights Committee, general comments No. 31, para. 11, and No. 29 (2001) on derogations from provisions of the Covenant during a state of emergency, para. 3.

[258] Human Rights Committee, general comment No. 31, para. 11, and No. 29, paras. 3, 12 and 16.

[259] CCPR/C/ISR/CO/3, paras. 9–10.

[260] CCPR/C/USA/CO/4, para. 9.

[261] *The Minnesota Protocol on the Investigation of Potentially Unlawful Death (2016)*, paras. 20–22.

[262] Protocol additional to the Geneva Conventions of 12 August 1949, and relating to the protection of victims of international armed conflicts (Protocol I), art. 36.

[263] A/HRC/23/47, paras. 113–114.

[264] See Treaty on the Non-Proliferation of Nuclear Weapons; Comprehensive Nuclear-Test-Ban Treaty; Treaty on the Prohibition of Nuclear Weapons (not yet in force); Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction; Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction.

[265] Human Rights Committee, general comment No. 14, para. 7; Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion of 8 July 1996 of the International Court of Justice.

[266] CCPR/C/FRA/CO/5, para. 21.

[267] Human Rights Committee, general comment No. 29, para. 7.

[268] Ibid., para. 16.

[269] Human Rights Committee, general comment No. 24 (1994) on issues relating to reservations made upon ratification or accession to the Covenant or the Optional Protocols thereto, or in relation to the declarations under article 41 of the Covenant, para. 8.

[270] Human Rights Committee, general comment No. 14, para. 2.

[271] Human Rights Committee, general comment No. 6, para. 2.

[272] General Assembly resolution 60/1, paras. 138–139.

_____