*State of Minnesota et al. v. Noem et al.*
No. 26-CV-00190-KMM-DJF (D. Minn.)


Amicus Curiae Brief of the Advocates for Human Rights

**Exhibit No. 13**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| MUBASHIR KHALIF HUSSEN, MAHAMED EYDARUS, and JAVIER DOE *on behalf of themselves and others similarly situated,* | Case No. 26-324 |
| Plaintiffs, | |
| v. | |
| KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; DAVID EASTERWOOD, *in his official capacity as U.S. Immigration and Customs Enforcement Field Office Director for St. Paul, Minnesota*; U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection*; U.S. BORDER PATROL; MICHAEL W. BANKS, *in his official capacity as Chief of U.S. Border Patrol*; and GREGORY BOVINO, *in his official capacity as Commander-at-Large of U.S. Border Patrol,* | **CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Defendants. | |

# INTRODUCTION

1.      This case seeks to end a startling pattern of abuse spearheaded by the Department of Homeland Security ("DHS") that is fundamentally altering civic life in the Twin Cities and the state of Minnesota.  Masked federal agents in the thousands are violently stopping and arresting countless Minnesotans based on nothing more than their race and perceived ethnicity irrespective of their citizenship or immigration status, or their personal circumstances.  At the center of DHS's campaign are Somali and Latino people, who are being targeted for stops and arrests based on racial profiling motivated by prejudice.

2.      DHS's crude dragnet ensnares noncitizens, including individuals with immigration status, without warrants or any lawful basis for arrest.  And its discriminatory practices also sweep in numerous U.S. citizens in the process, shackling them and scanning their faces while ignoring documentation of U.S. citizenship.  These brutal stops and arrests disrupt the most ordinary of activities—working, shopping, driving—and seek to unravel the strong bonds built by Minnesota's long history of welcoming immigrant communities. Although they will not succeed, DHS's practices are unlawful, and they must end.

3.      Plaintiffs seek injunctive relief to halt three unlawful policies and practices. First, federal agents are stopping people to question them about immigration status without reasonable suspicion of removability—and particularly targeting those they perceive to be Somali or Latino.  Second, federal agents are arresting people for immigration reasons without warrants and without probable cause to believe that they are removable, outrageously including U.S. citizens (who plainly cannot be detained for civil immigration

purposes) and individuals with immigration status. And third, federal agents are making warrantless arrests without probable cause to believe the person is a flight risk. The constitutional guarantees of the Fourth Amendment, the Equal Protection Clause, and federal statutory law, prohibit these kinds of police-state tactics. Police cannot simply stop and arrest people based only on their appearance. Federal agents' policies and practices are antithetical to bedrock legal protections that ensure residents of the United States can go about their daily lives without being snatched off the streets arbitrarily or due to the color of their skin. These policies and practices must be enjoined, as they cannot coexist with the rule of law.

4.      DHS's efforts began after a cabinet meeting at the White House on December 2, 2025, where President Donald Trump called people from Somalia "garbage," said, "we don't want them in our country," and told them to "go back to where they came from."[1]

5.      That same weekend, the Department of Homeland Security initiated "Operation Metro Surge," an ongoing action that has placed thousands of federal agents—often masked, armored, and carrying assault rifles and chemical munitions—on the streets of Minneapolis, St. Paul, and the greater Twin Cities area.

---

[1] Isabella Murray, Lalee Ibssa & Ivan Pereira, *Trump Describes Somali Immigrants as "Garbage" Amid Feud with Minnesota Congresswoman, Governor*, ABC News (Dec. 3, 2025), https://abcnews.go.com/Politics/trump-describes-somali-immigrants-garbage-amid-feud-minnesota/story?id=128069199.

6. Minnesota is home to the largest Somali population in the entire country. Statewide there are more than 76,000 people of Somali descent. Within Minnesota, the Somali population is concentrated in Minneapolis, St. Paul, and their surroundings—areas singled out for the DHS campaign.[2] The Somali population of Minnesota overwhelmingly consists of U.S. citizens or individuals with permanent legal status.[3]

7. Minnesota is also home to other immigrant groups, in particular Latinos, the largest group of foreign-born Minnesotans.[4] There are more than 388,000 Latino individuals in Minnesota.[5] The overwhelming majority of Latino Minnesotans are U.S. citizens or have permanent legal status.[6]

---

[2] Steve Karnowski & Associated Press, *5 Things to Know About the Somali Community in Minnesota After Trump's Attacks*, PBS NewsHour (Dec. 3, 2025), https://www.pbs.org/newshour/nation/5-things-to-know-about-the-somali-community-in-minnesota-after-trumps-attacks; *see also Somali Population in Minnesota by City: 2025 Ranking & Insights*, Neilsberg Insights (Oct. 1, 2025), https://www.neilsberg.com/insights/lists/somali-population-in-minnesota-by-city/.

[3] According to the U.S. Census Bureau, over 90% of Somali Minnesotans are American citizens. *See* Alyssa Chen, *Most Somali people in America and Minnesota are citizens*, Minnesota Reformer (Dec. 5, 2025), https://minnesotareformer.com/briefs/most-somali-people-in-america-and-minnesota-are-citizens/. In fact, almost 58% of Minnesotans of Somali descent were born in the U.S., and 87% of those born elsewhere are naturalized U.S. citizens. *See* Steve Karnowski & Associated Press, *5 Things to Know About the Somali Community in Minnesota After Trump's Attacks*, PBS NewsHour (Dec. 3, 2025), https://www.pbs.org/newshour/nation/5-things-to-know-about-the-somali-community-in-minnesota-after-trumps-attacks.

[4] Minnesota State Demographic Center, Immigration & Language, Minn. Dep't of Admin., https://mn.gov/admin/demography/data-by-topic/immigration-language/.

[5] City of Minnesota, *A Portrait of Hispanic/Latine Minnesotans*, Minnesota Council on Latino Affairs (Mar. 2023), https://mn.gov/mcla/assets/03_31_23%20-%20Demographic%20Report%20-%20MCLA_tcm1099-602196.pdf.

[6] UnidosUS, *Minnesota State Fact Sheet*, National Council of La Raza, https://unidosus.org/wp-content/uploads/2021/07/MN.pdf.

8.      Defendants are engaged in a racial profiling campaign of massive scale and with devastating consequences.  As Minneapolis Police Department Chief Brian O'Hara noted: "They are not stopping family members of folks who are Norwegian or Irish.  That's not happening."[7]  Agents are instead stopping individuals who appear to be Somali or Latino, based on their apparent race and ethnicity—then frequently arresting them in violation of federal law and constitutional protections.  The U.S. Constitution prohibits such a race-based campaign.

9.      These arrests are also being carried out with an unprecedented level of violence.  People targeted by ICE have been handcuffed, tackled, and beaten by federal agents.  Agents have broken car windows, dragged people from their cars, and used pepper spray and tear gas against compliant, non-violent people.

10.     Individuals living in the Twin Cities have been stopped and detained while engaging in routine, day-to-day activities.  Most have been encountered by ICE agents while traveling to or from their places of work, running errands, purchasing groceries, or even while at home.  The encounters with ICE agents are often violent and long-lasting, leaving people with physical injuries and emotional trauma.  In some cases, officials belatedly accept that there is no legal basis to stop or detain the person whom they arrested without any individualized assessment, and they then release the person.  But such belated

---

[7] Stated in an interview in *The Daily*, Michael Barbaro, *'A Breaking Point': The Minneapolis Police Chief on ICE*, N.Y. Times, (Jan. 12, 2026), https://www.nytimes.com/2026/01/12/podcasts/the-daily/minneapolis-police-chief-ice-shooting.html?smid=nytcore-ios-share.

measures are no cure for the harm that has been done.  Even those released from the agents' custody experience significant physical and psychological harm from their arbitrary arrest and detention, and they reasonably fear that they will experience those harms again.

11.    Defendants' policy and practice of making immigration arrests without a warrant and without probable cause have generated incredible fear in Somali and Latino communities across the Twin Cities and led to major changes to daily life.  Because the encounters take place in the middle of daily routines, those who have experienced them live in fear of them recurring.  Some individuals avoid being outside for too long, justifiably worried that they will re-encounter federal agents and be subjected to another violent detention.  Others have loved ones who check in on them frequently, to make sure that they are safe and will return home, as planned.  ICE's presence has also devastated immigrant-owned small businesses, as both customers and employees are too afraid to leave their homes.  News outlets report that around "80% of immigrant-owned business along key corridors in Minneapolis and St. Paul have closed in the past week," because of ICE's activities.[8]

12.    The federal government has increased the pace, intensity, and illegality of its campaign imposing substantial harms on the targeted communities and Minnesotans more generally—even after an ICE agent shot and killed Renee Good in Minneapolis last

---

[8] Dee DePass, *Immigrant corridors in both Minneapolis and St. Paul nearly shut down by intensifying ICE actions*, The Minn. Star Tribune (Jan. 13, 2026), https://www.startribune.com/immigrant-businesses-lose-sales-close-ice-action-twin-cities/601562613.

week. Indeed, DHS Secretary Noem has stated that DHS is sending "hundreds" more federal officers to Minnesota, showing that these unlawful policies and practices will not only continue but also expand.

13. DHS's campaign is consistent with similar policies and practices of unlawful suspicionless stops and warrantless arrests it has implemented throughout the United States, which courts throughout the country have found unlawful. *Ramirez Ovando v. Noem*, No. 1:25-cv-03183-RBJ, 2025 WL 3293467, at *15 (D. Colo. Nov. 25, 2025); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, No. 25-3417, 2025 WL 3465518, at *26-27 (D.D.C. Dec. 2, 2025); *United Farm Workers v. Noem*, 785 F. Supp. 3d 672 (E.D. Cal. 2025). Indeed, in one long-running case in Chicago, a court recently found that ICE's recent warrantless arrests violated a settlement agreement. *Castañon Nava v. Dep't of Homeland Sec.*, --- F. Supp. 3d ----, 2025 WL 2842146, at *21, 23 (N.D. Ill. Oct. 7, 2025). Despite these court orders, DHS has now moved on to Minnesota—not only implementing similar policies but also even further escalating the scale and intensity of unlawful stops and arrests.

14. Accordingly, Plaintiffs Mubashir Khalif Hussen, Mahamed Eydarus, and Javier Doe*[9] bring this lawsuit on behalf of themselves and those similarly situated to put an end to DHS's unlawful policies and practices in Minnesota, which are contrary to the basic precepts of liberty and equality central to the United States.

---

[9] Plaintiffs have concurrently filed a motion to proceed pseudonymously for Plaintiff Javier Doe. All pseudonyms are marked with an asterisk in their first instance.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) and 5 U.S.C. § 702 (right of review). It has remedial authority pursuant to 5 U.S.C. §§ 702, 705, and 706 (Administrative Procedure Act), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act), and the inherent equitable powers of this Court.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) and 5 U.S.C. § 703 because Defendants are officers or employees of the United States and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

17.     **Plaintiff Mubashir Khalif Hussen** is a 20-year-old Somali man who is a resident of Minneapolis in the state of Minnesota.  His family came to the United States as refugees, and he grew up in this country.  He is a United States citizen.  Mr. Hussen works as a manager at a mental health services provider in the Cedar-Riverside neighborhood of Minneapolis.

18.     **Plaintiff Mahamed Eydarus** is a 25-year-old man who is a resident of Fridley, Minnesota.  He is a U.S. citizen who was born in Atlanta, Georgia and is of Somali descent.

19.     **Plaintiff Javier Doe** is a 22-year-old Hispanic man who works in and is a resident of Richfield, Minnesota.  He is a U.S. citizen who was born in Minnesota and has lived in Minnesota his entire life.

20.     **Defendant Kristi Noem** is the Secretary of DHS and is sued in her official capacity.  As Secretary of DHS, she oversees component agencies including ICE, U.S. Customs and Border Protection ("CBP"), and U.S. Border Patrol.

21.     **Defendant U.S. Department of Homeland Security ("DHS")** is the federal agency responsible for administering and enforcing the nation's immigration laws pursuant to 8 U.S.C. § 1103(a).

22.     **Defendant U.S. Immigration and Customs Enforcement ("ICE")** is a component agency of DHS.  Among other functions, ICE carries out stops and arrests of individuals believed to be in violation of civil immigration law, maintains custody over individuals in immigration detention, and is responsible for management and oversight of the civil immigration detention system.

23.     **Defendant Todd M. Lyons** is the Acting Director of ICE and is sued in his official capacity.  As Acting Director of ICE, he oversees its functions, including managing enforcement of laws related to immigration, setting policies governing stops and arrests of individuals by ICE personnel, and managing the civil immigration detention system.

24.     **Defendant David Easterwood** is the acting ICE Field Office Director for Enforcement and Removal Operations in St. Paul, Minnesota and is sued in his official capacity.  As Field Office Director, he oversees decisions concerning arrest, detention, and removal decisions in the Twin Cities area.

25.     **Defendant U.S. Customs and Border Protection ("CBP")** is a component agency of DHS that is responsible for, among other things, interdiction and processing of individuals attempting to enter or exit the United States at the U.S. border without

authorization. CBP agents have been involved in making stops and arrests of individuals for civil immigration violations in Minnesota.

26. **Defendant Rodney S. Scott** is the Commissioner of CBP and is sued in his official capacity. As Commissioner of CBP, he has direct authority over all CBP policies, procedures, and practices related to stops, arrests, and detention.

27. **Defendant U.S. Border Patrol ("USBP" or "Border Patrol")** is a component agency of CBP and is responsible for the interdiction and processing of those who, without authorization, attempt to enter or leave the United States at its border. Border Patrol agents have made stops and arrests for civil immigration violations in Minnesota.

28. **Defendant Michael W. Banks** is Chief of the U.S. Border Patrol. He is sued in his official capacity. As chief of Border Patrol, he has authority over all Border Patrol policies, procedures, and practices regarding immigration stops, arrests, and detention.

29. **Defendant Gregory Bovino** is Commander-at-Large for the U.S. Border Patrol. He is sued in his official capacity. He has overseen CBP operations in Minnesota.

## FACTUAL ALLEGATIONS

**A.** **Defendants Are Engaging in Immigration Stops Without Reasonable Suspicion and Immigration Arrests Without Probable Cause in the Twin Cities, Particularly Targeting Somali and Latino People.**

30. Defendants are carrying out a campaign of mass stops and arrests ostensibly for immigration purposes in the Twin Cities, particularly targeting Somali and Latino people. They are detaining and often physically abusing large numbers of people whom they have no business stopping or arresting, including U.S. citizens and people with

immigration status. This case challenges three policies and practices that Defendants are carrying out in the Twin Cities.

31. First, Defendants have a policy and practice of conducting stops of people for investigation of their immigration status without reasonable suspicion of removability, particularly targeting people who appear to be Somali and Latino, in violation of the Fourth and Fifth Amendments.

32. Second, Defendants are arresting people without warrants and without probable cause of removability, in violation of the Fourth Amendment and the INA's warrantless arrest statute, 8 U.S.C. § 1357(a)(2). This includes the arrest of numerous U.S. citizens, despite the arrestees' statements that they are U.S. citizens and offers of documentation of U.S. citizenship, like a U.S. passport.

33. Third, Defendants are arresting people without warrants and without probable cause that the person poses a flight risk, in violation of 8 U.S.C. § 1357(a)(2). Congress strictly limited warrantless arrests to people who are at risk of flight before a warrant can be obtained. As they have during enforcement surges in other cities, Defendants are disregarding this statutory requirement and conducting warrantless arrests of people who have families, homes, and jobs in the Twin Cities, and present no flight risk.

34. Defendants are inflicting these policies on scores of Minnesotans, with more illegal stops and arrests on a daily basis. Plaintiffs' and witnesses' experiences illustrate these grave violations.

***Defendants' Unlawful Detention of Plaintiff Mubashir Khalif Hussen***

35.     On December 10, 2025, Plaintiff **Mubashir Khalif Hussen** left his second-floor office to get lunch at a restaurant on the first floor.  He stopped on the street to speak with a passerby about ICE activity earlier in the day.  An unmarked SUV drove up, and two federal agents wearing ski masks exited.  One walked quickly toward Mr. Hussen but did not say anything to him.  Mr. Hussen turned to walk away, hoping to be left alone, at which point the federal agent grabbed him and pushed him into a restaurant.  A second agent entered, and as a crowd gathered, the two dragged Mr. Hussen out of the restaurant and put him into a headlock on the ground.

36.     Mr. Hussen repeatedly informed the officers he was a U.S. citizen and repeatedly asked the agents to let him get his coat with his phone, so he could show them a picture of his passport card.  The agents refused to let him back into the building to retrieve his driver's license or his phone and put him in the back of the unmarked car.  They repeatedly told Mr. Hussen that they needed to scan his face.  Eventually, an agent got Mr. Hussen's coat, but when Mr. Hussen asked to be able to show the photo of his passport card, the agents refused.  Mr. Hussen's supervisor brought a copy of Mr. Hussen's passport card and showed it to the agents, but the agents ignored him.

37.     The agents drove Mr. Hussen, handcuffed, to a second location a few blocks away, where they again insisted on scanning Mr. Hussen's face and told him that if he did not let them scan his face they were going to "take [him] in."  After about thirty minutes at this second location, the agents drove Mr. Hussen to the ICE field office at Fort Snelling.  The officers did not indicate that they had a warrant for Mr. Hussen.  They ignored both

his statements and his documentary proof that he is a U.S. citizen. And at no point did the officers ask Mr. Hussen about his ties to the community.

38. At the ICE field office, the officers denied Mr. Hussen medical assistance and water. ICE eventually released Mr. Hussen, who was not criminally charged or placed in removal proceedings, kicking him out into the December cold and telling him to walk the seven miles from the field office back to where they detained him. Mr. Hussen only avoided this fate by chance when Mr. Hussen's family, who had been frantically searching for him, happened to arrive at the field office as he was kicked out.

39. Due to his Somali identity, Mr. Hussen is terrified of being arrested and detained again. On January 6, 2026, Mr. Hussen walked by ICE officers and protestors, and despite his fear, he recorded the scene on his phone from a public sidewalk. A car with federal agents drove by him, and as they passed him, an agent lowered the window and pepper-sprayed directly into Mr. Hussen's face. He is scared to go about his daily life in Minneapolis, in fear of further aggression or unlawful detention from federal agents, again because of his Somali identity.

**Defendants' Unlawful Detention of Plaintiff Mahamed Eydarus**

40. The morning of December 10, 2025, Plaintiff **Mahamed Eydarus**, a U.S. citizen, was leaving an overnight shift as a personal care assistant to meet his mother, also a U.S. citizen, who was coming to assume care of the same client. Mr. Eydarus and his mother were in the process of shoveling out Mr. Eydarus's parking space on the street when several unmarked vehicles drove up. Several unidentified plain clothes federal agents wearing masks then surrounded Mr. Eydarus and his mother on the street. Two individuals

accompanying the agents filmed the encounter; Mr. Eydarus later learned that at least one of the individuals was a social media influencer.

41.    The agents did not identify themselves and demanded Mr. Eydarus's identification to make sure that he was "not illegal."  They likewise asked to see Mr. Eydarus's mother's identification.  They did not indicate that they had a warrant or that they knew Mr. Eydarus or his mother.  The agents told Mr. Eydarus's mother to remove her niqab, which is a cultural and religious face covering, and then separated Mr. Eydarus from his mother—telling him that he could not be close to her because they were investigating.  An agent asked why Mr. Eydarus and his mother were speaking a "foreign language" (Somali).  Eventually, the agents left the scene.  At no point did the agents ask Mr. Eydarus or his mother about their ties to the community.  Mr. Eydarus is scared to go about his daily life in public, as he fears being again detained based on his Somali descent and appearance.

### *Defendants' Unlawful Detention of Plaintiff Javier Doe*

42.    Plaintiff **Javier Doe** is a Latino man and U.S. citizen by birth.  He was born in Minnesota and has lived there his entire life.  He works for Target Corporation at the Richfield, Minnesota store.  On January 8, 2026, while Javier was at work, he learned that federal agents were in the Target parking lot.  Javier observed unmarked SUVs and masked agents wearing "Border Patrol" vests.  One of the vehicles was blocking the path of his coworker, also a Latino U.S. citizen. Javier observed four masked agents wearing vests that said "Border Patrol" and Defendant Bovino.  Javier's coworker was recording the

agents on his phone.  The agents asked Javier and his coworker how they were.  Javier repeatedly said to the agents "fuck you," in accordance with his First Amendment rights.

43.    Defendant Bovino asked Javier and his coworker if they were U.S. citizens. Javier was disturbed because the question about whether he and his coworker were U.S. citizens seemed based on the fact that they were Latino.  The agents did not seem to know his name or have a piece of paper with his name on it.

44.    One agent walked toward Javier Doe.  He asked, "Are you from here?" to which Javier responded, "Fuck you, I don't need to tell you anything."  As Javier began to enter Target alongside an agent, the agent lunged and tackled him to the ground in the area between the automatic sliding doors.  Multiple federal agents pinned Javier down.  Javier could feel one of them pressing his knee on his neck.  Javier's coworker shouted that Javier worked at Target, but agents also seized the coworker.  The agents handcuffed Javier and dragged him into an SUV despite his repeated statements that he is a U.S. citizen.  Javier slipped because the handcuffs were limiting his movement, and his head slammed into the SUV.  Javier fell to the ground, and an agent grabbed him and pushed him into the car along with his coworker.  The agents drove fast, sometimes with rapid acceleration, while playing Mexican music loudly.  During this time, agents attempted to take scans of Javier's and his coworker's faces.  The agents asked for Javier's and his coworker's identification, and they examined Javier's passport book, which he was carrying with him.

45.    After driving around over the speed limit and playing music loudly, the agents pulled into a Walmart parking lot in Bloomington.  While they were sitting in the Walmart parking lot, Javier and the agents saw another federal agent checking an Asian

man's identification; the agents in the car began laughing at this sight. Eventually, agents released Javier in the Walmart parking lot, but they did not release his coworker at that time.

46.     Javier went to Fairview Emergency Care for examination. The emergency room examined Javier's arm, shoulder, neck, and head and performed a CT scan to ensure that he did not have a concussion from slamming his head or blood clots from the pressure of the federal agent kneeling on his neck. The next day, Javier was in greater pain, particularly in his ribs and chest.

47.     Javier believes he was targeted because of his Latino appearance, as agents ignored a white coworker who was similarly yelling at them. At no point did the federal agents ask Javier about his ties to the community.

                                      ***

48.     In addition to Plaintiffs, Defendants have unlawfully detained many other Minnesotans.

### Defendants' Unlawful Detention of Ali Dahir

49.     Ali Dahir is a U.S. citizen of Somali descent who has lived in the United States since 2001. He currently resides near Karmel Mall, in a neighborhood with a large Somali American population in Minneapolis. On December 2, 2025, Mr. Dahir was leaving his apartment when he observed uniformed officers wearing vests and masks knocking on doors in his building. Mr. Dahir was detained after sharing an elevator in his building—a building primarily housing residents of Somali and Latino descent—with the ICE agents. Mr. Dahir did not speak to or otherwise engage with the agents while in the

elevator. When Mr. Dahir exited the elevator and walked outside, the agents followed him, called him over, and stopped him, saying that they needed to speak with him.

50. The agents took a picture of Mr. Dahir's face with their phone and asked him for his identification. Mr. Dahir provided them with his Minnesota driver's license. They asked Mr. Dahir if he was a U.S. citizen, and when he responded that he was, they demanded proof. Mr. Dahir provided his passport card, but the agents still did not let him leave. Instead, they took his driver's license and passport card to their car. Mr. Dahir asked if he was free to go, but an officer said no because they were waiting for more information from their headquarters. The agents kept Mr. Dahir outside for at least 25 minutes in weather at or below 19 degrees Fahrenheit. When Mr. Dahir asked if he could leave to go to work, the agents told him he was not free to leave and threatened him with detention.

51. The agents also held a friend of Mr. Dahir's. The ICE agents prevented Mr. Dahir and his friend from leaving until media and other people from the neighborhood started to gather, at which point one of the ICE agents stated, "It's getting hot over here, let's go, let's go."

52. Mr. Dahir believes he was stopped solely because of his race and appearance. The agents did not present a warrant, ignored Mr. Dahir's statements and document providing proof of citizenship, and targeted an area with a large Somali-American population for immigration stops. The agents did not ask Mr. Dahir about his ties to the community.

### *Defendants' Unlawful Detention of Luisa Doe*

53.     Luisa Doe is a Latina woman from Honduras who lives in Minnesota.  She has a pending asylum application.  On December 13, 2025, Luisa was driving to work in Saint Paul when ICE agents in unmarked vehicles activated flashing lights and stopped her car.

54.     At this point, an ICE agent knocked on Luisa's car window, ordered her out of her car, and arrested her without presenting a warrant or asking any questions about her immigration status or ties to the community.  The agents failed to indicate the reason for the stop and did not appear to know Luisa or her name prior to stopping her car.  The ICE agents drove Luisa to a facility in St. Paul, where they detained her until transporting her to the Douglas County Jail in Wisconsin.  Luisa had no opportunity to communicate with her family during her arrest, and after she was missing for 24 hours, one of her children filed a missing person's report with the local police department—only learning from that process that she was in ICE custody.

55.     Luisa is still being held at the Douglas County Jail.  She is a diabetic and takes regular medication for her condition, but she has not been able to take her medication since her arrest and her health condition is deteriorating.  Luisa has requested medication, but that request has been denied.

56.     Luisa believes she was stopped and arrested solely because of her race and ethnicity, as agents did not know who she was and did not state any legal basis for the stop.

*Defendants' Unlawful Detention of Said Osman*

57.     Said Osman was born in Somalia and arrived in the United States in 2015 as a refugee.  He has held a green card since 2017 and is eligible for naturalization.  Mr. Osman is a resident of Kentucky.  On January 7, 2026, Mr. Osman traveled to Minneapolis to assist his mother and siblings with a move.  The following morning, Mr. Osman was visiting a mosque in a neighborhood known for Somali-American businesses and places of worship, near Karmel Mall.  He was dressed in Muslim attire: a kufi and thobe called a khamees.

58.     While walking to the mosque, Mr. Osman observed a black SUV with tinted windows pull alongside him.  Two masked men exited the vehicle and asked if he was a citizen.  Mr. Osman responded that he was legally present in the United States.  The men did not respond but instead grabbed his arm and attempted to force him into the SUV.  Mr. Osman refused to enter the car, worried that he was being kidnapped.  The men then started pushing on him and pinned him to the ground on top of the snow and ice.  Mr. Osman said that he would show them his ID, which was in his pocket, but the men refused to allow him to present it.  They then shoved Mr. Osman into the back of the SUV.

59.     Inside the SUV, the men—federal agents—told Mr. Osman, "We are trying to implement the law of the land," and later, "Trump is the president.  This is what he wants."  The agents asked if Mr. Osman spoke Spanish.  When a Muslim call to prayer sounded from Mr. Osman's phone, the agents told him to put his phone away.  Mr. Osman prays five times a day in accordance with the times for the call to prayer, an important religious practice to him.

60. The agents examined Mr. Osman's ID while he was in the SUV, and took a picture of his face, before releasing him. At no time did the agents ask Mr. Osman about his ties to the community.

61. Mr. Osman believes he was targeted because of his race, Somali appearance, and Muslim attire. At no point did the agents explain the reason for the stop or present a warrant. Moreover, despite targeting Mr. Osman, the ICE agents ignored a white pedestrian nearby.

### Defendants' Unlawful Detention of Crisareli Castillo

62. Crisareli Castillo is a U.S. citizen by birth and is of Mexican descent. She was born in Minneapolis and works as a support teacher at a Spanish-immersion daycare in Minneapolis. On January 7, 2026, Ms. Castillo arrived at work. Ms. Castillo's coworker, who is also Latina and is from Ecuador, had just parked her car, and Ms. Castillo—who is not good at parallel parking—asked the coworker to help her park her car while she stood nearby. Several unmarked SUVs with flashing lights approached and boxed in the car. Men wearing masks and "POLICE" vests exited the vehicles and approached Ms. Castillo without identifying themselves. Ms. Castillo could see that they were armed.

63. The officers ordered Ms. Castillo to remain in place and not move. They began to speak to Ms. Castillo in Spanish, even though Ms. Castillo speaks English. The officers asked Ms. Castillo if she had identification. She showed the officers her U.S. passport. An officer showed Ms. Castillo a photo of a Latina woman with curly hair and

asked if she worked at the daycare. The woman in the photo did not resemble Ms. Castillo or her coworker, apart from being Latina.

64. The officers then walked to the driver's side window of Ms. Castillo's car and asked for her coworker's identification. Ms. Castillo did not hear the officers ask her coworker questions about her ties to the community, nor did she hear her coworker say that she was in the country without authorization. The officers asked Ms. Castillo's coworker to get out of the car and arrested her.

65. Ms. Castillo and her Latina coworker were treated differently than white individuals present throughout the encounter due to their race. Officers asked only Ms. Castillo and her coworker for identification, ignoring approximately ten white bystanders. Moreover, they did not show the picture of the Latina woman to any of the white individuals present.

**Defendants' Unlawful Detention of A.A.**

66. A.A. is a 39-year-old lawful permanent resident of the United States who has lived in Minnesota since 2023. He is of Somali descent and resides in Burnsville with his U.S. citizen wife and their children. On January 9, 2026, after leaving the Walmart and while walking to his car, A.A. was approached by two individuals wearing masks and vests marked "ICE." The officers did not identify themselves, present a warrant, or explain any legal basis for stopping him. Without asking his name or reviewing his documents, they grabbed both of his arms, searched his pockets, and handcuffed him. Despite finding his wallet, they ignored documentation contained therein that would have confirmed his immigration status.

21

67.     The officers placed A.A. in the back of an unmarked sedan and drove him to a location that appeared to be a police station.  During the ride, they did not speak to him or ask any questions about his identity or legal status.  In the station parking lot, two additional ICE officers approached and began questioning A.A.  They asked where he came from, whether he was Somali, and how long he had lived in the U.S.  A.A. told them he came had come to the United States from Ethiopia, was Somali, and had lived in the United States for three years.  Only after these questions did the officers ask what his name was.  After taking his documents to their car, the officers returned and asked if he spoke Arabic.

68.     A.A. believes he was targeted solely because of his race and appearance, as the officers did not know his identity before handcuffing him, did not present a warrant, and made no attempt to verify his status before forcibly detaining him for over an hour.  This experience has left A.A. terrified that he could be detained again simply because of his Somali heritage.

### *Defendants' Unlawful Detention of Julio Doe*

69.     Julio Doe is a Latino man from El Salvador who has lived in Minnesota since around June 2024.  He has a pending asylum application under the Trafficking Victims Protection Reauthorization Act.  On December 24, 2025, while leaving work at a construction site with three other Latino workers, multiple ICE vehicles stopped Julio and the other workers.

70.     None of the agents identified themselves, presented a warrant, explained the reason for the stop, or indicated prior knowledge of Julio Doe's identity.  None of the agents asked him any questions about his ties to the community.  Julio provided

documentation confirming that he is validly seeking asylum status. The officers did not respond and arrested him. Julio remains detained.

71. Julio believes he was stopped and arrested because of his ethnicity, as the agents did not present a warrant, did not state why he was stopped or arrested, and did not inquire into his circumstances before detaining him.

### *Defendants' Unlawful Detention of Santiago Doe*

72. Santiago Doe is a Latino man from Honduras who has lived in the United States since 1995 and now resides in Minnesota. He is a maintenance worker and handyman. He has a pending I-130 petition seeking to obtain lawful permanent residence through his U.S. citizen daughter. On December 12, 2025, Santiago was driving to a work site in a company truck with ladders attached. He was obeying all traffic laws.

73. ICE agents pulled over the vehicle and stopped Santiago, pounding on the truck's windows. The ICE officers used Santiago's name, but never asked Santiago any questions about any community ties or his family, and they disregarded his pending petition for lawful permanent residence. The agents arrested Santiago and took him to a federal building before transferring him to the Freeborn County Jail.

74. Throughout this encounter, the agents never identified themselves, presented a warrant, nor explained why they stopped Santiago. Santiago believes he was stopped and arrested because of his ethnicity.

*Defendants' Unlawful Detention of Emmanuel Sackie*[10]

75.    On January 6, 2026, Emmanuel Sackie was shopping at the Family Dollar store when his fiancée called him and told him that immigration agents were surrounding their car, which she was sitting in outside the store.

76.    Mr. Sackie left the Family Dollar store to join his fiancée.  Immigration agents surrounded his car; Mr. Sackie told the agents he was a U.S. citizen and provided them with his driver's license.  The officers took Mr. Sackie's license, and asked for more proof that he is a U.S. citizen.  Mr. Sackie told the officers he did not have any additional documentation of citizenship on his person.

77.    A struggle ensued, and Mr. Sackie was placed in handcuffs by federal agents. He was put in a federal vehicle and taken to an unknown location before being released.

78.    Mr. Sackie's injuries were so severe he required medical attention at a hospital.  Mr. Sackie had never before been in handcuffs, and he "legally immigrated to the United States in search of a better life and to reunite with his family."  The encounter left him "shaken," feeling like he was "treated like an animal."

***

---

[10] For details concerning Mr. Sackie's arrest, *see* Ubah Ali, *U.S. citizen says encounter with ICE agents in Brooklyn Park landed him in the hospital,* CBS News (Jan. 6. 2026), https://www.cbsnews.com/minnesota/news/us-citizen-ice-encounter-injury-brooklyn-park/ and Jaheim T. Tumu, *Liberian-Born U.S. Citizen Hospitalized After Alleged Rough Encounter With ICE Agents in Minnesota,* Front Page Africa (Jan. 9, 2026), https://frontpageafricaonline.com/news/liberian-born-u-s-citizen-hospitalized-after-alleged-rough-encounter-with-ice-agents-in-minnesota/.

79.     Federal agents continued to make stops and interrogations based on race and ethnicity.  On January 8, federal agents surrounded a driver at the Minneapolis-St. Paul airport and asked about his ethnicity.  An agent in the video is heard stating "I can hear you don't have the same accent as me, that's why I'm asking" and "I want to know where you were born."[11]

80.     News reports and court filings have indicated additional persons, including U.S. citizens, stopped and arrested by federal agents without probable cause of removability, sowing terror throughout the Twin Cities metropolitan area.

81.     For example, a Native American man was detained in a grocery store parking lot in Robbinsdale, Minnesota, despite insisting that he was a citizen, only for ICE to let him go hours later.[12]

82.     A resident of Hopkins, Minnesota, originally from El Salvador was detained by ICE on the way to work—even though his removal case had been dismissed and he was pursuing lawful permanent resident status through his marriage to a U.S. citizen; his car was just left on the side of the road for his wife to pick up.[13]

---

[11] FREEDOMNEWS TV – NATIONAL / SCOOTERCASTER, *"You want my ID??" Bovino and CBP Checks Citizenship at Minneapolis Airport*, at 1:05 (YouTube, Jan. 7, 2026), https://www.youtube.com/watch?v=5QM2hqcfOis.

[12] Susan Du, *Tribal leaders say ICE is detaining American Indians during immigration sweeps*, The Minn. Star Trib. (Jan. 12, 2026), https://www.startribune.com/ice-detaining-american-indians-minneapolis-leaders-say/601561760.

[13] Sarah Thamer, *ICE arrest during recent enforcement surge disrupts lives of Hopkins family of 4*, MPR News (Jan. 9, 2026), https://www.mprnews.org/story/2026/01/09/hopkins-ice-arrest-of-father-disrupts-family-of-four.

83. Despite a pending asylum claim and no basis for detention, a man of Somali descent while working out near a gym near his home was detained at Crow Wing County for two weeks—before a Minnesota federal judge ordered his release pursuant to a habeas petition.[14]

84. A man of Turkish descent who was in a Home Depot parking lot was arrested despite having a legal permit to work and a pending application for asylum; he was detained in Kandiyohi County Jail and then transferred to Louisiana—an ordeal lasting more than two weeks before a Minnesota federal judge ordered his release pursuant to a habeas petition.[15]

85. A Minneapolis resident from Ecuador, whose youngest daughter is a United States citizen, was detained while driving, despite having a pending asylum application; he was detained at Freeborn County Detention Center for nearly two weeks before a Minnesota federal judge ordered the government to show cause for his continued detention.[16]

86. Another Minnesota resident from Ecuador who has been in the country for over two decades, who is married to a United States citizen, and who had a pending application for permanent residence was detained and flown to a facility in Texas; when a

---

[14] Jon Collins, *Dozens of immigrants detained by ICE going to court to request release*, MPR News (Dec. 31, 2025), https://www.mprnews.org/story/2025/12/31/immigrants-in-ice-custody-ask-court-for-release.

[15] *Id.*

[16] *Id.*

bond hearing was finally held two weeks later, the hearing resulted in the man's release on a $5,000 bond.[17]

87.     In south Minneapolis, ICE officers reportedly rammed into a Latino man's car and then questioned his immigration status for no apparent reason, demanding his identification.[18]

**B.     These Policies and Practices Violate the Constitution and Federal Law.**

**1.     Defendants' Stops Without Reasonable Suspicion, Targeting Somali and Latino Individuals, Violate the Fourth and Fifth Amendments.**

88.     Defendants are implementing a policy and practice of stopping individuals in the Twin Cities for immigration investigation without reasonable suspicion of removability, particularly targeting people whom they perceive to be Somali or Latino. This violates both the Fourth Amendment's protection against unreasonable seizures and the Fifth Amendment's equal protection guarantee.

89.     Defendants' stops of individuals who are, or are perceived to be, Somali and Latino without reasonable suspicion are consistent with and follow from senior Trump administration officials' promises to target the Somali community in the Twin Cities, their expressed animus toward the Somali and Latino communities—as outlined below—and their blatant disregard for basic legal protections in immigration enforcement. Defendants

---

[17] *Id.*

[18] Andrew Hazzard, *'Because I was Latino, that's it': ICE rams car in south Minneapolis while profiling driver*, Sahan Journal (Jan. 13, 2026), https://sahanjournal.com/public-safety/ice-rams-latino-man-car-south-minneapolis-immigration.

are indiscriminately stopping anyone they perceive to be Somali or Latino, based on nothing more than their appearance.

90. Defendants' stops of Somali and Latino individuals to investigate their immigration status are marked by coercion. Defendants regularly encounter Somali and Latino individuals in public settings and restrain their liberty in encounters in which, under the totality of the circumstances, a reasonable person would believe that he or she is not free to leave. Defendants regularly position themselves in a way to limit the individual's freedom of movement. Several officers are regularly present for a single stop. Officers display weapons. Officers engage in physical touching, including severe use of force. Officers use language and intonation that indicate compliance is necessary, including statements indicating that individuals are not free to leave. Officers retain control over individuals' property. And officers indicate (either expressly or implicitly) to the individuals that they are the focus of immigration investigation.

91. For example, as described above, Mr. Hussen was physically restrained, put in a headlock, and dragged into a squad car. Mr. Sackie was left hurt and hospitalized by his interaction with the federal agents. Luisa Doe was pulled over in her car and handcuffed. Mr. Osman was grabbed by the arm and pinned on the ground. A.A. was handcuffed and forced into a squad car. These are coercive and often violent stops that trigger Fourth Amendment protections.

92. In their investigatory stops of Somali and Latino individuals, Defendants systematically lack "specific and articulable facts" that provide an "objective" rationale for these seizures. *Terry v. Ohio*, 392 U.S. 1, 21 (1968).

28

93.     Not only are Defendants using the legally impermissible and illogical criterion of ethnicity as a basis for the stop with no other information, but Defendants are also systematically *disregarding* affirmative indications that people they have stopped are not removable: the stopped individuals' repeated statements and efforts to present passports and immigration documents, as detailed above.

### 2.     Defendants' Warrantless Arrest Policies and Practices Violate the Fourth Amendment and Federal Law.

94.     Defendants are violating the Fourth Amendment and the warrantless arrest statute, 8 U.S.C. § 1357(a)(2), in two primary ways.

95.     First, Defendants have a policy and practice of making warrantless immigration arrests in the Twin Cities without probable cause that a person is *removable* from the United States.  This violates both the Fourth Amendment and § 1357(a)(2).

96.     Second, Defendants have a policy and practice of making warrantless immigration arrests in the Twin Cities without probable cause that a person is a *flight risk*. This violates § 1357(a)(2).

97.     Law enforcement may stop individuals for questioning based on reasonable suspicion.  But reasonable suspicion is not sufficient for arrest.  Instead, Congress requires immigration arrests to be based on *warrants*, with certain narrow exceptions.  Under § 1357(a)(2), two conditions must be met before an agent may conduct a warrantless arrest: the agent must have "reason to believe" *both* that (1) the individual "is in the United States in violation of any [immigration] law or regulation," and (2) the individual "is likely to escape before a warrant can be obtained for his arrest." "[T]he term 'reason to believe' in

§ 1357(a)(2) means constitutionally required probable cause," *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010), which is a higher standard than reasonable suspicion. Probable cause "must be particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

98.     The statute's two-pronged probable cause requirement is mirrored in DHS's regulations for enforcement activities.  Specifically, 8 C.F.R. § 287.8(c)(2) provides that "[a]n arrest shall be made *only* when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States" and that "[a] warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained." (Emphasis added).

99.     Defendants' public statements demonstrate that their policy and practice is to make immigration arrests *without* probable cause as to removability or flight risk. Defendants have repeatedly made public statements highlighting their policy of making warrantless immigration arrests based on *reasonable suspicion* alone, rather than the legally required probable cause.  For example, in a September 25, 2025 post that has not been deleted, DHS's official X account stated that "[u]nder the [F]ourth [A]mendment of the U.S. Constitution, DHS law enforcement uses 'reasonable suspicion' to make arrests."[19]  And on December 16, 2025, DHS again asserted in an X post that "DHS law

---

[19] U.S Department of Homeland Security (@DHSgov), X (Sep. 25, 2025 at 4:45 PM), https://x.com/DHSgov/status/1971315047201694042?s=20.

enforcement uses 'reasonable suspicion' to make arrests."[20]  In a video posted on DHS's account on December 21, 2025, Deputy Assistant Secretary Lauren Bis made the same misstatement of law.

100.    Border Patrol commander Gregory Bovino, who has overseen immigration enforcement actions in the Twin Cities and other cities in the United States, has also told the press that "[w]e need reasonable suspicion to make an immigration arrest. . . . You notice I did not say probable cause, nor did I say I need a warrant.  We need reasonable suspicion of illegal alienage that's well-grounded within the United States immigration law."[21] Defendant Bovino was present during the arrest of Javier Doe.

101.    This same assertion was echoed by DHS spokeswoman Tricia McLaughlin, who reiterated that "DHS law enforcement uses 'reasonable suspicion' to make arrests."[22]

102.    Defendants misstate the law.  Law enforcement may stop an individual based on reasonable suspicion.  But that alone does not justify a warrantless arrest.  The Fourth Amendment requires probable cause.  And both 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2) require probable cause—both for removability and flight risk—to make a warrantless arrest.

---

[20] U.S Department of Homeland Security (@DHSgov), X (Dec. 16, 2025, at 12:21 PM), https://x.com/DHSgov/status/2000979658179752224?s=20.

[21] Hanna Park et al., *October 7, 2025: National Guard deployments*, CNN (Oct. 8, 2025), https://www.cnn.com/us/live-news/national-guard-chicago-portland-trump-10-07-25.

[22] Teo Armus & Jenny Gathright, *Lawsuit accuses ICE of illegally arresting Latino immigrants in D.C.*, The Washington Post (Sept. 25, 2025), https://www.washingtonpost.com/immigration/2025/09/25/dc-ice-arrests-lawsuit-trump/.

103.    In addition to instructing officers to apply an incorrect legal standard for arrests, Defendants have also systematically removed safeguards to facilitate mass arrests. Defendants no longer require immigration officers to gain prior supervisor approval of, or even to fill out a paper form with information about, the person they arrest. This reflects the administration's intention to "move[] from targeted enforcement to broad street sweeps."[23] And it provides officers who have been improperly instructed on the law free rein to arrest people with impunity.

104.    Defendants have implemented similar policies and practices of warrantless arrests in other locations throughout the United States, which courts have found unlawful. Individuals in Colorado, the District of Columbia, and the Eastern District of California have been subject to warrantless arrests made without probable cause of flight risk, which courts in those jurisdictions have held unlawful under § 1357(a)(2). *Ramirez Ovando v. Noem*, No. 1:25-cv-03183-RBJ, 2025 WL 3293467, at *15 (D. Colo. Nov. 25, 2025); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, No. 25-3417 (BAH), 2025 WL 3465518, at *26-27 (D.D.C. Dec. 2, 2025); *United Farm Workers v. Noem*, 785 F. Supp. 3d 672 (E.D. Cal. 2025). In a long-running lawsuit challenging warrantless arrests in Chicago, the district court recently found that ICE had arrested at least 22 class members without probable cause of flight risk in violation of a settlement agreement. *Castañon Nava v.*

---

[23] Julia Ainsley, Didi Martinez & Laura Strickler, *Under Trump administration, ICE scraps paperwork officers once had to do before immigration arrests*, NBC News (Sept. 9, 2025), https://www.nbcnews.com/politics/national-security/trump-administration-ice-scraps-paperwork- officers-immigration-arrests-rcna229407.

*Dep't of Homeland Sec.*, No. 18-cv-3757, 2025 WL 2842146, at *21, 23 (N.D. Ill. Oct. 7, 2025).

105.     Defendants' arrests in the Twin Cities reflect their policy, pattern, or practice of conducting warrantless arrests without probable cause of removability or flight risk.  For example, on December 10, 2025, ICE agents arrested Mr. Hussen despite his repeatedly informing them that he was a U.S. citizen who had a photo of his passport card in his pocket.  Agents didn't relent even when Mr. Hussen's boss arrived on the scene with scans of Mr. Hussen's passport card.  The agents refused to listen to Mr. Hussen's assertions of citizenship, and when offered the chance to look at substantiating documentation they refused, saying, "No, we are not going to do that."  Even if the agents had reasonable suspicion (which they did not) for the initial stop and questioning, they ignored affirmative evidence as to a complete lack of probable cause of removability.  Agents also failed to ask how long Mr. Hussen had lived in the Twin Cities, his family in Minnesota, or anything else relevant to flight risk, the second prong of the probable cause requirement.

106.     Like Mr. Hussen, Plaintiffs Mr. Eydarus and Javier Doe, are all U.S. citizens, and were each arrested without probable cause that they are in the United States in violation of any immigration law.  They were all also arrested absent probable cause that they are a flight risk.  None of them were asked a single question concerning their ties to their community and, in fact, were all arrested in circumstances giving rise to an inference that they posed no flight risk—even absent the basic fact that they are U.S. citizens.  Mr. Hussen was arrested during a lunch break from his place of work, which was within walking

distance; Mr. Eydarus was arrested after leaving an overnight shift to meet his mother, who works in the same location; and Javier Doe was arrested while he was at work.

107. Indeed, for *all* of the Minnesotans described who were arrested, Defendants had no probable cause to believe they presented a flight risk. In fact, arrests occurred in circumstances giving rise to precisely the opposite inference: Mr. Dahir was arrested just outside of his apartment building, while he was holding his Minnesota driver's license; Luisa Doe, Julio Doe, Santiago Doe, and Ms. Castillo were arrested while present at, traveling to, or leaving their local places of work; Mr. Osman was arrested while traveling to a local place of worship; and A.A.—who has a U.S. citizen wife and children—was arrested while walking to his car after shopping at Walmart.

**C.    DHS's Targeted Stops and Arrests Reflect Defendants' Animus Toward Somali and Latino People.**

*The Administration's and Decisionmakers' Anti-Somali Animus*

108. Throughout his campaign and presidency, President Donald Trump and other senior executive officials have made statements reflecting anti-immigrant animus based on race, ethnicity, and national origin—remarks expressly targeting Somali and Latino immigrants and, more broadly, non-white immigrants from various countries. These statements show the animus underlying Defendants' policies in Minnesota—suspicionless stops of individuals they perceive to be Somali or Latino, and warrantless arrests without probable cause as to removability or flight risk—and their implementation of those policies.

109. During a cabinet meeting at the White House on December 2, 2025—with Secretary Noem and Attorney General Pam Bondi present—President Trump made the following remarks:

> I don't want them in our country, I'll be honest with you, OK? Somebody would say, oh, that's not politically correct. I don't care. I don't want them in our country. Their country is no good for a reason. Their country stinks and we don't want them in our country . . . .
>
> We could go one way or the other[,] and we're going to go the wrong way if we keep taking in garbage into our country. Ilhan Omar is garbage, she's garbage. Her friends are garbage. These aren't people that work. These aren't people that say let's go, come on, let's make this place great. These are people that do nothing but complain. They complain, and from where they came from, they've got nothing . . . .
>
> But when they come from hell and they complain and do nothing but bitch we don't want them in our country. Let them go back to where they came from and fix it.[24]

110. The President's words on December 2 were not isolated; rather, they reflected his long-held animus toward Somalia—animus that dates back to at least 2018 and remains apparent in statements he made throughout the past few months.

111. During an Oval Office meeting with lawmakers convened to discuss a bipartisan immigration proposal on or about January 11, 2018, President Trump reportedly

---

[24] Roll Call, Remarks: *Donald Trump Holds a Cabinet Meeting at the White House - December 2, 2025*, Factbase (Dec. 2, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-cabinet-meeting-december-2-2025/. *See also* Max Matza & James FitzGerald, *Trump says he does not want Somalis in US as ICE plans Minnesota operation*, BBC (Dec. 3, 2025), https://www.bbc.com/news/articles/c208x9v68w3o.

asked: "Why are we having all these people from shithole countries come here?" and expressed a preference for immigrants from "countries such as Norway."[25]

112.   Leading up to the renewed enforcement focus on Minnesota's Somali community in late November 2025, President Trump posted disparaging remarks that Somali refugees are "completely taking over"[26] the state and (as reported) said, "I don't want [Somalis] in our country[.]"[27]

113.   On November 21, 2025, President Trump ordered that all green card holders from Somalia and more than a dozen other countries be reexamined.  The president wrote on his Truth Social platform that he was "terminating effective immediately, the Temporary Protected Status (TPS Program) for Somalis in Minnesota."[28]  President Trump

---

[25] Josh Dawsey, *Trump derides protections for immigrants from 'shithole' sountries,* Wash. Post (Jan 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.06cbc70bfaec; *see also* Eugene Kiely, *Trump Confirms His Disparaging Remark About 'Shithole Countries' at Immigration Meeting*, FactCheck.org (Dec. 11, 2025), https://www.factcheck.org/2025/12/trump-confirms-his-disparaging-remark-about-shithole-countries-at-immigration-meeting/.

[26] Donald J. Trump (@realDonaldTrump), Truth (Nov. 27, 2025, at 11:27 PM), https://truthsocial.com/@realDonaldTrump/posts/115625429081411360.

[27] FOX 9 Minneapolis-St. Paul, Trump on Somalis: 'I don't want them in our country,' at 1:25 (YouTube, Dec. 2, 2025), https://www.youtube.com/watch?v=7Vfi0vgRzUo.

[28] Faris Tanyos & Nick Lentz, *Trump says he is ending deportation protections for Somalis in Minnesota*, CBS News (Nov. 21, 2025), https://www.cbsnews.com/minnesota/news/trump-announces-ending-deportation-protections-somalis-minnesota/.

said, without providing evidence, that "Somali gangs are terrorizing the people of [Minnesota]."[29]

114.    On December 9, 2025, at a Pennsylvania rally, President Trump stated, again in shockingly racist terms: "I say why is it we only take people from shithole countries, right? Why can't we have some people from Norway, Sweden -- just a few -- let us have a few from Denmark. Do you mind sending us a few people? Send us some nice people, do you mind? But we always take people from Somalia, places that are a disaster, right? Filthy, dirty, disgusting, ridden with crime -- the only thing they're good at is going after ships."[30]

115.    Defendant U.S. Homeland Security Secretary Kristi Noem doubled down on President Trump's efforts to target Somali Minnesotans.    During the same December 2, 2025 cabinet meeting, Secretary Noem claimed that "50% of [Somali Minnesotans] are fraudulent, which means that that wacko Governor Walz either is an idiot or did it on purpose . . . . He brought people in there illegally who never should have been in this country. Said they were somebody that they're not[.]"[31]    Secretary Noem did not

---

[29] CBS Minnesota, *"Largest Immigration Operation Ever" Launched in Twin Cities, DHS Says*, CBS News (Jan. 7, 2026), https://www.cbsnews.com/minnesota/live-updates/ice-somali-immigrants-minneapolis-st-paul/.

[30] Roll Call, *Speech: Donald Trump Holds a Political Rally in Mount Pocono, Pennsylvania - December 9, 2025*, Factbase (Dec. 9, 2026), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-mount-pocono-pennsylvania=december-9-2025/. *See also* Kathryn Palmer, *Trump refers to 's---hole' countries at rally, calls Somalia 'filthy*,*'* USA Today (Dec. 10, 2025), https://www.usatoday.com/story/news/politics/2025/12/10/trump-denied-haiti-el-salvador-countries-comment/87700107007/.

[31] Tom Hauser & Morgan Reddekopp, *Fact Check: Noem's claims about Somalis in Minnesota difficult to verify*, KSTP.com (Dec. 4, 2025), https://kstp.com/kstp-news/top-news/kristi-noem-claims-50-of-visas-issued-in-minnesota-are-fraudulent/.

present evidence to support her claim.  Rather, she posted a video of her statements on X, captioning it: "We don't complain about problems, we fix them. Under the leadership of President Trump, DHS is taking on the incessant immigration fraud in Minnesota that has robbed billions of dollars from U.S. taxpayers. We're just getting started."[32]

116.    On December 10, 2025, President Trump disparaged Congresswoman Omar in terms specifically invoking her ethnicity and religion, stating: "You know, that's called the Great Big Minnesota scam with one of the dumbest governors ever in history. I love this Ilhan Omar, whatever the hell her name is, a little turban. I love her, she comes in, does nothing but bitch . . . . We ought to get her the hell out[.]" [33]

117.    On December 31, 2025, President Trump posted on Truth Social: "Much of the Minnesota Fraud, up to 90%, is caused by people that came into our Country, illegally, from Somalia . . . . Lowlifes like this can only be a liability to our Country's greatness. Send them back from where they came, Somalia, perhaps the worst, and most corrupt, country on earth.  MAKE AMERICA GREAT AGAIN!!!"[34]

118.    On January 4, 2026, speaking to reporters aboard Air Force One, President Trump stated: "[T]he Somalians are ripping off our country to the tune of, looks like $19 billion, but that's only what they can find . . . . [E]very one of them should be forced

---

[32] *Id.*; Secretary Kristi Noem (@Sec_Noem), X (Dec. 2, 2026, 2:59 PM), https://x.com/Sec_Noem/status/1995945916772331657.

[33] Jeff Wald, President Trump blasts Ilhan Omar, Gov. Walz at Pennsylvania Rally, Fox9 (Dec. 10, 2025), https://www.fox9.com/news/president-trump-blasts-ilhan-omar-gov-walz-pennsylvania-rally.

[34] Donald J. Trump (@realDonaldTrump), Truth (Dec. 31, 2025, at 10:55 AM), https://truthsocial.com/@realDonaldTrump/posts/115814993074933464.

to leave this country, including Ilhan Omar, who's a total crook . . . . [T]hink of it, $19 billion, at least, they've stolen from Minnesota and from the United States." [35]

119.  In an interview on Fox News on December 9, 2025, White House Deputy Chief of Staff Stephen Miller was explicit that his animus against Somali Minnesotans went beyond recent immigrants: "[Y]ou see with a lot of these immigrant groups, not only is the first generation unsuccessful — again, Somalia is a clear example here — not only is the first generation unsuccessful, but you see persistent issues in every subsequent generation.  So you see consistent high rates of welfare use, consistent high rates of criminal activity, consistent failures to assimilate.  But this shouldn't be a surprise . . . . Look, there are people all over the world that are great people.  But you look at the society — if Libya keeps failing, if the Central African Republic keeps failing, if Somalia keeps failing, Right?  If these societies all over the world continue to fail, you have to ask yourself: If you bring those societies into our country and then give them unlimited free welfare, what do we think is going to happen?"[36]

---

[35] The White House, President Trump Gaggles with Press on Air Force One, Jan. 4, 2026, at 19:33 (YouTube, Jan. 4, 2026), https://www.youtube.com/watch?v=9XVjd3R2T3g; Zolan Kanno-Youngs, et al, *Two Hours, Scores of Questions, 23,000 Words: Our Interview With President Trump*, N.Y. Times (Jan. 11, 2026), https://www.nytimes.com/2026/01/11/us/politics/trump-interview-transcript.html.

[36] *Stephen Miller breaks down long-term immigration impacts, assimilation,* Fox News (Dec. 9, 2025), https://www.foxnews.com/video/6386252117112.

120.    On January 13, 2026, when announcing the termination of Somalia's Temporary Protected Status, Defendant Noem said that "allowing Somali nationals to remain temporarily in the United States is contrary to [the] national interest[].".[37]

121.    Minnesota has an estimated 76,320 Somali residents[38] (1.3% of 5.8 million total state population[39]), and 39.5% of the nation's total Somali population.[40]

### The Administration's and Decisionmakers' Anti-Latino Animus

122.    For years, President Trump has also targeted Latinos with hateful comments. In announcing his first election bid in 2015, President Trump said (infamously): "When Mexico sends its people, they're not sending their best . . . . They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs.  They're bringing crime. They're rapists."[41]

---

[37] *Homeland Security Terminates Somalia's Temporary Protected Status Designation*, U.S. Department of Homeland Security (Jan. 13, 2026), https://www.uscis.gov/newsroom/news-releases/homeland-security-terminates-somalias-temporary-protected-status-designation.

[38] U.S. Census Bureau, American Community Survey, 1-Year Estimates Selected Population Profiles, Table S0201 (2024), https://data.census.gov/table/ACSSPP1Y2024.S0201?q=somali+minnesota.

[39] U.S. Census Bureau, American Community Survey, 1-Year Estimates Subject Tables, Table S0501 (2024), https://data.census.gov/table/ACSST1Y2024.S0501?g=040XX00US27.

[40] *See* U.S. Census Bureau, American Community Survey, 1-Year Estimates Selected Population Profiles, Table S0201 (2024), https://data.census.gov/table/ACSSPP1Y2024.S0201?t=311.

[41] Carol Allegri & Reuters, *What Donald Trump Has Said About Mexico and Vice Versa*, ABC News (Aug. 31, 2016), https://abcnews.go.com/Politics/donald-trump-mexico-vice-versa/story?id=41767704.

123.    More recently, in reference to Venezuelan immigrants in Colorado, President Trump stated, "they come from the dungeons, think of that, the dungeons of the third world, from prisons and jails, insane asylums, and mental institutions. And she has had them resettled beautifully into your community to prey upon innocent, American citizens."[42]

124.    During a 2023 rally President Trump referred to migrants, including those from South America, as "poisoning the blood of our country."[43]

125.    Others in the administration have unjustly tied some Latino communities to crime, including Defendant Noem, who alleged that "Venezuela emptied their prisons and told them to come to America. Far too few have been deported. If we don't want more families grieving like Laken Riley's, that has to change."[44]

### *Racially Discriminatory Effects*

126.    Defendants began implementing their unlawful policies and practices—stops of Somali and Latino individuals in the Twin Cities without reasonable suspicion as to immigration status and warrantless immigration arrests in the Twin Cities without probable cause of removability or flight risk—shortly after President Trump's tirade against Somali individuals.

---

[42] Roll Call, *Speech:* Donald Trump Holds a Campaign Rally in Aurora, Colorado, Roll Call (Oct. 11, 2024), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-rally-aurora-colorado-october-11-2024.

[43] National Cable Satellite Corporation, Donald Trump on Illegal Immigrants "Poisoning the Blood of Our Country," C-SPAN (Dec. 16, 2023), https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439/.

[44] Kristi Noem (@KristiNoem), X (Mar. 14, 2024, at 12:24 PM), https://x.com/KristiNoem/status/1768312288560247199.

127.   Following the series of White House statements, on December 1, 2025, the Trump administration launched an intensive immigration operation primarily targeted at Somali immigrants in the Minneapolis-St. Paul region.[45]   The directive for the ICE operation called for so-called strike teams and sought to bring in roughly 100 officers and agents from around the country for the operation.[46]

128.   All stops and arrests described in this complaint provide strong evidence of racial profiling.  In each encounter, there was no basis for Defendants to stop, much less arrest, any stopped individual.  Defendants merely saw a Somali or Latino person in public and decided to stop them, often with force, to investigate their immigration status, scan their faces, and in some cases arrest them—often over vehement protestations by the stopped person that they were a U.S. citizen or had immigration status.   This is quintessential racial profiling.

129.   In some instances, Defendants' racial profiling is not only blatant but explicit.  For example, Mr. Dahir was leaving his apartment when he observed uniformed officers wearing vests and masks knocking on doors in his building, which is located in a major hub for Somali residents.  The man was told that ICE needed to stop him because

---

[45] *See* Homeland Security, *ICE Arrests Worst of the Worst Criminal Illegal Aliens During Operation Metro Surge in Minneapolis Including Pedophiles, Domestic Abusers, and Gang Members*, U.S. Dep't of Homeland Sec. (Dec. 4, 2025), https://www.dhs.gov/news/2025/12/04/ice-arrests-worst-worst-criminal-illegal-aliens-during-operation-metro-surge.

[46] Hamed Aleaziz, Zolan Kanno-Youngs & Ernesto Londoño, *New ICE Operation Is Said to Target Somali Migrants in Twin Cities*, N.Y. Times (Dec. 2, 2025), https://www.nytimes.com/2025/12/02/us/politics/ice-somali-migrants-minneapolis-st-paul.html.

they were ostensibly looking for someone who looked like him. Despite showing officers his passport card, which confirmed his identity and citizenship status, the officers refused to let him go.

130. In stops and arrests, Defendants have repeatedly acted (beyond the fact of the stop or arrest) in ways that evince racial animus. For example, an agent asked Plaintiff Mr. Eydarus why he and his mother were speaking a "foreign language" (Somali). While driving Plaintiff Javier Doe and his coworker around the Twin Cities metro area post-arrest, agents played Mexican music loudly while the agent who was driving rapidly accelerated. Agents asked A.A. if he was Somali and if he spoke Arabic—questions irrelevant to his immigration status. And a federal agent said to a driver at the Minneapolis-St. Paul airport, "I can hear you don't have the same accent as me, that's why I'm asking," and "I want to know where you were born."

131. Defendants' persistence in targeting actual or perceived Somali and Latino individuals, even when told that they are citizens and presented with documentation of citizenship, such as a passport, is significant evidence that officers' true motivation is racial profiling.

132. Because of DHS's focus on Somali and Latino people in the largest operation in DHS's history, the impact of Operation Metro Surge is falling most heavily—and disproportionately, compared to white individuals—on Somalis and Latinos.

133. As of early December 2025, federal agents had arrested 12 people in Minneapolis "since launching an enforcement operation this week primarily focused on

43

Somali immigrants living unlawfully in the U.S."[47]  Of the 12 individuals arrested, six are Mexican nationals and five are from Somalia.[48]

134.  ICE has also targeted specific Somali neighborhoods and major hubs for Somali people in Minneapolis, knocking on the doors of various apartments located therein.

135.  In addition, ICE has targeted Somali businesses located in areas with Somali restaurants and establishments.  For example, ICE targeted Crossroad Health Services, a business with Somali employees that is located above two restaurants that serve Somali food.  ICE has also targeted Spanish-immersion childcare centers.

136.  The overwhelming majority of Somali and Latino individuals in Minnesota are U.S. citizens.  95% of Somali Minnesotans are U.S. citizens, according to 2024 U.S. Census Bureau data. The same is true for 76% of Latino Minnesotans.  The small percentage who are not U.S. citizens include legal permanent residents (green card holders) and others with immigration status.

137.  Defendants' policies are therefore essentially guaranteed to capture; detain for investigation, including questioning and facial scans; and arrest many individuals with immigration status and U.S. citizens whom federal agents cannot lawfully stop.  Moreover,

---

[47] Sarah Raza, *ICE says agents have arrested 12 people in Minneapolis as part of immigration operation*, AP News (Dec. 5, 2025), https://www.apnews.com/article/immigration-minnesota-trump-somali-ice-4911f903e12f949334afdad9dedee878.

[48] *Id.*

Defendants are systematically *disregarding* affirmative indications that people are not removable.

138.   In sum, Defendants have: (1) acted pursuant to a discriminatory motive by making disparaging comments about Plaintiffs' ethnicity and conducting stops and arrests without a legitimate purpose; (2) disregarded standard operating procedures by ignoring Plaintiffs' proof of citizenship, failing to show their ICE badges or otherwise identify themselves, and never presenting a warrant; and (3) singled out Plaintiffs due to their Somali or Latino origin, or appearance thereof, and residence in areas with a large non-white immigrant population, leading to a disproportionate number of Somali and Latino Minnesotans being stopped and arrested for ostensible immigration reasons.

### D.   Encounters Between Minnesotans and ICE Included Excessive Force

139.   Plaintiff and U.S. citizen Mr. Hussen was walking on the sidewalk when an ICE agent "came at [Mr. Hussen], grabbed [Mr. Hussen] forcefully, [and] pushed [Mr. Hussen] into" a restaurant.  Despite Mr. Hussen repeatedly telling the agents that he was a citizen, he was then "dragged [] out of the restaurant and put [] in a headlock on the ground."  Mr. Hussen experienced sufficient force that his jacket fell off, leaving him on the ground in the cold (on a day where temperatures in Minneapolis were below freezing). Once placed in an ICE vehicle, Mr. Hussen experienced pain in his back due to how tight his handcuffs were clasped.  However "[e]ach time that [he] asked the agents if they could loosen [the handcuffs], the officers squeezed them tighter."  At the ICE office in Fort Snelling, Mr. Hussen was denied water and his request for medical assistance was unmet. Mr. Hussen has experienced ongoing physical harm from this interaction: the handcuffs

45

left marks on his wrist for days, and he has been unable to sleep due to his sore back and wrists.

140. Luisa Doe was arrested by federal agents on December 13, 2025 around 6:00 am. She remains detained and is currently held at the Douglas County Jail. Luisa Doe is diabetic, and she has not been able to take her medication in the month since her arrest. Her health is deteriorating, but when she asks for help, ICE agents refuse to provide her medication. When Luisa Doe told the agents "how horrible" she felt, they placed her in isolation in a cold dark room with hard surfaces for 24 hours.

141. On January 7, 2026, civilian Renee Good tried to drive away from ICE agents when she was fatally shot by ICE agent Jonathan Ross. A witness noted that Ms. Good "backed up and turned her wheels away from [agents] to drive down the road" before ICE fired three times, killing Good.

142. On the same day that Renee Good was shot and killed by an ICE agent, a Minneapolis pastor who witnessed federal agents approaching a Hispanic woman told the agents to "take me, take me instead of her, I am not afraid of you either." After asking the pastor to repeat himself, an agent pointed a gun at the pastor's face, put him in handcuffs, and placed him in a car. While he was in the car, agents repeatedly asked the pastor whether he was afraid, to which he responded that he was not. One agent responded "[w]ell, you're White. You wouldn't be fun anyway."[49]

---

[49] Jessica Hart, Detained pastor says ICE let him go because he's White, Kare11 (Jan. 9, 2026), https://www.kare11.com/article/news/local/detained-pastor-says-ice-let-him-go-because-hes-white-mn/89-00df6b90-bae8-49b8-b980-941a4ba6ee8b.

E. **DHS's Unlawful Stops and Arrests Are Causing Enormous Harm to Plaintiffs, Class Members, Their Families, and Their Communities, and Plaintiffs and Class Members Are Likely to Be Subject to DHS's Unlawful Policies in the Future.**

143. Because of the widespread nature of Defendants' stops and arrests pursuant to their unlawful policies, and because of the systemic nature of Defendants' disregard for the requirements of federal law, Plaintiffs and those who live and work in Minnesota, particularly those of Somali or Latino origin, face a substantial risk that they will be subjected to unlawful warrantless arrests in the near future.

144. Plaintiff and U.S. citizen Mr. Hussen was stopped by ICE officers outside his office, a place he is frequently present. He sees ICE officers in his neighborhood "every day" since the start of Operation Surge, and he now avoids walking to places that he frequented in the past in order to avoid future encounters with agents. Since he was arrested and physically injured by ICE agents, he is "terrified" of being arrested again. He feels frightened when he recalls the injuries he suffered as a result of his encounters.

145. Plaintiff and U.S. citizen Mr. Eydarus was stopped when trying to shovel out a parking spot near his workplace. As Mr. Eydarus continues to work, and based on the officers' decision to stop him based only on his appearance, he fears a repeat encounter and being detained despite his citizenship. Mr. Eydarus returns to the street where he was stopped because of his part-time job, and he is "constantly on guard" of ICE agents. He remains worried that his family will be targeted by ICE in the future, or that he will be re-targeted himself.

146.     Plaintiff Javier Doe will continue to go to work even though CBP agents targeted him there, because his family needs to pay their bills. Javier Doe sees or hears evidence of federal immigration agents in his community every day. He is terrified that he will get picked up again at work or as he goes about his daily life in his community, for no reason other than his appearance, and that this time he may face greater injury.

147.     These feelings are shared by others who encountered ICE agents. A.A. was apprehended while purchasing groceries and diapers for his infant child, an activity he is sure to repeat. His wife is "terrified" he will be re-detained, and she "calls [him] every fifteen to thirty minutes" while he is "outside" to make sure that he is "okay." The circumstances giving rise to his arrest—being Somali, and needing to get groceries—will not change, and so he lives in fear that he will be stopped again. Plaintiffs and putative class members are squarely in the path of the government's unlawful policy and practice— under which they will inevitably be unlawfully arrested again.

148.     Mr. Dahir, too, was stopped by ICE officers in a place he lives and therefore is frequently present: the elevator of his apartment building. Because officers stopped him based only on his appearance, he fears a repeat encounter and re-detention, despite his citizenship. The same is true of Ms. Castillo. She is "afraid to be outside alone" because she is terrified of being stopped again. She is "especially scared" that she will be stopped and separated from her daughter.

149.     Defendants' policies and practices also caused significant physical and emotional harms to those they stopped or arrested. A.A., for example, was left "deeply concerned and scared" by the incident. Ms. Castillo was left "traumatized." Julio Doe

remains "scared," and "deeply concerned," and fears that he will suffer retaliation or be removed from his family.

150.   Defendants' unlawful policies are causing widespread harm, far beyond the individual plaintiffs and witnesses described here who have experienced unlawful stops. Karmel Mall, a vibrant cultural center that houses hundreds of Somali vendors and that is usually bustling with activity, is a "ghost city."[50]  Business owners who have lived in the city for 15 to 20 years and have lawful permanent status are afraid to go outside despite not being able to afford to close up shop.[51]  Sales at immigrant-run businesses along the Lake Street corridor have plummeted, with effects potentially worse than the COVID-19 pandemic.[52]   Minnesota's Department of Employment Economic Development Commissioner stated that ICE's actions are having a "negative impact" on "businesses large and small[,]" and some businesses will struggle to sustain payroll.[53]

151.   Somali Americans who are citizens are carrying proof of citizenship amid

---

[50] Nicole Ki & Matthew Alvarez, *A week into immigration operation, Minnesota Somalis remain on edge but vow resilience*, MPR News (Dec. 8, 2025), https://www.mprnews.org/story/2025/12/08/minnesota-somalis-remain-on-edge-in-face-of-immigration-operation-but-vow-resilience.

[51] *Id.*

[52] Dee DePass, *Immigrant corridors in both Minneapolis and St. Paul nearly shut down by intensifying ICE actions*, The Minn. Star Trib. (Jan. 13, 2026), https://www.startribune.com/immigrant-businesses-lose-sales-close-ice-action-twin-cities/601562613.

[53] Victor Stefanescu, *Minnesota's biggest companies starting to feel heat from ICE surge*, The Minn. Star Trib. (Jan. 14, 2026), https://www.startribune.com/minnesotas-biggest-companies-starting-to-feel-heat-from-ice-surge/601562852.

the ongoing ICE raids.[54]  A nurse practitioner reported that her patients began canceling appointments because of ICE presence, including a man who had a fever and was vomiting, and a woman who fell and broke her ankle.[55]  ICE agents have been present at Hennepin County Medical Center, including without a warrant, and have shackled patients receiving care, dissuading other community members from seeking treatment.[56]

152.  Minneapolis public school canceled remaining in-person classes the week of January 8, 2026, following armed Border Patrol agents entering Roosevelt High School property on January 7, 2026.[57]  According to school district officials from Fridley and Richfield, more than 30 percent of students were absent from classes that week.[58]

---

[54] Bethlehem Fields, Jeremy Raff & Mark Boyer, *Somali Americans Are Carrying Proof of Citizenship Amid ICE Raids*, N.Y. Times (Dec. 9, 2025), https://www.nytimes.com/video/us/100000010565397/somali-americans-citizenship-proof-ice-raids.html; Rachel Leingang, *'Somalis are the scapegoat': fear rises as Trump targets Minneapolis community*, The Guardian (Dec. 11, 2025), https://www.theguardian.com/us-news/2025/dec/11/somali-minneapolis-fear-trump-ice-deportation.

[55] Rachel Leingang, *'Somalis are the scapegoat': fear rises as Trump targets Minneapolis community*, The Guardian (Dec. 11, 2025), https://www.theguardian.com/us-news/2025/dec/11/somali-minneapolis-fear-trump-ice-deportation.

[56] Katrina Pross, *Hennepin County health care workers say ICE presence at hospital is 'disruptive,'* Sahan Journal (Jan. 13, 2026), https://sahanjournal.com/health/ice-agents-hospitals-hennepin-county-medical-center; Katelyn Vue, *Advocates, health care workers demand change at HCMC after ICE guarded patient's bedside*, Sahan Journal (Jan. 6, 2026), https://sahanjournal.com/immigration/hcmc-patient-arrested-immigration-agents-ice-unidos-mn.

[57] Elizabeth Shockman & Kyra Miles, *Twin Cities schools reopen with security measures tied to ICE operations*, MPR News (Jan. 12, 2026), https://www.mprnews.org/story/2026/01/12/ice-operations-prompt-changes-at-minnesota-schools.

[58] *Id.*

Minneapolis school district officials announced an "online learning option" for students through February 12, 2026, due to these safety concerns.[59]

153. Mass immigration stops and arrests in Minnesota will continue to escalate. On January 6, DHS announced it was sending 2,000 ICE agents to the Minneapolis-St. Paul area.[60] ICE Acting Director Todd Lyons called the initiative the agency's "largest immigration operation ever."[61]

154. On January 2, 2025, DHS posted a video of one of its Assistant Secretaries on Fox News stating, "We're going to have more and more of our agents on the ground in Minneapolis and . . . it looks like more resources are coming from the Trump administration."[62]

155. As part of this unprecedented enforcement surge, DHS publicly stated on X: "The largest DHS operation ever is happening right now in Minnesota," with 2,000 federal agents and officers deployed to the Minneapolis area.[63]

---

[59] *Id.*

[60] Rebecca Santana & Mike Balsamo, *Homeland Security plans 2,000 officers in Minnesota for its 'largest immigration operation ever'*, AP News (Jan. 6, 2026), https://apnews.com/article/immigration-enforcement-ice-noem-minnesota-somali-db661df6de1131a034da2bda4bb3d817.

[61] Rebecca Santana & Mike Balsamo, *2,000 federal agents sent to Minneapolis area to carry out 'largest immigration operation ever,'* ICE says, PBS News (Jan. 6, 2026), https://www.pbs.org/newshour/politics/2000-federal-agents-sent-to-minneapolis-area-to-carry-out-largest-immigration-operation-ever-ice-says.

[62] U.S. Department of Homeland Security (@DHSgov), X (Jan. 2, 2026 at 9:51 AM), https://x.com/DHSgov/status/2007102459936735651?s=20.

[63] Rebecca Santana & Mike Balsamo, *Homeland Security plans 2,000 officers in Minnesota for its 'largest immigration operation ever'*, AP News (Jan. 6, 2026),

156.    On January 7, 2026, Vice President J.D. Vance said that ICE would be going "door to door" as immigration enforcement activity ramped up.[64]

157.    On January 12, 2026, mere days after the shooting of Good, DHS announced that an additional 1,000 Customs & Border Protection officers would be deployed to the Minneapolis-St. Paul region.[65]    The forces come as President Trump threatens "RECKONING & RETRIBUTION" for Minnesota.[66]    The total of 3,000 ICE and CBP agents in Minnesota is equal to the Twin Cities' ten largest metropolitan police forces combined.[67]    The 2,000 ICE officers in Minnesota comprise 9% of the agency's personnel—a stark contrast to the 0.9% of the nation's unauthorized immigrants that live in Minnesota.[68]

---

https://www.apnews.com/article/immigration-enforcement-ice-noem-minnesota-somali-db661df6de1131a034da2bda4bb3d817.

[64] Trevor Hughes, *Immigration enforcement ramp-up has only just begun, VP Vance promises*, USA Today (Jan. 8, 2026), https://www.usatoday.com/story/news/nation/2026/01/08/jd-vance-promises-aggressive-immigration-enforcement/88086884007.

[65] Hamed Aleaziz & Madeleine Ngo, *Trump Officials Are Sending 1,000 More Immigration Officers to Minnesota*, N.Y. Times (Jan. 12, 2026), https://www.nytimes.com/2026/01/12/us/politics/border-patrol-minnesota-surge.html.

[66] Donald J. Trump (@realDonaldTrump), Truth (Jan. 13, 2026, at 8:40 AM), https://truthsocial.com/@realDonaldTrump/posts/115888070937502023.

[67] Jeff Hargarten & Jake Steinberg, *Homeland Security presence in Minnesota dwarfs Twin Cities' largest police forces*, The Minn. Star Trib. (Jan. 13, 2026), https://www.startribune.com/how-ice-numbers-compare-to-twin-cities-largest-police-forces/601562617.

[68] *Id.*

158.    These patrols are targeting predominantly Somali and Latino neighborhoods in the Twin Cities such as the Lake Street corridor, a six-mile east-west thoroughfare in South Minneapolis that is known for being the home of thousands of Latino, Somali and other immigrant-owned businesses.  DHS officers have become a constant presence there. Plaintiffs live, work, and visit family and friends in these neighborhoods.  Plaintiffs are likely to encounter these agents repeatedly, as they have in the past.  Because Defendants stop without reasonable suspicion as to immigration status, target Somali and Latino individuals for stops, and arrest indiscriminately, Plaintiffs are all but guaranteed to be detained and subjected to Defendants' policies again, especially as Defendants multiply their presence and the intensity of their operations.

## CLASS ACTION ALLEGATIONS

159.    Plaintiffs Mr. Hussen, and Mr. Eydarus, and Javier Doe bring this action on behalf of themselves and all others who are similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2).

160.    Mr. Hussen, Mr. Eydarus, and Javier Doe seek to represent the following classes:

**Stops Class:** All persons who, since December 1, 2025, have been or will be subject to an investigatory stop for immigration purposes by DHS in Minnesota.

**Equal Protection Subclass:** All persons who, since December 1, 2025, have been or will be stopped for immigration purposes by DHS in Minnesota pursuant to a policy of stopping Somali or Latino people based on race or ethnicity.

**Warrantless Arrests Class:** All persons who, since December 1, 2025, have been or will be subject to a warrantless arrest for immigration purposes by DHS in Minnesota.

    **Removability Subclass:** All persons who, since December 1, 2025, have been or will be subject to a warrantless arrest for immigration purposes by DHS in Minnesota without probable cause that the person is a non-citizen who is subject to removal from the United States.

    **Flight Risk Subclass:** All persons who, since December 1, 2025, have been or will be subject to a warrantless arrest for immigration purposes by DHS in Minnesota without probable cause that the person is likely to escape before a warrant can be obtained.

161. Plaintiffs reserve the right to amend or modify the class and subclass definitions as appropriate.

162. The proposed class and subclasses satisfy the prerequisites of Rule 23(a) and 23(b)(2). They easily satisfy the numerosity requirement of Rule 23(a)(1). Although the number of individuals who have been or will be subject to unlawful stops and arrests by Defendants under these policies is not known with precision, class members number in the thousands. Since December 1, 2025, federal agents have arrested more than 1,500 people in Minnesota.[69] The vast majority of these stops and arrests have been carried out without

---

[69] Homeland Security, *DHS Highlights Worst of Worst Criminal Illegal Aliens Including Rapists, Pedophiles, and Drug Traffickers Arrested Yesterday in Minneapolis*, U.S. Dep't of Homeland Security (Jan. 8, 2026),

a warrant. And Defendants are indiscriminately stopping and arresting people throughout this District without reasonable suspicion or probable cause, as illustrated by the numerous stories of Plaintiffs and witnesses in this case. There are more than 76,000 Somali Minnesotans and more than 388,000 Latino Minnesotans.

163. The proposed class and subclasses satisfy the commonality requirement of Rule 23(a)(2) as they share common issues of fact or law, including but not limited to whether Defendants' policies and practices violate the Fourth Amendment and 8 U.S.C. § 1357(a)(2).

164. The proposed classes also satisfy the typicality requirement of Rule 23(a)(3). The claims of the proposed class representatives are typical of the classes because they were stopped without reasonable suspicion, arrested without a warrant and without probable cause of removability or flight risk, and they were targeted based on their ethnicity.

165. Plaintiffs are adequate class representatives, as required by Rule 23(a)(4), as they have no conflict of interest with the putative class members, will fairly and adequately protect the interests of the class, and understand and accept their responsibilities as class representatives. They have also retained qualified counsel with significant experience.

166. The proposed classes satisfy the requirements of Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the class, as they have policies

---

https://www.dhs.gov/news/2026/01/08/dhs-highlights-worst-worst-criminal-illegal-aliens-including-rapists-pedophiles-and.

and practices to which everyone in the class and subclasses are subject. Final injunctive or declaratory relief therefore is appropriate to the class and subclasses as a whole.

167. Counsel for Plaintiffs have extensive experience litigating class actions and cases involving civil and constitutional rights generally, as well as the rights of noncitizens, and are therefore qualified to be certified as class counsel pursuant to Rule 23(g).

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of the Fourth Amendment: Investigative Stops without Reasonable Suspicion

168. Plaintiffs and the Stops Class restate and reallege all previous paragraphs of this Complaint.

169. Under the Fourth Amendment to the U.S. Constitution, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV.

170. Officers are able to briefly stop individuals to "make[] reasonable inquiries" based on "unusual conduct which leads [the officer] reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous," and only then is such a stop reasonable. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). But officers cannot make stops based on ascribing suspicion generally to individuals of a certain ethnicity. *Lopez-Fernandez v. Holder*, 735 F.3d 1043,

1047 (8th Cir. 2013); *Buffkins v. City of Omaha*, 922 F.2d 465, 470 (8th Cir. 1990); *United States v. Clay*, 640 F.2d 157, 159-60 (8th Cir. 1981).

171.    In the manner described more fully above, Defendants violated and are violating Plaintiffs' and class members' rights to be free from unreasonable seizure, specifically stops and arrests without probable cause and unreasonable termination of their freedom of movement.

172.    Plaintiffs and class members reasonably fear further violation of the Fourth Amendment as they go about their normal daily lives in the Twin Cities.

173.    This Court has inherent equitable authority to enjoin violations of the Constitution by federal officers.  *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

174.    This Court also has authority under the Administrative Procedure Act to "hold unlawful and set aside" such agency action.  5 U.S.C. § 706(2).

175.    As a result of Defendants' unlawful policy and practice, Plaintiffs and class members are facing irreparable harm and require injunctive relief, declaratory relief, and/or vacatur of the policy to prevent continued and future irreparable injury.

## SECOND CLAIM FOR RELIEF

### Violation of the Fourth Amendment:
### Warrantless Arrests Without Probable Cause of Removability

176.    Plaintiffs and the Warrantless Arrest Class restate and reallege all previous paragraphs of this Complaint.

177.    Except at the border and its functional equivalents, the Fourth Amendment

prohibits Defendants from arresting an individual without probable cause that the individual is in the United States in violation of an immigration law. An arrest based on "nothing more than possible removability" violates the Fourth Amendment. *Arizona v. United States*, 567 U.S. 387, 407 (2012).

178. Defendants have a policy and practice of making warrantless arrests in the Twin Cities without probable cause of removability.

179. Defendants' policy and practice of arresting individuals without regard to probable cause of removability violates the Fourth Amendment to the United States Constitution.

180. This Court has inherent equitable authority to enjoin violations of federal law and the Constitution by federal officers. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

181. This Court also has authority under the Administrative Procedure Act to "hold unlawful and set aside" such agency action. 5 U.S.C. § 706(2).

182. As a result of Defendants' unlawful policy and practice, Plaintiffs and class members are facing irreparable harm and require injunctive relief, declaratory relief, and/or vacatur of the policy to prevent continued and future irreparable injury.

### THIRD CLAIM FOR RELIEF

**Violation of 8 U.S.C. § 1357(a)(2) and the Administrative Procedure Act,
5 U.S.C. § 706:
Warrantless Arrests Without Probable Cause of Removability**

183. Plaintiffs and the Warrantless Arrest Class restate and reallege all previous paragraphs of this Complaint.

184.     Under 8 U.S.C. § 1357(a)(2), an agent may make an immigration arrest without a warrant only if they have "reason to believe" that (1) the individual "is in the United States in violation of any [immigration] law or regulation[,]" and (2) the individual "is likely to escape before a warrant can be obtained for his arrest[.]" *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010).    "[R]eason to believe" means "constitutionally required probable cause." *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010).  Probable cause "must be particularized with respect to the person to be searched or seized[.]" *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

185.     Defendants have a policy and practice of making warrantless arrests in the Twin Cities without probable cause of removability, as required by 8 U.S.C. § 1357(a)(2).

186.     This Court has inherent equitable authority to enjoin violations of federal law and the Constitution by federal officers.  *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

187.     This policy and practice is a final agency action that is "arbitrary, capricious, . . . or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(A), (C).  This Court also has authority under the Administrative Procedure Act to "hold unlawful and set aside" such agency action. 5 U.S.C. § 706(2).

188.     As a result of Defendants' unlawful policy and practice, Plaintiffs and class members are facing irreparable harm and require injunctive relief, declaratory relief, and/or vacatur of the policy to prevent continued and future irreparable injury.

## FOURTH CLAIM FOR RELIEF

**Violation of 8 U.S.C. § 1357(a)(2) and the Administrative Procedure Act,
5 U.S.C. § 706:
Warrantless Arrests Without Probable Cause of Flight Risk**

189.   Plaintiffs and the Warrantless Arrest Class restate and reallege all previous paragraphs of this Complaint.

190.   Under 8 U.S.C. § 1357(a)(2), an agent may make an immigration arrest without a warrant only if they have "reason to believe" that (1) the individual "is in the United States in violation of any [immigration] law or regulation[,]" and (2) the individual "is likely to escape before a warrant can be obtained for his arrest[.]" *Quintana*, 623 F.3d at 1239.   "[R]eason to believe" means "constitutionally required probable cause." *Quintana*, 623 F.3d at 1239.   Probable cause "must be particularized with respect to the person to be searched or seized[.]" *Pringle*, 540 U.S. at 371.

191.   Defendants have a policy and practice of making warrantless arrests in the Twin Cities without probable cause of flight risk as required by 8 U.S.C. § 1357(a)(2).

192.   This Court has inherent equitable authority to enjoin violations of federal law by federal officers.  *See Armstrong*, 575 U.S. at 326.

193.   Defendants' policy and practice is a final agency action that is "arbitrary, capricious, . . . or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations[.]"  5 U.S.C. § 706(2)(A), (C).  This Court also has authority under the Administrative Procedure Act to "hold unlawful and set aside" such agency action.  5 U.S.C. § 706(2).

194.   As a result of Defendants' unlawful policy and practice, Plaintiffs and class

members are facing irreparable harm and require injunctive relief, declaratory relief, and/or vacatur of Defendants' unlawful policy to prevent continued and future irreparable injury.

## FIFTH CLAIM FOR RELIEF

**Violation of 8 C.F.R. § 287.8(c)(2)(ii), 5 U.S.C. § 706, and the *Accardi* doctrine: Warrantless Arrests Without Individualized Assessment of Flight Risk**

195.    Plaintiffs and the Warrantless Arrest Class restate and reallege all previous paragraphs of this Complaint.

196.    Under 8 C.F.R. § 287.8(c)(2)(ii), "[a] warrant of arrest shall be obtained [for an arrest] except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained." *Quintana*, 623 F.3d at 1239. "[R]eason to believe" means "constitutionally required probable cause." *Quintana*, 623 F.3d at 1239.  Probable cause "must be particularized with respect to the person to be searched or seized[.]" *Pringle*, 540 U.S. at 371.

197.    Defendants have a policy and practice of making warrantless arrests in the Twin Cities without probable cause of flight risk as required by 8 C.F.R. § 287.8(c)(2)(ii).

198.    This Court has inherent equitable authority to enjoin violations of federal law and regulations by federal officers. *See Armstrong*, 575 U.S. at 326.

199.    This Court also has authority under the Administrative Procedure Act to "hold unlawful and set aside" such agency action.  5 U.S.C. § 706(2).

200.    Defendants' policy and practice is a final agency action that is "arbitrary, capricious, . . . or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(A), (C), and violates the

elementary principle of administrative law that agencies are required to follow their own regulations. *See Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). This Court also has authority under the Administrative Procedure Act to "hold unlawful and set aside" such agency action. 5 U.S.C. § 706(2).

201.    As a result of Defendants' unlawful policy and practice, Plaintiffs and class members are facing irreparable harm and require vacatur of Defendants' unlawful policy, injunctive relief, and/or declaratory relief to prevent continued and future irreparable injury.

## SIXTH CLAIM FOR RELIEF

### Violation of the Equal Protection Component of the Fifth Amendment (U.S. Const. amend. V): Discrimination Based on Ethnicity

202.    Plaintiffs and the Equal Protection Subclass restate and reallege all previous paragraphs of this Complaint.

203.    The Fifth Amendment's Due Process Clause embodies an equal protection guarantee. *Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954). Government action motivated by animus based on race, ethnicity, national origin, or religion is unconstitutional. *See Romer v. Evans*, 517 U.S. 620, 632 (1996).

204.    A plaintiff prevails on an Equal Protection claim by demonstrating, through direct or circumstantial evidence, that the government's conduct was motivated, at least in part, by discriminatory intent. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

205.    Defendants have adopted and implemented a policy and practice of conducting stops and arrests targeted at individuals in the Twin Cities area—including Plaintiffs—based on their perceived ethnicity as Somali or Latino.

206.    Defendants' adoption and implementation of the policy and practice are motivated by discriminatory animus toward Somali and Latino people.

207.    Defendants' policy and practice has the effect of unconstitutionally discriminating against Somali and Latino people.  Defendants treat individuals they perceive to be Somali or Latino differently by singling them out for investigatory immigration stops, subjecting them to restraint on their liberty and in many cases even greater harms—physical harm from use of excessive force and further restraint on liberty from arrest.

208.    By design, Defendants' policy and practice sweeps in large numbers of U.S. citizens and individuals with immigration status.

209.    Defendants' policy and practice is impermissible under the Fifth Amendment's equal protection guarantee, which requires that all people be treated equally under the law without regard for their race, ethnicity, or national origin.

210.    As a direct result of Defendants' unconstitutional conduct, Plaintiffs and members of the proposed class have suffered and continue to suffer the ongoing threat of discriminatory seizures on the basis of race, ethnicity, and national origin.

211.    This requires injunctive relief, declaratory relief, and/or vacatur of Defendants' unlawful policy to prevent continued and future irreparable injury.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.  Certify the Stops Class, Warrantless Arrest Class, Equal Protection Subclass, Removability Subclass, and Flight Risk Subclass as described above, and appoint Mr. Hussein, Mr. Eydarus, and Javier Doe as class representatives;

B.  Appoint undersigned counsel as class counsel;

C.  Declare that Defendants' policy and practice of stopping Somali and Latino individuals to investigate immigration status without reasonable suspicion that the individual is in the United States in violation of law or regulation regulating the admission, exclusion, expulsion, or removal of noncitizens violates the Fourth Amendment to the U.S. Constitution;

D.  Declare that Defendants' policy and practice of making warrantless immigration arrests without a pre-arrest, individualized determination of probable cause that the person being arrested is in the United States in violation of law or regulation regulating the admission, exclusion, expulsion, or removal of noncitizens violates 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(ii), and the Fourth Amendment to the U.S. Constitution;

E.  Declare that Defendants' policy and practice of making warrantless immigration arrests without a pre-arrest, individualized determination of probable cause that the person being arrested is likely to escape before a warrant can be obtained violates 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii);

F. Declare that Defendants' policy and practice of stopping, interrogating, detaining, holding, and arresting individuals based on a belief that such persons are Somali or Latino violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution;

G. With respect to the Stops Class, enjoin Defendants from stopping individuals without a valid individualized determination by the agent making the stop of reasonable suspicion that the person being stopped has committed an offense against the United States in the presence of the agent making the stop, a felony cognizable under the laws of the United States, or a violation of law or regulation regulating the admission, exclusion, expulsion, or removal of aliens, as required by 8 U.S.C. § 1357(b)(2), 8 U.S.C. § 1357(a)(5), 8 C.F.R. § 287.8(b)(2), and/or the Fourth Amendment to the U.S. Constitution;

H. With respect to the Warrantless Arrest Class and Removability Subclass, enjoin Defendants from enforcing their policy and practice of making warrantless civil immigration arrests in the State of Minnesota without a valid pre-arrest individualized determination by the arresting agent of probable cause that the person being arrested is in the United States in violation of law or regulation regulating the admission, exclusion, expulsion, or removal of aliens as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii);

I. With respect to the Warrantless Arrest Class and Flight Risk Subclass, enjoin Defendants from enforcing their policy and practice of making warrantless civil immigration arrests in the State of Minnesota without a valid pre-arrest

individualized determination by the arresting agent of probable cause that the

person being arrested is likely to escape before a warrant can be obtained, as

required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii);

J. With respect to the Equal Protection Subclass, enjoin Defendants from stopping,

interrogating, detaining, holding, or arresting individuals based on a belief that

such persons are Somali or Latino, as prohibited by the Due Process Clause of the

Fifth Amendment to the U.S. Constitution;

K. Vacate and set aside Defendants' policy and practice of stopping Somali and

Latino individuals to investigate immigration status without reasonable

suspicion that the individual is in the United States in violation of law or

regulation regulating the admission, exclusion, expulsion, or removal

of noncitizens violates the Fourth Amendment to the U.S. Constitution;

L. Vacate and set aside Defendants' policy and practice of making warrantless

immigration arrests without a valid pre-arrest, individualized determination of

probable cause that the person being arrested is in the United States in violation of

law or regulation regulating the admission, exclusion, expulsion, or removal of

noncitizens violates 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(ii), and the

Fourth Amendment to the U.S. Constitution;

M. Vacate and set aside Defendants' policy and practice of making warrantless

immigration arrests without a valid pre-arrest, individualized determination of

probable cause that the person being arrested is likely to escape before a warrant

can be obtained violates 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii);

N. Order Defendants, their subordinates, agents, employees, and all others acting in concert with them to expunge, subject to the documentation and production requirement set forth above, at a time and in a manner agreed upon with Plaintiffs, all records collected and maintained about Plaintiffs and class members from their unlawful stops and arrests, including any derivative information;

O. Award Plaintiffs their costs and reasonable attorneys' fees pursuant to 28 U.S.C. § 2412 and any other applicable source of law; and

P. Award such further relief as the Court deems appropriate.

Dated:  January 15, 2026                    s/ *Kshithij Shrinath*

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION IMMIGRANTS' RIGHTS PROJECT**

Spencer Amdur*
Oscar Sarabia Roman*
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
samdur@aclu.org
osarabia@aclu.org

Kathryn Huddleston*
Lucia Goin*
915 15th Street NW, 7th Floor
Washington, D.C. 20005
T: (212) 549-2500
khuddleston@aclu.org
lgoin@aclu.org

Omar C. Jadwat*
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
ojadwat@aclu.org

**COVINGTON & BURLING, LLP**

Robert Fram*
415 Mission Street, Suite 5400
San Francisco, CA 94105
rfram@cov.com
415-591-7025

Gregg Levy*
Paul Killebrew*
850 Tenth Street, NW
Washington, DC 20001
glevy@cov.com
pkillebrew@cov.com

**AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA**

Teresa Nelson (#269736)
Catherine Ahlin-Halverson (#350473)
Alicia Granse (#400771)
Benjamin Casper (#0276145)
P.O. Box 14720
Minneapolis, MN 55414
Tel: (651) 529-1692
tnelson@aclu-mn.org
cahlin@aclu-mn.org
agranse@aclu-mn.org
bcasper@aclu-mn.org

Ian Bratlie (#319454)
424 N. Riverfront Dr. No. 34
Mankato, MN 56001
Tel: (507) 995-6575
ibratlie@aclu-mn.org

**GREENE ESPEL PLLP**

Amran A. Farah, Reg. No. 0395354
Aaron P. Knoll, Reg. No. 0393066
Benjamin Larson, Reg. No. 0504146
Michelle E. Morrow, Reg. No. 0504419
Nicholas Scheiner, Reg. No. 0402470
Kshithij Shrinath, Reg. No. 0505164
X. Kevin Zhao, Reg. No. 0391302
222 S. Ninth Street, Suite 2200
Minneapolis, MN  55402
afarah@greeneespel.com
aknoll@greeneespel.com
blarson@greeneespel.com
mmorrow@greeneespel.com
nscheiner@greeneespel.com
kshrinath@greeneespel.com
kzhao@greeneespel.com
(612) 373-0830

Bree Peilen*
30 Hudson Yards
New York, NY 10001
bpeilen@cov.com

*Attorneys for Plaintiffs Hussen, Eydarus, and Javier Doe*

*Attorneys for Plaintiffs Hussen, Eydarus, and Javier Doe*

**ROBINS KAPLAN, LLP**

Raoul Shah, Reg. No. 0399117
Bahram Samie, Reg. No. 0392645
Ellen Levish, Reg. No. 0400878
Stacey Slaughter, Reg. No. 0296971
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
rshah@robinskaplan.com
bsamie@robinskaplan.com
elevish@robinskaplan.com
sslaughter@robinskaplan.com
(612) 349-8500

*Attorneys for Plaintiffs Hussen & Javier Doe*

*\* Pro Hac Vice motions forthcoming*