*State of Minnesota et al. v. Noem et al.*
No. 26-CV-00190-KMM-DJF (D. Minn.)


Amicus Curiae Brief of the Advocates for Human Rights

**Exhibit No. 38**

United Nations



**General Assembly**

**A**/78/254

Distr.: General
28 July 2023

Original: English

---

**Seventy-eighth session**
Item 73 (b) of the provisional agenda*
**Promotion and protection of human rights: human
rights questions, including alternative approaches for
improving the effective enjoyment of human rights and
fundamental freedoms**

## Extrajudicial, summary or arbitrary executions**

### Note by the Secretary-General

The Secretary-General has the honour to transmit to the General Assembly the
report of the Special Rapporteur on extrajudicial, summary or arbitrary executions,
Morris Tidball-Binz, submitted in accordance with Assembly resolution 77/218.

---

\* A/78/150.

\*\* The present report was submitted after the deadline so as to include the most recent
information.

---

23-14762 (E)    210823



Please recycle 

A/78/254

## Report of the Special Rapporteur on extrajudicial, summary or arbitrary executions, Morris Tidball-Binz

*Summary*

Femicide is a tragedy of pandemic proportions: every year, tens of thousands of women and girls are killed worldwide because of their gender. In the present report, the Special Rapporteur on extrajudicial, summary or arbitrary executions, Morris Tidball-Binz, focuses on an investigation of femicide as a means of identifying, seeking accountability for and helping to prevent this global scourge. The use of a gendered lens and specialized protocols in investigating gender-based killings of women and girls enables these deaths to be identified, documented and counted as femicides to help to ensure truth, justice and reparations for victims and their families, and ensures more accurate data collection and analysis to inform investigations and strengthen prevention.

23-14762

## I. Introduction

1.     Gender-related killings constitute an extreme and widespread manifestation of existing forms of gender-based violence. In the present report, the Special Rapporteur on extrajudicial, summary or arbitrary executions, Morris Tidball-Binz, retraces standards and highlights best practices concerning the investigation of femicide as a means of addressing impunity, providing justice to victims and their families and contributing to prevention.

2.     The Special Rapporteur is grateful to the States, civil society organizations and other stakeholders that responded to his calls for input. The replies received informed the present report.

## II. Activities of the Special Rapporteur

3.     The present report covers the main activities undertaken by the Special Rapporteur from April to July 2023, including an official country visit to Honduras. Activities undertaken from April 2022 to March 2023 are included in the Special Rapporteur's report to the Human Rights Council (A/HRC/53/29).

### A. Communications

4.     During the period under review, the Special Rapporteur issued, alone or jointly with other special procedures mandate holders, 59 communications to States and non-State actors, as well as 19 press statements.

### B. Meetings and other activities

5.     From 21 May to 2 June 2023, the Special Rapporteur carried out an official country visit to Honduras. He examined measures to investigate potentially unlawful deaths, including those resulting from institutional violence, deaths in custody and gender-based killings.

6.     From 3 to 7 July 2023, the Special Rapporteur, with the United Nations Joint Programme on Human Rights in the Philippines, the Department of Justice and the University of the Philippines College of Medicine, organized the first national training on the Revised United Nations Manual on the Effective Prevention and Investigation of Extra-legal, Arbitrary and Summary Executions (2016) (Minnesota Protocol).[1] The Special Rapporteur reiterates the availability of his mandate to provide technical assistance.

7.     The Special Rapporteur welcomes the adoption by consensus of Human Rights Council resolution 53/4 on 12 July 2023, which extends the mandate for three years and refers to the revised version of the Minnesota Protocol.

---

[1] *The Minnesota Protocol on the Investigation of Potentially Unlawful Death (2016): The Revised United Nations Manual on the Effective Prevention and Investigation of Extra-legal, Arbitrary and Summary Executions* (United Nations publication, 2017).

## III.  The investigation and documentation of gender-based killings of women and girls

8.      Femicide, the intentional murder of women and girls because they are female, is an act of gender-based violence and a violation of the right to life and of many other rights (see A/76/264, para. 42). Every day, hundreds of women and girls are killed worldwide owing to their gender. Perpetrators are most commonly partners or ex-partners, and are generally not subjected to punishment. The present report builds on the work of special procedures on femicide, including Special Rapporteurs Agnes Callamard (A/HRC/35/23), Rashida Manjoo (A/HRC/20/16) and Dubravka Šimonović (A/71/398), with a focus on investigation.

9.      Recommendations for the investigation of femicide are consistent: States must enact legal and administrative measures to uphold the rights of women and girls, including those whose gender expression or identity is female, applying a gender perspective in complementarity with an intersectional approach. Impunity for femicides must end: authorities must exercise due diligence, taking every possible step to investigate and prosecute femicides and provide effective support, remedies and reparations to victims and their families. Local beliefs, customs, traditions or religions must not be invoked to limit the rights of women and girls or as a defence against a charge of femicide. Training for police, prosecutors, forensic experts and the judiciary must be instituted and include content about gender stereotyping, gendered causes and impacts of violence and locally prevalent forms of femicides. Disaggregated data concerning femicides should be collected and analysed.

10.     In the present report, "women and girls" include those whose gender expression or identity is female. Attention must always be paid to intersecting identities, characteristics and vulnerabilities. Persons of any sex or gender are capable of committing femicides.

11.     A disproportionate number of examples are from Latin America, where many States are actively addressing high rates of femicide, including through measures contained in the Latin American Model Protocol for the Investigation of Gender-related Killings of Women (Latin American Model Protocol). The Secretary-General has recommended that States adapt this instrument and train justice officials on its application (see A/70/93).

12.     The Special Rapporteur would like to thank the Global Research Initiative on Forensic Medicine and Human Rights and Eleos Justice, Monash University; the Graduate School of Business and Law, RMIT University; and the Global Human Rights Clinic, University of Chicago Law School for their invaluable academic support for the preparation of the present report. He also thanks those who were interviewed and responded to the call for input.

### A.  Due diligence obligations of States

13.     The duty to investigate an unlawful death has assumed customary status in international law. The requirement for thorough investigation of all potentially unlawful deaths, including femicides, has been broadly recognized in authoritative international documents and case law. The 1994 Declaration on the Elimination of Violence against Women requires States to exercise due diligence to prevent, investigate and punish acts of violence against women perpetrated by the State or private persons. In 2010, the General Assembly, in its resolution 65/228, stressed that States must exercise due diligence to prevent and investigate acts of violence against women and punish the perpetrators, eliminate impunity and provide protection to the victims.

14.    United Nations treaty bodies have elucidated the due diligence obligations of States in response to potential femicides. The Human Rights Committee has affirmed that the right to life obliges States to investigate and prosecute the perpetrators of unlawful deprivations of life. Death investigations must be independent, impartial, prompt, thorough, effective, credible and transparent. Next of kin should be informed of relevant details of the investigation, be allowed to present new evidence and be afforded legal standing. Steps must be taken to protect them, witnesses and others involved in the investigation. Where a violation of the right to life has occurred, full reparation must be provided. Findings and recommendations should be made public, with information redacted made only as required for the public interest and protection of affected individuals (see CCPR/C/GC/36, para. 27).

15.    The Committee on the Elimination of Discrimination against Women has confirmed that States are responsible for investigating, prosecuting, applying sanctions and providing reparations in all cases of gender-based violence against women.[2] This obligation applies to actions, negligence and omissions by State agents[3] and non-State actors, including corporations operating extraterritorially.[4] The Committee emphasizes that due diligence obligations may be breached as a result of insufficient efforts to eliminate judicial gender stereotyping[5] and of a failure to train criminal justice system actors[6] to thoroughly investigate reports of violence[7] and protect victims from violence.[8]

16.    At the regional level, the Protocol to the African Charter on Human and Peoples' Rights on the Rights of Women in Africa (Maputo Protocol) explicitly recognizes women's right to life and mandates that States take appropriate and effective measures to punish perpetrators and provide reparations to victims. The Inter-American Convention on the Prevention, Punishment and Eradication of Violence against Women (Convention of Belém do Pará) recognizes women's right to life and obliges States to act with due diligence to investigate and impose penalties for violence against women.

17.    The Inter-American Court of Human Rights has repeatedly upheld this due diligence standard,[9] confirming that "State authorities … should initiate, ex officio and without delay, a serious, impartial and effective investigation using all available legal means, aimed at determining the truth and the pursuit, capture, prosecution and eventual punishment of all the perpetrators of the facts, especially when public officials are or may be involved".[10] The Inter-American Court has affirmed that article 1 of the American Convention on Human Rights obliges States to investigate violations of all Convention rights, including the right to life.[11]

---

[2] See CEDAW/C/GC/35, para. 23.

[3] Ibid.

[4] Ibid., para. 24 (b).

[5] *Vertido v. Philippines* (CEDAW/C/46/D/18/2008), para. 8.4, cited in European Institute for Gender Equality, *Improving Legal Responses to Counter Femicide in the European Union: Perspectives from Victims and Professionals* (Vilnius, 2023), p. 14.

[6] *Fatma Yildirim v. Austria* (CEDAW/C/39/D/6/2005), para. 12.3, cited in *Improving Legal Responses to Counter Femicide*, p. 14.

[7] *Goekce v. Austria* (CEDAW/C/39/D/5/2005), para. 12.3, cited in *Improving Legal Responses to Counter Femicide*, p. 14.

[8] *A. T. v. Hungary* (A/60/38 (Part I), annex III) para. 9.3, cited in *Improving Legal Responses to Counter Femicide*, p. 14.

[9] See *Improving Legal Responses to Counter Femicide*, annex 3, for a full list of relevant case law.

[10] Inter-American Court of Human Rights, *González et al. v. Mexico*, judgment of 16 November 2009, Series C, No. 205, para. 290.

[11] Ibid., para. 287.

A/78/254

18.   The duty to investigate is "an obligation of means and not of results";[12] accordingly, a cursory investigation will fall short.[13] Conducting investigations in a gender-discriminatory manner has been found to constitute a rights violation.[14] The Inter-American Court also affirmed that State responsibility may be engaged for acts violating Convention rights which, though not directly imputable to the State, were not sufficiently investigated or punished.[15]

19.   The European Court of Human Rights affirmed a corresponding obligation to investigate breaches of the right to life. Investigations must be prompt, expeditious and "accessible to the victim's family to the extent necessary to safeguard their legitimate interests".[16] Failure to seek out witnesses constitutes a failure to conduct a proper investigation.[17] The obligation applies irrespective of whether femicide is perpetrated by the State or a private individual,[18] and failure to discharge it may amount to a rights violation.[19] The Council of Europe Convention on Preventing and Combating Violence against Women and Domestic Violence (Istanbul Convention) outlines the same obligations.[20] Here the obligation flows from the right of women to be free from violence in both public and private spheres[21] and to be free from gender-based discrimination,[22] both of which extend to gender-related killing.[23]

### Best practice

20.   The Convention of Belém do Pará established a follow-up mechanism comprising a committee of experts that drafted a model law outlining requirements for femicide investigations.[24] The intention is to, inter alia, strengthen multisectoral acts of "investigation, prosecution, judgment, effective punishment, compliance with the law and comprehensive reparation". Guiding principles include the duty to act with strict, comprehensive and effective due diligence and to respect due process. Independence, court impartiality, non-discrimination, non-revictimization and dignity are also included.

21.   The gender perspective and ways to eliminate de facto and de jure obstacles producing impunity are emphasized, including through evidentiary standards free of gender stereotypes and prejudices, the treatment of personal data and qualified personnel. The responsibilities of the investigating body are established, including an

---

[12] Ibid., para. 289.

[13] Ibid. paras. 296–389.

[14] Inter-American Court of Human Rights, *Barbosa de Souza and others v. Brazil*, judgment of 7 September 2021, cited in *Improving Legal Responses to Counter Femicide*, pp. 16–17.

[15] *González et al. v. Mexico*, para. 292, citing European Court of Human Rights, *Ergi v. Turkey*, judgement of 28 July 1998, paras. 85–86; *Akkoç v. Turkey*, judgment of 10 October 2000, paras. 77–99; and *Kiliç v. Turkey*, judgment of 28 March 2000, paras. 78–83. See also *Improving Legal Responses to Counter Femicide*, p. 17, fn. 20.

[16] European Court of Human Rights, *Tërshana v. Albania*, application No. 48756/14, judgment of 4 August 2020, para. 154.

[17] European Court of Human Rights, *Aydin v. Turkey*, judgment of 25 September 1997, para. 104.

[18] European Court of Human Rights, *M.C. v. Bulgaria*, judgment of 4 December 2003, para. 151, cited in *Improving Legal Responses to Counter Femicide*, p. 17.

[19] See, e.g., *Aydin v. Turkey*, para. 109.

[20] Investigations and judicial proceedings must be carried out expeditiously (art. 49 (1)) and irrespective of whether the perpetrator is a State or non-State actor (art. 5 (2)).

[21] Art. 4 (1).

[22] Art. 4 (2).

[23] The European Court of Human Rights also confirmed that femicide constitutes a violation of the European Convention on Human Rights prohibition on discrimination in *Opuz v. Turkey*, judgment of 9 June 2009, cited in *Improving Legal Responses to Counter Femicide*, p. 17.

[24] Follow-up Mechanism, Convention of Belém do Pará, "Inter-American Model Law to Prevent, Punish and Eradicate the Violent Death of Women (Femicide-Feminicide)", explanatory memorandum (MESECVI/CEVI/doc.248/18.rev1 2018), 26 November 2018.

immediate exhaustive search for and identification of the victim or her remains; consideration of all violent deaths of women as probable femicides; and assessment of the context of the offence and the perpetrator's prior violence. Children of the victim are included as indirect victims whose best interests must be considered throughout the legal process and in the provision of reparations.

22.  In the landmark case of Mariana Lima, the Mexican Supreme Court of Justice also set standards for femicide investigations, as well as the right to truth as a form of reparation.[25] In June 2010, Mariana Lima Buendía, a 29-year-old law intern, had been murdered by her husband who, as a police officer in the State Attorney's office, concealed evidence, provided false statements and swayed the investigation towards a finding of suicide by hanging.

23.  The investigation was riddled with deficiencies. The husband had been involved in securing and analysing the death scene, which had not been secured. Crucial evidence had not been collected and records were incomplete, omitting critical details such as who had removed the body. The autopsy was unsatisfactory, concluding that Lima had died of suffocation.

24.  In separate statements, Lima's mother, sister and best friend described gross violence against Lima by her husband. Her sister noted numerous injuries on Lima's dead body. In September 2011, the prosecutor's office closed the case. Owing to the persistence of Lima's mother, in June 2013, another investigation took place, with the prosecutor's office concluding that grievances were unfounded.

25.  In 2015 a remedy was finally provided by the Mexican Supreme Court in an "amparo" action that protects individuals from acts or omissions by authorities that violate constitutionally guaranteed rights. The Court reiterated that, in cases of violence against women, authorities must adopt comprehensive measures, including an adequate legal framework, effectively apply the framework and conduct thorough responses to complaints.

26.  The Court described minimum requirements for femicide investigations, frequently citing the Latin American Model Protocol. It itemizes the multitudinous flaws in Lima's death investigation, finding that it was conducted with the intention of hiding facts, violating the rights to due diligence and access to justice. It ordered that a new investigation into Lima's death must apply a gender perspective, investigate and punish officers who had failed to fulfil their duties and train all officers involved in the death investigation.

27.  In March 2023, as a result of the new investigation by competent authorities, Lima's husband was sentenced to 70 years in prison.

## B.  The chasm between theory and practice

28.  The extensive research conducted for the present report indicates that, despite advances in norms and standards, femicide investigations remain deficient worldwide. Delays, inactivity, negligence, incompetence and the haphazard collection, mismanagement and disregard for contextual and physical evidence, coupled with over-reliance on testimonial accounts and disrespect for victims, commonly characterize investigations of violence against women. Mistaken or

---

[25] Mexico City, First Chamber of the Supreme Court, amparo in review 554/2013 (derived from the application to exercise authority to assert jurisdiction), Irinea Buendía Cortez (complainant), judgment of 25 March 2015.

deliberate mischaracterization of femicides as suicides or accidental deaths often serve as an excuse to close investigations.[26]

29.    Professionals with investigation responsibilities, including forensic doctors, pathologists and forensic scientists, often fail to incorporate a gender perspective into their investigations, which undermines their ability to correctly identify and reliably document gender-based killings. Poorly resourced investigative staff may lack necessary training, be insufficient in number and be subject to rapid turnover. Poor coordination among justice system entities, which can further undermine the capacity to effectively investigate gender-based killings, is commonplace.

30.    Families of victims, especially those from poor and marginalized communities, tend to face almost insurmountable hurdles to achieving justice. This includes intimidation and retaliation by accused persons and their networks, or by justice system officers who sometimes force families to relocate to escape threats to their lives, although not always successfully. A lack of confidence in the justice system, limited access to legal counsel and fear of retaliation, among other factors, discourage families from reporting cases.

31.    At any stage of an investigation and subsequent legal processes, police, prosecutors and judges can be subject to bribery, threats and active intimidation for exposing gender-based violence and can even be killed for enforcing the law. Political interference may also occur. Witnesses may be bought or suffer retaliation.

32.    Criminal justice agencies are often perceived as unresponsive, corrupt or likely to turn a blind eye to retaliation against families and witnesses, thereby rendering communities mute. This silence fosters impunity, as perpetrators know that their crimes are likely to go unpunished. As a result, even the promulgation of femicide laws and gender-friendly reforms to the investigatory systems are unlikely to lead to an immediate significant drop in the number of gender-related killings.

## C.    Femicide definitions, law and investigations

33.    To facilitate the investigation of any crime, including femicide, its legal definition and the elements required to prove its existence must be clear. Jurisdictions enacting law in response to femicide have adopted different approaches. Femicide may be treated as a separate crime, or as an aggravating factor in homicides. Some only include deaths owing to intimate partner violence, with diverse definitions of intimate partner. Intimate partner violence may be defined to include those not cohabiting, such as family members, fiancés, prior intimate partners and stalkers. Femicide law may be extended to those living in the same premises, such as family members, boarders and maids. Jurisdictions might incorporate non-intimate gender-based killings, providing a selection of descriptive categories with or without a general catch-all category. The category of "induced suicide" has been adopted by a few jurisdictions, an important new concept for all forensic investigators.

*Gender-related killings excused or condoned by the State*

34.    Gender-related killings can be indirect or passive, such as deaths owing to maternal mortality; the death of girls or women from simple neglect, through starvation or ill-treatment; and deliberate acts or omissions by the State (A/HRC/20/16, para. 16). Homicides perpetrated by non-State actors may be subsequently excused by the State (such as honour killings or femicides without

---

[26] See, for example, the Latin American Model Protocol.

adequate investigation). The term "feminicide" refers to an intentional killing with gender-related motivation and with the involvement, impunity or inaction of the State.

*Homicide and femicide*

35.    There has been a general failure to integrate within the jurisprudence of the crime of homicide the realities of inequality, discrimination and systematic infliction of lethal violence on women and girls – or, in other words, the misogynist character of these murders.[27] Recognizing femicide in law heightens social awareness of gender-based killings, potentially leading to improved investigation of these crimes, more accurate data collection and analysis and policies and programmes to punish and prevent femicide.

36.    Femicide offences must be provable while ensuring the protection of fundamental criminal law principles. An analysis of femicide law shows that concepts such as "contempt for the victim's status as a woman" or "exploitation of unequal power relationships"[28] may make it difficult to determine whether a perpetrator's conduct violates the law. Prosecutors may therefore prefer to bring a charge of homicide, resulting in an undercounting of femicide cases. The authors of the analysis caution: "[t]he fact that the victim is in a vulnerable situation, or is pregnant, or the killing takes place in the presence of her children; that her corpse is displayed in a public place, do not necessarily mean that she was killed because she is a woman. The murder could have occurred based on a completely different motive. Nevertheless, these can still be considered aggravating circumstances of the criminal conduct."[29]

37.    Whether a jurisdiction relies on homicide or femicide law, law and practice must be reviewed to ensure that anachronistic features that discourage investigation and unjustly excuse perpetrators are addressed. This includes misogynistic beliefs and discriminatory defences. Data collection should contain femicide-related categorizations and personal, interpersonal and structural features related to the victim, perpetrator and context in order to enhance awareness and understanding of the crimes, improve investigatory practices and inform the development of prevention strategies and programmes.

*Femicide directly perpetrated by the State: the death penalty*

38.    The death penalty can in some cases constitute femicide (see A/HRC/35/23). Currently, an estimated 5,000 women are on death row in at least 41 countries. In the last decade, women have been executed in at least 14 countries. The legal processes governing arrest, trials and sentencing are often deeply gendered, and many capital laws are applied in ways that exacerbate prior gender discrimination and violence. For example, during capital sentencing, courts routinely ignore women's histories of gender-based violence.[30] Mandatory death penalties deny judges the discretion to consider gendered patterns of exclusion, discrimination and violence.

---

[27] Diana E.H. Russell, "The origin and importance of the term femicide" (December 2011). Available at www.dianarussell.com/origin_of_femicide.html.

[28] Alicia Deus and Diana Gonzalez, *Analysis of Femicide/Feminicide Legislation in Latin America and the Caribbean and a Proposal for a Model Law*, Follow-up Mechanism to the Belém do Pará Convention and the United Nations Entity for Gender Equality and the Empowerment of Women (UN-Women) (2018), p. 45.

[29] Ibid.

[30] Mai Sato and Sandra Babcock, eds., *Silently Silenced: State-Sanctioned Killing of Women*, Eleos Justice, Monash University and Cornell Center on the Death Penalty Worldwide (2023).

39.    The second largest group of women offenders sentenced to death are women convicted of drug offences.[31] Capital drug laws often punish women recruited from marginalized groups with intersecting vulnerabilities. Economic insecurity is a gendered phenomenon and is instrumental in pushing women to commit drug offences.[32] Other offences for which women have been sentenced to death include adultery, same-sex intimacy, political and terrorism-related offences, blasphemy, witchcraft, kidnapping and armed robbery.[33] Capital adultery laws are frequently applied in a discriminatory manner, with women more likely to be prosecuted for adultery because of deep-seated patriarchal norms.[34] Capital sorcery offences have targeted women. Capital political offences have been used to silence women's rights advocates.[35]

40.    Many women are sentenced to death using capital laws that fail to take account of gendered patterns of exclusion and discrimination. Most of the listed crimes do not reach the threshold of "the most serious crimes" and therefore per se violate international law. This raises serious doubts about whether these women should have been convicted, let alone sentenced to death.

41.    On death row, women are subject to torture, inhuman or degrading treatment. While the question of whether the death penalty per se amounts to torture remains unsettled,[36] the Special Rapporteur is convinced that the death penalty, as currently practised, is tantamount to torture (see A/77/270). The psychological torture when awaiting execution is an inherent feature of capital punishment.[37] Women await execution for a prolonged period, often in dehumanizing conditions, including solitary confinement. While many death row conditions are experienced by women and men alike, women are more likely to lose family and community support.[38] As a result, women bear the full brunt of prisons' inadequate diet, negligible health services and social isolation, with profound impacts on their physical and mental health.

## D.    Femicide investigation

42.    There is no universal specific standard for femicide investigation (see A/HRC/20/16). The Principles on the Effective Prevention and Investigation of Extra-legal, Arbitrary and Summary Executions,[39] as supplemented by the Minnesota Protocol on the Investigation of Potentially Unlawful Death, is relevant for all investigations, including femicides, but does not consider the gender dimension.

43.    While the duty to investigate is triggered when the State knows or should have known of any potentially unlawful death, the Minnesota Protocol on the Investigation of Potentially Unlawful Death makes no explicit reference to femicide as a category

---

[31] Cornell Center on the Death Penalty Worldwide, *Judged For More Than Her Crime: A Global Overview of Women Facing the Death Penalty* (September 2018).

[32] Cornell Center on the Death Penalty Worldwide, *"No One Believed Me": A Global Overview of Women Facing the Death Penalty for Drug Offenses* (September 2021), p. 20.

[33] Cornell Center, *Judged for More Than Her Crime*, pp. 11–14.

[34] Advocates for Human Rights, International Federation of Action by Christians for the Abolition of Torture, International Harm Reduction Association, & World Coalition Against the Death Penalty, *Women sentenced to death: An invisible reality* (2021).

[35] Sato and Babcock, eds., *Silently Silenced*, p. 9.

[36] See A/HRC/10/44, A/HRC/19/61/Add.4 and A/HRC/36/27.

[37] John D. Bessler, "Torture and Trauma: Why the Death Penalty Is Wrong and Should Be Strictly Prohibited by American and International Law", *Washburn Law Journal*, vol. 58 (2019), pp. 57–58.

[38] Sato and Babcock, eds., *Silently Silenced*.

[39] Economic and Social Council resolution 1989/65, annex.

of potentially unlawful death requiring a particular investigative lens, including a gender perspective. The inclusion of a section on femicide investigation in the Minnesota Protocol would reinforce the understanding of femicide as a special category of unlawful death and contribute to improving its identification, documentation and reporting.

44.    The main difference between the investigation of femicides and homicides is the identification of gender-related criminal motivation. The Minnesota Protocol requires investigations of potentially unlawful deaths to:

(a)    Identify the victim;

(b)    Recover and preserve evidentiary material, including evidence associated with the crime scene and the disposal of the body;

(c)    Identify possible witnesses and obtain statements from them;

(d)    Determine the cause, manner, location and time of death and any pattern or practice that may have brought about the death;

(e)    Distinguish between natural death, accidental death, suicide and homicide;

(f)    Identify and apprehend person(s) involved in the crime;

(g)    Bring suspected perpetrator(s) before a competent court of law;

(h)    Ensure effective participation of victims and their representatives.

45.    The Latin American Model Protocol, adopted by some States and modified according to domestic law and context in others, contemplates analysis of gender-based violence and practical guidance for femicide investigation.[40] It emphasizes steps to identify gender-related intent, namely the examination of:

(a)    Context surrounding the death;

(b)    Circumstances of the death and disposal of the body;

(c)    Nature of the relationship connecting victim and perpetrator;

(d)    History and modes of violence between victim and perpetrator;

(e)    Perpetrators' modus operandi and violations committed before and after death;

(f)    Vulnerability and risks faced by the victim when killed;

(g)    Power inequalities between victim and perpetrator.

46.    The Latin American Model Protocol also describes factors that differentiate femicide from male homicide and suggests that femicide should be understood as a systematic hate crime. According to the Protocol, an "intersectional analysis is indispensable for studying the forms of violence that might have affected the femicide victim before, during, or after the crime". Offenders should not be pathologized as jealous or passionate, nor should victim behaviour be scrutinized. Power asymmetries should be discerned.

47.    Investigators must understand patriarchal norms and how they are reflected structurally, institutionally, interpersonally and individually (see A/HRC/20/16). The actions of perpetrators "draw on cultural patterns rooted in the misogynistic ideas of

---

[40] Françoise Roth, Mariela Labozzetta and Agustina Rodríguez, "The Latin American Model protocol for the investigation of gender-related killings of women (femicide/feminicide): a partially achieved success story", in *The Routledge International Handbook of Femicide and Feminicide*, Myrna Dawson, and Saide Mobayed Vega, eds. (London and New York, Routledge, 2023), pp. 433–442.

male superiority, discrimination against women, and disrespect towards her and her life". Investigators should collect details of prior contact of the victim and her children with medical or forensic services as well as complaints to police or other support agencies by the victim, her neighbours or friends. Investigators must identify the presence or absence of contextual elements, as well their physical manifestations.

48.   Forensic investigators should in particular look for evidence indicative of femicide, such as concealment.[41] Most staged homicidal scenes involve the killing of an intimate partner.[42] Concealment might take the form of an accident, a suicide or a kidnapping by an unidentified person and later discovery of the victim's remains, possibly in an unmarked grave.

49.   The examination of the clothing and the body of the victim for physical evidence of blood, hair, fibres and, especially, semen from the perpetrator is crucial. The victim's scalp and hair must be examined for indications of mistreatment. Injuries should be swabbed for saliva to determine whether they are the result of bites. The victim's mouth and cheeks must be examined, especially when there are indications that face or neck compressions have occurred. Intra-oral injuries may be associated with fellatio, gags or other foreign bodies. "Overkill", or the use of force and injuries beyond those required to kill, and disfigurement are common features of femicides. Breasts, buttocks and pelvic organs should be assessed for injuries, and limbs for evidence of the use of restraints. If the victim is pregnant, a complete examination of the foetus and placenta must be conducted. When available, investigation modalities such as radiology, toxicology, histology and pregnancy testing should be used. Testing for sexually transmitted diseases, including HIV, should be considered.

50.   Approaches adopted to evaluating sexual assaults in living victims should, at a minimum, also apply with respect to the genitalia of potential victims of femicide, including careful assessment of the anal canal and rectum. Injuries should be recorded through body diagrams and photographs to ensure that the examination is reviewable.[43]

51.   Given the predominance of femicides among all unlawful deaths of women and girls, all potentially unlawful deaths of women should be investigated as probable femicides.

*Gender-aware leadership in femicide investigations*

52.   The insidious belief that women cause the violence perpetrated against them undermines initiatives to address femicide. Authorities at the highest level must unequivocally condemn violence against women and underlying conscious and unconscious gender bias. Leadership must inculcate the idea that the investigation of gender-based violence, including femicides, must focus "on the actions of the alleged perpetrator, not on the victim's/survivor's character, behaviour, or credibility".[44] Gender-conscious legal and policy frameworks require commitment and investment, including for robust training programmes to build knowledge and shared understanding about gender-based violence in criminal justice institutions. Respectful behaviour for all people of all sexes, sexual preferences and genders should be vigorously modelled, encouraged and rewarded to foster community trust. Internal

---

[41] Yifat Bitton and Hava Dayan, "'The perfect murder': an exploratory study of staged murder scenes and concealed femicide", *The British Journal of Criminology*, vol. 59 (September 2019).
[42] Laura Gail Pettler, *Crime Scene Staging Dynamics in Homicide Cases* (Boca Raton, CRC Press, 2016).
[43] See "Some principles of photography in relation to autopsy" in United Nations Office on Drugs and Crime (UNODC), *Forensic Autopsy: Manual for Forensic Pathologists* (August 2015).
[44] UNODC and UN-Women, *The Handbook on Gender-Responsive Police Services for Women and Girls Subject to Violence* (2021).

protocols must be reviewed, and, likely, rewritten, and their implementation regularly evaluated.

**Best practice**

53.    In 2017, Spain adopted a State pact against gender-based violence with the unanimous support of the national Government, the autonomous communities, the Spanish Federation of Municipalities and Provinces and the State Observatory on Violence against Women. To facilitate its implementation from 2018 to 2022, the Equality Committee of the lower house of Congress appointed a subcommittee that recommended 213 measures, including the raising of awareness and prevention; the coordination of institutional responses; support and protection for victims and minors; and training and statistical monitoring. Measures were adopted by all levels of government and 1 billion euros were budgeted for implementation.[45]

54.    A handbook for police on gender-based violence has been drafted by UN-Women for use in various countries around the world. Unlike many police training materials, it is targeted at middle managers. One of the authors, a senior police officer and the Executive Director of the International Association of Women Police, stated: "it became obvious to me that you can train all the first responders in the world, but if those people who manage and lead front-line staff do not understand the importance of responding effectively to violence against women … other efforts will be in vain."[46]

55.    Another example of a best practice concerns the 2021 decision by the Inter-American Court of Human Rights in the case of *Vicky Hernández et al. v. Honduras*, which set a precedent for femicide investigations and creative penalties. Hernández was a transwoman, a sex worker and an activist who supported her family financially. The lesbian, gay, bisexual, transgender and intersex (LGBTI) community in Honduras is subject to extreme violence, including by the police. The murder of Hernández occurred during curfew following the 2009 coup d'état, when streets were under the control of security forces. An autopsy concluded that she had been shot in the head and might have been subject to sexual violence. Her murder was classified as a "crime of passion". Honduras admitted the death investigation was neither competent nor timely but rejected allegations that the State was responsible for her death, that prejudice against transwomen was a causal factor or that her family was directly affected.

56.    The Court ruled that there was a context of impunity in which Hernández's rights were often breached, and quoted the United Nations High Commissioner for Human Rights, who stated that transphobic violence "constitute[s] a form of gender-based violence, driven by a desire to punish those seen as defying gender norms". It found that Hernández's characteristics had placed her "in a particularly vulnerable situation where numerous factors of discrimination converged intersectionally" that should have informed the investigation. Honduras was found to have breached numerous rights, including the rights to life and personal integrity.[47]

57.    The Court granted diverse forms of reparation, pecuniary compensation, measures of restitution, rehabilitation and satisfaction and guarantees of non-repetition. These included the publication of a summary of the judgment in national newspapers; a public act acknowledging international responsibility; and an

---

[45] Carolina Villacampa, "Spanish criminal policy and the state pact on gender violence: a critical assessment" *SN Social Sciences*, vol. 1 (May 2021).

[46] UN-Women, "Supported by UN-Women, police forces are becoming more responsive to survivors of violence", 15 July 2021. Available at www.unwomen.org/en/news/stories/2021/7/feature-police-forces-becoming-more-responsive-to-survivors-of-violence.

[47] Inter-American Court of Human Rights, *Vicky Hernández et al. v. Honduras*, judgment of 26 March, 2021. Available at https://www.corteidh.or.cr/docs/casos/articulos/seriec_422_ing.pdf.

audiovisual documentary about discrimination and violence against transwomen in Honduras. It further ruled for a permanent training programme for State law enforcement agency members; procedures for changing gender identity on formal documents and public records; a protocol for criminal investigations and proceedings for LGBTI persons who are victims of violence; and a system to collect data on violence and discrimination against LGBTI people in order to assess type, prevalence, tendencies and patterns. The judgment also included a scholarship for study-related expenses, including technical or university education, for a close relative of Hernández's and the establishment of the Vicky Hernández study grant for transwomen. The State was ordered to provide the Court with a report, within one year of notification of the judgment, on compliance measures.

*Increasing the number of female criminal justice system actors*

58.    Increasing the number of women and people of diverse sexes, sexual preferences and genders working in the criminal justice system is essential, albeit insufficient. Their beliefs concerning gender cannot be assumed. For instance, the prevalence of female judges and public defenders in Honduras and female prosecutors and public defenders in El Salvador does not appear to have made an impact on femicide conviction rates.[48]

*Training*

59.    In 2010, the General Assembly urged States to ensure that criminal justice officers receive training on the unacceptability of violence against women, and on relevant laws, policies and programmes, including international law (see A/65/457). The Latin American Model Protocol states the need for "professional people able to identify the necessary factors for conceptualizing and inquiring into the existence of gender-based violence, according to international standards and treaties". The Protocol describes the consequences of inexistent or insufficient training, namely, unnecessary delays, the overlooking of important clues and failure to identify and analyse systematic patterns, all of which result in ineffective investigations.

60.    The mere provision of information and education to justice system personnel is unlikely to reverse entrenched beliefs. Personal, contextual and cultural factors influencing attitudes to femicide must inform the design, development, implementation and evaluation of training programmes. Personal factors include age, gender, marital status, education, tenure, prior direct experience in responding to femicide and legal knowledge. Environments in which office holders have committed gender-based violence and femicides are an obstacle.[49,50,51] Contextual factors include social norms, working conditions, organizational attitudes and political will to address the issue. Ongoing, sustainable training that targets beliefs, knowledge and practice are preferable to one-off short courses.

61.    Nevertheless, there is limited publicly available research that has examined domestic and intimate partner violence training for the police, and even less so for

---

[48] WOLA, "Little to celebrate: 5 facts about women and violence in El Salvador, Guatemala and Honduras", 8 March 2022. Available at www.wola.org/2022/03/women-violence-northern-triangle-5-facts/.

[49] Femicide Census, "At least 16 serving or former police officers have killed women. Why does this matter?" Available at https://www.femicidecensus.org/at-least-16-serving-or-former-police-officers-have-killed-women-why-does-this-matter/.

[50] Julie Suarez and Marty Jordan, "Three thousand and counting: a report on violence against women in Guatemala", Guatemala Human Rights Commission/USA (September 2007).

[51] Samantha Schmidt and Diana Durán, "A lawyer disappeared from a police academy. Her body was just found", *Washington Post*, 21 September 2022.

other criminal justice actors. Unless training programmes are offered and rigorously evaluated, preferred training models will be difficult to identify.

**Best practice**

62.    UNODC developed a training programme on incorporation of a gender perspective in police and prison action, in Tucumán, Argentina, through a virtual platform provided by provincial authorities. Resources targeted to police officers and prison personnel were made available on the platform. The 191 provincial police and penitentiary officers who participated generally found it useful, in particular in improving their relationships with victims of gender-based violence.

63.    To promote sustainability, participants who achieved the best averages were selected as future trainers. They participated in a "train the trainers" course and received a toolbox of relevant materials.[52]

*Specialist services*

64.    The General Assembly, in its resolution 65/228, recommended the use of specialized police, prosecutors and courts or dedicated court time to respond to violence against women. According to the 2015 report of the Secretary-General on femicide (A/70/93), specialized capacity fosters effective responses. However, a study on violence against women in Guatemala has stated that State institutions can perpetuate violence against women and girls "even in the face of policy reforms aimed at challenging impunity for gender-based violence, including the creation of specialised institutions, when public-facing officials have internalized prevailing gender norms, are motivated by competing drives in their daily work, and/or are too under-resourced and overwhelmed to prioritize the difficult goals of changing social and legal norms."[53]

*All-women police stations and gender desks*

65.    The first all-women police stations were established in Sao Paulo, Brazil in 1985 and have since been introduced in other countries.[54,55]

66.    A detailed study of all-women police stations in Haryana, India, the country with the largest number of all-women police stations, found that they did not benefit victims of gendered violence or lead to more criminal charges or convictions. Women were more likely to be counselled "about the virtue of family or one's social status" than to have cases registered and alleged perpetrators arrested.[56] Another study, drawn from Indian police data from 16 states, found that all-women police stations had no impact on femicide or survey-reported violence.[57] A study of gender desks in Kenya found that most were not functional. Those in Nairobi were generally "grossly understaffed and ill-equipped". Many stations had no trained personnel who could be

---

[52]  Juana M. García Galindo, UNODC, personal communication, 24 June 2023.

[53]  Erin Beck, "Violence against women and specialized justice in Guatemala: advances and limitations", *Law and Social Inquiry*, 4 April 2023.

[54]  Elizaveta Perova and Sarah Anne Reynolds, "Women's police stations and intimate partner violence: evidence from Brazil" *Social Science and Medicine* (February 2017).

[55]  Abby Córdova and Helen Kras, "State action to prevent violence against women: the effect of women's police stations on men's attitudes toward gender-based violence", *The Journal of Politics*, vol. 84 (January 2022).

[56]  N. Jassal, "Gender, law enforcement, and access to justice: evidence from all-women police stations in India", *American Political Science Review*, vol. 114, 11 August 2020.

[57]  Sofia Amaral, Sonia Bhalotra and Nishith Prakash, *Gender, Crime and Punishment: Evidence from Women Police Stations in India*, IZA Institute of Labor Economics, Working Paper Series (April 2021).

assigned elsewhere. There may be no office, tables, chairs, privacy or accessible transport.[58]

67.   The mere creation of all-women police stations or gender desks does not seem to ensure that services will improve. However, there are also examples of effective all-women police stations, and the contributing factors merit further analysis.

**Best practice**

68.   In Brazil, a study[59] found that the establishment of an all-women police station in a metropolitan municipality was associated with a 70 per cent reduction of the homicide rate of women aged 15 to 24, and a 17 per cent reduction for women aged 15 to 49. No effect was found in small cities and rural areas. Another study[60] suggests that highly visible all-women police stations in the country improve victims' access to these specialized services, highlight the criminality of such violence and promote more progressive views in men, who were more likely to reject domestic violence and support bystander intervention the longer an all-women police station had been present.

69.   UN-Women in Morocco has supported national police force restructuring, ensuring that every provincial police station has a unit trained to deal with female survivors of violence. In Meknès, in 2019, a young woman was raped by her boss and became pregnant. Although sex outside marriage is a crime in Morocco, a friend took her to the police station. She later recalled that "I was afraid that [the police officers] would ignore me and wouldn't believe what I was going to tell them. But … I was warmly welcomed by a female officer who introduced herself as the Chief of the Police Unit for Women Victims of Violence. I told myself that if the chief is a woman, maybe she will understand me. The first thing she told me was: There is a solution to everything. I will never forget that."[61]

*Specialist prosecutors*

70.   Special prosecutors may also be established for gender-based violence, including femicide. The following features are characteristic of poor prosecutorial practice in cases of gender-based violence:

    (a)   Unwillingness to address impunity and political obstacles;

    (b)   Reluctance to collaborate with civil society organizations;

    (c)   Resistance or inability to integrate a gender perspective or apply international standards;

    (d)   Failure to understand and respond to the consequences suffered by family members or re-traumatization caused by legal processes;

    (e)   Absence of a victim-centred approach;

    (f)   Limited understanding of gender mainstreaming in institutions and its practical implications.[62]

71.   With sufficient training, specialist prosecutors may improve trust in the criminal justice system and lessen the likelihood that misogynist beliefs inform prosecutions.

---

[58] Fredrick Ombwori, "Status of gender desks at police stations in Kenya: a case study of Nairobi Province", Institute of Economic Affairs, Series No. 22 (2009).

[59] Perova and Reynolds, "Women's police stations".

[60] Córdova and Kras, "State action to prevent violence against women".

[61] UN-Women, "Supported by UN-Women, police forces are becoming more responsive".

[62] OHCHR, "Strategic litigation for gender-based violence: experiences in Latin America", workshop report (Geneva, 2021).

However, a study of specialist women's police and prosecutors in Nicaragua found that even they often dismissed women's experiences of violence as unimportant.[63]

**Best practice**

72.    Other prosecutorial practices are more constructive. In Argentina, a specialized unit for violence against women was created within the Public Prosecutor's Office in 2015 to strengthen the prevention, eradication and punishment of gender violence. The same year, a transgender activist, Diana Sacayán, was murdered by two people. From the outset, the investigating prosecutor involved the unit for violence against women, the family and civil society organizations. The unit encouraged the application of the Latin American Model Protocol in order to exclude stereotypical or prejudiced views about the victim or the accused, to avoid loss or degradation of evidence and to make gendered features of the crime visible. The unit's staff interviewed Diana's relatives, friends, experts and activists, sometimes in their homes, and support was made available.

73.    Detailed information emerged from the autopsy, DNA studies, other seized evidence, photographs and digital data, including telephone and Facebook records. Anthropological and personal evidence about structural violence against transgender people and additional risks related to poverty and activism were incorporated into the trial. During sentencing, family and others were able to talk about how they had been affected.

74.    This case, including the extensive research undertaken, contributed to the adoption in Argentina of a law on transvesticide and a national protocol for the investigation and litigation of femicides.

75.    In Mexico, 19 of 32 states have a special prosecutor's office that exclusively investigates femicides and crimes against women. These states identified 1.5 times more femicides and had a 50 per cent higher rate of femicide investigation than states without them, even when homicide rates were similar. Trained personnel dedicated to this task appear "substantially more likely to classify female homicides as femicides" and "[s]tates without such specially designated personnel often lack a proper understanding of femicide as a category in criminal law."[64]

*Specialist courts*

76.    According to Edwin Cameron, a senior South African judge, judges "do not enter public office as ideological virgins. They ascend the Bench with built-in and often strongly held sets of values, preconceptions, opinions and prejudices. These are invariably expressed in the decisions they give, constituting 'inarticulate premises' in the process of judicial reasoning." [65] Recognizing this, several countries have established specialist courts for gender-based violence, some hearing femicide cases. Specialist courts may bring the advantages of trained personnel. They may also combine criminal, civil and family law jurisdictions to deal with violence against women and the consequences of femicide for child protection and custody.[66]

---

[63] Pamela Neumann, "When laws are not enough: violence against women and bureaucratic practice in Nicaragua", *Social Forces*, vol. 95 (March 2017).

[64] Teagan D. McGinnis, Octavio Rodríguez Ferreira and David A. Shirk, "Analyzing the problem of femicide in Mexico: the role of special prosecutors in combatting violence against women", Justice in Mexico Working Paper Series, vol. 19, No. 2 (July 2022).

[65] Edwin Cameron, "Judicial accountability in South Africa", *South African Journal on Human Rights*, vol. 6, No. 2 (1990), p. 258.

[66] European Institute for Gender Equality, *Improving Legal Responses to Counter Femicide in the European Union*, p. 9.

77.    The impact of a trial on victims' families, who are themselves also considered victims, can be highly traumatic. Specialist courts may be better equipped to address family members' needs, whether as witnesses or relating to exposure to explicit details about violence against their relative. Special provision for children is sometimes provided; for instance, evidence may be given in a separate room or their evidence may be recorded pre-trial.[67]

78.    However, specialist jurisdictions may be insufficiently supported. In Guatemala, femicide and gender-based violence courts were established with political, judicial and civil society support. "Courts were staffed by specially trained and often highly motivated judges, and other court personnel who dedicated their careers to making a difference in women's lives." Initial gains were regrettably undermined due to under-resourcing and staff burn-out. Non-specialist institutions were not reformed.[68]

79.    Where States starve specialist courts of resources, it may be preferable to ensure that all investigators, lawyers, judicial officers, court staff and support professionals are properly trained. However, well-supported specialized courts demonstrate potential.

**Best practice**

80.    In Spain, intimate partner violence courts were established in 2005 "to ensure an appropriate and effective treatment of the legal, family and special situation of the female victims".[69] Cases are opened in response to reports by victims or third parties to the police or directly to these courts. Intimate partner violence court judges lead investigations, decide whether to dismiss or pursue cases and issue protection orders. They are permitted to sentence perpetrators of minor offences and of offences punished with less than nine years of imprisonment where the perpetrator admits guilt. Otherwise, when the investigation has concluded, the case is referred to a criminal court.

81.    Where these courts exist, "[k]illings of women are framed within the broader concept of gender-based violence and … all cases of gender-based violence, including femicides, [are] investigated, prosecuted and sentenced by separate, specialised, law enforcement units and courts."[70] Victim support services are highly regarded.[71] Forensic medical evidence is not presented in these courts, but in a superior court. Relevant professionals have recommended that the jurisdiction of gender-based violence courts should extend to sentencing for femicide.[72]

82.    In 2022, judicial representatives drafted the Bangkok General Guidance for Judges on Applying a Gender Perspective in South and Southeast Asia, with the support of the International Commission of Jurists. The Guidance promotes a gender perspective to address direct, indirect and intersectional discrimination, outlining institutional policies to assist courts in becoming more gender responsive. Judges are encouraged to adopt a victim-centred approach without prejudicing the accused's right to a fair trial.

83.    An earlier edition, adopted by judges from Indonesia, the Philippines, Thailand and Timor-Leste, had already been formally integrated by the Supreme Court of

---

[67]  Ibid., p. 40.
[68]  Erin Beck and Lynn Stephen, "From legislation to everyday practices in Guatemala's violence against women courts", *Journal of Latin American Studies*, vol. 53, 14 September 2021, p. 752.
[69]  European Institute for Gender Equality, *Improving Legal Responses to Counter Femicide in the European Union*, p. 33.
[70]  Ibid., p. 9.
[71]  Ibid., p. 38.
[72]  Ibid.

Indonesia. The judiciaries of Maldives and Nepal are moving towards the formal adoption of the updated Guidance.[73]

*Coordination*

84.   An effective criminal justice response requires coordination between the criminal justice system, other agencies and civil society. UNODC stresses that "a coordinated response is essential to changing the manner in which the criminal justice system as a whole traditionally has responded to violence against women".[74] The General Assembly, in its resolution 65/228, urged States to develop mechanisms to ensure a comprehensive, multidisciplinary, coordinated, systematic and sustained response to violence against women in order to increase the likelihood of successful apprehension, prosecution and conviction of the offender. Coordination can improve agency accountability and transparency, inter-agency cooperation and public trust.

85.   Effective coordination requires shared understandings of mandates and functions and the nature of violence against women and girls and appropriate responses. Agencies must have clarity on who is responsible for what, from the initial report of a potential femicide to its investigation, prosecution and trial and including data collection and analysis and monitoring and evaluation. Communication among agencies should be free-flowing, subject only to legal and ethical standards intended to protect families, while not compromising ongoing investigations. Jointly created protocols and inter-agency training may assist.

**Best practice**

86.   Montenegro has introduced multi-agency efforts to reduce violence against women. In 2018, an operational team was established as a coordinating body to target poor links and resolve problems in the chain of institutions involved in domestic violence cases. The team comprises 19 members, from relevant ministries, the Police Directorate, the High Misdemeanour Court, the Supreme Court, the State Prosecutor's Office, the Council for Civilian Control of Police Operations and five civil society organizations.[75]

*Punishment of government officials*

87.   A feature of due diligence is that States ensure the exercise of powers by police, prosecutors and other criminal justice officials is undertaken according to the rule of law and that officials are held accountable for any infringement through appropriate oversight and accountability mechanisms (see General Assembly resolution 65/228). The Follow-up Mechanism of the Convention of Belém do Pará recommends that government officials who fail to act with all due diligence be punished.[76] Relevant laws have been enacted in several Latin American countries. In El Salvador, the Special Comprehensive Law for a Life Free of Violence for Women makes it a crime for a person exercising a public function to promote or tolerate impunity or to hinder investigation, prosecution and punishment. In 2009, South Africa undertook research

---

[73] International Commission of Jurists, "Six judiciaries from Asia commit to the adoption of the Bangkok General Guidance for Judges on Applying a Gender Perspective", 23 March 2023.

[74] UNODC, *Strengthening Crime Prevention and Criminal Justice Responses to Violence against Women* (Vienna, 2014).

[75] Sven Pfeiffer, UNODC, personal communication, 22 June 2023.

[76] Declaration on Femicide, adopted at the fourth meeting of the Committee of Experts of the Follow-up Mechanism to the Belém do Pará Convention, 15 August 2008.

A/78/254

into the incidence of femicide among its police forces in order to address and prevent its occurrence.[77]

## E. Obligations to families

88.    The families of victims must also be seen as victims and treated with dignity in femicide investigations. There should be no barriers for them to report a femicide or provide information relevant to the investigation. The information provided should be given due consideration and pursued if potentially helpful for the investigation. Families should be offered support and counselling and should be regularly updated about developments in investigations. Their needs as witnesses and when hearing distressing evidence should be addressed. Systems should be established to provide effective, expeditious and appropriate protection from potential violence and reprisals for victims and witnesses. Protection provided may extend to real, personal and work-related property.

89.    States are required to provide reparations to victims' families, which may encompass restitution, compensation, rehabilitation, satisfaction, guarantees of non-repetition and system reform. Authorities must act in the best interests of the victim's children throughout the investigation, the trial process and in the determination of reparations. Chile recently passed a law creating a pension for children of femicide victims under 18 years of age, including for cases of induced suicide.

## F. Long prison sentences do not discourage crimes

90.    Advocacy for the recognition of femicide as a crime was informed by carceral feminism, which overlooked innovative forms of justice such as restorative and transformative justice. The profile of those imprisoned – overwhelmingly poor, vulnerable, stigmatized and marginalized persons – was also neglected. Evidence suggests that, although a significant likelihood of being caught and the certainty of punishment may act as a deterrent for crime, severe penalties do not.[78] Mandatory minimum sentences for femicide, or maximum penalties beyond those prescribed for homicide, are therefore unlikely to deter potential perpetrators from committing femicides.

91.    In his report to the Human Rights Council (A/HRC/50/34), the Special Rapporteur discussed human rights abuses leading to unacceptable rates of deaths in prisons. The Special Rapporteur further described ways of preventing crime, including justice reinvestment and community strengthening. The organization Penal Reform International has stated that over-reliance on imprisonment is "not a viable, long-term solution to reducing overcrowding and the devastating consequences of imprisonment on individuals and societies".[79]

## G. Data collection

92.    Data collection for femicides is often hindered by inadequate "inter-agency coordination and the availability of adequate financial, human and technological

---

[77] Independent Complaints Directorate, Republic of South Africa, *Femicide: A Case Study on Members of the South African Police Service* (2009).
[78] National Institute of Justice, "Five things about deterrence", 5 June 2016.
[79] Penal Reform International, *Global Prison Trends 2022*, p. 3.

resources". [80] Data collection, essential to improving femicide investigations and prevention, is enhanced when all relevant data sources contribute information to a single coordinated system. This enriches the evaluation of femicide-related initiatives, the formulation of domestic policies, laws and national plans and enables measurable comparisons between past and present practice.

93.    Of the 173 Member States reporting homicide data in 2021, 36 per cent had no information on the sex of the victim. That year, 81,100 women and girls were reported killed,[81] a significant underestimate for reasons including the failure to report, record or register such deaths.[82] Country-level data may record the sex of the victim, but not the victim-perpetrator relationship. Femicide data is rarely disaggregated and therefore fails to provide insight into the victim's and perpetrator's traits and relationship or insight into killing patterns.[83] In some countries, civil society provides the most informative collection and analysis of femicide data.

94.    To begin to remedy this problem, in 2022, the UNODC and UN-Women sought to standardize femicide data collection by publishing a statistical framework for gender-related killings of women and girls.[84]

*Femicide watches and observatories*

95.    In 2015, the Special Rapporteur on violence against women, including its causes and consequences, called on States to establish multidisciplinary femicide watches and/or observatories (A/71/398, para. 29) and described modalities for their establishment (para. 83). Since then, a growing number have been established,[85] with various combinations of State agencies, civil society organizations and academic institutions. Observatories use many data sources to enhance case detection, address incomplete data and identify data bias.[86,87,88,89] These initiatives undertake research for the purpose of evidence-based advocacy, awareness-raising and promotion of policies and strategies for femicide prevention.[90]

**Best practice**

96.    In Ecuador, the Spotlight Initiative funds interventions to help women and girls live lives free of violence. The Initiative supported the Ministry of Women and

---

[80] Economic Commission for Latin America and the Caribbean, "Bringing an end to violence against women and femicide or feminicide: a key challenge for building a care society" (2022).

[81] UNODC and UN-Women, "Gender-related killings of women and girls (femicide/feminicide): global estimates of gender-related killings of women and girls in the private sphere in 2021" (2022), pp. 12 and 48.

[82] Ibid., p. 5 and 11–12.

[83] UNODC/CCPCJ/EG.8/2014/2, para. 24.

[84] UNODC and UN-Women, "Statistical framework for measuring the gender-related killing of women and girls (also referred to as 'femicide/feminicide')" (2022).

[85] E/CN.15/2023/CRP.6, para. 45.

[86] Submission of the International Lesbian, Gay, Bisexual, Trans, and Intersex Association to the Special Rapporteur on violence against women, its causes and consequences, 30 April 2021. Available at https://www.ohchr.org/sites/default/files/Documents/Issues/Women/SR/Femicide/2021-submissions/CSOs/the-international-lesbian-gay.pdf.

[87] Ardil Jabar and others, "Is the introduction of violence and injury observatories associated with a reduction in violence-related injury in adult populations? A systematic review and meta-analysis", *BMJ Open*, 31 July 2019.

[88] Reena Sarkar and others, "Family violence homicide rates: a state-wide comparison of three data sources in Victoria, Australia", *Health Information Management Journal*, 7 December 2021.

[89] Rodrigo Guerrero-Velasco and others, "Homicide epidemic in Cali, Colombia: a surveillance system data analysis, 1993–2018", *American Journal of Public Health*, vol. 111, No. 7 (July 2021).

[90] Office of the High Commissioner for Human Rights, "Femicide watch initiative (2021)", 21 December 2021.

Human Rights and the Ministry of the Interior in launching a single registry of violence in 2022. The registry is a digital platform that collects data from the nine government institutions comprising the national system to prevent and eradicate violence against women and girls. Ecuador also has a free interactive portal containing statistical information on femicides and other violent deaths, victim and perpetrator characteristics and the status of cases.[91]

97.    In Spain in 2015, the Secretary of State for Security initiated a national project for the detailed review of intimate partner homicides. This police-led initiative involves government, corrections, police and academic institutions and 21 universities in the collection of femicide and partner abuse data from 50 provinces with a view to detecting unreported intimate partner violence cases, as only 25 per cent of women reported violence before they were murdered. The review identified femicide risk factors that are now incorporated into police risk assessment tools, and is now collecting data prospectively.

98.    In Argentina, the Femicide Observatory, created by law in the Office of the Ombudsman, reviews newspapers to generate femicide statistics. Data are cross-checked with official statistics.[92] In Morocco, the Government created a national observatory on violence against women with tripartite composition from the Government, civil society and academia.[93] The official statistics of Argentina, Chile, Costa Rica and the Dominican Republic include femicides committed by intimate partners, family members and perpetrators unknown to the victim.[94] In Spain, in 2022, the Government extended data collection from intimate partner and ex-partner femicides to non-intimate partner femicides, in conformity with the Istanbul Convention.[95]

## IV. Conclusion

99.    Leadership on gender sensitivity by State institutions is a necessary foundation for the effective investigation and prevention of femicide. However, conservative and hierarchical institutions, including the criminal justice system, traditionally tend to uphold patriarchal values. As a result, these institutions often have significant difficulty in adopting a gender perspective, as required for the effective investigation and prevention of femicide. The challenge for and obligation of States is therefore to change these deeply rooted perspectives that contribute to impunity for perpetrators of femicide. The duty of States to investigate and prevent gender-based killings of women and girls are obligations, and not optional, under international law. The best practices described in the present report are proof that effective reforms are possible. The women's rights movement, civil society organizations and academic, social and religious entities play an essential role in helping States to fulfil these obligations, and must be supported accordingly.

---

[91] Andrea Villalba Fiallos, UNODC, personal communication, 23 June 2023.
[92] Argentine Ombudsman Femicide Observatory, "Femicide in Argentina: a partial report for the period from 1 January to 31 October 2019". Note that the Argentine Ombudsman Femicide Observatory exists alongside another national femicide observatory being implemented by the Supreme Court, together with similar initiatives by non-governmental organizations.
[93] Ibid., p. 53.
[94] Ibid., p. 49.
[95] Ibid., p. 48.

## V.  Recommendations

100.  **The Special Rapporteur encourages State authorities and other relevant entities to implement the following recommendations for the effective investigation and prevention of femicide and reiterates the availability of his mandate to provide technical assistance in this regard.**

101.  **Adopt gender and intersectional perspectives in law and practice: the law, as well as police, prosecutorial, forensic, judicial and defence practice, should be reviewed to ensure that overt and hidden gender stereotyping is eliminated and replaced with gender-aware law and practice.**

102.  **Due diligence: authorities must observe international and regional law governing due diligence obligations, eliminating barriers to the reporting, investigation, prosecution, defence and judicial determination of femicides.**

103.  **Law: if femicide law is enacted, it should observe fundamental criminal law principles. The elements of femicide offences should be capable of investigation and prosecution. Sentences should not be longer than for homicide.**

104.  **Investigation: in addition to observing the Minnesota Protocol requirements (investigations must be undertaken by an independent expert body, in a prompt, effective, thorough, impartial and transparent manner), femicide investigations should be non-discriminatory, adopt a gender perspective, and address intersectional issues. All potentially unlawful deaths of women should be investigated as probable femicides.**

105.  **As required by the Minnesota Protocol, investigations should establish the circumstances that led to a death and should identify the deceased and the cause and manner of death. Investigations of potential femicides should also consider:**

(a)  **The context surrounding the death;**

(b)  **Whether the apparent suicide of a woman has been staged and thus may be a femicide;**

(c)  **The means of disposal of the body, including whether it has been concealed;**

(d)  **Signs of previous mistreatment, injury patterns, evidence of overkill and violations committed after death;**

(e)  **The relationship between the victim and the perpetrator and the existence of power inequalities;**

(f)  **The types of violations (physical and non-physical) committed before death and the perpetrator's modus operandi;**

(g)  **The victim's vulnerability and the risks she faced when she was killed;**

(h)  **Any attendance by the victim and her children at medical or forensic services or prior complaints to police or other support agencies by the victim, her family, neighbours or friends.**

106.  **Femicide addendum to the Minnesota Protocol: a "femicide addendum" should be added to the Minnesota Protocol. Consideration should be given to adding "induced suicide" to the general terms applied to cause of death (i.e. natural, accidental, suicide, homicide and undetermined).**

107.  **Femicide Protocol: if jurisdictions have not created a protocol for femicide investigation, they should consider adapting the Latin American Model Protocol to suit local conditions.**

108.   **Protection and support for families and children: victims' families must be heard, treated with dignity and protected. Families should be offered support and counselling and kept updated about developments in investigations. Reparations should include restitution, compensation, rehabilitation, satisfaction and guarantees of non-repetition, including system reform. The State should act in the best interests of the victim's children.**

109.   **Leadership: State authorities, including every supervisory layer within criminal justice system management structures, should display their commitment to ending violence against women and girls. Gender-aware behaviour should be modelled, supported and praised when it occurs and reprimanded when it does not.**

110.   **Training of criminal justice system actors: femicide training should address both personal and contextual factors. Deeply ingrained misogynist beliefs must be challenged. Training content should be developed in partnership with civil society actors and academia. Training should be comprehensive, recurrent and properly resourced.**

111.   **Specialist services: creating specialist police, prosecutorial and judicial services can be helpful, but it is not sufficient. Services must be fit for purpose, have the power and resources required to fully respond to femicides and operate seamlessly with the broader justice system and civil society.**

112.   **Coordination: State and non-State agencies should operate in a coordinated and cooperative manner at all stages of the criminal justice process, including the data-collection and analysis stages, without compromising ongoing criminal investigations.**

113.   **Data collection and analysis: comprehensive data should be collected from all agencies involved in femicide investigations and analysed to inform future investigations and prevention. States should consider regularizing the content of their femicide data sets to create greater global uniformity. The UNODC and UN-Women statistical framework for measuring the gender-related killing of women and girls provides a useful basis. Femicide watch and observatory initiatives should be fostered.**

---