UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

STATE OF MINNESOTA, *by and through its Attorney General Keith Ellison*,
CITY OF MINNEAPOLIS, and
CITY OF ST. PAUL,

      Plaintiffs,

v.

KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; JOHN CONDON, *in his official capacity as Acting Executive Associate Director of Homeland Security Investigations*; U.S. Department of Homeland Security; TODD LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; MARCOS CHARLES, *in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations;* U.S. Immigration and Customs Enforcement; RODNEY SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection;* U.S. Customs and Border Protection; GREGORY BOVINO, *in his official capacity as Commander of the U.S. Border Patrol*; U.S. Border Patrol; DAVID EASTERWOOD, *in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement*, *in their official capacities,*

      Defendants.

Case No. 0:26-cv-00190-KMM-DJF

**DEFENDANTS' SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER / PRELIMINARY INJUNCTION**

---

## **INTRODUCTION**

Minnesota and its political subdivisions ask this Court to issue an unprecedented injunction—to halt a federal law-enforcement operation and evict federal officers from the State. Defendants' opposition brief explained why Plaintiffs' original theories (asserting violations of the Tenth Amendment's anti-commandeering doctrine and equal sovereignty principle) were legally groundless. In their reply, Plaintiffs pivoted to a new theory: that Operation Metro Surge violates the Tenth Amendment because it constitutes an effort to punish Plaintiffs for their policy choices and to coerce them to change those policies. This theory is equally unprecedented and equally groundless.

To start, Plaintiffs' factual premise is unsupported. The purpose of Operation Metro Surge is to enforce federal law in Minnesota—something the Executive holds "conclusive and preclusive" authority to do. *Trump v. United States*, 603 U.S. 593, 620 (2024). The statements on which Plaintiffs rely do not suggest anything different or expose a coercive motive; instead, they reflect the fact that Plaintiffs' assistance with enforcement of federal immigration law would likely require fewer federal resources to be deployed to Minnesota. This is common sense, not commandeering. Plaintiffs also provide no explanation of how these specific statements—including some from over a month after its inception, and from *other* federal agencies—can somehow taint the entirety of Operation Metro Surge.

Plaintiffs' novel and remarkable theory—that a facially valid exercise of federal law-enforcement authority can be enjoined if a court infers a covert subjective motive to alter State behavior—also fails as a matter of law. Plaintiffs rely almost exclusively on the Supreme Court's decision invalidating the Affordable Care Act's unique condition aimed

1

at coercing States to expand their Medicaid programs. But that was a case about an *express* condition imposed by *Congress* under the *Spending Clause*, and the remedy was to strike the problematic condition. This is a case about a supposedly *ulterior motive* on the part of the *Executive* in fulfilling his responsibilities under the *Take Care Clause*, and the remedy Plaintiffs seek would subject the Executive Branch to untenable judicial superintendence and second-guessing in the execution of its core constitutional functions.

With the facts on the ground changing by the minute, and with discussions between federal and state officials now active and ongoing, this Court should not massively expand the Tenth Amendment, contravene both the Take Care and Supremacy Clauses, and revolutionize the relationship between the federal government and the States, on the one hand, and between Article II and Article III, on the other. *Cf. Tincher v. Noem*, No. 26-1105, 2026 WL 194768, at *1 (8th Cir. Jan. 26, 2026). The Court should instead conclude that Plaintiffs lack a likelihood of success on the merits at this stage and deny their motion for a preliminary injunction.

## ARGUMENT

Plaintiffs' theory fails at the start because it violates the Take Care and Supremacy Clauses. "Article II of the Constitution assigns the 'executive Power' to the President and provides that the President 'shall take Care that the Laws be faithfully executed.'" *United States v. Texas*, 599 U.S. 670, 678 (2023) (quoting U.S. Const. Art. II, § 1, Cl. 1, § 3). With this power, the Executive Branch can enforce federal law as it sees fit and does not need to provide a detailed justification for doing so, or for its geographic or temporal prioritization. *See id.* at 678-79. And, under the Supremacy Clause, no state can impede federal law. *See,*

2

*e.g.*, *Arizona v. United States*, 567 U.S. 387, 398-400 (2012).  These basic principles of constitutional law end Plaintiffs' attempt to regulate the Executive's enforcement decisions.  And there is no basis—either in fact or in law—to conclude that the Tenth Amendment says otherwise.

**I.       Operation Metro Surge Has an Exclusively Lawful Purpose.**

Plaintiffs' new theory fails, first, on the facts.  The purpose of Operation Metro Surge has been, from the beginning, the enforcement of federal law.  *See* Dkt. 35-1 (Olson Decl.) ¶¶ 14, 16.  And the actions of federal officers over the past six weeks match this purpose.  *See id.* ¶ 16.  There is no dispute that federal law, and federal law alone, has been the subject of enforcement.  The point—and the only point relevant for purposes of the Tenth Amendment—is that federal law enforcement officers are in Minnesota enforcing validly enacted federal law.  *See Fernandez v. Wiener*, 326 U.S. 340, 362 (1945).

None of the statements on which Plaintiffs rely provides a reason to question this valid justification.  In their reply, Plaintiffs cited a handful of social media posts and media statements in which federal officials linked the surge in federal resources in Minnesota to the State's sanctuary laws and policies.  *See* Dkt. 60 at 9-12.  None of these statements indicate an unlawfully coercive purpose.  Instead, they reflect a commonsense proposition: If a state or locality decides not to assist the federal government, the federal government may need to devote more resources to that jurisdiction.  To put in terms of the Court's hypothetical, if a state were to legalize cocaine trafficking, the Drug Enforcement Administration would likely need to do more enforcement there as a result.  *Cf. Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 288 (1981) (recognizing that,

3

consistent with the Tenth Amendment, the federal government can require a state to choose between "either implement[ing]" the federal program "or else yield[ing] to a federally administered regulatory program"). This is exactly the point federal officials were making in the statements Plaintiffs cite. Assuming Plaintiffs are correct that the Tenth Amendment provides them with the freedom to enact their sanctuary policies, then more federal officers may be needed in Minnesota to fill the gap. This is a natural *consequence* of Plaintiffs' policy decisions, not a *punishment* for them.

At the hearing earlier this week, Plaintiffs pivoted to a letter that Attorney General Bondi sent Governor Walz on January 24, 2026, after the close of briefing. Dkt. 114-1. Plaintiffs fail to explain how a letter sent by the Department of Justice this week could shed light on the purpose of an operation undertaken by a different agency, the Department of Homeland Security, some six weeks prior. *Cf. Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019) ("[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record."). Regardless, there is no hint of a quid pro quo in the Attorney General's letter; she does not offer Plaintiffs a trade or commit to end Operation Metro Surge under any circumstances. Instead, citing the adverse "consequences" of certain policy choices for the people of Minnesota, the letter attempts to find common ground on three different issues, only one of which has any connection to this case. Dkt. 114-1 at 2-4. Such communications should be encouraged as a feature of our system of dual sovereignty, not used as a basis to enjoin federal action. *See Hodel*, 452 U.S. at 289 (noting the existence of "cooperative federalism").

4

Finally, Plaintiffs rely on a social media post from the President. Such a singular statement is of little relevance, especially given Operation Metro Surge's facially valid justification. *See Trump v. Hawaii*, 585 U.S. 667, 706 (2018) (rejecting claim of animus or improper purpose where government action was "expressly premised on legitimate purposes"). And certainly this single and unclear reference to "retribution" does not justify the unprecedented relief of ordering thousands of federal officers to leave Minnesota.

Beyond these statements, Plaintiffs insist that Operation Metro Surge is predicated on pretext because federal officers are making arrests beyond the "worst of the worst." Dkt. 60 at 12. But Article II directs the Executive Branch to faithfully execute the laws, not merely to enforce against the most egregious violations. The when, where, and how much of federal law-enforcement are reserved exclusively to the Executive, and are not subject to review by the States. *Texas*, 599 U.S. at 678-79. Thus, there is no basis to infer that the Executive Branch's decisions with respect to "how aggressively to pursue legal actions" are suggestive of a motive to coerce. *Id.* at 678 (quotation omitted)).

## II.    Operation Metro Surge Does Not Violate the Tenth Amendment.

Because the record does not come close to supporting a coercion finding, Plaintiffs' novel Tenth Amendment theory is a non-starter. But even if the Court believed otherwise about Operation Metro Surge's purpose, the Court should still conclude that Plaintiffs are unlikely to succeed in proving a Tenth Amendment violation as a matter of law. "[C]ourts generally lack meaningful standards for assessing the propriety of enforcement choices," *Texas*, 599 U.S. at 679, and Plaintiffs' attempts to look at subjective motivation contravenes settled principles of judicial review, *see e.g.*, *Hawaii*, 585 U.S. at 702.

5

In their reply, the principal authority for Plaintiffs' coercion argument is *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012) (*NFIB*). There, the Supreme Court held that Congress exceeded its power under the Spending Clause when it conditioned preexisting Medicaid funding on the state's agreement to implement the Affordable Care Act's expansion of Medicaid. *Id.* at 580. The condition's size and disproportionality, in light of the history of the Medicaid program, constituted a "gun to the head" and transgressed limits on Spending Clause legislation. *Id.* at 581. Accordingly, the Court ordered that the federal government could not "withdraw existing Medicaid funds for failure to comply with the requirements set out in the expansion." *Id.* at 585.

The *NFIB* framework has no application here, and even if it did, it would not support Plaintiffs' claim.

**A.** No court has ever expanded *NFIB* beyond its unique Spending Clause context, and this Court should not indulge Plaintiffs' attempt to import its framework into a case challenging the Executive's facially valid enforcement of federal law. There are at least three important distinctions that make it inappropriate to extend *NFIB* in this fashion, and doing so would carry radical and untenable implications for federalism and the separation of powers.

*First*, as noted, *NFIB* addressed unique concerns regarding the expansion of Congress's power under the Spending Clause. 567 U.S. at 576; *see* U.S. Const., Art. I, § 8, cl. 1 (granting Congress the power to collect taxes "to . . . provide for the . . . general Welfare of the United States"). For almost a century, the Supreme Court has recognized that the federal government could abuse this power in an effort to reach beyond its

6

enumerated powers and intrude on the powers reserved to the States. *See Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937) (recognizing that Congress could use its spending power to exert "undue influence"); *United States v. Butler*, 297 U.S. 1, 78 (1936) (rejecting argument that Spending Clause gives "power to the Congress to tear down the barriers, to invade the states' jurisdiction, and to become a parliament of the whole people, subject to no restrictions save such as are self-imposed"). And this concern animated the decision in *NFIB*. *See* 567 U.S. at 578 (explaining danger of Congress using its spending "power to implement federal policy it could not impose directly under its enumerated powers").

To Defendants' knowledge, no Court has ever extended this reasoning beyond the Spending Clause context. And certainly not to the context of federal law enforcement. This is for good reason—the Executive Branch can only execute a federal law based on an enumerated power. As a result, the risk to federalism presented by valid federal enforcement actions is minimal compared to the risk posed by the Spending Clause.

*Second*, *NFIB* dealt with an explicit condition. There was no ambiguity as to the terms of the Affordable Care Act's deal. *See* 567 U.S. at 581. This legislative clarity made it easy for the Court to evaluate the constitutionality of the condition. Indeed, Congress must set out any condition "unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). This is because "legislation enacted pursuant to the spending power is much in the nature of a contract." *Id.*

Plaintiffs here seek to deploy *NFIB* in a fundamentally different way—not to challenge a clear condition, but instead, based on an *inference* of an improper subjective

7

purpose, to challenge an objectively legitimate law-enforcement operation. To evaluate such a claim, a federal court would have to interrogate the subjective grounds for facially valid actions. Such a probe would run afoul of longstanding principles of judicial review. *See Dep't of Com.*, 588 U.S. at 781 (explaining that "judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided"); *Hawaii*, 585 U.S. at 702 (finding no basis "to probe the sincerity of the stated justifications for the policy by reference to extrinsic statements"); *cf. Hunter v. Underwood*, 471 U.S. 222, 228 (1985) ("Proving the motivation behind official action is often a problematic undertaking.").

*Third*, the remedy provided in *NFIB* does not map onto a case about federal law enforcement. Because the focus in *NFIB* was the statutory condition, the remedy was straightforward: sever the coercive condition from the rest of the statutory scheme and allow the States to maintain their old Medicare eligibility without losing existing Medicaid funding (or collecting the new funding). 567 U.S. at 585.

In the absence of a statutory condition, there is nothing to sever and no original deal to preserve. Instead, Plaintiffs ask the Court to halt Operation Metro Surge entirely and order federal officers to leave Minnesota—relief that would clearly violate the Take Care and Supremacy Clauses. Indeed, all agree that federal officers are charged with enforcing federal law. The Tenth Amendment cannot possibly require a federal law enforcement vacuum.

Further, any injunction against retaliatory or coercive actions would be impossible to administer, especially when Defendants vigorously maintain that Operation Metro Surge

8

is neither. The end result would inevitably be for this Court to superintend federal immigration enforcement in Minnesota. To avoid contempt, would Defendants have to move for relief each time they wish to send officers into Minnesota? Would the Court then have to adjudicate whether a proper purpose was behind the deployment of each officer? This is not the job of an Article III court, *see Lewis v. Casey*, 518 U.S. 343, 349 (1996) ("[I]t is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution."), especially in this context, *see Texas*, 599 U.S. at 679 ("The Executive Branch—not the Judiciary—makes arrests and prosecutes offenses on behalf of the United States."); *Chicago Headline Club v. Noem*, No. 25-3023, Dkt. No. 28 at 2 (7th Cir. Nov. 19, 2025) (staying an injunction that "impermissibly infring[ed] on principles of separation of powers").

Putting it all together, Plaintiffs' theory is that a court can take any facially legitimate exercise of any federal power, probe behind it to discern an illegitimate subjective purpose to "coerce" States to follow federal preferences, and then enjoin the federal action and eject federal officers from the State. This is not "equal sovereignty"—it is an extraordinary rewriting of foundational federalism principles through which any and all States could supplant federal priorities with their own. This is impracticable relief based on an unprecedented reading of the Tenth Amendment. The Court should reject it.

**B.** Even assuming the *NFIB* Spending Clause framework could be extended to challenges to federal enforcement operations, Plaintiffs would still lose. The Affordable Care Act left States with no real choice because (i) Medicaid funding "constitut[ed] over 10 percent of most States' total revenue"; (ii) States had "developed intricate statutory and

9

administrative regimes over the course of many decades to implement their objectives under existing Medicaid"; and (iii) the new condition was disproportionate because it provided that "[i]f a State d[id] not comply with the Act's new coverage requirements, it may lose not only the federal funding for those requirements, but all of its federal Medicaid funds." *NFIB*, 567 U.S. at 541, 582.  It was the combination of those three unique factors that gave *NFIB* its bite, and courts across the country have refused to extend *NFIB* beyond those parameters.  *See, e.g.*, *State v. Dep't of Just.*, 951 F.3d 84, 114-16 (2d Cir. 2020); *City of Los Angeles v. Barr*, 929 F.3d 1163, 1176 (9th Cir. 2019).

Here, none of this is true.  Perhaps most obviously, Plaintiffs have not changed any of their policies around immigration enforcement or otherwise and have not represented that they will be forced to.  Quite the opposite: Minnesota has doubled down, confirming that the federal action here is nowhere near as coercive as in *NFIB*.  *See, e.g.*, Ashleigh Fields, *Frey to Homan: Minneapolis 'will not enforce federal immigration laws'*, The Hill (Jan. 27, 2026), https://thehill.com/homenews/state-watch/5709296-frey-homan-sanctuary-policies-minneapolis.  Plaintiffs claim potential drops in revenue, *see* Dkt. 8 at 24-31, but they do not attempt to quantify an impact on their budgets, let alone suggest that the figure is comparable to what was at issue in *NFIB*.  And Plaintiffs have not established that Operation Metro Surge is disproportionate to the need created by their policies—an inquiry that again implicates the Executive Branch's conclusive and preclusive discretion over how, when, and where to enforce federal law.

\* \* \*

*NFIB* is the only case in which the Supreme Court has "deemed a condition unconstitutionally coercive in violation of the Tenth Amendment." *New York v. Yellen*, 15 F.4th 569, 582 (2d Cir. 2021). The Court should reject Plaintiffs' attempt to import this unique doctrine to an entirely new and different context, especially given the missing factual predicate and the stunning separation-of-powers issues that would result. In the light of these issues and the disruption caused by Plaintiffs' requested relief, if the Court grants Plaintiffs' motion and enters preliminary injunctive relief, the Court should stay any injunction pending appeal. *Cf. Tincher*, 2026 WL 194768, at \*1.

## CONCLUSION

The Court should deny the motion for a preliminary injunction.

Dated: January 28, 2026               Respectfully submitted,

                                                                                            BRETT A. SHUMATE
                                                                                            Assistant Attorney General
                                                                                            Civil Division

                                                                                            */s/ Brantley T. Mayers*
                                                                                            BRANTLEY T. MAYERS (FL #1039996)
                                                                                            Counsel to the Assistant Attorney General

                                                                                            ANDREW WARDEN
                                                                                            Assistant Director
                                                                                            LEE REEVES
                                                                                            Trial Attorney
                                                                                            U.S. Department of Justice
                                                                                            Civil Division, Federal Programs Branch
                                                                                            1100 L Street, N.W.
                                                                                            Washington, D.C. 20005

Telephone: (202) 616-5084
Fax: (202) 616-8470
Andrew.Warden@usdoj.gov

*Counsel for Defendants*