# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| STATE OF MINNESOTA, *by and through its Attorney General Keith Ellison*; CITY OF MINNEAPOLIS; and CITY OF ST. PAUL, | No. 26-cv-190 (KMM/DJF) |
| Plaintiffs, | |
| v. | **ORDER** |
| KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; JOHN CONDON, *in his official capacity as Acting Executive Associate Director of Homeland Security*; DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; MARCOS CHARLES, *in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations*; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; RODNEY SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection*; U.S. CUSTOMS AND BORDER PROTECTION; GREGORY BOVINO, *in his official capacity as Commander of the U.S. Border Patrol*; DAVID EASTERWOOD, *in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement*, | |
| Defendants. | |

---

In recent weeks, several thousand federal agents have arrived in Minnesota and its two largest cities as part of "Operation Metro Surge," an immigration enforcement campaign. The flood of federal agents has had profound effects on Minnesotans, requiring the State and the cities of Minneapolis and Saint Paul to respond in many ways. In this case, Plaintiffs (the State of Minnesota, Minneapolis, and Saint Paul), ask the Court to declare that the unprecedented surge of Defendants' agents in Minnesota is unconstitutional and unlawful, and enter an injunction halting Operation Metro Surge. (Dkt. 1 at 76–77.[1]) To that end, Plaintiffs filed a Motion for a Temporary Restraining Order (Dkt. 7), which the Court converted to a motion for a preliminary injunction (Dkt. 21).

The Court pauses to observe what it is *not* deciding. At this stage, the Court makes no final determination on the merits of any claims asserted by Plaintiffs. Nor does the Court offer any opinion about the wisdom of Operation Metro Surge. And the legality of many of the specific actions taken by federal agents during the operation is not before the Court in this case. Instead, the Court only decides whether to grant the extraordinary remedy of a preliminary injunction halting a federal law enforcement operation based upon the Tenth Amendment. In answering this question, the Court must view Plaintiffs' claims through the lens of the specific legal framework they invoke, and, having done so, finds that Plaintiffs have not met their burden. For the reasons discussed below, the motion is denied.

---

[1] Unless otherwise noted, the Court cites to page numbers found in the headers generated by the CM/ECF filing system.

## BACKGROUND

The relevant facts are largely undisputed at this stage. In their respective evidentiary submissions, each side understandably emphasizes the reality that supports their position. Plaintiffs describe the costs and consequences of what they characterize as an excessive and extreme law enforcement operation that is causing harm to the Twin Cities and State themselves, as well as to their residents. Defendants do not submit evidence directly contradicting these accounts, but instead highlight the importance of immigration enforcement and the number of undocumented people that have been arrested, including people with serious criminal histories. Defendants also present evidence broadly discussing how immigration enforcement agents have been met with resistance and, in some cases, threats and violence by protestors. Because the outcome in this case depends more on the relevant law than the granular facts, the Court provides a high-level summary of the extensive record before turning to the analysis.

### *Operation Metro Surge – Defendants' Perspective*

In early December 2025, the federal government launched Operation Metro Surge, an "exclusive federal operation" designed "to significantly increase 'at-large' arrests of illegal aliens in the Twin Cities metropolitan area, focusing on individuals with executable final orders." (Dkt. 35-2 ("Olson Decl.") ¶¶ 14, 16, 19.) According to Defendants, there are "approximately 66,000 aliens in Minnesota [who] appear to be or may be subject to enforcement actions under the Immigration and Nationality Act (INA)" (*id.* ¶ 17), though they do not specify how many of those noncitizens have either final orders of removal or criminal histories. Described as "a joint effort between ICE ERO and ICE HSI, with

assistance from other federal components,"[2] Operation Metro Surge entailed "approximately 2,000 additional ERO officers and HSI agents [being] detailed to the St. Paul Field Office . . . at different times and for varying lengths of time." (*Id.* ¶¶ 15–16.) By Defendants' own estimate, as of January 26, 2026, there were about 3,000 federal officers in Minnesota as part of the operation, in contrast to the 80 officers that "[t]ypically" cover ICE's operations in the Twin Cities. (*Id.* ¶ 15; Dkt. 120 at 2.)

Defendants maintain that Operation Metro Surge has "execute[d] federal law through immigration enforcement" without any participation from Minnesota's state, county, or municipal officials. (Olson Decl. ¶ 14.) According to Defendants, Operation Metro Surge "has led to the successful arrest and apprehension of" over "3,000 illegal aliens," including an unspecified number of people with a variety of criminal convictions. (*Id.* ¶¶ 16, 18.)

To carry out Operation Metro Surge, agents from ICE, HSI, U.S. Customs and Border Patrol ("CBP"), and other federal agencies have "participate[d] in a variety of different law enforcement actions in and around Minneapolis." (Dkt. 35-1 ("Harvick Decl.") ¶ 6.) Defendants' enforcement activities include engaging in "consensual encounters, investigative detentions, warrantless arrests, and arrests pursuant to both immigration and criminal judicial warrants." (*Id.*) According to Defendants, federal agents involved in Operation Metro Surge have faced "threats, violence, aggression, attacks,

---

[2] "ICE" refers to United States Immigration and Customs Enforcement. "ERO" refers to the Enforcement and Removal Operations division of ICE, and "HSI" refers to Homeland Security Investigations.

vehicle block-ins, and obstruction of immigration enforcement operations." (*Id.* ¶¶ 10–12; Olson Decl. ¶ 19.) Defendants also describe "routine, if not daily . . . *ad hoc* protest[s]" that coalesce into "public interference" when officers are attempting to carry out enforcement operations. (Harvick Decl. ¶ 22.)

### *Operation Metro Surge – Plaintiffs' Perspective*

Through a robust evidentiary record, Plaintiffs present a far different picture of how Operation Metro Surge has unfolded and its effect on Plaintiffs and their communities. The chief feature of the operation, according to Plaintiffs, is the rampant disregard for the law by the federal officers carrying it out. For example, ICE agents have engaged in racial profiling, appearing to question people about their citizenship status based on their perceived race or ethnicity, and in some cases placing them under arrest without a legal basis. (*See, e.g.*, Dkt. 13 at 2; Decl. 90-1 ("R.M. Decl.") at 2–3.) According to Plaintiffs, Defendants' indiscriminate, arbitrary, and unlawfully forceful methods of carrying out their stated law enforcement objectives and responding to anti-ICE observers and protesters have resulted in widespread fear across the state. Examples include, among many incidents, the fatal federal-officer-involved shootings of Renee Good and Alex Pretti; DHS agents ramming vehicles; agents throwing explosive cannisters of chemical irritants under family vehicles; and leaving undetonated chemical munitions and live ammunition behind on the scene of enforcement efforts. (Dkt. 106 ¶¶ 4, 6; Dkt. 105-2 at 5; *see generally* Dkt. 105;

Dkt. 86, Exs. 1–64.[3]) Plaintiffs also point out that many DHS agents have switched license plates on their vehicles and worn face coverings that conceal their identities, though Minnesota law prohibits such behavior.[4] (Dkt. 8 at 14 (citing Minn. Stat. §§ 168.36 and 609.735).)

The presence of so many agents and the methods by which they have carried out Operation Metro Surge has profoundly impacted the education system in the State and in the Twin Cities, disrupted the healthcare industry, caused religious observers to forego attending services and other programming at houses of worship, and affected local business communities. In the education sphere, reports of students and parents being subjected to federal officers' use of force and being detained on their way to and from school have had "negative impacts on attendance and student focus[.]" (Dkt. 75 ("Graff Decl.") ¶¶ 19–20.) It has also affected school staff members. (Dkt. 77 ("Lewis Decl.") ¶ 10.) As a result, multiple school districts have temporarily closed or "fe[lt] compelled to offer online learning tools or hybrid models" to accommodate students and families that "feel[] unsafe leaving their homes to bring children to and from school." (Graff Decl. ¶¶ 17, 19; *see, e.g.*, Lewis Decl. ¶¶ 5–8.) And, "to the extent the impacts of Operation Metro Surge fall

---

[3] The Declaration of Lindsey Middlecamp can be found at docket entry 86. Exhibits 1 through 68 to Ms. Middlecamp's declaration are included in docket entries 86, 88, and 89.

[4] Defendants present testimonial evidence that "the rise of doxxing, the advancement of facial recognition technologies, and the proliferation of bad actors on social media, has created an unprecedented operational risk for federal law enforcement officers that necessitates appropriate protective steps such as wearing masks in public to protect their identities." (Harvick Decl. ¶ 20.)

disproportionately on low-income or multilingual households, . . . addressing disruptions could require even more" state resources. (Graff Decl. ¶ 21.)

Similarly, Operation Metro Surge has impacted the provision of healthcare, as patients have canceled or delayed critical appointments out of fear of leaving their homes, resulting in preventable medical complications. (*See, e.g.*, Dkt. 79 ("Boschee Decl. 1") at 3–9.) It has also impacted places of worship, including one where congregants "witnessed ICE agents in the church parking lot during church services" (*id.* ¶ 17), which have faced significant decreases in attendance over the last few months (*id.* at 10–13). Operation Metro Surge has also resulted in cancelations of large events that would have generated substantial revenue for Plaintiffs. (Dkt. 64 ¶¶ 3–5, 7–13 (noting that the cancelation of one such event resulted in a loss of "several thousand dollars in tax revenue for" Minneapolis); Dkt. 65 ¶¶ 6–7, 10.) And, many Twin Cities businesses have reported numerous adverse impacts, including "significant decreases in customer traffic . . . because their customer base [is] not comfortable to go out and go shopping" (Dkt. 12 ¶ 4), decreases in revenue of up to 80 percent (*id.*), and staffing issues because "[e]mployees [are] not feeling comfortable coming to work . . . or [are] requesting reduced hours" (*id.* ¶ 5). (*See also* Dkt. 70 at 10–14; Dkt. 16, Exs. 9–10; Dkt. 70, Exs. 12–21; Dkt. 72 ¶ 3; Dkt. 73 ¶¶ 9–11; Dkt. 74 ¶¶ 9–18.)

Plaintiffs also allege that the way Defendants have carried out Operation Metro Surge has caused them to divert significant resources that otherwise would be used to advance important priorities of their own. For example, Minnesota's Department of Public Safety has expended significant additional resources to run the State's Emergency

Operations Center ("SEOC") in the wake of the fatal shooting of Renee Good on January 7, 2026. (Dkt. 14 ¶ 5.) And members of the State Patrol have been placed on alert to respond to public unrest that could result from DHS's activities. (*Id.* ¶ 7.) The Minnesota Department of Transportation has also reallocated resources away from ordinary duties in response to Operation Metro Surge, making it less available to address safety conditions on Minnesota roads and highways. (Dkt. 15 ¶¶ 6, 12–15, 16–21, 26–28.)

The immigration enforcement surge has similarly affected the resources and operations of the City of Minneapolis. Because the City has received a high volume of 911 emergency calls related to Defendants' immigration enforcement actions, which have triggered "community tensions" and large-scale protests, the Minneapolis Police Department ("MPD") has had to increase supervisor hours, pay more overtime, cancel scheduled leave for officers, keep its specialized units on paid on-call status, and provide increased mental health and other support to its staff. (Dkt. 9 ("Frey Decl.") ¶¶ 8–16; *see also* Dkt. 11 ¶¶ 2–15.) The need to respond to the effects of Operation Metro Surge has meant that MPD officers are not available to respond to other 911 emergency calls or public safety needs and has required significant additional work for other components of the Minneapolis government and its mayor's office. (*See, e.g.*, Dkts. 62–63, 67, 106.)

Saint Paul has experienced similar challenges. It has also had to devote resources to educate the public on distinguishing city officers from federal immigration officers, to enact temporary policies to counteract common public hazards arising from Operation Metro Surge, and to communicate with Defendants about violations of local ordinances in furtherance of their federal law enforcement purposes. (Dkt. 70 ¶¶ 5–29; Dkt. 70, Exs. 1,

3, 10; Dkt. 16-5.) Moreover, Plaintiffs allege unquantifiable harm from Operation Metro Surge, including the erosion of community trust that Plaintiffs have worked to rebuild over the last few years, which in turn had lowered crime rates in the Twin Cities. This decline in trust is attributable to federal agents' practices of failing to identify themselves, masking, and wearing inconsistent uniforms with inconsistent identification. (Frey Decl. ¶¶ 3, 5; Dkt. 70 ¶ 17; Dkt. 70-2.)

***Motivations for Operation Metro Surge***

The parties offer differing characterizations of the motivation behind Operation Metro Surge. Plaintiffs allege that it is not motivated by a legitimate law-enforcement purpose. According to Plaintiffs, the surge serves as a pretext for leveraging demands and punishing political leaders within the State and the Twin Cities who oppose Defendants' immigration policies, in part by enacting so-called "sanctuary" laws and ordinances that prohibit participation in federal immigration enforcement.[5] (*See* Dkt. 8 at 34–35 ("Defendants' conduct has and will continue to require Minnesota and its political subdivisions to take actions they would not take but for Defendants' conduct.").) Further, Plaintiffs assert that Operation Metro Surge is what Defendants have resorted to because their initial attempts "to coerce Plaintiffs 'the easy way' by trying to tie all federal funding" were enjoined and ultimately unsuccessful. (Dkt. 60 at 13.) Based in part on a letter from

---

[5] Defendants have generally referred to Plaintiffs' laws, ordinances, and policies that restrict cooperation with federal immigration enforcement as "sanctuary" laws, which, in turn, leads to Plaintiffs being called "sanctuary" jurisdictions. Plaintiffs have generally referred to those same cooperation-limiting measures as "separation" laws or polices. The Court takes no side in the debate underlying this difference in terminology but uses the term "sanctuary" because it seems well understood in common usage.

United States Attorney General Pamela Bondi to Minnesota Governor Tim Walz, Plaintiffs assert that among Defendants' true objectives in executing Operation Metro Surge are gaining access to Minnesota's voter rolls and pressuring the State and Twin Cities to cooperate with the federal government in its purported immigration enforcement efforts, including by sharing state records and "repeal[ing] . . . sanctuary policies[.]" (Dkt. 114-1 at 3–4; Dkt. 60 at 10–13 (citing statements by Defendants).) And, to achieve those coercive ends, Defendants have allegedly engaged in a pattern of misconduct designed to pressure Plaintiffs into enforcing federal immigration law.

On the other hand, Defendants claim that Operation Metro Surge was launched "to address the dangers arising from the presence of illegal aliens in the Twin Cities area, including dangerous criminal aliens engaged in violent crimes and drug trafficking." (Dkt. 33 at 9.) According to Defendants, those dangers are "exacerbated" by Plaintiffs' "sanctuary laws and policies that limit the cooperation of some state and local officials with federal immigration officials, which has hindered the federal government's ability to enforce immigration laws in Minnesota[.]" (*Id.*) They further maintain that all aspects of Operation Metro Surge have strictly been in furtherance of "the enforcement of federal law," in line with President Trump's campaign promises to more strictly enforce federal immigration laws. (*Id.* at 1 (emphasis omitted), 5–7.)

### *Claims and Procedural History*

On January 12, 2026, Plaintiffs filed their Complaint (Dkt. 1), seeking both preliminary and permanent injunctive relief, and they moved for a temporary restraining

order (TRO) that same day (Dkt. 5).[6] In the Complaint, Plaintiffs assert ten Causes of Action[7]:

1. Count I claims that Defendants have violated the "Tenth Amendment of the U.S. Constitution" through "Infringement on Plaintiffs' Police Power" and "Unlawful Coercion and Commandeering" (Dkt. 1 at 53–55);

2. Count II, brought by the State, claims that Defendants have violated "Equal Sovereignty Under the U.S. Constitution" based on disparate treatment of Minnesota relative to other states (*id.* at 58–60);

3. Counts III through VII claim that Defendants have violated the Administrative Procedure Act in a variety of ways, including by violating state and local laws (*id.* at 60–71);

4. Counts VIII and IX claim that Defendants have violated the First Amendment through unlawful retaliation and viewpoint discrimination (*id.* at 71–74); and

5. Count XI[8] claims that Defendants have engaged in "Ultra Vires Executive Action in Excess of Constitutional and Statutory Authority Conferred on the Executive" (*id.* at 75–76).

In moving for a TRO, Plaintiffs raised only their Tenth Amendment and Equal Sovereignty claims. (Dkt. 8.)

With respect to their Tenth Amendment claims, Plaintiffs focus their arguments on how Operation Metro Surge has caused them to divert significant financial and other resources away from other pressing state and local matters toward addressing the consequences of Operation Metro Surge. (*Id.* at 34–41.) Plaintiffs also describe the impact of the surge on essential services they provide to their citizens, including education, healthcare, and policing. (*Id.* at 38–41.) And, in support of injunctive relief on their Equal

---

[6] Plaintiffs filed several declarations in support of their motion. (*See, e.g.*, Dkts. 6, 9–16.)

[7] Unless stated otherwise, the claims are brought by all Plaintiffs.

[8] The Complaint does not include a "Count X."

Sovereignty claim, they allege that Minnesota has been singled out and targeted by ICE in a way that no other state has experienced.

On January 14, 2026, the Court held a status conference, during which the Court "declined to grant an ex parte TRO without giving Defendants an opportunity to respond to the motion for injunctive relief," converted the motion to one for a preliminary injunction,[9] and set expedited briefing deadlines. (Dkt. 21.) Defendants filed their Response to the motion (Dkt. 33) on January 19, and Plaintiffs submitted their Reply (Dkt. 60) on January 22, with additional evidence in support of their motion.[10] Plaintiffs' Reply addressed public statements made by Defendants and other members of the federal government concerning Operation Metro Surge and its purpose between the filing of Plaintiffs' motion and their Reply. (Dkt. 60 at 10–12 (citing statements).) Plaintiffs argue that their request for preliminary injunctive relief was strengthened by these developments, which showed that Defendants' "early claims regarding their purposes in conducting [Operation Metro Surge] (political retribution and fighting fraud) have largely given way

---

[9] Since the status conference, Plaintiffs have twice asked the Court to reconsider its decision to convert the motion for a temporary restraining order into a motion for a preliminary injunction. (Dkts. 31, 107.) To the extent that any further ruling on these requests is necessary, they are denied. The Court would not have found a likelihood of success on the merits necessary for granting a TRO when the case was filed, and it does not find that the factors support issuance of a preliminary injunction now.

Plaintiffs have also alleged that, had they understood the Court was going to convert the motion, they would have sought injunctive relief as to other claims in the Complaint, and not just the two sets of claims that were the focus of their initial filing. If, considering the Court's analysis here, Plaintiffs believe injunctive relief is appropriate as to other claims, they may file another motion.

[10] Dkts. 62–67, 70, 72–83, 86, 88–91, 105–06, 113–14.

to the purpose of compelling Plaintiffs to abandon their separation laws." (*Id.* at 18; *see id.* at 16–19.)

On January 26, 2026, the Court heard oral argument on Plaintiffs' motion. (Dkt. 119.) Following the hearing, the Court issued an Order for Supplemental Briefing (Dkt. 118), instructing Defendants to address the statements and arguments raised in Plaintiffs' Reply. Defendants filed their supplemental response on January 28. (Dkt. 129.)

**DISCUSSION**[11]

## I.   **Legal Standard**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Choreo, LLC v. Lors*, No. 25-1706, 2026 WL 82841, at *3 (8th Cir. Jan. 12, 2026) (quoting *id.* at 22). "The party seeking a preliminary injunction bears the burden of establishing the necessity of" the remedy. *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 316 (8th Cir. 2009); *see also Sleep Number Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022).

When a party moves for preliminary injunctive relief, courts consider four factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on the other parties . . . ; (3) the probability that the movant will succeed on the merits; and (4) the public interest." *Missouri*

---

[11] Defendants do not challenge Plaintiffs' assertion that they have standing to bring these claims or to seek prospective injunctive relief. In any event, because the Court finds Plaintiffs' arguments on standing to be well-supported and ultimately denies the motion for a preliminary injunction, the Court finds it unnecessary to engage in any lengthy discussion of standing in this Order.

*v. Trump*, 128 F.4th 979, 990 (8th Cir. 2025) (quoting *Wilbur-Ellis Co., LLC v. Erikson*, 103 F.4th 1352, 1355–56 (8th Cir. 2024). None of these factors is dispositive. *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.3d 109, 113 (1981)). "[R]ather, the court should balance all the factors in considering whether the injunction should be granted." *Id.*

## II. Likelihood of Success

First, the Court considers whether Plaintiffs have shown a likelihood of success on the merits of the claims raised in their motion for a preliminary injunction, which is often considered the "most important" factor. *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 593 (8th Cir. 2022); *see also Minn. Chapter of Associated Builders & Contractors, Inc. v. Blissenbach*, 155 F.4th 1015, 1021 (8th Cir. 2025) (stating that the probability of success is "the most significant factor"). Meeting the burden on this element "typically require[s]" the movant "to demonstrate that it has a 'fair' chance of prevailing on the merits[.]" *Sleep Number Corp.*, 33 F.4th at 1016 (quoting *Rodgers v. Bryant*, 942 F.3d 451, 455–56 (8th Cir. 2019).[12] In doing so, the Court does not determine whether the movant "will ultimately win." *See Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991) (quotation omitted).

---

[12] Defendants argue that Plaintiffs must "demonstrate that [they are] 'likely to prevail on the merits'" because they "seek[] to enjoin 'the enforcement of federal statutes[.]'" (Dkt. 33 at 13 (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 731–32, 732 n.6 (8th Cir. 2008) (en banc)).) Plaintiffs disagree that a heightened standard applies in a challenge to the method of law enforcement rather than the constitutionality of the law itself. The Court declines to resolve this dispute, finding that Plaintiffs fail to clear even the lower hurdle.

A.    **Tenth Amendment**

The Constitution establishes a system of federalism where there is "dual sovereignty" between the states and the federal government. *Printz v. United States*, 521 U.S. 898, 918–19 (1997) (citing *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991)). That system of dual sovereignty operates to "secure[] to citizens the liberties that derive from the diffusion of sovereign power." *New York v. United States*, 505 U.S. 144, 181 (1992) (quoting *Coleman v. Thompson*, 501 U.S. 722, 759 (1991) (Blackmun, J., dissenting)). The Constitution grants certain enumerated powers to the federal government and, implicitly, leaves "a residuary and inviolable sovereignty" to the states. *Printz*, 521 U.S. at 918–19 (quoting The Federalist No. 39, at 245 (J. Madison)) (indicating that "[r]esidual state sovereignty" is "reflected throughout the Constitution's text" and is "implicit . . . in the Constitution's conferral upon Congress" of only "enumerated" powers). The Tenth Amendment makes the implicit "express," *id.* at 919, when it states, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

Over the years, the United States Supreme Court has addressed, in various contexts, whether the exercise of federal power threatens to overstep and infringe on the power of the states in our system of dual sovereigns. In relevant part, the Supreme Court has recognized that the Tenth Amendment embodies an "anticommandeering principle" that prevents the federal government from infringing on the sovereignty of a state. *New York*, 505 U.S. 144 (1992); *Printz*, 521 U.S. 898 (1997); *Murphy v. Nat'l Coll. Athletic Ass'n*, 584 U.S. 453 (2018). However, the principle "did not emerge in [Supreme Court] cases

until relatively recently, when Congress attempted in a few isolated instances to extend its authority in unprecedented ways." *Murphy*, 584 U.S. at 471. The Supreme Court's "first experience with [federal commandeering of state governments] did not occur until the 1970's," when the Environmental Protection Agency passed regulations requiring states to take various steps to regulate auto emissions. *Printz*, 521 U.S. at 925 (discussing *EPA v. Brown*, 431 U.S. 99 (1977) (per curiam)). And, although the *Brown* case was dismissed before the Supreme Court issued an opinion, its "later opinions . . . made clear that the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Id.* (discussing *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264 (1981), and *Fed. Energy Regul. Comm'n v. Mississippi*, 456 U.S. 742 (1982)).

The federal government can run afoul of the anticommandeering principle in several ways. For instance, the Tenth Amendment is violated when the federal government attempts to compel states to enact or administer a federal regulatory program. *New York*, 505 U.S. at 188 (invalidating a federal statute requiring states to either adopt federal instructions for how to handle low-level radioactive waste or accept the waste, which amounted to a "choice between two unconstitutionally coercive regulatory techniques"). The federal government also cannot "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program," *Printz*, 521 at 935, because "[federal] laws conscripting state officers violate state sovereignty and are thus not in accord with the Constitution," *id.* at 925; *see id.* at 904, 933 (finding that a federal statute violated dual sovereignty when it required state law enforcement officers to

16

perform background checks on handgun purchasers in furtherance of federal law). Most recently, the Supreme Court held that a federal statute "prohibiting state authorization of sports gambling" violated the anticommandeering doctrine because it instructed state legislatures on what they could or could not do. *Murphy*, 584 U.S. at 474–75.

The constitutional prohibition on the federal government "requir[ing] the States to regulate" applies equally when the government "directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012) ("*NFIB*") (quoting *New York*, 505 U.S. at 178). Even when the federal government purports to "offer[] state governments a 'choice,'" it may "cross[] the line distinguishing encouragement from coercion." *New York*, 505 U.S. at 175; *but see South Dakota v. Dole*, 483 U.S. 203, 211 (1987) (finding that conditioning receipt of federal funds amounting to 5% of South Dakota's highway budget on raising its drinking age to 21 was offering "relatively mild encouragement" to the state and therefore was not "so coercive as to pass the point at which 'pressure turns into compulsion'" (quoting *Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937))).[13]

Against this backdrop, the Court considers Plaintiffs' assertion that Operation Metro Surge violates the anticommandeering principle. Plaintiffs essentially raise two theories in support of their claim. First, in what the Court calls the "resources theory," Plaintiffs

---

[13] While Defendants argue in their supplemental memorandum that *NFIB* and *Dole* are not strictly Tenth Amendment cases (Dkt. 129 at 3), the Court finds these cases instructive regarding overall "structural limits upon federal power," as they consider what the federal government can permissibly "impose upon the sovereign States." *NFIB*, 567 U.S. at 647 (Scalia, J., dissenting).

contend that Operation Metro Surge violates the anticommandeering doctrine and infringes on Plaintiffs' police powers by requiring Plaintiffs to expend significant state and local resources to address the harmful effects of the surge on their respective jurisdictions, ultimately diverting resources away from other matters of state and local priority. (*See* Dkt. 8 at 33–41.) Plaintiffs' second theory, which the Court refers to as the "improper influence theory," is advanced most clearly in their Reply. Under this theory, Plaintiffs assert that Defendants are carrying out Operation Metro Surge in unlawful ways to coerce Plaintiffs "through force . . . into abandoning policies they have a Tenth Amendment right to adopt." (Dkt. 60 at 16.) Pointing to Defendants' own statements, Plaintiffs argue that Operation Metro Surge is not a legitimate exercise of federal law enforcement power, but is instead a campaign of pressure to force Plaintiffs to yield and abandon their "sanctuary" policies. (*Id.* at 16–19.)

Though Plaintiffs' position is not without merit, for several reasons the Court finds that Plaintiffs have not shown the likelihood of success required for preliminary injunctive relief on either theory. First, entry of a preliminary injunction would require the Court to conclude there is a "fair chance" that the Supreme Court's limited Tenth Amendment anticommandeering precedent bars federal government action in the unprecedented

situation presented in this case. While this alone does not render injunctive relief improper, it weighs heavily against the issuance of an injunction.[14]

To be clear, the Court is not suggesting that the anticommandeering principle is categorically inapplicable to actions taken by the Executive Branch. Indeed, the Tenth Amendment itself refers to the powers granted to "the United States," and the relevant caselaw refers not only to Congress but also to limitations on what the "federal government" may do. *E.g.*, *Printz*, 521 U.S. at 935[15]; *New York*, 505 U.S. at 156–57.

At the same time, the Supreme Court cases on which Plaintiffs principally rely concerned statutes that either conscripted state law enforcement officers into federal service, *Printz*, 521 U.S. at 922, directly compelled states to enact or enforce a federal regulatory program, *New York*, 505 U.S. at 166, or directly limited what legislation states could or could not enact, *Murphy*, 584 U.S. at 470. Insofar as Plaintiffs' Tenth Amendment claims do not challenge the constitutionality of any federal statute, Defendants' challenged conduct does not fit neatly into the clearly defined prohibitions on the exercise of federal authority. Instead, Plaintiffs ask the Court to extend existing precedent to a new context

---

[14] Of course, this Order only considers the Tenth Amendment and Equal Sovereignty implications of actions already taken and those still underway by Defendants during Operation Metro Surge. Whether other future actions which might be taken by the Executive Branch in furtherance of their operations in Minnesota—such as deployment of the National Guard—could violate the Tenth Amendment are questions for another day.

[15] That the anticommandeering principle extends to actions taken by the Executive Branch seems likely given the *Printz* Court's observation that the Court's first experience with it arose in a case concerning regulations promulgated by the EPA, an executive agency, not by Congress. 521 U.S. at 925 (discussing *Maryland v. EPA*, 530 F.2d 215 (4th Cir. 1975); *Brown v. EPA*, 521 F.2d 827 (9th Cir. 1975)).

where its application is less direct—namely, to an unprecedented deployment of armed federal immigration officers to aggressively enforce immigration statutes. None of the cases on which they rely have even come close. While the novelty of Plaintiffs' claims does not necessarily preclude their ultimate success on the merits, it weighs against the propriety of preliminary injunctive relief.

Second, although the Court finds Plaintiffs' improper-influence theory to be the stronger of their two theories, the inferences to be drawn regarding the allegedly coercive purpose of Operation Metro Surge are not as one-sided as Plaintiffs suggest. Plaintiffs argue that Defendants are carrying out Operation Metro Surge in brazenly lawless ways specifically to coerce Plaintiffs into modifying or repealing their "sanctuary" laws and ordinances and otherwise cooperate with the Executive, thereby commandeering Plaintiffs' legislative processes. Plaintiffs certainly have put forth evidence to support this theory, including Attorney General Bondi's letter to Governor Walz, which states as much, and other statements by Defendants and other Executive Branch officials. (Dkt. 114, Exs. 1–6.) And Plaintiffs' theory finds additional support in more recent statements by executive officials. For example, Border Czar Tom Homan said on January 29, 2026, that "[t]he withdrawal of law enforcement resources here is dependent on cooperation" by state and local officials with the Administration's immigration priorities.[16] Several courts have already determined that the federal government cannot coerce "sanctuary" jurisdictions

---

[16] Associated Press, LIVE: Border Czar Tom Homan Holds News Conference in Minneapolis, at 20:44–20:50 (YouTube, Jan. 29, 2026), https://www.youtube.com/watch?v=IQ1xHRIhdMo ("Homan News Conference").

into changing their laws or carrying out the Executive Branch's immigration priorities by threatening to withhold appropriated funds. *E.g.*, *City & Cnty. of San Francisco v. Trump*, 783 F. Supp. 3d 1148, 1195 (N.D. Cal. 2025) (finding that plaintiffs were likely to succeed on their Tenth Amendment challenges to executive orders directing the federal government to withhold funds from sanctuary jurisdictions because they wielded "critical funding as a cudgel with which to coerce localities that do not wish to cut essential programs into accepting the federal government's conditions in exchange for the funds they were promised"); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 534 (N.D. Cal. 2017) (similar). Using a surge of executive force against a "sanctuary" jurisdiction to accomplish the same ends is arguably no less coercive than withholding funds, and the Court does not dismiss Plaintiffs' position as "legally frivolous," as Defendants suggest it should. (Dkt. 33 at 13.)

However, there is also support that cuts the other way, both in the briefing and the record, suggesting that there are other motivations behind Operation Metro Surge. Before its outset, several Executive Branch officials emphasized that Operation Metro Surge was a necessary response to allegations of widespread fraud in Minnesota against government programs. (Dkt. 1 ¶¶ 55–59 (citing statements from President Trump and other Executive Branch officials tying enforcement actions to alleged "fraud" in Minnesota).) Defendants have introduced evidence that the operation was also launched to increase arrests of noncitizens with criminal convictions in Minnesota and the Twin Cities, an effort they claim has been hindered by Plaintiffs' refusal to assist with federal immigration

21

enforcement efforts. (*See* Olson Decl. ¶¶ 14–18; Harvick Decl. ¶ 7; *cf.* Dkt. 1 ¶ 113.[17]) Based on the record before the Court, a factfinder could reasonably credit that Plaintiffs' sanctuary policies require a greater presence of federal agents to achieve the federal government's immigration enforcement objectives than in a jurisdiction that actively assists ICE. (*See* Olson Decl. ¶¶ 8–13; *see also* Harvick Decl. ¶ 16 (indicating that an injunction would limit CBP's ability to arrest and detain noncitizens with criminal records).) Because there is evidence supporting both sides' arguments as to motivation and the relative merits of each side's competing positions are unclear, the Court is reluctant to find that the likelihood-of-success factor weighs sufficiently in favor of granting a preliminary injunction. *See Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 488 (8th Cir. 1993) (affirming district court's denial of preliminary injunction where there was "evidence to directly support both [parties'] arguments").[18]

Relatedly, Plaintiffs' improper-influence claim invites the Court to identify the precise point at which a legitimate effort to enforce federal immigration law becomes unconstitutionally coercive and infringes on a state's sovereignty. On this record, there are

---

[17] Defendants do not concede that the federal agents involved in Operation Metro Surge are engaged in brazen lawlessness, but state that "the actions of federal officers over the past six weeks match" the operation's purpose of "enforcement of federal law." (Dkt. 129 at 4 (citing Olson Decl. ¶¶ 14, 16).)

[18] The Court is particularly reluctant to take a side in the debate about the purpose behind Operation Metro Surge. Not only is it difficult to identify a single motivation for a significant multifaceted operation, but doing so would venture into a uniquely controversial political question. *See Davis v. Bandemer*, 478 U.S. 109, 145 (1986) (O'Connor, J., concurring) ("To turn these matters over to the federal judiciary is to inject the courts into the most heated partisan issues.").

both quantitative and qualitative challenges to this line-drawing. Quantitatively, Plaintiffs cannot point to what number of federal officers would demonstrate a de facto Tenth Amendment anticommandeering violation. Qualitatively, there is no clear way for the Court to determine at what point Defendants' alleged unlawful actions (e.g., racial profiling, excessive force, deployment of chemical irritants, wearing face coverings, switching license plates, overusing city parking lots, among others) becomes so problematic that they amount to unconstitutional coercion and an infringement on Minnesota's state sovereignty. Plaintiffs have provided no metric by which to determine when lawful law enforcement becomes unlawful commandeering, simply arguing that the excesses of Operation Metro Surge are so extreme that the surge exceeds whatever line must exist. (Dkt. 126 at 31.) A proclamation that Operation Metro Surge has simply gone "so far on the other side of the line" is a thin reed on which to base a preliminary injunction.[19]

The line-drawing difficulties highlight a doctrinal challenge as well. The Supreme Court's anticommandeering caselaw involves situations where the federal government's

---

[19] Plaintiffs' quantitative hurdles are compounded by recent conflicting reports regarding whether the government is planning to "draw down" the number of federal agents in Minnesota. *See, e.g.*, Jeff Day, Homan Plans to Reduce Number of Federal Agents in Minnesota, Minn. Star Trib. (Jan. 29, 2026, 7:32 AM), https://www.startribune.com/ice-raids-minnesota/601546426; *see generally* Homan News Conference. *But see* Brooks Johnson, Trump Says 'Nothing is Going to Change' on Immigration Enforcement in Minnesota, Minn. Star Trib. (Jan. 29, 2026, 7:49 PM), https://www.startribune.com/ice-raids-minnesota/601546426. A possible reduction in force highlights the uncertainty of how to determine when a federal presence would cross into (or out of) a Tenth Amendment violation.

infringement on state sovereignty is not a question of fact, but a legal on-off switch: there is either a clearly identifiable congressional (or regulatory) command that violates state sovereignty, or there is not. When, for example, Congress tells the States that they cannot enact laws authorizing sports betting, a court can hold, based on the statute itself, that Congress cannot give such a command. *Murphy*, 584 U.S. 480 (explaining that the "direct command to the States" in the challenged statute was "exactly what the anticommandeering rule does not allow"). But even when it is clear what the coercion is, the caselaw does not describe a way by which the Court could draw the line between constitutionally permissible "pressure" and impermissible "compulsion." *See NFIB*, 567 U.S. at 578 (indicating that federal statutes placing conditions on states' receipt of federal funds should not "exert a power akin to undue influence") (quotation omitted); *Dole*, 483 U.S. at 211 (observing that in some circumstances, "the financial inducement offered by Congress might be so coercive as to pass the point at which pressure turns into compulsion"). And this jurisprudence certainly does not provide guidance on how the Court should make that determination as to a broad immigration law enforcement initiative.

The absence of doctrinal instruction on how to draw the necessary line, compounded by the challenges in drawing such a line in the context of Operation Metro Surge, means that issuing the requested injunctive relief—halting the operation entirely—could overstep the judicial role. As the Eighth Circuit very recently cautioned, "federal courts do not exercise general oversight of the Executive Branch." *Tincher v. Noem*, No. 26-1105, 2026 WL 194768, at *2 (8th Cir. Jan. 26, 2026) (per curiam) (quoting *Trump v. CASA, Inc.*, 606

U.S. 831, 861 (2025)). Plaintiffs' improper-influence theory invites the Court to risk doing just that.

Many of these same problems also weigh against a finding that Plaintiffs are likely to succeed on the merits of their resources theory. In addition to suffering from the same line-drawing problems discussed above, Plaintiffs' claims under this theory face an additional jurisprudential barrier. In *United States v. Texas*, 599 U.S. 670 (2023), Texas and Louisiana sued DHS, arguing that DHS was not doing enough to arrest and remove noncitizens from the United States, and in doing so, "impose[d] costs on the States" because they had "to incarcerate or supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government." *Id.* at 674. There, the Supreme Court held that Texas and Louisiana lacked standing to bring those claims, in part, because of the substantial discretion the Executive Branch has over arrest and detention decisions, as well as the absence of "meaningful standards for assessing the propriety of enforcement choices in this area." *Id.* at 679–80. Moreover, the Supreme Court explained that "in our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending," and "when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the States' claim for standing can become more attenuated." *Id.* at 680 n.3. If such downstream costs of Executive Branch enforcement decisions do not constitute an injury in fact sufficient for states to have standing to sue, it seems unlikely that the effect of such costs could form the basis of a Tenth Amendment anticommandeering violation.

For these reasons, the Court finds that Plaintiffs cannot cross the foremost hurdle in their request for an injunction on their Tenth Amendment claims because they have not shown a sufficient likelihood of success on the merits.

### B.    Equal Sovereignty

The Court also finds that Plaintiffs have not shown a sufficient likelihood of success on their Equal Sovereignty claim. Plaintiffs assert that Defendants have targeted Minnesota for unequal treatment—by deploying a massive surge of armed immigration enforcement officers—that is unrelated to a valid law enforcement purpose. Plaintiffs contend that the true motivation behind Operation Metro Surge, which has "drained state and local police resources and made Minnesota less safe," is partly political retribution. (Dkt. 8 at 41–45.) Plaintiffs allege that that disproportionate deployment of law enforcement agents to Minnesota is indefensible when other states with much larger populations of undocumented residents are not experiencing anything close to Operation Metro Surge.

In support of this claim, Plaintiffs rely primarily on *Shelby County v. Holder*, 570 U.S. 529 (2013). But *Shelby County* does not support the relief Plaintiffs seek. There, the Supreme Court acknowledged the "principle that all States enjoy equal sovereignty," *id.* at 535, but did so in a very different context. *Shelby County* involved a challenge to the constitutionality of § 4(b) of the Voting Rights Act, which subjected certain states to additional restrictions due to their histories of racially discriminatory election administration. *Id.* at 537 (describing the operation of §§ 4(b) and 5 of the VRA). In holding that § 4(b)'s formula, which resulted in certain jurisdictions being "singled out" for disparate treatment, was outdated and could no longer be constitutionally justified, *id.* at

26

550–51, the Supreme Court stated that "a departure from the fundamental principle of equal sovereignty requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets," *id.* at 542.

Seizing on that line, Plaintiffs argue that "Operation Metro Surge fails that test" and that "*Shelby County*'s reasoning applies with equal force [here because] it teaches that the federal government cannot single out States for disparate treatment without a strong and narrowly tailored justification." (Dkt. 60 at 23.) But Plaintiffs do not point to any authority applying *Shelby County*'s equal-sovereignty "test" in any other context. Nor do they explain how it applies to the Executive Branch's discretionary decisions about where to deploy federal personnel to enforce duly enacted federal laws. The Court can readily imagine scenarios where the federal executive must legitimately vary its use of law enforcement resources from one state to the next, and there is no precedent for a court to micromanage such decisions. Under the circumstances presented here, the Court finds that Plaintiffs have not shown the required likelihood of success on the merits of their Equal Sovereignty claim.

In sum, the Court concludes that the likelihood-of-success factor weighs against issuing an injunction.

## III.    Additional Considerations

As courts have frequently observed, an "absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied[.]" *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009). Nevertheless, the Court

27

briefly discusses the threat of irreparable harm to Plaintiffs in the absence of an injunction and the countervailing the threat of harm to Defendants if an injunction were issued.

Plaintiffs have made a strong showing that Operation Metro Surge has had, and will likely continue to have, profound and even heartbreaking, consequences on the State of Minnesota, the Twin Cities, and Minnesotans. Since Operation Metro Surge began, there have been multiple shootings of Minnesota residents by federal immigration enforcement agents. Additionally, there is evidence that ICE and CBP agents have engaged in racial profiling, excessive use of force, and other harmful actions. And Defendants do nothing to refute the negative impacts described by Plaintiffs in almost every arena of daily life, from the expenditure of vast resources in police overtime to a plummeting of students' attendance in schools, from a delay in responding to emergency calls to extreme hardship for small businesses. It would be difficult to overstate the effect this operation is having on the citizens of Minnesota, and the Court must acknowledge that reality here.

However, those are not the only harms to be considered. The Eighth Circuit has recently reiterated that entry of an injunction barring the federal government from enforcing federal law imposes significant harm on the government. *Tincher*, 2026 WL 194768, at *2 (quoting *CASA*, 606 U.S. at 861); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time a state is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). And Defendants have presented evidence that entry of the injunction requested by Plaintiffs would harm the federal government's efforts to enforce federal immigration laws. (Olson Decl. ¶¶ 16–18; Harvick Decl. ¶¶ 8–9, 15–16.) Balancing the harms described

by Plaintiffs against the interests of Defendants is not as straightforward as Plaintiffs suggest.

Ultimately, the Court finds that the balance of harms does not decisively favor an injunction. Paired with the Court's finding of an insufficient likelihood of success on the merits, the Court need not further weigh the competing interests of the parties. *See Oglala Sioux Tribe v. C&W Enters., Inc.*, 542 F.3d 224, 233 (8th Cir. 2008) (finding it "unnecessary to assess the remaining factors for injunctive relief" where the movant failed to show a likelihood of success).

Finally, even if the likelihood of success on the merits and the balance of harms each weighed more clearly in favor of Plaintiffs, the Court would still likely be unable to grant the relief requested: an injunction suspending Operation Metro Surge. The Eighth Circuit Court of Appeals recently vacated a much more circumscribed injunction which limited one aspect of the ongoing operation, namely the way immigration officers interacted with protesters and observers. *Tincher*, 2026 WL 194768, at \*1–2. The injunction in that case was not only much narrower than the one proposed here, but it was based on more settled precedent than that which underlies the claims now before the Court. Nonetheless, the Court of Appeals determined that the injunction would cause irreparable harm to the government because it would hamper their efforts to enforce federal law. *Id.* at \*2. If that injunction went too far, then the one at issue here—halting the entire operation—certainly would.

**ORDER**

For the reasons discussed above, **IT IS HEREBY ORDERED THAT** Plaintiffs'

Motion for a Preliminary Injunction (Dkt. 5) is **DENIED**.


Date: January 31, 2026                                      *s/Katherine M. Menendez*
                                                           Katherine M. Menendez
                                                           United States District Judge