UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| STATE OF MINNESOTA, by and through its Attorney General Keith Ellison, CITY OF MINNEAPOLIS, and CITY OF SAINT PAUL, <br><br> PLAINTIFFS, <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; JOHN CONDON, in his official capacity as Acting Executive Associate Director of Homeland Security Investigations; U.S. Department of Homeland Security; TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; MARCOS CHARLES, in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations; U.S. Immigration and Customs Enforcement; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. Customs and Border Protection; GREGORY BOVINO, in his official capacity as Commander of the U.S. Border Patrol; U.S. Border Patrol; DAVID EASTERWOOD, in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement, <br><br> DEFENDANTS. | Court File No. 0:26-cv-00190-KMM-DJF <br><br> RECEIVED BY MAIL <br><br> FEB 0 6 2026 <br><br> CLERK, U.S. DISTRICT COURT <br> MINNEAPOLIS, MINNESOTA <br><br> [PROPOSED] BRIEF OF WILLIAM MICHAEL CUNNINGHAM, ECONOMIST, AS AMICUS CURIAE |



SCANNED
FEB 0 6 2026
U.S. DISTRICT COURT MPLS

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

Submitted by:
William Michael Cunningham
PRO SE
PO Box 75574
Washington, DC 20013
202-455-0430
williamcunningham840@gmail.com

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

## Contents

TABLE OF AUTHORITIES.......................................................................................... 4

STATUTES ................................................................................................................... 5

OTHER AUTHORITIES ............................................................................................. 5

CORPORATE DISCLOSURE STATEMENT............................................................. 9

CERTIFICATE OF COMPLANCE........................................................................... 10

INTEREST OF THE AMICUS.................................................................................. 11

SUMMARY OF THE BRIEF .................................................................................... 13

ECONOMIC HARMS RELEVANT TO IRREPARABLE INJURY,
PROPORTIONALITY AND MERITS REVIEW .................................................... 14

SUMMARY OF ECONOMIC DAMAGES.............................................................. 16

Appendix 1 - DISPROPORTIONATE ECONOMIC HARM TO BLACK
RESIDENTS OF MINNESOTA............................................................................... 19

Appendix 2 – ECONOMIC DAMAGE ANALYSIS ............................................. 22

   A. Methodological Overview.................................................................................. 22

   B. Direct Business Revenue Losses (To Date) ...................................................... 22

   C. Public-Sector Costs (January, 2026) ................................................................ 23

   D. Labor Market and Human Capital Disruptions................................................. 24

   E. Forward-Looking Economic Damages Through December 31, 2026 ............ 24

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

**TABLE OF AUTHORITIES**

CASES

Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592 (1982)

Doran v. Salem Inn, Inc., 422 U.S. 922 (1975)

General Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312 (8th Cir. 2009)

Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp., 59 F.3d 80 (8th Cir. 1995)

Nebbia v. New York, 291 U.S. 502 (1934)

Printz v. United States, 521 U.S. 898 (1997)

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 1:25-cv-00596-ELH (D. Md. filed 2025).

William Michael Cunningham, Petitioner, v. Scott Bessent, in his official capacity as Secretary, and the U.S. Department of the Treasury; Defendants, Case No. 25-1046. United States Court of Appeals for the District of Columbia Circuit. Decided 3/12/2025.

Supreme Court of the United States. No. 97–5066. William Michael Cunningham, Petitioner v. Board of Governors of the Federal Reserve System. Petition for writ of certiorari to the United States Court of Appeals for the District of Columbia Circuit.

United States Court of Appeals FOR THE DISTRICT OF COLUMBIA CIRCUIT. No. 97-1256 William Michael Cunningham, APPELLANT v. Board of Governors of the Federal Reserve System, Appellee. Decided April 30, 1997.

United States Court of Appeals FOR THE DISTRICT OF COLUMBIA CIRCUIT. No. 98-1459 William Michael Cunningham, APPELLANT v. Board of Governors of the Federal Reserve System, Appellee. October, 1998.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

United States Court of Appeals FOR THE DISTRICT OF COLUMBIA CIRCUIT.

No. 22-1311 William Michael Cunningham, APPELLANT v. Board of Governors

of the Federal Reserve System, Appellee. October, 2022.

S.E.C. v. Bear, Stearns Co. Inc., (S.D.N.Y. Nov. 6, 2003) (Testimony before the

late Judge William H. Pauley III in the above cited case on behalf of the public at

the fairness hearing regarding the $1.4 billion-dollar Global Research Analyst

Settlement. See: https://www.creativeinvest.com/fairness.html

Brief of Amici Curiae William Michael Cunningham,

U.S. Securities Exchange Commission v. Citigroup Global Markets Inc., 11 Civ.

7387 (JSR) (S.D.N.Y. Nov. 28, 2011)

**STATUTES**

U.S. Const. Article I, Section 8 — Spending Clause

U.S. Const. Article I, Section 9, Clause 7 — Appropriations Clause

U.S. Const. Article II, Section 3 — Take Care Clause

U.S. Const. Fifth Amendment — Due Process Clause

U.S. Const. Article III — Judicial Power

**OTHER AUTHORITIES**

See: William Michael Cunningham, *SEC Response to Letter to SEC Commissioner*

*Mary Schapiro*. October 29, 1993, archived at:

https://www.creativeinvest.com/SECNigerianLetter.pdf

Edward Kulkosky. *Security Backed Exclusively by Minority Loans*, American

Banker Newspaper. Friday, December 2, 1994. Archived at:

https://www.creativeinvest.com/mbsarticle.html)

William Michael Cunningham, Black Wealth 2019 - Congressional Black Caucus

https://youtu.be/x4ukwLKqEzs

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

William Michael Cunningham, *Letter to Ms. Annette L. Nazareth, Director, Division of Market Regulation, US Securities and Exchange Commission*. Monday, December 22, 2003.

Housing Finance Regulatory Improvement Act, Hearing on H.R. 3703, before the Subcommittee on Capital Markets, Securities and Government Sponsored Entities (GSEs), 106th Cong, (2000) ("2000 GSE Hearings") (calling for GSE's to be subject to a through "Social Audit," an examination of the performance of an enterprise relative to certain social and ethical objectives.) Online at:

https://www.creativeinvest.com/fnma/

Select Revenue Measures Subcommittee of the House Ways and Means Committee. Joint hearing with the House Financial Services Committee, Subcommittee on Domestic Monetary Policy and Technology. June 18, 2009. (Testimony concerning the New Markets Tax Credit Program.) See:

https://www.creativeinvest.com/nmtctestimony.html

Mark Thomsen. *Property Flipping Remediation Yields Investment-grade Security*. SocialFunds.com October 10, 2001. Archived at:

https://www.creativeinvest.com/PropertyFlipping.pdf

William Michael Cunningham, *Warning Concerning Increased Risk of System-wide Failure to Ms. Elaine M. Hartmann of the Division of Market Regulation, US Securities and Exchange Commission*. Monday, December 22, 2005.

William Michael Cunningham, *Comments on Proposed Rule: Internet Availability of Proxy Materials Release Nos. 34-52926 IC-27182 File No. S7-10-05.* Monday, February 06, 2006. Archived at:

http://www.sec.gov/rules/proposed/s71005/wcunningham5867.pdf )

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

William Michael Cunningham, *Comments on Proposed Rule: Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice. [Release No. 34-87457; File No. S7-22-19].* February 1, 2020. Archived at: https://www.sec.gov/comments/s7-22-19/s72219-6733888-207542.htm

William Michael Cunningham, *Adam Smith on the Current Financial Crisis.* April 05, 2009. http://twisri.blogspot.com/2009/04/adam-smith-on-cur333rent-financial-crisis.html

"Bank accused of predatory practices. Lawsuit alleges black neighborhood, churches targeted." Gazette.net. Online at: http://www.gazette.net/stories/06182009/collnew182411_32521.shtml

William Michael Cunningham, *"The New Center of Power: China Overtakes the U.S. as the Globe's Biggest Energy Consumer."* (2010):88 pp. Creative Investment Research, 1 Aug. 2010.

William Michael Cunningham, *Why Trump Will Win.* June 11, 2016. archived at: https://www.linkedin.com/pulse/why-trump-win-william-michael-cunningham-am-mba

William Michael Cunningham, *US Economic and Market Forecast: 2014 to 2020. Fully Adjusted Return® Analysis.* Washington, DC: Creative Investment Research, 2013. Print.

United States Department of the Treasury, *Financial Crisis Response in Charts.* April 13 2012. Online at: https://drive.google.com/file/d/1b5qPxdqIUZHqm_qMfmy5YM3UNOxHVx4c/view?usp=sharing

George Stigler, "*The Theory of Economic Regulation*," Bell Journal of Economics, 2, 1971:3-21.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

Gary S. Becker (1957, 1971, 2nd ed.). *The Economics of Discrimination*. Chicago, University of Chicago Press.

William Michael Cunningham, Global Market Turmoil Graphic and Financial Crisis Calendar Graphic, Creative Investment Research, December, 2008 and November, 2009. Archived at: https://creativeinvest.com/Global_Turmoil.pdf and https://creativeinvest.com/FinCrisisCalendarGraphicFINAL.pdf

William Michael Cunningham, *Letter to Senator Richard Shelby on the financial rescue plan under consideration by the US House and the US Senate.* See: http://www.ethicalmarkets.com//wp-content/uploads/2008/12/financialbailoutcomment1.pdf

William Michael Cunningham, *Mortgage GSE's, Predatory Lending and Minority Banks.* August 07, 2007. (Prediction: Bear Stearns Will Fail.) http://twisri.blogspot.com/2007/08/morgage-gses-predatory-lending-and.html

William Michael Cunningham, *Racial Bias in Securitization and Community Lending.* August 09, 2009. http://twisri.blogspot.com/2009/08/wells-fargo-sued-for-racially-biased.html

William Michael Cunningham*, The relationship between investment banks and the economy.*  April 22, 2009.  http://twisri.blogspot.com/2009/04/commercial-and-investment-banks-used.html

William Michael Cunningham, *Transaction Cost Theory of the Financial Crisis* June 18, 2010. Online at: http://www.prlog.org/10746429-firm-releases-transaction-cost-theory-of-the-financial-crisis.html

Pope Francis, Apostolic Exhortation *Evangelii Gaudium* (24 November 2013).

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 29, I the undersigned pro se filer, make the following

declarations and disclosures:

1. William Michael Cunningham is a private individual and US citizen with no

   parent corporation. No publicly held corporation owns 10% or more of Mr.

   Cunningham.

2. William Michael Cunningham is an individual with no relevant disclosures.

Respectfully submitted,

Dated: February 2, 2026

/s/ William Michael Cunningham

William Michael Cunningham, Pro Se

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

**CERTIFICATE OF COMPLANCE**

Pursuant to Fed. R. App. P. 29, I certify that this amicus curiae brief complies with

the applicable requirements:

This brief does not exceed the 25-page limit for amicus briefs.

The brief has been prepared in a proportionally spaced typeface using 14-point

Times New Roman font, consistent with the typeface requirements of Federal

Rules of Appellate Procedure (FRAP) 32.

February 2, 2026

Respectfully submitted,

/s/ William Michael Cunningham

William Michael Cunningham, Pro Se

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

### INTEREST OF THE AMICUS

Amicus William Michael Cunningham is an economist and impact investment designer[1] who has, for decades, engaged with Congress, federal regulatory bodies and courts on matters of financial ethics, systemic risk, and economic well-being. His work includes testimony before the US Congress[2] and filings before the Securities and Exchange Commission[3], the Federal Reserve, and U.S. courts[4]. He offers an analysis and perspective rooted in the public interest.

Of particular relevance here, Amicus has worked directly with the City of Minneapolis on large-scale economic development initiatives affecting the same neighborhoods and economic corridors implicated in this case, including the Minneapolis Empowerment Zone and the Life Sciences Corridor.

---

[1] Edward Kulkosky. Security Backed Exclusively by Minority Loans, American Banker Newspaper. Friday, December 2, 1994. Archived at: https://www.creativeinvest.com/mbsarticle.html ) and see: Mark Thomsen. Property Flipping Remediation Yields Investment-grade Security. SocialFunds.com October 10, 2001. Archived at: https://www.creativeinvest.com/PropertyFlipping.pdf

[2] Housing Finance Regulatory Improvement Act, Hearing on H.R. 3703, before the Subcommittee on Capital Markets, Securities and Government Sponsored Entities (GSEs), 106th Cong. (2000) ("2000 GSE Hearings") (calling for GSE's to be subject to a through "Social Audit," an examination of the performance of an enterprise relative to certain social and ethical objectives.) Online at: https://www.creativeinvest.com/fnma/ and Select Revenue Measures Subcommittee of the House Ways and Means Committee. Joint hearing with the House Financial Services Committee, Subcommittee on Domestic Monetary Policy and Technology. June 18, 2009. (Testimony concerning the New Markets Tax Credit Program.) See: https://www.creativeinvest.com/nmtctestimony.html

[3] See: William Michael Cunningham, SEC Response to Letter to SEC Commissioner Mary Schapiro. October 29, 1993, archived at: https://www.creativeinvest.com/SECNigerianLetter.pdf Also see: William Michael Cunningham, Comments on Proposed Rule: Internet Availability of Proxy Materials Release Nos. 34-52926 IC-27182 File No. S7-10-05. Monday, February 06, 2006. Archived at: http://www.sec.gov/rules/proposed/s71005/wcunningham5867.pdf and William Michael Cunningham, Comments on Proposed Rule: Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice. [Release No. 34-87457; File No. S7-22-19]. February 1, 2020. Archived at: https://www.sec.gov/comments/s7-22-19/s72219-6733888-207542.htm

[4] Brief of Amici Curiae William Michael Cunningham, U.S. Securities Exchange Commission v. Citigroup Global Markets Inc., 11 Civ. 7387 (JSR) (S.D.N.Y. Nov. 28, 2011)

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

In 2004–2005, Amicus partnered with the City of Minneapolis to structure and submit a New Markets Tax Credit (NMTC) application to the U.S. Department of the Treasury, covering approximately $120 million in community development investments. That work included detailed economic modeling of job creation, payroll effects, healthcare delivery capacity, and spillover impacts in medically underserved and minority communities. The analysis projected the creation of 3,578 new jobs and $148.251 million in additional payroll, with projects concentrated in medical, educational, and workforce-training facilities.

This experience provides Amicus with a grounded, empirical understanding of how disruptions to daily activity, healthcare access, schooling, and commercial corridors translate into measurable and often irreversible economic harm in Minneapolis. Amicus does not seek to relitigate the Court's denial of preliminary injunctive relief. Instead, Amicus submits this brief to assist the Court and any reviewing court by providing objective economic metrics relevant to irreparable harm, proportionality, tailoring of relief, and future merits determinations.

Amicus's analysis is further informed by direct experience litigating issues involving unauthorized access to federal systems and the economic consequences of institutional control failures. In Case No. 25-1046[5], Amicus initiated an emergency legal action addressing unauthorized access to federal payment systems and related data controls. That matter underscores Amicus's familiarity with the operational realities, risk transmission mechanisms, and economic spillovers that arise when safeguards fail, and it informs the conservative economic assessment presented here.

---

[5] William Michael Cunningham, Petitioner, v. Scott Bessent, in his official capacity as Secretary, and the U.S. Department of the Treasury; Defendants, Case No. 25-1046. United States Court of Appeals for the District of Columbia Circuit.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

Recent admissions by the Department of Justice in parallel litigation confirm that institutional safeguards intended to constrain federal action have failed in ways that heighten the foreseeability and persistence of the economic harms documented in this brief. Defendants have acknowledged conduct inconsistent with agency policy and noncompliant with a court-ordered temporary restraining order, including continued access to personally identifiable information, unauthorized data transmission, and use of unapproved third-party servers.[6]

This background is offered solely to assist the Court in evaluating the reliability and relevance of Amicus's economic analysis, not to expand the claims at issue. The experience reflected in Case No. 25-1046 and in Case No. 1:25-cv-00596-ELH reinforces the prudence of early judicial intervention where the risk of harm is anticipated and, subsequently, demonstrated.

Amicus submits this brief to assist the Court in evaluating the magnitude, structure, and irreversibility of the economic harms arising from Defendants' actions. This brief supplements the record with economic facts relevant to equitable relief. No counsel for a party authored this brief in whole or in part, and no person other than amicus made a monetary contribution to its preparation or submission.

**SUMMARY OF THE BRIEF**

This brief quantifies substantial, ongoing, and irreparable economic harm from 1/1/2026 to 12/31/2026. This damage arises from recent federal actions in Minnesota. Updated evidence—including statewide and nationwide shutdowns, mass protests, corporate risk signaling by over sixty (60) Minnesota CEOs, and

---

[6] See: NOTICE OF CORRECTIONS TO THE RECORD in Case No. 1:25-cv-00596-ELH
https://storage.courtlistener.com/recap/gov.uscourts.mdd.577321/gov.uscourts.mdd.577321.197.0.pdf

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

DOJ admissions of institutional control failures—confirms that these harms are real, compounding, and unlikely to self-correct.

## ECONOMIC HARMS RELEVANT TO IRREPARABLE INJURY, PROPORTIONALITY AND MERITS REVIEW

The Court's Order recognizes that the federal actions at issue have produced "profound and heartbreaking consequences" affecting education, healthcare, commerce, and community trust, while declining—at the preliminary stage—to resolve novel constitutional questions.

In denying preliminary injunctive relief, the Court emphasized the difficulty of drawing a principled line between lawful federal enforcement activity and conduct that would exceed constitutional or statutory limits. Economic metrics supply an objective framework for addressing that concern. This section supplies quantitative economic context for those acknowledged harms, without presuming the legal conclusion the Court declined to reach.

Unlike abstract characterizations of "pressure" or "compulsion," economic indicators—such as widespread business closures, school absenteeism, avoidance of medical care, and corridor-level disruption—identify observable thresholds at which law enforcement activity produces system-level harm. These thresholds are relevant to proportionality and tailoring, regardless of the ultimate constitutional theory applied.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

By documenting when and how economic disruption escalates beyond ordinary enforcement effects, the record below assists the Court and any reviewing court in evaluating whether future relief, if any, should be geographically, temporally, or operationally constrained.

**A. Categories of Quantifiable Damage (to date)**

Using facts already in the record and public reporting in the Minnesota action, we calculate direct, indirect, and induced losses:

**1. Small Business Revenue Loss**

Documented 50–80% revenue declines in affected corridors: Daily lost receipts × number of establishments × duration.

Even under conservative assumptions, the federal operation has imposed a localized economic shock comparable to a natural disaster—without statutory authorization, compensation, or emergency safeguards.

**2. Public Sector Costs**

Overtime costs for police, emergency services and state agencies

Emergency redeployment

School closures → substitute instruction, virtual learning costs

Lost instructional days (human capital loss)

**3. Labor Market Disruption**

Absenteeism due to fear of detainment

Workforce withdrawal due to fear

Informal sector shutdowns

Multiplier effects on consumption

**4. Capital Flight & Long-Run Damage**

Commercial vacancy risk

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

1  Declining property values

2  Insurance and financing risk premiums

3  Permanent business closures

4  Based on Amicus's prior Minneapolis modeling work, disruptions to medical

5  corridors and workforce training facilities produce nonlinear losses: missed care

6  leads to higher downstream costs; missed schooling reduces lifetime earnings; and

7  business interruptions compound through supplier and household balance sheets.

8  Below, we present our damage[7] estimate.

### SUMMARY OF ECONOMIC DAMAGES

10  Under conservative assumptions grounded in publicly reported conditions and

11  regional economic indicators, Defendants' actions have imposed a substantial

12  economic shock on Minnesota communities:

| Category | Low ($M) | | High ($M) | |
|---|---|---|---|---|
| *Baseline corridor disruption damage* | $ | 220.0 | $ | 250.0 |
| *Public Cost Estimate Immediate police[8], public-sector response and education disruption costs* | $ | 5.4 | $ | 6.0 |
| *Statewide shutdown days. Post incident economic disruptions in Minnesota* | $ | 9.0 | $ | 12.0 |
| *MN protest escalation: Post incident economic disruptions in Minnesota* | $ | 20.1 | $ | 24.0 |
| *National protest wave spillover: National Shutdown Day economic disruptions* | $ | 22.0 | $ | 28.0 |

---

[7] We strongly encourage the Court to request a formal damage estimate from the Federal Reserve Bank of Minneapolis.
[8] See; https://www.cbsnews.com/minnesota/news/minneapolis-police-overtime-immigration-enforcement-surge/

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

| *TOTAL ECONOMIC HARM* | $ 276.5 | $ 320.0 |

These harms compound over time, increase the probability of permanent business closures, disrupt labor markets and education, and impair the State's ability to carry out core governmental functions.

These estimates are lower-bound figures; they exclude tourism losses, long-term investment deferral, and federal-state fiscal spillovers.

### Disproportionate Impact on Black Residents[9]

Consistent with Amicus's prior Minneapolis work, harms are concentrated among Black individuals, households and Black-owned businesses due to:

- lower liquidity buffers,
- higher exposure to disrupted service sectors,
- coupled household–firm balance sheets,
- reliance on public healthcare and schooling infrastructure.

As a result, identical percentage shocks produce larger welfare losses and a higher probability of permanent economic exit—an effect that is foreseeable and economically distinct from aggregate averages.

Amicus respectfully submits this brief following the Court's denial of preliminary injunctive relief to preserve an economic record relevant to future merits review, proportionality, and appellate consideration.

The Court emphasized difficulty in drawing a principled line between lawful enforcement and unconstitutional compulsion. Economic metrics supply such a

---

[9] See: Appendix 1.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

line. The marginal addition of enforcement personnel produces measurable,

escalating harm once thresholds affecting schooling, healthcare access, and

commercial corridors are crossed. These thresholds are observable, quantifiable,

and relevant regardless of the ultimate constitutional theory applied.

Amicus's analysis is therefore offered not as proof of constitutional violation, but

as evidence of scale, foreseeability, and irreversibility, which courts routinely

consider in tailoring relief and assessing administrative reasonableness.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

## Appendix 1 - DISPROPORTIONATE ECONOMIC HARM TO BLACK RESIDENTS OF MINNESOTA

The economic damages described above do not fall evenly across Minnesota's population. They interact with pre-existing structural vulnerabilities in a manner that imposes disproportionate and compounding harm on Black residents. This pattern of harm is not incidental; it is predictable, measurable, and economically distinct from generalized statewide losses.

### A. Pre-Existing Economic Exposure Amplifies the Shock

Black households in Minnesota enter periods of economic disruption with systematically lower buffers against income loss. Median household wealth, liquid savings, and access to formal credit remain substantially below statewide averages. As a result, revenue shocks, employment interruptions, and service disruptions translate more rapidly into missed rent, foregone medical care, and labor-force exit.

From an economic standpoint, this means that identical percentage losses produce larger real welfare effects for Black households than for the median household. Traditional aggregate models obscure this dynamic by focusing on averages rather than marginal harm.

### B. Concentration of Impacted Employment and Enterprise

Black workers and Black-owned businesses in Minnesota are disproportionately represented in sectors most exposed to abrupt demand suppression and operational disruption, including food service, retail, personal services, logistics, and health-support roles. These sectors exhibit high income volatility and limited capacity for remote work or revenue smoothing.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

For Black-owned small businesses, revenue losses are not merely foregone profits; they often represent the collapse of owner income, payroll capacity, and personal credit simultaneously. This dual exposure—business and household balance sheets deteriorating in tandem—creates a failure mode not captured by standard firm-level loss estimates.

## C. Labor Market Scarring and Long-Run Earnings Loss

Economic disruptions of this nature produce labor-market scarring effects that persist well beyond the immediate period of enforcement activity. Empirical research demonstrates that workers experiencing forced separation or extended instability face lower lifetime earnings, reduced attachment to the labor force, and diminished access to employer-sponsored benefits.

Because Black workers are more likely to be employed in roles without strong recall rights, union protections, or severance buffers, the probability that temporary disruption becomes permanent labor market exit is materially higher. These losses accrue over years, not months, and are effectively irreversible at the household level.

## D. Human Capital and Intergenerational Effects

Disruptions to schooling, childcare, and routine public services impose disproportionate costs on Black families, who are more likely to rely on public institutions as stabilizing infrastructure for labor force participation. When schools close or families withdraw out of fear, parents—particularly women—are forced to reduce hours or exit employment entirely.

The resulting losses are not limited to current income. Educational interruption, stress-induced absenteeism, and reduced household investment in children's

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

development generate intergenerational effects that compound existing disparities in educational attainment and earnings potential.

**E. Why These Harms Are Economically Distinct and Legally Relevant**

No standard statewide damage estimate captures these effects. Aggregate revenue loss figures understate harm where losses are concentrated among households and firms with the least capacity to absorb shocks. From a public-interest perspective, disproportionate economic injury to a defined population segment magnifies the irreparable nature of the harm and heightens the case for relief.

Courts evaluating the balance of equities may properly consider not only the magnitude of economic harm, but its distribution. As we have noted over the course of 30 years, where government action foreseeably intensifies existing economic inequities and produces durable harm to a specific community, the public interest weighs strongly in favor of preventing continuation of that action.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

### Appendix 2 – ECONOMIC DAMAGE ANALYSIS

This section quantifies the methodology used to calculate economic damages resulting from the federal enforcement actions in Minnesota, including direct, indirect, and induced impacts. Estimates are conservative and grounded in publicly reported facts, standard regional economic multipliers, and transparent assumptions. The purpose is to assist the Court in assessing the magnitude of ongoing harm to the public interest and the necessity of relief.

### A. Methodological Overview

Damages are estimated using a bottom-up approach that aggregates (i) direct business revenue losses, (ii) public-sector response costs, and (iii) labor market and human-capital disruptions. Forward-looking damages through December 31, 2026 are projected using scenario analysis.

Key Assumptions

- Revenue losses reported by affected businesses on protest days range from 50–80%; midpoint (65%) used for baseline estimates.
- Affected commercial corridors include retail, food service, personal services, and small professional firms. Specific firms impacted vary on a rotating basis.
- Economic multipliers are conservative (1.4) to avoid overstating indirect effects.
- Public-sector costs reflect overtime, emergency redeployment, and temporary education disruptions only.
- Forward projections assume no escalation beyond current conditions unless otherwise specified.

### B. Direct Business Revenue Losses (To Date)

Local reporting indicates that businesses in impacted areas experienced revenue declines of 50–80% on protest days.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

Estimated direct business revenue loss per month: approximately $20.122 million.

Losses compound over time and increase the probability of permanent closures.

| Sector | Estimated Number of Impacted Firms | Avg. Monthly Revenue ($) | Loss % | Monthly Loss ($) |
|---|---|---|---|---|
| Food & Beverage | 250 | $45,000 | 65% | $ 7,312,500 |
| Retail | 300 | $35,000 | 80% | $ 8,400,000 |
| Personal Services | 180 | $25,000 | 50% | $ 2,250,000 |
| Other Small Firms | 120 | $40,000 | 45% | $ 2,160,000 |
| | | | TOTAL | $ 20,122,500 |

**C. Public-Sector Costs (January, 2026)**

Federal actions have required substantial diversion of state and local resources.

Table 2 below summarizes public-sector costs for one month.

| TABLE 2 Public Cost | Units (hours or # students) | Unit Cost ($)/hr | Estimated Cost ($) |
|---|---|---|---|
| Law Enforcement Overtime[10] | 3,000/hours | $1,000 | $3,000,000 |
| Emergency Response & Coordination | 4,000/hours | $100 | $ 400,000 |
| School Closures & Virtual Instruction | 20,000 students | $100/student | $2,000,000 |
| | JANUARY | TOTAL | $5,400,000 |

---

[10] See: https://www.cbsnews.com/minnesota/news/minneapolis-police-overtime-immigration-enforcement-surge/

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

Estimated immediate public-sector costs exceed $5 million, exclusive of longer-term educational and social impacts.

**D. Labor Market and Human Capital Disruptions**

Fear-driven absenteeism and labor withdrawal reduce productivity and household income. These effects impose costs not fully captured by business revenue figures, including lost wages, reduced skill accumulation, and increased reliance on public assistance.

**E. Forward-Looking Economic Damages Through December 31, 2026**

Assuming continuation of current conditions for six months, followed by partial recovery, cumulative economic damages through December 31, 2026. Escalation or prolonged enforcement would materially increase this figure.