UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

STATE OF MINNESOTA, *by and through its Attorney General Keith Ellison*, CITY OF MINNEAPOLIS, and CITY OF ST. PAUL,

      Plaintiffs,

v.

KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; JOHN CONDON, *in his official capacity as Acting Executive Associate Director of Homeland Security Investigations*; U.S. Department of Homeland Security; TODD LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; MARCOS CHARLES, *in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations*; U.S. Immigration and Customs Enforcement; RODNEY SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection;* U.S. Customs and Border Protection; GREGORY BOVINO, *in his official capacity as Commander of the U.S. Border Patrol*; U.S. Border Patrol; DAVID EASTERWOOD, *in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement*, *in their official capacities,*

      Defendants.

Case No. 0:26-cv-00190-KMM-DJF

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**

_____

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ................................................ 1

LEGAL STANDARD ................................................................................................ 3

ARGUMENT ............................................................................................................. 4

I.    Plaintiffs lack standing to bring five of their claims. ................................... 4

      A. In Count III, Plaintiffs fail to plausibly allege an injury to their sovereign
         interests ................................................................................................... 5

      B. Plaintiffs' standing theories for Counts IV and V fail as a matter of law. .......... 7

      C. Plaintiffs lack standing in Counts VI and VII. .................................... 12

II.   Plaintiffs' claims are now moot .................................................................. 13

III.  Plaintiffs fail to state a Tenth Amendment claim. ..................................... 15

      A. Plaintiffs fail to allege any infringement on their police powers. .................... 16

      B. Plaintiffs fail to state an anticommandeering or coercion claim. .................... 17

IV.   Plaintiffs' Tenth Amendment *Ultra Vires* Claim Should Be Dismissed. .............. 23

V.    Minnesota fails to allege an Equal Sovereignty violation. ................................. 24

VI.   The State's APA claims are not justiciable. ................................................ 26

      A. Counts III, IV, V, and VI fail to plausibly allege a discrete agency
         action. ................................................................................................... 26

      B. Count VII fails to plausibly allege final agency action. ................................. 31

      C. Count VII challenges an action that is committed to agency discretion. .......... 35

VII.  Plaintiffs fail to allege viable APA claims in Counts III and VI. ........................ 40

      A. An APA cause of action is not available for an alleged violation of
         state and local law. ................................................................................ 40

      B. Count VI fails as a matter of law. ...................................................... 43

VIII.   Plaintiffs fail to state First Amendment claims. ....................................... 44

IX.   This Court Lacks Jurisdiction to Issue Injunctive Relief. ...................................... 47

CONCLUSION .................................................................................. 48

# TABLE OF AUTHORITIES

**Cases**

*Al Otro Lado, Inc. v. McAleenan,*
394 F. Supp. 3d 1168 (S.D. Cal. 2019) .......................................................................... 30

*Alsaidi v. U.S. Dep't of State,*
292 F. Supp. 3d. 320 (D.D.C. 2018) .............................................................................. 29

*Am. Tort Reform Ass'n v. OSHA,*
738 F.3d 387 (D.C. Cir. 2013) ....................................................................................... 33

*Arizona v. Biden,*
40 F.4th 375 (6th Cir. 2022) ................................................................................. 8, 33, 34

*Arizona v. California,*
283 U.S. 423 (1931) ....................................................................................................... 42

*Arizona v. United States,*
567 U.S. 387 (2012) ..................................................................................... 15, 25, 36, 38

*Ark. Right to Life State Pol. Action Comm. v. Butler,*
146 F.3d 558 (8th Cir. 1998) ......................................................................................... 12

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .................................................................................................... 4, 28

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta,*
785 F.3d 710 (D.C. Cir. 2015) ........................................................................... 32, 33, 34

*Bark v. U.S. Forest Serv.,*
37 F. Supp. 3d 41 (D.D.C. 2014) .............................................................................. 29, 30

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) .............................................................................................. 4, 28, 40

*Biden v. Texas,*
597 U.S. 785 (2022) .................................................................................................. 27, 30

*Boeing Co. v. Movassaghi,*
768 F.3d 832 (9th Cir. 2014) ......................................................................................... 42

*Braden v. Wal-Mart Stores, Inc.,*
588 F.3d 585 (8th Cir. 2009) ........................................................................................... 4

*Brock v. Cathedral Bluffs Shale Oil Co.*,
796 F.2d 533 (D.C. Cir. 1986) ...................................................................................... 38

*California v. Texas*,
593 U.S. 659 (2021) ..................................................................................................... 13

*Carlsen v. GameStop, Inc.*,
833 F.3d 903 (8th Cir. 2016) .......................................................................................... 3

*Chicago Headline Club v. Noem*,
2026 WL 622677 (7th Cir. Mar. 5, 2026) ..................................................................... 22

*City of Clarkson Valley v. Mineta*,
2008 WL 11512303 (E.D. Mo. Apr. 22, 2008) ............................................................... 7

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .................................................................................................... 4, 11

*City of N. Miami v. Fed. Aviation Admin.*,
47 F.4th 1257 (11th Cir. 2022) ...................................................................................... 7

*City of N.Y. v. DOD*,
913 F.3d 423 (4th Cir. 2019) ....................................................................................... 27

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ................................................................................................. 5, 11

*Firearms Regul. Account. Coal., Inc. v. Garland*,
112 F.4th 507 (8th Cir. 2024) ................................................................................. 32, 34

*Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*,
412 U.S. 94 (1973) ...................................................................................................... 45

*Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*,
138 F.3d 351 (8th Cir. 1998) ................................................................................. 13, 14

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) .................................................................................................... 24

*Corner Post, Inc v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) ........................................................................................ 26, 30, 31

*Crooks v. Lynch*,
557 F.3d 846 (8th Cir. 2009) ......................................................................................... 4

*Daines v. IRS*,
  2025 WL 2694788 (E.D. Wis. Sept. 22, 2025)................................................................29

*Delker v. MasterCard Int'l, Inc.*,
  21 F.4th 1019 (8th Cir. 2022) ........................................................................................40

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)........................................................................................................21

*Dep't of Educ. v. Brown*,
  600 U.S. 551 (2023)........................................................................................................13

*El-Shifa Pharm. Indus. Co., v. United States*,
  607 F.3d 836 (D.C. Cir. 2010)........................................................................................41

*Fed. Election Comm'n v. Cruz*,
  596 U.S. 289 (2022)..........................................................................................................4

*Fernandez v. Wiener*,
  326 U.S. 340 (1945)................................................................................................. 15, 18

*Food & Drug Administration v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024)..........................................................................................................9

*Garland v. Aleman Gonzalez*,
  596 U.S. 543 (2022)........................................................................................................47

*Geo Group, Inc. v. Newsom*,
  50 F.4th 745 (9th Cir. 2022) .................................................................................... 41, 42

*Greer v. Chao*,
  492 F.3d 962 (8th Cir. 2007) .............................................................................. 37, 38, 39

*Haaland v. Brackeen*,
  599 U.S. 255 (2023)..........................................................................................................7

*Hancock v. Train*,
  426 U.S. 167 (1976)........................................................................................................41

*Harrison v. Jefferson Par. Sch. Bd.*,
  78 F.4th 765 (5th Cir. 2023) .............................................................................................6

*Heckler v. Chaney*,
  470 U.S. 821 (1985)...............................................................................................*passim*

*Hekel v. Hunter Warfield, Inc.*,
118 F.4th 938 (8th Cir. 2024) ................................................................. 12

*Houston Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022) ............................................................................ 46, 47

*Hunter v. Page County*,
102 F.4th 853 (8th Cir. 2024) ................................................................. 28

*Hunter v. Underwood*,
471 U.S. 222 (1985) ................................................................................ 21

*Hussen v. Noem*,
2026 WL 657936 (D. Minn. Mar. 9, 2026) ............................................. 11

*In re Pre-Filled Propane Tank Antitrust Litig.*,
893 F.3d 1047 (8th Cir. 2018) ................................................................. 28

*In re SuperValu, Inc.*,
870 F.3d 763 (8th Cir. 2017) ..................................................................... 5

*Indep. Equip. Dealers Ass'n v. EPA*,
372 F.3d 420 (D.C. Cir. 2004) ................................................................. 26

*Interstate Com. Comm'n v. Bhd. of Locomotive Eng'rs*,
482 U.S. 270 (1987) ................................................................................ 36

*Iowa Migrant Movement for Just. v. Bird*,
157 F.4th 904 (8th Cir. 2025) ............................................................. 36, 39

*Johnson v. Maryland*,
254 U.S. 51 (1920) .................................................................................. 42

*Johnson v. United States*,
534 F.3d 958 (8th Cir. 2008) ..................................................................... 3

*Jones v. Bloomingdales.com, LLC*,
124 F.4th 535 (8th Cir. 2024) ................................................................. 10

*L.A. Press Club v. Noem*,
--- F. Supp. 3d ---, 2026 WL 103972 (C.D. Cal. Jan. 8, 2026) .......... 29, 30

*Liner v. Jafco, Inc.*,
375 U.S. 301 (1964) ................................................................................ 14

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ...................................................................................... 13

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ................................................................... 27, 29, 30, 31

*Maryland v. U.S. Dep't of Agric.*,
    151 F.4th 197 (4th Cir. 2025) ....................................................................... 9

*Mayhew v. Burwell*,
    772 F.3d 80 (1st Cir. 2014) ........................................................................ 25

*Mayo v. United States*,
    319 U.S. 441 (1943) .................................................................................... 42

*M'Culloch v. Maryland*,
    17 U.S. 316 (1819) ................................................................................ 16, 17

*Mennonite Church USA v. U.S. Dep't of Homeland Sec.*,
    778 F. Supp. 3d 1 (D.D.C. 2025) ................................................................ 13

*Muir v. Ala. Educ. Television Comm'n*,
    688 F.2d 1033 (5th Cir. 1982) .................................................................... 45

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    584 U.S. 453 (2018) ................................................................................ 15, 18

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ...................................................................................... 11

*NAACP v. Hunt*,
    891 F.2d 1555 (11th Cir. 1990) .................................................................. 45

*Nat'l Collegiate Athletic Ass'n v. Governor of N.J.*,
    730 F.3d 208 (3d Cir. 2013), abrogated on other grounds by Murphy v. Nat'l
    Collegiate Athletic Ass'n, 584 U.S. 453 (2018) .......................................... 25

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) .................................................................. 15, 20, 21, 23

*New England Synod v. DHS*,
    2026 WL 412329 (D. Mass. Feb. 13, 2026) ....................... 31, 32, 33, 34, 35

*New Mexico v. McAleenan*,
    450 F. Supp. 3d 1130 (D.N.M. 2020) ............................................ 45, 46, 47

*New York v. Dep't of Just.*,
951 F.3d 84 (2d Cir. 2020) ...................................................................................23

*New York v. United States*,
505 U.S. 144 (1992).............................................................................................17

*New York v. Yellen*,
15 F.4th 569 (2d Cir. 2021) ................................................................................23

*Ngure v. Ashcroft*,
367 F.3d 975 (8th Cir. 2004) ..........................................................35, 36, 38, 39

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004).........................................................................................27, 31

*Ohio v. Env't Prot. Agency*,
98 F.4th 288 (D.C. Cir. 2024), rev'd and remanded on other grounds sub nom.
*Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100 (2025)....24, 25

*Ojogwu v. Rodenburg L. Firm*,
26 F.4th 457 (8th Cir. 2022) ............................................................................. 10

*People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*,
60 F. Supp. 3d 14 (D.D.C. 2014).......................................................................29

*People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*,
797 F.3d 1087 (D.C. Cir. 2015)..........................................................................29

*Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*,
2026 WL 280089 (D. Md. Feb. 3, 2026) ....................................................31, 32, 40

*Printz v. United States*,
521 U.S. 898 (1997).......................................................................................17, 18

*Rakas v. Illinois*,
439 U.S. 128 (1978)............................................................................................... 8

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
525 U.S. 471 (1999).......................................................................................25, 39

*Reno v. Condon*,
528 U.S. 141 (2000).............................................................................................18

*Rodriguez v. U.S. Dep't of the Air Force*,
387 F. Supp. 3d 130 (D.D.C. 2019)....................................................................29

*Saginaw County v. STAT Emergency Med. Servs., Inc.*,
  946 F.3d 951 (6th Cir. 2020) ...................................................................6

*Scheffler v. Molin*,
  743 F.3d 619 (8th Cir. 2014) ..................................................................45

*Shelby County v. Holder*,
  570 U.S. 529 (2013)................................................................................24

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  446 F.3d 808 (8th Cir. 2006) ..................................................................27

*Sisseton–Wahpeton Oyate of Lake Traverse Rsrv. v. U.S. Corps of Eng'rs*,
  888 F.3d 906 (8th Cir. 2018) ..................................................................32

*Hekel v. Hunter Warfield, Inc.*
  146 S. Ct. 294 (2025)..............................................................................12

*Smook v. Minnehaha County*,
  457 F.3d 806 (8th Cir 2006) ...................................................................11

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)............................................................................4, 10

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998)................................................................................3, 4

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009)................................................................................11

*Tamenut v. Mukasey*,
  521 F.3d 1000 (8th Cir. 2008) ..........................................................35, 37

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015), aff'd by an equally divided court, 579 U.S. 547 (2016).. 6

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021)..................................................................4, 9, 10, 22

*Trump v. Hawaii*,
  585 U.S. 667 (2018)................................................................................21

*Trump v. United States*,
  603 U.S. 593 (2024)................................................................................25

ix

*Trump v. Vance*,
591 U.S. 786 (2020)................................................................................41, 42

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016)................................................................................32, 34

*Union Pac. R.R. Co. v. Peniston*,
85 U.S. (18 Wall.) 5 (1873) .........................................................................42

*United States v. Alexander*,
428 F.2d 1169 (8th Cir. 1970) .....................................................................46

*United States v. Am. Libr. Ass'n*,
539 U.S. 194 (2003).....................................................................................45

*United States v. Darby*,
312 U.S. 100 (1941).....................................................................................15

*United States v. Louper-Morris*,
672 F.3d 539 (8th Cir. 2012) .......................................................................16

*United States v. Maupin*,
3 F.4th 1009 (8th Cir. 2021) ........................................................................16

*United States v. Nixon*,
418 U.S. 683 (1974).....................................................................................25

*United States v. Texas*,
599 U.S. 670 (2023)...............................................................................*passim*

*United States v. Washington*,
596 U.S. 832 (2022).....................................................................................42

*Vigil v. FEMA*,
2024 WL 2404487 (D.N.M. May 23, 2024)................................................29

*Virginia ex rel. Cuccinelli v. Sebelius*,
656 F.3d 253 (4th Cir. 2011) .....................................................................6, 7

*Wal-Mart Stores E., LP v. Acosta*,
919 F.3d 1073 (8th Cir. 2019) .....................................................................38

*Washington v. U.S. Food & Drug Admin.*,
108 F.4th 1163 (9th Cir. 2024) ...................................................................8, 9

*Williamson v. Tucker*,
   645 F.2d 404 (5th Cir. 1981) ................................................................................. 3

**Statutes**

5 U.S.C. § 551(13) ............................................................................................... 27, 29

5 U.S.C. § 701(a)(2) ..................................................................................................... 35

5 U.S.C. § 704 .............................................................................................................. 27

5 U.S.C. § 706(2)(A) .................................................................................................... 41

6 U.S.C. § 211 .............................................................................................................. 44

8 U.S.C. § 1101(a)(17) ................................................................................................. 44

8 U.S.C. § 1226 ............................................................................................................ 44

8 U.S.C. § 1226(a) ....................................................................................................... 44

8 U.S.C. § 1357(a)(1) .............................................................................................. 37, 44

8 U.S.C. § 1252(f)(1) .............................................................................................. 1, 47, 48

8 U.S.C. §§ 1221-1232 ................................................................................................. 48

**Administrative & Executive Material**

8 C.F.R. § 287.1 ....................................................................................................... 44, 45

**Other Authorities**

Ann Woolhandler & Michael G. Collins, *State Standing,*
   81 Va. L. Rev. 387 (1995) ........................................................................................ 6

**INTRODUCTION**

In December 2025, the Department of Homeland Security ("DHS") began an immigration enforcement operation throughout the Twin Cities and other parts of Minnesota called Operation Metro Surge. In January 2026, Plaintiffs filed their Complaint—alleging constitutional and statutory violations related to Operation Metro Surge—and sought preliminary injunctive relief based on two of their constitutional claims. Since then, the Court denied Plaintiffs' request for preliminary relief, and Operation Metro Surge concluded.

Now, Defendants move to dismiss the Complaint. Plaintiffs lacked standing to bring many of their claims when they filed their Complaint, and, in any case, Plaintiffs' claims are now moot in light of Operation Metro Surge's conclusion. Even if the Court disagrees, Plaintiffs' problems do not end there. Plaintiffs fail to plausibly allege that Defendants violated the Constitution by prioritizing immigration enforcement efforts in Minnesota. And Plaintiffs' Administrative Procedure Act (APA) claims suffer from a lack of final agency action, a lack of reviewability, and a lack of legal merit, or some combination of the three. Finally, some of Plaintiffs' claims and requests for relief implicate the jurisdictional bar in 8 U.S.C. § 1252(f)(1), which provides yet another basis for dismissal. Accordingly, the Court should dismiss the Complaint in full.

**FACTUAL AND PROCEDURAL BACKGROUND**

The Court has extensive familiarity with the facts and circumstances of the recent immigration enforcement activity in Minnesota from other litigations, *see Tincher v. Noem*, 25-cv-4669 (D. Minn.), as well as prior proceedings in this case, *see* PI Order, ECF No.

135. Defendants therefore provide only a summary of the background relevant to this motion.

In December 2025, DHS initiated Operation Metro Surge. On January 12, 2026, Plaintiffs filed their Complaint, which asserts ten causes of action based on alleged conduct that occurred during Operation Metro Surge. Compl., ECF No. 1. Count I alleges that Defendants' actions violated the Tenth Amendment of the United States Constitution. Compl. ¶¶ 188-205. Count II alleges that Defendants violated Minnesota's "Equal Sovereignty Under the U.S. Constitution" based on disparate treatment of Minnesota relative to other states. *Id.* ¶¶ 206-14. Counts III through VII allege that Defendants have violated the APA in a variety of ways, including by violating state and local laws. *Id.* ¶¶ 215-69. Counts VIII and IX claim that Defendants violated the First Amendment through unlawful retaliation and viewpoint discrimination. *Id.* ¶¶ 270-82. Count XI claims that Defendants engaged in "Ultra Vires Executive Action in Excess of Constitutional and Statutory Authority Conferred on the Executive." *Id.* ¶¶ 283-88. [1]

Based on the allegations in Counts I and II of the Complaint, Plaintiffs moved for a temporary restraining order. *See* ECF No. 8 ("TRO Mot."). The Court later converted Plaintiffs' TRO motion into a motion for a preliminary injunction. *See* ECF No. 21. Following briefing and argument on Plaintiffs' motion, this Court denied Plaintiffs' request for emergency relief, finding that Plaintiffs had not shown a likelihood of success on the merits. *See* PI Order.

---

[1] The Complaint omits Count X.

Since this time, and as this Court has expressly determined previously, Operation Metro Surge has ended. *See Tincher v. Noem*, 25-cv-4669 (D. Minn. Mar. 5, 2026) (ECF No. 246 at 6) (concluding that injunction "is now moot because [Operation Metro Surge] has ended"); *accord* Declaration of Marty C. Raybon, Sr. ¶¶ 8-10 (*Tincher*, ECF No. 254); Second Declaration of David Easterwood Decl. ¶¶ 9-10 (*Tincher*, ECF No. 255).[2] Defendants now move to dismiss Plaintiffs' Complaint in its entirety.

## LEGAL STANDARD

Defendants move to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

Under Rule 12(b)(1), a plaintiff bears the burden of establishing that the court has subject-matter jurisdiction over the claims asserted in the complaint. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998). Rule 12(b)(1) attacks can be facial or factual. *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016). "A district court has the authority to dismiss an action for lack of subject matter jurisdiction on any one of three separate bases: '(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *Johnson v. United States*, 534 F.3d 958, 962 (8th Cir. 2008) (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)). Where a party seeks prospective equitable relief, the party must make "allegations of future

---

[2] Other courts in this district have similarly determined that Operation Metro Surge has concluded. *See, e.g.*, *Hussen v. Noem*, 26-cv-324 (D. Minn.) (ECF No. 163 at 4:16-5:17, 5:24-6:12) (confirming drawdown of agents in Minnesota and describing Operation Metro Surge as "ending").

3

injury [that are] particular and concrete." *Steel Co.*, 523 U.S. at 109. While allegations of past injury might support a remedy at law, prospective equitable relief requires plausible allegations of imminent future harm. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see Crooks v. Lynch*, 557 F.3d 846, 848 (8th Cir. 2009). This plausibility showing "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation[,]" and it "asks for more than a sheer possibility that [the] defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678; *see Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).

## **ARGUMENT**

### I.   **Plaintiffs lack standing to bring five of their claims.**

Plaintiffs "must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). To have standing, a plaintiff "must show (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 296 (2022). At the pleading stage, a plaintiff must "clearly allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation modified)). Plaintiffs fail to meet their burden with respect to five of their claims (Counts III-VII).

### A.   In Count III, Plaintiffs fail to plausibly allege an injury to their sovereign interests.

In Count III, Plaintiffs allege that Defendants have a policy of violating two Minnesota state laws and one St. Paul ordinance. Compl. ¶¶ 215-30. There are multiple standing problems with this claim that require dismissal. First, Plaintiffs fail to plausibly allege that Minneapolis has standing to sue over alleged violations of other jurisdictions' laws. *See In re SuperValu, Inc.*, 870 F.3d 763, 773 (8th Cir. 2017) ("Each plaintiff's standing must be assessed individually."). Beyond a conclusory allegation of harm, *see* Compl. ¶ 226, Plaintiffs allege with respect to Minneapolis that disregard for "state law will make it harder for state and local law enforcement to identify, investigate, and prosecute DHS agents who are acting unlawfully," and "undermine public trust in law enforcement," *id.* ¶ 227.[3] But Plaintiffs do not allege facts supporting the proposition that any imminent harm will befall Minneapolis specifically as the result of Defendants' alleged policy. Instead, Plaintiffs' allegation is predicated on speculation as to what may occur in the future. This is not enough. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("[W]e have repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." (citation modified)).

The other two Plaintiffs—Minnesota and St. Paul—are differently situated, as both claim a violation of their own laws. The result remains the same, though, for a violation of state or local law "does not by itself injure the government in an Article III way."

---

[3] Defendants address Plaintiffs' latter theory more below. *See infra* at 10.

5

*Saginaw County v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 956 (6th Cir. 2020); *see* Ann Woolhandler & Michael G. Collins, *State Standing*, 81 Va. L. Rev. 387, 393 (1995) (explaining that, as an historical matter, states could not "seek to enforce their own legislation" in an Article III court).  Instead, a state or locality must show an injury to its "sovereign interests," or, in this context, "some tangible interference with its authority to regulate or to enforce its laws."  *Saginaw County*, 946 F.3d at 957.  Or, in other words, a state or locality must be "hindered from enforcing its laws."  *Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 770 (5th Cir. 2023).  Courts have said that this may occur, for example, in the light of "federal assertions of authority to regulate matters they believe they control."  *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015), *aff'd by an equally divided court*, 579 U.S. 547 (2016) (per curiam).

In the Complaint, Plaintiff allege that Defendants are "unlawfully interfering" with Minnesota's ability to enforce its own laws.  Compl. ¶ 227.  But Plaintiffs fail to allege any facts in support of this assertion.  Instead, the only facts Plaintiffs provide concern alleged violations of state and local law.  *See, e.g.*, *id.* ¶¶ 149-53, 156-57, 218, 221, 224.  "Violating the law," though, "is different from hindering its enforcement."  *Harrison*, 78 F.4th at 772 ("We would not say a criminal defendant's mere disobedience of state or federal law hindered the respective government's enforcement of it.").  And Plaintiffs fail to plausibly allege that any resulting injury from these purported violations, which all concern federal officers in the process of enforcing federal law, is a cognizable injury to their sovereign interests.  *Cf. Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 270 (4th Cir. 2011)

("[T]he VHCFA reflects no exercise of 'sovereign power,' for Virginia lacks the sovereign authority to nullify federal law."); *infra* at 41-42.

Therefore, the Court should conclude that Minnesota and St. Paul lack standing and dismiss Count III.

**B.      Plaintiffs' standing theories for Counts IV and V fail as a matter of law.**

In Counts IV and V, Plaintiffs fail to allege any injury that would entitle them to standing to seek the requested injunctive relief.

*Count IV*.   In Count IV, Plaintiffs challenge an alleged policy of "targeting [their] residents with unjustified violence." Compl. ¶ 232.  Plaintiffs claim that this alleged policy harms their residents, requires a diversion of resources, and undermines public trust in state and local law enforcement. *Id.* ¶ 241.  None of these alleged harms confer standing to seek the requested relief.

To start, Plaintiffs lack standing to raise the claims of their residents.  A state does not have "standing as *parens patriae* to bring an action against the Federal Government." *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (citation modified).  And the same is true for the municipalities, which "derive their existence from the state and function as political subdivisions of the state." *City of N. Miami v. Fed. Aviation Admin.*, 47 F.4th 1257, 1277 (11th Cir. 2022) (citation omitted)); *see* Compl. ¶¶ 14-15 (alleging that Minneapolis and St. Paul are "organized and existing under and by virtue of the laws of the State of Minnesota"); *see also City of Clarkson Valley v. Mineta*, 2008 WL 11512303, at *5 (E.D. Mo. Apr. 22, 2008) ("[T]he City is a municipality and therefore cannot enforce the rights of its citizens under the doctrine of *parens patriae*.").  This is especially true here given

7

that Plaintiffs seek to vindicate their residents' Fourth Amendment rights, which are "personal rights" that "may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) (citation omitted)).

Plaintiffs also allege harms to their own interests, but none are sufficient to confer standing.

*First*, Plaintiffs allege that they have "been forced to divert resources and expend additional resources to maintain public safety and order" because of alleged use-of-force policy. Compl. ¶ 241. This is exactly the kind of "indirect effect[]" on "state [and local] spending" that is insufficient to generate an Article III case or controversy. *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023). Recent caselaw confirms as much. In *Texas*, the district court concluded that the plaintiffs, two states, "would incur additional costs" because of the federal government's alleged under-enforcement of federal immigration laws. *Id.* at 676. This case presents the mirror image, as Plaintiffs contend Defendants' alleged over-enforcement of federal immigration law has imposed downstream costs on Plaintiffs. But even with a finding of monetary harm, the Supreme Court held that the states in *Texas* lacked standing because their asserted injury—which, again, stemmed from enforcement decisions—was not "traditionally redressable in federal court." *Id.*; *see id.* at 681 ("The States' novel standing argument, if accepted, would entail expansive judicial direction of the Department's arrest policies."). This holding is not an outlier. In *Arizona v. Biden*, the Sixth Circuit was deeply skeptical of a challenge by a group of States to a policy that did "not impose any direct costs on the States or threaten the loss of any federal funding." 40 F.4th 375, 386 (6th Cir. 2022); *accord Washington v. U.S. Food & Drug*

8

*Admin.*, 108 F.4th 1163, 1174-76 (9th Cir. 2024). And, although not a state standing case, in *Food & Drug Administration v. Alliance for Hippocratic Medicine*, the Supreme Court rejected the proposition that an organization would have standing to challenge federal policies "provided they spend a single dollar opposing those policies." 602 U.S. 367, 395 (2024). Just as "[t]eachers in border states" may not "sue to challenge allegedly lax immigration policies that lead to overcrowded classrooms," neither may Plaintiffs sue the federal government whenever they allege that aggressive federal immigration enforcement policies, even indirectly, cause downstream impacts on state or city resources. *See id.* at 391-92.

Following from the above cases, the Court should conclude that Plaintiffs' financial injury—allegedly caused by a purported policy aimed at third parties, *see* Compl. ¶¶ 233, 241—is insufficient to establish standing. If Plaintiffs were right, then a state or locality would have standing to challenge any federal policy that increased costs. Because "[m]ost regulations have costs," such a rule would "make a mockery of the constitutional requirement of case or controversy," *id.* (citation omitted), with the "only limit" being the "states' willingness to sue." *Maryland v. U.S. Dep't of Agric.*, 151 F.4th 197, 210 (4th Cir. 2025). The Court should therefore reject it. *See Alliance*, 602 U.S. at 391-92.

*Second*, Plaintiffs allege that they are suffering intangible harm "because Defendants' actions undermine public trust in state and local law enforcement." Compl. ¶ 241; *see, e.g., id.* ¶¶ 139-40. This theory fares no better. Article III requires that a plaintiff's injury in fact be "concrete," or, in other words, "real, and not abstract." *TransUnion LLC*, 594 U.S. at 424 (citation omitted)). This requirement is "essential to the

9

Constitution's separation of powers." *Id.* at 429. To determine whether an intangible harm is sufficiently concrete, courts consider, among other things, whether the injury has a "close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.* at 425.

The intangible injury Plaintiffs allege is "insufficient to establish concrete injury in fact." *Ojogwu v. Rodenburg L. Firm*, 26 F.4th 457, 463 (8th Cir. 2022). Plaintiffs do not establish a "close relationship" between their alleged injury and "harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion LLC*, 594 U.S. at 425. This is reason enough to find a lack of a cognizable injury. The allegations concerning the alleged undermining of public trust in state and local law enforcement do not render plausible any concrete injury to Plaintiffs. *Cf. Jones v. Bloomingdales.com, LLC*, 124 F.4th 535, 540 (8th Cir. 2024).

Because Plaintiffs fail to "clearly allege facts demonstrating each element" of the standing test, *Spokeo*, 578 U.S. at 338 (citation modified), the Court should dismiss Count IV.

*Count V.* In Count V, Plaintiffs challenge an alleged policy "of making warrantless arrests in Minnesota without making individualized determinations of immigration status." Compl. ¶ 245. Plaintiffs' alleged harms largely overlap with those asserted in Count IV. Plaintiffs again seek to raise the rights of their residents and again allege that Defendants' actions "undermine public trust in state and local law enforcement." *Id.* ¶ 249. These theories of injury fail for the same reasons as above. *See supra* at 7-8, 10. Although not

10

apparent, it appears that Plaintiffs also allege some sort of financial harm resulting from "decreased commercial foot traffic in the Twin Cities." Compl. ¶ 249; *see id.* ¶¶ 164-65. Even if alleged, this is the same sort of attenuated financial harm that Plaintiffs allege in Count IV. Like there, it is insufficient here too. *See supra* at 8-9.

*   *   *

The above issues are not the only ones Plaintiffs face. Plaintiffs seek injunctive relief in both Counts IV and V. *See* Compl. ¶¶ 243, 250. To seek such relief, Plaintiffs' must show that an injury in fact is "actual and imminent." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Although past injuries are relevant "for their predictive value," *Murthy v. Missouri*, 603 U.S. 43, 59 (2024), past injuries are alone insufficient to justify injunctive relief, *see Smook v. Minnehaha County*, 457 F.3d 806, 816 (8th Cir 2006). Under *Lyons*, the question is whether a plaintiff has alleged "a sufficient likelihood" such he will "again be wronged in a similar way." 461 U.S. at 111; *see Hussen v. Noem*, 2026 WL 657936, at *40 (D. Minn. Mar. 9, 2026) (concluding Plaintiffs lacked standing because the record does not show "a significant probability that Defendants will stop or arrest" plaintiffs "in the imminent future"). Plaintiffs have not met this high bar.

When a plaintiff's theory of standing depends on a "highly attenuated chain of possibilities," it "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410. And, as discussed above, Plaintiffs rely on such a chain here. For Plaintiffs to sufficiently allege an imminent injury to their own interests, they must plausibly allege that (1) Defendants have policies authorizing excessive force and unjustified warrantless arrests; (2) Defendants will, pursuant to those policies,

11

unconstitutionally seize Plaintiffs' residents; and (3) these future seizures will cause harm to the public fisc or public trust in state and local law enforcement. Plaintiffs fail to do so. Indeed, as explained more below, Plaintiffs fail to clear the initial hurdle because they do not plausibly allege the existence of any policy. *See infra* at 28-31. This too demonstrates that Counts IV and V must be dismissed.

### C.     Plaintiffs lack standing in Counts VI and VII.

Plaintiffs' issues do not improve in Count VI, which concerns an alleged policy and practice of the U.S. Customs and Border Protection (CBP) "conducting border enforcement activity more than 100 miles from the border," Compl. ¶¶ 251-58, and Count VII, which concerns the "revocation of the 2021 Sensitive Locations Policy," *id.* ¶¶ 259-69; *see* Mem. from Benjamine C. Huffman, Acting Sec'y, ICE, "Enforcement Actions in or Near Protected Areas" (Jan. 20, 2025) ("Huffman Memo"), attached hereto as Ex. B. In both Counts, Plaintiffs offer only a conclusory allegation as to their supposed injury. *See id.* ¶ 256 ("Plaintiffs are suffering harm because of Defendants' actions."); *id.* ¶ 267 ("Plaintiffs are harmed by the revocation."). These allegations are insufficient. *See Hekel v. Hunter Warfield, Inc.*, 118 F.4th 938, 943 (8th Cir. 2024) (providing that "naked assertions" of harm "fall short of plausibly establishing injury" (citations modified)), *cert. denied*, 146 S. Ct. 294 (2025); *Ark. Right to Life State Pol. Action Comm. v. Butler*, 146 F.3d 558, 560 (8th Cir. 1998) ("Vague and conclusory allegations of harm are insufficient to create standing."). Dismissal of Counts VI and VII is therefore required.

In addition to the lack of a cognizable injury-in-fact in Count VII, Plaintiffs also have not carried their burden as to traceability and redressability. This is for two reasons.

12

*First*, Plaintiffs' alleged injury turns on the actions of third parties, which makes both traceability and redressability more difficult to establish. *See California v. Texas*, 593 U.S. 659, 675 (2021); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). Second, because the previous policy did not *prohibit* enforcement actions in or near sensitive locations, *see generally* Mem. from Alejandro Mayorkas, Sec'y of Homeland Sec., "Guidelines for Enforcement Actions in or Near Protected Areas" (Oct. 27, 2021) ("Mayorkas Memo"), attached hereto as Ex. A, the challenged enforcement actions cannot be meaningfully connected to the rescission decisions, *see Dep't of Educ. v. Brown*, 600 U.S. 551, 568 (2023) (finding no traceability when plaintiffs failed to "meaningfully connect" their injury with the challenged action), and any remedy nullifying DHS's revocation decision would not affect federal agents' ability to initiate enforcement actions in or near sensitive locations, *cf. Texas*, 599 U.S. at 691-92 (Gorsuch, J., concurring in the judgment). Third and finally, as other courts have found, the enforcement actions allegedly taking place in or near sensitive locations could just as plausibly have arisen from the administration's broader immigration agenda rather than the Huffman Memo's minor changes. *See, e.g.*, *Mennonite Church USA v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 1, 10-12 (D.D.C. 2025).

For these reasons, the Court should dismiss Counts VI and VII.

## II.   Plaintiffs' claims are now moot.

Even if Plaintiffs once had standing to raise all their claims, this case is now moot. "The doctrine that federal courts may not decide moot cases 'derives from the requirement of Article III of the Constitution under which the exercise of judicial power depends upon

the existence of a case or controversy.'" C*omfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*, 138 F.3d 351, 354 (8th Cir. 1998) (quoting *Liner v. Jafco, Inc.*, 375 U.S. 301, 306 n.3. (1964)).   "A claim for injunctive relief may become moot if challenged conduct permanently ceases." *Id.*

Here, Plaintiffs seek prospective relief based solely on Defendants' initiation of Operation Metro Surge and alleged conduct of law enforcement officers sent to Minnesota as the result of Operation Metro Surge.  *See* Compl. ¶¶ 1, 60-187.  Yet Operation Metro Surge "has ended."  *See* Order, *Tincher v. Noem*, ECF No. 246 at 6; Second Easterwood Decl. ¶¶ 5, 10 ("Operation Metro Surge was an exclusively federal operation" that has reached its "conclusion").  More importantly, the vast majority of DHS personnel who were surged to Minnesota as part of Operation Metro Surge—the main predicate for Plaintiffs' constitutional claims—have left.  *See* Raybon Decl. ¶¶ 7-10 (CBP demobilized approximately 1,029 employees assigned to Operation Metro Surge throughout February 2026); Second Easterwood Decl. ¶¶ 8-9 (while there were approximately 3,000 ICE officers and agents detailed to the St. Paul Field Office as part of Operation Metro Surge, approximately 482 remain).  The detailed ICE officers and agents who remain are focused on arrest and removal of incarcerated individuals and criminal investigations of fraud, money laundering, and public safety priorities.  Second Easterwood Decl. ¶¶ 10-11.  That is quite different from the type of "'at-large' arrests of illegal aliens in the Twin Cities metro area," First Declaration of David Easterwood Decl. ¶ 5, (*Tincher*, ECF No. 47), which was a focus of Operation Metro Surge, and which led to the types of interactions with DHS personnel that provide the predicate for Plaintiffs' Complaint.

14

Although Plaintiffs may argue the case is not moot because DHS remains active in Minnesota after Operation Metro Surge, Plaintiffs' factual allegations of Defendants' conduct during a significant surge of enforcement resources do not justify an injunction now that the surge has ended. To the extent this lawsuit ever presented a controversy, it is now moot.

### III. Plaintiffs fail to state a Tenth Amendment claim.

The Tenth Amendment states a "truism"—all "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., amend. X; *see United States v. Darby*, 312 U.S. 100, 124 (1941). For those powers delegated to the federal government—which includes the "power over the subject of immigration and the status of aliens," *Arizona v. United States*, 567 U.S. 387, 394 (2012)—the Tenth Amendment provides no source of limitation. *See Fernandez v. Wiener*, 326 U.S. 340, 362 (1945) ("The Tenth Amendment does not operate as a limitation upon the powers, express or implied, delegated to the national government."). Instead, the Tenth Amendment—and the doctrines that emanate from it—serves to ensure that the federal government exercises only its delegated powers.

As relevant here, one power the Constitution does not delegate to the federal government "is the power to issue direct orders to the governments of the States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 471 (2018). This principle is known as the "anticommandeering doctrine." *Id.* Relatedly, the Supreme Court has held that Congress cannot use its power of the purse to coerce the States to regulate in a certain way. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577, 585 (2012) (*NFIB*).

15

Plaintiffs allege that Defendants, through Operation Metro Surge, have infringed on Plaintiffs' police powers and engaged in coercion and commandeering. Compl. ¶¶ 189-204. The Court previously rejected Plaintiffs' Tenth Amendment theories at the preliminary injunction stage as unlikely to succeed. *See* PI Order. The Court should now dismiss those claims as a matter of law for the same reasons.

### A.        Plaintiffs fail to allege any infringement on their police powers.

Plaintiffs allege that Defendants, through Operation Metro Surge, have "infring[ed] upon Plaintiffs' ability to ensure the safety of their residents," and Plaintiffs' ability to "run[] public schools." Compl. ¶ 195 (citation omitted); *see id.* ¶¶ 192-97. Missing from these allegations, though, is any such infringement. To be sure, the Constitution leaves to the States "core police powers." *United States v. Maupin*, 3 F.4th 1009, 1013 (8th Cir. 2021). But here, Plaintiffs have not alleged that Defendants have exercised any such powers. Plaintiffs do not allege that Defendants are enforcing local law or running local schools. Instead, Plaintiffs merely claim that Defendants' enforcement of *federal* law in Minnesota has made it more difficult for Plaintiffs to exercise their police powers. *See* Compl. ¶¶ 192-97. This is not a cognizable Tenth Amendment theory, most especially because Plaintiffs do not challenge the constitutionality of the federal statutes Defendants are enforcing. In this circumstance, a Tenth Amendment claim "necessarily fails." *United States v. Louper-Morris*, 672 F.3d 539, 563 (8th Cir. 2012). If downstream effects of federal action justified a Tenth Amendment claim, then there would be no federal action to speak of. Such a result would turn a truism into a trump and run contrary to centuries of Supreme Court precedent. *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436

16

(1819) ("[T]he states have no power . . . to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the [federal] government."). The Court therefore should dismiss this portion of Count I.

**B.  Plaintiffs fail to state an anticommandeering or coercion claim.**

Next, Plaintiffs allege that Defendants' efforts to enforce federal law "are designed to coerce Plaintiffs into adopting and enforcing President Trump's policy priorities" and violative of the anticommandeering doctrine. Compl. ¶ 198. Relatedly, Plaintiffs allege that Defendants' efforts have "forced" a response from local law enforcement to "deal with the fallout." *Id.* ¶¶ 202-03.

Plaintiffs fail to state a cognizable anticommandeering or coercion claim. This conclusion is apparent after comparing the alleged facts here with the facts in cases in which the Supreme Court has found a constitutional violation on this basis.

1.  Start with anticommandeering. In *New York v. United States*, the Supreme Court considered provisions of the Low-Level Radioactive Waste Policy Amendments Act of 1985. 505 U.S. 144, 152-54 (1992). One provision offered the States a choice: regulate in accord with Congress's wishes or "tak[e] title to and possession of the low level radioactive waste generated within their borders and becom[e] liable for all damages waste generators suffer as a result of the States' failure to do so promptly." *Id.* at 174-75. Both options, the Court concluded, were unconstitutionally coercive; either way, a State was required to "implement[] legislation enacted by Congress." *Id.* at 176. In *Printz v. United States,* the Supreme Court considered the constitutionality of a federal statute that imposed

17

on state law enforcement officers the temporary obligation "to perform background checks on prospective handgun purchasers." 521 U.S. 898, 904, 933 (1997). The Supreme Court concluded that this legislation—which operated to "conscript[]" State officers to execute federal law—was "fundamentally incompatible with our constitutional system of dual sovereignty." *Id.* at 904-35. And in *Murphy v. National Collegiate Athletic Association*, the Supreme Court ruled that a provision of the Professional and Amateur Sports Protection Act—which prohibited a State from "authoriz[ing]" sports gambling— ran afoul of the anticommandeering doctrine because it "dictate[d] what a state legislature may and may not do." 584 U.S. at 474.

The facts here are far different than the facts of the above precedents. *See* PI Order at 20 (agreeing that "[n]one of the cases on which [Plaintiffs] rely have even come close" to the facts of this one). As for the anticommandeering line of cases, Plaintiffs do not allege that Defendants have "require[d] [Plaintiffs] to enact any laws or regulations," or that Defendants have "require[d] [Plaintiffs] to assist in the enforcement of federal statutes regulating private individuals." *Reno v. Condon*, 528 U.S. 141, 151 (2000) (concluding that Driver's Privacy Protection Act of 1994 did not violate anticommandeering principle because it lacked these features). Instead, Plaintiffs allege that they have not spent any time "assisting Defendants in immigration enforcement." Compl. ¶ 113 (emphasis omitted). Even if Plaintiffs are free to make that decision, there is no colorable argument that the federal government devoting more law enforcement resources to Minnesota in response to that decision somehow violates the Tenth Amendment. *See Fernandez*, 326 U.S. at 362. If it were otherwise, a state or locality would have constitutional license to

18

create a law enforcement vacuum—by both refusing to enforce the law and by suing to stop federal enforcement. The Tenth Amendment does not mandate such an absurd result.

This remains true regardless of whether an increased law enforcement presence results in a state or locality's diversion of resources. *See* Compl. ¶¶ 203-04. "[F]ederal policies frequently generate indirect effects on state revenues or state spending." *Texas*, 599 U.S. at 674, 680 n.3. If those indirect effects provided the predicate for a Tenth Amendment claim, then the federal government would be effectively paralyzed. Such downstream costs of federal action do not even give rise to an Article III "case or controversy" in many cases, let alone a Tenth Amendment violation. Indeed, as discussed above, just three years ago, the Supreme Court rejected by an 8-1 vote the reverse of this lawsuit—a suit brought by two states to compel *more* immigration enforcement. *Id.* at 674, 679. And even though the states claimed that federal policy caused downstream financial harms, the Supreme Court concluded that the suit failed on standing grounds, in large part because of the Executive's substantial enforcement discretion. *See id.* at 674, 679-80. If these downstream costs of federal action are insufficient to create standing, they are certainly not sufficient to state a Tenth Amendment claim.[4] *See* PI Order at 25 (agreeing that it is "unlikely").

---

[4] Elsewhere in the complaint, Plaintiffs allege that Defendants have "commandeered" state and local property by using public parking lots to stage enforcement actions. *See* Compl. ¶¶ 146-59. Plaintiffs provide no legal authority to support the proposition that federal officers, while enforcing federal law, violate the Tenth Amendment when they temporarily park in city-owned public parking lots.

2.      Relatedly, Plaintiffs allege that Defendants have engaged in unconstitutional coercion.  Plaintiffs claim that Defendants have deployed "federal troops" to Minneapolis and St. Paul not to enforce federal immigration law, but to force Plaintiffs to comply with Defendants' immigration policy.  Compl. ¶ 201.  This theory fares no better.

Plaintiffs rely on *NFIB*, where the Supreme Court held that Congress exceeded its power under the Spending Clause when it conditioned preexisting Medicaid funding on the state's agreement to implement the Affordable Care Act's expansion of Medicaid.  567 U.S. at 580; *see* Compl. ¶ 200.   This was because the condition's size and disproportionality, in light of the history of the Medicaid program, constituted a "gun to the head" of the States and transgressed limits on Spending Clause legislation.  *NFIB*, 567 U.S. at 581.

Defendants have previously explained why this theory is not cognizable.  *See* ECF No. 129.

*First*, *NFIB* addressed unique concerns regarding the expansion of Congress's power under the Spending Clause.  *See* U.S. Const., art. I, § 8, cl. 1 (granting Congress the power to collect taxes "to . . . provide for the . . . general Welfare of the United States"); *NFIB*, 567 U.S. at 578 (explaining danger of Congress using its spending "power to implement federal policy it could not impose directly under its enumerated powers").  Here, Plaintiffs challenge the execution of federal law. *See* Compl. ¶ 201. Because the Executive Branch can only execute a federal law based on an enumerated power, the risk to federalism presented by valid federal enforcement actions—the actions at issue in this case—is minimal compared to the risk posed by the Spending Clause.

20

*Second*, *NFIB* dealt with an explicit statutory condition. 567 U.S. at 581. But here, Plaintiffs seek to deploy *NFIB* in a fundamentally different way—not to challenge a clear condition, but instead, based on an *inference* of an improper subjective purpose, to challenge an objectively legitimate law-enforcement operation. To evaluate such a claim, a federal court would have to interrogate the subjective grounds for facially valid actions. Such a probe would run afoul of longstanding principles of judicial review. *See Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) (explaining that "judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided"); *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (finding no basis "to probe the sincerity of the stated justifications for the policy by reference to extrinsic statements"); *cf. Hunter v. Underwood*, 471 U.S. 222, 228 (1985) ("Proving the motivation behind official action is often a problematic undertaking."); PI Order at 22 n.18 (recognizing that conducting such an inquiry would be to "venture into a uniquely controversial political question").

*Third*, NFIB employed a straightforward remedy—severance of the unconstitutional provision—to alleviate the coercion. *See* 567 U.S. at 585. But here, Plaintiffs ask the Court to halt Operation Metro Surge entirely and order federal officers to leave Minnesota. *See* Compl. ¶ 205. This relief would clearly violate the Take Care and Supremacy Clauses. It would also be impossible to administer. *See* PI Order at 23-24. To avoid contempt, would Defendants have to move for relief each time they wish to send officers into Minnesota? Would the Court then have to adjudicate whether a proper purpose was behind the deployment of each officer? This is not the job of an Article III

21

court, *see TransUnion LLC*, 594 U.S. at 423–24 ("Federal courts do not exercise general legal oversight of the Legislative and Executive Branches."), especially in this context, *see Texas*, 599 U.S. at 679 ("The Executive Branch—not the Judiciary—makes arrests and prosecutes offenses on behalf of the United States."); *Chicago Headline Club v. Noem*, 2026 WL 622677, at *5 (7th Cir. Mar. 5, 2026) (vacating an injunction that "effectively established the district court as the supervisor of all Executive Branch activity in the city of Chicago").

To Defendants' knowledge, no court has ever extended *NFIB*'s reasoning beyond the Spending Clause context. For the reasons above, this Court should not be the first. Plaintiffs' theory is that a court can take any facially legitimate exercise of any federal power, probe behind it to discern an illegitimate subjective purpose to "coerce" States to follow federal preferences and then enjoin the federal action and eject federal officers from the State. This would be an extraordinary rewriting of foundational federalism principles through which any and all States could supplant federal priorities with their own. The Court has already declined to recognize the validity of this theory once, PI Order at 26, and it should do so again.

Even assuming the *NFIB* Spending Clause framework could be extended to challenges to federal enforcement operations, the Court should still dismiss the claim. The Affordable Care Act left States with no real choice because (i) Medicaid funding "constitut[ed] over 10 percent of most States' total revenue"; (ii) States had "developed intricate statutory and administrative regimes over the course of many decades to implement their objectives under existing Medicaid"; and (iii) the new condition was

22

disproportionate because it provided that "[i]f a State d[id] not comply with the Act's new coverage requirements, it may lose not only the federal funding for those requirements, but all of its federal Medicaid funds."  567 U.S. at 542, 582.  It was the combination of those three unique factors that gave *NFIB* its bite, and courts across the country have refused to extend *NFIB* beyond those parameters.  *See, e.g.*, *New York v. Dep't of Just.*, 951 F.3d 84, 114-16 (2d Cir. 2020).

Here, none of this is true.  Perhaps most obviously, Plaintiffs have not alleged that they have changed their policies.  Also, although Plaintiffs claim potential drops in revenue, *see* Compl. ¶¶ 164-81, they do not attempt to quantify an impact on their budgets, let alone suggest that the figure is comparable to what was at issue in *NFIB*.  And Plaintiffs have not established that Operation Metro Surge is disproportionate to the need created by their policies—an inquiry that again implicates the Executive Branch's conclusive and preclusive discretion over how, when, and where to enforce federal law.  *NFIB* is the only case in which the Supreme Court has "deemed a condition unconstitutionally coercive in violation of the Tenth Amendment."  *New York v. Yellen*, 15 F.4th 569, 582 (2d Cir. 2021).  This case is no candidate to be the second.

\* \* \*

Plaintiffs' commandeering and coercion theories fail as a matter of law.  The Court should dismiss them.

## IV.    Plaintiffs' Tenth Amendment *Ultra Vires* Claim Should Be Dismissed.

Plaintiffs' *ultra vires* claim (Count XI) is simply a repackaged version of their Tenth Amendment claim (Count I).  This claim adds nothing new and should be dismissed for

23

the reasons stated above.  As the Supreme Court recently explained, *ultra vires* review is "strictly limited" and Plaintiffs have not carried their heavy burden to meet this demanding standard.  *See Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (stating than an *ultra vires* claim "is essentially a Hail Mary pass-and in court as in football, the attempt rarely succeeds" (citation omitted)).

## V.      Minnesota fails to allege an Equal Sovereignty violation.

Minnesota, on its own, contends that the federal government violates the principle of "Equal Sovereignty" when it prioritizes law enforcement in some States over others.  Compl. ¶¶ 206-14 (Count II).  This claim should be dismissed.

The case at the heart of Minnesota's claim is *Shelby County v. Holder*, 570 U.S. 529 (2013).  There, the Supreme Court addressed whether provisions of the Voting Rights Act—which required some parts of the country, but not others, to seek federal preclearance for changes to state election law—departed from our "tradition of equal sovereignty."  *Id.* at 544; *see id.* at 550 ("The provisions of § 5 apply only to those jurisdictions singled out by § 4.  We now consider whether that coverage formula is constitutional in light of current conditions.").  Because the Act's distinctions in coverage were based on "decades-old data and eradicated practices," the Court declared that § 4(b)—the subsection that set out the coverage formula—was unconstitutional.  *Id.* at 551.

*Shelby County* has zero relevance here.  Unlike in *Shelby County*, this case does not involve any statute that unevenly intrudes, or even intrudes in any way, on the States' powers.  And multiple circuits have cabined *Shelby County* to the "context of sensitive areas of state and local policymaking."  *Ohio v. Env't Prot. Agency*, 98 F.4th 288, 310

24

(D.C. Cir. 2024), *rev'd and remanded on other grounds sub nom. Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100 (2025); *Mayhew v. Burwell*, 772 F.3d 80, 95 (1st Cir. 2014); *Nat'l Collegiate Athletic Ass'n v. Governor of N.J.*, 730 F.3d 208, 239 (3d Cir. 2013), *abrogated on other grounds by Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018).

This case implicates no sensitive area. The Constitution confers on the federal government the authority over immigration. *See Arizona*, 567 U.S. at 416. And Congress, through the Immigration and Nationality Act (INA), has placed broad discretion in the federal government to enforce the Nation's immigrations laws. *See id.* at 396. Viewed properly, Minnesota is challenging the Executive Branch's exercise of that enforcement discretion. But Article II gives the President "conclusive and preclusive" authority in this regard. *Trump v. United States*, 603 U.S. 593, 620 (2024) ("[T]he Executive Branch has 'exclusive authority and absolute discretion' to decide which crimes to investigate and prosecute." (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)); *Texas*, 599 U.S. at 678 ("Under Article II, the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." (citation omitted)). This "principle of enforcement discretion" not only "extends to the immigration context," it also has special purchase here given the associated "foreign-policy objectives." *Texas*, 599 U.S. at 679 (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-91 (1999)).

Nor does Minnesota explain how it is similarly situated to other states that are not being treated equally or what equality in immigration enforcement would look like. On

25

the one hand, Minnesota is not the only state that has seen an increase in immigration enforcement, as Plaintiffs admit. *See* Compl. ¶ 35. On the other hand, those states have "sanctuary" policies that make it harder to enforce immigration law safely in coordination with local authorities. This, in turn, requires more public and direct enforcement actions than in states that cooperate, such as Texas. In any event, equality in law enforcement makes little sense between states. Minnesota does not provide any evidence that it is being treated unequally, instead claiming that the surge is "politically" motivated and thus somehow inherently unequal. *See* Compl. ¶ 211. Minnesota cites no case law for this novel position.

For the above reasons, the Court should dismiss the Equal Sovereignty claim.

## VI.    The State's APA claims are not justiciable.

On top of the Tenth Amendment and Equal Sovereignty claims, Plaintiffs add several claims under the APA. None of them are justiciable.

### A.    Counts III, IV, V, and VI fail to plausibly allege a discrete agency action.

The APA does not allow a court to "exercise judicial review over everything done by an administrative agency." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) (citation modified). The APA instead permits review of only agency actions "made reviewable by statute" or that are "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. Identifying a reviewable action is thus "necessary … for stating a claim under the APA." *Corner Post, Inc v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (citation omitted).

For an "agency action" to be reviewable under the APA, it must be one of the "circumscribed, discrete" actions identified in the statutory definition of that term, *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 62 (2004)—*i.e.*, "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof." 5 U.S.C. § 551(13); *see also id.* § 551(4), (6), (8), (10), (11) (defining "rule," "order," "license," "sanction," "relief"). A plaintiff seeking judicial review under the APA must therefore challenge a "specific" agency action falling within one of these discrete categories, rather than attempt to challenge an "abstract" policy or decision divorced from a concrete action, *Biden v. Texas*, 597 U.S. 785, 809 (2022), or challenge "at a high[ ]level of generality" an agency "operation" or "program," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990); *accord SUWA*, 542 U.S. at 64 (the APA's discrete-action "limitation precludes … broad programmatic attack[s]"); *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 813 (8th Cir. 2006) ("A broad agency program is not a final agency action within the meaning of 5 U.S.C. § 704."). In that way, the APA constrains courts to their constitutionally limited role, permitting them to review discrete, concrete acts but precluding them from reviewing "sweeping actions" that seek "systemic" or "programmatic improvements" of agency operations or "wholesale correction" of agency conduct, which would impermissibly enmesh courts into pervasive oversight of an agency's "day-to-day operations," *see Lujan*, 497 U.S. at 891, 893-94, 899, and require them to "adjudicate generalized grievances" with "an agency's performance," *City of N.Y. v. DOD*, 913 F.3d 423, 431 (4th Cir. 2019). The APA's discrete-action requirement keeps courts "from entering such a quagmire." *Id.*

In Counts III, IV, V, and VI, Plaintiffs claim that Defendants are "operating" in Minnesota under certain "policies" that allegedly violate the APA. *See* Compl. ¶¶ 216, 232, 245, 254. Specifically, Count III alleges that Defendants are operating under a "policy" of using "tactics and conduct" to violate certain state and city laws, *id.* ¶¶ 216–17—namely, a state masking law, *id.* ¶ 218, a state license-plate law, *id.* ¶ 221, and a city parking lot ordinance, *id.* ¶ 224. Count IV alleges that Defendants are operating under a "policy" of "using excessive force" against Minnesota residents. *Id.* ¶¶ 232, 240. Count V alleges that Defendants are operating under a "policy" to make "warrantless arrests … without making individualized determinations of immigration status." *Id.* ¶¶ 245, 248. And Count VI alleges that CBP officers and agents have a "policy" of conducting immigration enforcement activity more than 100 miles from the border. *Id.* ¶ 254.

But the complaint contains no "*factual* matter" that suggests that these imagined "policies" even exist, much less that they are embodied in discrete agency actions of the type listed in § 551(13) and capable of judicial review. *See Twombly*, 550 U.S. at 556; *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1056 (8th Cir. 2018) ("Naked assertions devoid of further factual enhancement" cannot suffice to plead a plausible claim for relief. (citation modified) (quoting *Iqbal*, 556 U.S. at 678)). Indeed, Plaintiffs point to no document, order, regulation, statement, or any other concrete expression indicating that these purported policies exist. Instead, Plaintiffs simply speculate, through vague and conclusory assertions, that they do. *See Hunter v. Page County*, 102 F.4th 853, 874–75 (8th Cir. 2024) ("speculative," "conclusory," and "barebones allegations … are insufficient to state a claim in federal court" (citation modified)). But Plaintiffs' "nebulous assertion

28

of the existence of a 'policy,'" supported by "no facts," cannot plausibly establish that the policy actually exists.  *See Rodriguez v. U.S. Dep't of the Air Force*, 387 F. Supp. 3d 130, 135 (D.D.C. 2019) (citation omitted); *accord, e.g.*, *L.A. Press Club v. Noem*, --- F. Supp. 3d ---, 2026 WL 103972, at *9 (C.D. Cal. Jan. 8, 2026) ("conclusory" allegations cannot "plausibly establish the existence of … a policy"); *Daines v. IRS*, 2025 WL 2694788, at *4 (E.D. Wis. Sept. 22, 2025) ("speculation and conjecture" cannot "plausibly alleg[e] the existence of" a policy, much less "the existence of a rule," "under the APA").  Nor can the State "nakedly assert" that Defendants have adopted a "policy … to go on a fishing expedition for evidence to support" their speculations.  *People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*, 60 F. Supp. 3d 14, 20 (D.D.C. 2014), *aff'd*, 797 F.3d 1087 (D.C. Cir. 2015); *accord Alsaidi v. U.S. Dep't of State*, 292 F. Supp. 3d. 320, 328 (D.D.C. 2018) ("Plaintiff cannot use the APA to justify a fishing expedition for evidence that defendants" have a "policy that plaintiff believes exists.").

Moreover, Plaintiffs' reliance on allegations regarding the purported conduct of some DHS agents is misplaced.  The conduct of agency officers or employees is, of course, not itself discrete agency action.  *See* 5 U.S.C. § 551(13) ("rule," "order," "license," etc.); *see also Lujan*, 497 U.S. at 899 (the APA does not permit review of an agency's "day-to-day operations"); *Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014) (the APA does not permit review of "agency behavior" (citation omitted)); *Vigil v. FEMA*, 2024 WL 2404487, at *39 (D.N.M. May 23, 2024) (explaining that "an agency's daily operations" and "the day-to-day activities of agency employees" are not reviewable agency actions under the APA (citation modified) (citation omitted)); *L.A. Press Club*, 2026 WL 103972,

29

at *8 ("A 'pattern and practice' is" not sufficiently "discrete" to be "reviewable final agency action." (citation omitted)).   Nor can one reasonably infer from the State's allegations about disparate incidents involving DHS agents that any of Plaintiffs' imagined policies exist, much less that they are reflected in discrete, reviewable actions.  *See Bark*, 37 F. Supp. 3d at 50 (the APA "requires more" than merely "attach[ing] a 'policy' label to" and agency's "practices" to plead "final agency action"); *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1207 (S.D. Cal. 2019) ("A plaintiff may not simply attach a policy label to disparate agency practices or conduct."); *L.A. Press Club*, 2026 WL 103972, at *8 (refusing to infer a policy's existence based on allegations about a "pattern" of conduct); *Nw. Ctr. for Alternatives to Pesticides v. DHS*, 552 F. Supp. 3d 1078, 1087 (D. Or. 2021) (rejecting APA challenge to DHS's surge of officers to Portland, Oregon that allegedly was "to quell protests using large volumes of chemical and other munitions"). [5]

Instead of challenging discrete action, Plaintiffs effectively bring a broad programmatic challenge to every aspect of DHS's law enforcement response to the problem of illegal immigration in Minnesota.  Such challenges are impermissible under the APA.  The Supreme Court's decision in *Lujan* squarely forecloses Plaintiffs' request for judicial review of these alleged "policies" or "programs."  497 U.S. at 890 (holding that a so-called "land withdrawal review program" was "not an 'agency action' under the APA

---

[5] Again, even if Plaintiffs had plausibly alleged that one or more of these policies exists in the abstract, that would not be enough to plead a justiciable APA claim.  *Biden*, 597 U.S. at 809 (considering it an "error" to "review[] an abstract decision apart from specific agency action, as defined in the APA"); *Corner Post*, 603 U.S. at 808 (a final agency action is "necessary … for stating a claim under the APA").

because it did "not refer to a single BLM order or regulation" and was "no more an identifiable 'agency action' . . . than a 'weapons procurement program' of the Department of Defense or a 'drug interdiction program' of the Drug Enforcement Administration"). A unanimous Supreme Court reaffirmed this view in *SUWA*, 542 U.S. at 63-64 (emphasizing that the five specific actions listed in the APA—"rule, order, license, sanction [and] relief"—all "involve circumscribed, discrete agency actions," and do not allow for a broad challenge to the manner in which an agency implements its programs). Therefore, Counts III, IV, V, and VI should be dismissed pursuant to Rule 12(b)(6) for failing to plausibly allege a reviewable agency action. *See Corner Post*, 603 U.S. at 808.

**B.     Count VII fails to plausibly allege final agency action.**

Count VII challenges DHS's revocation of a 2021 memorandum that provided immigration agents with guidance regarding enforcement operations in certain sensitive locations like churches, schools, and hospitals. *See* Mayorkas Memo. DHS revoked that memorandum in 2025 and provided updated guidance for immigration enforcement operations in these locations. *See* Huffman Memo. While the Huffman Memo is a discrete agency action, it is not a *final* agency action susceptible to APA review. *See New England Synod v. DHS*, 2026 WL 412329, at *27-28 (D. Mass. Feb. 13, 2026) (concluding that the Huffman Memo is not final agency action reviewable under the APA). *But see Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*,

31

2026 WL 280089, at *6 (D. Md. Feb. 3, 2026) (finding Huffman Memo final agency action).[6]

An agency action is "final" under the APA if it (i) "mark[s] the consummation of the agency's decisionmaking process," and (ii) determines "rights or obligations" or creates "direct and appreciable legal consequences." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (citation omitted).  The Eighth Circuit has focused the second inquiry on the party seeking judicial review, asking whether the challenged action "inflict[s] some legal injury" on the plaintiff by "either compel[ling] affirmative action or prohibit[ing] otherwise lawful action." *Firearms Regul. Account. Coal., Inc. v. Garland*, 112 F.4th 507, 518 (8th Cir. 2024) (quoting *Sisseton–Wahpeton Oyate of Lake Traverse Rsrv. v. U.S. Corps of Eng'rs*, 888 F.3d 906, 915 (8th Cir. 2018)).

By that measure, while the Huffman Memo may satisfy finality's first prong, it cannot satisfy the second.

The Huffman Memo is a routine policy statement that "explains how the agency … will exercise its broad enforcement discretion" under existing statutory and regulatory rules—*i.e.*, the INA and its implementing regulations.  *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015) (citation omitted); *accord New England Synod*, 2026 WL 412329, at *27 (the Huffman Memo is a "general statement of policy" that "explains how the agency will exercise its broad enforcement discretion"

---

[6] The two district courts that have addressed this issue have reached different conclusions about whether the Huffman Memorandum is final agency action.  As explained herein, the Court should follow the reasoning set forth in *New England Synod*.

32

(citation modified)).  Policy statements like this rarely constitute final agency action.  *See*

*New England Synod*, 2026 WL 412329, at \*27 (citing *Am. Tort Reform Ass'n v. OSHA*,

738 F.3d 387, 395 (D.C. Cir. 2013)); *see also, e.g.*, *Arizona*, 40 F.4th at 387-89 (policy

statement that created guidelines for the exercise of agency discretion was not final agency

action); *Huerta*, 785 F.3d at 715-718 (same).  That is because policy statements, like the

Huffman Memo, impose no legally binding obligations or prohibitions on the public or

regulated parties.  *See Huerta*, 785 F.3d at 716-17.  Indeed, one of the defining

characteristics of a policy statement (as opposed to, say, a legislative rule) is that they have

no binding legal effect whatsoever, and the agency thus retains the authority and discretion

to change its position from that of an existing policy statement in any given case.  *Id.*  Also,

the Huffman Memo expressly confirms that it "is not intended to, does not, and may not

be relied upon to create any right or benefit," Huffman Memo at 1—a "telltale sign[] … of

a nonbinding policy statement, not of reviewable agency action," *Arizona*, 40 F.4th at 388.

Given all this, Plaintiffs cannot seriously suggest that the Huffman Memo directly

inflicts a "legal injury" on the State—a necessary element of final agency action.  *See*

*Firearms Regul. Account. Coal.*, 112 F.4th at 518.  It neither "compels" Plaintiffs to take

an "affirmative action" nor "prohibits" Plaintiffs' from taking "otherwise lawful action."

*See id.*  Nor does it put the State to a choice "between heavy compliance costs or feared

[legal] liability." *See Arizona*, 40 F.4th at 387.  So "[w]hatever costs" the Huffman Memo

may allegedly create for Plaintiffs "downstream arise only from officials who exercise the[]

discretion" that the INA has delegated to them and that the Huffman Memo has preserved.

*Id.* at 388.  Those alleged costs thus cannot be said to be the Huffman Memo's "'direct or

33

appreciable legal' consequences." *Id.* (citation omitted); *see also Hawkes*, 578 U.S. at 598 (requiring that any legal consequences be "direct and appreciable" to satisfy finality's second prong).

Moreover, it makes no difference for finality purposes that the Huffman Memo officially revoked the Mayorkas Memo. *New England Synod*, 2026 WL 412329, at *27 (the Huffman Memo's revocation of the Mayorkas Memo did not make it final agency action). That memorandum, like the Huffman Memo, was a nonbinding policy statement that explained how the agency would "exercise its broad enforcement discretion." *See Huerta*, 785 F.3d. at 716. It offered no interpretations of the INA or any other relevant statute or regulation. *See New England Synod*, 2026 WL 412329, at *27. It imposed no obligations or prohibitions on the public or regulated parties, nor created any rights or benefits. *See* Mayorkas Memo; *Huerta*, 785 F.3d at 716-17; *Arizona* 40 F.4th at 387-88. And it neither withdrew nor limited the agency's enforcement discretion, but simply provided guidance for lower-level employees who exercise that discretion. *See New England Synod*, 2026 WL 412329, at *27 (the Mayorkas Memo simply "provided guidance regarding enforcement discretion"); *see also Arizona*, 40 F.4th at 387-88 (guidance document that did "not rule out any enforcement action against any noncitizen" but rather "preserve[d] officials' discretion" and allowed them "to make decisions 'depending on the facts'" was not final agency action); *Huerta*, 785 F.3d at 718 (same conclusion for similar reasons). Therefore, because the Mayorkas Memo created no "direct and appreciable legal consequences," *Hawkes*, 578 U.S. at 598 (citation omitted), its revocation had no such

34

consequences either, *New England Synod*, 2026 WL 412329, at *27 (the Mayorkas Memo's revocation had no "legal consequences").

Count VII should thus be dismissed pursuant to Rule 12(b)(6) for failing to plausibly allege final agency action.

### C.    Count VII challenges an action that is committed to agency discretion.

The lack of final agency action aside, the Huffman Memo also reflects a wholly discretionary policy choice about how best to enforce federal immigration laws. That decision is committed to agency discretion by law, and thus unreviewable under the APA.

The APA bars judicial review of agency actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). A statute commits an action to an agency's discretion where it "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *accord Ngure v. Ashcroft*, 367 F.3d 975, 982 (8th Cir. 2004) ("[A]ctions are committed to agency discretion where it is not possible to devise" from the statute "an adequate standard of review for an agency action."). Determining whether a meaningful standard for reviewing an agency's discretionary decision exists thus "requires careful examination of" the statutory "language and structure … that supplies the applicable legal standards for reviewing that action" and "the nature of the administrative action at issue." *Tamenut v. Mukasey*, 521 F.3d 1000, 1003-04 (8th Cir. 2008) (en banc) (citations omitted). "The absence of any statutory factors to guide the agency's decision-making process, in combination with the open-ended nature of the inquiry, generally supports the conclusion that the 'agency action is committed to agency discretion by law.'" *Id.* (citation omitted);

35

*see also Ngure*, 367 F.3d at 982 ("An important factor … is whether the agency decision involves a complicated balancing of a number of factors which are peculiarly within its expertise," as an "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." (citation omitted)).  Only when Congress "has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion," should a court find that there is sufficient law to apply on judicial review.  *Heckler*, 470 U.S. at 833-34. And where "the type of agency decision in question has traditionally been committed to agency discretion"—*e.g.*, the exercise of enforcement discretion—the action does not "become[] reviewable" just because the agency provides a "reason" for it.  *Interstate Com. Comm'n v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 282-83 (1987) (citation omitted).

Measured by these principles, the Huffman Memo reflects a decision that is committed to agency discretion by law.

Congress, through the INA and other statutes, has granted DHS broad discretion in enforcing federal immigration laws.  *See Arizona*, 567 U.S. at 396 ("A principal feature of the" statutory "removal system is the broad discretion exercised by immigration officials."); *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 921 (8th Cir. 2025) ("Federal immigration law grants broad discretion to federal officials.").  Nothing in the INA indicates that Congress intended to "limit [the] agency's exercise of enforcement power" "by setting substantive priorities or by otherwise circumscribing [the] agency's power to discriminate among issues or cases it will pursue."  *Heckler*, 470 U.S. at 832-33. The INA, far from seeking to impose constraints on the agency's "exercise of enforcement

36

power," thus affords the Executive Branch ample discretionary authority to prioritize when and, as relevant here, where it will enforce the law. *Id.* at 833.

Indeed, the INA imposes few location-based restrictions on DHS officers' and agents' authority to enforce immigration law, *see, e.g.*, 8 U.S.C. § 1357(e) (limiting when immigration officers may enter a farm or similar agricultural operation for investigative purposes), and it imposes only limited constraints on DHS's discretion with respect to the mechanics of enforcement, *see, e.g., id.* §§ 1226(a), 1231(a)(1)(A), (a)(2), 1357(a). Congress has placed no other location-specific restrictions on DHS's enforcement discretion, like whether, when, or under what circumstances immigration officers may enter or approach sensitive locations like churches or schools. The INA's silence with respect to these types of locations leaves this Court with no meaningful standard to apply in reviewing the Huffman Memo. *See Heckler*, 470 U.S. at 830; *see also, e.g., Tamenut*, 521 F.3d at 1004 (holding that the BIA's decision to reopen removal proceedings was committed to agency discretion because the governing statute and implementing regulations "provide[] no guidance" for determining when reopening is "appropriate," "sets forth no factors … to consider" in making that decision, "place[d] no constraints on the BIA's discretion," and "specifies no standards for a court to use to cabin" that discretion); *Greer v. Chao*, 492 F.3d 962, 965 (8th Cir. 2007) (highlighting many of the same factors as indicative of whether a statute provides a meaningful standard for reviewing agency action).

The "nature of the administrative action at issue" further supports the conclusion that the Huffman Memo is committed to agency discretion. *Tamenut*, 521 F.3d at 1003-04

37

(citation omitted).  "When it comes to" an agency's exercise of "discretionary enforcement powers, courts do not usually interfere."  *Greer*, 492 F.3d at 966; *accord Wal-Mart Stores E., LP v. Acosta*, 919 F.3d 1073, 1077 n.1 (8th Cir. 2019) (an agency's enforcement choices are "an area in which the courts have traditionally been most reluctant to interfere" (quoting *Brock v. Cathedral Bluffs Shale Oil Co.* 796 F.2d 533, 538 (D.C. Cir. 1986) (Scalia, J.))).  That's because enforcement decisions traditionally involve considerable agency discretion, *see Texas*, 599 U.S. at 678 ("Under Article II, the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." (citation modified)); *see also Arizona*, 567 U.S. at 396 ("A principal feature of the removal system is the broad discretion exercised by immigration officials."), and typically "involve[] a complicated balancing of … factors" that "are peculiarly within" an agency's "expertise," *Greer*, 492 F.3d at 964 (quoting *Heckler*, 470 U.S. at 831). Agency decisions are generally unsuitable for judicial review when they require "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise" or involve choices about where best to spend "agency resources," including whether the agency "is likely to succeed if it acts" and "whether the particular enforcement action requested best fits the agency's overall policies[.]" *Heckler*, 470 U.S. at 831; *accord Ngure*, 367 F.3d at 982, 987.  An "agency is far better equipped than the courts" to balance these factors and "to deal with the many variables involved in the proper ordering of its [enforcement] priorities." *Ngure*, 367 F.3d at 982, 987 (quoting *Heckler*, 470 U.S. at 831-32).  For these reasons, the Supreme Court and the Eighth Circuit have long recognized that agency decisions about whether to pursue enforcement action are committed to agency

38

discretion. *See, e.g.*, *Heckler*, 470 U.S. at 831 ("[A]n agency's decision not to prosecute or enforce, whether through civil and criminal process, is a decision generally committed to an agency's absolute discretion."); *Ngure*, 367 F.3d at 982 ("whether to institute an enforcement action" is a decision "traditionally left to agency discretion" (citation omitted)); *Greer*, 492 F.3d at 963-67 (an agency's decision whether to bring an enforcement action was committed to agency discretion).

This is particularly true for immigration enforcement decisions. *See Iowa Migrant Movement*, 157 F.4th at 921-22 ("Discretion in the enforcement of federal immigration law," including the need to "balance many factors" like public safety, public welfare, and resource constraints, "is vital for accomplishing the purposes of federal immigration law."). Indeed, the Supreme Court recently emphasized that lawsuits (like this one) that challenge agency immigration enforcement operations "run up against the Executive's Article II authority to enforce federal law," and that "courts generally lack meaningful standards for assessing the propriety of enforcement choices" regarding arrest and detention, given the Executive Branch's need to weigh "resource constraints and regularly changing public-safety and public-welfare needs . . . when devising arrest and prosecution policies." *Texas*, 599 U.S. at 678–80; *see also Reno*, 525 U.S. at 490 ("Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake."). "These concerns are greatly magnified in the deportation context." *Reno*, 525 U.S. at 490.

Therefore, without any meaningful standards by which to assess the exercise of discretion reflected in the Huffman Memo, that action is committed to agency discretion by law.[7] Count VII can thus be dismissed under Rule 12(b)(6) on that basis, as well.

### VII.   Plaintiffs fail to allege viable APA claims in Counts III and VI.

#### A.   An APA cause of action is not available for an alleged violation of state and local law.

As explained, *supra* at 28, Count III claims that Defendants are violating the APA because, as a matter of policy, their operations in Minnesota are violating not *federal* law but a *state* masking law, a *state* license plate law, and a *city* parking lot ordinance. *See* Compl. ¶¶ 216–30. And based on that claim, the State asks the Court to enjoin Defendants "from violating state law and city ordinances." *Id.* ¶ 230. But even if Count III was justiciable, *but see supra* at 31, it fails to state a viable APA claim. *See Delker v. MasterCard Int'l, Inc.*, 21 F.4th 1019, 1024 (8th Cir. 2022) ("Stating an adequate claim for relief requires" sufficient allegations "respecting all the material elements necessary to sustain recovery under some viable legal theory." (quoting *Twombly* 550 U.S. at 562)).

What the Plaintiffs claim is that, by allegedly acting contrary to *state* and *city* laws, Defendants' immigration enforcement operations are "contrary to law" under the APA. *See* Compl. ¶¶ 216-30; *see also* 5 U.S.C. § 706(2)(A) (permitting a court to "set aside agency action" that is "not in accordance with law"). But the "law" in § 706(2)(A) refers only to *federal* law. A contrary understanding of the APA—*i.e.*, that federal agencies'

---

[7] For the reasons explained herein, the Court in *Philadelphia Yearly*, 2026 WL 280089 at *6-8, erred in finding the Huffman Memo was not committed to agency discretion by law.

actions are subject to state and city laws and can be set aside and equitably enjoined for contravening those laws—would flip the Supremacy Clause on its head.  As then-Judge Kavanaugh has explained, "the APA does not borrow state law or permit state law to be used as a basis for seeking injunctive or declaratory relief against the United States." *El-Shifa Pharm. Indus. Co.*, *v. United States,* 607 F.3d 836, 854 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring in the judgment).

The Supremacy Clause provides that "the Laws of the United States" are "the supreme Law of the Land," state law "notwithstanding."  U.S. Const. art. VI, cl. 2.  In that way, "the Constitution 'guarantees the entire independence of the General Government from any control by the respective States.'"  *Trump v. Vance*, 591 U.S. 786, 800 (2020) (citation omitted).  The Supremacy Clause thus prohibits, among other things, "States from interfering with or controlling the operations of the Federal Government."  *United States v. Washington*, 596 U.S. 832, 838 (2022).  This foundational principle—"embodied in the modern doctrine of intergovernmental immunity—traces its origin" to *McCulloch*, *Geo Group, Inc. v. Newsom*, 50 F.4th 745, 754 (9th Cir. 2022) (en banc), and was reaffirmed two hundred years later in *Trump v. Vance*, where the Supreme Court reiterated that states can neither "control the operations of the constitutional laws enacted by [C]ongress," nor impede the Executive Branch's "execution of those laws," 591 U.S. at 800-01 (citations omitted).  Between *McCulloch* and *Trump* lies centuries of Supreme Court precedent holding that "activities of the Federal Government are free from regulation by any state." *Hancock v. Train*, 426 U.S. 167, 178 (1976) (quoting *Mayo v. United States*, 319 U.S. 441, 445 (1943)).  Indeed, over 100 years ago the Supreme Court held that states could not

41

enforce their driver's license laws against federal Post Office workers delivering mail, *Johnson v. Maryland*, 254 U.S. 51 (1920), yet that is exactly what Plaintiffs seek to do here. *Accord Arizona v. California*, 283 U.S. 423, 451 (1931) ("The United States may perform its functions without conforming to the police regulations of a State."); *Union Pac. R.R. Co. v. Peniston*, 85 U.S. (18 Wall.) 5, 36–37 (1873); *see also Vance*, 591 U.S. at 830-31 & n.5 (Alito, J., dissenting) ("[T]wo centuries of case law prohibit the States from taxing, regulating, or otherwise interfering with the lawful work of federal agencies, instrumentalities, and officers" (footnotes omitted)). And under this precedent, lower courts have repeatedly found violations of intergovernmental immunity where (as the State would have it) state laws would "directly interfere with the functions of the federal government." *See, e.g.*, *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839-40 (9th Cir. 2014).

There's no question that, under the Plaintiffs' legal theory and requested relief, the State and the City of St. Paul would directly regulate the federal government's operations in Minnesota and would subordinate those operations to state and city restrictions that are nowhere reflected in federal law. Put simply, the State and St. Paul would be able to dictate how and under what circumstances the federal government would be permitted to enforce federal immigration laws in Minnesota. Such a result would be constitutionally repugnant. *See Geo Group*, 50 F.4th at 751 ("It would give the state a virtual power of review over federal immigration decisions, and allow the discretion of the federal officers to be exercised only if the state approves. The State cannot exert this level of control over the federal government's immigration operations." (citation modified)). The APA thus cannot

42

be sensibly understood to allow a challenge to a federal agency action based on the claim that it is contrary to a state or city law.

Therefore, even if justiciable, Count III fails to state a viable APA claim.

### B.    Count VI fails as a matter of law.

Count VI fails to state a claim because CBP officers and agents have broad authority to conduct immigration enforcement operations nationwide. CBP has statutory authority to "enforce and administer all immigration laws," which includes "all laws, conventions, and treaties of the United States relating to the immigration, exclusion, deportation, expulsion, or removal of aliens." 6 U.S.C. § 211; 8 U.S.C. § 1101(a)(17). Further, federal regulations authorize "CBP officers" and "Border patrol agents" to enforce a wide variety of INA provisions. *See* 8 C.F.R. § 287.5 (exercise of powers by immigration officers). For example, 8 U.S.C. § 1357(a)(1) and (2) authorize CBP officers and agents to "interrogate . . . any alien or person believed to be an alien concerning to his right to be or to remain in the United States" and conduct warrantless arrests when the officer or agent has "reason to believe" the alien is in the United States unlawfully and is likely to escape before a warrant can be obtained. *See* 8 C.F.R. § 287.5(a)(1), (c). CBP officers and agents also may "take and consider evidence concerning the privilege of any person to enter, reenter, pass through, or reside in the United States." 8 U.S.C. § 1357(b); *see* 8 C.F.R. § 287.5(a)(2). Additionally, CBP officers and agents may "execute warrants of arrest for administrative immigration violations" under 8 U.S.C. § 1226 and "execute warrants of criminal arrest issued under the authority of the United States." 8 C.F.R. § 287.5(e)(3); *see* 8 U.S.C. § 1226(a) (stating that upon issuance of an administrative warrant, "an alien may be arrested

43

and detained pending a decision on whether the alien is to be removed from the United States").

Contrary to Plaintiffs' assertion, Border Patrol agents are not limited to operating only within 100 miles from the U.S. border. *See* Comp. ¶¶ 251-58.  8 U.S.C. § 1357(a)(3) provides that "[a]ny officer . . . shall have power without warrant . . . within a reasonable distance from any external boundary of the United States, to board and search for aliens . . . [in] any railway car, aircraft, conveyance, or vehicle . . . for the purpose of patrolling the border to prevent the illegal entry of aliens into the United.  Federal regulations define a "reasonable distance" to be within 100 miles of land and coastal borders.  8 C.F.R. § 287.1. Plaintiffs incorrectly argue that this authority limits any and all CBP activity outside of 100 miles from the border.  It does not.  The plain text of § 1357(a)(3), as well as the implementing regulation, makes clear that CBP's authority is constrained only to a very limited extent:  agents and officers generally cannot "board and search" buses or trains or cars, without a warrant, outside the 100-mile zone.  The Complaint makes no plausible allegation that CBP officers violated that limitation during Operation Metro Surge.  In any event, this provision does not override any of the authorities discussed above that provide CBP officers and agents with broad power to enforce the Nation's immigration laws without any geographic limitation.  Accordingly, the Court should dismiss Count VI for failure to state a claim.

## VIII.  Plaintiffs fail to state First Amendment claims.

Plaintiffs next allege that Defendants violated the First Amendment in two ways. First, Plaintiffs contend that Defendants retaliated against them for their policy views.

44

Compl. ¶¶ 270-77.  To state this claim, Plaintiffs must plausibly allege "(1) that [they] engaged in a constitutionally protected activity; (2) that [Defendants] took adverse action against [them] that would chill a person of ordinary firmness from continuing in the activity; and (3) that the adverse action was motivated in part by [Plaintiffs'] exercise of [their] constitutional rights."  *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014).  Second, Plaintiffs contend that Defendants engaged in unconstitutional viewpoint discrimination.  Compl. ¶¶ 278-82.  Both claims center around the idea that Defendants' actions are designed to punish Plaintiffs for their protected political viewpoints.  And both fail as a matter of law.

To start, the First Amendment "protects people and private entities, not governments."  *New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1208 (D.N.M. 2020).  Even though the Supreme Court has not definitively ruled on the issue, *United States v. Am. Libr. Ass'n*, 539 U.S. 194, 211 (2003), most courts agree that the First Amendment does not protect government speech, *see, e.g.*, *NAACP v. Hunt*, 891 F.2d 1555, 1565 (11th Cir. 1990) ("[G]overnment speech itself is not protected by the First Amendment."); *Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1038 n.12 (5th Cir. 1982) (en banc) ("Government expression, being unprotected by the First Amendment, may be subject to legislative limitation which would be impermissible if sought to be applied to private expression."); *see also Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 139 n.7 (1973) (Stewart, J., concurring) ("The purpose of the First Amendment is to protect private expression and nothing in the guarantee precludes the government from controlling its own expression or that of its agents." (citation omitted)).

45

The Court should join this chorus. To accept Plaintiffs' position on the First Amendment would be to drag into federal court "all sorts of matters previously left for the political process to resolve." *New Mexico*, 450 F. Supp. 3d at 1211. Political disputes would become constitutional ones. And federal courts would have to engage in impossible task of line-drawing to determine when and how a surge in federal law enforcement crosses the constitutional line. *Cf.* PI Order at 23-24.

Plaintiffs do not come anywhere close to showing that the First Amendment requires any of this amidst policy disagreements between federal, state, and local governments. Plaintiffs also fail to substantiate the proposition that a state or locality can claim a right under the Tenth Amendment to decline to assist the federal government and then claim a right under the First Amendment to limit the resulting response. *Cf. Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022) ("[W]hen it comes to disagreements of this sort, history suggests a different understanding of the First Amendment."). Plaintiffs' position is not a vindication of "free speech," but instead an attempt by the minority to suppress the speech of the majority. Or, in other words, an inversion of the First Amendment's main station. *See United States v. Alexander*, 428 F.2d 1169, 1175 (8th Cir. 1970) ("[T]he First Amendment has generally been judicially invoked to protect the speech of small and unpopular minorities."); *see also New Mexico*, 450 F. Supp. 3d at 1212 ("It would be ironic if a minority of the nation, who amounted to a majority within a State or municipality, could decrease the speech and expressive actions of a majority of the nation represented in the national government."); *cf. Houston Cmty. Coll. Sys.*, 595 U.S. at 478 (The First Amendment "cannot be used as a weapon to silence other[s].").

46

Also, with respect to the retaliation claim specifically, Plaintiffs fail to plausibly allege that Defendants would not have taken the same law enforcement actions absent a retaliatory motive. *See id.* at 477 ("Under this Court's precedents, a plaintiff pursuing a First Amendment retaliation claim must show, among other things, that the government took an adverse action in response to his speech that would not have been taken absent the retaliatory motive." (citation omitted)). The facially legitimate law enforcement justification for Defendants' actions squarely refutes such an argument. Compl. ¶ 275; *cf.* PI Order at 20-22.

\* \* \*

"It is doubtful that the Framers of the Constitution or the Bill of Rights intended to move . . . political disputes between States and the federal government into the federal courts under the guise of the First Amendment." *New Mexico*, 450 F. Supp. 3d at 1212. The Court has already rejected such a move under the guise of the Tenth Amendment. *See* PI Order at 15-26. For many of the same reasons, the Court should dismiss Plaintiffs' First Amendment claims.

## IX. This Court Lacks Jurisdiction to Issue Injunctive Relief.

Finally, an independent jurisdictional impediment to injunctive relief exists in 8 U.S.C. § 1252(f)(1). Under that provision, lower courts lack "jurisdiction or authority to enjoin or restrain the operation" of 8 U.S.C. §§ 1221-1232—the INA provisions "governing the inspection, apprehension, examination, and removal of aliens." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549-50 (2022). This provision "prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions

47

to enforce, implement, or otherwise carry out the specified statutory provisions." *Id.* at 550. Yet, throughout the Complaint, Plaintiffs raise claims, and request relief, that would "enjoin or restrain the operation" of 8 U.S.C. §§ 1221-1232 in their respective jurisdictions. Accordingly, § 1252(f)(1) provides another basis for dismissal.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss Plaintiffs' Complaint without leave to re-file.


Dated: March 16, 2026                    Respectfully submitted,

                                         BRETT A. SHUMATE
                                         Assistant Attorney General
                                         Civil Division

                                          */s/ Brantley T. Mayers*
                                         BRANTLEY T. MAYERS (FL#1039996)
                                         Counsel to the Assistant Attorney General

                                         ANDREW WARDEN
                                         Assistant Director
                                         LEE REEVES
                                         Trial Attorney
                                         U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L Street, N.W.
                                         Washington, D.C. 20005
                                         Telephone: (202) 616-5084
                                         Fax: (202) 616-8470
                                         Andrew.Warden@usdoj.gov

                                         *Counsel for Defendants*

48