**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

|  |  |
|---|---|
| STATE OF MINNESOTA, *by and through its Attorney General Keith Ellison*, CITY OF MINNEAPOLIS, and CITY OF ST. PAUL,<br><br>Plaintiffs,<br><br>v.<br><br>KRISTI NOEM *in her official capacity as Special Envoy*; MARKWAYNE MULLIN *in his official capacity as Secretary of the U.S. Department of Homeland Security*; STEPHEN MILLER, *in his official capacity as Homeland Security Advisor,* JOHN CONDON, *in his official capacity as Acting Executive Associate Director of Homeland Security Investigations*; U.S. Department of Homeland Security; TODD LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; MARCOS CHARLES, *in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations;* U.S. Immigration and Customs Enforcement; RODNEY SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection;* U.S. Customs and Border Protection; TOM HOMAN, in his official capacity as Border Czar, GREGORY BOVINO, *in his official* | Civ. No. 26-cv-00190-KMM-DJF<br><br><br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

| | |
|---|---|
| *capacity as Commander of the U.S. Border Patrol*; U.S. Border Patrol; DAVID EASTERWOOD, *in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement*,<br><br>Defendants. | |

# Contents

INTRODUCTION ............................................................................................. 6

JURISDICTION AND VENUE ......................................................................... 10

PARTIES .......................................................................................................... 10

I.    PLAINTIFFS ................................................................................................. 10

II.   DEFENDANTS ............................................................................................. 11

FACTUAL ALLEGATIONS ............................................................................ 13

I.    THE TRUMP ADMINISTRATION HAS TARGETED MINNESOTA BECAUSE OF DISFAVORED LOCAL GOVERNMENT SPEECH AND EXPRESSIVE POLICIES. ............. 13

II.   THE TRUMP ADMINISTRATION HAS A PATTERN OF DISCRIMINATING AND RETALIATING AGAINST DEMOCRAT-LED JURISDICTIONS WITH UNLAWFUL FEDERAL ACTIONS. ...................................................................................... 15

III.  THE TRUMP ADMINISTRATION'S USE OF "FRAUD" AS PRETEXT FOR ITS UNLAWFUL RETALIATION AGAINST MINNESOTA. ................................................ 20

IV.  DHS AGENCY ACTIONS CULMINATING IN "OPERATION METRO SURGE." ............ 24

V.   UNLAWFUL, AGGRESSIVE TACTICS CHARACTERIZING "OPERATION METRO SURGE." ..................................................................................................... 31

VI.  JANUARY 2026 SHOOTINGS. ...................................................................... 39

VII.   DEFENDANTS' OCCUPATION DOES NOT HAVE VALID IMMIGRATION ENFORCEMENT MOTIVES, BUT RATHER IS AN ACT OF COERCION, COMMANDEERING, AND INTIMIDATION. ................................................. 46

VIII.   IMPACT ON STATE AND LOCAL LAW ENFORCEMENT. ........................................... 49

    A.   Impact on Minneapolis ................................................................ 49

    B.   Impact on Saint Paul .................................................................. 53

    C.   Impact on State Agencies ............................................................ 57

    D.   Other Impacts ............................................................................ 59

IX.   IMPACT ON PLAINTIFFS' REVENUE STREAMS. ........................................... 65

X.   OPERATION METRO SURGE IS CHARACTERIZED BY MILITARY TACTICS, SIZE, SCOPE, AND DURATION THAT EXCEED DEFENDANTS' STATUTORY AUTHORITY. ................................................................................................... 79

    A.   Defendants Have No Statutory Authority to Deploy ICE and CBP Agents as a De Facto Standing Domestic Army. ....................................... 82

XI.   DEFENDANTS' UNLAWFUL AND ARBITRARY AND CAPRICIOUS FINAL AGENCY ACTIONS. .................................................................................. 86

    A.   Defendants' Arbitrary and Capricious Termination of Sensitive Locations Policy and Subsequent, Recurring, Violent Enforcement Activity in Sensitive Locations. ................................................... 87

    B.   Defendants' Unlawful Roving Patrols Policy. ............................... 92

    C.   Defendants' Unlawful Biometric Scanning Policy. ...................... 97

    D.   Defendants' Unlawful Conceal Plates Policy ............................ 101

    E.   Defendants' Unlawful Trespass and Warrantless Entry Policy ............... 105

    F.   Defendants' Unlawful Arrest Policy ......................................... 112

    G.   Defendants' Unlawful Racial and National-Origin Profiling Policy ........ 116

H.      Defendants' Unlawful Policy and Determination that the Supremacy Clause Exempts Federal Agents from Following State Masking Laws   120

I.      Defendants' Deployment of the Deployment of Overwhelming Forces Policy ...................................................................................... 124

J.      Defendants' Unlawful Excessive Force Policy ......................................... 126

K.      Defendants' Drastic Reduction in Training Policy ................................... 129

XII.    DEFENDANTS CONTINUE TO HARM PLAINTIFFS AND THREATEN ADDITIONAL HARM .......................................................................................... 130

CAUSES OF ACTION ............................................................................................ 131

COUNT I -Tenth Amendment of the U.S. Constitution (brought by all Plaintiffs) ....... 131

COUNT II - Violation of Equal Sovereignty Under the U.S. Constitution .................... 137

COUNT III - Unconstitutional Retaliation in Violation of the First Amendment .......... 139

COUNT IV-Violation of the First Amendment – Viewpoint Discrimination ................ 142

COUNT V - Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C) - Exceeds
Statutory Authority and Arbitrary and Capricious: Operation Metro Surge ........ 143

COUNT VI - Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (B), and (C) -
Arbitrary and Capricious, Contrary Constitutional Right, and Exceeds
Statutory Authority: Supremacy Clause and Unlawful Masking Policy.............. 145

COUNT VII - Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202 - Enforceability
of Minn. Stat. § 609.735 Against Federal Agents ................................................ 148

COUNT VIII - Administrative Procedure Act 5 U.S.C. § 706(2)(A), (C) - Contrary
to Law, Exceeds Statutory Authority, and Arbitrary and Capricious:
Excessive Force Policy ........................................................................................ 150

COUNT IX - Administrative Procedure Act 5 U.S.C. § 706(2)(A), (C) - Exceeds
Statutory Authority and Arbitrary and Capricious: The Unlawful Arrest
Policy .................................................................................................................... 152

COUNT X - Administrative Procedure Act - 5 U.S.C. § 706(2)(A), (B), (C) -
Contrary to Constitutional Right, Exceeds Statutory Authority, and Arbitrary
and Capricious: Unlawful Racial and National-Origin Profiling Policy.............. 154

COUNT XI - Administrative Procedure Act - 5 U.S.C. § 706(2)(A) - Arbitrary and
Capricious: Revocation of 2021 Sensitive Locations Policy and Adoption of
2025 Sensitive Locations Policy .......................................................................... 156

COUNT XII - Administrative Procedure Act,  5 U.S.C. § 706(2)(A) and (C) - Arbitrary and Capricious and in Excess of Statutory Authority: Roving Patrols Policy ..................................................................................................... 159

COUNT XIII - Administrative Procedure Act, 5 U.S.C. § 706(2) (A) and(C) - Arbitrary and Capricious and in Excess of Statutory Authority: Biometric Scanning Policy ................................................................................... 161

COUNT XIV - Administrative Procedure Act 5 U.S.C. § 706(2)(A) - Arbitrary and Capricious: Drastic Reduction in Training Requirements .................................. 163

COUNT XV - Administrative Procedure Act, 5 U.S.C. § 706(2)(A) - Arbitrary and Capricious: Deployment of Overwhelming Forces................................................ 164

COUNT XVI - Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (B) - Not in Accordance with the Law and Contrary to Constitutional Right: Illegal Trespass and Warrantless Entry Policy ................................................................ 166

COUNT XVII - Administrative Procedure Act  5 U.S.C. § 706(2)(A) - Not in Accordance with the Law and Arbitrary and Capricious: Conceal Plates Policy ....................................................................................................................... 167

COUNT XVIII - Ultra Vires Agency Action Not Authorized by Congress: Use of Military Force ..................................................................................................... 169

COUNT XIX - Ultra Vires Executive Action Not Authorized by Congress .................. 173

PRAYER FOR RELIEF ................................................................................................. 174

## INTRODUCTION

1.    In December 2025, the federal government initiated "Operation Metro Surge," an unprecedented deployment of federal immigration enforcement agents from numerous agencies of Defendant U.S. Department of Homeland Security ("DHS") to the

State of Minnesota, including into the cities of Saint Paul and Minneapolis. Operation Metro Surge instilled fear among people living, working and visiting the Minneapolis-Saint Paul metro area (the "Twin Cities"). Thousands of armed and masked DHS agents, many of whom received a fraction of the training they would have previously been required to complete, stormed the Twin Cities to conduct militarized raids and carry out dangerous, illegal, and unconstitutional stops and arrests (including in sensitive public places like schools, courthouses, and hospitals), culminating in widespread community trauma and, in two tragic and preventable instances, fatal shootings

2.      The massive deployment of armed agents to Minnesota was not related to any legitimate law enforcement objectives, and instead was an alarming escalation of the Trump Administration's central, unlawful goals: retaliation, commandeering, and coercion.

3.      At its zenith in terms of personnel deployment, Defendants sent upwards of 4,000 agents to participate in Operation Metro Surge—a number that greatly exceeds the combined number of sworn police officers in Minneapolis and Saint Paul. Operation Metro Surge was, in essence, a federal invasion of the State of Minnesota, beginning first within the Twin Cities and then fanning out to other regions of the State.

4.      Operation Metro Surge was an unlawful means to an unlawful end. Operation Metro Surge was designed, at the highest levels of the Trump Administration, not as a legitimate enforcement action, but rather to coerce, to commandeer, and to punish Plaintiffs. Defendants unlawfully invaded Minnesota with a paramilitary force. And they did so to accomplish several illicit purposes: to retaliate against Plaintiffs; to violate

7

Plaintiffs' sovereignty; to coerce Plaintiffs; to commandeer Plaintiffs' resources; and to use fear and illegality as an expedient immigration enforcement mechanism.

5. The Tenth Amendment gives the State of Minnesota and its subdivisions, including the Cities of Minneapolis and Saint Paul, inviolable sovereign authority to protect the health and wellbeing of all those who reside, work, or visit within their borders. The people of Minnesota are entitled to basic safety and dignity in their communities. They have the right to move about their daily lives confident that their constitutional rights and civil liberties will remain intact and will not be infringed. They have the right to go to work, take their children to school, and move through public and private spaces free from fear of violence inflicted against themselves or their loved ones by their federal government. They are entitled to access city services and use city facilities without being harassed by federal agents in parking lots. They expect that law enforcement, whether federal, state, or local, will follow the law, avoid creating dangerous and chaotic circumstances, and conduct itself in a manner that distinguishes officers from masked criminals. Indeed, being free from unlawful seizures, excessive force and retaliation are not a list of aspirations Minnesotans deserve; these are rights enshrined within state and federal laws.

6. The Tenth Amendment also prohibits the federal government from regulating the States or cities themselves or trying to coerce or commandeer a State's or city's legislative process. Here, Defendants attempted to do just that by deploying 3,000 to 4,000 lawless armed agents.

7. Further, under the First Amendment, Minnesota and its political subdivisions are autonomous entities which are entitled to engage in expressive conduct amounting to

8

political speech, without retaliation by the federal government when the speech is disfavored.

8. When the federal government itself violates legal rights and civic norms on such a broad scale and public panic is high, state and city governments bear the costs—both tangible and intangible. Defendants' agents' reckless tactics endangered the public safety, health, and welfare of all Minnesotans. Defendants' concerted efforts to obfuscate their illegal activities by withholding accurate information and propounding knowingly false information further threatened the State and Cities' sovereign interests.

9. The unlawful tactics used by Defendants' agents have left members of Plaintiffs' communities afraid to shop, go to work, attend school, attend religious services, access basic government services, visit health professionals, or otherwise live their lives. They have also resulted in school closures across the Twin Cities and in other parts of the State due to student safety concerns. Even with announced drawdowns of federal agents, communities continued to feel the harmful impacts.

10. The unlawful tactics used by Defendants' agents also undermine public trust in state and local law enforcement because individuals confuse or conflate Defendants with local police. Deteriorating public trust in local law enforcement has serious consequences: it suppresses the reporting and prosecution of crime, especially for immigrant populations. Defendants' agents' tactics also sap state and local resources when local law enforcement officers are called away from their important work to respond to avoidable incidents Defendants' agents cause.

11.     Plaintiffs bring this suit asking the Court to declare the ways in which the federal government violated the law, enjoin further legal violations and unlawful escalations by Defendants, and prevent further harms to Plaintiffs.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this Complaint under 28 U.S.C. § 1331.  The Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

13.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities.  Plaintiffs are governments within this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within this district.

14.     Defendants are not entitled to immunity from Plaintiffs' claims.

## PARTIES

**I.     PLAINTIFFS**

15.     Plaintiff State of Minnesota is a sovereign state of the United States of America.  Minnesota is represented by and through its chief legal officer, Attorney General Keith Ellison, who is authorized to sue on the State's behalf, including on behalf of its public schools and its citizens.  Minn. Stat. § 8.01.

16.     Plaintiff City of Minneapolis ("Minneapolis") is a municipal corporation organized and existing under and by virtue of the laws of the State of Minnesota. It is a home rule charter city. Minneapolis is the largest city in Minnesota and one of its most diverse.  Minneapolis is home to the largest Somali diaspora community in the country.

17.     Plaintiff City of Saint Paul ("Saint Paul") is a municipal corporation organized and existing under and by virtue of the laws of the State of Minnesota. It is a home rule charter city. Saint Paul is the second-largest city in Minnesota and the capital of Minnesota. Saint Paul is highly diverse and is home to the largest urban Hmong population in the country.

## II.    DEFENDANTS

18.     Defendant Kristi Noem was, at times relevant to this Complaint, Secretary of DHS and in that capacity was charged with the supervision and management of all decisions and actions of that agency. On information and belief, Kristi Noem was transferred to a role as "Special Envoy" on or around March 5, 2026.

19.     Defendant Markwayne Mullin, as of March 24, 2026, is the Secretary of DHS and in that capacity is charged with the supervision and management of all decisions and actions of that agency.

20.     Defendant Stephen Miller has been described as a Senior Advisor on Homeland Security and, according to public reporting, has significant oversight and authority over DHS' immigration policies and operational strategies leading up to and during Operation Metro Surge, including by leading reported daily phone calls in which he issued directives to DHS officials to be more aggressive during enforcement actions. Miller is reportedly the architect of the current administration's immigration enforcement agenda. He reportedly directed that immigration agents purposefully force confrontations with anti-ICE protesters in order to win a public relations battle over immigration enforcement.

11

Miller reportedly said that immigration agents needed to engage protesters and vanquish them by force of arms, by any force necessary.

21. Defendant Tom Homan has been described as the Trump Administration's "Border Czar." On information and belief, Tom Homan is an official within DHS, with direct responsibility over Operation Metro Surge and related agency actions.

22. Defendant John Condon is the Acting Executive Associate Director of Homeland Security Investigations ("HSI"), an agency within DHS.

23. Defendant U.S. Department of Homeland Security is a cabinet agency within the executive branch of the United States government.  28 U.S.C. § 501.

24. Defendant Todd M. Lyons is the Acting Director and the senior official currently performing the duties of the Director of the United States Immigration and Customs Enforcement ("ICE") agency. ICE is an agency within DHS. Its stated purpose is to "[p]rotect America through criminal investigations and enforcing immigration laws to preserve national security and public safety."

25. Defendant Marcos Charles is Acting Executive Associate Director of Enforcement and Removal Operations ("ERO") within ICE.

26. Defendant U.S. Immigration and Customs Enforcement is an agency of DHS.

27. Defendant Rodney Scott is the Commissioner of the U.S. Customs and Border Protection ("CBP"). CBP is an agency within DHS. Its stated mission is to "[p]rotect the American people, safeguard our borders, and enhance the nation's economic prosperity."

28. Defendant U.S. Customs and Border Protection is an agency of the Department of Homeland Security.

29. Defendant Gregory Bovino is the "Chief Patrol Agent" of CBP's El Centro Sector. Defendant Noem named Defendant Bovino, "Commander-at-Large." On information and belief, Defendant Bovino was positioned outside the typical chain of command within DHS and, at times relevant to the Complaint, reported directly to Defendant Noem, including during the time frame when he had direct responsibility for DHS activities in the Twin Cities.

30. Defendant U.S. Border Patrol is a federal law enforcement agency under the U.S. Customs and Border Protection.

31. Defendant David Easterwood is the Saint Paul Field Office Acting Director of Enforcement and Removal Operations for ICE. The Saint Paul Field Office is responsible for ICE activities in Minnesota, Iowa, Nebraska, North Dakota, and South Dakota.

32. Each individual Defendant is sued in their official capacity.

## FACTUAL ALLEGATIONS

### I. The Trump Administration Has Targeted Minnesota because of Disfavored Local Government Speech and Expressive Policies.

33. President Trump and others within the Trump Administration, including Defendants, have repeatedly used their public platforms to attack Plaintiffs, their people, and their elected officials, both within the context of immigration and for other disfavored expressive acts and speech.

13

34.     Defendants targeted Minnesota and the Twin Cities with an unprecedented surge of federal agents with a purpose to retaliate against Minnesota and its subdivisions for disfavored speech. The surging of federal agents was not for the purpose of good faith immigration enforcement or the promotion of public safety.

35.     President Trump has made his disdain for Minnesota, its municipalities, and its politicians, well known. On Friday January 9, 2026, President Trump expressed the root of his displeasure in plain terms during a recorded interview: he essentially claimed that Minnesota is "corrupt" and "crooked" because its officials accurately reported election results and those results did not declare him the winner.[1]

36.     President Trump did not win the majority of votes cast in Minnesota in 2016, 2020, or 2024.

37.     His repeated claims to the contrary, which he made in response to requests to explain actions his administration was taking in Minnesota, reveals that his purpose is to punish the State for voting for his opponents. Even before the January 9, 2026, interview, President Trump repeatedly demonstrated personal animosity toward Minnesota Governor Tim Walz, the Democratic vice-presidential nominee in the 2024 election.

---

[1] *President Trump Participates in a Meeting with Oil and Gas Executives,* Youtube (Jan. 9, 2026), https://www.youtube.com/watch?v=iaE8lw8_x30&t=30s (relevant portion beginning at 54:14 and ending at 56:05.)

14

38.    For example, in the wake of the assassination of former State Speaker of the House Melissa Hortman and her husband Mark Hortman, President Trump said that Governor Walz is "so whacked out, I'm not calling him."[2]

39.    President Trump has called Governor Walz a "dangerously liberal extremist" and separately called him "the seriously retarded Governor of Minnesota, Tim Walz."[3]

40.    President Trump has also called Minneapolis Mayor Jacob Frey a "fool."[4]

## II.    The Trump Administration Has a Pattern of Discriminating and Retaliating Against Democrat-Led Jurisdictions with Unlawful Federal Actions.

41.    Minneapolis and Saint Paul are now the latest of the cities with elected leaders who do not politically align with Trump to be flooded with federal agents. Los Angeles, Portland, Chicago, and Washington, D.C., have experienced their own influxes of federal agents, and Defendant DHS has made clear that ICE "will continue to surge into sanctuary jurisdictions nationwide."[5] Since retaking office on January 20, 2025, President Trump issued several executive orders intended to deter states and localities from implementing—and to discriminate and retaliate against states and localities which

---

[2] Cheyanne M. Daniels, *Trump won't call 'whacked out' Walz after Minnesota shooter charged*, Politico (June 17, 2025), https://www.politico.com/news/2025/06/17/trump-walz-phone-call-00410141.

[3] Zak Failla, *Trump Uses Slur Against Gov. Tim Walz in Thanksgiving Truth Social Tirade; Walz Fires Back*, Msn.com (Nov. 28, 2025), https://perma.cc/XA3M-ZMP2.

[4] Howard Thompson, *Pres. Trump rails against Somalis: 'They've destroyed Minnesota'*, Fox 9 (Dec. 3, 2025), https://www.fox9.com/news/pres-trump-rails-against-somalis-destroyed-minnesota-dec-2025.

[5] DHS (@DHSgov), X (Jan. 8, 2026 9:28 AM CT), https://perma.cc/84T8-B5VZ.

maintain—so-called "sanctuary" policies or laws. The "sanctuary" laws at issue are not laws that interfere with or limit federal immigration enforcement but, rather, laws that ensure state and local government resources are only used to promote state and local policy objectives while precluding those resources from being coerced or commandeered into federal civil immigration enforcement. By way of example: local policymakers have determined that public safety improves when members of the public are willing to report crimes and participate in investigations or trials as witnesses, and that such willingness decreases when the public believes local police may act as "immigrant-catchers" rather than crime solvers. Policies or laws which establish a clear separation between local police duties, and federal immigration enforcement duties are both permissible and completely appropriate within a system of federalism.

42.    The Trump Administration, including Defendants DHS and Noem, have repeatedly criticized Minnesota and elected leaders Governor Tim Walz and Mayor Jacob Frey for being "sanctuary politicians"[6] with "sanctuary policies."[7]

43.    And the Trump Administration has issued a series of executive orders targeting "sanctuary" jurisdictions. By way of example, the Administration issued

---

[6] DHS (@DHSgov), X (Oct. 27, 2025 8:57 AM CT), https://perma.cc/8H4T-KZD4; Secretary Kristi Noem (@KristiNoem), X (Oct. 24, 2025 5:16 PM CT), https://x.com/KristiNoem/status/1981847364827746413; Secretary DHS (@DHSgov), X (July 9, 2025 11:48 AM CT), https://x.com/DHSgov/status/1942989123544924541.

[7] DHS (@DHSgov), X (Dec. 5, 2025 9:50 AM CT), https://x.com/DHSgov/status/1996970373078720774.

Executive Order 14159, Protecting the American People Against Invasion, on January 20, 2025, which directed DHS and the Department of Justice ("DOJ") to withhold federal funds from "sanctuary" jurisdictions as a way to discriminate against those jurisdictions because they have in place "sanctuary" policies.

44.    The Administration issued executive order 14287, Protecting American Communities from Criminal Aliens, on April 28, 2025, which directed the Attorney General and Secretary of Homeland Security to publish a list of "sanctuary" jurisdictions and directed each federal agency to utilize that list to discriminate against "sanctuary" jurisdictions and identify Federal Funds to those jurisdictions for suspension or termination.[8]

45.    In accordance with the President's effort to discriminate against "sanctuary cities," the Trump Administration, acting through various federal agencies, has sought to assert a sweeping entitlement to use state law enforcement officers for federal immigration enforcement. It has done so by attempting to require Minnesota and other states to agree to "cooperate with" federal immigration enforcement activities as a condition for receiving billions of dollars in federal funding—with "cooperation" meaning: give the federal government access to private data, give the federal government access to state or municipal

---

[8] *See also* Executive Order 14218, *Ending Taxpayer Subsidization of Open Borders* (Feb. 19, 2025), https://public-inspection.federalregister.gov/2025-03137.pdf (directing federal agencies to ensure that funding to "States and localities do not, by design or effect . . . abet so called 'sanctuary' policies that seek to shield illegal aliens from deportation").

facilities, or directly assist the federal government by loaning them the efforts of state or local personnel.

46.    For example, beginning in March 2025, DHS and its agencies, including the Federal Emergency Management Agency ("FEMA"), sought to upend the state-federal emergency management system, holding critical emergency preparedness and response funding hostage unless Minnesota and other states promised to devote their criminal enforcement and other state agency resources to the federal government's civil immigration enforcement.

47.    Forced to choose between foregoing federal funds or facing compulsory diversion of limited law enforcement resources to enforce federal immigration law beyond what Minnesota law allows, Minnesota, with other states, brought suit to challenge those coercive conditions. *State of Illinois v. Federal Emergency Management Agency*, 25-cv-00206 (D.R.I.) (filed May 13, 2025). In September 2025, the court granted summary judgment to the states, holding among other things that those conditions violated the Constitution and were tantamount to "economic dragooning." *Illinois v. Fed. Emergency Mgmt. Agency*, No. CV 25-206 WES, 2025 WL 2716277, at *14 (D.R.I. Sept. 24, 2025). Minnesota and other states have similarly challenged discriminatory and coercive immigration-enforcement conditions by the U.S. Department of Transportation, *California v. U.S. Dept. of Transportation*, 25-cv-00208 (D.R.I.) (filed May 13, 2025) and DOJ, *New Jersey v. U.S. Dept. of Justice*, 25-cv-00404 (D.R.I.) (filed August 18, 2025).

48.    The funding for Minnesota jeopardized by these discriminatory and coercive actions by the Trump administration totals over $2 billion. Those funds are critical to the

18

state's services to its residents and used by Minnesota to maintain state and local roads and bridges, protect against and respond to natural disasters, and provide emergency shelter to crime victims and conduct sexual assault forensic exams, among other things.

49.    Similarly, the Cities of Minneapolis and Saint Paul were threatened with cuts to tens of millions of dollars federal funding if they did not change local ordinances and begin aiding the federal government in immigration enforcement.  They have joined with other municipalities across the country in bringing lawsuits challenging those unlawful immigration enforcement conditions.  *City and County of San Francisco, et al v. Trump, et al*, 25-cv-01350 (N.D.C.) (filed  Feb. 7, 2025)(Minneapolis and St. Paul); *Martin Luther King, Jr. County, et al, v. Turner, et al*, 25-cv-815 (W.D. Wash) (filed May 2, 2025) (Minneapolis); *City of Fresno v. Turner*, 3:25-cv-07070 (N.D. Cal.) (Saint Paul); *City of Chicago v. DOJ*, 25-cv-13863 (N.D. Ill.) (Saint Paul).

50.    In the midst of these immigration-related federal defunding actions and responsive lawsuits and in response to Executive Order 14287, DHS published, on May 29, 2025, a list of 500 purported "sanctuary jurisdictions" around the country. It accused them of "shamefully obstructing" the Trump Administration's deportation plans and "shielding dangerous criminal aliens."

51.    As reported, very soon after publishing the list, the Trump Administration faced objections from Republican stronghold jurisdictions that found themselves on the list. DHS quickly and quietly removed the list from the website where it had been posted.

52.    Less than two weeks later, the Trump Administration posted a new version of its sanctuary jurisdiction target list. That August 5, 2025, publication shortened the list

19

from about 500 to just 35 jurisdictions. The new sanctuary "jurisdiction" list targeted twelve states (including Illinois, California, Oregon, and Minnesota), and the District of Columbia.

53.    Although DOJ stated that its intention in pressuring "sanctuary jurisdictions" was to "compel compliance with federal law," in reality, the Administration's efforts sought to impermissibly compel sovereign states like Minnesota to disavow their own laws, adopt the enforcement priorities of Trump Administration, and to bear the associated costs. The August 5, 2025 publication specifically bragged about the success of a "threatening" letter that coerced Louisville, Kentucky, to revoke its "sanctuary policies."

54.    In September 2025, the Administration sued Plaintiffs in federal court for these so-called "sanctuary policies"[9] even though the Administration had brought, and lost, nearly identical lawsuits in several other jurisdictions.

## III.    The Trump Administration's Use of "Fraud" as Pretext for its Unlawful Retaliation Against Minnesota.

55.    At some point in or around November 2025, President Trump began to exploit a high-profile COVID-19 era fraud scheme, which had already been investigated and prosecuted in Minnesota.

56.    The case in question is generally referred to as the "Feeding Our Future" fraud. The fraud was perpetrated between 2020 and early 2022 and targeted a USDA-funded child nutrition program during the COVID-19 pandemic. In January 2022, the

---

[9] *United States v. State of Minnesota et al.*, Case No. 0:25-cv-03798 (D. Minn. 2025).

Federal Bureau of Investigation ("FBI") stated in a sworn search warrant affidavit that the Minnesota Department of Education ("MDE") (the state agency administering the USDA funds) affirmatively brought the State's concerns to the FBI in April 2021, and ultimately provided documents and testimony to support federal investigation and prosecution.[10] MDE had also referred the matter to USDA-OIG even earlier, in the fall of 2020, but MDE escalated its referral to the FBI when the USDA-OIG took no action. In September 2022, DOJ ultimately announced federal charges against 47 defendants for their alleged roles in the fraud scheme, many of whom pled guilty or were later convicted at trial, and additional charges and convictions have followed.[11] Far from a scenario where a state agency hid fraud or obstructed investigations, this case shows a partnership between state and federal investigative resources.

57.     Yet, while the "Feeding our Future" fraud case was in no way new, President Trump and others in his Administration have repurposed the case to use the pretext of "fraud" concerns as an excuse to engage in all manner of unlawful actions. Pertinent to this lawsuit, the Trump Administration seized on the fact that the Feeding our Future scheme involved a large number of individuals of Somali origin, and since then, has used the case

---

[10] *See* Affidavit in Support of Search Warrant, Case No. 22-MJ-040 TNL (D. Minn. Jan. 20, 2022) at ¶¶ 51-54.

[11] *U.S. Attorney Announces Federal Charges Against 47 Defendants in $250 Million Feeding Our Future Fraud Scheme*, U.S. Department of Justice (Sept. 20, 2022), https://perma.cc/A9FN-55GS; *see also* Katrina Pross, *Here's everyone who's been sentenced in the Feeding Our Future fraud*, Sahan Journal (Jan. 24, 2025), https://perma.cc/5MQ5-K6DE.

to disparage the entire Somali community and Minnesota's Democratic politicians and policies.

58.    On November 21, 2025, President Trump posted on social media that Minnesota "is a hub of fraudulent money laundering activity," and that he was therefore "terminating, effective immediately, the Temporary Protected Status (TPS Program) for Somalis in Minnesota."[12] Then, on Thanksgiving Day, President Trump posted a lengthy screed falsely claiming that "Hundreds of thousands of refugees from Somalia are completely taking over the once great State of Minnesota. Somalian gangs are roving the streets looking for 'prey' as our wonderful people stay locked in their apartments and houses hoping against hope that they will be left alone . . . ." [13]

59.    Less than two weeks later, Vice President J.D. Vance posted on social media that "A welfare fraud scandal in Minnesota reveals that large numbers of new arrivals aren't assimilating and are funneling our tax dollars to literal terrorist groups."[14]

60.    Then, on December 5, 2025, Defendant Stephen Miller stated explicitly that the fraud case would be a pivotal talking point in the Trump Administration's effort to

---

[12] Ryan Mancini, *Trump to end legal protections for Somalis in Minnesota*, The Hill (Nov. 22, 2025), https://thehill.com/homenews/administration/5618582-donald-trump-legal-protections-somalia-minnesota/.

[13] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 27, 2025, 10:27 PM CT), https://truthsocial.com/@realDonaldTrump/posts/115625429081411360.

[14] JD Vance (@JDVance), X (Nov. 24, 2025, 11:07 AM CT), https://x.com/JDVance/status/1993003582812008575

reduce the number of immigrants within the United States. Specifically, Miller stated in an interview that the Feeding our Future fraud case showed that the Democratic party had used migration as a weapon against the American people and proved that this country should stop "third world migration." [15]

61.    On January 5, 2026, President Trump reacted to Governor Walz's announcement that he would not seek reelection with a social media post that accused the governor—without any support—of being "caught, REDHANDED, along with Ilhan Omar, and others of his Somali friends, stealing Tens of Billions of Taxpayer Dollars."[16] The post also criticized Democratic governors of other states.

62.    The Trump Administration's sudden focus on "fraud" in Minnesota was just its latest attempt to shroud retaliation against Democratic politicians in new packaging. Even Defendant Noem has admitted that DHS is solely aiming the pretextual spear of fighting fraud at states led by Democratic governors, posting on X that "[w]e will root out every case of fraud we find from Minneapolis to California to New York."[17]

---

[15] Sean Hannity Show, *Stephen Miller: This scandal will 'rock the CORE' of politics*, Fox News (Dec. 6, 2025) (https://www.youtube.com/watch?v=9tps5OvCkfw) (relevant portion beginning at 2:20 time stamp and ending at 6:47.).

[16] Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 5, 2026, 1:13 PM CT), https://truthsocial.com/@realDonaldTrump/posts/115844083693194821.

[17] Secretary Kristi Noem @KristiNoem, X (Jan. 6, 2026 6:05 PM CT), https://x.com/Sec_Noem/status/2008691367375982905.

**IV.    DHS Agency Actions Culminating in "Operation Metro Surge."**

63.    Since the Trump Administration took office in January 2025, Defendants have placed significant emphasis on increasing the scope and aggressiveness of deportation efforts.

64.    Public reporting has indicated that, in the course of phone calls with DHS leadership in 2025, Defendant Stephen Miller has:

a.    Directed DHS officials to achieve 3,000 daily arrests;

b.    Directed DHS officials to achieve 1,000,000 deportations within a year; and

c.    Directed DHS officials to increase "round them up" style enforcement in public places (purportedly demanding to know during one call, "Why aren't you at Home Depot? Why aren't you at 7-Eleven?").

65.    The full scope of agency actions taken since January 2025 remains obfuscated by DHS' lack of transparency. However, upon information and belief, Plaintiffs allege that DHS took several agency action relevant to Plaintiffs' claims, discussed below.

66.    In or around January 2025, DHS rescinded the "sensitive areas" policy, removing restrictions on immigration enforcement at or near locations previously deemed sensitive such as schools, hospitals, and churches.

67.    At some time between January 2025 and March 2025, on information and belief, DHS leadership rescinded prior guidance regarding agent identification, and thereafter, the practice of DHS agents wearing face-covering masks and forgoing other forms of individualized identification became standard.

68.    Also, at some time between January 2025 and March 2025, on information and belief, DHS leadership rescinded prior guidance regarding the publication of removal and detention figures and related data which had previously been produced on a regular, ongoing basis.

69.    In or around December 2025, DHS deployed an overwhelming volume of agents to Minnesota, particularly the Twin Cities, incorporating all of the agency directives above, and cultivated fear and the sense that DHS agents could be on any street corner.

70.    Public reporting corroborates that DHS had an objective to "flood the airwaves" with content showing immigrants being chased, grabbed, and detained, with DHS even inviting right-wing influencers and war-zone videographers to ride along with law enforcement agents and record field operations.[18]  That reporting cites a former DHS press secretary describing the new approach as "veer[ing] into propaganda, into creating fear," and further noted that the White House pressured DHS to paint pictures of areas targeted by immigration enforcement as war-torn.[19]

71.    Consistent with that directive, on December 6, 2025, Defendant Noem posted on X that "DHS has surged law enforcement to Minneapolis and has already arrested more

---

[18] Joyce Sohyun Lee and Drew Harwell, *'It's a war' Inside ICE's media machine*, The Washington Post (Dec. 23, 2025), https://www.washingtonpost.com/technology/interactive/2025/ice-social-media-blitz/.

[19] *Id.*

than 1,500 crooks and creeps: murderers, rapists, pedophiles, and gang members. We will continue to fulfill @POTUS Trump's promise to Make America Safe Again." [20]

72.     Defendant DHS similarly posted the following on X, which Defendant Noem reposted: "The largest DHS operation is happening right now in Minnesota. @POTUS Trump and @Sec_Noem have rallied DHS law enforcement personnel to keep Americans safe and ERADICATE fraud. We're not leaving until the problem is solved."[21]

73.     To initiate the "operation," Defendants deployed at least 100 ICE and HSI agents from across the country to the Twin Cities.

74.     Defendants pivoted more resources and efforts to Operation Metro Surge in Minnesota after the Supreme Court blocked the Trump Administration from deploying the National Guard in Illinois, *Trump v. Illinois*, No. 25A443, 2025 WL 3715211 (Dec. 23, 2025) (mem.).    On December 31, 2025, President Trump announced that he was withdrawing the National Guard from Chicago, Los Angeles, and Portland but left the door open to sending federal forces "in a much different and stronger form." Shortly thereafter, on January 6, 2026, Defendants singled out Minnesota for its largest ever immigration operation.

75.     Defendants acknowledge that Operation Metro Surge is the largest of its kind. On January 6, 2026, a day after news reports that an additional 2,000 ICE agents

---

[20] Secretary Kristi Noem (@Sec_Noem), X (Jan. 6, 2026 7:52 PM CT), https://x.com/Sec_Noem/status/2008718230039450008.

[21] DHS (@DHSgov), X, (Jan. 6, 2026 3:21 PM CT), https://x.com/DHSgov/status/2008650038847959106.

would be sent to Minnesota, DHS posted a clip from an interview of Defendant Lyons describing ICE's operation in Minnesota as "the largest immigration operation ever taking place right now."[22] Defendants stated that these agents were "taking the fight to these sanctuary jurisdictions . . . ."

76.     Defendant Bovino and additional CBP agents were also deployed to Minneapolis to assist in the expanded Operation Metro Surge. And on January 8, 2026, the day after an ICE agent shot and killed Renee Good in Minneapolis, the Trump Administration reportedly deployed more than 100 additional CBP agents to Minnesota from operations in Chicago and New Orleans.[23]

77.     Defendants have stated their goal is to detain and deport dangerous individuals, but instead they have engaged in what DHS describes as "consensual" (namely: random) encounters with people on the street. Defendants have also stated their goal was to prioritize detaining and deporting the highest number of immigrants with no legal right to remain in the U.S., but data shows that just over 1.5% of Minnesota's total population are noncitizen immigrants without legal status, less than half the national

---

[22] DHS (@DHSgov), X, (Jan. 6, 2026, 12:02 PM CT), https://x.com/DHSgov/status/2008600031620952221.

[23] Hamed Aleaziz and Madelein Ngo, *Trump Administration Deploying More Border Patrol Agents to Minnesota*, N.Y. Times (Jan. 8, 2026), https://www.nytimes.com/2026/01/08/us/politics/border-patrol-minnesota-trump.html.

average rate.[24] On information and belief, that small percentage includes individuals whose presence has been long known to DHS and who have kept regularly scheduled appointments with DHS. Many states have higher rates of reported non-citizens relative to their populations, including Utah, Texas, and Florida. These higher percentages persist despite the fact that the local jurisdictions allegedly provide assistance to federal agents in immigration enforcement.  The Administration has made no similar efforts to surge federal immigration agent deployments into cities in Utah, Texas, or Florida.  Incredibly, the reported non-citizen population of Utah, Florida, and Texas (combined together) is nearly the size of the entire population of Minnesota.[25]

78.    Available public reporting also contradicts DHS's public claims that Operation Metro Surge focused on apprehending either "the worst of the worst" or known targets of fraud investigations. Many of DHS' arrestees in Minnesota lack any criminal conviction history. Indeed, for many of DHS' arrestees in Minnesota, the only laws they are alleged to have violated are the underlying immigration laws DHS seeks to enforce.

79.    During Operation Metro Surge, the increased presence of Defendants' agents was marked by increasingly inflammatory rhetoric from President Trump and others within

---

[24] Cameron Macht, *The Role of Undocumented Immigrants in Minnesota's Workforce*, MN Department of Employment and Economic Development (March 2025), https://mn.gov/deed/newscenter/publications/trends/mar-2025/immigrants.jsp.

[25] *State Immigration Data Profiles,* Migration Policy Institute, https://www.migrationpolicy.org/programs/data-hub/state-immigration-data-profiles.

the Administration about people of Somali heritage. These range from direct comments in

interviews and speeches, to juvenile memes posted on official social media accounts:

> a.      The day after Operation Metro Surge commenced, President Trump called Somali Americans "garbage" stating that he did not want them in the country.[26]

> b.      Also in December 2025, Homeland Security Advisor Stephen Miller made disparaging remarks about Somali people during a television interview, stating, "We should not be shocked, when you import a population whose primary occupation is pirate, that they are going to come here and steal everything we have."[27]

> c.      On December 31, 2025, President Trump and the White House's social media accounts both shared a claim that "Much of the Minnesota Fraud, up to 90%, is caused by people that came into our Country, Illegally, from Somalia. 'Congresswoman' Omar, an ungrateful loser who only complains and never contributes, is one of the many scammers. Did she really marry her brother? Lowlifes like this can only be a liability to our Country's greatness. Send them back from where they came, Somalia . . . ."[28]

> d.      Also on December 31, 2025, Defendant DHS posted on social media, "We will not live like this anymore," accompanied by a meme depicting Minneapolis Mayor Jacob Frey standing in front of a pile of garbage with a speech bubble containing Somali script. [29]

---

[26] N'dea Yancey-Bragg, *A 'volcano' of controversy has hit the Minnesota Somali community*, USA Today (Dec. 7, 2025), https://perma.cc/4BFE-QEL4.

[27] Jesse Waters Primetime, *'GO HOME': Stephen Miller decries 'pirate' Somalis amid alleged fraud scandal,* Fox News (Dec. 19, 2025) https://www.youtube.com/watch?v=Eqs42DviZ3Q (relevant portion beginning at 0:01 and ending at 0:36).

[28] Donald J. Trump (@realDonaldTrump) Truth Social, (Dec. 31, 2025, 9:55 AM CT), https://truthsocial.com/@realDonaldTrump/posts/115814993074933464; White House (@WhiteHouse), X, (Dec. 31, 2025, 10:10 AM CT), https://perma.cc/SYE3-TAQT.

[29] Homeland Security (@DHSgov), X (Dec. 31, 2025, 12:55 PM CT), https://x.com/DHSgov/status/2006439129291304998.

80.    Defendants Noem, DHS, and ICE have claimed that the expanded deployment is aimed at rooting out fraud in Minnesota.  Defendant Noem has claimed that "the amount of fraud in Minnesota is unprecedented" and additional DHS agents were deployed to Minnesota to "help get to the bottom of it." And the expansion came just days after the U.S. Department of Health and Human Services announced a pause in all federal childcare funding to Minnesota and the Small Business Administration announced a freeze on funding to Small Business Development Centers.

81.    The White House has similarly expressed that deployed DHS agents have been sent to Minnesota to help with "targeted, door-to-door investigations at locations of suspected fraud."

82.    Defendants' actions within Minnesota and the Twin Cities were not "targeted." DHS agents conducted raids at job sites and businesses, detaining and deporting individuals while they were performing essential work that directly benefits Plaintiffs' communities. DHS agents also conducted general sweeps of wherever they happened to go, detaining people within their path based on their race and ethnicity.  Defendants' conduct further undermines the notion that they are focusing efforts on individuals with violent criminal histories or known targets in fraud investigations—particularly where fraud allegations are primarily investigated via reviewing documents, not by roving groups of DHS agents dressed in riot gear and military fatigues.

83.    By way of one example, public reporting indicates that on December 13, 2025, DHS agents surrounded a Minnesota residence where a roofing crew was at work,

and without appearing to know the names or identities of the laborers on the roof, engaged in a multi-hour standoff in freezing temperatures demanding that the laborers come down.[30]

### V.  Unlawful, Aggressive Tactics Characterizing "Operation Metro Surge."

84.  Defendants' agents carrying out immigration enforcement in Minnesota and the Twin Cities are engaging in widespread unlawful conduct, as they have in other cities like Chicago and Los Angeles where they have surged federal agents. *See, e.g., Chicago Headline Club v. Noem*, No. 25C12173, 2025 WL 3240782 *4-6 (N.D. Ill. Nov. 20, 2025); *L.A. Press Club v. Noem*, 799 F. Supp. 3d 1036, 1045 (C.D. Cal. 2025).

85.  The widespread unlawful conduct was not a mistake, or the work of isolated "bad apples." Rather, it represented the culmination of DHS' decision-making on how to coerce Plaintiffs, and to retaliate against the local governments by inflicting pain on Plaintiffs' residents and economy and by interfering with Plaintiffs' ability to provide for their residents' public safety, health, and welfare.

86.  As part of Operation Metro Surge, Defendants' agents have racially profiled Minnesotans, resulting in unconstitutional and unlawful detentions of Minnesotans.

---

[30]  Frankie McLister and Stephen Swanson, *Ice Agents surround Chanhassen construction site amid subzero temps,* CBS News (Dec. 13, 2025), https://www.cbsnews.com/minnesota/news/ice-agents-surround-chanhassen-construction-site/

87.    For example: on December 10, 2025, two masked DHS agents tackled and arrested Mubashir, a Somali American man; one agent put him in a choke hold. [31] DHS agents arrested Mubashir despite Mubashir repeatedly asking that he be allowed to show them his legal identification. DHS agents then detained Mubashir for two hours for no apparent reason other than his perceived national origin.

88.    A similar incident appears to have occurred on January 8, 2026. According to the allegations in *Hussen v. Noem,* 26-cv-324 (ECT/ECW), two young Latino men working at a Target store were questioned about their citizenship when they were filming and criticizing CBP agents and Defendant Bovino.  Ignoring the white Target employee who was also criticizing them, the CBP agents asked the Latino men about their citizenship. When one stated that he did not have to tell them anything, the CBP agents tackled the Latino men to the ground and handcuffed them. Video from the scene shows agents forcing one of the men into a DHS vehicle *after* the man yells that he is a U.S. citizen. Public reporting also indicates that family members of one of the men placed calls to ICE offices reiterating that he was a U.S. citizen but that DHS agents nonetheless took and held him for hours at an unknown location, with no notice to the family of where he had been taken or when he would return. [32]

---

[31] Katelyn Vue, *U.S. citizen offered to show I.D. but was arrested by immigration officers in Cedar-Riverside*, Sahan Journal (Dec. 9, 2025), https://perma.cc/TTM9-AZVA.

[32] *See* Felicity Dachel, *Federal agents take 2 into custody at Richfield Target*, Kare 11 (Jan. 8, 2026) https://www.kare11.com/article/news/local/ice-in-minnesota/federal-agents-
(Footnote Continues on Next Page)

89.    Also on January 8, 2026, CBP agents surrounded and questioned a driver at the Minneapolis-St. Paul airport and asked him if he is a U.S. Citizen. A CBP agent is heard on the video stating, "I can hear you don't have the same accent as me, that's why I'm asking" and "I want to know where you were born."[33] When the driver refused to provide his identification, and insisted that the CBP agent identify himself, the CBP agent took a photograph of the man with his phone. Defendant Bovino was present for the interaction and continued to ask the man for his identification while the CBP agent indicated he was using the photograph he had just taken to verify the man's immigration status.

90.    Also on January 8, 2026, DHS agents arrested a 20-year-old man in Robbinsdale, Minnesota, for seemingly no other reason than his perceived national origin.[34] The man, whose father was born in Mexico, was himself born in Minnesota. DHS agents held the man in federal custody for over six hours before releasing him.

91.    In another incident of racial profiling, DHS agents approached a team of four Minneapolis Public Works employees, working in Minneapolis and wearing City uniforms and badges. The agents asked the three nonwhite City employees for identification and

---

richfield-target/89-074f28c7-c04f-4392-9165-08ca304b0f39 ("the men told witnesses they were U.S. citizens").

[33] FREEDOMNEWS TV – NATIONAL / SCOOTERCASTER, *"You want my ID??" Bovino and CBP Checks Citizenship at Minneapolis Airport*, YouTube (Jan. 7, 2026), https://www.youtube.com/watch?v=5QM2hqcfOis.

[34] Kim Hyatt and Sofia Barnett, *U.S. citizen swept up in ICE enforcement as Twin Cities operation continues*, The Minnesota Star Tribune (Jan. 8, 2026), https://www.startribune.com/us-citizen-arrested-ice-day-after-fatal-shooting-renee-good-twin-cities-immigration-operation/601560460.

asked them each questions about their citizenship and place of birth. The agents did not ask to see any identification or ask any questions of the fourth employee, who was white.

92.    Additional public reporting describes separate instances in which Native Americans have been detained or taken into DHS custody, including: four individuals reported to be members of the Oglala Sioux Tribe who DHS agents apparently accosted on a public roadway.[35]

93.    Of course, the full scale to which citizens have been detained or taken into custody based on race and ethnicity is difficult to track given the scope of Operation Metro Surge.

94.    In separate but related litigation brought by plaintiffs alleging widespread racial profiling by DHS agents, the Court issued an Order on March 9, 2026 finding Plaintiffs had made "a clear showing that there was not reasonable, articulable suspicion of criminal activity supporting the stops of these 23 individuals," and that, "these individuals were stopped based solely on their race or ethnicity." *See Hussen, et. al. v. Noem, et. al.,* Court File No. 26-CV-324 (ECT) (ECF 191, March 9, 2026.)

95.    Plaintiffs have also received reports of DHS agents using their vehicles in unsafe, aggressive ways that either intentionally or recklessly risk injury to others or actively cause collisions. For example, in Minneapolis, there have been multiple calls

---

[35]  Nick Lentz, *4 members of Oglala Sioux Tribe detained by ICE in Minneapolis, president says,* CBS News (Jan. 9, 2026), https://www.cbsnews.com/minnesota/news/oglala-sioux-tribe-members-detained-ice-minneapolis/.

related to DHS agents violating traffic laws, driving dangerously, ramming vehicles, and getting into traffic accidents.

96.    DHS agents have also conducted (or attempted to conduct) warrantless searches or arrests. On December 5, 2025, DHS agents entered a south Minneapolis restaurant, Hola Arepa, and attempted to get access to non-public areas of the restaurant without a warrant. When asked specifically by the restaurant's general manager to present their judicial warrant, the agents attempted to intimidate the restaurant's employees by asserting "We don't need one."[36]

97.    In another example of unlawful behavior, DHS agents have been observed changing the license plates on their vehicles. Vehicles associated with federal immigration efforts have also been spotted by legal observers with different front and back license plates.

98.    Defendants' agents have also conducted their unlawful acts in ways which spark public outrage, which Plaintiffs allege, upon information and belief, to be by design.

99.    On or around December 15, 2025, DHS agents in Minneapolis detained a woman, and dragged her handcuffed across a frozen road, despite being repeatedly told by bystanders that she was pregnant.[37]

---

[36] Raya Quttaineh, *Owner of Minneapolis restaurant says ICE entered without a warrant, staff pushed back* (Dec. 5, 2025 7:17 AM CT), https://www.kare11.com/article/news/local/south-minneapolis-restaurant-ice-entered-without-warrant-staff-push-back/89-7af99452-0ed8-4de5-9a27-6cb74cdc3e07.

[37] Fox 9, Youtube (Dec. 17, 2025), https://www.youtube.com/shorts/iVtS5XGOVYc

100.    On December 21, 2025, a DHS agent shot at a man in his car in Saint Paul.

101.    On January 18, 2026, DHS officers used a battering ram to break down the door of a home in Saint Paul and entered carrying rifles and riot shields. Despite his daughter-in-law trying to present his identification, the agents handcuffed 85-year-old ChongLy Scott Thao, led him outside in subzero temperatures wearing only boxer shorts and slip-on shoes, put him in an S.U.V., and drove him around for nearly an hour while questioning him. Mr. Thao is a Hmong immigrant and U.S. citizen with no criminal record.[38]

102.    The foregoing tactics—racial profiling, forceful arrests, warrantless entries, and aggressive enforcement at sensitive locations—have understandably led to protests.

103.    Minnesota is full of civically engaged people, across the political spectrum—it has one of the highest rates of volunteerism in the country,[39] one of the highest rates of voter turnout, and a documented ethos for civic engagement and neighbors helping neighbors that exceeds the national average.[40]

---

[38] Maia Coleman, *ICE Arrest of a Citizen, Barely Dressed, Sows Fear in Twin Cities*, The New York Times, January 20, 2026 (available at: https://www.nytimes.com/2026/01/20/us/chongly-scott-thao-ice-arrest.html).

[39] Sarah Ritter, *Minnesota ranks No. 3 in volunteerism nation as nonprofits see rebound*, The Star Tribune, November 29, 2024 (available at: https://www.startribune.com/minnesota-ranks-third-volunteering-report/601188453).

[40] Mary Murphy, *Why does Minnesota lead the country in voter turnout -- and which areas lead Minnesota?* InForum (Oct. 26, 2024) https://www.inforum.com/news/minnesota/why-does-minnesota-lead-the-country-in-voter-turnout-and-which-areas-lead-minnesota); *see also* U.S. Census, New U.S. Census (Footnote Continues on Next Page)

104.    Faced with concern that state-sanctioned illegal conduct going unchecked and that race and national origin discrimination is harming their neighbors, Minnesotans have hit the streets to exercise their First Amendment rights to speak out, observe, and record.

105.    Defendants have engaged in unlawful conduct towards protestors and legal observers too.

106.    On December 6, 2025, a Minneapolis woman volunteering as an observer followed a DHS vehicle. When she parked, she was boxed in by other DHS vehicles and confronted. In the recorded interaction that followed, a DHS agent told her she was breaking the law and threatened to arrest her if she continued.[41]

107.    On December 9, 2025, a Minneapolis woman who heard DHS was patrolling her community went to the impacted area and stood on a public sidewalk. While at a safe distance, she asked, "Are you ICE?" Seconds later, she was forced to the ground, handcuffed, detained, shackled, and left in a cell for hours, after having her wedding ring cut off.[42]

---

Bureau and Americorps Research Tracks Virtual Volunteering for First Time, (Nov. 19, 2024) https://www.census.gov/library/stories/2024/11/civic-engagement-and-volunteerism.html.

[41] Jon Collins, 'Tinted windows and out-of-state plates': How ICE watchers look for agents in their neighborhoods, MPR News (Dec. 5, 2025) https://www.mprnews.org/story/2025/12/05/twin-cities-ice-watchers-keep-tabs-for-agents-in-their-neighborhoods).

[42] Christopher Magan, ACLU of Minnesota sues ICE over alleged mistreatment of observers (Dec. 17, 2025), https://www.startribune.com/aclu-of-minnesota-sues-ice-over-
(Footnote Continues on Next Page)

108.    Shortly before Renee Good was shot and killed on January 7, 2026, a different scene unfolded less than a mile away. An attorney for the State of Minnesota with expertise in civil rights law witnessed an apparent DHS arrest unfolding, and she approached the scene in order to act as a witness. She identified herself as an attorney and stood a safe distance from the arrest. A DHS agent jumped out of his vehicle, unloaded entire canisters of pepper spray on her at point blank range, causing such irritation that she had to strip her clothing off on the scene to reduce the effect.

109.    On January 9, 2026, a white pastor of a Minneapolis church has described seeing DHS agents approach a Hispanic woman. The pastor reports that when he told DHS they should take him instead and that he was not afraid, DHS pointed a gun in his face, handcuffed him, placed him in the back of a vehicle, and released him after purportedly saying, "you're White. You wouldn't be fun anyway."[43]

110.    In addition to the foregoing specific examples, by January 12, 2026, Minneapolis had received at least sixteen 911 calls related to DHS agents engaging in inappropriate force or threats of force including brandishing guns, pepper spraying, shoving, and using tear gas. Calls reporting inappropriate force or threats of force continued during the pendency of Operation Metro Surge.

---

alleged-mistreatment-of-observers/601548112.

[43] Jessica Hart, *Detained pastor says ICE let him go because he's White*, KARE11 (Jan. 9, 2026) (available at https://www.kare11.com/article/news/local/detained-pastor-says-ice-let-him-go-because-hes-white-mn/89-00df6b90-bae8-49b8-b980-941a4ba6ee8b).

111.    DHS, ICE, and CBP placed a significant public image emphasis on their aggressive immigration enforcement actions in Minnesota when the scope of Operation Metro Surge expanded.

112.    For example: on January 5, 2026, Defendant Noem herself participated in a heavily propagandized, videotaped immigration raid in Saint Paul, Minnesota.[44]

113.    Also on January 5, 2026, the White House posted on its official X account indicating that "President Donald J. Trump and his Administration are UNLEASHING a relentless assault to dismantle the massive fraud empires built in Minnesota under the watch of incompetent Democrats like Tim Walz and his Radical Left enablers."[45]

114.    And on January 6, 2026, DHS, on its official X account, posted simply: "GOOD MORNING MINNEAPOLIS!" This post was reposted by the official X accounts of The White House, ICE, and U.S. Citizenship and Immigration Services. The increase in Defendants' agents and immigration enforcement actions across the immigrant-populated neighborhoods of the Twin Cities caused widespread fear amongst Minnesotans.

## VI.    January 2026 Shootings.

115.    On January 7, 2026, Jonathan Ross, an ICE agent, shot and killed a Minnesota resident, Renee Good.

---

[44]    Homeland    Security    (@DHSgov),    X    (Jan.    6,    2026,    3:21    PM), https://x.com/DHSgov/status/2008650038847959106.

[45]    The    White    House    (@WhiteHouse),    X    (Jan.    5,    2026    3:54    PM    CT) https://x.com/WhiteHouse/status/2008296166773948523.

116.   Immediately community members on the scene called 911, and MPD and other emergency personnel responded.  MPD officers performed crowd management while the crowd continued to get more agitated, especially with the presence of the ICE agents at the scene.

117.   DHS agents deployed pepper spray at the crowd at the scene of the shooting.

118.   The crowd continued to grow and were agitated by DHS agents present at the scene. MPD had to call for mutual aid from other agencies to help maintain the perimeter for the FBI and BCA investigators. The crowd calmed down once DHS agents left the area.

119.   However, later in the day ice and snowballs were thrown at the local officers as some individuals did not differentiate between the actions of DHS agents and the actions of local police attempting to secure the scene.

120.   The fatal shooting of Renee Good forced the lockdown of Green Central Elementary School, which was just a few blocks away.[46]

121.   Following the January 7, 2026, fatal shooting, the Trump Administration, including at least some of Defendants, repeatedly issued statements to create false narratives of lawlessness in Minnesota and to accuse the victim of "domestic terrorism."[47]

---

[46] *No school for MPS rest of the week; Apparent ICE presence at Roosevelt High School causes chaotic scene*, KSTP (Jan. 8, 2026, 9:31 AM), https://kstp.com/kstp-news/top-news/apparent-ice-presence-at-roosevelt-high-school-causes-chaotic-scene/.

[47] *See, e.g.,* Kristi Noem calls actions leading up to fatal ICE shooting 'act of domestic terrorism', Fox 9 Minneapolis-St. Paul (YouTube, Jan. 7, 2026), (Footnote Continues on Next Page)

40

122.    The Trump Administration also used the horrific events as yet another opportunity to attack Democrats and Minnesota's "sanctuary politicians." President Trump called Good—without evidence—a "professional agitator" and claimed that she "violently, willfully, and viciously ran over the ICE Officer." The President also blamed the "Radical Left" for "threatening, assaulting, and targeting our Law Enforcement Officers and ICE Agents on a daily basis"—again without evidence.[48]

123.    In a social media post, Defendant DHS accused Good of an act of "domestic terrorism" and blamed "[s]anctuary politicians" for "creat[ing] an environment that encourages rampant assaults on law enforcement."[49] Defendant Noem reposted this statement on her social media.

124.    Despite Good's killing, DHS agents continued to unlawfully terrorize the Twin Cities community throughout the day. At around 11:45 a.m. Minneapolis received 911 calls regarding DHS agent activity at a dollar store on Lake Street.  DHS agents were met with unsurprising protests after the fatal shooting two hours earlier but used pepper spray and rammed vehicles when leaving.

---

https://www.youtube.com/watch?v=GPVpHDyOXCM; *see also* Homeland Security (@DHSgov), X (Jan. 7, 2026) https://x.com/DHSgov/status/2008958123092979817; *see also* Acting Ice Director comments on Minneapolis shooting, Newsmax (Youtube Jan. 9, 2026) https://www.youtube.com/watch?v=3wERJwNfTQA (relevant portion beginning at 2:11 and ending at 3:57).

[48] Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 7, 2026, 2:28 PM CT), https://truthsocial.com/@realDonaldTrump/posts/115855701696773990.

[49] Homeland Security (@DHSgov), X (Jan. 7, 2026, 6:23 PM CT), https://x.com/DHSgov/status/2009058387418562922.

125.    Later that same day, community reports and videos posted to social media show a chaotic scene on Roosevelt High School grounds in Minneapolis when class was dismissed for the day. DHS agents dressed in fatigues and riot helmets were firing pepper spray at individuals in a crowd that included high school students, teachers and school administrators. Minneapolis Public Schools cancelled school on January 8 and 9, 2026, "due to safety concerns related to [January 7] incidents around the city." [50] These cancellations impacted around 100 schools and 30,000 students. And multiple other schools cancelled classes or shifted to remote learning on January 9, 2026, amid DHS activity. Following the January 7 incident, Saint Paul Public Schools canceled field trips and sports-related events in Minneapolis as well as any events requiring travel through Minneapolis. [51]

126.    Defendants' agents used Renee Good's death to threaten Minnesota residents. By way of one example, on January 11, 2026, Defendants' agents threatened a legal observer, telling him to go home, not to "make a bad decision", and threatened "You did not learn from what just happened?"

---

[50] *No school Jan. 8-9 due to safety concerns,* Minneapolis Public Schools (Jan. 7, 2026), https://www.mpschools.org/about-mps/news/news-details/~board/minneapolis-public-schools-news/post/no-school-jan-8-9-due-to-safety-concerns.

[51] Imani Cruzen, "St. Paul Public Schools shares federal activity procedures, cancels events in Minneapolis," *Pioneer Press*, January 8, 2026 (available at https://www.twincities.com/2026/01/08/spps-district-shares-procedures-in-case-of-federal-activity/).

127. On January 14, 2026, as part of continued escalating violence, a DHS agent shot a Minnesota resident, Julio Cesar Sosa-Celia, through a doorway of a residential building.

128. MPD officers responded to the scene of the shooting and attempted to render aid to the individual who had been shot, but he refused to come out while the DHS agents were present.

129. MPD officers attempted to secure the scene so that the BCA and federal agents could collect evidence. However, unsurprisingly after the shooting of Renee Good only one week before, a large crowd quickly formed, and they were upset with the actions of the DHS agents.

130. MPD once again had to call for mutual aid from other agencies, including the State Patrol, in order to keep the scene secure for evidence collection.

131. During the course of that incident, DHS agents indiscriminately fired crowd control munitions at whoever was in the area, resulting in their setting off tear gas cannister underneath a vehicle containing a family coming home from a basketball game. An infant in the vehicle suffered respiratory distress and MPD officers had to escort paramedics to render aid.

132. Then on January 24, 2026, CBP agents shot and killed a Minnesota resident, Alex Pretti. This was the third shooting involving federal immigration agents in less than three weeks, and the second preventable fatality.

133.    Within minutes Minneapolis received multiple 911 calls about the shooting, and callers reported that DHS agents were attempting to detain 30 bystanders who had witnessed the shooting.

134.    MPD responded to the scene to hold the perimeter and called the BCA to begin an investigation at the crime scene.  MPD's Mobile Field Force, SWAT team, strike teams, and drone operators were activated and readied to deploy if needed.

135.    The crowd quickly grew and expressed their anger at this additional unnecessary fatal shooting.  DHS agents deployed chemical agents, flashbangs, and gas munitions.

136.    MPD once again had to keep the peace in a volatile situation they did not create.  They again called for aid from other agencies, and the Minnesota State Patrol and officers from the Minnesota Department of Natural Resources, responded to assist with holding the scene.  Officers from Saint Paul assisted with answering regular 911 calls in Minneapolis as MPD officers were being utilized for holding the scene.

137.    DHS agents used crowd control munitions including less-lethal impact munitions, tear gas, and flashbangs.  One of the exploding munitions started a fire in a dumpster when it exploded.  MPD was required to escort the Minneapolis Fire Department into the scene so the fire could be put out.

138.    As a result of the drain on MPD's resources caused by this incident, the two prior officer-involved shootings, and overall by Operation Metro Surge, Minneapolis Mayor Jacob Frey requested that Governor Tim Walz use the Minnesota National Guard to help reinforce local law enforcement resources in Minneapolis.

139.    Once again, the Trump Administration used the horrific events to attack Democrats and Minnesota's "sanctuary politicians." The day after Pretti's killing, President Trump posted on his Truth Social account: "Democrat run Sanctuary Cities and States are REFUSING to cooperate with ICE, and they are actually encouraging Leftwing Agitators to unlawfully obstruct their operations to arrest the Worst of the Worst People! By doing this, Democrats are putting Illegal Alien Criminals over Taxpaying, Law-Abiding Citizens, and they have created dangerous circumstances for EVERYONE involved. Tragically, two American Citizens have lost their lives as a result of this Democrat ensued chaos."[52]

140.    Defendants' conduct in Minnesota and the Twin Cities is consistent with abuses in other jurisdictions around the country.  On December 9, 2025, U.S. Senator Richard Blumenthal, ranking member of the Permanent Subcommittee on Investigations, released a minority staff report highlighting firsthand accounts of Americans who were unlawfully assaulted and detained by federal immigration agents.[53]  The report details routine unlawful seizures and excessive force resulting in injuries. This national trend is paired with national reporting and further contributes to Minnesotans' perceptions and fears.  Locally, Defendants' unlawful conduct is also reflected in the allegations in the

---

[52] Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 25, 2026, 4:36 PM CT), https://truthsocial.com/@realDonaldTrump/posts/115958124569932540.

[53] Sen. Richard Blumenthal, "Unchecked Authority: Examining the Trump Administration's Extrajudicial Immigration Detentions of U.S. Citizens," https://www.hsgac.senate.gov/wp-content/uploads/2025.12.8_ICE-Report-revised-FINAL.pdf.

lawsuit and motion for injunctive relief in *Tincher v Noem*, which seeks to vindicate the rights of the Minnesotans who have been unlawfully seized and been the victims of excessive force by federal immigration agents for exercising their First Amendment rights to observe or protest federal government conduct. Complaint, *Tincher v Noem*, No. 25-cv-04669 (D. Minn. Dec. 17, 2025), Dkt. No. 1.

## VII.   Defendants' Occupation Does Not Have Valid Immigration Enforcement Motives, But Rather Is an Act of Coercion, Commandeering, And Intimidation.

141.   According to libertarian think-tank Cato Institute's analysis of ICE data, as of June 14, of the more than 200,000 individuals who had been arrested by ICE at that point in fiscal year 2025, 65% had no criminal convictions and more than 93% had no violent convictions.

142.   As further evidence that Defendants are not focusing Operation Metro Surge on the "worst of the worst," Defendants have also detained children in Minnesota. On January 20, 2026, Defendants' agents detained five-year-old Liam Conejo Ramos as he returned home with his father from school. Zena Stenvik, superintendent for Columbia Heights Public Schools, said, "The agent took the child out of the still-running car, led him to the door and directed him to knock on the door asking to be let in in order to see if

anyone else was home, essentially using a 5-year-old as bait," before detaining and sending him to a detention facility in Texas.[54]

143.    The Trump Administration and Defendants continued to occupy Minnesota in an effort to coerce Plaintiffs to fulfill of the Administration's ransom requests. Attorney General Pam Bondi sent a letter to Plaintiffs on January 24, 2026, the day of Pretti's death, demanding Plaintiffs: (1) share all of Plaintiffs' records on Medicaid and Food and Nutrition Services programs; (2) repeal "sanctuary policies"; and (3) allow the Department of Justice access to Plaintiffs' voter rolls. Attorney General Bondi indicated that acquiescing to her requests would "help bring back law and order to Minnesota."

144.    And on January 25, 2026, the day after Pretti's death, President Trump posted the following demand:

---

[54] *Liam Conejo Ramos and his father have landed back in Minnesota following a judge's order,* MPR News (Feb. 1, 2026) https://www.mprnews.org/story/2026/02/01/liam-conejo-ramos-5-returned-to-minnesota-following-judges-order.



Donald J. Trump
@realDonaldTrump

That is why I am hereby calling on Governor Walz, Mayor Frey, and EVERY Democrat Governor and Mayor in the United States of America to formally cooperate with the Trump Administration to enforce our Nation's Laws, rather than resist and stoke the flames of Division, Chaos, and Violence:

1. Governor Walz and Mayor Frey should turn over all Criminal Illegal Aliens that are currently incarcerated in their State Prisons and Jails to Federal Authorities, along with all Illegal Criminals with an active warrant or known Criminal History, for Immediate Deportation.

2. State and Local Law Enforcement must agree to turn over all Illegal Aliens arrested by Local Police.

3. Local Police must assist Federal Law Enforcement in apprehending and detaining Illegal Aliens who are wanted for Crimes.

4. Democrat Politicians must partner with the Federal Government to protect American Citizens in the rapid removal of all Criminal Illegal Aliens in our Country. Some Democrats, in places like Memphis, Tennessee, or Washington, D.C., have done so, resulting in safer streets for ALL.

In addition, I am hereby calling on the United States Congress to immediately pass Legislation to END Sanctuary Cities, which is the root cause of all of these problems. American Cities should be Safe Sanctuaries for Law Abiding American Citizens ONLY, not Illegal Alien Criminals who broke our Nation's Laws.

All of these requests are rooted in COMMON SENSE, and will provide the best possible circumstances to, MAKE AMERICA GREAT AGAIN! The Trump Administration is standing by, and waiting for ANY Democrat to do the right thing, and work with us on these important matters of MAKING AMERICA SAFE like it is in all sections of our Country where we are, together with Local Leadership, participating and involved.

DONALD J. TRUMP
PRESIDENT OF THE UNITED STATES OF AMERICA

145.    As set forth herein, a series of agency actions preceded Operation Metro Surge but were brought to bear in Minnesota with extra impact when compounded with the separate agency decision to deploy an unprecedented volume of agents. Several other agency actions compounded the harms.

48

146. In order to ensure Operation Metro Surge could maximize pain without requiring differentiation based on potential refugee status, on December 18, 2025, Defendant Marcos Charles rescinded prior Policy Number 11039.1 (regarding refugees who were present for at least one year but had not yet achieved lawful permanent resident status.").

147. And, on information and belief, in order to ensure the retaliatory, coercive, and commandeering purposes of Operation Metro Surge were maximized, between December 2025 and January 2025, DHS decision-makers adopted a permissive policy with regard to use of force. On or around January 18, 2026, during a public interview with television program 60 Minutes, Defendant Marcos Charles seemed to confirm no agents had been disciplined for any of the publicly reported conduct up until that date.[55]

## VIII. Impact on State and Local Law Enforcement.

148. The culture of fear and unrest caused by Defendants' actions has resulted in obvious negative impacts on state and local law enforcement.

### A. Impact on Minneapolis

149. From December 9, 2025, (a week into Operation Metro Surge) when Minneapolis began tracking the relevant data, to January 12, 2026, there were over one hundred and fifty 911 calls related to Defendants' immigration enforcement actions. Each

---

[55] *Minneapolis' police chief fears possible 'moment where it all explodes' as ICE Operation Continues,* 60 Minutes (Jan. 18, 2026) https://www.youtube.com/watch?v=5O9QcbmG2mE (pertinent portion 07:25-10:22).

call took time and resources of Minneapolis staff and law enforcement to deal with because each call must be assessed and may need to be investigated.  Subsequent to January 12, 2026, calls have continued with over 200 more calls through February 12, 2026.

150.    Beginning on December 18, 2025, MPD had one or more supervisors dedicated to monitoring public safety needs due to Defendants' immigration enforcement activities during the daytime hours.  Beginning on the date of the January 7 fatal ICE shooting, an additional lieutenant was assigned during some nighttime hours.

151.    Operation Metro Surge resulted in MPD needing to send officers to respond to public safety needs caused by over 30 ICE-related incidents between December 9, 2025, and January 12, 2026.  The incidents requiring officer assistance include calls from concerned citizens who have seen individuals being kidnapped by unidentified people or people callers were not sure were federal immigration agents.  Incidents also include ICE abandoning vehicles on the public right of way after detaining the individuals in the car.  By way of example, on January 8, 2026, DHS agents pulled someone out of a vehicle, in the middle of the road, and departed the scene leaving that vehicle in the middle of the street. The vehicle, which was abandoned by the agents, was not even placed in park. Local law enforcement responded after reports the vehicle had rolled and blocked traffic.

152.    Officers also responded to multiple incidents to maintain public safety where there was a tense protest situation caused by Defendants' aggressive and reckless actions.

153.    Responding to calls where there is tension between community and federal immigration enforcement authorities presents many complexities and concerns for local

law enforcement. This is particularly concerning given the reported shortened training period for recently-hired agents.

154. On January 7, 2026, MPD began separately tracking overtime for public safety responses related to Defendants' immigration enforcement activities. To be clear: these hours do not reflect time spent *assisting* Defendants in immigration enforcement, but rather, represent hours spent ensuring general public safety in the face of Defendants' surge in forces and reckless and aggressive immigration enforcement tactics and public reactions to the same. The overtime is paid at 1.5 times the rate of each officer's regular wage. From January 7, 2026, through March 28, 2026, federal immigration activities cost MPD over $6 million. Due to the need to be available to respond to deescalate tensions around Defendants' immigration enforcement activities, MPD informed all sworn staff on January 7, 2026, that any scheduled days off would be cancelled through at least January 11, 2026. MPD canceled approximately 983 scheduled days off. For the same reasons, officers were working longer shifts, extending past their 8- or 10-hour shifts. These changes impacted officers' personal lives and left them exhausted.

155. In addition, Minneapolis SWAT personnel and Strike Team personnel were placed on paid on-call status on December 19, 2025, prepared to respond to public needs due to Defendants' immigration enforcement activities. MPD also placed its Unmanned Aerial Vehicle Team on paid on-call status on January 7, 2026. Minneapolis had some MPD officers on paid on call status through February 22, 2026.

156. The surge, and the events surrounding the January 7 fatal ICE shooting, took a toll on the mental health of MPD officers as well. MPD observed a marked increase in

the utilization of health and wellness resources by officers, with officers accessing contracted therapeutic services at higher-than-normal rates and reporting heightened hypervigilance and fear. For officers present during the 2020 unrest, the incident has triggered traumatic memories as the officers resume operational duties amid concerns of potential instability. Officers who joined the department after 2020 report similar emotional impacts, having experienced prior unrest as community members. While comprehensive data is not yet available, there is a legitimate concern that the cumulative psychological impact of responding to Operation Metro Surge may contribute to increased attrition from the department, as officers confront the destabilizing effects of actions by Defendants on the community they are sworn to protect.

157.    Another impact is that MPD officers responding to public needs caused by Defendants' Operation Metro Surge activities prevented those officers from responding to other 911 calls from the communities MPD serves.  On January 7, shortly after 10:00 am, all priority-2 and priority-3 911 calls were put into "pending" status because MPD officers were responding to activities following the fatal shooting of a Minneapolis resident by an ICE agent in Minneapolis. Ultimately, nearly 95 MPD officers responded to the scene on January 7 to deal with the aftermath of the fatal shooting, and while they were doing so, they were not responding to 911 calls, investigating reports of crimes, or fulfilling other law enforcement obligations for the benefit of the communities that MPD serves. Similarly, MPD administration has devoted considerable time to planning around the impacts of the way Defendants are conducting immigration enforcement in Minneapolis,

52

and that is time and attention that would otherwise be spent on making Minneapolis a safer place for people to live, work and visit.

158.    The impacts on the operations of Plaintiff Minneapolis have been far-reaching. Starting with the tragic January 7 fatal shooting in Minneapolis, and due to Defendants' inflammatory tactics, Minneapolis initiated its emergency preparedness protocols, which meant significant additional work for numerous City departments, from the Emergency Management Department, to Police, Fire, Public Works, Finance, Communications, the Mayor's Cabinet, Mayor's staff and the Mayor, and many more, taking them all away from pressing City priorities.

### B.  Impact on Saint Paul

159.    Since January 17, 2026, Saint Paul Police Department ("SPPD") has had a full time Commander in charge of Operation Metro Surge-related incidents in Saint Paul. This is because the Police Chief's office identified a need to ensure SPPD was collecting and storing data relating to SPPD's response to Operation Metro Surge. This Commander was tasked with tracking immigration operations and interactions in the City of Saint Paul, as well as the costs associated to SPPD. This position was designed to ensure that SPPD had an understanding of federal immigration operations in Saint Paul and a means for follow-up and response when deemed necessary.

160.    SPPD incurred $446,780.60 in costs attributable to Operation Metro Surge between November 25, 2025, and February 19, 2026. These costs were not budgeted. They represent an unplanned, uncompensated financial burden imposed on the City of Saint Paul by federal enforcement activity and the community response it generated.

161. Approximately 84 percent of these costs were overtime pay, a direct reflection of the unpredictability of federal enforcement. SPPD could not staff for a surge for which it had no advance knowledge.

162. January 24, 2026—the day Alex Pretti was fatally shot in Minneapolis—was the single most expensive day of the entire period, generating 1,007.5 overtime hours and $99,079.52 in costs.

163. Even SPPD officers are not immune from what Saint Paul submits are unlawful stops by DHS agents. The SPPD Chief stated in a press conference on January 20, 2026, that two off-duty SPPD officers of color were stopped separately by DHS agents in traffic stops that the Chief opined were outside the bounds of what federal agents are allowed to do.[56]

164. SPPD has responded to multiple incidents involving Defendants' agents.

165. On November 18, 2025, SPPD received a call regarding DHS agents present at Bro-Tex, Inc., a paper manufacturing company in Saint Paul, causing related protest activity.

---

[56] Lydia Morrell, *Twin Cities Law Enforcement Raises Concerns about ICE Agents Racially Profiling Citizens,* Kare11, Jan. 20, 2026, https://www.kare11.com/article/news/local/ice-in-minnesota/twin-cities-law-enforcement-raises-concerns-about-ice-agents-racially-profiling-citizens/89-80f7b210-df6f-4516-9c05-20cf8890c7bb.

166. On November 25, 2025, SPPD received several calls and responded to the scene at 609 Rose Avenue E. where DHS agents were conducting an immigration enforcement operation.

167. On December 11, 2025, SPPD received multiple calls regarding DHS agents present in the area of Arcade Street and 7th Street E. near Centromex Supermercado and the Mexican Consulate Building.

168. On December 21, 2025, SPPD received a call to report shots fired shortly before 8:30 a.m. SPPD officers responded to the scene. Once on the scene, officers learned that a federal agent was involved in a use of force incident. SPPD completed a state accident report.

169. On January 11, 2026, SPPD responded to an incident in Saint Paul where a vehicle crashed into a sign pole on a busy intersection as a result of DHS agents' actions, in which the driver was then taken into custody by DHS agents. The vehicle required towing services after the crash.

170. Each call takes time and resources of SPPD, because each call must be assessed and may need to be investigated. Responding to calls relating to activities of DHS agents diverts time and resources from other policing needs.

171. SPPD has also had to devote time and resources to developing guidance and communicating with residents regarding the differences between DHS agents and SPPD officers. For example, SPPD issued a public statement reminding residents that "SPPD officers are required to be in uniform or have clear SPPD markings on them when engaged

55

in arrest activities. This means if you see a SPPD officer or our markings (i.e. squad, vest, jacket) in the community, it is not an immigration detail."

172. SPPD has faced continuous challenges because the public's confusion in distinguishing SPPD officers from federal agents persists. To mitigate this confusion, Saint Paul published a guide to Saint Paul uniforms and badges, including photographs of various SPPD and DSI uniforms.

173. Reflective magnetic badges for unmarked SPPD vehicles were ordered on January 21, 2026, costing the department $7,499. These identifying markers were needed to delineate between federal law enforcement and SPPD to community members.

174. Operation Metro Surge has also needlessly flooded Saint Paul with DHS agents despite Saint Paul's reduced crime rates.

175. SPPD is a national leader in utilizing community-oriented policing to reduce crime and solve cases.

176. In 2025, SPPD solved more than 70 percent of crimes and between 2020 and 2025 the clearance rate (how often police close a case through an arrest or an exceptional reason such as a suspect dying) for homicides ranged from 89 percent to 93 percent.

177. Between 2022 and 2025 violent crime in Saint Paul decreased significantly. For example, murder rates decreased 44 percent, robberies decreased 56 percent, aggravated assaults decreased 70 percent, and shots fired decreased 45 percent.

178. Community trust has been and continues to be of paramount importance to SPPD's ability to successfully maintaining low crime rates and high case solve rates.

179.    Defendants' agents practice of concealing their identity, failing to identify themselves, masking, and wearing inconsistent uniforms with inconsistent identification creates confusion for Saint Paul residents. On information and belief, residents have had trouble distinguishing Defendants' agents from SPPD officers.

180.    This confusion leads to decreased community trust in SPPD. When trust decreases, residents are less likely to call SPPD to report crimes or cooperate in investigations. This harms SPPD's ability to effectively protect public safety in Saint Paul.

### C. Impact on State Agencies

181.    The State of Minnesota promptly felt impacts on state law enforcement resources, public trust, and operations by early January, and those harms continued to accrue in the time that followed. Minnesota's Department of Public Safety ("DPS") recognized that the January 7 fatal shooting had created a particularly heightened risk of escalating tension and public response. Based on that heightened need, DPS deemed it necessary to direct expenditure of additional resources to run the State's Emergency Operations Center ("SEOC") in the days that followed. The SEOC serves as a unified command center to ensure that various state and local agencies can make timely and efficient responses to different types of emergencies. Operating the SEOC twelve hours a day for five consecutive days required at least seven senior leadership officials, and other state personnel, to redeploy from their usual duties, and in at least one instance, required a contractor be hired at extra cost (projected to be $65,000) to complete work the redeployed personnel would have otherwise performed in their ordinary course of duties. Although the extent of SEOC varied at different points during Operation Metro Surge, costs to the State

associated with the SEOC operations between January and February 2026 are reasonably believed to be approximately $137,000.

182. DPS also found it necessary to have State Patrol resources in order to stay prepared for the perceived risks associated with DHS activities and public unrest they have the potential to cause. Costs associated with heightened state patrol demands are estimated to have exceeded $1.4 million between January 1, 2026, and February 24, 2026, above the personnel and operational costs otherwise expected for that time frame. In addition to those State Patrol costs, the State also expended additional resources from the Department of Natural Resources' law enforcement personnel. These additional costs related to Operation Metro Surge are estimated to have exceeded $1.05 million between January 1, 2026, and February 24, 2026, above the personnel and operational costs otherwise expected.

183. On January 8, 2026, also due to the very real public safety and public order concerns created by Defendants' intentional attempt to sow unrest, Governor Walz issued an executive order activating the Minnesota State National Guard so that they would be ready to help law enforcement maintain peace. The Executive Order stated that the extent of costs associated with that activation will be paid from the State's general fund, pursuant to Minn. Stat. Section 192.52 (2025).

184. Additionally, the Minnesota Department of Transportation (MnDOT) had to divert personnel and fleet vehicles since January 8, 2026. This included at least one instance of requested assistance with closing highway ramps in response to public safety concerns, and other expenditure of personnel and fleet resources for emergency preparation.

185.    Although the full scope of impact is not yet known on either an economic or operational level, DHS activities also necessitated diversion or interruption of State resources in other measurable ways. By way of example, MnDOT's Fort Snelling location, known as the "Central Shop" where certain electrical and fabrication services take place, was significantly impacted due to its immediate proximity to DHS' Whipple Building location. The Central Shop turned off its HVAC systems due to DHS' use of chemical irritants against protestors on January 8, 2026. The overall interruption to the Central Shop left MnDOT unable to perform work necessary to repair a traffic signal in its usual timeframe, requiring at least one known intersection to remain on a four-way stop setting for hours longer than typical (which risks both delays in traffic flow and higher risk of collision). MnDOT was also unable to perform scheduled work on snowplow fabrication scheduled for January 8, 2026, at the Central Shop, and had other heightened personnel demands related to snowplow relocation and staging. Additional harms and impacts continued to accrue.  Other maintenance activities were suspended or severely limited out of several locations because crews and equipment were redeployed, and two major truck stations were rendered unavailable for ordinary operations for extended periods of time as they were needed for vehicle and equipment staging. These disruptions impacted one of two dedicated guardrail repair crews that fell weeks behind in guardrail repair work. The disruptions also resulted in a substantial rise in overtime costs and extended shifts for MNDOT personnel, created gaps in snow and ice control and pothole response, and otherwise reduced MNDOT's ability to address safety-critical infrastructure needs.

### D. Other Impacts

59

186.    Defendants' unlawful tactics also undermine public trust in state and local law enforcement because individuals cannot distinguish between ICE activities and local police actions. Deteriorating public trust has consequences: it suppresses the reporting and prosecuting of serious crimes, especially those that affect the immigrant population. Public trust in local law enforcement is paramount to effective community policing—including trust between law enforcement and immigrant communities.

187.    Defendants' tactics undermine public trust in local law enforcement because Defendants' agents are engaging in unnecessarily provocative and at times unlawful behavior while clothed in garb and using resources that make them look like local law enforcement.  For example, DHS agents have used tactics to resemble local police, like using vests that say "POLICE," vehicles with police lights, and yellow police tape.

188.    DHS agents conceal their faces with masks which increases the distrust and fear provoked by Defendants' actions. Minnesota law makes it a crime for a person to conceal their identity by means of a mask in a public place. Minn. Stat. § 609.735. Even if it were not a violation of state law, the FBI itself has reportedly issued a law enforcement bulletin to DHS identifying at least five instances in 2025 involving kidnappings, attempted rapes, and robberies which were effectuated by masked men claiming to be immigration officers.[57] The FBI bulletin reportedly acknowledges the rise in impersonation crimes

---

[57]    Dell Cameron and Caroline Haskins, *FBI Warns of Criminals Posing as ICE, Urges Agents to ID Themselves*, Wired (Nov. 4, 2025) https://www.wired.com/story/fbi-warns-of-criminals-posing-as-ice-urges-agents-to-id-themselves/.

linked to the recent increase in ICE enforcement actions is further eroding trust between communities and police.

189.    Because Defendants' agents are not clearly identifying themselves as federal agents, community members frequently cannot distinguish between immigration enforcement activities, possible criminal activities, and local law enforcement officers. Local law enforcement has been working for years to improve police-community relations, and the intentional lack of agency identification by DHS agents sets back that progress and confuses the public.

190.    This is particularly problematic as Minnesota recovers from the shared distress associated with political assassinations which were perpetrated in Minnesota in June 2025 by a man who posed as a police officer to induce his victims to open their doors.

191.    Hidden identities combined with the apparently unlawful tactics makes it difficult for community members to know what agency the agents represent, which in turn erodes hard-earned community trust being rebuilt by local law enforcement day by day—particularly where the tactics being used by DHS agents are at odds with the carefully developed, trained, and enforced local policies designed to increase that trust. The impact is not unnoticed. After the fatal January 7 shooting a crowd in Minneapolis could be heard chanting, "M-P-D, K-K-K, I-C-E, THEY'RE ALL THE SAME!"[58]

---

[58]    Eric Roper, *ICE tactics threaten to unravel trust with local law enforcement*, The Minnesota Star Tribune (Jan. 11, 2026) https://www.startribune.com/ice-mpd-law-enforcement-minnesota/601560440.

192.   Decreased trust in law enforcement also erodes public safety because the community is less likely to report criminal activity, and less likely to cooperate as witnesses.   For example, in Hennepin County there has been a marked decrease in individuals who are cooperating in prosecution of violent crimes.

193.   Between February 17, 2026, and March 6, 2026, the U.S. Immigration Policy Center (USIPC) at the University of California at San Diego conducted two mixed-mode, probability-based surveys of residents aged 18 and older—one in Minneapolis and one in Saint Paul (collectively, "the USIPC Surveys"). The Minneapolis sample included 728 respondents (margin of error ±3.6 percent), while the St. Paul sample included 662 respondents (margin of error ±3.8 percent). To ensure representativeness, respondent-level survey weights were constructed using iterative proportional fitting ("raking") to adjust for observable differences in age, gender, race and ethnicity, and employment status.

194.   The surveys were conducted, evaluated, and interpreted using appropriate and accepted scientific and technical methods. The survey results and conclusions are reliable.

195.   In Minneapolis, 28.3 percent of those surveyed said "yes" to having at least one interaction with federal immigration enforcement agents during Operation Metro Surge.

196.   Of those surveyed in Minneapolis who had at least one interaction with federal immigration enforcement agents, 57.1 percent said they are less likely to trust law enforcement because of the interaction; 49.4 percent said they are less likely to seek help

from law enforcement because of the interaction; and 31.1 percent said that they are less likely to obey commands from law enforcement because of the interaction.

197.    In Minneapolis, respondents who reported an interaction with federal immigration enforcement agents during Operation Metro Surge are 19.9 percent less likely to trust law enforcement compared to respondents who did not report an interaction and this difference is systematic and non-random.

198.    Moreover, Minneapolis respondents who reported an interaction with federal immigration enforcement agents during Operation Metro Surge are 29.5 percent less likely to seek help from law enforcement compared to respondents who did not report an interaction and this difference is systematic and non-random. Lastly, respondents who reported an interaction with federal immigration enforcement agents during Operation Metro Surge are 31.8 percent less likely to obey the commands of law enforcement compared to respondents who did not report an interaction and this difference is systematic and non-random.

199.    The health implications are also stark. Minneapolis respondents who reported an interaction with federal immigration enforcement agents during Operation Metro Surge were 49.2 percent more likely to miss a medical appointment compared to those who did not report an interaction. Moreover, respondents who reported an interaction with federal immigration enforcement agents during Operation Metro Surge who had a medical issue that required urgent or hospital care were 48.5 percent more likely to avoid going to urgent care or to the hospital than those who did not report an interaction. Lastly, respondents who reported an interaction with federal immigration enforcement agents

63

during Operation Metro Surge who had scheduled vaccination missed a vaccination were 37.5 percent more likely to miss the vaccination than those who did not report an interaction.

200.    The USIPC Surveys show similar results for Saint Paul. Respondents who reported an interaction with federal immigration enforcement agents during Operation Metro Surge are 22.7 percent less likely to trust law enforcement compared to respondents who did not report an interaction and this difference is systematic and non-random.

201.    Moreover, Saint Paul respondents who reported an interaction with federal immigration enforcement agents during Operation Metro Surge are 24.0 percent less likely to seek help from law enforcement compared to respondents who did not report an interaction and this difference is systematic and non-random. Lastly, respondents who reported an interaction with federal immigration enforcement agents during Operation Metro Surge are 20.5 percent less likely to obey the commands of law enforcement compared to respondents who did not report an interaction and this difference is systematic and non-random.

202.    Saint Paul Respondents who reported an interaction with federal immigration enforcement agents during Operation Metro Surge were 35.8 percent more likely to miss a medical appointment compared to those who did not report an interaction. Moreover, respondents who reported an interaction with federal immigration enforcement agents during Operation Metro Surge who had a medical issue that required urgent or hospital care were 19.2 percent more likely to avoid going to urgent care or to the hospital than those who did not report an interaction. Lastly, respondents who reported an interaction

with federal immigration enforcement agents during Operation Metro Surge who had scheduled vaccination missed a vaccination were 15.8 percent more likely to miss the vaccination than those who did not report an interaction.

203. In Saint Paul, 19.2% of those surveyed said "yes" to having at least one interaction with federal immigration enforcement agents during Operation Metro Surge.

204. Of those surveyed in Saint Paul who had at least one interaction with federal immigration enforcement agents, 58.3 percent said they are less likely to trust law enforcement because of the interaction; 46.1 percent said they are less likely to seek help from law enforcement because of the interaction; and 26.3 percent said that they are less likely to obey commands from law enforcement because of the interaction.

205. These survey results show that Defendants' actions have caused significant and quantifiable reputational harm to Plaintiffs' law enforcement agencies. A report of the survey results entitled *Large-Scale Immigration Enforcement and Its Consequences: The Impact of Operation Metro Surge* is attached hereto as Exhibit A to the Amended Complaint and incorporated herein.

## IX.    Impact on Plaintiffs' Revenue Streams.

206. Plaintiffs' operating budgets depend heavily on revenue collected through state and local taxes, including income tax, property tax, and sales tax. In Minnesota, a wide range of sales and services are taxable.[59] The Twin Cities Metro area accounts for

---

[59] *Taxable Sales,* Minnesota Department of Revenue, https://perma.cc/E423-C5M7.

over half of Minnesota's total population,[60] and over half of the overall jobs in Minnesota.[61] That population and employment density corresponds with a higher density of businesses that bring in tax revenue to Plaintiffs,[62] and the Twin Cities Metro has historically been the State's biggest driver of tax revenue.[63] Retail and service industries are particularly important to the Twin Cities Metro revenue stream: retail trade is the third highest employment sector in the region, and the service industry is the fifth highest.[64] Together, retail sectors and service sectors alone account for nearly 300,000 jobs in the region.[65]

207.    Saint Paul has a local sales tax rate of 1.5 percent, which businesses collect from customers and remit to the State of Minnesota, which then distributes the funds to the

---

[60] *Recent Population Growth in the Metro Area*, Minnesota Department of Employment and Economic Development, https://mn.gov/deed/data/locallook/metro/metro-blog.jsp?id=1045-680261.

[61] Tim O'Neil, *The Same Old Story? Labor Market Trends in the Metro Area,* Minnesota Department of Employment and Economic Development (June 2025) https://mn.gov/deed/newscenter/publications/trends/june-2025/metro.jsp.

[62] *See, e.g., Metro Area Industry Statistics*, Minnesota Department of Employment and Economic Development (2024) https://mn.gov/deed/newscenter/publications/trends/june-2025/metro.jsp ); *Location Patterns of Restaurants*, Minnesota Department of Employment and Economic Development (August 2019) https://mn.gov/deed/newscenter/publications/review/august-2019/locations-restaurants.jsp.

[63] McVan, *Twin Cities metro sends money to rural counties*, Minnesota Reformer (Dec. 4, 2023) https://minnesotareformer.com/2023/12/04/twin-cities-metro-sends-money-to-rural-counties/.

[64] O'Neil, *supra,* at https://mn.gov/deed/newscenter/publications/trends/june-2025/metro.jsp.

[65] *Id.*

City of Saint Paul. Within this 1.5 percent, 0.5 percent sales tax funds the Sales Tax Revitalization ("STAR") Program for economic development and capital projects. The remaining 1 percent sales tax is dedicated to repairs and improvements of streets, bridges, parks, and recreational facilities. Saint Paul relies on this revenue to support City services.

208. Minneapolis collects Local Option Sales Taxes. Minneapolis assesses a 0.5% sales tax city-wide. When purchases are made in Minneapolis, that city-wide sales tax is collected and paid at the same time as the State's sales tax is collected and paid. Minneapolis also collects an entertainment tax of 3%, a downtown restaurant tax of 3%, a lodging tax of 3%, and a downtown liquor tax of 3%. Minneapolis uses its Local Option Sales Tax revenue to pay into its Downtown Assets Fund, which supports various downtown assets such as the Minneapolis Convention Center. After ensuring the health of the Downtown Assets Fund, Minneapolis may use remaining funds generated by local option sales taxes to support government functions. Revenue from the Entertainment Tax may support Minneapolis' General Fund. Remaining revenue from other local sales taxes must be used specifically for economic development and. These amounts are transferred to Minneapolis' General Fund.

209. Significant public reporting reflected that Operation Metro Surge reduced customer traffic and has caused some local businesses to close their doors altogether based

on the perceived risk of violence by DHS and concerns for employee and customer safety.[66]

Small business owners in Minneapolis (particularly along targeted areas of East Lake Street and Cedar Riverside) and in Saint Paul (particularly along targeted areas of Midway and the East Side)  reported decreases in customer traffic and the need to reduce business hours and stock.

210.    According to the Federal Reserve, "[f]irms in urban markets, especially Minneapolis–St. Paul, were negatively impacted by increased immigration enforcement actions. Hospitality and tourism firms, among others, said that legal, foreign-born workers were choosing not to work due to safety concerns, which were impacting operations as well as overall customer demand."[67]

211.    Businesses within Minneapolis have lost revenue, decreased hours, or closed altogether during periods of increased immigration enforcement.

---

[66] *See, e.g.*, *How ICE raids are threatening Twin Cities small businesses*, WCCO-CBS (Dec. 16, 2025) https://www.youtube.com/watch?v=DjOZsPaHKIU); *see also* Dee Depass, *ICE crackdown chills sales at immigrant-owned businesses*, The Star Tribune (Dec. 24, 2025) https://www.startribune.com/garbage-somali-protest-spend-st-joan-of-arc-trinity-church-raids-ice-minneapolis-st/601546734; *see also* Dustin Nelson, *Twin Cities businesses close in response to ICE presence,* Bring Me The News (Jan. 8, 2026) https://bringmethenews.com/minnesota-lifestyle/twin-cities-businesses-close-in-response-to-ice-presence; *see also* Dustin Nelson, *List of Twin Cities events cancelled and businesses closed in response to ongoing ICE presence*, Bring Me The News (Jan. 10, 2026) https://bringmethenews.com/minnesota-lifestyle/list-of-twin-cities-events-canceled-and-businesses-closed-in-response-to-ongoing-ice-presence).

[67] The Biege Book, Summary of Commentary on Current Economic Conditions by Federal Reserve District, at 37 (Feb. 2026), available at https://www.federalreserve.gov/monetarypolicy/files/BeigeBook_20260304.pdf

212.    Between March 23, 2026, and April 19, 2026, the USIPC conducted a probability-based survey of businesses in Minneapolis. The survey sample included 489 completed responses (margin of error +/- 4.4 percent).  A memorandum summarizing the Minneapolis business survey results is attached hereto as Exhibit B to the Amended Complaint and incorporated herein.

213.    The survey was conducted, evaluated, and interpreted using appropriate and accepted scientific and technical methods. The survey results and conclusions are reliable.

214.    Of those surveyed, 60.0 percent of businesses said Operation Metro Surge had a negative impact on their business.

215.    Of those reporting a negative impact, 72.0 percent reported decreased customer traffic; 66.6 percent reported customers avoiding the area of their business due to enforcement activity; 63.7 percent reported reduced sales or revenue; 59.2 percent reported reduced profits or owner income; 52.2 percent reported decreased demand for their products or services; 44.3 percent reported customers cancelling reservations or appointments; 40.4 percent reported reduced hours or days of operation; 25.5 percent reported having to temporarily close their business; and 1.6 percent reported permanently closing their business.

216.    Of those surveyed, 53.6 percent of businesses reported negative workforce impacts.

217.    Of those reporting negative workforce impacts, 67.2 percent reported employees missed work due to fear or safety concerns; 51.2 percent reported employees requesting fewer hours or schedule changes; 33.7 percent reported reducing operating

hours due to staffing shortages; 29.7 percent reported employees leaving their jobs or resigning; and 31.4 percent reported fewer workers applying for jobs.

218.    Based on responses to the survey, it was concluded that Minneapolis businesses lost more than $444 million in revenue because of Operation Metro Surge with impacts concentrated in restaurants, retail, and service-based business. It was further concluded that because the distribution of losses across sectors was right-skewed, median-based estimates should be interpreted as lower-bound estimates of revenue losses attributable to Operation Metro Surge.

219.    Businesses within Saint Paul have lost revenue, decreased hours, or closed temporarily due to ongoing and increasing immigration enforcement operations.

220.    Between March 17, 2026, and April 11, 2026, the USIPC conducted a probability based survey of businesses in Saint Paul. The survey sample included 405 completed responses (margin of error +/- 4.8 percent).  A memorandum summarizing the Saint Paul business survey results is attached hereto as Exhibit C to the Amended Complaint and incorporated herein.

221.    The survey was conducted, evaluated, and interpreted using appropriate and accepted scientific and technical methods. The survey results and conclusions are reliable.

222.    Of those surveyed, 61.0 percent of businesses said Operation Metro Surge had a negative impact on their business.

223.    Of those reporting a negative impact, 62.7 percent reported decreased customer traffic; 57.4 percent reported customers avoiding the area of their business due to enforcement activity; 47.9 percent reported reduced sales or revenue; 42.8 percent

reported reduced profits or owner income; 40.3 percent reported decreased demand for their products or services; 38.7 percent reported customers cancelling reservations or appointments; 25.2 percent reported reduced hours or days of operation; and 14.9 percent reported having to temporarily close their business.

224.    Of those surveyed, 57.6 percent of businesses reported negative workforce impacts.

225.    Of those reporting negative workforce impacts, 61.8 percent reported employees missed work due to fear or safety concerns; 33.5 percent reported employees requesting fewer hours or schedule changes; 26.3 percent reported reducing operating hours due to staffing shortages; 14.6 percent reported employees leaving their jobs or resigning; and 14.1 percent reported fewer workers applying for jobs.

226.    Based on responses to the survey, it was concluded that Saint Paul businesses lost $165,441,657 in revenue because of Operation Metro Surge. It was further concluded that because the distribution of losses across sectors was right-skewed, median-based estimates should be interpreted as lower-bound estimates of revenue losses attributable to Operation Metro Surge.

227.    The CEO of a prominent, immigrant-owned restaurant and grocery store located on the west side of Saint Paul, stated that its reduced hours of operation were because of increased federal immigration enforcement activity.

228.    Store employees at another immigrant-owned grocery store located in Saint Paul, noticed a sharp decline in foot traffic beginning December 5, 2025. A store employee

71

has stated that only "a quarter of people came out to shop," demonstrating a dramatic decrease in business.

229.    DHS consistently had a presence of vehicles and agents in the parking lot of a Karen-owned market in Saint Paul. Saint Paul has a large Karen population, and that population has reported that having DHS vehicles parked in that specific parking lot interferes with their ability to feel safe to purchase their culturally specific food which in turn harms the revenue of those local businesses.

230.    The reason reported for loss of revenue is that customers feared the presence of DHS agents at area businesses.

231.    Some Twin Cities businesses said that they risked permanent closure if the Defendants' tactics did not end. Because those fears impacted business operations and ultimately sales, property, and income taxes, Plaintiffs' operating budgets suffered.

232.    Event venues have cancelled scheduled events.[68]

233.     Immigrant-owned or immigrant-serving businesses that have remained open have experienced an uptick in harassment and threats.[69] These impacts are not limited to

---

[68] Dustin Nelson, *List of Twin Cities events cancelled and businesses closed in response to ongoing ICE presence*, Bring Me The News (Jan. 10, 2026) https://bringmethenews.com/minnesota-lifestyle/list-of-twin-cities-events-canceled-and-businesses-closed-in-response-to-ongoing-ice-presence).

[69] Carson Hartzog, *Harassment toward Somali businesses surges after viral video*, The Star Tribune (Jan. 9, 2026) https://www.startribune.com/harassment-toward-somali-businesses-surges-after-viral-video/601555420.

the Twin Cities; businesses in other regions of Minnesota have reported negative business impacts associated with DHS activities.[70]

234.    The Minneapolis Convention Center, owned by Plaintiff Minneapolis, provides about $250 million per year in economic impact to the regional economy and $20-25 million in direct revenue to the City of Minneapolis. Event activity in Minneapolis facilitates spending in the city which contributes sales and use taxes along with entertainment taxes in the amount of an estimated $100 million per year.  These taxes help pay for the city's hospitality infrastructure. The events at the Minneapolis Convention Center support over 8,600 local jobs and a larger hospitality workforce of more than 36,000. Minneapolis Convention Center events also attract visitors to downtown Minneapolis and are vital to maintaining a safe and thriving downtown area. Since the beginning of Operation Metro Surge, the Convention Center has had clients cancel previously scheduled events due to concerns related to ICE activity and the safety of event participants.

235.    When an event with a large number of individuals from out-of-town cancels it is particularly hard on the hospitality industry in Minneapolis as those hotel rooms are

---

[70] *Local immigrant businesses struggling amid ICE activity*, ABC 6 News- KAAL TV, January 9, 2026 (available at https://www.kaaltv.com/news/local-immigrant-owned-businesses-face-financial-challenges-amid-increased-ice-activity/) (describing similar fears and negative business impacts in Rochester).

unlikely to be filled at the last minute in Minnesota in January or February. Minneapolis also collects a local lodging tax which would be affected by the cancellations.

236.    Events are booked usually about five years in advance. This means both that a cancelled event cannot be replaced at the last minute by another event, and that events happening today that affect the public perception of the desirability and safety of Minneapolis as a destination have long-term effects on the ability of Minneapolis to book events at the Convention Center and Minneapolis's economic vitality.

237.    Meet Minneapolis, which is a marketing organization which handles sales and marketing for the Convention Center conducted an omnibus survey of 2,030 American travelers. Among Minneapolis-interested travelers, 20.6 percent altered plans to travel to a destination because of ICE activity. Nearly half of the general traveling population (46.1 percent) said they are likely to avoid a destination if they expect a visible federal law-enforcement presence.

238.    Businesses that shutter their doors and customers that choose to stay home out of fear reduce revenue for Plaintiffs. These revenue-reducing measures are reasonably foreseeable steps taken in direct response to the safety concerns Defendants have cultivated. Daycare and school closures also require Minnesotans to use leave or be absent from work to supervise their children at home.

239.    The impacts Plaintiffs describe herein are not limited to noncitizen immigrants staying home due to fears, or noncitizens being removed and therefore unable to patronize or work at businesses. Certainly, noncitizen immigrants comprise a small, but important, part of Minnesota's economic landscape. Data suggests that noncitizen

74

immigrants without legal status comprise just over 1.5 percent of Minnesota's total population (less than half the national average of 3.3 percent) and account for 2.2 percent of Minnesota's total labor force.[71]

240.    But Defendants created such a scope of fear, including for native-born citizens, naturalized citizens, and legally-present immigrants, that those groups also reported staying home, fearing that even carrying their passports and other forms of identification would be insufficient to protect them from the risk of illegal detainer, arrest, deportation, or other abusive deprivation of rights without due process.

241.    These fears were bolstered and exacerbated by Defendants. Widely circulated videos, from both within Minnesota and beyond, showed individuals pleading with DHS that they were United States citizens or legally present during chaotic, violent arrests, to no apparent impact. These fears were also borne out in Defendants' own apparent policy to initiate contact with random people within their line of sight based on race and ethnicity. Moreover, the Trump Administration also publicly announced a desire to "de-naturalize" or deport American citizens and meet peaceful protestors with retaliation and force, further contributing to the strongly-held impression that interactions with Defendants are inherently risky, even for law-abiding people.

---

[71]    Cameron Macht, *The Role of Undocumented Immigrants in Minnesota's Workforce*, Minnesota Department of Employment and Economic Development (March 2025) https://mn.gov/deed/newscenter/publications/trends/mar-2025/immigrants.jsp; *see also 50 States: Immigrants by Number and Share*, Immigration Research Initiative (Jan. 24, 2025) https://immresearch.org/publications/50-states-immigrants-by-number-and-share/.

242.    Other jurisdictions that have faced surges of militarized forces (either by DHS or by federalized National Guard troops) confirm economic harms are a natural consequence which is already known to Defendants. For example, in November 2025, Chicago business owners reported "pandemic-era" drops in sales amidst DHS' "Operation Midway Blitz."[72] In Washington, D.C., when the Trump Administration federalized National Guard troops with the supposed purpose of cutting down on violent crime rates, data revealed that out-of-town visitor spending was not negatively impacted, but resident spending fell dramatically: those who lived there and were invested in their community were "turned off" from spending in the region.[73] These harms occurred with far fewer DHS agents present than were deployed in Minnesota, therefore Defendants would have known that the economic consequences of so many agents would be that much more dire, and that such a consequence was intended.

243.    By causing employees to miss work, Operation Metro Surge also harmed Minnesota's revenue by decreasing the income base that is subject to state income tax.

---

[72]    Joanna Hernandez, *In Chicago, Some Businesses Report Pandemic Era Drop in Sales Amid Immigration Raids*, WTTW, (Nov. 6, 2025) https://news.wttw.com/2025/11/06/chicago-some-businesses-report-pandemic-era-drop-sales-amid-immigration-raids; *see also* Nathaniel Meyersohn, *Trump's mass deportation push is crushing local economies,* CNN (Oct. 16, 2025) https://perma.cc/R2PP-8BEP

[73]    Tracy Hadden Loh and Glencora Haskins, *Consumer Spending and visitor demand in the Washington, DC region are dropping,* Brookings, (Dec. 12, 2025) https://www.brookings.edu/articles/consumer-spending-and-visitor-demand-in-the-washington-dc-region-are-dropping/.

244. The USIPC Surveys also quantified aspects of Operation Metro Surge's negative economic impact.

245. Respondents were asked if they missed work due to Operation Metro Surge. In Minneapolis, among those in the workforce, 35.7 percent said "yes" to missing work because of Operation Metro Surge. Workers in Minneapolis missed an average of 7.9 days of work. In St. Paul, among those in the workforce, 20.5 percent said "yes" to missing work because of Operation Metro Surge. Workers in St. Paul missed an average of 11.4 days of work.

246. In Minneapolis, respondents who reported an interaction with DHS agents were 39.6 percent more likely to miss work during Operation Metro Surge compared to respondents who did not report an interaction and this difference is systematic and non-random.

247. In Saint Paul, respondents who reported an interaction with DHS agents were 26.8 percent more likely to miss work during Operation Metro Surge compared to respondents who did not report an interaction and this difference is systematic and non-random.

248. Minneapolis respondents who were questioned about their immigration or citizenship status were 15.7 percent more likely to miss work; respondents who were distrusted despite showing identification were 35.9 percent more likely to miss work; respondents who were randomly stopped while walking were 36.4 percent more likely to miss work; respondents who were randomly pulled over while driving were 17.9 percent more likely to miss work; respondents who were shown an administrative or judicial

warrant were 44.8 percent more likely to miss work; respondents who reported that federal immigration enforcement officials entered their homes despite refusing entry were 35.3 percent more likely to miss work; respondents who reported an interaction at or near a sensitive location were 22.7 percent more likely to miss work; respondents who were detained were 32.6 percent more likely to miss work; respondents who reported that physical force was used against them were 25.0 percent more likely to miss work; respondents who reported that chemical agents were used against them were 30.1 percent more likely to miss work; respondents who reported that weapons were drawn against them were 29.9 percent more likely to miss  work; and respondents who reported that weapons were drawn against them during the course of their interaction were 40.4 percent more likely to miss work.

249.    Saint Paul respondents who were questioned about their race, ethnicity, or national origin were 33.8 percent more likely to miss work; respondents who were questioned about speaking English were 26.6 percent more likely to miss work; respondents who were distrusted despite showing identification were 27.4 percent more likely to miss work; respondents who were shown an administrative or judicial warrant were 51.0 percent more likely to miss work; respondents who reported that federal immigration enforcement officials entered their homes despite refusing entry were 33.7 percent more likely to miss work; respondents who were detained were 32.9 percent more likely to miss work; respondents who reported that chemical agents were used against them were 50.8 percent more likely to miss work; respondents who reported that weapons were drawn against them were 30.8 percent more likely to miss work; and respondents who

reported that weapons were drawn against them during the course of their interaction were 31.9 percent more likely to miss work.

250. Operation Metro Surge is estimated to have resulted in $189.2 million in lost wages in Minneapolis and $54.6 million in St. Paul.

251. These lost wages reduced Minnesota's income tax revenue and were caused, predictably, by Operation Metro Surge.

## X. Operation Metro Surge Is Characterized By Military Tactics, Size, Scope, And Duration That Exceed Defendants' Statutory Authority.

252. Operation Metro Surge involved the deployment of 3,000-4,000 federal agents to the Twin Cities. Defendants' agents were heavily militarized and deployed wearing masks and wielding instruments of war to carry out domestic shock and awe tactics to intimidate the populace.

253. The federal government has never deployed such a large number of immigration agents in this fashion before. Operation Metro Surge represents a novel use of federal immigration statutory authority that blows past historical precedents.

254. "Courts must exercise their independent judgment in deciding *whether an agency has acted within its statutory authority*, as the [Administrative Procedure Act (APA)] requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (emphasis added). The Court noted that "Congress in 1946 enacted the APA 'as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices.'" *Id*. (quoting *United States v. Morton Salt*, 338 U.S. 632, 644 (1950)).

255.    "Agencies have only those powers given to them by Congress" and when an agency asserts its statutory authority in a broad or novel way that has major "economic and political significance," courts must "hesitate before concluding that Congress meant to confer such authority." *W. Virginia v. EPA*, 597 U.S. 697, 721, 723 (2022) (cleaned up). Because courts must "presume" that Congress "intends to make major policy decisions itself, not leave those decisions to agencies," courts must apply "common sense" and assume Congress did not provide extraordinary authority through implicit grants or vague language. *Id.* at 723.

256.    When an agency exercises its authority in a novel way that will have significant social and economic consequences, a "colorable" or "plausible textual basis for the agency action" is not enough—the agency must instead show a "clear congressional authorization" for the power it claims." *Id.* at 722-23. *See also DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 51 (2020) (Thomas, J., concurring) (noting "DHS could not appeal to general grants of authority" like the authority to establish "national immigration enforcement policies" because "adopting a broad interpretation of these general grants of authority would run afoul of" various rules of statutory interpretation, including the "expectation that Congress speaks clearly when it delegates the power" to make decisions with major economic and political significance).

257.    Defendants' authority to utilize federal immigration agents is limited and defined by statute and regulation. CBP duties and powers are defined, e.g., in 6 U.S.C. § 211. ICE agents' duties and powers are, inter alia, defined in 8 U.S.C. § 1357. Relevant statutory definitions of powers and duties are also found in 8 U.S.C. § 1103.

258.    Nothing in these, or any other statute, give Defendants that authority to deploy emigration agents in the manner of Operation Metro Surge.

259.    Further, the executive branch's historical use of immigration enforcement agents establishes that Operation Metro Surge was extraordinary and unlawful. These historical precedents span multiple administration and include: Operation Wagon Train in 2006; a May surge in California; a 2008 surge in the Carolinas and Georgia; Operation Cross Check in 2011-2015; a 2014 surge in Wisconsin; a 2014 surge in Texas; Project Wildfire in 2015; Project Shadowfire in 2016; the Midwest Enforcement Action in 2016; the 2014 Midwest Operation; a 2015 Nationwide operation; 2016 Family Enforcement Operations; the 2017 First 100 Days Surge; a 2017 Los Angeles operation; and 2017 nationwide gang surge; the 2018 Operation SOAR; and a 2024 Houston area operation.

260.    These historical examples of immigration enforcement surges and operations were nothing like the paramilitary invasion and tactics that characterized Operation Metro Surge. The historical precedent therefore supports the conclusion that Defendants lacked the statutory authority to execute Operation Metro Surge.

**A. Defendants Have No Statutory Authority to Deploy ICE and CBP Agents as a De Facto Standing Domestic Army.**

261.    The Framers of the United States Constitution feared a king or tyrant that would use a standing army against its own citizens. Starting with the Declaration of Independence, the Framers spoke out against large bodies of armed troops that were "protect[ed] . . . by a mock Trial from punishment for any Murders which they should commit on the Inhabitants of these States."

262.    In designing our federal system of checks and balances, the Framers assured that military power was divided between Congress, the Executive, and the States, specifically to guard against the possibility of an Executive consolidating all military power and using it against the populace. *See* The Federalist Papers Nos. 29 and 45; U.S. CONSTIT. Art. I, Section 8, Art. II, Section 2, and Amendment X.

263.    Following the Civil War, Congress enacted the Posse Comitatus Act to further prohibit the use of the military to execute domestic laws, except where expressly authorized by the Constitution or an Act of Congress. *See* 18 U.S.C. § 1385.

264.    This prohibition on the Executive consolidating and using the military against the people is therefore a core principle to our federal system and to the rule of law.

265.    Operation Metro Surge was, in essence, the domestic deployment of a paramilitary force of 3,000-4,000 masked, armed, camouflaged agents over the repeated objections of Plaintiffs.[74]

266.    The equipment Defendants have outfitted their 4,000 agents with is military equipment, designed for close combat fighting and employed by the Armed Forces in foreign military wars and armed conflicts including Afghanistan and Iraq.

267.    As reported by a U.S. Marine Corps veteran in the New York Times, the gear used by DHS agents on civilians in Minnesota is "the physical manifestation of decades of war, fine-tuned and perfected for close-quarters killing over myriad operations in faraway lands but now wielded in broad daylight in American cities. This type of equipment is often reserved for SWAT and hostage rescue units."[75]

268.    On January 11, 2026, no fewer than eight DHS agents showed up on the doorstep of Teyana Gibson Brown, a Minneapolis resident, armed with military tactical gear and weapons including silencers, MAWLS (modular advanced weapons lasers) MLOK Rails (widely used across the Armed Forces), dump pouches for spent ammunition cartridges and rifle combat magwell to widen the rifle's magazine aperture and make reloading faster.

---

[74] Defendant's Response to Court's Question Regarding Size of Operation Metro Surge at 2, State of Minnesota v. Noem, No. 0:26-cv-00190-KMM-DJF (Jan. 26, 2026).

[75] Thomas Gibbons-Neff, *The Height of Close-Combat Weaponry Is on This Woman's Doorstep*, New York Times, Jan. 28, 2026.

269.     Hundreds if not thousands of photographs and videos throughout Operation Metro Surge depict the weapons of war carried by DHS agents and used against Plaintiffs' residents to inflict two fatalities, dozens of injuries, widespread property damage, and most of all fear, submission, and oppression by a military force against residents.

270.     At the same time, Defendants agents have failed to engage in any reasonable enforcement of federal immigration law and instead have interfered with the ordinary policing functions of Plaintiffs and acted as a posse comitatus towards Plaintiffs' residents writ large, regardless of citizenship or immigration status.

271.     On January 29, 2026, Border Czar Tom Homen described the DHS agents in Minnesota as people who "have been in theater[76] eight months.  Some of these people have been in theater eight months . . . . [T]hey've been in theater a long time."[77]

272.     Defendants' tactics of imposing quotas for arrests, deploying chemical irritants to disperse lawful assemblies or protests, implementing policies dispensing with basic Constitutional guarantees under the First, Third, Fourth, Fifth and Sixth Amendments, and stopping, detaining, and arresting Plaintiffs' residents without judicial

---

[76] "Theater" in this context refers to "theater of war," defined as "the entire land, sea, and air area that is or may become involved directly in war operations."  https://www.merriam-webster.com/dictionary/theater%20of%20war.

[77] *Border czar Tom Homen holds press conference in Minneapolis*, Associated Press, YouTube (Jan. 29, 2026), https://www.youtube.com/watch?v=IQ1xHRIhdMo&t=1918s (relevant portion beginning at 31:56. and ending at 32:03).

warrants or probable cause that a federal law has been violated are tactics of an occupying army, not federal law enforcement agents.

273. Defendants lack the statutory authority to use immigration agents as a standing army to be deployed domestically and unbridled by statutory constraints placed on the domestic deployment of the military.

**B.   Previous Administrations Have Never Used ICE and CBP Agents as They Were in Operation Metro Surge.**

274. No previous federal administration has interpreted ICE and CBP's authority to extend to an operation on a scale that comes anywhere close to that of Operation Metro Surge.

275. "[T]he contemporaneous construction" of statutory authority by "those who were called upon to act under the law, and were appointed to carry its provisions into effect" carries great weight, especially where it has been "the longstanding practice of the government." *Loper Bright*, 603 U.S. at 386.

276. The federal government has never deployed such a large number of immigration agents in a single metro area. Further, the length of time that Operation Metro Surge continued with such intense activity was unprecedented.

277. The disproportionate number of officers and size of the operation in Minnesota is also demonstrated by the way in which Operation Metro Surge has outstripped complementary federal staffing to carry out related activities that are necessary as part of any immigration enforcement operation.

278.    The surge in ICE and CBP activity outstripped DOJ's capacity to manage related litigation, as demonstrated by the well-documented pattern of DOJ failing to comply with court orders.

279.    The history of enforcement across prior Administrations, including enforcement surges, demonstrates that Operation Metro Surge is out of proportion to past surges both in terms of number of agents and length.

280.    Operation Metro Surge extends beyond ICE and CBP's statutory and regulatory authority, which never authorized the deployment of 3,000-4,000 militarized federal agents to a single metropolitan area in the manner of a domestic military deployment.

281.    Instead, this kind of action provided the basis for one of the indictments against King George in the Declaration of Independence: "He has . . . sent hither Swarms of Officers to harass our People."

## XI.    Defendants' Unlawful And Arbitrary And Capricious Final Agency Actions.

282.    Operation Metro Surge itself is the result of an agency action, taken contrary to law, to develop and launch an operation aimed at spiking fear as an immigration enforcement tool.

283.    During Operation Metro Surge, Defendants have terminated longstanding policies governing immigration enforcement, instead adopting policies and taking final agency actions that are contrary to law and arbitrary and capricious.

284.    Each of Defendants' actions have caused sovereign and proprietary injuries to Plaintiffs. Herein, Plaintiffs allege the below unlawful agency actions and their related

resulting injuries. The intensity and violence of Defendants' conduct was intended to and continues to exacerbate Plaintiffs' injuries.

**A. Defendants' Arbitrary and Capricious Termination of Sensitive Locations Policy and Subsequent, Recurring, Violent Enforcement Activity in Sensitive Locations.**

285.    Defendants have had a long-standing policy and practice, dating back to at least the early 1990s, of immigration authorities avoiding immigration enforcement in or near certain locations known as "sensitive" or "protected" locations.

286.    With a dozen memoranda from 1993 to 2016, Defendants established a longstanding policy of avoiding immigration enforcement activities in sensitive locations, such as schools, churches, hospitals, and courthouses.

287.    In 2018, ICE issued Directive No. 11072.1 (the "Directive"), explicitly authorizing civil immigration arrests inside federal, state, and local courthouses.[78]

288.    Following the change in administrations, DHS issued a Memorandum on April 27, 2021, revoking the 2018 ICE Directive and replacing it with guidance limiting the conduct of civil courthouse arrests. Then, on October 27, 2021, DHS issued a memorandum entitled "Guidance for Enforcement Actions in or Near Protected Areas" that superseded a 2011 memorandum and further strengthened the sensitive locations

---

[78]    ICE, *Directive Number 11072.1: Civil Immigration Enforcement Actions Inside Courthouses*    (Jan.    10,    2018)    (available    at https://www.ice.gov/sites/default/files/documents/Document/2018/ciEnforcementActions Courthouses.pdf).

policy. [79] The 2021 Memorandum prohibits enforcement action, to the fullest extent possible, "in or near a location that would restrain people's access to essential services or engagement in essential activities." The 2021 Memorandum also set forth a more expansive list of sensitive locations. The list includes but is not limited to: schools, medical care facilities, places of worship, daycare, and funeral homes.

289. On January 20, 2025, DHS under the Trump Administration revoked the 2021 policy prohibiting immigration arrests in sensitive locations such as schools, courthouses, and hospitals.

290. That same day, Acting DHS Director Benjamine Huffman issued a short memo stating that immigration officers are only required to use "a healthy dose of common sense" when conducing immigration enforcement actions, and that "bright line rules regarding where or immigrations laws are permitted to be enforced" are not necessary. [80] Thus, the memo stripped all protections for sensitive locations or protected areas, including the requirements to refrain from conducting enforcement actions in these places except in extraordinary circumstances which required prior approval or exigent circumstances.

---

[79] *Memorandum from Alejandro N. Mayorkas, Guidelines for Enforcement Actions in or Near Protected Areas,* Department of Homeland Security (Oct. 27, 2021) (available at https://www.dhs.gov/sites/default/files/publications/21_1027_opa_guidelines-enforcement-actions-in-near-protected-areas.pdf).

[80] Memorandum from Benjamine C. Huffman, *Enforcement Actions in or Near Protected Areas*, Department of Homeland Security (Jan. 20, 2025) (available at https://www.dhs.gov/sites/default/files/2025-03/25_0120_S1_enforcement-actions-in-near-protected-areas.pdf).

291.    The next day, DHS issued a press release announcing the rescinded protected areas policy. DHS "explained" that the "Biden Administration's" policy "tie[d] the hands" of law enforcement, and the new policy would stop "criminal aliens—including murders [sic] and rapists" from "hid[ing] in America's schools and churches to avoid arrest."[81]

292.    DHS offered no logical explanation for departing from three decades of consistent policies; it simply issued the above referenced press release. But the "explanation" given is not credible; it runs counter the guidelines in the 2021 Policy, which exempted from any restrictions enforcement actions targeting violent or dangerous criminals.

293.    It is also implausible and unsupported; DHS offered no supporting evidence that *any* undocumented immigrants—let alone a statistically significant number—who committed murder or sexual assault were "hiding" in schools or churches.

294.    DHS also did not consider the reliance interests of those who may be impacted by a change in their policies, as required. In rescinding the 2021 Policy, DHS gave no consideration to the interests of individuals, organizations, and state and local governments. It paid no mind to the potential impact on affected entities, including healthcare providers, social services providers, schools, or city parks and recreation locations. It did not evaluate how its action would affect the people who have come to rely

---

[81] *Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole*, Department of Homeland Security (Jan. 21, 2025) (available at https://www.dhs.gov/news/2025/01/21/statement-dhs-spokesperson-directives-expanding-law-enforcement-and-ending-abuse).

on services provided at these sensitive locations. It did not consider any of the facts or reasoning supporting the 2021 Policy. It did not explain why the policies of the last three decades were insufficient, nor what change in circumstances necessitated the sudden departure. It did not describe why the public policy and safety concerns cited by agency leaders in past memos no longer applied. And it evaluated no alternative approaches. These are all hallmarks of arbitrary and capricious agency actions.

295.    The USIPC Surveys show that in Minneapolis, 72.8 percent of respondents who reported an interaction with federal immigration enforcement agents at or near a sensitive location missed work during Operation Metro Surge compared to 50.2 percent of respondents who did not report an interaction at or near a sensitive location. This 22.7 percent difference is statistically significant. In other words, respondents who reported an interaction with federal immigration enforcement agents at or near a sensitive location were 22.7 percent more likely to have missed work during Operation Metro Surge and this difference is systematic and non-random.

296.    Moreover, 77.2 percent of respondents who reported an interaction with federal immigration enforcement agents at or near a sensitive location missed a scheduled medical appointment during Operation Metro Surge compared to 44.5 percent of respondents who did not report an interaction at or near a sensitive location. This 32.7 percent difference is statistically significant. In other words, respondents who reported an interaction with federal immigration enforcement agents at or near a sensitive location were 32.7 percent more likely to have missed a scheduled medical appointment during Operation Metro Surge and this difference is systematic and non-random.

297.    In St. Paul, 76.9 percent of respondents who reported an interaction with federal immigration enforcement agents at or near a sensitive location are less likely to seek help from law enforcement compared to 53.3 percent of respondents who did not report an interaction at or near a sensitive location. This 23.7 percent difference is statistically significant . In other words, respondents who reported an interaction with federal immigration enforcement agents at or near a sensitive location are 23.7 percent less likely to seek help from law enforcement and this difference is systematic and non-random.

298.    Immigration enforcement at sensitive locations, as well as Operation Metro Surge itself, has interfered with the free exercise of religion. Plaintiffs' residents avoided churches, synagogues, mosques, and temples; and they declined opportunities to receive pastoral care.[82]

299.    Immigration enforcement at courthouses has also interfered with Plaintiffs' administration of justice. Enforcement at courthouses deters witnesses and victims from going to court. Further, a witness who is arrested while waiting to testify cannot fulfill their legal obligation. A defendant arrested in the hallway before their hearing cannot exercise their right to appear, and a victim is robbed of the opportunity to seek justice. An attorney who cannot safely advise their client in the courthouse cannot provide effective

---

[82]    Kyle Cheney, *Churches vs. Ice,* Politico (Feb. 26, 2026), https://www.politico.com/news/2026/02/26/ice-immigration-churches-lawsuits-00802076.

representation. These are not abstract concerns. They are documented realities in Minnesota courts recently.

300.   As set forth above, and on information and belief, Defendants have targeted Minnesota residents at these sensitive locations. This has caused harm to Plaintiffs' cognizable interest in public safety, and the health and wellbeing of their residents.

**B. Defendants' Unlawful Roving Patrols Policy.**

### 1. Roving Patrols and Indiscriminate Questioning.

301.   In 2017, Tom Homan, then Acting Director of ICE, explained that ICE "conducts targeted immigration enforcement actions" based on "a lot of investigatory and intelligence work developing leads on where we may locate the target of the arrest," with a focus on "specific individuals with a criminal history." Homan further explained that ICE "do[es] not conduct neighborhood raids or sweeps; instead, our officers go to a specific location to locate a specific individual."

302.   But, to meet the ever-increasing arrest quotas set by the Trump Administration, Defendants abandoned these practices and adopted an unlawful "Roving Patrol Policy," questioning residents they randomly encountered about citizenship and immigration status without any reasonable articulable basis to believe they are unlawfully present in the United States.

303.   Defendant Greg Bovino was hand-selected as a commander who was eager to implement this policy. Public reporting indicates that DHS received complaints that Bovino instructed agents to engage in racial profiling, and that during his time in Los

Angeles (before becoming commander of Operation Metro Surge) he was warned that his tactics could result in fatalities.[83]

304.   U.S. citizens are not required to carry or produce proof of citizenship during daily activities.

305.   The Roving Patrol Policy sought to boost arrest numbers. Agents were instructed to meet quotas—75 arrests per field office or more than 1,800 nationwide per day in January 2025, later raised in May 2025 to 3,000 nationwide daily. Defendant Stephen Miller promised that the administration was "going to keep pushing to get that number up higher each and every day."

306.   On December 31, 2025, DHS claimed its goal was to remove 100 million residents from the United States.[84]

307.   Leadership encouraged aggressive tactics; in June 2025, Acting ERO Director Defendant Marco Charles told agents to "turn up the creative knob to 11 and push the envelope."

308.   In addition to encouraging neighborhood raids and sweeps, Defendants also directed agents to arrest as many "collateral" individuals as possible during operations,

---

[83] Katie J. M. Baker and Hamed Aleaziz, *Greg Bovino's final days: Harsh words and few regregs,* The Minnesota Star Tribune (Mar. 24, 2026),https://www.startribune.com/greg-bovinos-final-days-harsh-words-and-few-regrets/601634609.

[84] As a point of reference, the entire population of the United States is currently less than 350 million individuals and that number includes individuals who are here without legal status.                     https://www.census.gov/topics/population.html https://www.census.gov/topics/population/foreign-born/about/faq.html.

regardless of warrants. "Collateral" individuals are persons an immigration officer happens to encounter when seeking to arrest a specific person identified in a warrant. Defendant Charles reportedly directed via email that "[A]ll collaterals encounter[d] need to be interviewed and anyone that is found to be amenable to removal needs to be arrested . . . we need to turn up the creative knob up to 11 and push the envelope."[85]  On the television news program 60 Minutes, Defendant Charles stated, "Our officers are conducting targeted enforcement looking for the worst of the worst.  If they encounter anybody in the area of which they are operating, they are ok to talk to those people. They'

309.    Defendant Bovino has confirmed the policy, stating publicly during a CNN interview, "I can question anyone anywhere in the United States as to their citizenship . . . and our agents are trained to do that."

310.    Defendants have repeatedly implemented the Roving Patrol Policy in Plaintiffs' jurisdictions.

311.    Contrary to Defendant Bovino's assertions, immigration officers only have authority to question people "as to [their] right to be or to remain in the United States" in certain circumstances, and not just "anyone anywhere in the United States." *See* 8 U.S.C. § 1357(a).

### 2. Defendants Implement Roving Patrols in Minnesota.

---

[85] Jose Olivares, *US immigration officers ordered to arrest more people even without warrants,* The Guardian (June 4, 2025), https://www.theguardian.com/us-news/2025/jun/04/immigration-officials-increased-detentions-collateral-arrests

312.   The USIPC Surveys demonstrate that Defendants deployed widespread roving patrols in Minnesota.

313.   Despite being described as targeted immigration enforcement actions aimed at the "worst of the worst," the USIPC Surveys show that federal immigration enforcement agents frequently engaged in broad, non-targeted stops of residents. In Minneapolis, among those who reported having at least one interaction with federal immigration enforcement agents during Operation Metro Surge, 43.9 percent said that they were randomly stopped on the street by federal immigration enforcement agents while walking and 54.0 percent said that they were randomly pulled over by federal immigration enforcement agents while driving. 58.5 percent said that they were asked about their immigration or citizenship status; and 46.7 percent said that federal immigration enforcement agents did not believe they were lawful permanent residents or U.S. citizens despite showing them identification.

314.   In St. Paul, among those who reported having at least one interaction with federal immigration enforcement agents during Operation Metro Surge, 36.5 percent said that they were randomly stopped on the street by federal immigration enforcement agents while walking and 30.3 percent said that they were randomly pulled over by federal immigration enforcement agents while driving. 29.8 percent said that they were asked about their immigration or citizenship status; and 20.8 percent said that federal immigration enforcement agents did not believe they were lawful permanent residents or U.S. citizens despite showing them identification.

315.   The Roving Patrol Policy was also more likely to be employed against persons of color than against white individuals. Persons of color in Minneapolis were 16.3

95

percent more likely to be randomly stopped while walking or randomly pulled over while driving compared to white respondents and this difference is systematic and non-random.

316.    The Roving Patrol Policy has severely impacted Plaintiffs' residents' ability to go about their daily lives free from Defendants' intrusion and demands for information. This diminishes the freedom and security of Minnesota residents and deprives them of rights secured under the Minnesota Constitution and federal law.

317.    As such the Roving Patrol Policy has caused many of Plaintiffs' residents to miss work and to refrain from patronizing Minnesota businesses, and it has caused businesses to shut down temporarily and permanently. These results have injured Plaintiffs by decreasing particular revenue streams which are identified elsewhere in this Complaint as will be further evidenced with expert and fact discovery.

318.    The Roving Patrol Policy caused chaos and disruptions on State- and City-managed property, roads, and sidewalks, required the State, Minneapolis, and Saint Paul to divert resources, and it increased distrust between law enforcement and communities, which interferes with Plaintiffs' law enforcement priorities.

319.    Under the Roving Patrol Policy, federal agents in Minnesota are questioning individuals far from the border without any basis to believe they lack lawful status. This shift from targeted enforcement to indiscriminate questioning is arbitrary, capricious, and violates 8 U.S.C. § 1357(a), which limits questioning to those agents reasonably believe are non-citizens.

### C. Defendants' Unlawful Biometric Scanning Policy.

320. Congress strictly limits DHS's authority to collect or store biometric information, permitting it only in narrow circumstances such as from visa applicants and at entry and exit points. 8 U.S.C. §§ 1201(b), 1365b(a), 1365b(c)(2), 1365b(d), 1731(a).

321. Outside of the border, Congress authorized DHS to secure biometric information from immigrants only after a removal proceeding is initiated. 8 U.S.C. § 1357(f); 8 C.F.R § 236.5.

### 1. Capture and Retention of Biometric Information

322. To implement Congress's directive for a biometric entry-exit system, CBP developed and deployed facial recognition technology known as Traveler Verification Service (TVS).

323. CBP used TVS facial recognition technology to match photographs taken of arriving or departing travelers with biometric templates generated from pre-existing photographs maintained by CBP, including photographs captured by CBP during previous entry inspection, photographs from U.S. passports and visas, and photographs from other DHS encounters.

324. U.S. citizens could decline to have their photographs taken as part of the biometric entry-exit program. For U.S. citizens who consented to participate in the biometric entry-exit program, CBP retained facial photographs only until their identities were verified.

325. CBP recognized that "the collection of biometrics is a privacy-sensitive practice." Accordingly, CBP issued Privacy Impact Assessments (PIAs) documenting each

97

new phase of TVS testing and deployment, culminating in a comprehensive, 49-page Privacy Impact Assessment issued in November 2018.

326.    In September 2023, DHS issued Directive 026-11, instituting what DHS described as "the most extensive requirements of any Federal agency" to ensure that facial recognition and capture technologies ("FR/FC technologies") were "used properly" "to support critical law enforcement investigations, while protecting privacy and individual rights."

327.    DHS Directive 026-11, "Use of Face Recognition and Face Capture Technologies," imposed strict safeguards on facial recognition and capture technologies, including bias testing, opt-out rights for U.S. citizens, and oversight by privacy and civil rights offices.

328.    DHS rescinded DHS Directive 026-11 sometime on or before February 14, 2025.

329.    In June 2025, CBP launched a mobile application called Mobile Fortify that scans fingerprints and performs facial recognition. The application then compares the collected data to biometric information stored in a number of DHS databases, including TVS, Border Patrol's Seizure and Apprehension Workflow, and DHS's Office of Biometric Identity Management's ("OBIM") Automated Biometric Identification System ("IDENT"), which holds immigration history information.

330.    Unlike TVS, DHS does not limit Mobile Fortify to use at ports of entry and exit. DHS does not restrict when, where, from whom, or the circumstances under which immigration agents may take biometric information using Mobile Fortify. According to a

98

February 2025 DHS Privacy Threshold Analysis, immigration officers may use Mobile Fortify to take biometric information "[w]hen ICE agents or officers encounter an individual or associates of that individual."

331.    The February 2025 DHS Privacy Threshold Analysis states that "ICE agents do not know an individual's citizenship at the time of initial encounter and will use the Mobile Fortify mobile application to determine or verify the individual's identity." It states that "the intended purpose of the Mobile Fortify Application is to identify aliens who are removable from the United States," but expressly authorizes agents to "use Mobile Fortify to collect information in identifiable form about individuals regardless of citizenship or immigration status." DHS acknowledges that a "photo taken by an agent using the Mobile Fortify mobile application could be that of someone other than an alien, including US. citizens or lawful permanent residents."

332.    ICE and CBP do not provide the opportunity for individuals to decline or consent to the collection and use of face photographs and fingerprint scans, and DHS has not identified any policies, practices or procedures limiting, or governing its use of Mobile Fortify. Prior PIAs and Privacy Act system of records notices ("SORNs") were seemingly developed with respect to other technologies that differ from Mobile Fortify in terms of functionality, purpose, and scope of use.

333.    DHS retains all biometric information (both face photographs and fingerprints) taken using the Mobile Fortify app, including that of U.S. citizens, for 15 years.

99

334.   The policy to use Mobile Fortify for interior removal investigations represents significant departures from the CBP's TVS system entry-exit program.

335.   Defendants are using Mobile Fortify to scan the fingerprints and faces of people in Minnesota.

336.   The rescission of DHS Directive 026-11 and the issuance of the February 2025 DHS Privacy Threshold Analysis marked the consummation of Defendants' decision-making process and determined the rights or obligations from which legal consequences flowed.

### 2. Defendants Implemented the Biometric Scanning Policy in Minnesota.

337.   In January 2026, at least seven American citizens were told explicitly by Defendants' agents that those citizens were recorded with facial recognition technology in and around Minneapolis. Photographs of these incidents show that Defendants' agents were using Mobile Fortify.[86]

338.   And other Minnesotans have reported notifications from the federal government stating that due to their involvement in observation activities concerning Defendants' agents, their expedited airport security screening privileges had been revoked.

### 3. Defendants' Biometric Scanning Policy Has Injured Plaintiffs.

---

[86] Sheera Frenkel and Aaron Krolik, *How ICE already knows who Minneapolis protestors are,* The Minnesota Star Tribune (Jan. 30, 2026), https://www.startribune.com/how-ice-already-knows-who-minneapolis-protesters-are/601573934.

339.    The indiscriminate use of Mobile Fortify to capture and retain biometric data of Minnesota residents, including U.S. citizens, negates Minnesota's constitutional and statutory protections on the capture, retention, and use of such information, violates Minnesota law, interferes with Plaintiffs' ability to administer public programs, exceeds DHS's statutory authority on the deployment of this technology, and is arbitrary and capricious.

340.    Fear of Defendants' indiscriminate use of Mobile Fortify to capture and retain biometric data has caused Plaintiffs' residents to miss work, to decide to refrain from patronizing Minnesota businesses, and it has caused businesses to shut down temporarily and permanently. These results have injured Plaintiffs by decreasing particular revenue streams which are identified elsewhere in this Complaint and will be further quantified and characterized with expert and fact discovery.

### D.  Defendants' Unlawful Conceal Plates Policy

#### 1. Defendants Hide, Remove, and Swap License Plates in Violation of State and Federal Law.

341.    DHS has adopted an unlawful and arbitrary "Conceal Plates Policy" allowing immigration agents to conceal, remove, or swap legally required license plates when engaged in enforcement activities in Minnesota.

342.    Motor vehicles that the federal government owns, leases commercially, or leases through the General Services Administration Fleet generally must use U.S. Government license plates, unless an exception applies. 41 C.F.R. §§ 102-34.5(a), 102-34.90. Federal regulations include an exemption for "[m]otor vehicles used primarily for

investigative, law enforcement, intelligence, or security duties . . . when identifying these motor vehicles would interfere with those duties." 41 C.F.R. § 102-34.155(a).

343.   When a federal government vehicle is exempt from the requirement to display U.S. Government plates, it must instead "display the regular license plates of the State, Commonwealth, territory or possession of the United States, or the District of Columbia, where the motor vehicle is principally operated." 41 C.F.R. § 102.34.155(b). Exempt vehicles also "must be registered and inspected in accordance with the laws of the jurisdiction where the motor vehicle is regularly operated." 41 C.F.R. § 102-34.120.

344.   Minnesota law requires vehicles registered in Minnesota to display both front and back license plates. Minn. Stat. § 169.79, subd. 6. Minnesota drivers shall keep their license plates "legible and unobstructed." Minn. Stat. § 169.79, subd. 7. Vehicles must display their assigned license plates; plate switching, which obscures the true plate of a particular vehicle, is not allowed, regardless of the reason for doing so.  Minn. Stat. § 169.79, subd. 1.

### 2. Defendants Have Implemented the Conceal Plates Policy in Minnesota.

345.   Minnesota's Driver and Vehicle Services ("DVS") has received numerous reports that Defendants have been seen changing or removing license plates on vehicles their agents have been using in their immigration enforcement efforts.

346.   One observer, Luke Mielke, observed ICE agents outside of the Whipple building changing license plates on the vehicles that they were using.

347.    DVS has also received reports that identical license plates have been used on separate vehicles.

348.    In January 2026, Defendants' agents were observed driving a Jeep Cherokee with license plates registered to a Porsche 911.

349.    Defendants' agents were also observed driving a Chevy Tahoe without any license plates, and another Jeep with license plates registered to a Ferrari with expired tabs from 2019.

350.    As shown below, on January 9, 2026, Defendants' agents were observed in Edina, MN, operating a Dodge Durango without a rear license plate.



351.    A Minnesota Star Tribune review of more than 100 Minnesota license plates attached to immigration enforcement vehicles showed that nearly 60 percent were not registered with the state of Minnesota, including the Chevy Tahoe that federal agent Jonathan Ross traveled in the day he fatally shot Renee Good in south Minneapolis.

352.   Another 11 percent of the plates reviewed by the Star Tribune had some kind of irregularity, including expired tabs from different vehicles or plates registered to a nonexistent business. A quarter of the vehicles were rentals.

353.   An observer also reported that Defendants' immigration agents also obscured their license plates with mud or snow.

354.   In December 2025, DVS officials wrote to Defendants explaining that the Conceal Plates Policy was illegal and that it "would not be tolerated."

355.   The Conceal Plates Policy has also been implemented in Illinois and documented by that State's "Plate Watch" hotline.

356.   In a statement to the press responding to allegations of misuse of license plates, DHS confirmed the Conceal Plates Policy. DHS Assistant Secretary Tricia McLaughlin acknowledged that "DHS is not going to confirm our vehicles" because doing so would put a "target on our officers' backs." She also incorrectly asserted that federal vehicles "meet federal regulations for law enforcement."

357.   Upon information and belief, no DHS employee has been disciplined for concealing, omitting, or switching license plates.

### 3. The Conceal Plates Policy Has Injured Plaintiffs.

358.   Obscuring, removing, or swapping license plates has allowed Defendants' agents to avoid accountability for abuses. It also has created dangerous situations where Plaintiffs' residents cannot tell the difference between immigration officers engaged in enforcement activities and civilians posing as immigration officers to engage in criminal activity.

359.   Minnesota maintains a license plate program as a critical part of motor vehicle administration and to support roadway safety, traffic and parking enforcement, and revenue collection. Minnesota state and local law enforcement agencies rely on compliance with federal and state laws requiring the display of accurate license plate numbers for vehicle identification and ownership verification, crime solving and prevention, traffic law enforcement, and ensuring public safety.

360.   Defendants' Conceal Plates Policy impedes Plaintiffs from enforcing violations of state law that involve vehicles, including hit-and-run incidents, theft, abductions, and carjackings, and prevents state and local law enforcement agencies from tracking and recording violations of state traffic laws, locating stolen vehicles, and identifying vehicles involved in criminal activities.

361.   The Conceal Plates Policy has therefore increased the cost of the public safety services that Plaintiffs provide to their residents.

### E.  Defendants' Unlawful Trespass and Warrantless Entry Policy

362.   "[A]bsent exigent circumstances or consent, an entry into a private dwelling to conduct a search or effect an arrest is unreasonable without a warrant." *Steagald v. United States*, 451 U.S.  204, 214 n.7 (1981). Law enforcement, including immigration enforcement agents, *U.S. v. Romero-Bustamente*, 337 F.3d 1104, 1109–10 (9th Cir. 2003), can enter private property to search for a person only based upon a judge determining that a "legitimate object of a search is located in the third party's home." *Id.* This principle applies to private commercial property. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 474 (1986) (noting that "absent exigent circumstances, the Fourth Amendment prohibits police

from searching an individual's home or business without a search warrant even to execute an arrest warrant for a third person").

363. "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley v. State of Florida*, 385 U.S. 39, 47 (1966). Therefore, it may prohibit unauthorized trespass. *Id.*

364. "[T]he owner of property has the exclusive right to use of the property and an automatic right to an injunction against a trespasser." *Okaw Drainage Dist. of Champaign & Douglas Cnty., v. Nat'l Distillers & Chem. Corp.*, 882 F.2d 1241, 1248 (7th Cir. 1989). Property owners, including states, are protected from federal government intrusion and control over their property. *Texas v. United States Dep't of Homeland Sec.*, 123 F.4th 186, 212–14 (5th Cir. 2024). Federal agents may not intrude on those rights merely because they purport to be doing so under the authority to enforce immigration laws. *Id.* at 213 (noting that the public interest in "clear protections for property rights from government intrusion and control" is "protected by ensuring that . . . actions taken by federal agents to enforce immigration law do not unnecessarily intrude into the rights of countless property owners").

365. When immigration officers lack consent or a warrant, they may "access . . . private lands, but not dwellings," but only within 25 miles of the border and "for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States." 8 U.S.C. § 1357(a)(3). Minneapolis and Saint Paul are not within 25 miles of the territorial

106

border of the United States, and immigration officers were not patrolling the border while in Minnesota.

### 1. Defendants Have Implemented the Illegal Trespass and Warrantless Entry Policy.

366. Defendants implemented an illegal Trespass and Warrantless Entry Policy to conduct immigration enforcement.

367. On May 12, 2025, ICE leadership issued a Memorandum to implement "Executive Order 14159, *Protecting the American People Against Invasion*."

368. The May 12, 2025, Memorandum describes the process by which ICE Agents may rely on an administrative warrant to conduct an arrest in an immigrant's place of residence:

369. Although the DHS has not historically relied on administrative warrants alone to arrest aliens subject to final orders of removal in their place of residence, the DHS Office of General Counsel has recently determined that the U.S. The Constitution, the immigration and Nationality Act, and the immigration regulations do not prohibit relying on administrative warrants for this purpose. Accordingly, in light of this legal determination, ICE immigration officers may arrest and detain aliens subject to a final order of removal issued by an immigration judge, the Board of Immigration Appeals (BIA), or a U.S. district court judge or magistrate judge in their place of residence. … ICE immigration officers should consider all available enforcement mechanisms, including the use of the Form I-205 to arrest an alien in their place of residence, to achieve the requirements of E.O. 14159, in accordance with applicable law and policies.

370. The May 12, 2025, Memorandum further provides:

Before entering a residence pursuant to Form I-205, ICE officers and agents must "knock and announce." In announcing, officers and agents must state their identity and purpose. Following announcement, officers and agents must allow those inside the residence a reasonable chance to act lawfully. Should the alien refuse admittance, ICE officers and agents should use only a necessary and reasonable amount of force to enter the alien's residence, following proper notification of the officer's or agent's authority and intent to enter. ICE officers and agents must not effectuate an arrest in a third-party residence without consent, exigency, or a judicial warrant to enter the third-party residence."

371. Consistent with the May 12, 2025, Memorandum, Defendants' agents are instructed that administrative warrants allow ICE to arrest immigrants in their homes – without consent to enter the residence and without a judicial warrant.

372. Defendants have also trespassed on and commandeered Plaintiffs' property during their recent immigration enforcement efforts.

373. Under Saint Paul's Charter, for example, public parking lots in or adjacent to public parks may only be used for "[p]arking of vehicles while utilizing park facilities;" "[w]alking to and from lawfully parked vehicles without delay;" and "[o]ther uses as authorized by city permit." Saint Paul Legislative Code Sec. 170.07 (h)(1)(a)-(c).

374. It is "unlawful to use a public parking lot in or adjacent to a public park in the city for any purpose other than enumerated above." *Id*. Sec. 170.07(h)(2).

375. On November 18, 2025, however, DHS agents trespassed on and commandeered the Saint Paul-owned parking lot at Newell Park (900 Fairview Avenue N., Saint Paul, MN 55104) without authorization from Saint Paul to stage immigration enforcement actions.

108

376. On information and belief, this staging was to conduct an enforcement raid at Bro-Tex Inc., a nearby paper manufacturing company, where Defendants detained 14 individuals.

377. DHS agents positioned at least 30 vehicles in the Newell Park parking lot, severely limiting Saint Paul's ability to provide parking for recreation in the park.

378. Similarly, on November 25, 2025, DHS agents trespassed on and commandeered the Saint Paul -owned parking lot at Arlington Hills Community Center (1200 Payne Avenue, Saint Paul, MN 55130) without authorization from Saint Paul to stage immigration enforcement actions.

379. And on December 13-16, 2025, DHS agents trespassed on and commandeered the Saint Paul-owned parking lot at Conway Recreation Center (2090 Conway Street, Saint Paul, MN 55119) without authorization from Saint Paul to stage immigration enforcement actions.

380. During the incidents described in paragraphs 375-379, DHS agents were not utilizing park facilities. DHS agents' use of the parking lot was in direct violation of Saint Paul's ordinances.

381. On December 23, 2025, Saint Paul sent a Cease-and-Desist letter to Defendant Easterwood, ordering DHS to "immediately cease and desist from any further use of these parking lots as well as any other Saint Paul Park parking lot."

382. Defendants did not respond to Saint Paul's letter and continued to trespass on and commandeer Saint Paul property.

383. On January 3, 2026, Defendants again trespassed on and commandeered the Arlington Hills Community Center parking lot to, on information and belief, stage for immigration enforcement action nearby.

384. On January 6, 2026, Defendants trespassed on and commandeered Saint Paul's Phalen Recreation Center parking lot to, on information and belief, stage for immigration enforcement action nearby.

385. On January 16, 2026, DHS agents unlawfully used parking lots at Como Regional Park, which are parks property owned by Saint Paul.

386. Additionally, following the incident at Como Regional Park on January 16, 2026, DHS agents trespassed on and commandeered the parking lot at the West Minnehaha Recreation Center. On information and belief, the federal agents staged immigration enforcement actions at the Center while it was open.

387. DHS agents' presence required staff to place the building into a "Secure State", which is essentially a lockdown, until the site was cleared. This caused significant confusion, worry, and distress among employees, youth, and parents. One parent attempting to access the center during this time was not immediately allowed inside due to the safety protocols, which caused distress.

388. On January 17, 2026, DHS agents unlawfully trespassed on and commandeered the parking lot at Hallie Q Brown Community Center.

389. DHS agents can be seen on Saint Paul property surveillance footage unlawfully loitering in Saint Paul-owned parking lots. The presence of DHS agents in these parking lots both practically restricts residents from using the commandeered space for

110

lawful parking, and on information and belief, quells residents' desire to recreate in Saint Paul's parks and recreation centers.

390. When federal agents trespass on and commandeer Saint Paul's parks parking lots, city leadership is forced to divert staff and supervisory resources to monitor, respond, and communicate with families and the public about safety conditions. This consistent, unplanned diversion of personnel and attention pulls staff away from their core responsibilities: supervising youth programs, maintaining facilities, and delivering routine services, and further requires the reassignment of personnel and additional coordination that is not budgeted. This includes Parks and Recreation staff working on their scheduled time off.

391. Saint Paul Parks and Recreation centers provide daycare services to Saint Paul residents.

392. Twelve buildings have been placed into a Secure State due to DHS activity near or on the recreation center property, at least 14 times total.

### 2. The Illegal Trespass and Warrantless Entry Policy has Injured Plaintiffs.

393. The USIPC Surveys show that Minneapolis and Saint Paul residents who reported that federal immigration enforcement officials entered their homes, despite refusing entry were 35.3 and 33.7 percent, respectively, more likely to miss work.

394. Defendants' continued trespassing on and commandeering of Saint Paul property diminished Saint Paul's ability to offer recreational services to the Saint Paul

community and directly violated Saint Paul city ordinances, which expressly reserve the use of park property for park purposes.

395. Defendants' trespassing on and commandeering of Saint Paul property caused fear and intimidation amongst Saint Paul employees.

396. Not only were Saint Paul employees afraid while at work, which affected their ability to do their jobs effectively, but Saint Paul employees were afraid to go to work, which caused staffing shortages and recreation program cancellations.

397. This disruption to Saint Paul's ability to provide services harmed Saint Paul and its residents.

398. Saint Paul has also had to expend resources, such as employee time, to respond to the emergency situations Defendants created on or near Saint Paul property.

399. Saint Paul has suffered irreparable harm, including the inability to offer essential city services, and the unnecessary expenditure of Saint Paul's resources.

### F. Defendants' Unlawful Arrest Policy

400. Under 8 U.S.C. § 1357(a)(2), Congress gave ICE agents authority to arrest an individual if: there is probable cause to believe that (1) the individual is removable alien and (2) the individual is likely to escape before warrant for his arrest can be obtained.

401. Defendants, and ICE in particular, have long interpreted the "likely to escape" element to mean situations in which agents believe that someone is a "flight risk" and unlikely to comply with future immigration obligations like appearing for hearings.

402. In 2022, DHS agreed to a settlement that set forth a policy standard that tracked the "flight risk" analysis and set forth factors that would bear on whether an

112

individual was likely to comply with future immigration obligations, such as "ties to the community (such as a family, home or employment) or lack thereof, or other specific circumstances that weigh in favor or against a reasonable belief that the subject is likely to abscond."

### *1. Defendants Adopt the Unlawful Arrest Policy*

403.    During Operation Metro Surge, and as of the date the Original Complaint, Defendants adopted a more expansive Unlawful Arrest Policy. Based on information and belief, this policy allowed immigration officers to arrest individuals who were not a flight risk for future immigration enforcement obligations, but about whom the officer believed Defendants would not be able to arrest at a later time using normal enforcement procedures.

404.    Though Defendant's Unlawful Arrest Policy was in place and operationalized upon the commencement of Operation Metro Surge, the Unlawful Arrest Policy was acknowledged and memorialized by Defendant Lyons in a January 28, 2026 memorandum. The memorandum provided a post-hoc, legally flawed rationale for the DHS' already operationalized Unlawful Arrest Policy. To support their expansive Unlawful Arrest Policy, Defendant Lyons' memorandum focused on a new, dubious interpretation of the statutory phrase "likely to escape."

405.    In the memorandum, Defendant Lyons wrote: "ICE previously applied the phrase 'likely to escape' as being the equivalent of 'flight risk.' This unreasoned position was incorrect."

113

406.    The memorandum continues: "A flight risk analysis looks at whether an alien is likely to attend future immigration court hearings, appear before ERO as directed, surrender for removal, and comply with other immigration obligations."

407.    Defendant Lyons specifically rejected the use of flight-risk factors that DHS had previously used when determining whether an agent had authority to arrest an individual: "Therefore, when an immigration officer assesses whether an alien is likely to escape, he or she should consider the factors relevant to immediacy of obtaining and serving an arrest warrant on alien who may not yet have been subject to immigration enforcement, rather than factors relevant to whether an alien is likely to appear for immigration hearings and cooperate after having already been subject to immigration enforcement."

408.    That Defendants adopted the Unlawful Arrest Policy before Defendant Lyons' memorandum was issued is demonstrated by the enormous volume of immigration arrests effected by Defendants that were inconsistent with Defendants' prior arrest policy based on "flight risk." But Plaintiffs further allege, in the alternative, that to the extent there was no such policy before January 28, 2026, the policy was fully implemented as of that date.

### 2. Defendants Implement the Unlawful Arrest Policy in Minnesota

409.    During Operation Metro Surge, Defendants arrested thousands of individuals, with Defendant Noem claiming more than 10,000 arrests as of January 19, 2026.

410.     Since commencement of Operation Metro Surge, and as memorialized in the January 28, 2026, memorandum, Defendants' immigration agents in Minnesota had been implementing the Unlawful Arrest Policy in Minnesota and when determining whether to place someone under a custodial arrest failed to consider whether the arrested individual was likely to comply with future immigration obligations.

### 3. The Unlawful Arrest Policy Has Harmed Plaintiffs

411.     The USIPC Survey showed that in Minneapolis, among those who reported having at least one interaction with federal immigration enforcement agents during Operation Metro Surge, 24.6 percent said that they were detained.

412.     The USIPC Survey also showed that in Saint Paul, among those who reported having at least one interaction with federal immigration enforcement agents during Operation Metro Surge, 11.6 percent said that they were detained.

413.     As such, large numbers of Plaintiffs' residents were detained by Defendants' immigration agents and subjected to the Unlawful Arrest Policy. Extrapolating the USIPC Survey, nearly 30,000 Minneapolis residents and nearly 7,000 Saint Paul residents were detained. Accordingly, Defendants detained approximately one in twenty Minneapolis and Saint Paul residents.

414.     The USIPC Surveys show that Minneapolis and Saint Paul residents who reported being detained were more likely to miss work by 32.6 and 32.9 percent, respectively.

415.     Defendants' indiscriminate and unlawful arrests under the Unlawful Arrest Policy have caused Plaintiffs' residents to fear being subject to an unlawful arrest that could

115

result in significant time in custody. This fear has caused Plaintiffs' residents to miss work, to refrain from patronizing Minnesota businesses, and it has caused businesses to shut down temporarily and permanently. These results have injured Plaintiffs by decreasing particular revenue streams which are identified elsewhere in this Complaint and will be further quantified and characterized with expert and fact discovery.

## G. Defendants' Unlawful Racial and National-Origin Profiling Policy

416.    Defendants have long known that federal law prohibits law enforcement from profiling individuals based on race or apparent national origin.

417.    Although race and national origin may sometimes be used to identify a particular suspect when law enforcement has particularized information about whether the suspect is of a particular race or national origin, it is unlawful for law enforcement to base law enforcement action on generalized stereotypes related to race or national origin.

418.    The illegality of race- and national origin-based profiling is reflected in numerous federal immigration laws, regulations, and policies.

419.    The President's discretion to issue visas is, for example, limited by 8 U.S.C. § 1152(a)(1)(A), which provides that "no person shall . . . discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence."

420.    Department of Homeland Security guidelines unequivocally state that race, ethnicity, and national origin cannot factor in to whether enforcement actions are taken: "A noncitizen's race, religion, gender, sexual orientation or gender identity, national origin, or political associations *shall never be factors in deciding to take enforcement action*."

116

Guidelines for the Enforcement of Civil Immigration Law, Department of Homeland Security (Sept. 30, 2021) (reimplemented in September 2023 (emphasis added).

### 1. Defendants Adopt the Unlawful Racial and National-Origin Profiling Policy

421.    On September 8, 2025, the U.S. Supreme Court granted the federal government's application for a stay of a district court's temporary restraining order in *Noem v. Vasquez Perdomo*.

422.    The only written opinion supporting the decision was a concurrence from Justice Brett Kavanaugh. His opinion reasons that the federal government would likely win on the merits in the case because he reasoned that it is lawful to stop suspected undocumented immigrants in the Los Angeles area based on any combination of four factors: (1) apparent race or ethnicity; (2) speaking Spanish or speaking English with an accent; (3) presence at a particular location (e.g., bus stop, car wash, tow yard, day laborer pick up site, agricultural site, etc.); and (4) the type of work one does.

423.    In Fall 2025, around the time that the *Vasquez Perdomo* decision issued, DHS issued guidance on the use of race and apparent national origin to justify detaining individuals.

424.    Based on information and belief, the guidance unjustifiably extended the reasoning in *Vasquez Perdomo*, which was limited to Los Angeles region, such that it established a policy of allowing Defendants' immigration agents to profile based on race and apparent national origin alone without the existence of other factors.

117

425. Based on information and belief, the Fall 2025 guidance was a final agency action.

426. As such, Defendants adopted the unlawful Racial and National Origin Profiling Policy.

### 2. Defendants Implement the Unlawful Racial and National-Origin Profiling Policy in Minnesota

427. As is evidenced by the examples given above, Defendants have implemented the Unlawful Racial and National-Origin Profiling Policy in Minnesota.

428. According to the USIPC Surveys, in Minneapolis, 63.9 percent of respondents who reported having at least one interaction with federal immigration enforcement agents during Operation Metro Surge said that they were asked about their race, ethnicity, or national origin; 55.6 percent said that they were asked if they speak English; 58.5 percent said that they were asked about their immigration or citizenship status; and 46.7 percent said that federal immigration enforcement agents did not believe they were lawful permanent residents or U.S. citizens despite showing them identification.

429. According to the USIPC Surveys, in Saint Paul, 42.8 percent of respondents who reported having at least one interaction with federal immigration enforcement agents during Operation Metro Surge said that they were asked about their race, ethnicity, or national origin; 32.8 percent said that they were asked if they speak English; 29.8 percent said that they were asked about their immigration or citizenship status; and 20.8 percent said that federal immigration enforcement agents did not believe they were lawful permanent residents or U.S. citizens despite showing them identification.

118

430.    The Unlawful Racial and National-Origin Profiling Policy has been a central feature of Defendants' immigration enforcement operations in Minnesota since it was adopted.

431.    In *Hussen v. Noem*, No. 26-CV-324 (ECT/ECW), 2026 WL 657936, at *37 (D. Minn. Mar. 9, 2026), Judge Tostrud concluded that "Defendants have adopted a policy authorizing federal immigration officers to conduct investigatory stops based on ethnicity or race without reasonable suspicion that the individuals were violating immigration laws." Plaintiffs adopt and incorporate as allegations into this First Amended Complaint Judge Tostrud's findings of fact as if fully set forth herein. *Id.* at *2-*27.

### 3. The Unlawful Racial and National-Origin Profiling Policy Has Harmed Plaintiffs

432.    The Unlawful Racial and National-Origin Profiling Policy has destroyed Plaintiffs' residents' ability to go about their daily lives free from being subject unlawful profiling.

433.    The Unlawful Racial and National-Origin Profiling Policy has caused Plaintiffs' residents to miss work, to decide to refrain from patronizing Minnesota businesses, and it has caused businesses to shut down temporarily and permanently. These results have injured Plaintiffs by decreasing particular revenue streams which are identified above and will be further quantified and characterized with expert and fact discovery.

434.    The USIPC Surveys evince Defendants' Unlawful Racial and National-Origin Profiling Policy and they show the effect on Plaintiffs' residents and the concomitant harm to Plaintiffs.

119

435.   In Minneapolis, persons of color were 22.1 percent more likely than white persons to be asked (1) about their race, ethnicity, or national origin; (2) whether they speak English, or (3) about their immigration or citizenship status.

436.   Additionally, the results are stark for the relationship between racial profiling and the behavioral and attitudinal items in the survey in Minneapolis. Those who were racially profiled were 23.4 percent more likely to miss work; 24.7 percent less likely to seek help from law enforcement; 30.4 percent more likely to have missed a scheduled medical appointment; 33.2 percent more likely to have avoided urgent or hospital care; and 26.7 percent more likely to have missed a scheduled vaccination. All of these differences are systematic and non-random.

437.   In Saint Paul, the results are also stark for the relationship between racial profiling and the behavioral and attitudinal items in the survey. Those who were racially profiled were 26.9 percent more likely to miss work; 26.5 percent less likely to obey the commands of law enforcement; 65.2 percent more likely to have missed a scheduled medical appointment; and 48.1 percent more likely to have avoided urgent or hospital care. All of these differences are systematic and non-random.

438.   The Unlawful Racial and National-Origin Profiling Policy causes chaos and disruptions on State- and City-managed property, roads, and sidewalks, requires the State, Minneapolis, and Saint Paul to divert resources, and it increases distrust between law enforcement and communities, which interferes with their law enforcement priorities.

### H. Defendants' Unlawful Policy and Determination that the Supremacy Clause Exempts Federal Agents from Following State Masking Laws

439.   Defendants have adopted, authorized, implemented, ratified, and maintained a policy and practice under which federal immigration and other federal law-enforcement agents operating in Minnesota may conceal their identities with masks and similar face coverings while carrying out enforcement actions in public.

440.   This is part of a broader final agency action (1) determining that federal agents conducting federal operations are not subject to state masking laws, including Minn. Stat. § 609.735, under the Supremacy Clause related doctrines of federal immunity; and (2) authorizing federal agents to disregard state masking laws ("Unlawful Masking Policy").

441.   The existence and finality of the Unlawful Masking Policy is evident from: (1) Defendants' statements in *United States v. California*, No. 2:25-cv-10999 (C.D. Cal.) and in this case; (2) out-of-court statements of Defendants and other federal leaders; and (3) the ubiquitous use of masks by federal agents conducting immigration enforcement in Minnesota and other states with masking bans.

442.   The existence and finality of the Unlawful Masking Policy is evident from Defendants' litigation positions.  In *United States v. California*, No. 2:25-cv-10999 (C.D. Cal. Nov. 17, 2025), the United States filed suit to enjoin, among other laws, California's masking law as applied to federal agents, stating that "the Federal Government does not intend to comply with the challenged [masking] law." *California*, No. 2:25-cv-10999 (ECF 1, ¶11); *see also id.* ¶¶ 15, 51; *id.* at ECF 11-2, ¶ 38 ("The inability to conceal officers' identities during enforcement actions thus compromises DHS's mission . . . .") (Decl. of Sergio Albarran); *id.* at ECF 11-3, ¶ 18 ("USBP leadership has authorized its personnel,

121

when wearing Class C uniforms and plain-clothes undercover uniforms, to wear facial coverings, which may include eye protection, facial masks, or a combination of both.") (Decl. of Michael Vargas).

443.   The United States contends in *California* that state masking laws violate the Supremacy Clause and intergovernmental immunity doctrines as applied to federal agents. *See generally id.* at ECF 1, ECF 11.

444.   Defendants have reiterated the same position in this litigation. *See* ECF 158 at 42, *Minnesota v. Noem*, No. 0:26-cv-00190-KMM-DJF (D. Minn.) ("There's no question that, under the Plaintiffs' legal theory and requested relief, the State and the City of St. Paul would directly regulate the federal government's operations in Minnesota and would subordinate those operations to state and city restrictions that are nowhere reflected in federal law. Put simply, the State and St. Paul would be able to dictate how and under what circumstances the federal government would be permitted to enforce federal immigration laws in Minnesota. Such a result would be constitutionally repugnant."); *see also id*. at 41-42 (implying that federal agents complying with Minn. Stat. § 609.735 would violate the Supremacy Clause and intergovernmental immunity doctrine and "directly interfere" with federal operations).

445.   The existence and finality of the Unlawful Masking Policy is also evident from the public statements of Defendants and other senior leaders, including but not limited to the following statements:

    a.     In a June 8, 2025, interview on *Face the Nation*, Defendant Noem stated that federal agents need to wear masks or similar face coverings for their "safety" and to "protect[ ] their identity." [87]

    b.     In a July 20, 2025, interview on *Face the Nation*, Defendant Lyons stated that ICE permits agents to wear masks or similar face coverings to "keep themselves and their family safe." [88]

    c.     In a February 15, 2026, interview on *Face the Nation*, Defendant Homan stated that federal agents enforcing immigration laws must wear masks or similar face coverings because of unique "threats" against ICE. [89]

    d.     In a March 23, 2026, post on Truth Social, President Donald Trump stated: "I am a BIG proponent of ICE wearing masks as they search for, and are forced to deal with, hardened criminals, many of whom were let into our Country by Sleepy Joe Biden and his wonderful 'Border Czar,' Kamala (she never even went to the Border!), through their absolutely INSANE Open Border Policy. I would greatly appreciate, however, NO MASKS, when helping our Country out of the Democrat caused MESS at the airports, etc. Thank you! President DJT." [90]

446.    The existence and finality of the Unlawful Masking Policy is also evident by the fact that nearly all DHS agents wear masks or similar face coverings while enforcing immigration law in the field, including in Minnesota and California.

---

[87] Face the Nation, *Kristi Noem, Sen. Amy Klobuchar and more,* CBS News (June 8, 2025) (available at https://www.youtube.com/watch?v=9jz09WTM91Q)

[88] Face the Nation, *Howard Lutnick, ICE head Todd Lyons and more*, CBS News (July 20, 2025) (available at https://www.youtube.com/watch?v=-cm2XPqeQbs)

[89] Face the Nation, *Tom Homan, Sen. Thom Tillis and more*, CBS News (Feb. 15, 2026) (available at https://www.youtube.com/watch?v=FONotcEE7IA)

[90] Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 23, 2026, 7:57 AM CT), https://truthsocial.com/@realDonaldTrump/posts/116278600245530358

447. DHS agents continue to wear masks or similar face coverings while enforcing immigration law in Minnesota.

448. Most if not all ICE agents do not wear masks while working in airports to support TSA.

449. DHS agents began widespread use of masks or similar face coverings to hide their identities in 2025.

450. No other law enforcement entity, federal or state, uses masks or similar face coverings at the same rate as DHS agents to conceal identities during enforcement actions.

451. Wearing masks or similar face coverings is neither necessary nor proper for DHS agents while performing immigration enforcement.

452. Minnesota Statutes § 609.735, with some exceptions, prohibits any person from concealing his or her identity in public by means of a robe, mask, or other disguise. The statute is a generally applicable criminal prohibition that contains no exemption for law enforcement agents or officers—state, local, or federal. It applies equally to all persons within Minnesota's borders and reflects the Legislature's considered judgment that public safety is promoted when individuals acting in public spaces are identifiable. *See Minnesota Voters All. v. Walz*, 492 F. Supp. 3d 822, 835 (D. Minn. 2020) (citing Minn. Stat. § 609.735).

### I. Defendants' Deployment of the Deployment of Overwhelming Forces Policy

453. During Operation Metro Surge, Defendant DHS massively increased the staffing and deployment of personnel in Minnesota and the Twin Cities.

454. According to Samuel J. Olson ICE Enforcement and Removal Operations (ERO) Field Office Director, the ERO St. Paul Office is ordinarily staffed with approximately 190 officers covering the five states of Minnesota, North Dakota, South Dakota, Nebraska, and Iowa, and in the Twin Cities of St. Paul and Minneapolis, ERO has approximately 80 officers.

455. During Operation Metro Surge, thousands more ICE and CPB agents were deployed in Minnesota.

456. The staffing and assigning of huge numbers of personnel was disproportionate to the needs within the area. To the extent Defendants claim to be prioritizing Minnesota for immigration enforcement because of the people potentially subject to enforcement actions under the INA, other states have immigrant populations that dwarf Minnesota's. As for the alleged purposes of fighting fraud and crime, the overwhelming staffing is not germane to unlawful immigration or alleged fraud. The enormous increase of staffing was intended to be an overwhelming show of force.

457. Defendant DHS departed from its prior staffing and deployment policies with regard to assigned personnel within Minnesota, and decided, as final agency action for purposes of Operation Metro Surge, to flood Minnesota and the Twin Cities with an intentionally overwhelming show of force, disproportionate to the needs within the area and aimed instead at maximizing fear and overriding Plaintiffs' sovereign interests. That decision marked the consummation of Defendants' decisionmaking process and determined the rights or obligations from which legal consequences flowed.

458. The flooding of Minnesota and the Twin Cities with an intentionally overwhelming show of force has injured Plaintiffs by causing harm to Plaintiffs' cognizable interest in public health and public safety, and the wellbeing of their residents, among other harms.

459. Defendants' Deployment of the Overwhelming Number of Federal Agents Policy and departure from their prior Staffing and Deployment Policies is arbitrary and capricious.

## J. Defendants' Unlawful Excessive Force Policy

### 1. Statutory and Administrative Limits on Defendants' Use of Force

460. ICE and CBP are required to publish regulations that "prescribe the categories of officers and employees . . . who may use force (including deadly force) and the circumstances under which force may be used." 8 U.S.C. §1357(a)(5).

461. According to 8 C.F.R. § 287.8(a)(1)(ii), "non-deadly force may be used only when a designated immigration officer . . . has reasonable grounds to believe that such force is necessary."

462. According to 8 C.F.R § 287.8(a)(1)(iii), an immigration officer "shall always use the minimum non-deadly force necessary to accomplish the officer's mission and shall escalate to a higher level of non-deadly force only when such higher force is warranted by the actions, apparent intentions, and apparent capabilities of the suspect, prisoner, or assailant." DHS's written use of force policy provides that immigration officers may use force only when no reasonably effective, safe, and feasible alternative appears to exist and may use only the level of force that is objectively reasonable in light of the facts and

126

circumstances confronting the agent at the time. This standard is an objective one that, in the context of use of force policy and practice, is often referred to as "objective reasonableness." The use of excessive force by DHS employees is strictly prohibited. The DHS 2023 written use of force policy provides that, when feasible, agents must attempt to identify themselves, issue verbal warnings, and afford reasonable opportunity for compliance before applying force.

463.   A 2021 Border Patrol use of force policy also includes the objective reasonableness standard, as well as requirements that officers identify themselves as law enforcement and issue warnings before using force "when feasible."

464.   According to CBP's 2021 written policy, agents may use certain riot control tactics and weapons on those demonstrating "active resistance" and other, more dangerous tactics, on those exhibiting "assaultive resistance." "Active resistance" is a type of resistance "where physical attributes are being used to resist an officer/agent's control efforts" and where "[t]he efforts are not directed toward the officer/agent but rather appear intended to thwart an officer/agent's control efforts." "Assaultive resistance" is "resistance characterized by a level of aggression or violence that causes or has the potential to cause physical injury to the officer/agent, others, or self." This includes a subject's attempts (or apparent intent) to make physical contact in an attempt to control or assault the officer/agent.

465.   Agents may use tear gas either for area saturation or a compliance tool only against subjects who demonstrate, at a minimum, active resistance. CBP agents may use a

127

compressed air launcher as a kinetic impact delivery system and specialty impact munitions only on those demonstrating, at a minimum, assaultive resistance.

466.   Further, under the 2021 ICE Firearms and Use of Force Handbook, agents may launch projectiles containing chemical agents including tear gas in a general area (not targeted at a specific person) only after clear, verbal commands fail to secure compliance. Agents may fire a projectile containing chemical agents at a person only after clear verbal commands and if the use of dispersed chemical agents and physical pressure are ineffective.

467.   The 2021 CBP policy prohibits agents from dispersing chemical agents with a compressed air launcher, and mandates consideration of other force options, "on subjects who are: small children; elderly; visibly pregnant; or operating a conveyance." CBP policy prohibits agents from intentionally targeting the head, neck, groin, spine, or female breast.

### 2. Defendants Implement a Policy of Excessive Force in Minnesota

468.   As evidenced by the allegations herein, Defendants have adopted and implemented an Excessive Force Policy in Minnesota. This policy is especially evident upon examination of Defendants' uses of force against non-resisting or passively resisting protesters.

469.   Defendants' agents have consistently deployed force against non-resisting or passively resisting individuals that would only be lawful under the statutes and regulations described above against individuals engaged in active resistance or assaultive resistance.

470.   Defendants' agents have, e.g., consistently deployed tear gas and other non-lethal crowd control measures against non-resisting or passively resisting protesters.

128

471. On information and belief, no CBP or ICE agents have been disciplined in connection with their decisions to use force during Operation Metro Surge.

472. The Excessive Force Policy has injured Plaintiffs. It has caused Plaintiffs' residents to miss work, to decide to refrain from patronizing Minnesota businesses, and it has caused businesses to shut down temporarily and permanently. These results have injured Plaintiffs by decreasing particular revenue streams which are identified above and will be further quantified and characterized with expert and fact discovery.

### K. Defendants' Drastic Reduction in Training Policy

473. Before the Trump Administration retook office, newly hired ICE officers received over 580 hours of training over the course of five months through the nation's Federal Law Enforcement Training Center (FLETC), consistent with regulatory guidelines. See 8 C.F.R. § 287(g).

474. According to public reporting, in or around August 2025, however, Defendant DHS and its leadership approved a drastic reduction in its training program requirements in order to boost the number of officers it could deploy against its targeted jurisdictions.

475. This Reduction in Training Policy resulted in Defendants gutting training programs by cutting 240 hours from its existing program in classroom training, including training on critical topics such as firearms training, lawful use of force, lawful arrests, detention practices, rights of protestors and the limits of ICE officer authority. This amounts to an approximately 40 percent decrease in the training time for new ICE officers.

129

476.   The only apparent basis for reducing these requirements is to allow officers to proceed to fieldwork more quickly, to the neglect of all other relevant factors that properly bear on the appropriate amount of training that federal immigration officers should receive before being entrusted to enforce the law.

477.   Upon information and belief, Defendants deployed ICE officers trained under the new Reduction in Training Policy implemented in August 2025. Deploying an unprecedented force of 3,000 to 4,000 immigration officers to Minnesota that were undertrained has caused serious and substantial harm to Plaintiffs. As detailed at length in this Complaint, Defendants' immigration officers engaged in a campaign of excessive force, unlawful arrests, unlawful entries, unsafe firearms practices, and otherwise aggressive behavior towards public observers. This lawless conduct, which the earlier training program was designed to prevent, is, at least in part,  the direct result of the Reduction in Training Policy and has harmed Plaintiffs.

## XII.   Defendants Continue to Harm Plaintiffs and Threaten Additional Harm

478.   Defendants' agents continue to operate in Minnesota and continue to subject Plaintiffs and Plaintiffs' residents to the unlawful policies and agency actions described above.

479.   As such, the economic and sovereign harm to Plaintiffs continues.

480.   Indeed, although Defendants have stated that they have allegedly "ended" Operation Metro Surge, an estimated 400 federal immigration agents were still operating in Minnesota as of March 14, 2026. This is more than double than the number of federal immigration agents that were typically assigned to the multi-state region covered by ICE's

St. Paul Office before Operation Metro Surge began. Plaintiffs also remain under coercive and retaliatory threats in violation of the constitution and Plaintiffs' constitutional rights. For example, in an appearance on the *Ingraham Angle* on February 13, 2026, Defendant Homan stated that, although Defendants were purporting to "end" Operation Metro Surge, "We're not going away." Defendant Homan continued: "And let me say this, over 800 flights a day land in Saint Paul, Minnesota. If we need to come back, we'll come back."

481. Further, the Trump administration is now threatening to deploy immigration agents to polling stations during the November 2026 election.

482. Speaking at the Conservative Political Action Conference (CPAC), Deputy Attorney General Todd Blanche said he could not understand why anyone would disagree with a president deploying federal agents to the polls, and he echoed recent calls from far-right activists for President Donald Trump to deploy immigration agents to voting sites during the 2026 midterms.[91]

## CAUSES OF ACTION

### COUNT I -Tenth Amendment of the U.S. Constitution (brought by all Plaintiffs)

483. Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

---

[91] *WATCH: Deputy AG Todd Blanch Calls to Deploy ICE to Polling Sites,* Forbes Breaking News, YouTube (Mar. 27, 2026), https://www.youtube.com/watch?v=6Km1Zvo8bDw

484. Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

485. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." *See Printz v. United States*, 521 U.S. 898, 935 (1997).

486. As set forth above, Defendants sent an unprecedented number of federal law enforcement officers to the Twin Cities, and Defendants' agents engaged in unlawful conduct that harmed Plaintiffs' residents, infringed on Plaintiffs' police powers, and violated state sovereignty.

487. Under our system of federalism, policing and crime control remain one of the most basic rights reserved to the States and their municipalities. "Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). "[T]he power to establish the ordinary regulations of police has been left with the individual States and cannot be assumed by the national government." *Patterson v. State of Kentucky*, 97 U.S. 501, 503 (1878).

488. Local control of law enforcement is also essential to the protection of liberty and government accountability. "Because the police power is controlled by 50 different States instead of one national sovereign, the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed. The

132

Framers thus ensured that powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' were held by governments more local and more accountable than a distant federal bureaucracy." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) (quoting The Federalist No. 45, at 293 (J. Madison)).

489. Defendants' aggressive and militarized surge interfered with the ability of state and local law enforcement to address crime and protect residents' health, welfare and safety. As set forth above, for example, MPD and SPPD officers were forced to work overtime and expend additional resources to ensure general public safety and maintain order because of Defendants' actions.

490. In addition to infringing upon Plaintiffs' ability to ensure the safety of their residents, Defendants' actions also infringed upon Plaintiffs' other "vital functions of modern government," including "running public schools." *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 535–36. "[I]t is well established that education is a traditional concern of the States" and their instrumentalities. *United States v. Lopez*, 514 U.S. 549, 580-81 (1995) (Kennedy, J., concurring).

491. The State of Minnesota guarantees a right to public education. *J.K. ex rel. Kaplan v. Minneapolis Pub. Schs. (Special Sch. Dist. No. 1)*, 849 F. Supp. 2d 865, 871 (D. Minn. 2011). The Minnesota Constitution requires the state to maintain a system of public schools that is "general and uniform" as well as "thorough and efficient." Minn. Const. art. XIII, § 1. And under state law, children between the ages of 7 and 17 are required to attend school. Minn. Stat. § 120A.22 subd. 5.

492.     Defendants' actions also interfered with this guarantee. As set forth above, Minneapolis Public Schools cancelled classes for multiple days due to safety concerns after an ICE agent shot and killed an innocent bystander and then—later that same day—DHS agents conducted an enforcement action at a Minneapolis high school. Saint Paul Public Schools and multiple other schools cancelled classes as well amid overwhelming activity by Defendants' agents.

***Unlawful Coercion and Commandeering***

493.     In addition to infringing upon Plaintiffs' police powers, Defendants' actions were designed to coerce Plaintiffs into adopting and enforcing President Trump's policy priorities.

494.     "The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz*, 521 U.S. at 935.

495.     Similarly, the federal government "may not simply 'commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'" *New York v. United States*, 505 U.S. 144, 161 (1992) (quoting *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981)). Such impermissible pressure can occur "whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 578.

134

496.    In America's 250 years of existence, the federal government has never invaded a State with paramilitary forces in an attempt to coerce a State and bend its will; in an attempt to compel legislation or participation in a federal regulatory program. But that is exactly what Defendants have attempted to do with Operation Metro Surge, as evidenced by Attorney General Bondi's January 24, 2026, ransom note.

497.    Historical evidence, context, facts, and documents from the Founding era, the 19th century American interbellum, and more, compel the conclusion that coercion of a State through force in this manner is unconstitutional. Moreover, the historical record confirms that the federal judiciary, and this Court in particular, have the authority and jurisdiction to enjoin or hold unlawful the executive branch's brazen and unlawful attempts at coercion and commandeering through force.

498.    Defendants' actions were designed to force an impermissible "choice": use state and local law enforcement resources to carry out the federal government's civil immigration priorities or accept occupation by militarized federal agents, and if that does not ensure compliance, then federal troops. This is particularly true in light of threats by President Trump that he has "the absolute right" to invoke the Insurrection Act to deploy the military, even though there has been no legal basis to do so. These threats suggest that the federal government attempted to create a pretext for military deployment by provoking civil unrest. Given the need to avoid further escalation to protect public safety and in light of the threats of military deployment, Defendants' actions amounted to coercion and commandeering in violation of Plaintiffs' rights under the Tenth Amendment. Defendants' Tenth Amendment violation has caused ongoing harm to Plaintiffs.

499.    Additionally, in violation of the Tenth Amendment, Defendants' unlawful actions and the manner in which Defendants enforced federal immigration law in the Twin Cities was an unlawful attempt to commandeer state and local law enforcement to assist federal agents in carrying out federal immigration laws.

500.    Defendants' actions forced local law enforcement to respond to public safety incidents caused by Defendants' conduct to ensure the safety of residents and federal agents, and to deal with the fallout, including upset family members, outraged witnesses, children, animals and vehicles left behind, and agents facing crowds of protesters.

501.    Similarly, on January 8, 2026, Governor Walz issued an executive order activating the Minnesota State National Guard—at the State's expense—to address public safety risks associated with Defendants' actions.

502.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants' actions are unconstitutional and violate all Plaintiffs' rights under the Tenth Amendment and that Defendants may not prevent the State from exercising sovereign authority reserved for the States by the Constitution. Plaintiffs are also entitled to injunctive relief preventing Defendants from interfering with Plaintiffs' ability to ensure the health, education, and safety of their residents with their reserved police powers.  Finally, Plaintiffs are entitled to an injunction preventing Defendants from using an inundation of federal agents and the threat of military occupation to coerce state and local officials into carrying out their enforcement efforts.

## COUNT II - Violation of Equal Sovereignty Under the U.S. Constitution
### (brought by Plaintiff State of Minnesota)

503.   Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

504.   Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27.

505.   "Not only do States retain sovereignty under the Constitution, there is also a 'fundamental principle of equal sovereignty' among States." *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 544 (2013) (citation omitted). The Supreme Court has long recognized that our nation "was and is a nation of States, equal in power, dignity, and authority," and that this "constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized." *Coyle v. Smith*, 221 U.S. 559, 567, 580 (1911).

506.   This "fundamental principle of equal sovereignty remains highly pertinent in assessing subsequent disparate treatment of States" by the federal government. *Shelby Cnty*, 570 U.S. at 544 (citation omitted).

507.   As set forth above, Defendants have targeted Minnesota for disparate treatment relative to other states based not on any real or legitimate concern for public safety or fraud. Rather, Defendants have repeatedly made statements that reflect their true intent—to punish Minnesota's elected officials and residents for their perceived political leanings, to target so-called "sanctuary" jurisdictions, to create false political narratives of

lawlessness in Minnesota, and to incite flashpoints between Minnesota residents and immigration agents.

508.   Defendants' actions in other states further demonstrate the disingenuous nature of these immigration and law enforcement surges.  The Trump Administration's actions to mobilize National Guard troops in California, Illinois, and Oregon were enjoined as unlawful. Defendants pivoted to Minnesota after the Supreme Court blocked the Trump Administration from deploying the National Guard in Illinois, *Trump v. Illinois*, No. 25A443, 2025 WL 3715211 (U.S. Dec. 23, 2025) (mem.).  Defendants decided to single out Minnesota—another politically disfavored "sanctuary" jurisdiction—for their largest ever immigration operation, even though Minnesota has a fraction of the undocumented population of other states. "[D]espite the tradition of equal sovereignty," Defendants have applied this harsh infringement on state sovereignty "to only [four] states" and the District of Columbia. *Id.* at 544.

509.   Maintaining the peace and reducing crime are core state and local governmental functions, and Defendants' surge in immigration enforcement in Minnesota has had significant impacts on the ability of state and local law enforcement to perform their normal duties. As set forth above, officers who would be deployed to crime prevention and investigation efforts are instead being called upon to respond to incidents where tensions have been escalated by Defendants' agents roaming the streets wearing masks, conducting operations near schools or on school property, harassing lawful protestors, and shooting unarmed citizens.

510.    Our Constitutional structure does not contemplate or allow the executive branch of the federal government to punish Minnesota for political differences or disfavored policies with unasked-for, unnecessary, and unwelcome federal law enforcement "surges." An "extraordinary departure from the traditional course of relations between the States and the Federal Government" in the form of a militarized law enforcement response can only be justified by dire and "unique circumstances," and must be limited to "areas where immediate action" is truly necessary. *Id.* at 546.

511.    Pursuant to 28 U.S.C. § 2201, Plaintiff State of Minnesota is entitled to a declaration that Defendants' actions based on Minnesota's lawful exercise of its core sovereign powers are unconstitutional and that Defendants may not single out Minnesota for disparate treatment based on its exercise of core sovereign power reserved for the States by the Constitution. Plaintiff State of Minnesota is also entitled to injunctive relief preventing Defendants from implementing or effectuating retaliatory actions and threats or from engaging in future retaliatory conduct based on Minnesota's lawful exercise of its sovereign authority.

**COUNT III - Unconstitutional Retaliation in Violation of the First Amendment**
**(Brought by all Plaintiffs)**

512.    Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

513.    The Supreme Court has repeatedly held that "the First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018); *see, e.g.*, *Hous. Cmty. Coll. Sys.*

139

*v. Wilson*, 595 U.S. 468, 474 (2022); *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Because a state or municipality "is the voice of its residents," "a curtailment of its right to speak might be thought a curtailment of the unquestioned First Amendment right of those residents." *Creek v. Vill. of Westhaven*, 80 F.3d 186, 193 (7th Cir. 1996).

514.  Plaintiffs Minneapolis and Saint Paul are municipal corporations and are "associations of citizens" with First Amendment Rights under *Citizens United v. FEC*, 558 U.S. 310 (2010).

515.  The State's voters elected a Democratic governor; indeed, Minnesota's voters elected Democrats to all of Minnesota's statewide offices.  Additionally, Plaintiff Cities are widely considered to be Democratic cities with elected leaders who identify as Democrats.  The State's Governor and Plaintiff Cities' elected leaders are vocally opposed to the Trump Administration's agenda and have repeatedly criticized the President and his Administration on behalf of their constituents. This political speech is constitutionally protected activity.

516.  As set forth above, Defendants have been open about the fact that they are retaliating against Plaintiffs because of these political differences and this protected First Amendment activity. As set forth above, Defendants DHS and Noem have labeled Governor Walz and Mayor Frey "sanctuary politicians." Similarly, after Governor Walz criticized the fact that it took "50 ICE agents to arrest one guy in a library," Defendant Noem responded on social media: "yes, there's strength in law enforcement numbers to remove these violent criminals from the communities you refuse to protect."

140

517.    Other statements by the President reinforce this retaliatory motive. As set forth above, President Trump's criticism of Governor Walz intensified after his 2024 Vice Presidential campaign and President Trump has repeatedly attacked him.

518.    Defendants' actions also "constitute[] a sufficiently adverse action" against the State and municipalities "to give rise to an actionable First Amendment claim," *Wilson*, 595 U.S. at 477. Defendants have "threatened to wield [their] power" against the State for opposing the President's agenda. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 194 (2024). Defendants did not just made threats. Defendants opened investigations, ordered funding freezes, and issued large penalties against the State. And, most importantly in this case, Defendants sent an unprecedented number of federal law enforcement officials to the State and into Plaintiff Cities, causing harm and disruption to residents. And, on the heels of nationally publicized criticism by Governor Walz and Mayor Frey directed at the Trump Administration over the January 7 fatal ICE shooting, Defendant Noem announced an even larger deployment of DHS agents into Operation Metro Surge.

519.    These draconian punishments easily meet the standard for an "adverse action . . . that would chill a person of ordinary firmness from continuing in the activity." *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014).

520.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants' actions violate the First Amendment and that Defendants may not retaliate against Plaintiffs for First Amendment-protected activity. Plaintiffs are also entitled to injunctive relief preventing Defendants from implementing or effectuating retaliatory

141

actions and threats or from engaging in future retaliatory conduct based on First Amendment-protected activity.

### COUNT IV-Violation of the First Amendment – Viewpoint Discrimination
### (Brought by all Plaintiffs)

521.    Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

522.    Defendants violate another core First Amendment principle: the prohibition on viewpoint discrimination. The Supreme Court has long held that "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 829 (1995). While "[a] government official can share her views freely and criticize particular beliefs," the First Amendment forbids "us[ing] the power of the State to punish or suppress disfavored expression." *Vullo*, 602 U.S. at 188. And because a state or municipality "is the voice of its residents," where a federal action singling out municipalities that pass resolutions on issues disfavored by the federal government, "a genuine First Amendment issue would be present." *Vill. of Westhaven*, 80 F.3d at 19.

523.    Plaintiffs Minneapolis and Saint Paul are municipal corporations and are "associations of citizens" with First Amendment Rights under Citizens United, 558 U.S. 310.

524.    Defendants are targeting Minnesota, Minneapolis, and Saint Paul through a myriad of federal actions, including targeted executive orders, terminated, or suspended grant funding, and other federal agency actions because Defendants disagree with certain

142

viewpoints expressed by and policies adopted by Plaintiffs. As set forth above, Defendants have repeatedly criticized and targeted Plaintiffs because they have adopted so-called "sanctuary" laws and policies.

525.   While the President and Defendants may disagree with some of the viewpoints that they attribute to Plaintiffs and their elected leaders, the First Amendment does not allow them to discriminate against Plaintiffs—or their residents—based on those viewpoints.

526.   Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants' actions targeting Minnesota, Minneapolis, and Saint Paul based on viewpoints expressed and adopted by their elected leaders are unconstitutional and that Defendants may not discriminate against the State and Plaintiff Cities for those viewpoints. Plaintiffs are also entitled to injunctive relief preventing Defendants from implementing or effectuating the discriminatory actions and threats or from engaging in future discriminatory conduct.

## COUNT V - Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C) - Exceeds Statutory Authority and Arbitrary and Capricious: Operation Metro Surge
### (Brought by all Plaintiffs)

527.   Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

528.   Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

143

529.    The APA requires that a court hold unlawful and set aside any agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

530.    "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the [Administrative Procedure Act (APA)] requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (emphasis added). The Court noted that "Congress in 1946 enacted the APA 'as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices.'" *Id.* (quoting *United States v. Morton Salt*, 338 U.S. 632, 644 (1950)).

531.    "Agencies have only those powers given to them by Congress" and when an agency asserts its statutory authority in a broad or novel way that has major "economic and political significance," courts must "hesitate before concluding that Congress meant to confer such authority." *W. Virginia v. EPA*, 597 U.S. 697, 721, 723 (2022) (cleaned up). Because courts must "presume" that Congress "intends to make major policy decisions itself, not leave those decisions to agencies," courts must apply "common sense" and assume Congress did not provide extraordinary authority through implicit grants or vague language. *Id.* at 723.

532.    When an agency exercises its authority in a novel way that will have significant social and economic consequences a "colorable" or "plausible textual basis for the agency action" is not enough—the agency must instead show a "clear congressional authorization" for the power it claims." *Id.* at 722-23. *See also DHS v. Regents of the Univ.*

144

*of Cal.*, 591 U.S. 1, 51 (2020) (Thomas, J., concurring) (noting "DHS could not appeal to general grants of authority" like the authority to establish "national immigration enforcement policies" because "adopting a broad interpretation of these general grants of authority would run afoul of" various rules of statutory interpretation, including the "expectation that Congress speaks clearly when it delegates the power" to make decisions with major economic and political significance).

533.    Operation Metro Surges' size, scope, duration, and character, including militarized weapons and tactics, were an unprecedented use of federal immigration agents.

534.    No previous administration has used federal immigration agents in any manner that even remotely resembles Operation Metro Surge.

535.    In carrying out Operation Metro Surge, Defendants exceeded the statutory authority granted by Congress. Operation Metro Surge must therefore be held unlawful pursuant to 5 U.S.C. § 706(2)(C).

536.    Operation Metro Surge must also be held unlawful pursuant to 5 U.S.C. § 706(2)(A) as arbitrary and capricious.

**COUNT VI - Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (B), and (C) - Arbitrary and Capricious, Contrary Constitutional Right, and Exceeds Statutory Authority: Supremacy Clause and Unlawful Masking Policy**
**(Brought by All Plaintiffs)**

537.    Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

145

538.    Purporting to apply the Supremacy Clause, Defendants have adopted final agency action (1) determining that federal agents conducting federal operations are not subject to state masking laws, including Minn. Stat. § 609.735, under the Supremacy Clause and related federal immunity doctrines; and (2) authorizing federal agents to disregard state masking laws ("Unlawful Masking Policy").

539.    Defendants' Unlawful Masking Policy is a final agency action because it marked the consummation of Defendants' decisionmaking process and determined rights or obligations from which legal consequences would flow. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

540.    The Unlawful Masking Policy violates the Administrative Procedure Act, 5 U.S.C. § 706(2), in three independent ways:

a.    The Unlawful Masking Policy is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law at least with respect to Minn. Stat. § 609.735, because it adopts a categorical constitutional exemption without undertaking the required conflict-specific inquiry into whether compliance with Minn. Stat. § 609.735 would actually prevent federal agents from performing federal duties. *See* 5 U.S.C. § 706(2)(A).

b.    The Unlawful Masking Policy is contrary to constitutional right, power, privilege, or immunity because it attributes to the Supremacy Clause a categorical displacement of Minnesota's sovereign authority that the Constitution does not permit or require. *See* 5 U.S.C. § 706(2)(B).

c.    The Unlawful Masking Policy is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, because no Act of Congress authorizes Defendants to declare federal agents categorically exempt from Minnesota's anti-masking statute. *See* 5 U.S.C. § 706(2)(C).

541.    Defendants failed to identify any federal statute or regulation or sufficient evidence requiring or justifying routine public masking by federal agents in Minnesota.

146

542. Defendants failed to consider narrower, individualized alternatives to categorical noncompliance, including compliance except in circumstances of true operational necessity, undercover work, or exigency.

543. Defendants further failed to account for the obvious and foreseeable harms caused by masked federal operations in Minnesota, including public confusion, 911 calls reporting unidentified masked men, diversion of Plaintiffs' dispatch and police resources, escalation risks, and interference with state and local public-safety functions.

544. The Supremacy Clause does not itself grant the Executive Branch unilateral power to nullify a neutral, generally applicable state criminal law in the absence of valid preemption or a true constitutional immunity.

545. By treating Minnesota's anti-masking law as categorically unenforceable against federal agents, Defendants have denied effect to Minnesota's retained constitutional authority and unlawfully enlarged federal executive power at the expense of powers reserved to the States under the Tenth Amendment.

546. No federal statute authorizes Defendants to displace Minnesota criminal law by executive interpretation of the Supremacy Clause or federal immunity doctrines alone.

547. Whatever authority Defendants possess to supervise federal personnel and prescribe internal policy does not include authority to create categorical immunity from generally applicable state law absent valid federal preemption enacted by Congress or otherwise established by controlling law.

548. Application of Minn. Stat. § 609.735 to federal agents does not violate the Supremacy Clause or intergovernmental immunity principles.

147

549. As a result, Plaintiffs have suffered harm, including by expending resources responding to 911 calls reporting unidentified and/or unlawfully masked men and interference with state and local public-safety functions.

550. Plaintiff State of Minnesota further has a paramount sovereign interest in enforcing its own laws and Defendants' actions are unlawfully interfering with that sovereign authority. Defendants' disregard for state law also makes it harder for state and local law enforcement to identify, investigate, and prosecute DHS agents who are acting unlawfully. Defendants' actions also undermine public trust in law enforcement, which further undermines public safety efforts by state and local law enforcement officials.

551. The Unlawful Masking Policy must be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(A), (B), and (C).

### COUNT VII - Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202 - Enforceability of Minn. Stat. § 609.735 Against Federal Agents

552. Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

553. An actual and justiciable controversy exists between Plaintiffs and Defendants concerning whether Minn. Stat. § 609.735 is enforceable against federal agents operating in Minnesota.

554. Defendants contend, and have acted on the determination, that federal agents are categorically exempt from Minn. Stat. § 609.735 under the Supremacy Clause and related doctrines of federal immunity.

555. Plaintiffs contend that Minn. Stat. § 609.735 is a neutral, generally applicable criminal law that applies to federal agents unless and until Defendants establish a valid basis for federal preemption or immunity in a particular circumstance.

556. That controversy is ripe because Defendants have publicly adopted and defended their position, asserted it in federal litigation challenging a similar California law, and implemented masks in ongoing federal operations in Minnesota and elsewhere.

557. The controversy is concrete because Defendants' position causes present operational harms to Plaintiffs, including increased emergency calls reporting masked men, diversion of 911 and public-safety resources, and impairment of Plaintiffs' interests in the enforcement of Minnesota law.

558. Plaintiff State of Minnesota further has a paramount sovereign interest in enforcing its own laws, and Defendants' actions are unlawfully interfering with that sovereign authority. Defendants' disregard for state law also makes it significantly more difficult and resource-intensive for state and local law enforcement to identify, investigate, and prosecute DHS agents who are acting unlawfully. Defendants' actions also undermine public trust in law enforcement, which further undermines public safety efforts by state and local law enforcement officials.

559. Plaintiffs are entitled to a declaration identifying the parties' rights and obligations and holding that Minn. Stat. § 609.735 is enforceable against federal agents operating in Minnesota under the Supremacy Clause and related federal immunity doctrines.

149

## COUNT VIII - Administrative Procedure Act 5 U.S.C. § 706(2)(A), (C) - Contrary to Law, Exceeds Statutory Authority, and Arbitrary and Capricious: Excessive Force Policy
### (Brought by all Plaintiffs)

560. Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

561. Defendants and their agents discussed in this complaint were operating pursuant to a final federal policy, approved by responsible federal agency heads with final policymaking authority, targeting Plaintiffs' residents with unjustified violence.

562. As set forth above, Defendants intentionally applied physical force, including use of projectiles and chemical weapons, on Plaintiffs' residents. They also restricted Plaintiffs' residents' freedom of movement through a show of authority.

563. The force Defendants used was unreasonable.

564. Federal law provides for the publication of regulations that "prescribe the categories of officers and employees . . . who may use force (including deadly force) and the circumstances under which such force may be used." 8 U.S.C. § 1357(a).

565. Federal regulation provides that "Non-deadly force may be used only when a designated immigration officer . . . has reasonable grounds to believe that such force is necessary." 8 C.F.R. § 287.8(a)(ii).

566. Federal regulation further provides that "[a] designated immigration officer shall always use the minimum non-deadly force necessary to accomplish the officer's mission and shall escalate to a higher level of non-deadly force only when such higher level

150

of force is warranted by the actions, apparent intentions, and apparent capabilities of the suspect, prisoner, or assailant." 8 C.F.R. § 287.8(a)(iii).

567.   Federal regulation further provides that "[d]eadly force is any use of force that is likely to cause death or serious physical injury" and that "[d]eadly force may be used only when a designated immigration officer . . . has reasonable grounds to believe that such force is necessary to protect the designated immigration officer or other persons from the imminent danger of death or serious physical injury." 8 C.F.R. § 287.8(a)(2)(i)-(ii).

568.   Defendants' policy and practice of using force against Plaintiffs' residents fails to take into consideration the risk of harm associated with each weapon used, and permits uses of force that, in violation of 8 C.F.R. § 287.8(a): (1) do not further any legitimate mission assigned to Defendants by law; (2) target the general public; (3) are not based on reasonable grounds to believe such force is necessary; and/or (4) deploy gratuitous violence exceeding the minimum necessary to accomplish any legitimate aims.

569.   Defendants' Excessive Force Policy is "final agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A), and violates the elementary principle of administrative law that agencies are required to follow their own regulations, *see United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).

570.   As a result of Defendants' unlawful policy and practice, both Plaintiffs and Plaintiffs' residents are suffering and will continue to suffer harm. As set forth, Plaintiffs have been forced to divert resources and expend additional resources to maintain public safety and order because of Defendants' unlawful immigration enforcement tactics.

151

Plaintiffs are suffering harm because, as a direct result of Defendants' actions, Plaintiffs' residents have stayed home out of fear that federal agents will unlawfully use excessive force against them on their way to work or school. This has led to business and school closures and decreased commercial foot traffic in the Twin Cities. Plaintiffs are also suffering harm because Defendants' actions undermine public trust in state and local law enforcement.

571. In the absence of an injunction, Defendants will continue to engage in their unlawful policies and practices against Plaintiffs' residents, as described herein.

572. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a permanent injunction preventing Defendants from using unreasonable and unjustifiable force against Plaintiffs' residents.

573. The Excessive Force Policy must be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(C).

574. The Excessive Force Policy must also be held unlawful pursuant to 5 U.S.C. § 706(2)(A) as arbitrary and capricious.

**COUNT IX - Administrative Procedure Act 5 U.S.C. § 706(2)(A), (C) - Exceeds Statutory Authority and Arbitrary and Capricious: The Unlawful Arrest Policy
(Brought by all Plaintiffs)**

575. Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

576. Defendants and the federal agents discussed in this complaint are operating pursuant to the Unlawful Arrest Policy, which was documented and given a dubious legal

justification in a January 28, 2026, memorandum. The Unlawful Arrest Policy is a final federal policy, approved by responsible federal agency heads with final policymaking authority, of making warrantless arrests in Minnesota without making the requisite individualized determinations of whether the arrested individual is likely to escape.

577. As set forth above, Defendants' agents are arresting individuals under a newly adopted, and incorrect, interpretation of whether an individual is likely to escape.

578. Under 8 U.S.C. § 1357(a)(2), an agent may make an immigration arrest without a warrant only if they have "reason to believe" that (1) the individual "is in the United States in violation of any [immigration] law or regulation," and (2) the individual "is likely to escape before a warrant can be obtained for his arrest." See also 8 C.F.R. § 287.8(c)(2)(i), (ii) (same).

579. "Reason to believe" is "considered the equivalent of probable cause," *Lau v. U.S. Immigr. & Naturalization Serv.*, 445 F.2d 217, 222 (D.C. Cir. 1971), which "must be particularized with respect to the person to be searched or seized," *Barham v. Ramsey*, 434 F.3d 565, 573 (D.C. Cir. 2006) (quoting *Maryland v. Pringle*, 540 U.S. 366 (2003)).

580. Defendants' Unlawful Arrest Policy purports that immigration agents may make warrantless arrests using an overly broad interpretation of "likely to escape" without making individualized determinations as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i). It is a final agency action that is "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C) and "arbitrary and capricious," 5 U.S.C. § 706(2)(A).

153

581. As a result of Defendants' unlawful policy and practice, both Plaintiffs and Plaintiffs' residents are suffering and will continue to suffer harm. Plaintiffs are suffering harm because, as a direct result of Defendants' actions, Plaintiffs' residents have stayed home out of fear that they will be unlawfully targeted and detained on their way to work or school. This has led to business and school closures and decreased commercial foot traffic in the Twin Cities. Plaintiffs are also suffering harm because Defendants' actions undermine public trust in state and local law enforcement.

582. The Unlawful Arrest Policy must be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(C) and 706(2)(A).

**COUNT X - Administrative Procedure Act - 5 U.S.C. § 706(2)(A), (B), (C) - Contrary to Constitutional Right, Exceeds Statutory Authority, and Arbitrary and Capricious: Unlawful Racial and National-Origin Profiling Policy**
**(Brought by all Plaintiffs)**

583. Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

584. Defendants and the federal agents discussed in this complaint are operating pursuant to the Unlawful Racial and National-Origin Profiling Policy, which was adopted in a Fall 2025 memorandum. The Unlawful Racial and National-Origin Profiling Policy is a final federal policy, approved by responsible federal agency heads with final policymaking authority, of unlawfully seizing individuals based on race and apparent national origin.

585.    As set forth above, Defendants' agents have stopped people while walking and driving in Minnesota simply based on perceived race or national origin because the agents perceive them to be of Latino, Somali, or some other race or ethnicity disfavored by the Administration.

586.    Under 8 U.S.C. § 1357(a)(2), an agent may make an immigration arrest without a warrant only if they have "reason to believe" that (1) the individual "is in the United States in violation of any [immigration] law or regulation," and (2) the individual "is likely to escape before a warrant can be obtained for his arrest." *See also* 8 C.F.R. § 287.8(c)(2)(i), (ii) (same). "Reason to believe" is "considered the equivalent of probable cause," *Lau v. U.S. Immigr. & Naturalization Serv.*, 445 F.2d 217, 222 (D.C. Cir. 1971), which "must be particularized with respect to the person to be searched or seized," *Barham v. Ramsey*, 434 F.3d 565, 573 (D.C. Cir. 2006) (quoting *Maryland v. Pringle*, 540 U.S. 366 (2003)).

587.    Defendants' Unlawful Racial and National-Origin Profiling Policy allows Defendants' immigration agents to seize individuals without making individualized determinations of immigration status as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i) and is a *final* agency action that is "not in accordance with law" and is "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(A), (C).

588.    Defendants' Unlawful Racial and National-Origin Profiling Policy bases seizures on race and national origin in *ways* that violate the Fourth and Fifth Amendments.

589.    As a result of Defendants' Unlawful Racial and National-Origin Profiling Policy, both Plaintiffs and Plaintiffs' *residents* are suffering and will continue to suffer

155

harm. Plaintiffs are suffering harm because, as a direct result of Defendants' actions, Plaintiffs' residents have stayed home out of fear that they will be unlawfully targeted and detained on their way to work or school. This has led to business and school closures and decreased commercial foot traffic in the Twin Cities. Plaintiffs are also suffering harm because Defendants' actions undermine public trust in state and local law enforcement.

590.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a permanent injunction preventing Defendants from implementing the Unlawful Racial and National-Origin Profiling Policy; and an order holding the Unlawful Racial and National-Origin Profiling Policy unlawful and vacating it.

591.    The Unlawful Racial and National-Origin Profiling Policy must be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(A), (B), (C).

### COUNT XI - Administrative Procedure Act - 5 U.S.C. § 706(2)(A) - Arbitrary and Capricious: Revocation of 2021 Sensitive Locations Policy and Adoption of 2025 Sensitive Locations Policy
### (Brought by all Plaintiffs)

592.    Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

593.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

594.    An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an

156

important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

595. Defendants' revocation of the 2021 Sensitive Locations Policy is a final agency action subject to the APA.

596. Defendants' adoption of the 2025 Sensitive Locations Policy and its implementation are final agency actions subject to the APA.

597. Defendants' actions violate the APA because they are arbitrary and capricious, for reasons including: (1) the decisions were motivated by animosity and discriminatory attitude toward immigrants; (2) Defendants failed to offer adequate explanation for their departure from the long-standing policy to limit enforcement actions in or near sensitive locations; (3) they failed to grapple with important health, education, religious, and public safety repercussions of federal immigration enforcement in or near sensitive locations; (4) they failed to explain prioritizing civil arrests in or near sensitive locations over those harms and repercussions; (5) they failed to apply reasoned analysis regarding alternatives to civil arrests in or near sensitive locations; (6) they failed to examine relevant data and articulate a satisfactory explanation for agency actions; (7) they failed to consider availability of alternative measures which would achieve the enforcement objective (e.g., making the arrest off and a reasonable distance from the premises); (8) they failed to articulate the importance of the enforcement objective in the context of priorities;

157

and (9) they failed to describe measures which can be taken to minimize the impact on the operation of the hospital or school or place of worship.

598. Defendants have not provided a rational basis for the revocation of the 2021 Sensitive Locations Policy or the adoption of the 2025 Sensitive Locations Policy.

599. Defendants departed significantly from their normal procedures.

600. Defendants did not take into account Plaintiffs' reliance interests in immigration enforcement policy for sensitive locations.

601. Plaintiffs are harmed by the revocation of the 2021 policy and adoption and implementation of the 2025 policy.

602. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the revocation of the 2021 Sensitive Locations Policy and the adoption and implementation of the 2025 Sensitive Locations Policy violate the APA because they are arbitrary and capricious.

603. Plaintiffs are also entitled to vacatur of the revocation of the 2021 Sensitive Locations Policy and the implementation of that revocation pursuant to 5 U.S.C. § 706.

604. Plaintiffs are also entitled to vacatur of the 2025 Sensitive Locations Policy and implementation of that policy pursuant to 5 U.S.C. § 706.

**COUNT XII - Administrative Procedure Act,  5 U.S.C. § 706(2)(A) and (C) -
Arbitrary and Capricious and in Excess of Statutory Authority: Roving Patrols
Policy**

**(Brought by all Plaintiffs)**

605.    Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

606.    Defendants include "agency[ies]" under the APA. 5 U.S.C. § 551(1).

607.    The Administrative Procedure Act ("APA") requires that a court set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

608.    Defendants' authority to interrogate persons comes from 8 U.S.C. § 1357(a), which authorizes interrogation only of "any alien or person believed to be an alien," not any person. *United States v. Cantu*, 519 F.2d 494, 496–97 (7th Cir. 1975).

609.    No statutory provision authorizes immigration officers to ask any individual they encounter about their citizenship or immigration status. The statutes governing DHS enforcement authority allow for the interrogation of individuals only when there are articulable reasons to believe the person questioned is subject to removal.

610.    Defendants' Roving Patrol Policy is a final agency action because it marked the consummation of Defendants' decisionmaking process and determined rights or obligations from which legal consequences would flow. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

159

611.    Defendants' policy of directing immigration agents to question any individual about their immigration status exceeds statutory authority. The Roving Patrol Policy therefore must be set aside under the APA as it exceeds statutory authority.

612.    Under the APA, a court must set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 52 (1983) (agency action must be supported by a "rational connection between the facts found and the choice made"); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must provide "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account"); *accord FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025). Agencies may not rely on explanations that are "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). A court "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

613.    Defendants implemented a new policy of indiscriminately interrogating residents about their immigration status.

614.    Defendants have not provided an adequate explanation for adopting and implementing the Roving Patrol Policy, have failed to provide a reasoned explanation for

160

the departures from prior policy, have offered pretextual reasons, and have failed to consider alternatives.

615.    The previous DHS policy, under which officers did not indiscriminately question residents, had engendered significant reliance interests. Plaintiffs justifiably relied on that policy to ensure that their residents could go about their daily lives, engage in economic activities, and secure public benefits without fear of being subject to interrogation or demands for documentation of lawful immigration status.

616.    Defendants failed to consider the adverse impact of their Roving Patrol Policy on the safety and security of Plaintiffs.

617.    The Roving Patrols Policy must be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(A) and (C).

### COUNT XIII - Administrative Procedure Act, 5 U.S.C. § 706(2) (A) and(C) - Arbitrary and Capricious and in Excess of Statutory Authority: Biometric Scanning Policy
### (Brought by all Plaintiffs)

618.    Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

619.    Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

620.    The APA requires that a court set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

161

621. Congress has authorized Defendant DHS to collect biometric information at points of entry into the United States, 8 U.S.C. §§ 1365a(d), 1365b(c)(2).

622. Congress has authorized Defendant DHS to collect biometric information of noncitizen residents in the interior only after removal proceedings have commenced, 8 U.S.C. § 1357(f).

623. Defendants' use of Mobile Fortify to scan biometric information of Plaintiffs' residents without consent, without individualized suspicion, and to retain that information for 15 years is not authorized by statute.

624. Defendants' unrestricted use of Mobile Fortify to scan biometric information of Plaintiffs' residents is a final agency action because it marked the consummation of Defendants' decisionmaking process and determined rights or obligations from which legal consequences would flow. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

625. In imposing the Biometric Scanning Policy, Defendants exceeded the statutory authority granted by Congress. The Biometric Scanning Policy therefore must be set aside under the APA as it is contrary to law.

626. The APA requires that a court set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A).

627. Defendant CBP departed from its prior policy of limited biometric scanning of noncitizens at ports of entry or of citizens at ports of entry with consent.

628. Defendant ICE departed from its prior policy of biometric scanning of enforcement targets in removal proceedings.

162

629. Defendants have not provided an adequate explanation for adopting and implementing the Biometric Scanning Policy, have failed to provide a reasoned explanation for the departures from prior policy, have offered pretextual reasons, and have failed to consider alternatives.

630. The prior policy had engendered significant reliance interests. Plaintiffs justifiably relied on that policy to ensure that their residents could go about their daily lives without fear of being subject to the capture and retention of their sensitive biometric information, and the risk of its disclosure.

631. Defendants failed to consider the adverse impact of their Biometric Scanning Policy on the safety and security of Plaintiffs.

632. The Biometric Scanning Policy must be held unlawful and set aside pursuant to 5 U.S.C. § 706(2) (A) and(C).

## COUNT XIV - Administrative Procedure Act 5 U.S.C. § 706(2)(A) - Arbitrary and Capricious: Drastic Reduction in Training Requirements
### (Brought by all Plaintiffs)

633. Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

634. Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

635. The APA requires that a court set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A).

636. Defendant DHS departed from its prior training and qualification policies and adopted, as final agency action for purposes of many graduating DHS agents, a new policy to drastically reduce required training by half, and intentionally reduce the training DHS agents received regarding constitutional rights, use of force, and appropriate crowd control methods. That decision marked the consummation of Defendants' decision-making process and determined the rights or obligations from which legal consequences flowed.

637. Defendants have not provided an adequate explanation for adopting and implementing the Reduction in Training Policy, have failed to provide a reasoned explanation for the departures from prior policy, have offered pretextual reasons, and have failed to consider alternatives.

638. The prior policy had engendered significant reliance interests. Plaintiffs justifiably relied on that policy to ensure that the armed federal agents had received necessary training to prepare them to engage in operations without reckless disregard for the constitution or outright lawlessness.

639. Defendants failed to consider the adverse impact of their Reduction in Training Policy on the safety and security of Plaintiffs.

640. The Reduction in Training Policy must be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(A).

## COUNT XV - Administrative Procedure Act, 5 U.S.C. § 706(2)(A) - Arbitrary and Capricious: Deployment of Overwhelming Forces
### (Brought by all Plaintiffs)

164

641. Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

642. Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

643. The APA requires that a court set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A).

644. Defendant DHS departed from its prior staffing and deployment policies with regard to assigned personnel within Minnesota, and decided, as final agency action for purposes of Operation Metro Surge, to flood Minnesota and the Twin Cities with an intentionally overwhelming show of force, disproportionate to the needs within the area and aimed instead at maximizing fear and overriding Plaintiffs' sovereign interests. That decision marked the consummation of Defendants' decisionmaking process and determined the rights or obligations from which legal consequences flowed.

645. Defendants have not provided an adequate explanation for adopting and implementing the Deployment of Overwhelming Forces Policy, have failed to provide a reasoned explanation for the departures from prior policy, have offered pretextual reasons, and have failed to consider alternatives.

646. The prior policy had engendered significant reliance interests. Plaintiffs justifiably relied on that policy to ensure that their residents could go about their daily lives without fear of being accosted by masked, armed, federal agents on every street corner.

647. Defendants failed to consider the adverse impact of their Deployment of Overwhelming Forces Policy on the safety and security of Plaintiffs.

165

648.    The Deployment of Overwhelming Forces Policy must be held unlawful and set aside as arbitrary and capricious pursuant to 5 U.S.C. § 706(2)(A).

**COUNT XVI - Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (B) - Not in Accordance with the Law and Contrary to Constitutional Right: Illegal Trespass and Warrantless Entry Policy**
**(Brought by all Plaintiffs)**

649.    Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

650.    Defendants include "agenc[ies] under the APA. 5 U.S.C. § 551(1).

651.    The APA requires that a court set aside agency action that is "not in accordance with law" or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A), (B).

652.    Defendants' policy of entering private property in Plaintiffs' jurisdictions without a judicial warrant or the consent of the owner purportedly to search for immigrants unlawfully in the United States, or to stage for immigration enforcement actions is a final agency action because it marked the consummation of Defendants' decisionmaking process and determined rights or obligations from which legal consequences would flow. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

653.    Under the Fourth Amendment to the United States Constitution, absent a judicial warrant, immigration agents may enter onto private premises only with consent of the owner or when faced with exigent circumstances.

166

654. City ordinances also condition use of City-owned property. Under Saint Paul's Charter, public parking lots in or adjacent to public parks may only be used for "[p]arking of vehicles while utilizing park facilities;" "[w]alking to and from lawfully parked vehicles without delay;" and "[o]ther uses as authorized by city permit." Saint Paul Legislative Code Sec. 170.07 (h)(1)(a)-(c). It is "unlawful to use a public parking lot in or adjacent to a public park in the city for any purpose other than enumerated above." *Id.* Sec. 170.07(h)(2). These conditions apply to anyone entering onto City-owned park property, including DHS agents.

655. As described above, under the Illegal Trespass and Warrantless Entry Policy, Defendants' agents have been unlawfully trespassing on and commandeering Plaintiffs' property in violation of state and local law, and entering the private premises of Plaintiffs' residents without a warrant, without seeking consent, and in the absence of exigent circumstances.

656. Because the Illegal Trespass and Warrantless Entry Policy violates the Fourth Amendment to the United States Constitution and state and local law, it must be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(A) and (B).

**COUNT XVII - Administrative Procedure Act  5 U.S.C. § 706(2)(A) - Not in Accordance with the Law and Arbitrary and Capricious: Conceal Plates Policy (Brought by all Plaintiffs)**

657. Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

658. Defendants include "agenc[ies] under the APA. 5 U.S.C. § 551(1).

167

659. The APA requires that a court set aside agency action that is "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

660. Motor vehicles that the federal government owns or leases must use U.S. Government license plates or comply with the vehicle registration and inspection laws of the jurisdiction in which the vehicles are principally operated. 41 C.F.R. §§ 102-34.5(a), 102-34.90, 102-34.155(a)–(b), 102-34.120.

661. Motor vehicles operated and used by Defendants in Minnesota during Operation Metro Surge generally have not displayed federal U.S. Government license plates and have failed to comply with the registration and inspection laws of Minnesota. Federal officials have regularly removed or obstructed Minnesota license plates and/or illegally swapped Minnesota license plates on their vehicles.

662. Defendants' policy of removing, obscuring, or swapping Minnesota license plates on motor vehicles used by Defendants' agents in Minnesota is contrary to federal regulations and is a final agency action because it marked the consummation of Defendants' decisionmaking process and determined rights or obligations from which legal consequences would flow. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

663. Defendants' policy of removing, obscuring, or swapping Minnesota license plates on motor vehicles used by Defendants' agents in Minnesota is contrary to law. The Conceal Pates Policy therefore must be set aside under the APA as it is contrary to law.

664. The Conceal Plates Policy must be held unlawful and set aside as contrary to law and arbitrary and capricious pursuant to 5 U.S.C. § 706(2)(A).

**COUNT XVIII - Ultra Vires Agency Action Not Authorized by Congress: Use of Military Force**

**(Brought by all Plaintiffs)**

665.    Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

666.    Operation Metro Surge, as deployed by the President and Secretary of Homeland Security, violated fundamental and long-standing concepts enshrined in our Constitution and laws that forbid the use of military troops for law enforcement.

667.    The history of the Nation demonstrates that the Founders firmly rejected the notion that military troops could be used as a police force for the enforcement of domestic laws. Resentment of Britain's use of military troops as a police force was one of the animating forces behind the Declaration of Independence.  One of the American colonists' primary grievances was that the King had "affected to render the Military independent of and superior to the Civil power." Declaration of Independence para. 14.  Other grievances related to Britain's use of troops in the colonies were that the King had "kept among us, in times of peace, Standing Armies without the Consent of our legislatures" and "Quarter[ed] large bodies of armed troops among us." *Id*. paras. 13, 16.

668.    Given the fraught history of British troops used to enforce laws in the colonies, the principle that military troops cannot be used as a police force to enforce domestic laws was firmly enshrined by the Founders in the Militia Clause of the Constitution, Article I, Section 8. The Founders intended that the President "be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States," but gave Congress,

169

not the President, authority in all other respects over the military, including the power to "declare War," *id*. Art. I, § 8, cl. 11; to "raise and support Armies," *id*. Art. I, § 8, cl. 12; and, pertinent here, to "provide for calling forth the Militia to execute the Laws of the Union, suppress insurrections and repel Invasions," *id*. art. I, § 8, cl. 15; and to "provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States." *Id*. art. I, § 8, cl. 16. Thus, any decision to permit military troops to enforce laws is a decision that only Congress, not the President, can make.

669.    This limitation on the Executive's authority to use military troops for law enforcement, absent explicit Congressional authorization, is further reflected in the Posse Comitatus Act, 18 U.S.C. § 1385. The Act, first promulgated in 1878 in response to federal troops used to enforce laws in the South during the Reconstruction Era, prohibits the willful use of the Armed Forces[92] to execute domestic laws, except where expressly authorized by the Constitution or an Act of Congress. *See* 18 U.S.C. § 1385. Congress further reaffirmed the "continued importance" of the Posse Comitatus Act when recognizing certain statutory exceptions allow for the use of Armed Forces "for a range of domestic purposes" the overarching sense of Congress remains that these exceptions cannot swallow the rule that the Armed Forces cannot be used as a posse comitatus to execute the laws. 6 U.S.C. § 466.

---

[92] While the Posse Comitatus Act initially defined military as "the Army", the statutory definition has been expanded to include all branches of the Armed Forces.

170

670.    One area where Congress has explicitly authorized use of the military troops for law enforcement is the Insurrection Act, 10 U.S.C. § 251. However, that Act does not provide congressional authorization in this case for the actions and tactics employed by the DHS in Operation Metro Surge because the President has not invoked the Act. The President has chosen not to invoke the Insurrection Act because he "doesn't need it."

671.    Nothing in the enabling act for DHS or the Immigration and Naturalization Act, (*see e.g.*, 8 U.S.C. §§ 1103, 1182, 1225, 1226, 1357) or any other enactment of Congress, authorizes the actions ordered by the President and the Secretary of the DHS in Operation Metro Surge.  Nothing authorizes the President or the Secretary to deploy 3,000-4,000 masked, highly armed, militarized federal agents, dwarfing the number of local law enforcement. Although Congress's enactments authorize immigration arrests upon proper warrants, *see e.g.* 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States"), none of Congress's enactments permit the type of arrests seen frequently in Operation Metro Surge, including warrantless, forced entries into private homes, road blockades, pulling over vehicles traveling on public roads, demands made on people to produce documentation of their status simply based their skin color or accents and the other atrocities documented by witness accounts and video evidence.  Further, nothing authorizes federal agents to arrest U.S. citizens engaged in protected First Amendment activity, or shoot pepper balls at nonviolent protesters, or assault and tear gas them, or use excessive and even deadly force against citizens documenting the actions of federal agents.

672. DHS has amassed an untrained, private military and been given funding, headcount, and military-grade weapons, vehicles, and gear. The alleged "law enforcement" presence looks nothing like law enforcement. They look and act like an undisciplined and untrained military force because that is what they are.

673. Defendants have provided military tactical gear designed for close-combat wars to their agents and turned them loose on U.S. citizens and Plaintiffs' residents with impunity, referring to the agents as being "deployed" into a "theater for a very long time" as if these agents were in a war zone.

674. The sheer number of heavily equipped DHS "agents" outfitted in military tactical gear including camouflage, helmets, gas masks, and military-grade weapons is a force 10 times larger than National Guard members the Executive sent to the cities of Chicago and Los Angeles in 2025. *See Newsom v. Trump*, Case No. 25-cv-04870-CRB, Order Granting Renewed Injunction at 1 (Doc. 225) (N.D. Cal. Dec. 10. 2025); *Trump v. Illinois*, 607 U.S. ___ at 3 (2025) (Kavanaugh, J. concurring).

675. An overwhelming military-style presence, the intimidation of a local population, the suppression of dissent and the suspension of constitutional rights are all hallmarks of a military invasion, not a law enforcement operation.

676. Defendants have intentionally circumvented the limitations the Constitution and the Posse Comitatus Act place on the use of military troops and usurped Congress's authority by sending 3,000-4,000 armed troops into the State to deal with civil immigration enforcement.

677. The unprecedented "law enforcement" surge by DHS under the guise of civil immigration enforcement is, in truth, a paramilitary occupation of a Sovereign State by unidentified, masked, heavily armed troops, mustered in violation of Article I, Section 8 of the Constitution, and deployed in violation of the Posse Comitatus Act by the Executive.

## COUNT XIX - Ultra Vires Executive Action Not Authorized by Congress
### (Brought by all Plaintiffs)

678. Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

679. An executive agency "has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

680. Defendants may exercise only that authority which is conferred by statute. *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (noting that federal agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires").

681. Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

682. Plaintiffs allege, in the alternative, that if Defendants' adoption of Operation Metro Surge, Unlawful Arrest Policy, Unlawful Racial and National Origin Profiling

173

Policy, Roving Patrol Policy, Biometric Scanning Policy, Unlawful Masking Policy, Excessive Force Policy, Drastic Reduction in Training Policy, the Deployment of Overwhelming Forces Policy, and the Warrantless Entry and Trespass Policy do not constitute "final agency action", or that they are not otherwise subject to review under the APA, that these actions are *ultra vires* in excess of statutory authority granted by Congress.

683.  These policies were implemented by Defendants without authority conferred by statute. No provision of DHS's authorizing statutes conferred on it the power to adopt and implement the policies alleged above.

684.  The actions of Defendants are prohibited by 8 U.S.C. § 1357.

685.  Each of the final agency actions challenged above are ultra vires.

686.  Plaintiffs are entitled to a declaration that the above actions are ultra vires and to injunctive relief preventing Defendants from continuing their unlawful policies in excess of statutory authority.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask that the Court grant the following relief:

1. Declare under 28 U.S.C. § 2201 that Defendants' unprecedented surge of Defendants' agents in Minnesota is unconstitutional and unlawful, including as an ultra vires action, a violation of the Tenth Amendment of the United States Constitution, the First Amendment of the United States Constitution, the Equal Sovereignty doctrine, the Milita Clause, as set forth above and provide any further relief that may be necessary;

2. Declare under 28 U.S.C. § 2201 that the above-identified policies violate the APA as set forth above, hold the policies unlawful, and vacate and set them aside pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2202;

3. Declare under 28 U.S.C. § 2201 that the above-identified policies are prohibited by federal law, including 8 U.S.C. § 1357, and thus ultra vires as set forth above;

4. Declare under 28 U.S.C. § 2201 that Minn. Stat. § 609.735 is enforceable against federal agents operating in Minnesota under the Supremacy Clause and related federal immunity doctrines;

5. Hold unlawful and enjoin Defendants' unprecedented surge of Defendants' agents in Minnesota or any other similar action in Minnesota, over the objection of the Governor of Minnesota and Mayors of Minneapolis and Saint Paul;

6. Permanently enjoin Defendants from implementing the unprecedented surge in Minnesota or any other similar action in Minnesota;

7. Permanently enjoin Defendants from implementing the unprecedented surge in Minnesota at or near sensitive locations and in other unlawful ways that interfere with Plaintiffs' ability to ensure the health, education, and safety of their residents with their reserved police powers, that coerce state and local officials into carrying out Defendants' enforcement efforts, and that violate state law and city ordinances;

8. Permanently enjoin Defendants from engaging in the unlawful actions described in this Complaint, specifically prohibiting Defendants, their officers, agents, assigns, and all persons acting in concert with them from:

   a. Arresting or threatening to arrest any person who is not subject to a lawful immigration arrest unless there is probable cause to believe the individual has committed a crime;

   b. Threatening or using physical force, including brandishing weapons, against any person who is not subject to a lawful immigration arrest where such threat or force is not reasonably necessary to stop an immediate and serious threat of physical harm to a law enforcement officer or another person and there is not reasonable suspicion or probable cause that the person subject to force or threatened with force has committed a crime;

   c. Dispersing individuals engaged in First Amendment-protected activity with physical force. Defendants may ask an individual engaged in First Amendment-protected activity to change location to avoid disrupting law enforcement, as long as the instructions are clear and the individual has time to comply and sufficient opportunity to observe and exercise his or her First Amendment rights;

   d. Pointing firearms at individuals who are not posing an immediate threat of death or serious bodily injury to another person;

175

e.  Using hands-on physical force such as pulling or shoving to the ground, tackling, or body slamming any person who is not causing an immediate threat of physical harm to others, unless objectively necessary and proportional to effectuate an apprehension and arrest;

f.  Using chokeholds, carotid restraints, or any other restraint technique that applies prolonged pressure to the neck and may restrict blood flow or air passage against any person, unless such force is objectively necessary to stop an immediate threat of the person causing serious bodily injury or death to another person;

g.  Seizing or arresting any person who is complying with a lawful and authorized crowd dispersal order, unless there is specific probable cause to believe that the person has committed a crime for which a custodial arrest is warranted and for which the federal agent has lawful authority to make an arrest;

h.  Concealing his or her identity by means of mask or other disguise in a public place;

i.  Further requiring Defendants' agents to:

j.  Wear visible identification of a unique, personally assigned, and recognizable alphanumeric identifier sequence affixed to their uniforms and conspicuously displayed in two separate places. The same unique and personally assigned identifier sequence must remain conspicuously displayed in two separate places despite changes to the agent's uniform or tactical gear;

k.  Wear and activate body worn cameras ("BWCs") when engaged in enforcement activities unless expressly exempted by CBP, ICE, or DHS policy;

9.  Award Plaintiffs their costs and reasonable attorneys' fees; and

10. Order such other and further relief as this Court deems just and appropriate.


Respectfully submitted,

Dated: April 20, 2026            KEITH ELLISON
                                 Attorney General
                                 State of Minnesota


176

*s/ Brian S. Carter*
LIZ KRAMER (#0325089)
Solicitor General
PETER J. FARRELL (#0393071)
Deputy Solicitor General
KATHERINE BIES (#0401675)
BRIAN S. CARTER (#0390613)
LINDSEY MIDDLECAMP (#0392589)
JOSEPH RICHIE (#0400615)
Special Counsel

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 757-1010 (Voice)
(651) 282-5832 (Fax)

liz.kramer@ag.state.mn.us
peter.farrell@ag.state.mn.us
brian.carter@ag.state.mn.us
katherine.bies@ag.state.mn.us
joseph.richie@ag.state.mn.us
lindsey.middlecamp@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

Dated: April 20, 2026

KRISTYN ANDERSON
City Attorney
*/s/ Kristyn Anderson*
KRISTYN ANDERSON (0267752)
HEATHER P. ROBERTSON (0390470)
Assistant City Attorney
SARA J. LATHROP (0310232)
Assistant City Attorney
KIRSTEN H. PAGEL (0399114)
Assistant City Attorney
ADAM E. SZYMANSKI (0397704)
Assistant City Attorney
MICHAEL A. BREY (#0398620)
Assistant City Attorney
350 South Fifth Street
Minneapolis, MN 55415
Tel: 612-673-3000

177

kristyn.anderson@minneapolismn.gov
sara.lathrop@minneapolismn.gov
heather.robertson@minneapolismn.gov
kirsten.pagel@minneapolismn.gov
adam.szymanski@minneapolismn.gov
michael.brey@minneapolismn.gov

*Attorneys for Plaintiff City of Minneapolis*

Dated: April 20, 2026

IRENE KAO
City Attorney
*By: /s/ Irene Kao*
IRENE KAO (0392282)
KELSEY MCELVEEN (0396744)
Assistant City Attorney
ALEXANDER HSU (0399275)
Assistant City Attorney
15 W. Kellogg Blvd., #400
Saint Paul, MN 55102
Tel: 651-266-8710
Irene.kao@ci.stpaul.mn.us
Kelsey.mcelveen@ci.stpaul.mn.us
Alexander.hsu@ci.stpaul.mn.us

*Attorneys for Plaintiff City of Saint Paul*