# Large-Scale Immigration Enforcement and Its Consequences: The Impact of Operation Metro Surge

Tom K. Wong[*]

March 24, 2026

[*]Gabriel de Roche provided technical assistance and support on this project. Suhani Pawar, Kaylin Compton, Lisette Lemaire, and Annie Nguyen also provided research assistance.

Exhibit A, p. 1

# Introduction

Operation Metro Surge marked an unprecedented deployment of federal immigration enforcement agents in Minnesota, generating widespread concern about its social, economic, and institutional impacts. Concerns about civil rights and civil liberties violations during the course of enforcement actions, declining public trust in law enforcement, significant wage losses, and disruptions to public education and public health underscore the breadth of its consequences. This report draws on original survey data to document how these impacts were experienced across Minneapolis and St. Paul.

Between February 17, 2026 and March 6, 2026, the U.S. Immigration Policy Center (USIPC) at UC San Diego conducted two mixed-mode, probability-based surveys of residents aged 18 and older—one in Minneapolis and one in St. Paul. The Minneapolis sample included 728 respondents (margin of error ±3.6%), while the St. Paul sample included 662 respondents (margin of error ±3.8%). To ensure representativeness, respondent-level survey weights were constructed using iterative proportional fitting ("raking") to adjust for observable differences in age, gender, race and ethnicity, and employment status.[1]

# Interactions with Federal Immigration Enforcement Agents

At its peak, between 3,000 to 4,000 federal immigration enforcement agents were deployed across Minnesota. The data indicates that Operation Metro Surge was not only large in scale, but it was also widely experienced by residents in Minneapolis and in St. Paul. Indeed, substantial shares of residents in both cities report having at least one interaction with federal immigration enforcement agents during Operation Metro Surge.

In Minneapolis, 28.3 percent of respondents said "yes" to having at least one interaction with federal immigration enforcement agents during Operation Metro Surge. In St. Paul, 19.2 percent of respondents said "yes" to having at least one interaction

---

[1]In Minneapolis, the resulting weights were well-distributed (min = 0.39, max = 2.04) with limited variance inflation (design effect of 1.10), indicating minimal loss of precision due to weighting. In St. Paul, raking achieved exact convergence to target margins; however, the resulting weights exhibited moderate dispersion (min = 0.32, max = 3.20) and a design effect of 1.37, indicating some loss of precision due to unequal weighting. Post-stratification weights were thus trimmed at an upper bound of 2.5 and rescaled to maintain a mean of 1.

Exhibit A, p. 2

with federal immigration enforcement agents during Operation Metro Surge.

In Minneapolis, 63.9 percent of respondents who reported having at least one interaction with federal immigration enforcement agents during Operation Metro Surge said that they were asked about their race, ethnicity, or national origin; 55.6 percent said that they were asked if they speak English; 58.5 percent said that they were asked about their immigration or citizenship status; and 46.7 percent said that federal immigration enforcement agents did not believe they were lawful permanent residents or U.S. citizens despite showing them identification. In St. Paul, 42.8 percent of respondents who reported having at least one interaction with federal immigration enforcement agents during Operation Metro Surge said that they were asked about their race, ethnicity, or national origin; 32.8 percent said that they were asked if they speak English; 29.8 percent said that they were asked about their immigration or citizenship status; and 20.8 percent said that federal immigration enforcement agents did not believe they were lawful permanent residents or U.S. citizens despite showing them identification.

Moreover, despite being described as targeted immigration enforcement actions aimed at the "worst of the worst,"[2] the data suggest that federal immigration enforcement agents frequently engaged in broad, non-targeted stops of residents. In Minneapolis, among those who reported having at least one interaction with federal immigration enforcement agents during Operation Metro Surge, 43.9 percent said that they were randomly stopped on the street by federal immigration enforcement agents while walking and 54.0 percent said that they were randomly pulled over by federal immigration enforcement agents while driving. In St. Paul, among those who reported having at least one interaction with federal immigration enforcement agents during Operation Metro Surge, 36.5 percent said that they were randomly stopped on the street by federal immigration enforcement agents while walking and 30.3 percent said that they were randomly pulled over by federal immigration enforcement agents while driving.

In Minneapolis, among those who reported having at least one interaction with federal immigration enforcement agents during Operation Metro Surge, 73.1 percent said that federal immigration enforcement agents did not show them an administrative or judicial warrant. Moreover, 22.7 percent said that federal immigration enforcement agents asked to enter their home, they said no, but they entered anyway. In St. Paul, among those who reported having at least one interaction with federal immigration enforcement agents during Operation Metro Surge, 90.9 percent said

---

[2]For example, see U.S. Department of Homeland Security (DHS) press release entitled, "ICE Continues to Remove the Worst of the Worst for Minneapolis Streets as DHS Law Enforcement Marks 3,000 Arrests During Operation Metro Surge."

3

that federal immigration enforcement agents did not show them an administrative or judicial warrant. Moreover, 12.9 percent said that federal immigration enforcement agents asked to enter their home, they said no, but they entered anyway.

The data also show that federal immigration enforcement agents conducted operations at or near previously protected "sensitive locations." In Minneapolis, among those who reported having at least one interaction with federal immigration enforcement agents during Operation Metro Surge, 52.6 percent said that their interaction happened at or near a school, healthcare facility, childcare facility, courthouse, or place of worship. In St. Paul, among those who reported having at least one interaction with federal immigration enforcement agents during Operation Metro Surge, 51.9 percent said that their interaction happened at or near a school, healthcare facility, childcare facility, courthouse, or place of worship.

Finally, the data show concerning trends regarding being detained and the use of force by federal immigration enforcement agents. In Minneapolis, among those who reported having at least one interaction with federal immigration enforcement agents during Operation Metro Surge, 24.6 percent said that they were detained; 22.9 percent said that they were physically assaulted; 25.7 percent said that federal immigration enforcement agents used pepper spray, tear gas, or another chemical agent against them; 38.1 percent said that federal immigration enforcement agents already had their weapons drawn when they approached them; and 29.5 percent said that federal immigration enforcement agents drew their weapons on them during the course of our interaction. In St. Paul, among those who reported having at least one interaction with federal immigration enforcement agents during Operation Metro Surge, 11.6 percent said that they were detained; 13.9 percent said that they were physically assaulted; 17.7 percent said that federal immigration enforcement agents used pepper spray, tear gas, or another chemical agent against them; 27.9 percent said that federal immigration enforcement agents already had their weapons drawn when they approached them; and 28.2 percent said that federal immigration enforcement agents drew their weapons on them during the course of our interaction.

Table 1 summarizes the results.

# Operation Metro Surge Undermined Public Trust in Law Enforcement

The data also make clear that the conduct of federal immigration enforcement agents during Operation Metro Surge decreased public trust in law enforcement in both Minneapolis and St. Paul.

Table 1: Reported Interactions with Federal Immigration Enforcement Agents

| Survey Item | Minneapolis (%) | St. Paul (%) |
|---|---|---|
| *At least one interaction* | *28.3* | *19.2* |
| Questioned Race, Ethnicity, or National Origin | 63.9 | 42.8 |
| Questioned Speaking English | 55.6 | 32.8 |
| Questioned Immigration or Citizenship | 58.5 | 29.8 |
| Distrusted Despite Showing ID | 46.7 | 20.8 |
| Randomly Stopped on Street | 43.9 | 36.5 |
| Random Stopped While Driving | 54.0 | 30.3 |
| Did Not Show Warrant | 73.1 | 90.9 |
| Entered Home Despite Refusing Entry | 22.7 | 12.9 |
| Sensitive Location | 52.6 | 51.9 |
| Were Detained | 24.6 | 11.6 |
| Physical Force Used Against Them | 22.9 | 13.9 |
| Chemical Agents Used Against Them | 25.7 | 17.7 |
| Weapons Drawn (Approach) | 38.1 | 27.9 |
| Weapons Drawn (During) | 29.5 | 28.2 |

Respondents were asked whether they agreed or disagreed with the statement, "I generally have less trust in law enforcement now as a result of how Immigration and Customs Enforcement (ICE) agents and Border Patrol (BP) agents have conducted federal immigration enforcement operations during Operation Metro Surge." In Minneapolis, 57.1 percent "strongly agree" or "somewhat agree" with the statement. In St. Paul, 58.3 percent "strongly agree" or "somewhat agree" with the statement. These data make clear that majorities in both cities experienced an erosion of public trust in law enforcement as a result of Operation Metro Surge.

Respondents were also asked whether they agreed or disagreed with the statement, "I am less likely to seek help from law enforcement now as a result of how Immigration and Customs Enforcement (ICE) agents and Border Patrol (BP) agents have conducted federal immigration enforcement operations during Operation Metro Surge." In Minneapolis, 49.4 percent "strongly agree" or "somewhat agree" with the statement. In St. Paul, 46.1 percent "strongly agree" or "somewhat agree" with the statement. These results are particularly striking, as they suggest that Operation Metro Surge changed the help-seeking behaviors of a large percentage of residents in Minneapolis and in St. Paul.

Finally, respondents were asked whether they agreed or disagreed with the statement, "I am less likely to obey the commands of law enforcement now as a result of

how Immigration and Customs Enforcement (ICE) agents and Border Patrol (BP) agents have conducted federal immigration enforcement operations during Operation Metro Surge." In Minneapolis, 31.1 percent "strongly agree" or "somewhat agree" with the statement. In St. Paul, 26.3 percent "strongly agree" or "somewhat agree" with the statement. These results are significant because they suggest a measurable decline in the perceived legitimacy of law enforcement, which not only has implications for compliance, but also officer safety, and the overall effectiveness of community policing.

Table 2: Impact of Operation Metro Surge on Trust and Behavior Toward Law Enforcement

| Survey Item | Minneapolis (%) | St. Paul (%) |
|---|---|---|
| Less trust law enforcement | 57.1 | 58.3 |
| Less likely to seek help law enforcement | 49.4 | 46.1 |
| Less likely to obey commands law enforcement | 31.1 | 26.3 |

## Impact on Work and Wages

There is growing evidence about the negative economic impact of Operation Metro Surge.[3]

Respondents were asked whether concerns about federal immigration enforcement caused them to miss work since the beginning of Operation Metro Surge. In Minneapolis, among those in the workforce, 35.7 percent said "yes" to missing work because of Operation Metro Surge. Workers in Minneapolis missed an average of 7.9 days of work. In St. Paul, among those in the workforce, 20.5 percent said "yes" to missing work because of Operation Metro Surge. Workers in St. Paul missed an average of 11.4 days of work.

In Minneapolis, 63.4 percent said they missed work because their workplace closed; 66.4 percent said they missed work because of concerns about their personal safety because of the increased presence of federal immigration enforcement agent; 34.5 percent said they missed work because their childcare provider was unable to show up because of the increased presence of federal immigration enforcement agents; and 28.7 percent said they missed work because their caregiver was unable to show up because of the increased presence of federal immigration enforcement

---

[3]For example, see surveys from the City of Minneapolis and from the City of St. Paul and forthcoming surveys from USIPC.

agents. In St. Paul, 48.2 percent said they missed work because their workplace closed; 65.7 percent said they missed work because of concerns about their personal safety because of the increased presence of federal immigration enforcement agent; 29.9 percent said they missed work because their childcare provider was unable to show up because of the increased presence of federal immigration enforcement agents; and 27.8 percent said they missed work because their caregiver was unable to show up because of the increased presence of federal immigration enforcement agents.

Using data on employment, occupation, wage data from the Minnesota Department of Employment and Economic Development, and missed days of work, it is possible to estimate the wage losses experienced by workers because of Operation Metro Surge.

In Minneapolis, the average hourly wage for workers employed full-time and who reported missing work because of Operation Metro Surge is $48.22. These workers missed an average of 6.86 days of work. This means that full-time workers lost an average of $2,315.48 in wages because of Operation Metro Surge. For the full-time workers in Minneapolis who missed work because of Operation Metro Surge, the total wage loss is estimated to be $173.9 million. This likely underestimates average lost wages because a 35-hour work week is assumed. The average hourly wage for workers employed part-time and who reported missing work because of Operation Metro Surge is $31.20. These workers missed an average of 9.88 days of work. This means that part-time workers lost an average of $1,233.38 in wages because of Operation Metro Surge. For the part-time workers in Minneapolis who missed work because of Operation Metro Surge, the total wage loss is estimated to be $15.3 million. These data suggest that workers in Minneapolis lost an estimated $189.2 million in wages because of Operation Metro Surge.

In St. Paul, the average hourly wage for workers employed full-time and who reported missing work because of Operation Metro Surge is $46.00. These workers missed an average of 6.29 days of work. This means that full-time workers lost an average of $1,754.37 in wages because of Operation Metro Surge. For the full-time workers in St. Paul who missed work because of Operation Metro Surge, the total wage loss is estimated to be $43.9 million. This likely underestimates average lost wages because a 35-hour work week is assumed. The average hourly wage for workers employed part-time and who reported missing work because of Operation Metro Surge is $24.74. These workers missed an average of 12.99 days of work. This means that part-time workers lost an average of $1,286.12 in wages because of Operation Metro Surge. For the part-time workers in St. Paul who missed work because of Operation Metro Surge, the total wage loss is estimated to be $10.7 million. These data suggest that workers in St. Paul lost an estimated $54.6 million in wages because of

Operation Metro Surge.

## Impact on Families and Students

Aggressive federal immigration enforcement, particularly at or near sensitive locations such as schools, can negatively impact families and students. Respondents were asked whether they are the parent or legal guardian of a child or children currently attending a public K-12 school. Among these respondents, we asked whether concerns about federal immigration enforcement efforts have caused them to keep their child or children at home, instead of sending them to school, since the beginning of Operation Metro Surge. We also asked about learning disruptions.

In Minneapolis, the majority of respondents with a child or children currently attending a public K-12 school, or 53.3 percent, said "yes" to keeping their child or children at home, instead of sending them to school, because of concerns related to Operation Metro Surge. In terms of whether the increased presence of federal immigration enforcement agents caused learning disruptions, the majority of respondents, or 56.8 percent, said "moderate" to "high" levels of disruptions in learning. In St. Paul, a near majority of respondents with a child or children currently attending a public K-12 school, or 45.1 percent, said "yes" to keeping their child or children at home, instead of sending them to school, because of concerns related to Operation Metro Surge. In terms of whether the increased presence of federal immigration enforcement agents caused learning disruptions, the majority of respondents, or 53.2 percent, said "moderate" to "high" levels of disruptions in learning.

## Public Health Implications of Operation Metro Surge

Operation Metro Surge also caused a series of negative public health implications.

For example, we asked respondents whether concerns about federal immigration enforcement caused them to miss a scheduled medical appointment. In Minneapolis, 44.8 percent did not have any scheduled medical appointments since the beginning of Operation Metro Surge. However, among those who did, 29.2 percent said "yes" to missing a scheduled medical appointment. In St. Paul, 45.9 percent did not have any scheduled medical appointments since the beginning of Operation Metro Surge. However, among those who did, 20.6 percent said "yes" to missing a scheduled medical appointment. Missed medical appointments carry a range of public health implications. For example, missed medical appointments can delay diagnosis or treatment, worsen chronic conditions, and reduce access to preventive care. Severe

health complications can also increase reliance on emergency services, which places additional strains on healthcare systems.

Moreover, we asked respondents whether concerns about federal immigration enforcement caused them to stay at home instead of going to urgent care or to the hospital to address a medical issue. In Minneapolis, 69.9 percent did not need to go to urgent care or to the hospital to address a medical issue since the beginning of Operation Metro Surge. However, among those who did, 39.9 percent said "yes" to staying at home instead of going to urgent care or to the hospital. In St. Paul, 72.2 percent did not need to go to urgent care or to the hospital to address a medical issue since the beginning of Operation Metro Surge. However, among those who did, 30.6 percent said "yes" to staying at home instead of going to urgent care or to the hospital. These results are particularly concerning, as delaying or forgoing care can worsen acute conditions and increase the risk of serious health complications. Moreover, delaying care often results in more severe and resource-intensive treatment later, which also places additional strains on healthcare systems.

Lastly, we asked respondents whether concerns about federal immigration enforcement caused them to miss a regularly scheduled vaccination. In Minneapolis, 61.4 percent did not have a regularly scheduled vaccination since the beginning of Operation Metro Surge. However, among those who did, 30.6 percent said "yes" to missing a regularly scheduled vaccination. In St. Paul, 67.6 percent did not have a regularly scheduled vaccination since the beginning of Operation Metro Surge. However, among those who did, 21.1 percent said "yes" to missing a regularly scheduled vaccination. The public health implications are clear, as missed vaccinations increase individual susceptibility to preventable diseases and can weaken herd immunity, thus raising the risk of community outbreaks.

The table below summarizes the results.

Table 3: Public Health Impacts of Operation Metro Surge

| Survey Item | Minneapolis (%) | St. Paul (%) |
|---|---|---|
| Missed Medical Appointment | 29.2 | 20.6 |
| Avoided Urgent/Hospital Care | 39.9 | 30.6 |
| Missed Vaccination | 30.6 | 21.1 |

Altogether, these data demonstrate that Operation Metro Surge disrupted access to routine care, urgent services, and preventive vaccinations, creating serious risks for both individual and public health.

9

# Appendix

Tom K. Wong

April 4, 2026

1

Exhibit A, p. 10

# 1  Differential Experiences by Race and Ethnicity

Respondents of color experienced Operation Metro Surge very differently from White respondents.

## 1.1  Interactions with Federal Immigration Enforcement Agents

Table 1 summarizes differences between respondents of color and White respondents when it comes to interactions with federal immigration enforcement agents in Minneapolis.

Table 1: Minneapolis: POC–White Differences in Reported Interactions

|  | POC | White | Difference | $p$ |
|---|---|---|---|---|
| Interaction | 34.1 | 24.3 | 9.8 | .008 |
| Questioned race, ethnicity, national origin | 80.5 | 47.9 | 32.6 | $< .001$ |
| Questioned speaking English | 69.9 | 41.9 | 28.1 | $< .001$ |
| Questioned immigration or citizenship | 72.8 | 44.9 | 27.9 | $< .001$ |
| Distrusted despite showing ID | 59.6 | 34.4 | 25.2 | .001 |
| Randomly stopped on street | 51.7 | 36.5 | 15.2 | .039 |
| Randomly stopped while driving | 62.5 | 45.9 | 16.5 | .024 |
| Did not show warrant | 74.6 | 71.6 | 3.1 | .641 |
| Entered home despite refusing entry | 21.2 | 24.1 | -2.9 | .645 |
| Sensitive location | 50.8 | 54.2 | -3.3 | .655 |
| Were detained | 26.6 | 22.6 | 4.0 | .533 |
| Physical force used against them | 26.4 | 19.7 | 6.7 | .287 |
| Chemical agents used against them | 21.6 | 29.7 | -8.1 | .210 |
| Weapons drawn (approach) | 44.7 | 31.9 | 12.7 | .081 |
| Weapons drawn (during) | 32.4 | 26.7 | 5.7 | .411 |

To begin, the data show that 34.1 percent of respondents of color reported interacting with federal immigration enforcement agents in Minneapolis compared to 24.3 percent of White respondents. This 9.8 percent difference is statistically significant (p = .008). In other words, respondents of color in Minneapolis were 9.8 percent more likely to report interacting with federal immigration enforcement agents during Operation Metro Surge compared to White respondents and this difference is systematic and non-random.

Moreover, 80.5 percent of respondents of color who reported an interaction said

2

that they were questioned about their race, ethnicity, or national origin compared to 47.9 percent of White respondents. This 32.6 percent difference is statistically significant ($p < .001$). In other words, respondents of color in Minneapolis were 32.6 percent more likely to report being questioned about their race, ethnicity, or national origin compared to White respondents and this difference is systematic and non-random. The data further show that 69.9 percent of respondents of color who reported an interaction said that they were questioned about speaking English compared to 41.9 percent of White respondents. This 28.1 percent difference is statistically significant ($p < .001$). This means that respondents of color in Minneapolis were 28.1 percent more likely to report being questioned about speaking English compared to White respondents and this difference is systematic and non-random. When it comes to their immigration or citizenship status, 72.8 percent of respondents of color who reported an interaction said that they were questioned about their immigration or citizenship status compared to 44.9 percent of White respondents. This 27.9 percent difference is statistically significant ($p < .001$). Otherwise put, respondents of color in Minneapolis were 27.9 percent more likely to report being questioned about their immigration or citizenship status compared to White respondents and this difference is systematic and non-random. Lastly, 59.6 percent of respondents of color who reported an interaction said that they were distrusted despite showing identification compared to 34.4 percent of White respondents. This 25.2 percent difference is statistically significant ($p = .001$). In other words, respondents of color in Minneapolis were 25.2 percent more likely to report being distrusted despite showing identification compared to White respondents and this difference is systematic and non-random.

Regarding randomly being stopped while walking or pulled over while driving, the data also show clear patterns by race and ethnicity. For example, 51.7 percent of respondents of color who reported an interaction were randomly stopped on the street while walking compared to 36.5 percent of White respondents. This 15.2 percent difference is statistically significant ($p = .039$). In other words, respondents of color in Minneapolis were 36.5 percent more likely to be randomly stopped while walking compared to White respondents and this difference is systematic and non-random. Moreover, 62.5 percent of respondents of color who reported an interaction were randomly stopped while driving compared to 45.9 percent of White respondents. This 16.5 percent difference is statistically significant ($p = .024$). This means that respondents of color in Minneapolis were 16.5 percent more likely to be randomly pulled over while driving compared to White respondents and this difference is systematic and non-random.

Table 2 summarizes differences between respondents of color and White respondents when it comes to interactions with federal immigration enforcement agents in

3

St. Paul.

Table 2: St. Paul: POC–White Differences in Reported Interactions

|  | POC | White | Difference | $p$ |
|---|---|---|---|---|
| Interaction | 18.8 | 19.4 | -0.6 | .893 |
| Questioned race, ethnicity, national origin | 53.9 | 36.9 | 17.0 | .172 |
| Questioned speaking English | 43.3 | 27.3 | 15.9 | .179 |
| Questioned immigration or citizenship | 57.9 | 14.9 | 42.9 | < .001 |
| Distrusted despite showing ID | 38.7 | 11.4 | 27.2 | .009 |
| Randomly stopped on street | 33.1 | 38.2 | -5.2 | .662 |
| Randomly stopped while driving | 38.2 | 26.1 | 12.1 | .312 |
| Did not show warrant | 88.3 | 92.3 | -4.0 | .512 |
| Entered home despite refusing entry | 16.9 | 10.8 | 6.1 | .462 |
| Sensitive location | 59.9 | 47.8 | 12.1 | .328 |
| Were detained | 20.9 | 6.8 | 14.2 | .062 |
| Physical force used against them | 17.9 | 11.9 | 6.0 | .459 |
| Chemical agents used against them | 9.5 | 21.9 | -12.5 | .140 |
| Weapons drawn (approach) | 20.5 | 31.8 | -11.2 | .303 |
| Weapons drawn (during) | 31.0 | 26.8 | 4.3 | .703 |

When it comes to St. Paul, there is no statistically significant difference between respondents of color and White respondents when it comes to reported interactions with federal immigration enforcement agents (p = .893).

However, respondents of color in St. Paul who reported an interaction were more likely to be questioned about their immigration or citizenship status and were also more likely to be distrusted despite showing identification. More specifically, 57.9 percent of respondents of color who reported an interaction were questioned about their immigration or citizenship status compared to 14.9 percent of White respondents. This 42.9 percent difference is statistically significant (p < .001). In other words, respondents of color in St. Paul were 42.9 percent more likely to be questioned about their immigration or citizenship status compared to White respondents and this difference is systematic and non-random. Moreover, 38.7 percent of respondents of color who reported an interaction were distrusted despite showing identification compared to 11.4 percent of White respondents. This 27.2 percent difference is statistically significant (p = .009). This means that respondents of color in St. Paul were 27.2 percent more likely to be distrusted despite showing identification compared to White respondents and this difference is systematic and non-random.

4

## 1.2  Trust in Law Enforcement

Table 3 shows differences between respondents of color and White respondents when it comes to attitudes about law enforcement in Minneapolis. As the table shows, 54.6 percent of respondents of color said that they "somewhat agree" or "strongly agree" that they are less likely to seek help from law enforcement as a result of how federal immigration enforcement agents conducted themselves during Operation Metro Surge compared to 45.8 percent of White respondents. This 8.9 percent difference is statistically significant (p = .028). In other words, respondents of color in Minneapolis are 8.9 percent less likely to seek help from law enforcement compared to White respondents and this difference is systematic and non-random.

Table 3: Minneapolis: POC–White Differences in Trust and Help-Seeking

|  | POC | White | Difference | $p$ |
|---|---|---|---|---|
| Less trust | 62.9 | 62.2 | 0.7 | .858 |
| Less likely to seek help | 54.6 | 45.8 | 8.9 | .028 |
| Less likely to obey commands | 34.6 | 28.7 | 5.8 | .124 |

Table 4 shows differences between respondents of color and White respondents when it comes to attitudes about law enforcement in St. Paul. As the table shows, none of the differences are statistically significant.

Table 4: St. Paul: POC–White Differences in Trust and Help-Seeking

|  | POC | White | Difference | $p$ |
|---|---|---|---|---|
| Less trust | 52.6 | 61.4 | -8.8 | .112 |
| Less likely to seek help | 50.9 | 43.5 | 7.4 | .187 |
| Less likely to obey commands | 22.6 | 28.3 | -5.7 | .209 |

## 1.3  Missed Work

When it comes to missed work, respondents of color in Minneapolis were 6.9 percent more likely to say that concerns about federal immigration enforcement efforts caused them to miss work since the beginning of Operation Metro Surge; however, this result is not statistically significant (p = .151). Respondents of color in St. Paul were 2.5 percent more likely to say that concerns about federal immigration enforcement efforts caused them to miss work since the beginning of Operation Metro

Surge; however, this result is also not statistically significant (p = .612). There are also no statistically significant differences when it comes to missing work because their workplace was closed.

There is, however, a statistically significant difference among respondents in Minneapolis when it comes to missing work because "I was concerned about my personal safety because of the increased presence of federal immigration enforcement agents." In Minneapolis, 84.7 percent of respondents of color reported missing work for this reason compared to 61.8 percent of White respondents. This 22.9 percent difference is statistically significant (p < .001). In other words, respondents of color in Minneapolis were 22.9 percent more likely to miss work because of concerns about their personal safety during Operation Metro Surge compared to White respondents and this difference is systematic and non-random.

There is also a statistically significant difference among respondents in Minneapolis when it comes to missing work because "My childcare provider was unable to show up because they were concerned about the increased presence of federal immigration enforcement agents." In Minneapolis, 57.2 percent of respondents of color reported missing work for this reason compared to 39.6 percent of White respondents. This 17.6 percent difference is statistically significant (p < .040). In other words, respondents of color in Minneapolis were 17.6 percent more likely to miss work because their childcare provider was unable to show up during Operation Metro Surge compared to White respondents and this difference is systematic and non-random.

Lastly, there is a statistically significant difference among respondents in St. Paul when it comes to missing work because "My caregiver was unable to show up because they were concerned about the increased presence of federal immigration enforcement agents." In St. Paul, 66.8 percent of respondents of color reported missing work for this reason compared to 26.4 percent of White respondents. This 40.4 percent difference is statistically significant (p < .002). In other words, respondents of color in St. Paul were 40.4 percent more likely to miss work because their caregiver was unable to show up during Operation Metro Surge compared to White respondents and this difference is systematic and non-random.

Table 5 summarizes the results for Minneapolis and Table 6 summarizes the results for St. Paul.

6

Table 5: Minneapolis: POC–White Differences in Missed Work

|  | POC | White | Difference | $p$ |
|---|---|---|---|---|
| Missed Work | 39.6 | 32.7 | 6.9 | .151 |
| Workplace Closed | 67.3 | 63.8 | 3.5 | .623 |
| Personal Safety | 84.7 | 61.8 | 22.9 | $< .001$ |
| Childcare Provider | 57.2 | 39.6 | 17.6 | .040 |
| Caregiver | 51.2 | 38.9 | 12.2 | .179 |

Table 6: St. Paul: POC–White Differences in Missed Work

|  | POC | White | Difference | $p$ |
|---|---|---|---|---|
| Missed Work | 23.3 | 20.8 | 2.5 | .612 |
| Workplace Closed | 66.4 | 48.4 | 18.0 | .149 |
| Personal Safety | 58.5 | 73.5 | -14.9 | .167 |
| Childcare Provider | 56.1 | 38.8 | 17.3 | .265 |
| Caregiver | 66.8 | 26.4 | 40.4 | .002 |

## 1.4 Missed School

When it comes to missed school, respondents of color in Minneapolis who are parents or legal guardians of a child or children currently attending a public K-12 school were 11.1 percent more likely to say that concerns about federal immigration enforcement efforts caused them to keep their child or children at home instead of sending them to school; however, this difference is not statistically significant (p = .112). Respondents of color in St. Paul who are parents or legal guardians of a child or children currently attending a public K-12 school were 4.2 percent less likely to say that concerns about federal immigration enforcement efforts caused them to keep their child or children at home instead of sending them to school; however, this difference is also not statistically significant (p = .689).

7

# 2  Impact of Interactions with Federal Immigration Enforcement Officials

The following examines interactions with federal immigration enforcement agents and the behavioral and attitudinal items in the survey. Table 7 shows the relationship between reported interactions with federal immigration enforcement agents and missed work, attitudes about law enforcement, and health implications in Minneapolis.

Table 7: Minneapolis: Interaction vs. No Interaction

|  | Interaction | No Interaction | Difference | $p$ |
|---|---|---|---|---|
| Missed work | 61.8 | 22.2 | 39.6 | $< .001$ |
| Less trust | 76.8 | 56.9 | 19.9 | $< .001$ |
| Less likely to seek help | 70.5 | 41.0 | 29.5 | $< .001$ |
| Less likely to obey commands | 53.9 | 22.1 | 31.8 | $< .001$ |
| Missed medical appointment | 62.0 | 12.8 | 49.2 | $< .001$ |
| Avoided urgent/hospital care | 66.2 | 17.7 | 48.5 | $< .001$ |
| Missed vaccination | 53.6 | 16.1 | 37.5 | $< .001$ |

As the table shows, 61.8 percent of respondents who reported an interaction with federal immigration enforcement agents during Operation Metro Surge missed work compared to 22.2 percent of respondents who did not report an interaction. This 39.6 percent difference is statistically significant ($p < .001$). In other words, respondents who reported an interaction were 39.6 percent more likely to miss work during Operation Metro Surge compared to respondents who did not report an interaction and this difference is systematic and non-random.

As the table also shows, 76.8 percent of respondents who reported an interaction with federal immigration enforcement agents during Operation Metro Surge said that they had less trust in law enforcement compared to 56.9 percent who did not report an interaction. This 19.9 percent difference is statistically significant ($p < .001$). In other words, respondents who reported an interaction with federal immigration enforcement agents during Operation Metro Surge are 19.9 percent less likely to trust law enforcement compared to respondents who did not report an interaction and this difference is systematic and non-random. Moreover, 70.5 percent of respondents who reported an interaction with federal immigration enforcement agents during Operation Metro Surge said that they are less likely to seek help from law enforcement compared to 41.0 percent who did not report an interaction. This 29.5 percent differ-

8

ence is statistically significant (p < .001). This means that respondents who reported an interaction with federal immigration enforcement agents during Operation Metro Surge are 29.5 percent less likely to seek help from law enforcement compared to respondents who did not report an interaction and this difference is systematic and non-random. Lastly, 53.9 percent of respondents who reported an interaction with federal immigration enforcement agents during Operation Metro Surge said that they are less likely to obey the commands of law enforcement compared to 22.1 percent who did not report an interaction. This 31.8 percent difference is statistically significant (p < .001). Otherwise put, respondents who reported an interaction with federal immigration enforcement agents during Operation Metro Surge are 31.8 percent less likely to obey the commands of law enforcement compared to respondents who did not report an interaction and this difference is systematic and non-random.

The health implications are also stark. As the table also shows, 62.0 percent of respondents who reported an interaction with federal immigration enforcement agents during Operation Metro Surge who had a medical appointment missed a medical appointment compared to 12.8 percent who did not report an interaction. This 49.2 percent difference is statistically significant (p < .001). Moreover, 66.2 percent of respondents who reported an interaction with federal immigration enforcement agents during Operation Metro Surge who had a medical issue that required urgent or hospital care avoided going to urgent care or to the hospital compared to 17.7 percent who did not report an interaction. This 48.5 percent difference is statistically significant (p < .001). Lastly, 53.6 percent of respondents who reported an interaction with federal immigration enforcement agents during Operation Metro Surge who had a scheduled vaccination missed a vaccination compared to 16.1 percent who did not report an interaction. This 37.5 percent difference is statistically significant (p < .001).

Table 8 shows similar patterns for St. Paul with all relationships being statistically significant except for avoiding urgent or hospital care and missed vaccination.

9

Table 8: St. Paul: Interaction vs. No Interaction

|                              | Interaction | No Interaction | Difference | $p$      |
|------------------------------|-------------|----------------|------------|----------|
| Missed work                  | 42.4        | 15.6           | 26.8       | < .001   |
| Less trust                   | 76.6        | 53.9           | 22.7       | < .001   |
| Less likely to seek help     | 65.6        | 41.5           | 24.0       | < .001   |
| Less likely to obey commands | 42.8        | 22.3           | 20.5       | .002     |
| Missed medical appointment   | 49.5        | 13.7           | 35.8       | < .001   |
| Avoided urgent/hospital care | 44.1        | 24.9           | 19.2       | .070     |
| Missed vaccination           | 33.0        | 17.3           | 15.8       | .091     |

# 3   Implications of Racial Profiling

The following combines whether a person was asked about their race, ethnicity, or national origin, whether they speak English, or whether they were asked about their immigration or citizenship status, into a "racial profiling" variable.

To begin, in Minneapolis, 87.3 percent of respondents of color who reported an interaction with federal immigration enforcement agents were asked at least one of these three questions compared to 65.2 percent of White respondents. This 22.1 percent difference is statistically significant (p < .001). In other words, respondents of color in Minneapolis were 22.1 percent more likely to be racially profiled compared to White respondents and this difference is systematic and non-random. Although respondents of color in St. Paul were also more likely to be racially profiled compared to White respondents, this difference is not statistically significant.

Table 9 shows the relationship between racial profiling and the behavioral and attitudinal items in the survey in Minneapolis. The results are stark. Those who were racially profiled were 23.4 percent more likely to miss work (p =.015); 24.7 percent less likely to seek help from law enforcement (p = .003); 30.4 percent more likely to have missed a scheduled medical appointment (p = .004); 33.2 percent more likely to have avoided urgent or hospital care (p = .024); and 26.7 percent more likely to have missed a scheduled vaccination (p = .047). All of these differences are systematic and non-random.

10

Table 9: Minneapolis: Racial Profiling and Social Outcomes

|                               | Racial Profiling | No Racial Profiling | Difference | $p$ |
|-------------------------------|------------------|---------------------|------------|------|
| Missed work                   | 67.3             | 43.9                | 23.4       | .015 |
| Less trust                    | 79.9             | 67.0                | 12.8       | .098 |
| Less likely to seek help      | 73.1             | 62.3                | 10.8       | .191 |
| Less likely to obey commands  | 59.8             | 35.1                | 24.7       | .003 |
| Missed medical appointment    | 68.6             | 38.2                | 30.4       | .004 |
| Avoided urgent/hospital care  | 70.4             | 37.2                | 33.2       | .024 |
| Missed vaccination            | 57.0             | 30.3                | 26.7       | .047 |

Table 10 shows the relationship between racial profiling and the behavioral and attitudinal items in the survey in St. Paul. The results are also stark. Those who were racially profiled were 26.9 percent more likely to miss work (p =.022); 26.5 percent less likely to obey the commands of law enforcement (p = .029); 65.2 percent more likely to have missed a scheduled medical appointment (p < .001); and 48.1 percent more likely to have avoided urgent or hospital care (p = .001). All of these differences are systematic and non-random.

Table 10: St. Paul: Racial Profiling and Social Outcomes

|                               | Racial Profiling | No Racial Profiling | Difference | $p$ |
|-------------------------------|------------------|---------------------|------------|---------|
| Missed work                   | 54.6             | 27.6                | 26.9       | .022    |
| Less trust                    | 80.9             | 71.7                | 9.1        | .369    |
| Less likely to seek help      | 67.5             | 63.3                | 4.2        | .722    |
| Less likely to obey commands  | 55.2             | 28.7                | 26.5       | .029    |
| Missed medical appointment    | 76.3             | 11.2                | 65.2       | < .001  |
| Avoided urgent/hospital care  | 58.3             | 10.2                | 48.1       | .001    |
| Missed vaccination            | 40.1             | 12.4                | 27.7       | .051    |

# 4   Implications of Roving Patrols

The following combines whether a person was randomly stopped by federal immigration enforcement agents while walking or whether they were randomly pulled over by federal immigration enforcement agents while driving into a "roving patrol" variable.

To begin, in Minneapolis, 79.3 percent of respondents of color who reported

11

an interaction with federal immigration enforcement agents were either randomly stopped while walking or randomly pulled over while driving compared to 63.0 percent of White respondents. This 16.3 percent difference is statistically significant (p < .001). In other words, respondents of color in Minneapolis were 16.3 percent more likely to be randomly stopped while walking or randomly pulled over while driving compared to White respondents and this difference is systematic and non-random. Although respondents of color in St. Paul were also more likely to be randomly stopped while walking or randomly pulled over while driving compared to White respondents, this difference is not statistically significant.

Table 11 shows the relationship between roving patrols and the behavioral and attitudinal items in the survey in Minneapolis. The results are stark. Those who were subject to roving patrols were 30.8 percent more likely to miss work (p =.001); 16.4 percent less likely to seek help from law enforcement (p = .034); 17.8 percent less likely to obey the commands of law enforcement (p = .027); 31.5 percent more likely to have missed a scheduled medical appointment (p = .001); and 36.1 percent more likely to have avoided urgent or hospital care (p = .003). These differences are systematic and non-random.

Table 11: Minneapolis: Roving Patrols and Social Outcomes

|  | Roving Patrol | No Roving Patrol | Difference | $p$ |
|---|---|---|---|---|
| Missed work | 70.0 | 39.2 | 30.8 | .001 |
| Less trust | 80.8 | 67.0 | 13.8 | .055 |
| Less likely to seek help | 75.3 | 58.9 | 16.4 | .034 |
| Less likely to obey commands | 59.1 | 41.3 | 17.8 | .027 |
| Missed medical appointment | 70.9 | 39.4 | 31.5 | .001 |
| Avoided urgent/hospital care | 74.5 | 38.5 | 36.1 | .003 |
| Missed vaccination | 58.0 | 38.9 | 19.1 | .102 |

Table 12 shows the relationship between roving patrols and the behavioral and attitudinal items in the survey in St. Paul. Unlike Minneapolis, the results in St. Paul are not statistically significant.

12

Table 12: St. Paul: Roving Patrols and Social Outcomes

|                              | Roving Patrol | No Roving Patrol | Difference | $p$  |
|------------------------------|---------------|------------------|------------|------|
| Missed work                  | 50.6          | 34.3             | 16.3       | .195 |
| Less trust                   | 80.1          | 73.6             | 6.5        | .519 |
| Less likely to seek help     | 72.5          | 59.4             | 13.1       | .259 |
| Less likely to obey commands | 44.0          | 41.8             | 2.2        | .854 |
| Missed medical appointment   | 55.5          | 45.3             | 10.3       | .524 |
| Avoided urgent/hospital care | 37.1          | 50.6             | -13.5      | .445 |
| Missed vaccination           | 26.4          | 42.7             | -16.3      | .348 |

# 5  Sensitive Locations

Regarding interactions with federal immigration enforcement agents at or near sensitive locations, some significant trends emerge.

In Minneapolis, 72.8 percent of respondents who reported an interaction with federal immigration enforcement agents at or near a sensitive location missed work during Operation Metro Surge compared to 50.2 percent of respondents who did not report an interaction at or near a sensitive location. This 22.7 percent difference is statistically significant (p = .005). In other words, respondents who reported an interaction with federal immigration enforcement agents at or near a sensitive location were 22.7 percent more likely to have missed work during Operation Metro Surge and this difference is systematic and non-random. Moreover, 77.2 percent of respondents who reported an interaction with federal immigration enforcement agents at or near a sensitive location missed a scheduled medical appointment during Operation Metro Surge compared to 44.5 percent of respondents who did not report an interaction at or near a sensitive location. This 32.7 percent difference is statistically significant (p < .001). In other words, respondents who reported an interaction with federal immigration enforcement agents at or near a sensitive location were 32.7 percent more likely to have missed a scheduled medical appointment during Operation Metro Surge and this difference is systematic and non-random.

Table 13: Minneapolis: Sensitive Locations and Social Outcomes

|  | Sensitive Loc | No Sensitive Loc | Difference | $p$ |
|---|---|---|---|---|
| Missed work | 72.8 | 50.2 | 22.7 | .005 |
| Less trust | 80.7 | 72.5 | 8.3 | .185 |
| Less likely to seek help | 75.4 | 65.2 | 10.1 | .136 |
| Less likely to obey commands | 57.6 | 49.8 | 7.8 | .295 |
| Missed medical appointment | 77.2 | 44.5 | 32.7 | $< .001$ |
| Avoided urgent/hospital care | 74.0 | 54.2 | 19.8 | .056 |
| Missed vaccination | 59.9 | 44.4 | 15.5 | .134 |

In St. Paul, 76.9 percent of respondents who reported an interaction with federal immigration enforcement agents at or near a sensitive location are less likely to seek help from law enforcement compared to 53.3 percent of respondents who did not report an interaction at or near a sensitive location. This 23.7 percent difference is statistically significant (p = .039). In other words, respondents who reported an interaction with federal immigration enforcement agents at or near a sensitive location are 23.7 percent less likely to seek help from law enforcement and this difference is systematic and non-random.

Table 14: St. Paul: Sensitive Locations and Social Outcomes

|  | Sensitive Loc | No Sensitive Loc | Difference | $p$ |
|---|---|---|---|---|
| Missed work | 44.7 | 38.6 | 6.1 | .617 |
| Less trust | 78.9 | 74.2 | 4.7 | .642 |
| Less likely to seek help | 76.9 | 53.3 | 23.7 | .039 |
| Less likely to obey commands | 50.1 | 34.9 | 15.1 | .216 |
| Missed medical appointment | 46.9 | 51.9 | -5.1 | .741 |
| Avoided urgent/hospital care | 42.7 | 45.3 | -2.5 | .890 |
| Missed vaccination | 32.3 | 33.8 | -1.4 | .933 |

# 6 Interactions With Federal Immigration Enforcement Agents and Missed Work

Table 15 isolates the relationship between reported interactions with federal immigration enforcement agents in Minneapolis and missed work during Operation Metro

14

Surge. As the table shows, respondents who were questioned about their immigration or citizenship status were 15.7 percent more likely to miss work (p = .019); respondents who were distrusted despite showing identification were 35.9 percent more likely to miss work (p < .001); respondents who were randomly stopped while walking were 36.4 percent more likely to miss work (p < .001); respondents who were randomly pulled over while driving were 17.9 percent more likely to miss work (p < .029); respondents who were shown an administrative or judicial warrant were 44.8 percent more likely to miss work (p < .001); respondents who reported that federal immigration enforcement officials entered their homes despite refusing entry were 35.3 percent more likely to miss work (p < .001); respondents who reported an interaction at or near a sensitive location were 22.7 percent more likely to miss work (p = .005); respondents who were detained were 32.6 percent more likely to miss work; respondents who reported that physical force was used against them were 25.0 percent more likely to miss work (p = .002); respondents who reported that chemical agents were used against them were 30.1 percent more likely to miss work (p < .001); respondents who reported that weapons were drawn against them were 29.9 percent more likely to miss work (p < .001); and respondents who reported that weapons were drawn against them during the course of their interaction were 40.4 percent more likely to miss work (p < .001).

Table 15: Minneapolis: Interaction Characteristics and Missed Work

|  | Missed Work | No Missed Work | Difference | $p$ |
|---|---|---|---|---|
| Race, ethnicity, or national origin | 65.9 | 54.3 | 11.6 | .172 |
| Speak English | 68.3 | 52.6 | 15.7 | .058 |
| Immigration or citizenship status | 70.0 | 50.8 | 19.2 | .019 |
| Distrusted despite showing ID | 80.5 | 44.5 | 35.9 | < .001 |
| Randomly stopped on street | 82.0 | 45.6 | 36.4 | < .001 |
| Randomly stopped while driving | 69.3 | 51.3 | 17.9 | .029 |
| Did not show warrant | 93.1 | 48.3 | 44.8 | < .001 |
| Entered home despite refusing entry | 88.2 | 52.9 | 35.3 | < .001 |
| Sensitive location | 72.8 | 50.2 | 22.7 | .005 |
| Were detained | 86.1 | 53.5 | 32.6 | < .001 |
| Physical force used against them | 80.8 | 55.7 | 25.0 | .002 |
| Chemical agent used against them | 83.9 | 53.8 | 30.1 | < .001 |
| Weapons drawn (approach) | 79.7 | 49.9 | 29.9 | < .001 |
| Weapons drawn (during) | 89.6 | 49.2 | 40.4 | < .001 |

15

Table 16 isolates the relationship between reported interactions with federal immigration enforcement agents in St. Paul and missed work during Operation Metro Surge. As the table shows, respondents who were questioned about their race, ethnicity, or national origin were 33.8 percent more likely to miss work (p = .004); respondents who were questioned about speaking English were 26.6 percent more likely to miss work (p = .036); respondents who were distrusted despite showing identification were 27.4 percent more likely to miss work (p = .045); respondents who were shown an administrative or judicial warrant were 51.0 percent more likely to miss work (p < .001); respondents who reported that federal immigration enforcement officials entered their homes despite refusing entry were 33.7 percent more likely to miss work (p = .035); respondents who were detained were 32.9 percent more likely to miss work (p = .028); respondents who reported that chemical agents were used against them were 50.8 percent more likely to miss work (p < .001); respondents who reported that weapons were drawn against them were 30.8 percent more likely to miss work (p = .042); and respondents who reported that weapons were drawn against them during the course of their interaction were 31.9 percent more likely to miss work (p < .019).

Table 16: St. Paul: Interaction Characteristics and Missed Work

|  | Missed Work | No Missed Work | Difference | $p$ |
|---|---|---|---|---|
| Race, ethnicity, or national origin | 61.1 | 27.2 | 33.8 | .004 |
| Speak English | 59.6 | 33.1 | 26.6 | .036 |
| Immigration or citizenship status | 48.5 | 38.5 | 10.0 | .426 |
| Distrusted despite showing ID | 63.3 | 35.8 | 27.4 | .045 |
| Randomly stopped on street | 56.8 | 34.3 | 22.5 | .094 |
| Randomly stopped while driving | 60.2 | 33.7 | 26.6 | .064 |
| Did not show warrant | 87.1 | 36.0 | 51.0 | < .001 |
| Entered home despite refusing entry | 71.5 | 37.8 | 33.7 | .035 |
| Sensitive location | 44.7 | 38.6 | 6.1 | .617 |
| Were detained | 70.3 | 37.4 | 32.9 | .028 |
| Physical force used against them | 62.5 | 39.0 | 23.5 | .125 |
| Chemical agent used against them | 85.5 | 34.8 | 50.8 | < .001 |
| Weapons drawn (approach) | 66.9 | 36.1 | 30.8 | .042 |
| Weapons drawn (during) | 65.4 | 33.4 | 31.9 | .019 |

16