UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

STATE OF MINNESOTA, *by and*
*through its Attorney General Keith Ellison*,
CITY OF MINNEAPOLIS, and
CITY OF ST. PAUL,

        Plaintiffs,

v.

KRISTI NOEM, *in her official capacity as Special Envoy*;
MARKWAYNE MULLIN, *in his official capacity*
*as Secretary of the U.S. Department of*
*Homeland Security*;[1] STEPHEN MILLER, *in his*
*official capacity as Homeland Security Advisor*,
JOHN CONDON, *in his official capacity as Acting*
*Executive Associate Director of Homeland Security*
*Investigations*; U.S. Department of Homeland
Security; TODD LYONS, *in his official capacity as*
*Acting Director of U.S. Immigration and Customs*
*Enforcement*; MARCOS CHARLES, *in his official*
*capacity as Acting Executive Associate Director,*
*Enforcement and Removal Operations;*
U.S. Immigration and Customs Enforcement;
RODNEY SCOTT, *in his official capacity as*
*Commissioner of U.S. Customs and Border*
*Protection;* U.S. Customs and Border Protection;
TOM HOMAN, *in his official capacity as Border Czar*,
GREGORY BOVINO, *in his official capacity*
*as Commander of the U.S. Border Patrol*; U.S. Border
Patrol; DAVID EASTERWOOD, *in his official*
*capacity as Acting Director, Saint Paul Field Office,*
*U.S. Immigration and Customs Enforcement*,

        Defendants.

Case No. 0:26-cv-00190-KMM-DJF

**DEFENDANTS' MEMORANDUM
OF LAW IN SUPPORT OF
MOTION TO DISMISS AMENDED
COMPLAINT**

_____

_____

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Markwayne Mullin, the current Secretary of Homeland Security, is automatically substituted as a defendant for former Secretary Kristi Noem.

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ................................................ 2

LEGAL STANDARD ............................................................................................... 4

ARGUMENT ............................................................................................................ 5

I.   Plaintiffs Lack Standing. ............................................................................... 5

    A.   Plaintiffs' alleged financial injuries are insufficient. .................................. 5

    B.   Plaintiffs' alleged intangible injuries do not give rise to standing. .............. 8

    C.   Plaintiffs cannot assert the interests of their residents. .............................. 11

    D.   Plaintiffs' challenges to the revocation of the so-called sensitive locations policy and the Lyons Memo fail for a lack of traceability and redressability. ........................................................................................ 13

    E.   For various reasons, Plaintiffs lack standing to bring other claims as well. .................................................................................................... 14

II.   The Conclusion of Operation Metro Surge Requires Dismissal. ........................ 15

III.   Plaintiffs Fail to State a Tenth Amendment Claim. ....................................... 19

    A.   Plaintiffs fail to allege any infringement on their police powers. .............. 19

    B.   Plaintiffs fail to state an anticommandeering or coercion claim. ............... 20

IV.   Minnesota Fails to State an Equal Sovereignty Claim. .................................... 28

V.   Plaintiffs fail to state First Amendment Claims. .............................................. 31

VI.   Plaintiffs' APA claims are not justiciable. ..................................................... 34

    A.   Most of Plaintiffs' APA claims fail to plausibly allege a discrete agency action. ....................................................................................... 34

    B.   Counts IX and XI fail to plausibly allege final agency action. ................... 42

C.     Counts V, IX, and XI challenge actions that are committed to
       agency discretion. ...................................................................................46

VII.  The Court Should Dismiss Count VII. ...................................................................52

VIII. Count XVIII Fails to State a Valid Claim For Relief. .............................................55

IX.   Plaintiffs' *Ultra Vires* Claim (Count XIX) Should Be Dismissed. ........................56

X.    This Court Lacks Jurisdiction to Issue Injunctive Relief. ......................................57

CONCLUSION ........................................................................................................57

## TABLE OF AUTHORITIES

**CASES**                                               **PAGE(S)**

*ACLU v. NSA*,
  493 F.3d 644 (6th Cir. 2007) ...................................................................................... 39

*Al Otro Lado, Inc. v. McAleenan*,
  394 F. Supp. 3d 1168 (S.D. Cal. 2019).......................................................................... 39

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
  458 U.S. 592 .............................................................................................................11-12

*Alsaidi v. U.S. Dep't of State*,
  292 F. Supp. 3d. 320 (D.D.C. 2018)............................................................................. 38

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
  148 F.4th 648 (9th Cir. 2025)....................................................................................... 33

*Am. Tort Reform Ass'n v. OSHA*,
  738 F.3d 387 (D.C. Cir. 2013)...................................................................................... 43

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022) ...................................................................... 7, 43, 44, 45

*Arizona v. California*,
  283 U.S. 423 (1931)............................................................................................... 10, 53

*Arizona v. United States*,
  567 U.S. 387 (2012)....................................................................................... 29, 47, 49

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).............................................................................. 4, 5, 37, 55-56

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*,
  785 F.3d 710 (D.C. Cir. 2015)................................................................................ 43, 45

*Bark v. U.S. Forest Serv.*,
  37 F. Supp. 3d 41 (D.D.C. 2014).............................................................................. 38, 39

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................................................4, 36-37

iii

*Bernbeck v. Gale*,
829 F.3d 643 (8th Cir. 2016) ...................................................................... 16

*Biden v. Texas*,
597 U.S. 785 (2022)........................................................................ 35, 37, 39

*Boeing Co. v. Movassaghi*,
768 F.3d 832 (9th Cir. 2014) ...................................................................... 53

*Boire v. Greyhound Corp.*,
376 U.S. 473 (1964)..................................................................................... 56

*Bost v. Illinois State Bd. of Elections*,
607 U.S. 71 (2026)......................................................................................... 9

*Braden v. Wal-Mart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009) ..................................................................... 4-5

*Braitberg v. Charter Commc'ns, Inc.*,
836 F.3d 925(8th Cir. 2016)....................................................................... 18

*Brock v. Cathedral Bluffs Shale Oil Co.*,
796 F.2d 533 (D.C. Cir. 1986)..................................................................... 49

*California v. Texas*,
593 U.S. 659 (2021)..................................................................................... 13

*Carlsen v. GameStop, Inc.*,
833 F.3d 903 (8th Cir. 2016) ........................................................................ 4

*Chicago Headline Club v. Noem*,
168 F.4th 1033 (7th Cir. 2026) ................................................................... 26

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010)..................................................................................... 32

*City of Clarkson Valley v. Mineta*,
No. 4:04CV00301 RWS, 2008 WL 11512303 (E.D. Mo. Apr. 22, 2008) .................... 12

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)................................................................... 4, 16, 17, 18

*City of North Miami v. Fed. Aviation Admin.*,
47 F.4th 1257 (11th Cir. 2022) ................................................................... 12

iv

*City of New York v. DOD*,
    913 F.3d 423 (4th Cir. 2019) ................................................................................35

*City of New York v. United States*,
    179 F.3d 29 (2d Cir. 1999). ...............................................................................22

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)...............................................................................16, 17-18

*Cobell v. Kempthorne*,
    455 F.3d 301 (D.C. Cir. 2006)........................................................................40-41

*Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*,
    412 U.S. 94 (1973)..............................................................................................32

*Corner Post, Inc v. Bd. of Governors of Fed. Rsrv. Sys.*,
    603 U.S. 799 (2024)......................................................................................34, 39

*Creek v. Vill. of Westhaven*,
    80 F.3d 186 (7th Cir. 1996) ...............................................................................32

*Crooks v. Lynch*,
    557 F.3d 846 (8th Cir. 2009) ................................................................................4

*Daines v. IRS*,
    No. 24-CV-1057,  2025 WL 2694788 (E.D. Wis. Sept. 22, 2025) ..............................38

*Dawson v. Steager*,
    586 U.S. 171 (2019)...........................................................................................23

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)...................................................................................24-25, 25

*Dep't of Educ. v. Brown*,
    600 U.S. 551 (2023)...........................................................................................13

*Fed. Election Comm'n v. Cruz*,
    596 U.S. 289 (2022).............................................................................................5

*Fernandez v. Wiener*,
    326 U.S. 340 (1945)...........................................................................................22

*Firearms Regul. Account. Coal., Inc. v. Garland*,
    112 F.4th 507 (8th Cir. 2024) .......................................................................42-43, 44

*Food & Drug Admin. v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024)................................................................................7, 9

*Fridley Public School District v. Mullin*,
  No. 26-CV-1023 (LMP/LIB), 2026 WL 1244043 (D. Minn. May 6, 2026)..........*passim*

*Garland v. Aleman Gonzalez*,
  596 U.S. 543 (2022).....................................................................................57

*Geo Group, Inc. v. Newsom*,
  50 F.4th 745 (9th Cir. 2022) .......................................................................53

*Greer v. Chao*,
  492 F.3d 962 (8th Cir. 2007) ...............................................................49, 50

*Haaland v. Brackeen*,
  599 U.S. 255 (2023)......................................................................................12

*Hancock v. Train*,
  426 U.S. 167 (1976).....................................................................................53

*Harrison v. Jefferson Par. Sch. Bd.*,
  78 F.4th 765 (5th Cir. 2023) .......................................................................10

*Heckler v. Chaney*,
  470 U.S. 821 (1985)............................................................................*passim*

*Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*,
  452 U.S. 264 (1981).....................................................................................25

*Houston Cmty. Coll. Sys. v. Wilson*,
  595 U.S. 468 (2022).....................................................................................33

*Hunter v. Page County*,
  102 F.4th 853 (8th Cir. 2024) .....................................................................37

*Hunter v. Underwood*,
  471 U.S. 222 (1985)..................................................................................25-26

*Hussen v. Noem*,
  No. 26-CV-324 (ECT/ECW), 2026 WL 657936 (D. Minn. Mar. 9, 2026)...................17

*In re Pre-Filled Propane Tank Antitrust Litig.*,
  893 F.3d 1047 (8th Cir. 2018) ................................................................36-37

*In re SuperValu, Inc.*,
   870 F.3d 763 (8th Cir. 2017) ................................................................................. 9

*Indep. Equip. Dealers Ass'n v. EPA*,
   372 F.3d 420 (D.C. Cir. 2004) (Roberts, J.) ...................................................... 34

*Interstate Com. Comm'n v. Bhd. of Locomotive Eng'rs*,
   482 U.S. 270 (1987)............................................................................................ 47

*Iowa Migrant Movement for Just. v. Bird*,
   157 F.4th 904 (8th Cir. 2025) ...................................................................... 47, 50

*Johnson v. Maryland*,
   254 U.S. 51 (1920).......................................................................................53, 54

*Johnson v. United States*,
   534 F.3d 958 (8th Cir. 2008) ................................................................................ 4

*Jones v. Bloomingdales.com, LLC*,
   124 F.4th 535 (8th Cir. 2024) ............................................................................... 9

*L.A. Press Club v. Noem*,
   --- F. Supp. 3d ----, 2026 WL 103972 (C.D. Cal. Jan. 8, 2026) ....................37, 38, 39

*LaBatte v. Gangle*,
   161 F.4th 1109 (8th Cir. 2025).......................................................................... 19

*Laney v. City of St. Louis*,
   56 F.4th 1153 (8th Cir. 2023) ............................................................................ 33

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)............................................................................................ 13

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990)......................................................................................*passim*

*Maryland v. United States Dep't of Agric.*,
   151 F.4th 197 (4th Cir. 2025) .......................................................................... 6, 7

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923)............................................................................................ 12

*Mayhew v. Burwell*,
   772 F.3d 80 (1st Cir. 2014)................................................................................ 29

*Mayo v. United States*,
  319 U.S. 441 (1943)..................................................................................................53

*McCulloch v. Maryland*,
  17 U.S. (4 Wheat.) 316 (1819)................................................................................ 19

*Mennonite Church USA v. DHS*
  778 F. Supp. 3d 1 (D.D.C. 2025).............................................................................. 14

*Minnesota v. Noem*,
  818 F. Supp. 3d 1030 (D. Minn. 2026)...............................................................*passim*

*Mitchell v. Kirchmeier*,
  28 F.4th 888 (8th Cir. 2022) ................................................................................... 33

*Muir v. Ala. Educ. Television Comm'n*,
  688 F.2d 1033 (5th Cir. 1982) (en banc) ........................................................ 32

*NAACP  v. Hunt*,
  891 F.2d 1555 (11th Cir. 1990) ............................................................................... 32

*Nat'l Collegiate Athletic Ass'n v. Governor of N.J.*, ("*NCAA*"),
  730 F.3d 208 (3d Cir. 2013*),*
  *abrogated on other grounds by Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S.
  453 (2018) ...............................................................................................................29

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, ("*NFIB*"),
  567 U.S. 519 (2012)..............................................................................22, 24, 26, 27

*New England Synod v. DHS*,
  No. CV 25-40102-FDS, 2026 WL 412329 (D. Mass. Feb. 13, 2026)...................*passim*

*New Mexico v. McAleenan*,
  450 F. Supp. 3d 1130 (D.N.M. 2020) ................................................... 31, 32, 34

*New York v. DOJ*,
  951 F.3d 84 (2d Cir. 2020) .................................................................................27-28

*New York v. United States*,
  505 U.S. 144 (1992)..............................................................................................20-21

*New York v. Yellen*,
  15 F.4th 569 (2d Cir. 2021) ..................................................................................... 28

*Ngure v. Ashcroft*,
367 F.3d 975 (8th Cir. 2004) ................................................................. 46-47, 49-50

*Noem v. Vasquez Perdomo*,
146 S. Ct. 1 (2025) ................................................................................................ 16

*Norton v. S. Utah Wilderness All.* ("*SUWA*"),
542 U.S. 55 (2004) ........................................................................................... 35, 41

*Nuclear Regul. Comm'n v. Texas*
605 U.S. 665 (2025) ........................................................................... 54-55, 56-57

*Nw. Ctr. for Alternatives to Pesticides v. DHS*,
552 F. Supp. 3d 1078 (D. Or. 2021) ........................................................... 39-40

*Ohio v. EPA*,
98 F.4th 288 (D.C. Cir. 2024)*, rev'd and remanded on other grounds sub nom.*
*Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100 (2025) ....................................29, 30

*Ohio v. Thomas*,
173 U.S. 276 (1899) ........................................................................................ 11, 53

*Ojogwu v. Rodenburg L. Firm*,
26 F.4th 457 (8th Cir. 2022) ................................................................................ 8

*Park v. Forest Serv.*,
205 F.3d 1034 (8th Cir. 2000) ........................................................................... 16

*People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*,
60 F. Supp. 3d 14 (D.D.C. 2014) ....................................................................... 38

*People for the Ethical Treatment of Animals v. USDA*,
797 F.3d 1087 (D.C. Cir. 2015) ......................................................................... 38

*Phila. Yearly Meeting of Religious Soc'y of Friends v. DHS*,
No. CV 25-0243-TDC, 2026 WL 280089 (D. Md. Feb. 3, 2026) .......................... 42, 51

*Printz v. United States*,
521 U.S. 898 (1997) ........................................................................................... 21

*Railway Clerks v. Assoc. for Benefit of Noncontract Emps.*,
380 U.S. 650 (1965) ........................................................................................... 56

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
525 U.S. 471 (1999)............................................................................30, 50-51

*Reno v. Condon*,
528 U.S. 141 (2000).................................................................................21

*Rockwell Int'l Corp. v. United States*,
549 U.S. 457 (2007).................................................................................17

*Rodriguez v. U.S. Dep't of Air Force*,
387 F. Supp. 3d 130 (D.D.C. 2019)........................................................37-38

*Royal Canin U.S.A., Inc. v. Wullschleger*,
604 U.S. 22 (2025)...................................................................................17

*Saginaw County v. STAT Emergency Med. Servs., Inc.*,
946 F.3d 951 (6th Cir. 2020) ...................................................................9-10

*Scheffler v. Molin*,
743 F.3d 619 (8th Cir. 2014) .....................................................................31

*Shelby County v. Holder*,
570 U.S. 529 (2013)............................................................................. 28, 30

*Sierra Club v. U.S. Army Corps of Eng'rs*,
446 F.3d 808 (8th Cir. 2006) ....................................................................35

*Sisseton–Wahpeton Oyate of Lake Traverse Rsrv. v. U.S. Corps of Eng'rs*,
888 F.3d 906 (8th Cir. 2018) ....................................................................43

*Skelly Oil Co. v. Phillips Petroleum Co.*,
339 U.S. 667 (1950).................................................................................52

*South Carolina v. Katzenbach*,
383 U.S. 301 (1966).................................................................................12

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)...................................................................................5

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998).....................................................................................4

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009).................................................................................17

x

*Tamenut v. Mukasey*,
   521 F.3d 1000 (8th Cir. 2008) .................................................................. 46-47, 48-49

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015)*,
   aff'd by an equally divided court,* 579 U.S. 547 (2016) (per curiam) ........................... 10

*Tincher v. Noem*,
   164 F.4th 1097 (8th Cir. 2026) ............................................................................. 26

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021).............................................................................. 5, 8, 9, 26

*Trump v. Hawaii*,
   585 U.S. 667 (2018).....................................................................................25-26

*Trump v. United States*,
   603 U.S. 593 (2024) ........................................................................................ 30

*Trump v. Vance*,
   591 U.S. 786 (2020).................................................................................. 53, 54

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   578 U.S. 590 (2016)..........................................................................42-43, 44, 45, 46

*United States v. Am. Libr. Ass'n*,
   539 U.S. 194 (2003)........................................................................................ 32

*United States v. California*,
   173 F.4th 1060 (9th Cir. 2026) ........................................................................ 10, 54

*United States v. Louper-Morris*,
   672 F.3d 539 (8th Cir. 2012) .............................................................................. 20

*United States v. Maupin*,
   3 F.4th 1009 (8th Cir. 2021) .............................................................................. 19

*United States v. Minnesota*,
   Case No. 0:25-cv-03798 (ECT/JFD) ..................................................................... 26

*United States v. Nixon*,
   418 U.S. 683 (1974)........................................................................................ 30

*United States v. Texas*,
   599 U.S. 670 (2023).................................................................................*passim*

xi

*United States v. Washington*,
   596 U.S. 832 (2022)......................................................................................53

*Vigil v. FEMA*,
   No. CIV 23-0941 JB/JFR, 2024 WL 2404487 (D.N.M. May 23, 2024)..................38-39

*Virginia ex rel. Cuccinelli v. Sebelius*,
   656 F.3d 253 (4th Cir. 2011) ........................................................................10

*Wal-Mart Stores E., LP v. Acosta*,
   919 F.3d 1073 (8th Cir. 2019) .......................................................................49

*Warth v. Seldin*,
   422 U.S. 490 (1975).....................................................................................12

*Washington v. U.S. Food & Drug Admin.*,
   108 F.4th 1163 (9th Cir. 2024) ...................................................................7, 11

*Williamson v. Tucker*,
   645 F.2d 404 (5th Cir. 1981) ..........................................................................4

## STATUTES

5 U.S.C. § 551(13)...............................................................................34-35, 37, 38

5 U.S.C. § 701(a)(2) ....................................................................................... 46

5 U.S.C. § 704 ...........................................................................................34-35, 35

8 U.S.C. § 1252(f)(1)...................................................................................... 1, 57

8 U.S.C. § 1357 .............................................................................................. 48

8 U.S.C. §§ 1221-1231 .................................................................................... 57

10 U.S.C. § 101(a)(4) ...................................................................................... 56

18 U.S.C. § 1385 ............................................................................................ 56

Minnesota Statute § 609.735 .............................................................................. 52

## FEDERAL RULES
Fed. R. Civ. P. 12(b)(1) and 12(b)(6).................................................................... 4

**OTHER AUTHORITIES**

Ann Woolhandler & Michael G. Collins, *State Standing*,
81 Va. L. Rev. 387 (1995) ........................................................................................ 10

**INTRODUCTION**

In December 2025, the Department of Homeland Security ("DHS") began an immigration enforcement operation throughout the Twin Cities and other parts of Minnesota called Operation Metro Surge. In January 2026, Plaintiffs filed their Complaint—alleging constitutional and statutory violations related to Operation Metro Surge—and sought preliminary injunctive relief based on two of their constitutional claims. Since then, the Court denied Plaintiffs' request for preliminary relief and Operation Metro Surge concluded. In April 2026, two months after the end of Operation Metro Surge, Plaintiffs filed an Amended Complaint seeking prospective relief based on events that occurred during that now-concluded operation.

Defendants now move to dismiss the Amended Complaint in its entirety. Plaintiffs lacked standing to bring most of their claims when they filed their initial Complaint, and the standing failures are even more apparent in the now-operative Amended Complaint. Even if the Court disagrees, Plaintiffs' problems do not end there. Plaintiffs fail to plausibly allege that Defendants violated either the First or Tenth Amendments by prioritizing immigration enforcement efforts in Minnesota. And Plaintiffs' Administrative Procedure Act (APA) claims suffer from a lack of final agency action, a lack of reviewability, and a lack of legal merit, or some combination of the three. Plaintiffs' other non-APA claims are similarly meritless. Finally, some of Plaintiffs' claims and requests for relief implicate the jurisdictional bar in 8 U.S.C. § 1252(f)(1), which provides yet another basis for dismissal. Accordingly, the Court should dismiss the Amended Complaint in full.

## FACTUAL AND PROCEDURAL BACKGROUND

The Court has extensive familiarity with the facts and circumstances of the immigration enforcement activity that occurred in Minnesota during Operation Metro Surge from other litigations, *see Tincher v. Noem*, 25-cv-4669 (D. Minn.), as well as prior proceedings in this case, *see Minnesota v. Noem*, 818 F. Supp. 3d 1030 (D. Minn. 2026). Defendants therefore provide only a summary of the background relevant to this motion.

In December 2025, DHS initiated Operation Metro Surge. The mission of Operation Metro Surge was to significantly increase 'at-large' arrests of illegal aliens in the Twin Cities metropolitan area, focusing on criminal aliens and individuals with executable final orders. Operation Metro Surge has now ended, as this Court previously determined. *See Tincher v. Noem*, 25-cv-4669 (D. Minn. Mar. 5, 2026) (ECF No. 246 at 6) (concluding that injunction "is now moot because [Operation Metro Surge] has ended"); *id.* at ECF No. 324 at 5 ("Operation Metro Surge ("OMS") has come to an end."); *accord* Declaration of Marty C. Raybon, Sr. ¶¶ 8-10 (*Tincher*, ECF No. 254); Second Declaration of David Easterwood Decl. ¶¶ 9-10 (*Tincher*, ECF No. 255).[2]

On January 12, 2026, Plaintiffs filed their Complaint, which asserted ten causes of action based on alleged conduct that occurred during Operation Metro Surge. ECF No. 1. Plaintiffs immediately moved for a temporary restraining order based on alleged Tenth Amendment and Equal Sovereignty violations. *See* ECF No. 8 ("TRO Mot."). The Court

---

[2] Other courts in this district have similarly determined that Operation Metro Surge has concluded. *See, e.g.*, *Hussen v. Noem*, 26-cv-324 (D. Minn.) (ECF No. 163 at 4:16-5:17, 5:24-6:12) (confirming drawdown of agents in Minnesota and describing Operation Metro Surge as "ending").

later converted Plaintiffs' TRO motion into a motion for a preliminary injunction. *See* ECF No. 21. Following briefing and argument on Plaintiffs' motion, this Court denied Plaintiffs' request for emergency relief, finding that Plaintiffs have not shown a likelihood of success on the merits of the Tenth Amendment and Equal Sovereignty claims. *See Minnesota*, 818 F. Supp. 3d at 1035.

Plaintiffs next sought expedited discovery, but the Court (Foster, M.J.) denied that motion as "insufficiently supported and overly broad." *See* ECF No. 147. Thereafter, Defendants moved to dismiss the Complaint in its entirety. *See* ECF No. 158. In response, Plaintiffs filed an Amended Complaint, which totals 178 pages and asserts 19 separate counts for relief. *See* ECF No. 167 (Am. Compl.).

Count I alleges that Defendants' actions violated the Tenth Amendment of the United States Constitution. Am. Compl. ¶¶ 483-502. Count II alleges that Defendants violated Minnesota's "Equal Sovereignty Under the U.S. Constitution" based on disparate treatment of Minnesota relative to other states. *Id.* ¶¶ 503-11. Counts III and IV allege that Defendants violated the First Amendment through unlawful retaliation and viewpoint discrimination. *Id.* ¶¶ 512-26. Counts V, VI, and VIII-XVII allege that Defendants have violated the APA in a variety of ways through the execution of purported law enforcement policies. *Id.* ¶¶ 527-51, 560-664. Count VII seeks a declaratory judgment that the State of Minnesota can enforce its state law prohibiting masking in public against federal officers. *Id.* ¶¶ 552-59. Counts XVIII and XIX allege that Defendants engaged in *ultra vires* action that was not authorized by Congress through the use of purported military force and the adoption of various alleged law enforcement policies. *Id.* ¶¶ 665-686.

Defendants now move to dismiss Plaintiffs' Amended Complaint in its entirety.

## LEGAL STANDARD

Defendants move to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

Under Rule 12(b)(1), a plaintiff bears the burden of establishing that the court has subject-matter jurisdiction over the claims asserted in the complaint. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998). Rule 12(b)(1) attacks can be facial or factual. *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016). "A district court has the authority to dismiss an action for lack of subject matter jurisdiction on any one of three separate bases: '(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *Johnson v. United States*, 534 F.3d 958, 962 (8th Cir. 2008) (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)). Where a party seeks prospective equitable relief, the party must make "allegations of future injury [that are] particular and concrete." *Steel Co.*, 523 U.S. at 109. While allegations of past injury might support a remedy at law, prospective equitable relief requires plausible allegations of a "real and immediate threat of repeated injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see Crooks v. Lynch*, 557 F.3d 846, 848 (8th Cir. 2009). This

plausibility showing "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation[,]" and it "asks for more than a sheer possibility that [the] defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678; *see Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).

## ARGUMENT

### I.    Plaintiffs Lack Standing.

Plaintiffs "must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). To have standing, a plaintiff "must show (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 296 (2022). At the pleading stage, a plaintiff must "clearly allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs fail to meet their burden for every count asserted in the Amended Complaint. Rather than address each claim individually, Defendants will address the standing issues collectively.

### A.  Plaintiffs' alleged financial injuries are insufficient.

Across the Amended Complaint, Plaintiffs allege that some of Defendants' alleged policies have harmed Plaintiffs' pocketbooks. *See, e.g.*, Am. Compl. ¶ 317 (alleged roving patrols policy); *id.* ¶ 361 (alleged conceal plates policy); *id.* ¶ 388, 398 (alleged illegal trespass policy); *id.* ¶ 415 (alleged unlawful arrest policy); *id.* ¶¶ 433, 438 (alleged profiling policy); *id.* ¶ 472 (alleged excessive force policy); *id.* ¶ 549 (alleged masking policy). These allegations suffer from one or more of the same flaws.

5

*First*, even though "monetary harms generally qualify as injuries-in-fact," when viewing "the injuries of states" and localities, it is necessary to "consider the context in which the alleged injuries arose." *Maryland v. United States Dep't of Agric.*, 151 F.4th 197, 209 (4th Cir. 2025).[3] Accordingly, the fact that in some contexts downstream pocketbook injury is sufficient for standing does not mean that it always is. The Supreme Court's decision in *United States v. Texas*, 599 U.S. 670 (2023) confirms as much. There, the district court found that the plaintiff states "would incur additional costs" because of the enforcement policy at issue. *Id.* at 676. But the Supreme Court concluded, after consulting its "precedents and longstanding historical practice," that the suit was not the "kind redressable by a federal court," especially in the backdrop of "the Executive's Article II authority to enforce federal law." *Id.* at 678; *see id.* at 681 ("The States' novel standing argument, if accepted, would entail expansive judicial direction of the Department's arrest policies.").

This case presents the mirror image of *Texas*, as Plaintiffs contend Defendants' alleged over-enforcement of federal immigration law has imposed downstream costs on Plaintiffs. But the result under Article III is the same. Like in *Texas*, Article II's enforcement authority is the foundation for DHS's immigration enforcement discretion. And here, like in *Texas*, indirect financial injury does not give rise to an Article III case or controversy. *See Fridley Public School District v. Mullin*, No. 26-CV-1023 (LMP/LIB), 2026 WL

---

[3] Here, like in *Maryland v. United States Department of Agriculture*, the "proper parties to bring [the] suit," are the individuals who are subject to the challenged policies, not the state and local governments. 151 F.4th 197, 210 (4th Cir. 2025).

1244043, at *13 (D. Minn. May 6, 2026) (holding school districts lack standing to challenge DHS immigration enforcement based on alleged costs incurred in response to such enforcement).

*Second*, the alleged policies do "not impose any direct costs on the States or threaten the loss of any federal funding." *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022); *accord Washington v. U.S. Food & Drug Admin.*, 108 F.4th 1163, 1174-76 (9th Cir. 2024). Plaintiffs' financial injuries are therefore exactly the kind of "indirect effect[]" on "state [and local] spending" that is insufficient to generate an Article III case or controversy. *Texas*, 599 U.S. at 680 n.3. If Plaintiffs were right that downstream harms to revenue streams were enough for a state or city to challenge federal action in federal court, then a state or locality would have standing to challenge any federal policy that increased costs. Because "[m]ost regulations have costs," such a rule would "make a mockery of the constitutional requirement of case or controversy," *Arizona*, 40 F.4th at 386, with the "only limit" being the "states' willingness to sue," *Maryland*, 151 F.4th at 210. The Court should therefore reject Plaintiffs' theory of attenuated financial harm.

*Third*, with respect to a few different claims, Plaintiffs claim injury by way of diversion of resources. *See, e.g.*, Am. Compl. ¶ 318 (alleged roving patrols policy); *id.* ¶ 390 (alleged trespass policy); *id.* ¶ 438 (alleged profiling policy); *id.* ¶ 570 (alleged excessive force policy). This does not cut it either. The Supreme Court has made clear that plaintiffs cannot establish standing by alleging that they are "diverting resources" in response to a federal policy—such as by "incurring costs to oppose [the government's] actions." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 390, 394 (2024).

7

For these reasons, Plaintiffs' stated financial injuries do not give rise to Article III standing.

**B.  Plaintiffs' alleged intangible injuries do not give rise to standing.**

Plaintiffs also claim various intangible injuries.[4] First, with respect to the alleged roving patrols policy and alleged profiling policy, Plaintiffs claim an "increased distrust between law enforcement and communities." *See, e.g.*, Am. Compl. ¶¶ 318, 438, 550, 558. This is not a cognizable harm. Article III requires that a plaintiff's injury in fact be "concrete," or, in other words, "real, and not abstract." *TransUnion LLC*, 594 U.S. at 424 (citation omitted)). This requirement is "essential to the Constitution's separation of powers." *Id.* at 429. To determine whether an intangible harm is sufficiently concrete, courts consider, among other things, whether the injury has a "close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.* at 425.

The intangible injury Plaintiffs allege is "insufficient to establish concrete injury in fact." *Ojogwu v. Rodenburg L. Firm*, 26 F.4th 457, 463 (8th Cir. 2022). Plaintiffs do not establish a "close relationship" between their alleged injury and "harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion LLC*, 594 U.S. at 425. This is reason enough to find a lack of standing. The allegations concerning

---

[4] Defendants' argument under *United States v. Texas* applies with respect to the alleged intangible injuries too. *See supra* at 6-7.

the alleged undermining of public trust in state and local law enforcement do not render plausible any concrete injury to Plaintiffs. *Cf. Jones v. Bloomingdales.com, LLC*, 124 F.4th 535, 540 (8th Cir. 2024). Also, any such injury—which relies on subjective reactions to Defendants' conduct and conflation between federal, state, and local law enforcement— rests on speculation and a causation chain that is "simply too attenuated." *All. for Hippocratic Med.*, 602 U.S. at 391.[5]

Next, with respect to the alleged mask policy, the alleged biometric scanning policy, the alleged trespass policy, and the alleged conceal plates policy, Plaintiffs claim a violation of state and Saint Paul law. *See, e.g.*, Am. Compl. ¶¶ 339, 360 394, 452, 545, 550. Plaintiffs also contend, in a similar vein, that the alleged conceal plates policy impedes enforcement of state law. *Id.* ¶ 360.

These theories fare no better.[6] A violation of state or local law "does not by itself injure the government in an Article III way." *Saginaw County v. STAT Emergency Med.*

---

[5] Plaintiffs also claim standing because Saint Paul employees were "afraid to go to work" and therefore recreation programs were cancelled. Am. Compl. ¶¶ 395-96. These allegations only go to Saint Paul's potential standing, but they do not set forth a cognizable harm. Saint Paul cannot sue on behalf of its employees. *See Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party."). And the cancellation of recreation programs relies on a causation chain that is "simply too attenuated," *All. for Hippocratic Med.*, 602 U.S. at 391, and runs afoul of the principle that "[p]laintiffs cannot manufacture standing by voluntarily incurring costs," *Bost v. Illinois State Bd. of Elections*, 607 U.S. 71, 82 (2026) (internal quotation omitted).

[6] In addition, Plaintiffs fail to plausibly allege that Minneapolis has standing to sue over alleged violations of other jurisdictions' laws. *See In re SuperValu, Inc.*, 870 F.3d 763, 773 (8th Cir. 2017) ("Each plaintiff's standing must be assessed individually.").

*Servs., Inc.*, 946 F.3d 951, 956 (6th Cir. 2020); *see* Ann Woolhandler & Michael G. Collins, *State Standing*, 81 Va. L. Rev. 387, 393 (1995) (explaining that, as a historical matter, states could not "seek to enforce their own legislation" in an Article III court). Instead, a state or locality must show an injury to its "sovereign interests," or, in this context, "some tangible interference with its authority to regulate or to enforce its laws." *Saginaw County*, 946 F.3d at 957. In other words, a state or locality must be "hindered from enforcing its laws." *Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 770 (5th Cir. 2023). Courts have said that this may occur, for example, in the light of "federal assertions of authority to regulate matters they believe they control." *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015), *aff'd by an equally divided court*, 579 U.S. 547 (2016) (per curiam).

There is no such injury here because none of the state or local laws apply to federal officers. *See, e.g.*, *Arizona v. California*, 283 U.S. 423, 451 (1931) ("The United States may perform its functions without conforming to the police regulations of a State."); *United States v. California*, 173 F.4th 1060, 1067 (9th Cir. 2026) ("The Supremacy Clause prohibits States from enacting a law that directly regulates federal operations even if the law regulates state operations in the same manner."). This is the holding of *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253 (4th Cir. 2011). There, Virginia enacted a statute contrary to the Affordable Care Act's individual mandate and sued on that basis, contending "that Congress lacked constitutional authority to enact the individual mandate." *Id.* at 267. The Fourth Circuit concluded that Virginia lacked standing to sue, despite the claimed conflict between the state and federal law. *Id.* at 269. Among other things, the Fourth Circuit concluded that the individual mandate did not "affect Virginia's ability to enforce"

10

state law because "the Constitution itself withholds from Virginia the power to enforce the VHCFA against the federal government." *Id.* at 270.

The same logic applies here. The alleged policies do not affect Plaintiffs' ability to enforce state or local law because Plaintiffs never had the ability to enforce these laws against federal officers. *See Ohio v. Thomas*, 173 U.S. 276, 283 (1899) (recognizing that "federal officers who are discharging their duties in a state . . . are not subject to the jurisdiction of the state"). In other words, Plaintiffs' sovereign interests have not been injured.

Finally, as for Plaintiffs' claim that the alleged conceal plates policy makes it harder to detect violations of state law, *see* Am. Compl. ¶ 360, this is also not a cognizable injury. *See, e.g.*, *Washington*, 108 F.4th at 1176 ("Th[e] cognizable interest in the preservation of sovereign authority . . . does not convey standing to challenge federal action that affects state law enforcement indirectly, by making violations of state law more difficult or costly to detect."). Moreover, because this alleged injury is premised on federal officers not complying with state and local laws, Plaintiffs lack redressability because, as explained above, it is unconstitutional to enforce such laws against federal officers. Standing is therefore absent.

### C.  Plaintiffs cannot assert the interests of their residents.

In some parts of the Amended Complaint, Plaintiffs claim injury by way of injury to their residents. *See, e.g.*, Am. Compl. ¶¶ 300, 316-17, 340, 397, 415, 433, 458, 472, 570, 581, 589. Although states may litigate on behalf of their citizens as *parens patriae* in certain contexts, it is well established that "[a] State does not have standing as *parens patriae* to

11

bring an action against the Federal Government." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 607, 610 n.16. That is because the federal government is "the *ultimate parens patriae* of every American citizen." *South Carolina v. Katzenbach,* 383 U.S. 301, 324 (1966). It is thus "no part of [a State's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government" because "[i]n that field it is the United States, and not the state, which represents them *as parens patriae.*" *Massachusetts v. Mellon*, 262 U.S. 447, 486 (1923); *see Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) ("A state does not have standing as *parens patriae* to bring an action against the Federal Government." (alteration adopted) (quotation omitted)). Indeed, the Supreme Court has left no doubt about the inability of a State to bring such an action, describing this issue as "open and shut." *Id.* And the same is true for a municipality, which "derive[s] [its] existence from the state and function[s] as [a] political subdivision[] of the state." *City of North Miami v. Fed. Aviation Admin.*, 47 F.4th 1257, 1277 (11th Cir. 2022) (quotation omitted)); *see* Am. Compl. ¶¶ 16-17 (alleging that Minneapolis and Saint Paul are "organized and existing under and by virtue of the laws of the State of Minnesota"); *see also City of Clarkson Valley v. Mineta*, No. 4:04CV00301 RWS, 2008 WL 11512303, at *5 (E.D. Mo. Apr. 22, 2008) ("[T]he City is a municipality and therefore cannot enforce the rights of its citizens under the doctrine of *parens patriae.*"). Accordingly, the Court should not consider any *parens patriae* theory in evaluating whether Plaintiffs have standing.

12

**D. Plaintiffs' challenges to the revocation of the so-called sensitive locations policy and the Lyons Memo fail for a lack of traceability and redressability.**

In addition to the lack of a cognizable injury-in-fact regarding the revocation of the so-called sensitive locations policy, Plaintiffs also have not carried their burden as to traceability and redressability. This is for three reasons. First, Plaintiffs' alleged injury turns on the actions of third parties, which makes both traceability and redressability more difficult to establish. *See California v. Texas*, 593 U.S. 659, 675 (2021); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). Second, because the previous guidance did not *prohibit* enforcement actions in or near sensitive locations, *see Fridley Public School*, 2026 WL 1244043, at *8 ("The prior guidance . . . did not categorically preclude such activity."); *see generally* Mem. from Alejandro Mayorkas, Sec'y of Homeland Sec., "Guidelines for Enforcement Actions in or Near Protected Areas" (Oct. 27, 2021) ("Mayorkas Memo")[7], the challenged enforcement actions cannot be meaningfully connected to the rescission decisions, *see Dep't of Educ. v. Brown*, 600 U.S. 551, 568 (2023) (finding no traceability when plaintiffs failed to "meaningfully connect" their injury with the challenged action), and any remedy nullifying DHS's revocation decision would not affect federal agents' ability to initiate enforcement actions in or near sensitive locations, *cf. Texas*, 599 U.S. at 691-92 (Gorsuch, J., concurring in the judgment). Third and finally, as other courts have found, the enforcement actions allegedly taking place in or near sensitive locations could just as plausibly have arisen from the administration's broader immigration agenda rather

---

[7] Attached as Exhibit A.

13

than the then-Acting Secretary Huffman Memo's[8] minor changes. *See, e.g., Mennonite Church USA v. DHS*, 778 F. Supp. 3d 1, 10-12 (D.D.C. 2025).

For these reasons, this Court should follow the recent decision from another Judge of this Court and hold that Plaintiffs lack standing to challenge the revocation of the so-called sensitive locations policy. *See Fridley Public School District*, 2026 WL 1244043, at *16 ("None of the Plaintiffs has demonstrated a cognizable harm that is both traceable to the specific conduct they challenge—issuance and implementation of the 2025 Guidance—and redressable by this Court.").

For similar reasons, this Court should also dismiss Count IX, which challenges a January 28, 2026, memorandum on warrantless arrests (the "Lyons Memo").[9] *See* Am. Compl. ¶ 576. As explained at further length below, *infra* at 44, regardless of the Memo, federal officers retain the statutory discretion to carry out warrantless arrests. Therefore, any claimed injury is not traceable to the Lyons Memo, and not redressable by vacatur of that Memo. *Cf. Texas*, 599 U.S. at 691-92 (Gorsuch, J., concurring in the judgment).

**E.  For various reasons, Plaintiffs lack standing to bring other claims as well.**

In Counts V and XVIII, Plaintiffs wage programmatic challenges to Operation Metro Surge. *See* Am. Compl. ¶¶ 527-36, 665-77. These claims, like others, run headlong into the Supreme Court's admonition in *Texas* that federal courts are not available to hear challenges to exercises of enforcement discretion. *See* 599 U.S. at 678-79. To the extent these claims are intended to aggregate Plaintiffs' other claims, *see* Am. Compl. ¶¶ 533, 671,

---

[8] Attached as Exhibit B.
[9] Attached as Exhibit C.

Plaintiffs lack standing for the reasons stated above.[10] And to the extent Plaintiffs attempt to smuggle in other challenges through these claims, *see, e.g.*, *id.* ¶ 671, Plaintiffs do not allege any facts making it plausible that they have standing to, for example, challenge federal officers stopping motor vehicles or arresting specific individuals.

## II.    The Conclusion of Operation Metro Surge Requires Dismissal.

Plaintiffs seek prospective relief based solely on Defendants' initiation of Operation Metro Surge and alleged conduct of law enforcement officers sent to Minnesota as the result of Operation Metro Surge. *See generally* Am. Compl. But Operation Metro Surge "has ended." *See* Order, *Tincher v. Noem*, ECF No. 246 at 6; Second Easterwood Decl. ¶¶ 5, 10 ("Operation Metro Surge was an exclusively federal operation" that has reached its "conclusion."). More importantly, the vast majority of DHS personnel who were surged to Minnesota as part of Operation Metro Surge have left. *See* Raybon Decl. ¶¶ 7-10 (CBP demobilized approximately 1,029 employees assigned to Operation Metro Surge throughout February 2026); Second Easterwood Decl. ¶¶ 8-9 (while there were approximately 3,000 ICE officers and agents detailed to the Saint Paul Field Office as part of Operation Metro Surge, approximately 482 remain). The detailed ICE officers and agents who remain are focused on arrest and removal of incarcerated aliens and criminal investigations of fraud, money laundering, and public safety priorities. Second Easterwood Decl. ¶¶ 10-11. That is quite different from the type of "'at-large' arrests of illegal aliens in

---

[10] The same is true of Count XIX, which is an *ultra vires* claim alternative to all of Plaintiffs' APA claims. *See* Am. Compl. ¶ 682.

the Twin Cities metro area," First Declaration of David Easterwood Decl. ¶ 5, (*Tincher*, ECF No. 47), which was a focus of Operation Metro Surge, and which led to the types of interactions with DHS personnel that provide the predicate for Plaintiffs' Amended Complaint.

Standing for prospective relief "does not exist merely because plaintiffs experienced past harm and fear its recurrence." *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 2 (2025) (Kavanaugh, J., concurring in the grant of the application for stay). Instead, Plaintiffs must show a concrete, personal, and particularized threat of future injury without reliance on a "speculative chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013).

The Supreme Court's decision in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), illustrates these principles. There, police officers stopped the plaintiff for a traffic violation, seized him, and placed him in a chokehold. *Id.* at 97-98. The Court held that the plaintiff had not shown that "he was likely to suffer future injury from the use of the chokeholds" because no "immediate threat" existed that the plaintiff would be subjected to another chokehold "without any provocation or resistance on his part"—even though the police department allegedly "routinely appl[ied] chokeholds" in such situations. *Id.* at 105. Applying *Lyons*, the Eighth Circuit has consistently held that plaintiffs lack standing to seek prospective relief merely because they were subject to allegedly improper law-enforcement conduct in the past. *See, e.g., Bernbeck v. Gale*, 829 F.3d 643, 647-48 (8th Cir. 2016); *Park v. Forest Serv.*, 205 F.3d 1034, 1037 (8th Cir. 2000).

*Lyons* and its progeny foreclose standing here. Plaintiffs' claims arise from alleged

16

incidents that occurred during Operation Metro Surge. Those prior incidents do not establish that plaintiffs will likely "again be wronged in a similar way." *Lyons*, 461 U.S. at 111.

"[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 32 (2025) (quoting *Rockwell Int'l Corp. v. United States* 549 U.S. 457, 473-474 (2007)). Because the amended complaint "is now the operative one[,] the old complaint has become irrelevant" in assessing jurisdiction. *Id.* at 36. And by the time Plaintiffs filed their Amended Complaint in April 2026, Operation Metro Surge had long since ended. Nothing material has changed since. Plaintiffs therefore cannot show that an injury in fact is "actual and imminent." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *see Hussen v. Noem*, No. 26-CV-324 (ECT/ECW), 2026 WL 657936, a*t* \*40 (D. Minn. Mar. 9, 2026) (concluding Plaintiffs lacked standing because the record does not show "a significant probability that Defendants will stop or arrest" plaintiffs "in the imminent future").

This is especially true given that Plaintiffs' standing theories largely rely on alleged downstream harms from nonexistent policies. *Cf. Hussen*, 2026 WL 657936, at \*31 ("The standing determination depends partially on the nature of Defendants' policies, so those policies must be determined at the outset."). Also, even assuming the existence of any such policy, none are directed at Plaintiffs themselves. Instead, Plaintiffs allege that acts taken pursuant to these policies result in downstream harm to Plaintiffs. That Plaintiffs' theory of injury relies on a chain of events increases its speculative nature. *See, e.g.*, *Clapper*, 568

17

U.S. at 414. For example, even if it is deemed likely that courthouse arrests will continue in Minneapolis, this alone is insufficient. Instead, Plaintiffs need to plausibly allege that these arrests will both occur and result in cognizable injury to Plaintiffs. No such allegation is present.

Instead of the imminence that Article III requires when a plaintiff seeks forward-looking relief, Plaintiffs offer only conjecture, speculation, and hypotheticals. This will not do. *See Braitberg v. Charter Commc'ns, Inc.*, 836 F.3d 925, 929 (8th Cir. 2016). Plaintiffs first claim that the challenged policies remain. Am. Compl. ¶ 478. But Plaintiffs have not plausibly alleged any final agency action that would resemble a policy. This renders implausible Plaintiffs' claim to continuing harm. *See id.* ¶ 479. And even if such hypothetical policies existed, Plaintiffs have not shown that they face a real and imminent threat of harm traceable to those policies given the end of Operation Metro Surge. Plaintiffs also claim that "an estimated 400 federal immigration agents were still operating in Minnesota as of March 14, 2026, which "is more than double than the number of federal immigration agents that were typically assigned to the multi-state region covered by ICE's St. Paul Office before Operation Metro Surge began." *Id.* ¶ 480. But Plaintiffs do not explain why the presence of a specific number of officers alone should determine whether this case remains justiciable. Together with the number of officers, Plaintiffs point to a three-month-old statement from Tom Homan, in which he states that federal officers would "come back" if needed. *Id.* ¶ 480. This statement hardly demonstrates that Plaintiffs face a "real and immediate threat of repeated injury." *Lyons,* 461 U.S. at 102. Finally, Plaintiffs point to statements concerning the potential use of immigration agents to ensure election

18

integrity in November 2026. Am. Compl. ¶ 481-82. Missing from these allegations is any explanation of why they suffice to show a "personal interest" in *this* litigation. *LaBatte v. Gangle*, 161 F.4th 1109, 1116 (8th Cir. 2025).

In sum, the end of Operation Metro Surge requires dismissal of this case.

### III.    Plaintiffs Fail to State a Tenth Amendment Claim.

Plaintiffs allege that Defendants, through Operation Metro Surge, have infringed on Plaintiffs' police powers and engaged in coercion and commandeering. Am. Compl. ¶¶ 483-502. The Court previously rejected Plaintiffs' Tenth Amendment theories at the preliminary injunction stage as unlikely to succeed. *See Minnesota*, 818 F. Supp. 3d at 1041-47. The Court should now dismiss those claims as a matter of law for the same reasons.

### A.  Plaintiffs fail to allege any infringement on their police powers.

Plaintiffs contend that Defendants have "infring[ed] upon Plaintiffs' ability to ensure the safety of their residents," and Plaintiffs' ability to "run[] public schools." Am. Compl. ¶ 490 (citation omitted); *see id.* ¶¶ 489, 491-92. Missing from these allegations, though, is any such infringement. To be sure, the Constitution leaves to the states "core police powers." *United States v. Maupin*, 3 F.4th 1009, 1013 (8th Cir. 2021). But here, Plaintiffs have not alleged that Defendants have exercised any such powers. Plaintiffs do not allege that Defendants are enforcing local law or running local schools. Instead, Plaintiffs merely claim that Defendants' enforcement of *federal* law in Minnesota has made it more difficult for Plaintiffs to exercise their police powers. *See* Am. Compl. ¶¶ 489-92. This is not a cognizable Tenth Amendment theory, especially because Plaintiffs do not

19

challenge the constitutionality of the federal statutes Defendants are enforcing. In this circumstance, a Tenth Amendment claim "necessarily fails." *United States v. Louper-Morris*, 672 F.3d 539, 563 (8th Cir. 2012). If downstream effects of federal action justified a Tenth Amendment claim, then there would be no federal action to speak of. Such a result would run contrary to centuries of Supreme Court precedent. *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819) ("[T]he states have no power . . . to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the [federal] government."). The Court therefore should dismiss this portion of Count I.

**B.  Plaintiffs fail to state an anticommandeering or coercion claim.**

Next, Plaintiffs allege that Defendants' efforts to enforce federal law "are designed to coerce Plaintiffs into adopting and enforcing President Trump's policy priorities" and violative of the anticommandeering doctrine. Am. Compl. ¶¶ 493-99. Relatedly, Plaintiffs allege that Defendants' efforts have "forced" a response from local law enforcement to "deal with the fallout." *Id.* ¶¶ 500-01.

Plaintiffs fail to state a cognizable anticommandeering or coercion claim. This conclusion is apparent after comparing the alleged facts here with the facts in cases in which the Supreme Court has found a constitutional violation on this basis.

1.      Start with anticommandeering. In *New York v. United States*, the Supreme Court considered provisions of the Low-Level Radioactive Waste Policy Amendments Act of 1985. 505 U.S. 144, 152-54 (1992). One provision offered the states a choice: regulate in accord with Congress's wishes or "tak[e] title to and possession of the low level

radioactive waste generated within their borders and becom[e] liable for all damages waste generators suffer as a result of the States' failure to do so promptly." *Id.* at 174-75. Both options, the Court concluded, were unconstitutionally coercive; either way, a State was required to "implement[] legislation enacted by Congress." *Id.* at 176. In *Printz v. United States*, the Supreme Court considered the constitutionality of a federal statute that imposed on state law enforcement officers the temporary obligation "to perform background checks on prospective handgun purchasers." 521 U.S. 898, 904, 933 (1997). The Supreme Court concluded that this legislation—which operated to "conscript[]" State officers to execute federal law—was "fundamentally incompatible with our constitutional system of dual sovereignty." *Id.* at 904-35. And in *Murphy v. National Collegiate Athletic Association*, the Supreme Court ruled that a provision of the Professional and Amateur Sports Protection Act—which prohibited a State from "authoriz[ing]" sports gambling—ran afoul of the anticommandeering doctrine because it "dictate[d] what a state legislature may and may not do." 584 U.S. at 474.

The facts here are far different than the facts of the above precedents. *See Minnesota*, 818 F. Supp. 3d at 1044 (agreeing that "[n]one of the cases on which [Plaintiffs] rely have even come close" to the facts of this one). Plaintiffs do not allege that Defendants have "require[d] [Plaintiffs] to enact any laws or regulations," or that Defendants have "require[d] [Plaintiffs] to assist in the enforcement of federal statutes regulating private individuals." *Reno v. Condon*, 528 U.S. 141, 151 (2000) (concluding that Driver's Privacy Protection Act of 1994 did not violate anticommandeering principle because it lacked these features). Instead, Plaintiffs allege that they have not spent any time "assisting Defendants

21

in immigration enforcement." Am. Compl. ¶ 154 (emphasis omitted). Even if Plaintiffs are free to make that decision, there is no colorable argument that the federal government devoting more law enforcement resources to Minnesota in response to that decision somehow violates the Tenth Amendment. *See Fernandez v. Wiener*, 326 U.S. 340, 362 (1945) ("The Tenth Amendment does not operate as a limitation upon the powers, express or implied, delegated to the national government."). If it were otherwise, a state or locality would have constitutional license to create a law enforcement vacuum—by both refusing to enforce the law and by suing to stop federal enforcement. Plaintiffs cannot "turn the Tenth Amendment's shield" into "a sword allowing states and localities" to thwart federal enforcement. *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999). The Tenth Amendment does not mandate such an absurd result.

This remains true regardless of whether an increased law enforcement presence results in a state or locality's diversion of resources. *See* Am. Compl. ¶¶ 500-01. "[F]ederal policies frequently generate indirect effects on state revenues or state spending." *Texas*, 599 U.S. at 674, 680 n.3. If those indirect effects provided the predicate for a Tenth Amendment claim, then the federal government would be effectively paralyzed. Such downstream costs of federal action do not even give rise to an Article III "case or controversy" in this case, let alone a Tenth Amendment violation. Indeed, as discussed above, just three years ago, the Supreme Court rejected by an 8-1 vote the reverse of this lawsuit—a suit brought by two states to compel *more* immigration enforcement. *Id.* at 674, 679. And even though the states claimed that federal policy caused downstream financial harms, the Supreme Court concluded that the suit failed on standing grounds, in large part

22

because of the Executive's substantial enforcement discretion. *See id.* at 674, 679-80. If these downstream costs of federal action are insufficient to create standing, they are certainly not sufficient to state a Tenth Amendment claim.[11] *See Minnesota*, 818 F. Supp. 3d at 1047 (agreeing that it is "unlikely").

2.      Relatedly, Plaintiffs allege that Defendants have engaged in unconstitutional coercion. Plaintiffs claim that Defendants have deployed "federal troops" to Minneapolis and Saint Paul not to enforce federal immigration law, but to force Plaintiffs to comply with Defendants' immigration policy. Am. Compl. ¶¶ 493-99. This theory fares no better.

Plaintiffs rely on *National Federation of Independent Business v. Sebelius*, where the Supreme Court held that Congress exceeded its power under the Spending Clause when it conditioned preexisting Medicaid funding on the state's agreement to implement the Affordable Care Act's expansion of Medicaid. 567 U.S. 519, 580 (2012); *see* Am. Compl. ¶ 495. This was because the condition's size and disproportionality, in light of the history of the Medicaid program, constituted a "gun to the head" of the states and transgressed limits on Spending Clause legislation. *NFIB*, 567 U.S. at 581.

---

[11]    Elsewhere in the complaint, Plaintiffs allege that Defendants have "commandeered" state and local property by using public parking lots to stage enforcement actions. *See* Am. Compl. ¶¶ 372-88. Plaintiffs provide no legal authority to support the proposition that federal officers, while enforcing federal law, violate the Tenth Amendment when they temporarily park in city-owned public parking lots. Indeed, barring federal officers from using public parking while allowing state and local law enforcement to do so would unconstitutionally discriminate against the federal government. *See Dawson v. Steager*, 586 U.S. 171, 175 (2019).

Defendants have previously explained why this theory is not cognizable. *See* ECF No. 129.

*First*, *NFIB* addressed unique concerns regarding the expansion of Congress's power under the Spending Clause. *See* U.S. Const., art. I, § 8, cl. 1 (granting Congress the power to collect taxes "to . . . provide for the . . . general Welfare of the United States"); *NFIB*, 567 U.S. at 578 (explaining danger of Congress using its spending "power to implement federal policy it could not impose directly under its enumerated powers"). Here, Plaintiffs challenge the execution of federal law. *See* Am. Compl. ¶ 499. Because the Executive Branch can only execute a federal law based on an enumerated power, the risk to federalism presented by valid federal enforcement actions—the actions at issue in this case—is minimal compared to the risk posed by the Spending Clause.

*Second*, *NFIB* dealt with an explicit statutory condition. 567 U.S. at 581. But here, Plaintiffs seek to deploy *NFIB* in a fundamentally different way—not to challenge a clear condition, but instead, based on an *inference* of an improper subjective purpose, to challenge an objectively legitimate law-enforcement operation. For example, Plaintiffs claim that a January 24 letter from Attorney General Bondi and a January 25 social media post from the President demonstrate a coercive intent. *See* Am. Compl. ¶ 143-44, 496.

There are problems in the particular and in the general with Plaintiffs' theory. Plaintiffs do not (and could not) explain how a letter sent by the Department of Justice could shed light on the purpose of an operation undertaken by a different agency, the Department of Homeland Security, months prior. *Cf. Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019) ("[I]n reviewing agency action, a court is ordinarily limited to evaluating

24

the agency's contemporaneous explanation in light of the existing administrative record."). Regardless, the Bondi letter is entirely consistent with the federal government's desire to enforce immigration law. And there is no hint of a *quid pro quo* in the letter. Instead, citing the adverse "consequences" of certain policy choices for the people of Minnesota, the letter attempts to find common ground on three different issues. The same is true of the President's social media post, which demonstrates a desire to work together with state and local leaders to address immigration issues. *See* Am. Compl. ¶ 143. Such communications should be encouraged as a feature of our system of "cooperative federalism," not used as a basis to declare unconstitutional federal action. *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 289 (1981).[12]

As a general matter, to evaluate a claim like Plaintiffs', a federal court would have to interrogate the subjective grounds for facially valid actions. Such a probe would run afoul of longstanding principles of judicial review. *See Dep't of Com.*, 588 U.S. at 781 (explaining that "judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided"); *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (finding no basis "to probe the sincerity of the stated justifications for the policy by reference to extrinsic statements"); *cf. Hunter v. Underwood*, 471 U.S. 222, 228 (1985) ("Proving the motivation behind official action is often a problematic undertaking."); *Minnesota*, 818 F. Supp. 3d at 1045 n.18

---

[12] In a related lawsuit pending in this district, the United States has sued the State of Minnesota, City of Minneapolis, the City of Saint Paul, and Hennepin County over their sanctuary policies that interfere with the federal government's enforcement of its immigration laws. *See United States v. Minnesota*, Case No. 0:25-cv-03798 (ECT/JFD).

(recognizing that conducting such an inquiry would be to "venture into a uniquely controversial political question").

*Third*, NFIB employed a straightforward remedy—severance of the unconstitutional provision—to alleviate the coercion. *See* 567 U.S. at 585. But here, Plaintiffs ask the Court to superintend federal law enforcement in Minnesota. *See* Am. Compl. ¶ 502. This relief would clearly violate the Take Care and Supremacy Clauses. It would also be impossible to administer. *See Minnesota*, 818 F. Supp. 3d at 1045-46. To avoid contempt, would Defendants have to move for relief each time they wish to send officers into Minnesota? Would the Court then have to adjudicate whether a proper purpose was behind the deployment of each officer? This is not the job of an Article III court, *see TransUnion LLC*, 594 U.S. at 423–24 ("Federal courts do not exercise general legal oversight of the Legislative and Executive Branches."), especially in this context, *see Texas*, 599 U.S. at 679 ("The Executive Branch—not the Judiciary—makes arrests and prosecutes offenses on behalf of the United States."); *Tincher v. Noem*, 164 F.4th 1097, 1099-1100 (8th Cir. 2026) (staying "structural injunction" against DHS law enforcement because it is "too broad" and "too vague"); *Chicago Headline Club v. Noem*, 168 F.4th 1033, 1040 (7th Cir. 2026) (vacating an injunction that "effectively established the district court as the supervisor of all Executive Branch activity in the city of Chicago").

To Defendants' knowledge, no court has ever extended *NFIB*'s reasoning beyond the Spending Clause context. This is not for a lack of conflict between state and federal governments. And it is not for lack of federal enforcement efforts in specific states. Instead, it is simply because the Tenth Amendment provides no authority for a federal court to

26

superintend such an enforcement effort. This Court should reject Plaintiffs' theory, which would allow a court to take any facially legitimate exercise of any federal power, probe behind it to discern an illegitimate subjective purpose to "coerce" states to follow federal preferences, and then enjoin the federal action and eject federal officers from the State. This would be an extraordinary rewriting of foundational federalism principles through which any and all states could supplant federal priorities with their own. The Court has already declined to recognize the validity of this theory once, and it should do so again.

Even assuming the *NFIB* Spending Clause framework could be extended to challenges to federal enforcement operations, the Court should still dismiss the claim. In *NFIB*, the Affordable Care Act left states with no real choice because (i) Medicaid funding "constitut[ed] over 10 percent of most States' total revenue"; (ii) states had "developed intricate statutory and administrative regimes over the course of many decades to implement their objectives under existing Medicaid"; and (iii) the new condition was disproportionate because it provided that "[i]f a State d[id] not comply with the Act's new coverage requirements, it may lose not only the federal funding for those requirements, but all of its federal Medicaid funds." 567 U.S. at 542, 582. It was the combination of those three unique factors that gave *NFIB* its bite, and courts across the country have refused to extend *NFIB* beyond those parameters. *See, e.g.*, *New York v. DOJ*, 951 F.3d 84, 114-16 (2d Cir. 2020).

Here, none of this is true. Perhaps most obviously, Plaintiffs have not alleged that they have changed their policies. Also, although Plaintiffs allege lost business revenue and wages, *see, e.g.*, Am. Compl. ¶¶ 211, 226, 250, they do not attempt to quantify an impact

27

on their budgets, *see id.* ¶ 231 (claiming only that "Plaintiffs' operating budgets suffered"), let alone suggest that the figure is comparable to what was at issue in *NFIB*. And Plaintiffs have not established that Operation Metro Surge is disproportionate to the need created by their policies—an inquiry that again implicates the Executive Branch's conclusive and preclusive discretion over how, when, and where to enforce federal law. *NFIB* is the only case in which the Supreme Court has "deemed a condition unconstitutionally coercive in violation of the Tenth Amendment." *New York v. Yellen*, 15 F.4th 569, 582 (2d Cir. 2021). The present case is no candidate to be the second.

*   *   *

Plaintiffs' Tenth Amendment theories fail as a matter of law. Accordingly, the Court should dismiss Count I.

## IV.    Minnesota Fails to State an Equal Sovereignty Claim.

Minnesota, on its own, contends that the federal government violates the principle of "Equal Sovereignty" when it prioritizes law enforcement in some states over others. Am. Compl. ¶¶ 503-13 (Count II). This claim should be dismissed.

The case at the heart of Minnesota's claim is *Shelby County v. Holder*, 570 U.S. 529 (2013). There, the Supreme Court addressed whether provisions of the Voting Rights Act (VRA)—which required some parts of the country, but not others, to seek federal preclearance for changes to state election law—departed from our "tradition of equal sovereignty." *Id.* at 544; *see id.* at 550 ("The provisions of § 5 apply only to those jurisdictions singled out by § 4. We now consider whether that coverage formula is constitutional in light of current conditions."). Because the Act's distinctions in coverage

28

were based on "decades-old data and eradicated practices," the Court declared that § 4(b)—the subsection that set out the coverage formula—was unconstitutional. *Id.* at 551.

Minnesota argues that their claim is cognizable under *Shelby County* because Defendants' alleged actions have had "significant impacts on the ability of state and local law enforcement to perform their normal duties." Am. Compl. ¶ 509. But unlike in *Shelby County*, this case does not involve any statute that unevenly intrudes, or intrudes in any way, on the states' powers. And Minnesota's argument misses *Shelby County*'s lynchpin: the fact that the VRA represents "an uncommon exercise of congressional power" in the area of election regulation, which "the Framers of the Constitution intended the States to keep for themselves." *Id.* at 543, 545 (quotation omitted). Recognizing this key to *Shelby County*'s holding, multiple circuits have cabined *Shelby County* to the "context of sensitive areas of state and local policymaking." *Ohio v. EPA*, 98 F.4th 288, 310 (D.C. Cir. 2024), *rev'd and remanded on other grounds sub nom. Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100 (2025); *Mayhew v. Burwell*, 772 F.3d 80, 95 (1st Cir. 2014); *Nat'l Collegiate Athletic Ass'n v. Governor of N.J.*, 730 F.3d 208, 239 (3d Cir. 2013) (*NCAA*), *abrogated on other grounds by Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018).

This case involves no sensitive area and no "drastic departure from the basic principles of federalism." *Shelby County*, 570 U.S. at 535. The Constitution confers on the federal government the authority over immigration. *See Arizona v. United States*, 567 U.S. 387, 416 (2012). And Congress, through the Immigration and Nationality Act (INA), has placed broad discretion in the federal government to enforce the Nation's immigrations laws. *See id.* at 396. *Shelby County* is accordingly inapplicable. *See Ohio*, 98 F.4th at 310

29

("*Shelby County* does not support requiring a heightened justification for disparate intrusions into areas over which the Constitution grants Congress such comprehensive control.").

Viewed properly, Minnesota is challenging the Executive Branch's exercise of that enforcement discretion. But Article II gives the President "conclusive and preclusive" authority in this regard. *Trump v. United States*, 603 U.S. 593, 620 (2024) ("[T]he Executive Branch has 'exclusive authority and absolute discretion' to decide which crimes to investigate and prosecute." (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)); *Texas*, 599 U.S. at 678 ("Under Article II, the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." (citation omitted)). This "principle of enforcement discretion" not only "extends to the immigration context," but also has special purchase here given the associated "foreign-policy objectives." *Texas*, 599 U.S. at 679 (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-91 (1999)).

Minnesota also fails to explain how it is similarly situated to other states that are not being treated equally or what equality in immigration enforcement would look like. Minnesota is not the only state that has seen an increase in immigration enforcement. *See* Am. Compl. ¶ 508. And those states generally have "sanctuary" policies that make it harder to enforce immigration law safely in coordination with local authorities. This, in turn, may require more public and direct enforcement actions than in states that cooperate, such as Texas. In any event, equality in law enforcement makes little sense between states. *See Minnesota*, 818 F. Supp. 3d at 1048 ("The Court can readily imagine scenarios where the

30

federal executive must legitimately vary its use of law enforcement resources from one state to the next, and there is no precedent for a court to micromanage such decisions."). Minnesota does not provide any evidence that it is being treated unequally, instead claiming that the surge is "politically" motivated and thus somehow inherently unequal. *See* Am. Compl. ¶¶ 507-08, 510. Minnesota cites no case law for this novel position.

For these reasons, the Court should dismiss Count II.

**V.     Plaintiffs fail to state First Amendment Claims.**

Plaintiffs next allege that Defendants violated the First Amendment in two ways. First, Plaintiffs contend that Defendants retaliated against them for their policy views. Am. Compl. ¶¶ 512-20 (Count III). To state this claim, Plaintiffs must plausibly allege "(1) that [they] engaged in a constitutionally protected activity; (2) that [Defendants] took adverse action against [them] that would chill a person of ordinary firmness from continuing in the activity; and (3) that the adverse action was motivated in part by [Plaintiffs'] exercise of [their] constitutional rights." *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014). Second, Plaintiffs contend that Defendants engaged in unconstitutional viewpoint discrimination. Am. Compl. ¶¶ 521-26 (Count IV). Both claims center around the idea that Defendants' actions are designed to punish Plaintiffs for their protected political viewpoints. And both fail as a matter of law.

To start, the First Amendment "protects people and private entities, not governments." *New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1208 (D.N.M. 2020). Even though the Supreme Court has not definitively ruled on the issue, *United States v. Am. Libr. Ass'n*, 539 U.S. 194, 211 (2003), most courts agree that the First Amendment

31

does not protect government speech, *see, e.g.*, *NAACP v. Hunt*, 891 F.2d 1555, 1565 (11th Cir. 1990) ("[G]overnment speech itself is not protected by the First Amendment."); *Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1038 n.12 (5th Cir. 1982) (en banc) ("Government expression, being unprotected by the First Amendment, may be subject to legislative limitation which would be impermissible if sought to be applied to private expression."); *see also Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 139 n.7 (1973) (Stewart, J., concurring) ("The purpose of the First Amendment is to protect private expression and nothing in the guarantee precludes the government from controlling its own expression or that of its agents." (citation omitted)). The cases Plaintiffs cite do not hold to the contrary. In *Creek v. Village of Westhaven*, the Seventh Circuit did "not decide" the question of whether municipalities have First Amendment rights. 80 F.3d 186, 193 (7th Cir. 1996). And *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010), did not answer the question in Plaintiffs' favor either.

The Court should conclude that Plaintiffs' speech is not protected by the First Amendment. To accept Plaintiffs' position on the First Amendment would be to drag into federal court "all sorts of matters previously left for the political process to resolve." *New Mexico*, 450 F. Supp. 3d at 1211. Political disputes would become constitutional ones. And federal courts would have to engage in the impossible task of line-drawing to determine when and how a surge in federal law enforcement crosses the constitutional line. *Cf. Minnesota*, 818 F. Supp. 3d at 1046.

Plaintiffs do not come anywhere close to showing that the First Amendment requires any of this amidst policy disagreements between federal, state, and local governments.

32

Plaintiffs also fail to substantiate the proposition that a state or locality can claim a right under the Tenth Amendment to decline to assist the federal government and then claim a right under the First Amendment to limit the resulting response. *Cf. Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022) ("[W]hen it comes to disagreements of this sort, history suggests a different understanding of the First Amendment.").

Also, with respect to the retaliation claim specifically, Plaintiffs fail to plausibly allege that retaliatory animus was the but-for cause of the DHS officers' actions. Instead, the "obvious alternative explanation" is that the officers were enforcing federal immigration law. *Laney v. City of St. Louis*, 56 F.4th 1153, 1158 (8th Cir. 2023). Put simply, "the obvious alternative explanation that the officers were simply trying to maintain law and order" will defeat a First Amendment retaliation claim. *Mitchell v. Kirchmeier*, 28 F.4th 888, 896-97 (8th Cir. 2022). Plaintiffs have not plausibly alleged that Defendants would not have taken the same law enforcement actions absent a retaliatory motive. *See Houston Cmty. Coll. Sys.*, 595 U.S. 477 ("Under this Court's precedents, a plaintiff pursuing a First Amendment retaliation claim must show, among other things, that the government took an adverse action in response to his speech that would not have been taken absent the retaliatory motive." (citation omitted)); *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 148 F.4th 648, 654-55 (9th Cir. 2025). The facially legitimate law enforcement justification for Defendants' actions squarely refutes such an argument. Am. Compl. ¶ 518; *cf. Minnesota*, 818 F. Supp. 3d at 1044-45.

* * *

"It is doubtful that the Framers of the Constitution or the Bill of Rights intended to move . . . political disputes between States and the federal government into the federal courts under the guise of the First Amendment." *New Mexico*, 450 F. Supp. 3d at 1212. The Court has already rejected such a move under the guise of the Tenth Amendment. *See Minnesota*, 818 F. Supp. 3d at 1041-47. For many of the same reasons, the Court should dismiss Counts III and IV.

## VI.   Plaintiffs' APA claims are not justiciable.

On top of their Tenth Amendment and Equal Sovereignty claims, Plaintiffs add several claims under the APA in Counts V, VI, and VIII-XVII. None of them are justiciable.

### A. Most of Plaintiffs' APA claims fail to plausibly allege a discrete agency action.

The APA does not allow a court to "exercise judicial review over everything done by an administrative agency." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) (citation modified). The APA instead permits review of only agency actions "made reviewable by statute" or that are "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. Identifying a reviewable action is thus "necessary … for stating a claim under the APA." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (citation omitted).

For an "agency action" to be reviewable under the APA, it must be one of the "circumscribed, discrete" actions identified in the statutory definition of that term, *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 62 (2004)—*i.e.*, "the whole or part of

34

an agency rule, order, license, sanction, relief, or the equivalent or denial thereof," 5 U.S.C. § 551(13); *see also id.* § 551(4), (6), (8), (10), (11) (defining "rule," "order," "license," "sanction," and "relief"). A plaintiff seeking judicial review under the APA must therefore challenge a "specific" agency action falling within one of these discrete categories, rather than attempt to challenge an "abstract" policy or decision divorced from a concrete action, *Biden v. Texas*, 597 U.S. 785, 809 (2022), or challenge "at a high[ ]level of generality" an agency "operation" or "program," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990); *accord SUWA*, 542 U.S. at 64 (the APA's discrete-action "limitation precludes … broad programmatic attack[s]"); *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 813 (8th Cir. 2006) ("A broad agency program is not a final agency action within the meaning of 5 U.S.C. § 704.").

In that way, the APA constrains courts to their constitutionally limited role, permitting them to review discrete, concrete acts but precluding them from reviewing "sweeping actions" that seek "systemic" or "programmatic improvements" of agency operations or "wholesale correction" of agency conduct, which would impermissibly enmesh courts into pervasive oversight of an agency's "day-to-day operations," *see Lujan*, 497 U.S. at 891, 893-94, 899, and require them to "adjudicate generalized grievances" with "an agency's performance," *City of New York v. DOD*, 913 F.3d 423, 431 (4th Cir. 2019). The APA's discrete-action requirement keeps courts "from entering such a quagmire." *Id.*

Plaintiffs claim that Defendants are operating in Minnesota under certain purported "policies" that allegedly violate the APA. Specifically, Count VI alleges that Defendants are operating under a "policy" of disregarding a Minnesota masking law. Am. Compl.

35

¶ 538. Count VIII alleges that Defendants are operating under a "policy" of targeting Minnesotans "with unjustified violence." *Id.* ¶ 561. Count X alleges that Defendants are operating under a "policy" of "unlawfully seizing" Minnesotans based on their "race and apparent national origin." *Id.* ¶ 584. Count XII alleges that Defendants are operating under a "policy" that directs DHS agents to question everyone about their immigration status. *Id.* ¶ 611. Count XIII alleges that Defendants are operating under a "policy" of scanning Minnesotans' "biometric information" without any restrictions. *Id.* ¶ 624. Count XIV alleges that Defendants are operating under a "policy" to "drastically reduce[]" the training of DHS agents regarding constitutional rights, use of force, and crowd control. *Id.* ¶ 636. Count XV alleges that Defendants are operating under a "policy" of "flood[ing] Minnesota and the Twin Cities with an intentionally overwhelming show of force, disproportionate to the needs within the area," and intended to "maximiz[e] fear and overrid[e] Plaintiffs' sovereign interests." *Id.* ¶ 644. Count XVI alleges that Defendants are operating under a "policy" of entering private property without a judicial warrant or consent to search for unlawfully present immigrants or to stage for immigration enforcement actions. *Id.* ¶ 652. Count XVII alleges that Defendants are operating under a "policy" that directs DHS agents to remove, obscure, or change the licenses plates on DHS vehicles. *Id.* ¶ 662.

But the complaint contains no "*factual* matter" that suggests that these imagined "policies" even exist, much less that they are embodied in discrete agency actions of the type listed in § 551(13) and capable of judicial review. *See Twombly*, 550 U.S. at 556; *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1056 (8th Cir. 2018) ("Naked assertions devoid of further factual enhancement" cannot suffice to plead a plausible claim

36

for relief. (citation modified) (quoting *Iqbal*, 556 U.S. at 678)). Indeed, Plaintiffs point to no document, order, regulation, statement, or any other concrete expression indicating that these purported policies exist.[13] Instead, Plaintiffs simply speculate, through vague and conclusory assertions, that they do. *See Hunter v. Page County*, 102 F.4th 853, 874–75 (8th Cir. 2024) ("speculative," "conclusory," and "barebones allegations … are insufficient to state a claim in federal court" (citation modified)). But Plaintiffs' "nebulous assertion of the existence of a 'policy,'" supported by "no facts," cannot plausibly establish that the policy actually exists. *Rodriguez v. U.S. Dep't of Air Force*, 387 F. Supp. 3d 130, 135 (D.D.C. 2019) (citation omitted); *accord, e.g.*, *L.A. Press Club v. Noem*, --- F. Supp. 3d --, 2026 WL 103972, at *9 (C.D. Cal. Jan. 8, 2026) ("conclusory" allegations cannot

---

[13] While Plaintiffs cite a "February 2025 DHS Privacy Threshold Analysis" for the Mobile Fortify Mobile App in support of its claim regarding an alleged policy of unrestricted scanning of Minnesotans' biometric information, that document does not suggest that such a policy exists, much less that it is reflected in a discrete agency action. As a Privacy Threshold Analysis, that document provided only "a general description of" the Mobile Fortify app, the personally identifiable information the app would collect "and from whom," and how DHS would use "that information," all for the sole purpose of assessing "whether there is a need for additional Privacy Compliance Documentation." *See* Ex. D, DHS, *Privacy Threshold Analysis* at 1 (Feb. 2025). Given its limited purpose, the document did not purport to create, implement, summarize, or fully reflect DHS policy regarding the collection and use of biometric information during immigration enforcement operations, including existing restrictions on that collection and use. Therefore, even with this document, Plaintiffs' allegations regarding a policy of unrestricted scanning of Minnesotans' biometric information rests on sheer speculation. And in any event, Plaintiffs' allegations come nowhere close to plausibly identifying a discrete, reviewable agency action that reflects this imagined policy, as a Privacy Threshold Analysis is not a "rule, order, license, sanction, relief, or the equivalent or denial thereof," *see* 5 U.S.C. § 551(13); *id.* § 551(4), (6), (8), (10), (11) (defining "rule," "order," "license," "sanction," and "relief"); *see also Biden v. Texas*, 597 U.S. 785, 809 (2022) (considering it an "error" to "review[] an abstract decision apart from specific agency action, as defined in the APA"), and does not bear any of the markers of finality—*i.e.*, the consummation of a decisionmaking process with legal consequences for Plaintiffs, *see infra* at 42-43.

37

"plausibly establish the existence of … a policy"); *Daines v. IRS*, No. 24-CV-1057, 2025 WL 2694788, at *4 (E.D. Wis. Sept. 22, 2025) ("speculation and conjecture" cannot "plausibly alleg[e] the existence of" a policy, much less "the existence of a rule," "under the APA"). Nor can Plaintiffs "nakedly assert" that Defendants have adopted a "policy … to go on a fishing expedition for evidence to support" their speculations. *People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*, 60 F. Supp. 3d 14, 20 (D.D.C. 2014), *aff'd*, 797 F.3d 1087 (D.C. Cir. 2015); *accord Alsaidi v. U.S. Dep't of State*, 292 F. Supp. 3d. 320, 328 (D.D.C. 2018) ("Plaintiff cannot use the APA to justify a fishing expedition for evidence that defendants" have a "policy that plaintiff believes exists.").

Moreover, Plaintiffs' reliance on allegations regarding the purported conduct of some DHS agents is misplaced. The conduct of agency officers or employees is, of course, not itself discrete agency action. *See* 5 U.S.C. § 551(13) ("rule," "order," "license," etc.); *see also Lujan*, 497 U.S. at 899 (the APA does not permit review of an agency's "day-to-day operations"); *Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014) (the APA does not permit review of "agency behavior" (citation omitted)); *Vigil v. FEMA*, No. CIV 23-0941 JB/JFR, 2024 WL 2404487, at *39 (D.N.M. May 23, 2024) (explaining that "an agency's daily operations" and "the day-to-day activities of agency employees" are not reviewable agency actions under the APA (citation modified) (citation omitted)); *L.A. Press Club*, 2026 WL 103972, at *8 ("A 'pattern and practice' is" not sufficiently "discrete" to be "reviewable final agency action." (citation omitted)). Nor can one reasonably infer from Plaintiffs' allegations about disparate incidents involving DHS agents that any of Plaintiffs' imagined policies exist, much less that they are reflected in discrete, reviewable actions.

38

*See Bark*, 37 F. Supp. 3d at 50 (the APA "requires more" than merely "attach[ing] a 'policy' label to" agency's "practices" to plead "final agency action"); *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1207 (S.D. Cal. 2019) ("A plaintiff may not simply attach a policy label to disparate agency practices or conduct."); *L.A. Press Club*, 2026 WL 103972, at *8 (refusing to infer a policy's existence based on allegations about a "pattern" of conduct).[14]

Separately, in Count V, Plaintiffs allege that Operation Metro Surge in its entirety violates the APA. *See* Am. Compl. ¶¶ 533-36. But challenging this entire operation, including every aspect of DHS's law enforcement response to the problem of illegal immigration in Minnesota, is hardly a challenge to a discrete agency action. *See Nw. Ctr. for Alternatives to Pesticides v. DHS*, 552 F. Supp. 3d 1078, 1087 (D. Or. 2021) (holding no final agency action in APA challenge to "Operation Diligent Valor," which Plaintiffs allege was DHS's surge of officers to Portland, Oregon "to quell protests using large volumes of chemical and other munitions"); *ACLU v. NSA*, 493 F.3d 644, 678 (6th Cir. 2007) (rejecting APA challenge to the National Security Agency's (NSA) alleged "program" of "warrantless interception of overseas communications, the NSA's failure to comply with FISA's warrant requirements, and the NSA's presumed failure to comply with the FISA minimization procedures," for failure to allege "final agency action"). Plaintiffs'

---

[14] Again, even if Plaintiffs had plausibly alleged that one or more of these policies exist in the abstract, that would not be enough to plead a justiciable APA claim. *Biden*, 597 U.S. at 809 (considering it an "error" to "review[] an abstract decision apart from specific agency action, as defined in the APA"); *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (a final agency action is "necessary … for stating a claim under the APA").

39

similar broadside against DHS's immigration enforcement efforts generally, or Operation Metro Surge writ large, is precisely the sort of broad, programmatic challenges that courts have held are not cognizable under the APA.

Instead of challenging discrete action, Plaintiffs effectively bring a broad programmatic challenge to every aspect of DHS's law enforcement response to the problem of illegal immigration in Minnesota. Such challenges are impermissible under the APA. The Supreme Court's decision in *Lujan v. National Wildlife Federation*, 497 U.S. 871, 875 (1990), squarely forecloses Plaintiffs' request for judicial review of these alleged "policies" or "programs." In that case, the National Wildlife Federation brought a challenge to what it called the Bureau of Land Management's (BLM) "land withdrawal review program." 497 U.S. at 875. That "program" consisted of thousands of various actions, such as public land status determinations, that the BLM undertook pursuant to the directives of the Federal Land Policy and Management Act. *Id.* at 877, 890. The Supreme Court held that the "so-called 'land withdrawal review program'" was "not an 'agency action' within the meaning of § 702" because it did "not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations." *Id.* at 890. What the plaintiffs alleged was a "program" that was "no more an identifiable 'agency action' . . . than a 'weapons procurement program' of the Department of Defense or a 'drug interdiction program' of the Drug Enforcement Administration." *Id.* Plaintiffs' Amended Complaint suffers from the same flaw, as they attempt to aggregate hundreds of disparate interactions between federal law enforcement officers and the people of Minnesota into a purported policy. The APA does not permit such a lawsuit. *Cf. Cobell v. Kempthorne*, 455

40

F.3d 301, 307 (D.C. Cir. 2006) ("[A]n on-going program or policy is not, in itself, a 'final agency action' under the APA," and a court's "jurisdiction does not extend to reviewing generalized complaints about agency behavior." (citation omitted)).

A unanimous Supreme Court reaffirmed this view in *SUWA*, in which the plaintiffs sought to compel the Secretary of Interior to take additional actions with respect to off-road vehicle use, arguing that the failure to take such action amounted to "agency action unlawfully withheld or unreasonably delayed" under Section 706 of the APA. 542 U.S. at 57 (citation omitted). In rejecting APA review in that case, the Court analyzed the definition of "agency action" in the APA and stressed that the five specific actions listed ("rule, order, license, sanction [, and] relief") all "involve circumscribed, discrete agency actions," *id.* at 62 (citation omitted), and consequently, "agency action" does not include a broad challenge to the manner in which an agency implements its programs, *id.* at 63-64. Moreover, citing the Attorney General's Manual on the APA, the Court noted that the APA "empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing how it shall act.'" *Id.* (emphasis omitted). Consequently, the Court concluded that challenges to "[g]eneral deficiencies in [agency] compliance . . . lack the specificity requisite for agency action." *Id.* at 66.

Plaintiffs assert precisely the type of broad programmatic challenge to an agency's operations that *Lujan* and *SUWA* squarely foreclose. Therefore, Counts V, VI, VIII, X, XII, XIII, XIV, XV, XVI, and XVII should be dismissed for failing to plausibly allege a reviewable agency action.

### B. Counts IX and XI fail to plausibly allege final agency action.

Plaintiffs also claim that two guidance documents violate the APA. Count IX challenges a memorandum that provides immigration agents with current guidance regarding the exercise of warrantless-arrest authority. *See* Lyons Memo. And Count XI challenges a memorandum that provides immigration agents with current guidance regarding enforcement operations in certain sensitive locations like churches, schools, and hospitals. *See* Huffman Memo. While these memos are internal agency guidance, they are not *final* agency actions susceptible to APA review. *New England Synod v. DHS*, No. CV 25-40102-FDS, 2026 WL 412329, at *27-28 (D. Mass. Feb. 13, 2026) (the Huffman Memo is not final agency action); *but see Phila. Yearly Meeting of Religious Soc'y of Friends v. DHS*, No. CV 25-0243-TDC, 2026 WL 280089, at *6 (D. Md. Feb. 3, 2026) (finding Huffman Memo is final agency action).[15]

An agency action is "final" under the APA if it (i) "mark[s] the consummation of the agency's decisionmaking process," and (ii) determines "rights or obligations" or creates "direct and appreciable legal consequences." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (citation omitted). The Eighth Circuit has focused the second inquiry on the party seeking judicial review, asking whether the challenged action "inflict[s] some legal injury" on the plaintiff by "either compel[ling] affirmative action or prohibit[ing] otherwise lawful action." *Firearms Regul. Account. Coal., Inc. v. Garland*,

---

[15] The two district courts that have addressed this issue have reached different conclusions about whether the Huffman Memo is final agency action. As explained herein, the Court should follow the reasoning in *New England Synod*.

42

112 F.4th 507, 518 (8th Cir. 2024) (quoting *Sisseton–Wahpeton Oyate of Lake Traverse Rsrv. v. U.S. Corps of Eng'rs*, 888 F.3d 906, 915 (8th Cir. 2018)).

By that measure, while the Lyons and Huffman Memos may satisfy finality's first prong, they cannot satisfy the second.

Both memos are routine policy statements that "explain[] how the agency … will exercise its broad enforcement discretion" under existing statutory and regulatory rules—*i.e.*, the Immigration and Nationality Act (INA) and its implementing regulations. *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015) (citation omitted); *accord New England Synod*, 2026 WL 412329, at \*27 (the Huffman Memo is a "general statement of policy" that "explains how the agency will exercise its broad enforcement discretion" (citation modified)). Policy statements like these rarely constitute final agency action. *See New England Synod*, 2026 WL 412329, at \*27 (citing *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013)); *see also, e.g.*, *Arizona*, 40 F.4th at 387-89 (policy statement that created guidelines for the exercise of agency discretion was not final agency action); *Huerta*, 785 F.3d at 715-718 (same). That is because policy statements, like the Lyons and Huffman Memos, impose no legally binding obligations or prohibitions on the public or regulated parties. *See Huerta*, 785 F.3d at 716-17. Indeed, one of the defining characteristics of a policy statement (as opposed to, say, a legislative rule) is that they have no binding legal effect whatsoever, and the agency thus retains the authority and discretion to change its position from that of an existing policy statement in any given case. *Id.* Also, neither the Lyons Memo nor the Huffman Memo purport to create any rights or benefits, and the Huffman Memo expressly confirms as

43

much, *see* Huffman Memo at 1—which is a "telltale sign[] … of a nonbinding policy statement, not of reviewable agency action," *Arizona*, 40 F.4th at 388.

Given all this, Plaintiffs cannot seriously suggest that the Lyons or Huffman Memos directly inflict a "legal injury" on them—a necessary element of final agency action. *See Firearms Regul. Account. Coal.*, 112 F.4th at 518. Neither memo directly regulates Plaintiffs nor "compels" Plaintiffs to take an "affirmative action" nor "prohibits" Plaintiffs from taking "otherwise lawful action." *See id.* Nor do the memos put Plaintiffs to a choice "between heavy compliance costs or feared [legal] liability." *Arizona*, 40 F.4th at 387. So "[w]hatever costs" the Lyons and Huffman Memos may allegedly create for Plaintiffs "downstream arise only from officials who exercise the[] discretion" that the INA has delegated to them, which discretion the Lyons and Huffman Memos have preserved. *Id.* at 388. Indeed, even without these memos, the INA would still authorize DHS agents to carry out the exact same actions to which Plaintiffs object in challenging the memos—*i.e.*, enforcement in sensitive locations and warrantless arrests. Any alleged downstream costs from these actions thus cannot be said to be the Lyons and Huffman Memos' "'direct or appreciable legal' consequences." *Id.*; *Hawkes*, 578 U.S. at 598 (requiring that any legal consequences be "direct and appreciable" to satisfy finality's second prong).

Moreover, it makes no difference for finality purposes that the Huffman Memo officially revoked the Mayorkas Memo or that the Lyons Memo departs from the agency's prior guidance pertaining to the exercise of its discretion. *New England Synod*, 2026 WL 412329, at *27 (the Huffman Memo's revocation of the Mayorkas Memo did not make it final agency action). The Mayorkas Memo, like the Huffman Memo, was a nonbinding

44

policy statement that explained how the agency would "exercise its broad enforcement discretion." *Huerta*, 785 F.3d. at 716. It offered no interpretations of the INA or any other relevant statute or regulation. *See New England Synod*, 2026 WL 412329, at \*27. It imposed no obligations or prohibitions on the public or regulated parties, nor created any rights or benefits. *See* Mayorkas Memo; *Huerta*, 785 F.3d at 716-17; *Arizona* 40 F.4th at 387-88. And it neither withdrew nor limited the agency's enforcement discretion, but simply provided internal guidance for lower-level employees who exercise that discretion. *See New England Synod*, 2026 WL 412329, at \*27 (the Mayorkas Memo simply "provided guidance regarding enforcement discretion"); *see also Arizona*, 40 F.4th at 387-88 (guidance document that did "not rule out any enforcement action against any noncitizen" but rather "preserve[d] officials' discretion" and allowed them "to make decisions 'depending on the facts'" was not final agency action); *Huerta*, 785 F.3d at 718 (same conclusion for similar reasons). And the same goes for DHS's prior approach to its warrantless-arrest authority. Therefore, because the Mayorkas Memo and DHS's prior approach to its warrantless-arrest authority created no "direct and appreciable legal consequences," *Hawkes*, 578 U.S. at 598 (citation omitted), their revocation had no such consequences either, *New England Synod*, 2026 WL 412329, at \*27 (the Mayorkas Memo's revocation had no "legal consequences").

Count IX and XI should thus be dismissed for failing to plausibly allege final agency action.

45

### C. Counts V, IX, and XI challenge actions that are committed to agency discretion.

The lack of final agency action aside, the Lyons and Huffman Memos also reflect wholly discretionary policy choices about how best to enforce federal immigration laws. Those decisions are committed to agency discretion by law, and are thus unreviewable under the APA.

The APA bars judicial review of agency actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). A statute commits an action to an agency's discretion where it "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *accord Ngure v. Ashcroft*, 367 F.3d 975, 982 (8th Cir. 2004) ("[A]ctions are committed to agency discretion where it is not possible to devise" from the statute "an adequate standard of review for an agency action."). Determining whether a meaningful standard for reviewing an agency's discretionary decision exists thus "requires careful examination of" the statutory "language and structure … that supplies the applicable legal standards for reviewing that action" and "the nature of the administrative action at issue." *Tamenut v. Mukasey*, 521 F.3d 1000, 1003-04 (8th Cir. 2008) (en banc) (citations omitted). "The absence of any statutory factors to guide the agency's decision-making process, in combination with the open-ended nature of the inquiry, generally supports the conclusion that the 'agency action is committed to agency discretion by law.'" *Id.* (citation omitted); *see also Ngure*, 367 F.3d at 982 ("An important factor … is whether the agency decision involves a complicated balancing of a number of factors which are peculiarly within its

46

expertise," as an "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." (citation omitted)). Only when Congress "has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion," should a court find that there is sufficient law to apply on judicial review. *Heckler*, 470 U.S. at 833-34. And where "the type of agency decision in question has traditionally been committed to agency discretion"—*e.g.*, the exercise of enforcement discretion—the action does not "become[] reviewable" just because the agency provides a "reason" for it. *Interstate Com. Comm'n v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 282-83 (1987) (citation omitted).

Measured by these principles, the Lyons and Huffman Memos reflect decisions that are committed to agency discretion by law.

Congress, through the INA and other statutes, has granted DHS broad discretion in enforcing federal immigration laws. *See Arizona*, 567 U.S. at 396 ("A principal feature of the" statutory "removal system is the broad discretion exercised by immigration officials."); *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 921 (8th Cir. 2025) ("Federal immigration law grants broad discretion to federal officials."). Nothing in the INA indicates that Congress intended to "limit [the] agency's exercise of enforcement power" "by setting substantive priorities or by otherwise circumscribing [the] agency's power to discriminate among issues or cases it will pursue." *Heckler*, 470 U.S. at 832-33. The INA, far from seeking to impose constraints on the agency's "exercise of enforcement power," thus affords the Executive Branch ample discretionary authority to prioritize when and, as relevant here, where and how it will enforce the law. *Id.* at 833.

47

Indeed, relevant to the Huffman Memo, the INA imposes few location-based restrictions on DHS officers' and agents' authority to enforce immigration law, *see, e.g.*, 8 U.S.C. § 1357(e) (limiting when immigration officers may enter a farm or similar agricultural operation for investigative purposes), and it imposes only limited constraints on DHS's discretion with respect to the mechanics of enforcement, *see, e.g.*, *id.* §§ 1226(a), 1231(a)(1)(A), (a)(2), 1357(a). Congress has placed no other location-specific restrictions on DHS's enforcement discretion, like whether, when, or under what circumstances immigration officers may enter or approach sensitive locations like churches or schools. *See Fridley Public School District*, 2026 WL 1244043, at *2.

Similarly, relevant to the Lyons Memo, while the INA specifies the circumstances under which a DHS agent may execute a warrantless arrest, *see* 8 U.S.C. § 1357(a)(2), including where the agent has reason to believe that an individual has violated a law "regulating the admission, exclusion, expulsion, or removal of aliens" and "is likely to escape before a warrant can be obtained for his arrest," *id.*, the statute does not indicate what factors an agent should reasonably consider when determining whether an individual "is likely to escape." The INA's silence with respect to these matters leaves this Court with no meaningful standard to apply in reviewing the Lyons or Huffman Memos. *See Heckler*, 470 U.S. at 830; *see also, e.g.*, *Tamenut*, 521 F.3d at 1004 (holding that the Board of Immigration Appeals' (BIA) decision to reopen removal proceedings was committed to agency discretion because the governing statute and implementing regulations "provide[] no guidance" for determining when reopening is "appropriate," "sets forth no factors … to consider" in making that decision, "place[d] no constraints on the BIA's discretion," and

48

"specifies no standards for a court to use to cabin" that discretion); *Greer v. Chao*, 492 F.3d 962, 965 (8th Cir. 2007) (highlighting many of the same factors as indicative of whether a statute provides a meaningful standard for reviewing agency action).

The "nature of the administrative action at issue" further supports the conclusion that the Lyons and Huffman Memos are committed to agency discretion. *Tamenut*, 521 F.3d at 1003-04 (citation omitted). "When it comes to" an agency's exercise of "discretionary enforcement powers, courts do not usually interfere." *Greer*, 492 F.3d at 966; *accord Wal-Mart Stores E., LP v. Acosta*, 919 F.3d 1073, 1077 n.1 (8th Cir. 2019) (an agency's enforcement choices are "an area in which the courts have traditionally been most reluctant to interfere" (quoting *Brock v. Cathedral Bluffs Shale Oil Co.* 796 F.2d 533, 538 (D.C. Cir. 1986) (Scalia, J.))). That's because enforcement decisions traditionally involve considerable agency discretion, *see Texas*, 599 U.S. at 678 ("Under Article II, the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." (citation modified)); *see also Arizona*, 567 U.S. at 396 ("A principal feature of the removal system is the broad discretion exercised by immigration officials."). Agency decisions are generally unsuitable for judicial review when they require "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise" or involve choices about where best to spend "agency resources," including whether the agency "is likely to succeed if it acts" and "whether the particular enforcement action requested best fits the agency's overall policies[.]" *Heckler*, 470 U.S. at 831; *accord Ngure*, 367 F.3d at 982, 987. An "agency is far better equipped than the courts" to balance these factors and "to deal with the many variables involved in

49

the proper ordering of its [enforcement] priorities." *Ngure*, 367 F.3d at 982, 987 (quoting *Heckler*, 470 U.S. at 831-32). For these reasons, the Supreme Court and the Eighth Circuit have long recognized that agency decisions about whether and how to pursue enforcement action are committed to agency discretion. *See, e.g.*, *Heckler*, 470 U.S. at 831 ("[A]n agency's decision not to prosecute or enforce, whether through civil and criminal process, is a decision generally committed to an agency's absolute discretion."); *Ngure*, 367 F.3d at 982 ("whether to institute an enforcement action" is a decision "traditionally left to agency discretion" (citation omitted)); *Greer*, 492 F.3d at 963-67 (an agency's decision whether to bring an enforcement action was committed to agency discretion).

This is particularly true for immigration enforcement decisions. *See Iowa Migrant Movement*, 157 F.4th at 921-22 ("Discretion in the enforcement of federal immigration law," including the need to "balance many factors" like public safety, public welfare, and resource constraints, "is vital for accomplishing the purposes of federal immigration law."). Indeed, as discussed above, the Supreme Court recently emphasized that lawsuits (like this one) that challenge agency immigration enforcement operations "run up against the Executive's Article II authority to enforce federal law," and that "courts generally lack meaningful standards for assessing the propriety of enforcement choices" regarding arrest and detention, given the Executive Branch's need to weigh "resource constraints and regularly changing public-safety and public-welfare needs . . . when devising arrest and prosecution policies." *Texas*, 599 U.S. at 678–80; *see also Reno*, 525 U.S. at 490 ("Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's

50

overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake."). "These concerns are greatly magnified in the deportation context." *Reno*, 525 U.S. at 490.

Therefore, without any meaningful standards by which to assess the exercise of discretion reflected in the Lyons and Huffman Memos, those actions are committed to agency discretion by law.[16] Count IX and XI can thus be dismissed on that basis, as well.

Additionally, Plaintiffs' general challenge to Operation Metro Surge in Count V must also be dismissed because the INA imposes no judicially enforceable limits on the "size, scope, duration [, or] character" of federal immigration enforcement efforts. Am. Comp. ¶ 533. It is up to the Executive Branch—and only the Executive Branch—to determine the manner and extent to which it will enforce federal immigration law. *See Texas*, 599 U.S. at 680 ("[T]he Executive Branch must balance many factors when devising arrest and prosecution policies. That complicated balancing process in turn leaves courts without meaningful standards for assessing those policies."). As this court correctly recognized in denying Plaintiffs' request for a preliminary injunction, "federal courts do not exercise general oversight of the Executive Branch." *Minnesota*, 818 F. Supp. 3d at 1046 (quotations omitted). Nevertheless, Plaintiffs again ask this Court to do exactly that, and superintend Defendants' immigration enforcement efforts subject to a standard that this Court has already recognized is as unarticulated as it is inarticulable. *See id.* at 1045-

---

[16] For the reasons explained herein, the court in *Philadelphia Yearly Meeting of Religious Society of Friends v. DHS*, No. CV 25-0243-TDC, 2026 WL 280089 at \*6–8 (D. Md. Feb. 3, 2026), erred in finding the Huffman Memo was not committed to agency discretion by law.

51

46 (denying injunctive relief and noting that "Plaintiffs have provided no metric by which to determine when lawful law enforcement becomes unlawful commandeering"). For this additional reason, Count V must be dismissed.

### VII.    The Court Should Dismiss Count VII.

In Count VII, Plaintiffs seek a declaratory judgment that Minnesota Statute § 609.735—which provides that a "person whose identity is concealed by the person in a public place by means of a robe, mask, or other disguise, unless based on religious beliefs, or incidental to amusement, entertainment, protection from weather, or medical treatment, is guilty of a misdemeanor"—is "enforceable against federal agents operating in Minnesota." Am. Compl. ¶ 559. This claim should be dismissed.

As a threshold matter, Plaintiffs do not identify an appropriate cause of action to assert this claim. They point to the Declaratory Judgment Act, 28 U.S.C. § 2201, but it does not by itself provide a basis for federal jurisdiction or judicial review. Instead, it merely expands the remedies available in an otherwise proper civil action. *See Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950). Thus, it does not provide a basis for judicial review of Count VII.

Even if this Court concludes otherwise, Count VII fails on the merits. The Supremacy Clause provides that "the Laws of the United States" are "the supreme Law of the Land," state law "notwithstanding." U.S. Const. art. VI, cl. 2. In that way, "the Constitution 'guarantees the entire independence of the General Government from any control by the respective States.'" *Trump v. Vance*, 591 U.S. 786, 800 (2020) (citation

52

omitted). The Supremacy Clause thus prohibits, among other things, "States from interfering with or controlling the operations of the Federal Government." *United States v. Washington*, 596 U.S. 832, 838 (2022). This foundational principle—"embodied in the modern doctrine of intergovernmental immunity—traces its origin" to *McCulloch*, *Geo Group, Inc. v. Newsom*, 50 F.4th 745, 754 (9th Cir. 2022) (en banc), and was reaffirmed two hundred years later in *Trump v. Vance*, where the Supreme Court reiterated that states can neither "control the operations of the constitutional laws enacted by [C]ongress," nor impede the Executive Branch's "execution of those laws," 591 U.S. at 800-01 (citations omitted). Between *McCulloch* and *Trump* lies centuries of Supreme Court precedent holding that "activities of the Federal Government are free from regulation by any state." *Hancock v. Train*, 426 U.S. 167, 178 (1976) (quoting *Mayo v. United States*, 319 U.S. 441, 445 (1943)). Indeed, over 100 years ago the Supreme Court held that states could not enforce their driver's license laws against federal Post Office workers delivering mail, *Johnson v. Maryland*, 254 U.S. 51 (1920), yet Plaintiffs seek to do the same thing again here, *accord Arizona*, 283 U.S. at 451; *Ohio*, 173 U.S. at 283; *Vance*, 591 U.S. at 830-31 & n.5 (Alito, J., dissenting) ("[T]wo centuries of case law prohibit the States from taxing, regulating, or otherwise interfering with the lawful work of federal agencies, instrumentalities, and officers" (footnotes omitted)). Under this precedent, lower courts have repeatedly found violations of intergovernmental immunity where (as Plaintiffs would have it) state laws would "directly interfere with the functions of the federal government." *See, e.g.*, *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839-40 (9th Cir. 2014).

53

In their attempt to subject federal officers to § 609.735's prohibition on wearing a mask, *see* Am. Compl. ¶ 558, Plaintiffs seek to "control[] how the government conducts specifically governmental functions," *California*, 173 F.4th at 1067. The Supreme Court has said time and again that states (and localities) lack this power. *See, e.g.*, *Trump v. Vance*, 591 U.S. at 800-01. More recently, the Ninth Circuit granted an injunction pending appeal to prohibit California from enforcing a state law that required federal law enforcement officers to display identification. *California*, 173 F.4th at 1063.

And it is no answer that § 609.735 is a "neutral, generally applicable criminal law." Am. Compl. ¶ 555. For one, this is not accurate—there are exceptions to the mask ban. *See* § 609.735 (providing exceptions for use of a mask "based on religious beliefs, or incidental to amusement, entertainment, protection from weather, or medical treatment"). Even if it was truly neutral and generally applicable, this is not legally relevant: "The Supremacy Clause prohibits States from enacting a law that directly regulates federal operations even if the law regulates state operations in the same manner." *California*, 173 F.4th at 1067; *see Johnson*, 254 U.S. at 56-57 ("[E]ven the most unquestionable and most universally applicable of state laws, such as those concerning murder, will not be allowed to control the conduct of a marshal of the United States acting under and in pursuance of the laws of the United States.").

Application of over two centuries of Supreme Court precedent leads to the same conclusion: § 609.735 does not apply to federal officers enforcing federal law. Count VII therefore fails as a matter of law.  This Court should dismiss it.

54

## VIII.   Count XVIII Fails to State a Valid Claim For Relief.

Plaintiffs allege in Count XVIII that Operation Metro Surge constituted an unlawful "use of military troops for law enforcement." Am. Compl. ¶ 666. As an initial matter, Plaintiffs do not identify the APA or any other express statutory cause of action to assert this claim. To the extent Plaintiffs assert this claim under an implied equitable ultra vires theory, any such claim fails because it does not fall within the narrow circumstances for such claims identified by the Supreme Court. *See Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025).

In any event, the claim fails because Plaintiffs do not allege that any members of the United States military participated in Operation Metro Surge, nor could they have plausibly done so. Instead, they deride the DHS law enforcement personnel that participated in Operation Metro Surge as "an untrained, private military" and assert that "DHS has been given funding, headcount, and military-grade weapons, vehicles" and "military tactical gear designed for close-combat wars." Am. Compl. ¶ 673. All of this, Plaintiffs allege, "is in truth a paramilitary occupation of a Sovereign State by unidentified, masked, heavily armed troops mustered in violation of the Constitution, and deployed in violation of the Posse Comitatus Act." *Id*. Plaintiffs' overwrought rhetoric about alleged tactics and attire does not change the fact that they have alleged no facts that would plausibly support a claim that Operation Metro Surge unlawfully involved military personnel from the Armed Forces of the United States, *see* 10 U.S.C. § 101(a)(4), in violation of the Constitution or the Posse Comitatus Act, 18 U.S.C. § 1385. *See Iqbal*, 556

U.S. at 686 ("[T]he Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context.").

### IX.  Plaintiffs' *Ultra Vires* Claim (Count XIX) Should Be Dismissed.

Plaintiffs' *ultra vires* claim (Count XIX) is expressly a restatement of their challenges to Defendants' various alleged policies as well as Operation Metro Surge more broadly. *See* Am. Compl. ¶ 682. As explained above, Plaintiffs' APA challenges to the alleged policies, as well as Operation Metro Surge, fail for several reasons, including the fact that they do not constitute final agency action within the meaning of the APA. Plaintiffs cannot evade this foundational requirement by relabeling those same challenges as *ultra vires*.

The Supreme Court has "strictly limited" the scope of *ultra vires* review, reasoning that "ultra vires review could become an easy end-run around the limitations of . . . judicial-review statutes." *Nuclear Regul. Comm'n*, 605 U.S. at 681 (noting that an *ultra vires* claim "is essentially a Hail Mary pass-and in court as in football, the attempt rarely succeeds" (citation omitted)). Thus, the Supreme Court has held that *ultra vires* claims must fit within "painstakingly delineated procedural boundaries"; such review "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition'" in a statute. *Id.* (first quoting *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964), then quoting *Railway Clerks v. Assoc. for Benefit of Noncontract Emps.*, 380 U.S. 650, 660 (1965)). Here, Plaintiffs "basically dress up a typical statutory-authority argument as an ultra vires claim." *Id.* "That is a fairly common maneuver" in trying to bring an *ultra*

56

*vires* claim—which the Supreme Court has now squarely rejected. *Id.* Plaintiffs' *ultra vires* claim therefore fails, and Count XIX must be dismissed.

## X.    This Court Lacks Jurisdiction to Issue Injunctive Relief.

Finally, an independent jurisdictional impediment to injunctive relief exists in 8 U.S.C. § 1252(f)(1). Under that provision, lower courts lack "jurisdiction or authority to enjoin or restrain the operation" of 8 U.S.C. §§ 1221-1232—the INA provisions "governing the inspection, apprehension, examination, and removal of aliens." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549-50 (2022). This provision "prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Id.* at 550. Yet, throughout the Amended Complaint, Plaintiffs raise claims, and request relief, that would "enjoin or restrain the operation" of 8 U.S.C. §§ 1221-1232 in their respective jurisdictions. Accordingly, § 1252(f) requires dismissal of Plaintiffs' claims that seek to "enjoin or restrain the operation" of 8 U.S.C. §§ 1221-1232.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Amended Complaint without leave to re-file.

Dated: May 20, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

/s/ Brantley T. Mayers
BRANTLEY T. MAYERS(FL #1039996)
Counsel to the Assistant Attorney General
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 890-9874
brantley.t.mayers@usdoj.gov

ANDREW WARDEN
Assistant Director
LEE REEVES
Trial Attorney
Civil Division, Federal Programs Branch

*Counsel for Defendants*