UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

STATE OF MINNESOTA, *by and through its Attorney General Keith Ellison*, CITY OF MINNEAPOLIS, and CITY OF ST. PAUL,

      Plaintiffs,

      v.

Markwayne Mullin, *in his official capacity as Secretary of the U.S. Department of Homeland Security*; JOHN CONDON, *in his official capacity as Acting Executive Associate Director of Homeland Security Investigations*; U.S. Department of Homeland Security; TODD LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; MARCOS CHARLES, *in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations;* U.S. Immigration and Customs Enforcement; RODNEY SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection;* U.S. Customs and Border Protection; GREGORY BOVINO, *in his official capacity as Commander of the U.S. Border Patrol*; U.S. Border Patrol; DAVID EASTERWOOD, *in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement*,

      Defendants.

Civ. No.: 26-190 (KMM/DJF)

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION TO STAY DISCOVERY**

Defendants decry Plaintiffs' insistence that discovery proceed under the normal operation of the federal and local rules as a "fishing expedition," but what they omit to tell

the Court is that relevant documents obtained from court records and released by whistleblowers corroborate the allegations in the Amended Complaint and rebut arguments made in Defendants' motion to dismiss. This fact alone should be enough to defeat Defendants' claim of good cause for a stay of discovery. But the other good-cause factors also weigh heavily in favor of denying the motion: the merits of Defendants' motion to dismiss is not based on substantial grounds because Defendants' arguments misconstrue the law and invite the Court to resolve disputed facts on a motion to dismiss; the burden on Defendants to provide discovery while the motion to dismiss is pending is slight because Plaintiffs have put forth targeted and narrow discovery requests; and staying discovery will prejudice Plaintiffs as evidence goes stale and Defendants mount arguments that could be rendered untenable if Plaintiffs had discovery. For the reasons stated below, Plaintiffs respectfully request that the Court deny Defendants' motion to stay discovery.

## BACKGROUND

*Pleadings and Dispositive Motions.* On January 12, 2026, Plaintiffs filed the original Complaint in this matter along with a motion for a temporary restraining order ("TRO"). The motion for a TRO was based solely on Plaintiffs' Tenth Amendment and Equal Sovereignty claims. On January 31, 2026, after converting the motion to one for a preliminary injunction, the Court denied Plaintiffs' request for preliminary relief.

After the Court denied injunctive relief, Plaintiffs filed a motion for expedited discovery, which the Court denied on February 16, 2026.

On March 17, 2026, Defendants moved to dismiss the original Complaint. In lieu of responding to the motion, Plaintiffs filed an Amended Complaint on April 20, 2026. The

Amended Complaint asserts nineteen counts: Count I is a claim under the Tenth Amendment; Count II is a claim under Equal Sovereignty; Counts III and IV assert First Amendment claims; Count V is an Administrative Procedures Act ("APA") challenge to Operation Metro Surge; Count VI is an APA challenge to Defendants' Unlawful Masking Policy; Count VII is declaratory judgment claim that Minnesota law regarding masking is enforceable against Defendants; Count VIII is an APA challenge to Defendants' Excessive Force Policy; Count IX is an APA challenge to Defendants' Unlawful Arrest Policy; Count X is an APA challenge to Defendants' Unlawful Racial and National-Origin Profiling Policy; Count XI is an APA challenge to Defendants' Revocation of the 2021 Sensitive Location Policy and Adoption of 2025 Sensitive Locations Policy; Count XII is an APA challenge to Defendants' Roving Patrol Policy; Count XIII is an APA challenge to Defendants' Biometric Scanning Policy; Count XIV is an APA challenge to Defendants' Drastic Reduction in Training Requirements; Count XV is an APA challenge to Defendants' Deployment of Overwhelming Forces; Count XVI is an APA challenge to Defendants' Illegal Trespass and Warrantless Entry Policy; Count XVII is an APA challenge to Defendants' Conceal Plates Policy; Count XVIII is an ultra vires challenge to Defendants' use of military force; and Count XIX is a more general ultra vires challenge.

Defendants moved to dismiss the Amended Complaint on May 20, 2026.

On May 27, 2026, Defendants moved to stay discovery while the motion to dismiss is pending.

*Plaintiffs attempt to begin discovery under the normal operation of the rules.* On April 28, 2026, the State of Minnesota, pursuant to District of Minnesota LR 26.1(d)(2),

requested via email that all other Parties attend a Rule 26(f) conference on May 13, 2026, at 10 a.m. Central. Further, the State informed Defendants that their attendance was mandatory under the local rule's terms. LR 26.1(d)(2)(A) provides that any party may request a Rule 26(f) conference and that a non-requesting party's attendance is mandatory if the request is: "made in writing at least 14 days before the requested date for the conference; and . . . the request is made at least 30 days after each defendant has answered, pleaded, or otherwise responded in the action."

Because Defendants "otherwise responded in the action" when they filed a motion to dismiss March 16, 2026, Defendants' attendance at the Rule 26(f) conference was mandatory. Nevertheless, Defendants maintained that the State had not properly invoked LR 26.1's mandatory conference because Defendants had not "'answered, pleaded, or otherwise responded in the action' to Plaintiffs Amended Complaint." (Carter Decl. Ex. 1 at 12.) The State repeatedly encouraged Defendants to attend the May 13 conference and explained that LR 26.1 requires that Defendants have "responded in the action"; it does not require that Defendants have responded to the operative complaint. (*Id.* at 1, 7, 9-11.) Plaintiffs explained that the plain meaning of the local rule compels the rejection of Defendants' assertion that the filing of an amended complaint somehow resets the mandatory-Rule 26(f)-conference clock. In encouraging Defendants to attend the Rule 26(f) conference, Plaintiffs indicated that the conference would provide an occasion to discuss the possibility of staged discovery so that the discovery burden could be lessened while the motion to dismiss was pending. (*Id.* at 10.)

4

Defendants did not appear at the Rule 26(f) conference, which was held via a Teams appointment that was emailed to all parties. (Carter Decl. ¶ 2.) On May 19, 2026, Plaintiffs served five document requests on Defendants. (Carter Decl. Exs. 2-3.) In the email accompanying the discovery requests, counsel for Minnesota wrote:

> On the off chance that Defendants are willing to reverse course and entertain some phased discovery at this time, the State would certainly invite a negotiation concerning that possibility. For example, given robust document and evidence perseveration assurances from Defendants, I could imagine supporting an agreement to accept an initial document production with a scope even more narrow than the metes and bounds of the five, targeted document requests attached hereto.

(Carter Decl. Ex. 3.) On May 27, 2026, Plaintiffs filed a Rule 26(f) report. Defendants filed a motion to stay discovery that same day.

## LEGAL STANDARD

Although a district court may stay discovery in civil cases, it may only do so if the party requesting the stay has met its burden of showing good cause. *United States v. Agri Stats, Inc.*, No. 23-CV-3009 (JRT/JFD), 2024 WL 3061570, at *2 (D. Minn. May 17, 2024). "[I]t, of course, is black letter law that the mere filing of a motion to dismiss the complaint does not constitute 'good cause' for the issuance of a discovery stay." *TE Connectivity Networks, Inc. v. All Sys. Broadband, Inc.*, No. CIV. 13-1356 ADM/FLN, 2013 WL 4487505, at *2 (D. Minn. Aug. 20, 2013) (quotation marks omitted). "Neither is it sufficient to cite the 'cost inherent to litigation' in pushing for a stay." *Agri Stats, Inc.*, 2024 WL 3061570, at *2. Instead, there must be some "unique facts or circumstances that would make the discovery not just burdensome but unduly burdensome." *Id.*

District courts have wide discretion to weigh the competing interests of the parties and find a practical solution. *See TE Connectivity Networks, Inc.*, 2013 WL 4487505, at \*2. In *Agri Stats, Inc.*, the Court acknowledged that "there is no universally accepted test," 2024 WL 3061570, at \*2, but set forth the factors used by the Court previously in *In re Pork Antitrust Litig.*: "the merits of the motion, the scope of the discovery, the potential harm to the plaintiff if discovery is delayed, the potential hardship or injustice to the defendant if discovery proceeds, and the resources of the parties and the Court." No. 18-CV-1776 (JRT/HB), 2019 WL 480518, at \*4 (D. Minn. Feb. 7, 2019). In addition, the *Agri Stats, Inc.*, Court analyzed "the public's interest alongside the interests of the Plaintiffs, because they represent the public." 2024 WL 3061570 at \*2. Given the fact that, like *Agri Stats, Inc.*, this lawsuit involves litigants who represent the public, Plaintiffs follow the analytical framework set forth in that case.

## ARGUMENT

(1) The weak merits of Defendants' motion to dismiss, (2) the lack of prejudice to Defendants because of the narrow discovery sought at this stage, (3) the unfair prejudice to Plaintiffs, (4) the Court's and the Parties' resources; and (5) the public interest all weigh in favor of denying the motion to stay discovery. These factors are discussed in order below.

## I.   THE MERITS OF DEFENDANTS' MOTION TO DISMISS DO NOT SUPPORT A STAY BECAUSE THE MOTION LACKS SUBSTANTIAL GROUNDS.

When considering a motion to stay, courts ask whether "the complaint is clearly without merit" and whether a dispositive motion "seems likely to resolve the entire

litigation." *TE Connectivity Networks, Inc.*, 2013 WL 4487505, at *2. "Put another way, if the dispositive motion appears to have substantial grounds, and is not unfounded in the law, a stay *may* be appropriate until the motion is decided." *Agri Stats, Inc.*, 2024 WL 3061570, at *3 (emphasis added) (quotation marks omitted). Although courts consider the merits of dispositive motions when evaluating a motion to stay, the analysis is done for a different purpose and under a different standard than when the dispositive motions is ultimately decided. *Id.* As such this Court has commented that after a dispositive motion is evaluated regarding a motion to stay, "[t]he district judge, applying a different standard for a different purpose, may or may not reach the same conclusion." *Id.*

Defendants spend only two pages arguing the merits of their motion to dismiss—whereas the memorandum in support of the discovery motion spans about fifty-seven pages. Plaintiffs will refrain from rebutting each and every argument made in the motion to dismiss but will instead focus on the arguments mentioned in Defendants' motion to stay. Accordingly, in the following subsections Plaintiffs will establish that: 1. Plaintiffs have standing; 2. Plaintiffs' Tenth Amendment and Equal Sovereignty claims are viable; 3. Plaintiffs' First Amendment claims are viable; and 4. Plaintiffs' APA claims are justiciable because they are based on discrete final agency actions.

> **A.** **Plaintiffs Have Standing Because Defendants Caused A Dramatic Decrease In Plaintiffs' Revenue Streams With More Than Half A Billion Dollars In Damage To Plaintiffs' Economies.**

As an initial matter, it is worth noting that the Court has already considered Plaintiffs' standing and concluded that "the Court finds Plaintiffs' arguments on standing to be well-supported." *Minnesota v. Noem*, 818 F. Supp. 3d 1030, 1040 n.11 (D. Minn.

2026). The Court's remark is unsurprising given that Defendants' arguments on standing are in contravention with controlling Eighth Circuit precedent regarding a state's standing to challenge a federal action that causes indirect harm to the state. *See Iowa v. Wright*, 154 F.4th 918, 938 (8th Cir. 2025).

In *Iowa*, a group of plaintiff states challenged the federal Department of Energy's new rule changing its method of calculating the petroleum-equivalency factor used in determining the equivalent petroleum-based fuel economy values of electric vehicles. *Id.* at 937. According to the plaintiff states, they had standing to challenge the new DOE rule because the rule "will increase the adoption of electric vehicles, the rule will increase wear to public roads, increasing costs to the states to maintain their roads." *Id.* at 938. The Eighth Circuit agreed, holding that: "Here, increased costs to maintain public roads is an injury that actually exists and is particular to the states as states. They do not assert 'broad generalities,' nor is the possibility of harm 'too speculative for Article III purposes.'" *Id.* The Eighth Circuit also held that "[t]he harm to the states is particularized and concrete" and that "even a small amount of money is ordinarily an injury." *Id.* (quotation marks omitted).

The same analysis applies here. The federal government acted, and that action has indirectly caused a financial injury to Plaintiffs. If the "small amount" of increased cost of road maintenance from the extra weight of electric vehicles was enough to give the plaintiff states standing in *Iowa*, then the $609 million in economic activity destroyed by Defendants and the concomitant tax revenue lost by Plaintiffs must suffice for a constitutional injury. (Am. Compl. ¶¶ 206-41, Dkt. No. 167.) The Amended Complaint

also contains detailed allegations setting forth the increase in cost of Plaintiffs' provision of public services that was caused by Defendants' illegal actions. (Am. Compl. ¶¶ 148-85.) Like the increase in road maintenance costs in *Iowa*, the cost increases pled here are particularized, concrete, and have already occurred. These cost increases are also cognizable injuries.

Defendants' assertion that *United States v. Texas*, 599 U.S. 670 (2023), holds otherwise is based on a blatant misrepresentation of that case's holding and reasoning. Defendants assert that *Texas* demonstrates the inadequacy of "indirect" or "downstream" injuries. (Dkt. No. 175 at 6-7.) But Defendants misrepresent *Texas*'s holding. There, the state lacked standing because it was challenging a prosecutorial policy of *nonenforcement*, not because its injury was supposedly indirect. Here is the lynchpin of the Court's analysis:

> The States have not cited any precedent, history, or tradition of courts ordering the Executive Branch to change its arrest or prosecution policies so that the Executive Branch makes more arrests or initiates more prosecutions. On the contrary, this Court has previously ruled that a plaintiff lacks standing to bring such a suit.

*Id.* at 677. The Court, in fact, recognized that the state's monetary loss was "an injury," but found the injury was not "legally and judicially cognizable" due to the limitation on the judiciary compelling the Executive Branch to make more arrests or initiate more prosecutions. 599 U.S., at 676-77. By contrast, here, Defendants' use of coercive and otherwise illegal power is precisely the point. Plaintiffs are not seeking more enforcement of federal law, nor challenging the Executive's exercise of investigative or prosecutorial discretion. The financial harms caused to Plaintiffs by Defendants' unlawful actions, whether those actions are under the guise of "law enforcement" or not, establish a

9

cognizable constitutional injury. *See also Fridley Pub. Sch. Dist., Indep. Sch. Dist. 14 v. Mullin*, No. 26-CV-1023 (LMP/LIB), 2026 WL 1244043, at *12 (D. Minn. May 6, 2026) (relying on *Texas* in holding that increase in absenteeism at plaintiff schools caused by immigration enforcement actions and the potential loss of enrollment-based funding arising therefrom was a cognizable injury).

Defendants' reliance on *Food & Drug Admin. v. All. for Hippocratic Med.*, for the proposition that Plaintiffs' use of resources to respond to Defendants' conduct cannot confer standing is also misplaced. There, the Court explained that "abstract social interests" and "strong opposition to the government's conduct," are not concrete injuries, nor can a plaintiff make them so by "expending money to gather information and advocate against the defendant's action." 602 U.S. 367, 394 (2024). Here, Plaintiffs' injuries do not arise from information gathering or advocacy. They suffered pecuniary injuries and expended financial and human resources to protect and preserve services, employees, and property. (Am. Compl. ¶¶ 148-85.) *Hippocratic Medicine* recognized that these types of injuries confer standing. 602 U.S. at 390-91 (identifying diversion of resources and increasing insurance costs as injuries but finding plaintiffs "lack[] record support" that they have incurred or will incur such injuries in the future). *See also Washington v. United States Dep't of Educ.*, No. C 25-1228, 2025 WL 2966255, at *6-7 (W.D. Wash. Oct. 21, 2025) (states had standing to challenge revocation of grants to third parties based on "fiscal harm to Plaintiff States that will flow from Defendants' actions: . . . the discontinuation of any Grant will decrease student access to school-based services and lead students . . . to seek needed mental health services" from Plaintiffs' "mental health care system."). In short,

10

Plaintiffs have alleged significant economic harm and, with particularized allegations and data-based surveys, (*see* Am. Compl. Exs. A-C), tied that harm directly to specific actions taken by Defendants. This is more than sufficient to establish Plaintiffs' standing.[1]

### B. Defendants' Supposed Conclusion of Operation Metro Surge Does Not Change the Conclusion that Plaintiffs Have Standing.

Defendants' argument that the alleged conclusion[2] of Operation Metro Surge deprives the Court of standing founders for at least three reasons. First, defendants bear a "heavy" burden when arguing that a case or controversy has become moot because of voluntary cessation of complained-of activity. *W. Virginia v. EPA*, 597 U.S. 697, 719 (2022). When a defendant changes its practices such that a plaintiff obtains the requested relief, "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quotation omitted). In other words, voluntary cessation does not moot a case when the defendant is "free to return to his old ways." *Id.* Here, without the Court's intervention, Defendants are certainly free to return to their "old ways," *id.* at 189, and moreover they have threatened to do so, (Am. Compl. at ¶¶ 478-82).

---

[1]    Defendants also put forth a straw man argument and suggest that Plaintiffs assert a *parens patriae* theory of standing based on the standing of their residents. Of course, Plaintiffs are not asserting *parens patriae*—Plaintiffs have alleged concrete, particularized injuries suffered by Plaintiffs; as such, Plaintiffs need not rely on *parens patriae*.

[2]    For the purposes of this brief, Plaintiffs assume without conceding that Operation Metro Surge has ended. Plaintiffs note, however, that the 482 remaining federal immigration officers is far greater than was deployed here before Operation Metro Surge. (Compare Dkt. 175, p. 29, with Dkt. 167, ¶ 454.)

11

Second, an injury sufficient for standing must be "actual or imminent." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Defendants' unlawful policies and actions have caused actual injuries. Because Plaintiffs already were injured, they have standing to challenge and seek vacatur of the unlawful policies and seek the Court's determination of the legality of Defendants' actions. *Brennan v. Dickson*, 45 F.4th 48, 54 (D.C. Cir. 2022) (plaintiff seeking vacatur show that challenged action has "either harmed him or imminently will do so"). An "impending" injury is required for a plaintiff to seek only future relief, as in the cases Defendants rely on.

Third, Plaintiffs have standing to seek injunctive relief because they have alleged the existence of a policy and that they are likely to be subjected to it again. *City of Los Angeles v. Lyons*, 461 U.S. 95, 106 (1983). Plaintiffs have alleged seven unlawful policies, that remain in place and are being enforced against Plaintiffs and others. Moreover, Plaintiffs have not acceded to Defendants' demand that they change their laws and policies and redirect resources to civil immigration enforcement. Because the impetus for Defendants' wrongful conduct remains, it is likely that Defendants will continue or increase enforcement of their unlawful policies.

### C.     Defendants' Arguments For Dismissal Of Plaintiffs' Tenth Amendment Claims Misconstrue Precedent And Prematurely Require Resolution Of Factual Disputes.

Defendants acknowledge the Tenth Amendment bars "unconstitutional coercion." (Dkt. 175 at 21.) But they assert Plaintiffs' claim is "implausible" because it is different than the federal government's coercive conduct previously addressed by the courts. *NFIB*, where the Supreme Court held expansion of the federal Medicaid program

12

unconstitutionally coercive, illustrates the flaws in their motion to dismiss. *Nat'l Fed. of Indep. Bus. v. Sebelius ("NFIB")*, 567 U.S. 519 (2012). Defendants highlight three distinctions between this case and NFIB, but they are immaterial. NFIB's holding and reasoning apply here.

1.      To start, Defendants assert that enforcement of a "federal law based on an enumerated power" presents "minimal" federal concern. (Dkt. 175 at 24.) But NFIB and this case both arise from enforcement of a federal law based on an enumerated power. In *NFIB*, the Court recognized that the Spending Clause gave the federal government authority to create, modify, and expand Medicaid but concluded that the nature and scope of the proposed expansion was unconstitutionally coercive. 567 U.S. at 582. Contrary to Defendants' suggestions, a violent incursion designed to maximize economic damage and harm to a State under the guise of Article II authority to enforce immigration law presents as much "danger" to federalism as when the government threatened the loss of Medicaid funds under the Spending Clause.

In both instances, the federal government violates the Tenth Amendment by purporting to carry out federal responsibilities in a way intended to compel the States to abandon sovereign laws and policies. As the Court stated when it denied Plaintiffs' motion for a preliminary injunction:

> Several courts have already determined that the federal government cannot coerce "sanctuary" jurisdictions into changing their laws or carrying out the Executive Branch's immigration priorities by threatening to withhold appropriated funds. Using a surge of executive force against a 'sanctuary jurisdiction' to accomplish the same ends is arguably no less coercive than withholding funds.

*Minnesota*, 818 F. Supp. 3d at 1045 (citation modified); *see also Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) ("A government official cannot do indirectly what she is barred from doing directly.").

In fact, Defendants' reliance on the Court's denial of the preliminary injunction illustrates why their motion to dismiss will fail. In denying the injunction, the Court explicitly rejected Defendants' contention that the Tenth Amendment claim was "legally frivolous," noted that "Plaintiffs certainly have put forth evidence to support" the coercion theory, and "ma[de] no final determination on the merits of" that claim. *Minnesota*, 818 F. Supp. 3d at 1044-45. Critically, the Court declined to issue a preliminary injunction *because of disputed questions of fact* regarding Defendants' coercive purpose. *Id.* at 1049. But on a motion to dismiss, the factual disputes that precluded injunctive relief now require denial of Defendants' motion to dismiss because the motion to dismiss standard requires the Court to accept Plaintiffs' allegations are true.

2.      Defendants also attempt to distinguish *NFIB* because the federal government "explicit[ly]" threatened repercussions against the states in that case, while here Plaintiffs' coercion claim turns on "an inference of an improper subjective purpose" related to an "objectively legitimate law-enforcement operation." (Dkt. 175 at 25.) This argument fails on the facts and the law.

No "inference" is required to discern Defendants' intent to coerce Plaintiffs; it was expressly stated numerous times, most notably at the terrifying height of Operation Metro Surge, in the U.S. Attorney General's letter to Plaintiffs on January 24, 2026, the day of Pretti's death, demanding Plaintiffs: (1) share all of Plaintiffs' records on Medicaid and

14

Food and Nutrition Services programs; (2) repeal "sanctuary policies"; and (3) allow the Department of Justice access to Plaintiffs' voter rolls. Attorney General Bondi indicated that acquiescing to her requests would "help bring back law and order to Minnesota." (*See* Am. Compl. at ¶ 143.) Defendants attempt to distance themselves from the letter, alleging that the Attorney General heads a different agency, but, giving Plaintiffs all inferences due under the 12(b)(6) standard, the Attorney General was acting as Defendants' agents and was, as chief lawyer and law enforcement officer for the United States, explaining the purpose of the *ongoing* Operation Meto Surge. The Complaint asserts numerous other explicit connections made by the federal government, including the following day, when President Trump posted to social media a demand that Plaintiffs acquiesce to the federal government's demands regarding immigration enforcement. (*Id*., ¶ 144.)

Moreover, Defendants' mere assertion of an "objectively legitimate law-enforcement operation," cannot justify dismissal when the Complaint plausibly alleges their actions were intentionally wrongful, inconsistent with purported law-enforcement activity, and interfered with the exercise of Plaintiffs' sovereign authority. Defendants characterize their conduct as merely assigning more resources to a so-called sanctuary jurisdiction and incant "immigration enforcement" on virtually every page. But Defendants cannot refute the allegations in the Complaint by force of repetition. The Complaint alleges in detail that Defendants are abusing their power with an unprecedented intrusion on Minnesota's sovereign rights. Plaintiffs have alleged that Defendants' purported enforcement of immigration law is a pretext. Defendants' argument would require the Court to disregard Plaintiffs' allegations and accept Defendants' denials, which is the

opposite of the legal standard on a motion to dismiss.

Nevertheless, Defendants assert the Court must accept as true any "facially valid" justification Defendants proffer because "interrogat[ing] the subjective grounds" for their conduct would improperly intrude upon executive authority. (Dkt. 175 at 25.) But the cases on which Defendants rely make clear that courts regularly inquire into the subjective grounds for executive action and this case is no exception. *See Dep't of Com. v. New York*, 588 U.S. 752, 761-62 (2019) (the district court concluded the government's purported rationale for including immigration question on census form was a pretext and vacated the rule and the Supreme Court affirmed); *Trump v. Hawaii*, 585 U.S. 667, 704-05 (2018) (The Court declined to accept the government's purported facially valid rationale for its action and "look[ed] behind the face of the Proclamation" "to consider[ ] whether the entry policy is plausibly related to the Government's stated objective."); *Hunter v. Underwood*, 471 U.S. 222, 228-32 (1985) (examining subjective racial motivation for "facially" race-neutral state constitutional provision). Here, the Court is not required to and should not take Defendants at their word; Plaintiffs have plausibly alleged that Defendants' explanations for their actions are pretext.

3.      Defendants take issue with Plaintiffs' request for relief, characterizing the relief in NFIB—"severance of the unconstitutional [statutory] provision"—as a "straightforward remedy" and arguing that declaratory relief would "violate the Take Care and Supremacy Clauses." (Dkt. 175 at 26.) Defendants do not explain why a declaratory judgment would somehow establish the Court as the supervisor of all Executive Branch activity in Minnesota. In fact, a declaratory judgment is the least intrusive form of relief as

it merely "declare[s] the rights" of the parties "whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

Further, arguments over the scope of relief, i.e., the details of any declaratory judgment are wholly irrelevant to a motion to dismiss. Courts repeatedly hold that discussions of the form of relief to which a plaintiff is entitled are premature at the pleading stage.

> It would be premature at the pleadings stage to determine whether the specific forms of disgorgement sought by the SEC are prohibited as a matter of law, and . . . instead any determination on the availability of specific forms of relief should be undertaken after the case has been factually and legally developed.

*United States Sec. & Exch. Comm'n v. Carebourn Cap., L.P.*, No. 21-CV-2114 (KMM/JFD), 2022 WL 1639515, at *7 (D. Minn. May 24, 2022) (citation modified); *see also Jones v. Butler*, 663 F. App'x 468, 470 (7th Cir. 2016) (holding that a demand for relief is not part of the claim). At this early stage, there are no findings and no verdict, so Defendants' speculation regarding the appropriate scope of relief is premature.

4.    Finally, Defendants argue that Operation Metro Surge cannot be coercive under *NFIB* because "Plaintiffs have not alleged that they have changed their policies." (Dkt. 175 at 27.) In other words, Defendants assert that the Tenth Amendment does not prohibit attempted coercion—it only prevents coercive acts to which a State surrenders. It cannot be the case that the Founders intended that the Tenth Amendment be so anemic.

Defendants' motion to dismiss the Tenth Amendment misconstrues case law and depends on the resolution of fact disputes that is not allowed under the 12(b)(6) standard. It is therefore unlikely to prevail.

**D.      Defendants Have Not Met Their Burden Of Showing That Plaintiffs'
First Amendment Claims And Equal Sovereignty Claims Are Likely To
Be Dismissed.**

As an initial matter, it is worth noting that the discovery involved with the First
Amendment and Equal Sovereignty claims will overlap with several other claims, such as
the Tenth Amendment claim and the APA claim challenging Defendants' statutory
authority to use immigration enforcement agents as a de facto domestic military force. As
such, the merits of this claim may or may not ultimately be relevant to the Court's analysis
on the motion to stay. *See Tjaden v. Brutlag, Trucke & Doherty*, P.A., No. 24-CV-1452
(KMM/DJF), 2024 WL 3046478, at *2 (D. Minn. June 18, 2024) (no good cause to stay
discovery because motion to dismiss even if granted would not dispose of all claims).
Accordingly, the merits of Defendants' motion to dismiss the First Amendment and Equal
Sovereignty claims do not support a stay of discovery.

Defendants' attack Plaintiffs' First Amendment claims by asserting that "Plaintiffs
do not cite any case where a court has ever recognized that a State or municipal government
has First Amendment rights vis a vis the federal government." (Dkt. 187 at 6.) Plaintiffs
have yet to brief this issue and therefore have not had the opportunity to provide citations.
But, courts have, in fact, recognized that municipal corporations have First Amendment
rights, and Plaintiffs did cite to one such instance in their Amended Complaint. (*See*
Dkt. 167 ¶¶ 513, 522.) In *Creek v. Village of Westhaven*, 80 F.3d 186 (7th Cir. 1996), Judge
Posner reasoned that it is "[not] out of the question that a municipality could have First
Amendment rights." He reasoned that there "is at least an argument that the marketplace
of ideas would be unduly curtailed if municipalities could not freely express themselves on

18

matters of public concern." *Id.* at 193. "To the extent . . . that a municipality is the voice of its residents—is, indeed, a megaphone amplifying voices that might not otherwise be audible—a curtailment of its right to speak might be thought a curtailment of the unquestioned First Amendment rights of those residents." *Id.* Judge Posner provided, by way of example: "if federal law imposed a fine on municipalities that passed resolutions condemning abortion, one might suppose that a genuine First Amendment issue would be presented. *Id.* This Seventh Circuit analysis suggests an action for First Amendment viewpoint discrimination or retaliation is available to local government. *See id.*

As another example, the U.S. District Court for the Eastern District of New York ruled in *County of Suffolk v. Long Island Lighting Co.*, 710 F. Supp. 1387 (E.D.N.Y. 1989), that the County of Suffolk, a municipal corporation, had a First Amendment right "to speak and act in opposition to" a nuclear power plant that it believed posed danger to its residents. *Id.* at 1390. The court reasoned the locality could express itself in such a way because "[a] municipal corporation, like any corporation, is protected under the First Amendment in the same manner as an individual." *Id.*; *see also Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 701 F. Supp. 2d 568, 598-99 (S.D.N.Y. 2010) (treating city as potential First Amendment right holder).

Whether States and municipalities have First Amendment rights remains unresolved in the Eighth Circuit, and the Supreme Court has specifically declined to decide the issue. *See, e.g., United States v. Am. Library Ass'n*, 539 U.S. 194, 211 (2003). The caselaw cited by Defendants in support of their arguments that Plaintiffs are unlikely to succeed on their First Amendment claims is not binding on this Court and only illuminates the judicial

19

uncertainty on the issue. (*See* Dkt. 187 at 6-7.) Further, Defendants do not address or cite any caselaw related to Plaintiffs' assertion that Plaintiffs Minneapolis and Saint Paul as municipal corporations are unique "associations of citizens" with First Amendment rights under *Citizens United v. FEC*, 558 U.S. 310 (2010), and should be afforded the same rights as their non-municipal corporate counterparts. (*See* Dkt. 167 ¶¶ 514, 523.) *See Citizens United*, 558 U.S. at 388 (Scalia, J. concurring) (suggesting "towns and cities" may be considered corporations possessing First Amendment Rights). Likewise, Plaintiffs also acknowledge that their Equal Sovereignty claim would require the Court to extend precedence. Nevertheless, the Supreme Court recognizes a "'fundamental principle of equal sovereignty' among the States." *Shelby Cnty. v. Holder*, 570 U.S. 529, 544 (2013) (quoting *Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009)). This principle is "highly pertinent" to "assessing disparate treatment of States." *Shelby Cnty.*, 570 U.S. at 544. And under this principle, the federal government can treat States differently, but such disparate treatment must be "'sufficiently related to the problem that it targets.'" *Id.* at 542 (quoting *Northwest Austin*, 557 U.S. at 203). Here, Plaintiffs have plausibly alleged that Operation Metro Surge was executed to punish Minnesota because Defendants perceive it and its elected representatives to be enemies of the Trump administration.

But the federal government cannot impose different burdens on States absent "compelling evidence" that the different treatment is warranted. *See Shelby Cnty.*, 570 U.S. at 550-56. And political retribution cannot be "compelling evidence." *Cf. Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (holding agency action unlawful because courts

20

"cannot ignore the disconnect between the decision made and the explanation given"). Finally, Defendants decry Minnesota's theory as novel, but it is akin to the recent conclusion that sending out-of-state National Guard troops to Oregon violated the Equal Sovereignty principle. *See Oregon v. Trump*, 809 F.Supp.3d 1193, 1234-35 (D. Or. 2025). And if Minnesota's Equal Sovereignty claim is novel, it is only because Defendants' actions are unprecedented.

### E.    Plaintiffs Have Pled Justiciable APA Claims.

Defendants' motion to dismiss Plaintiffs' APA claims is unlikely to succeed because it misconstrues the law and asks the Court to decide disputed facts.

### 1.    Plaintiffs have alleged discrete agency actions.

First, Defendants' argument that Plaintiffs' APA claims should be dismissed because they allege the mere conduct of individual employees will likely fail because it misconstrues the law and the allegations in the Amended Complaint. Plaintiffs have plausibly alleged discrete agency action sufficient to support their APA claims. Under the APA, "'agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof[.]" 5 U.S.C. § 551(13). The "central purpose" of the APA is to permit a "broad spectrum of judicial review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). The word "action" in § 551(13) encompasses "comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001).

This expansive statutory definition reaches situations in which agencies adopt an "equivalent" of rules or orders, 5 U.S.C. § 551(13), without producing a formal and final

statement. "[A]gency action need not be in writing to be judicially reviewable as a final action." *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138 (D.D.C. 2018) (citing *Venetian Casino Resort LLC v. Equal Emp't Opportunity Comm'n*, 530 F.3d 925, 929 (D.C. Cir. 2008) (adjudicating challenge to agency's "decision . . . to adopt [an unwritten] policy of disclosing confidential information without notice")); *see also, e.g.*, *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (court can review an unwritten agency policy).

In *New York v. Trump,* for example, the plaintiffs challenged an OMB funding freeze that was evidenced by a memorandum. 171 F.4th 1 (1st Cir. 2026). The government withdrew the memorandum and argued there was no longer an "agency action" subject to review. *Id.* at 11. But the court rejected this ploy, explaining, "[t]he States are challenging the OMB Directive, not the piece of paper that contained it." *Id.* at 16; *see also Venetian Casino Resort*, 530 F.3d at 931 ("The Manual is relevant insofar as it illuminates the nature of the policy, but the agency took final action by adopting the policy, not by including it in the Manual."); *Illinois v. Vought*, No. 26 CV 1566, 2026 WL 962287, *2, *4 (N.D. Ill. Mar. 12, 2026) (finding reviewable agency action despite "no formal, official memo" based on "circumstantial" evidence).

Accordingly, whether an agency has taken a reviewable "action" depends on questions of fact, which can be proved through evidence other than an express written agency policy statement. *New York*, 171 F.4th at 16 (citing *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 386 (D.C. Cir. 2018). Courts have relied on all manner of probative allegations to find agency action, including (a) statements by agency decision makers describing an agency policy; (b) a pervasive practice amongst agency employees consistent

22

with a policy; (c) ratification of agency conduct by those with decision-making authority; and (d) whether the alleged action is inconsistent with established agency policies or rules.[3] Plaintiffs' allegations fall within each of these categories, easily surpassing the plausibility bar for alleging a series of discrete and reviewable policies subject to APA review.

Again, Defendants mischaracterize the law, asserting that a "pattern or practice is not sufficiently discrete to be a reviewable final agency action." (Dkt. 175 at 38 (quotation marks omitted).) In support of their sweeping proposition that a pattern or practice cannot evince a final agency action, Defendants cite a single district court case, *Los Angeles Press Club v. Noem*, 820 F. Supp. 3d 1034, 1048 (C.D. Cal. 2026). But, moreover, they leave out a key qualifying from their quotation—the court stated that "A 'pattern and practice' is *generally* insufficiently discrete to constitute reviewable final agency action." 820 F. Supp. at 1048. And while the *Los Angelas Press Club* court dismissed one of plaintiffs' claims for want of agency action, it refused to do so regarding another, in part, because the plaintiff had pled "extensive allegations of DHS agents 'us[ing] force against multiple Plaintiffs'

---

[3]    *Xirum v. U.S. Immigr. & Customs Enf't*, No. 1:22-CV-00801-TWP-KMB, 2024 WL 3718145, at *10 (S.D. Ind. Aug. 8, 2024) (relying on statements by ICE Director to find agency action via adoption of general policy); *Nava v. Dep't Homeland Security*, 435 F. Supp. 3d 880, 903 (Jan. 24, 2020) (finding reviewable agency action where the plaintiffs "allege that ICE applied the policy in five specific cases, and likely in numerous others"); *New York v. U.S. Immigr. & Customs Enf't*, 431 F. Supp. 3d 377, 387 (S.D.N.Y. 2019) (change in number of courthouse arrests "suggests that the Directive embodies ICE's novel interpretation of its statutory authority to conduct courthouse arrests, and not merely case-by-case guidance to individual officers"); *Washington v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 3d 863, 871-73 (W.D. Wash. 2020) (rejecting argument that courthouse arrest policy was not agency action "because CBP has done nothing to disassociate itself from its agents' behavior"); *AAUP v. Rubio*, 802 F. Supp. 3d 120, 191 (D. Mass. Sept. 30, 2025) (finding enforcement initiative used in "unprecedented way" and "new use of the invoked statutes" was final agency action).

and others 'at the precise moment that [they] began videorecording the agents arresting a protester.'" *Id.* The court therefore held that allegations of the behavior of individual agents can support an allegation of a discrete agency action, and this is precisely what Plaintiffs do here and other plaintiffs have done in other related cases against some of the Defendants here. In *Escobar Molina v. U.S. Dep't of Homeland Sec.*, the court held that there was "no doubt that defendants in practice have consummated a decisionmaking process that resulted in the implementation of a new policy of conducting warrantless civil immigration arrests based on a lower standard than probable cause." 811 F. Supp. 3d , 43 (D.D.C. 2025) (citation modified); *Cf. Am. Ass'n of Univ. Professors v. Trump*, No. 25-CV-07864, 2025 WL 3187762, at *35 (N.D. Cal. Nov. 14, 2025) ("Defendants' numerous public statements on the issue and pattern of implementing the . . . Policy at other universities makes the directive sufficiently clear to show [final agency action.]")

Under the weight of all of the above precedent, Defendants' argument that Plaintiffs have not pleaded "factual matter" to show a "discrete agency action" is likely to be rejected by the Court. Defendants do not even address the substantive allegations supporting each agency action, dismissing them collectively as "vague," "conclusory," "speculative," and "unsupported." (Dkt. 175 at 35-36.) The Complaint refutes these descriptions with particularized factual allegation. Plaintiffs will not belabor the point by going through each APA claim separately, but Plaintiffs' APA claim challenging Defendants' roving patrols of immigration agents is illustrative. Defendants implemented a Roving Patrol Policy of arbitrarily stopping and questioning residents about their citizenship without cause or justification replacing a previous policy of targeted investigation and arrest. (Am. Compl.

24

¶ 302.) Defendants' statements confirm that this was their new policy. (Am. Compl. ¶ 301, 307, 309.) And Defendants repeatedly implemented the policy in Minnesota. ¶¶ 312-319. These allegations suffice to show the Roving Patrol Policy is agency action. *See also Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1208 (S.D. Cal. 2019) (finding agency action based on "various instances of U.S. government officials' acknowledgement of [the unwritten] policy") (finding "extensive allegations of alleged turnbacks of asylum seekers by CBP officers . . . along U.S.-Mexico border . . . plausibly point to the existence of an unwritten policy"); *Nava*, 435 F. Supp. 3d at 903 (finding unwritten agency action where plaintiffs alleged numerous applications). The same is true for Plaintiffs' other APA claims that are challenged in this manner.

Second, Defendants' argument that Plaintiffs' APA claim challenging Operation Metro Surge itself is a nonjusticiable programmatic challenge will likely fail because that argument also misconstrues the law and the allegations in the Amended Complaint. The "principal purpose" of the APA limitations is "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004). A plaintiff thusly "cannot seek wholesale improvement of [an agency] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). Instead, the APA allows litigants "to challenge only those circumscribed and discrete actions within a program—not the entire program and every decision made under it." *Wilderness Watch v.*

25

*Hall*, No. 23-CV-284 (NEB/LIB), 2025 WL 3515520, at *5 (D. Minn. Sept. 29, 2025) (citation modified).

Here, in Count V of the Amended Complaint, Plaintiffs challenge as single action by the federal government: the Surge itself. Defendants tacitly concede this point by asserting that Operation Metro Surge was a discrete action that has concluded and was part of the administration's overall immigration program. Plaintiffs are not mounting a wholesale challenge to Defendants' immigration enforcement program—instead, Plaintiffs are challenging a discrete action within that program. *Id.* at *5-6. Further, the Amended Complaint alleges that Operation Metro Surge was executed to punish and coerce Plaintiffs. In other words, Plaintiffs allege that Operation Metro Surge was a sanction, and sanctions are in the heartland of APA review. *See* 5 U.S.C. § 551(13) (explicitly defining agency action to include sanctions). Basically, sending a domestic military force comprised of 4,000 immigration enforcement agents to occupy a large metro area with "at-large" activity is not something that the law gives Defendants the authority to do. This is not a broad programmatic challenge, and Defendants' motion to dismiss on that point will likely fail.

This Court's analysis in *Wilderness Watch v. Hall* is especially instructive on this point. No. 23-CV-284 (NEB/LIB), 2025 WL 3515520 (D. Minn. Sept. 29, 2025). *Wilderness Watch* involved the issuance of special-use-permits to commercial towboats that allowed them to operate in the Boundary Waters Canoe Wilderness Area. 2025 WL 3515520, at *7. The parties and the Court agreed that the issuance of a special-use-permit was a final agency action. *Id.* at *6. But the plaintiff also asserted that the

issuance of all of the special-use-permits—in aggregate—was a final agency action that was contrary to statutory law. *Id.* Like Defendants here, the defendants asserted that this was an impermissible broad programmatic challenge because it combined multiple agency actions into one. This Court disagreed: "Because Wilderness Watch asserts that the Forest Service's issuance of special-use permits—in aggregate—violated the limits of the Wilderness Plan and the BWCAW Act, the Court concludes that it maintains subject-matter jurisdiction over Counts One and Two. *Id.* at 7. The same analysis holds here: Plaintiffs allege the Operation Metro Surge— comprised of individual agency policies, and in its discrete entirety—is contrary to law and exceeds statutory authority.

### 2.    Counts IX and XI allege final agency actions.

Defendants also assert that Counts IX, which involves warrantless arrests, and XI, which involves immigration enforcement at sensitive locations, are not justiciable under the APA for want of finality. Other courts analyzing the same or related warrantless arrest and sensitive locations claims have treated the policies final agency action subject to judicial review. *Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, No. CV 25-0243-TDC, 2026 WL 280089, at *4 (D. Md. Feb. 3, 2026) (treating the "2025 policy" as a reviewable action impacting religious freedom at sensitive locations); *Ramirez Ovando v. Noem*, 810 F. Supp. 3d, 1209, 1235 (D. Colo. 2025) (collecting cases on warrantless arrests); *see also id.* at 1236 (holding that the warrantless arrest policy "is sufficiently 'discrete'"); *Escobar Molina*, 811 F. Supp. 3d at 42-49 (holding that the warrantless arrest policy is reviewable final agency action). In light of this precedent, Defendants have not shown that they are likely to prevail on dismissal of

27

Counts IX and XI based on their finality argument.

### 3. Counts V, IX and XI do not entail actions committed to agency discretion.

Defendants' final argument regarding the APA claims is that the actions challenged in Counts V, IX, and X are exempt from judicial review because they are "committed to agency discretion by law." However, section 701(a)(2) is a "very narrow" exception to the presumption of judicial review. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971). It is limited to those "rare instances" when "there is no law to apply." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (citation omitted). Here, the Amended Complaint sets forth the ample law to guide the Court's review. (*See, e.g.*, Am. Compl. ¶¶ 255-57, 400-02.)

Defendants attempt to turn the "very narrow" exception in § 701(a)(2) into a broad rule that all immigration "enforcement decisions" are immune from review. But courts regularly review immigration enforcement policies under the APA. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 19 (2020) (DHS deferred enforcement program reviewable); *Perez Perez v. Wolf*, 943 F.3d 853, 861 (9th Cir. 2019) ("In several immigration cases, we have held that there are meaningful standards of review and have declined to apply § 701(a)(2)").

Defendants fail to distinguish between "single-shot []enforcement decision[s]," which may be within the agency's discretion, and "an agency's adoption of a general enforcement policy, [which] is subject to review." *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998). Defendants rely on *Chaney*, 470 U.S. 821, and cases

that followed it, but those cases are about individual enforcement decisions. *Id.* at 832-33. "Major agency policy decisions are quite different from day-to-day agency enforcement decisions. Where an agency expresses a broad or general enforcement policy, different considerations than those driving Chaney's presumption are at play." *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 699 (4th Cir. 2019) (citations omitted). Although the "rescission [of a policy] may lead to increased enforcement, it does not, by itself, constitute a particular enforcement action" committed to agency discretion. *Regents*, 591 U.S. at 18; *see also Texas v. United States*, 40 F.4th 205, 221-22 (5th Cir. 2022) (finding reviewable agency action because it "does not represent a one-off enforcement decision, but rather a calculated, agency-wide rule limiting ICE officials' abilities to enforce statutory law.").

To the extent Defendants assert there are no "meaningful standards" against which to compare the Policy, that argument also fails. "Even where statutory language grants an agency unfettered discretion, its decision may nonetheless be reviewed if regulations or agency practice provide a meaningful standard by which this court may review its exercise of discretion." *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1069 (9th Cir. 2015) (citation modified). *See also Natural Resources Defense Council v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011) (concluding that agency withdrawal of previously-held discretion is reviewable agency action); *Franklin v. Massachusetts*, 505 U.S. 788, 819-20 (1992) (Stevens, J., concurring in part) ("[t]he statutory framework and the long-held administrative tradition provide a judicially administrable standard of review."). "Prior policies" can "provide a benchmark against which to measure whether [each] agency

29

justified its choice on specious grounds, failed to satisfy the general requirements of reasoned agency decisionmaking, or failed to comply with its own regulations." *Sequen v. Albarran*, 814 F. Supp. 3d 1005, 1027 (N.D. Ca. 2025). DHS's former policy, codified in the 2021 memoranda, established standards for enforcement activities at sensitive locations and thus provide "law to apply." Given this authority and analysis, Defendants have not shown that they are likely to win dismissal of Counts V, IX, and XI based on their committed-to-agency discretion argument.

The analysis above demonstrates that Defendants' motion to dismiss arguments lack substantial grounds, and the merits of their motion to dismiss therefore weighs against the stay of discovery.

## II.    THE SCOPE OF DISCOVERY SOUGHT BY PLAINTIFFS AT THIS STAGE IS NARROW, AND DEFENDANTS' BURDEN RESPONDING THERETO IS THEREFORE MINIMAL.

Defendants grossly mischaracterize the scope of discovery sought by Plaintiffs at this stage and fail to mention the fact that Defendants have refused to engage with Plaintiffs' repeated attempts to discuss an initial, limited stage of discovery during the pendency of Defendants' motion to dismiss. As such, the burden on Defendants is minimal.

As an initial matter, Defendants attempt to daisy-chain their motion to stay discovery to the Court's denial of the Plaintiffs' motion for expedited discovery. (Dkt. 187 at 7-8.) This attempt should be rejected for two reasons. First, regarding the motion for expedited discovery, Plaintiffs were asking for discovery outside of the normal operation of applicable court rules. Here, Plaintiffs are simply insisting that the normal operation of rules be followed. It is Defendants' burden to establish deviation therefrom. Second, as

discussed just below, the scope of discovery sought by Plaintiffs at this point is much more limited than what was sought in Plaintiffs' motion for expedited discovery.

The scope of discovery sought by Plaintiffs at this stage of the litigation is narrowly tailored and limited to a discrete set of legal issues, such as standing and documents that would evidence the alleged informal agency actions. In short, the May 19 discovery requests seek a handful of categories of documents: documents that define Operation Metro Surge's scope and purpose; documents that set forth Defendants' authority to execute Operation Metro Surge; documents regarding Operation Metro Surge's effect on Plaintiffs' economies and their provision of public services to their residents; and documents that set forth the final agency actions alleged in the Amended Complaint. (Carter Decl. Ex. 2.) The Court will note that much of this discovery is directed at the very factual disputes that Defendants improperly raise in their motion to dismiss. Indeed, if Defendants' factual assertions on these issues are correct, they should be eager to so demonstrate by producing the relevant documents.

Instead, Defendants incorrectly assert that "the discovery [Plaintiffs] seek is tantamount to any and all materials related to Defendants' immigration enforcement efforts in the State of Minnesota for more than the last seven years." (Dkt. 187 at 8.) This assertion is certainly not consistent in either the plain meaning of Plaintiffs' discovery requests or in Plaintiffs' representations to Defendants about the discovery they seek at this stage of the litigation. In fact, in the email serving the document requests, counsel for Minnesota once again urged Defendants to engage in a good faith discussion regarding the possibility of limited, staged discovery while the motion to dismiss was pending:

31

> On the off chance that Defendants are willing to reverse course and entertain some phased discovery at this time, the State would certainly invite a negotiation concerning that possibility. For example, given robust document and evidence perseveration assurances from Defendants, I could imagine supporting an agreement to accept an initial document production with a scope even more narrow than the metes and bounds of the five, targeted document requests attached hereto.

(Carter Decl. Ex. 3.) Minnesota's counsel had previously encouraged Defendants to participate in the Rule 26(f) conference so that the parties could discuss the possibility of limited, staged discovery. (Carter Decl. Ex. 1 at 1, 7, 9-11.) Defendants refused to attend the Rule 26(f) conference and discuss the issue, even though the plain meaning of District of Minnesota Local Rule 26.1 required their attendance. In any event, Minnesota clearly indicated to Defendants its openness to narrowing the scope of Plaintiffs' May 19 discovery requests for an initial, staged document production.[4] Defendants refused to hear from Plaintiffs on anything other than a complete stay, yet they now allege the scope of the May 19 discovery requests are overbroad, "extensive and intrusive." (Dkt. 187 at 8.) The Court should not allow Defendants to wield as a sword their refusal to engage in a good faith meet and confer process.

Because the scope of Plaintiffs' document requests is narrow the burden on Defendants is small.

---

[4]    Plaintiffs note that they drafted the discovery requests reasonably broad, especially in terms of time frame, in case the requests ultimately count against the number of requests available to them. As Minnesota's counsel indicated in his May 19 email to Defendants, he was open to negotiating a narrower document production during the pendency of the motion to dismiss.

### III.   PLAINTIFFS WILL BE PREJUDICED IF DISCOVERY IS STAYED.

At the same time Defendants assert that Plaintiffs' APA claims fail for want of discrete agency action and invite the Court to resolve disputed facts on a motion to dismiss, they refuse to allow Plaintiffs to conduct discovery that would support their APA claims. This maneuver manifests unfair prejudice.

Consider, for example, Defendants' arguments regarding the Warrantless Entry Policy and the Unlawful Racial and National-Origin Profiling Policy. The Warrantless Arrest Policy was first challenged here in Count V of the original Complaint. When the Complaint was filed, Plaintiffs did not, of course, possess the Lyons Memo that evidences the Warrantless Arrest Policy. In Defendants' motion to dismiss the original Complaint, they asserted that Plaintiffs' APA claim on warrantless arrests failed because there was not a discrete agency action. (Dkt. No. 158 at 28.) Now that Plaintiffs have the Lyons Memo in hand and pled accordingly, (Am. Compl. ¶ 404.) Defendants have dropped their argument that the Warrantless Arrest Policy does not involve a discrete agency action. In support of Plaintiffs' APA claim challenging the Unlawful Racial and National-Origin Profiling Policy, Plaintiffs alleged the existence of Fall 2025 DHS guidance on the use of race and apparent national origin to justify detaining individuals. (Am. Compl. ¶ 423.) The existence of the guidance was leaked by a whistleblower, but Plaintiffs do not have a copy of the guidance. Unlike the Warrantless Arrest Policy, in the absence of the Fall 2025 guidance, Defendants assert that the Unlawful Racial and National-Origin Profiling Policy is not a discrete agency action. If Plaintiffs had documents responsive to their discovery,

how many more of their APA claims would no longer be subject to Defendants' no-discrete-agency-action argument?

Additionally, a stay would also potentially prejudice Plaintiffs in terms of evidence preservation. Notably, Plaintiffs' request to discuss staged discovery with Defendants included a request for "document and evidence perseveration assurances from Defendants." (Carter Decl. Ex. 3.) To date, Plaintiffs have received no assurances on preservation efforts, which is particularly troubling given public reporting that DOJ and White House officials have authorized destruction of communications,[5] and considering the fact that Trump officials have already deleted (and potentially directed others to delete) signal communications in violation of federal law.[6] At least one oversight organization reports that in FOIA communications, DHS represented that they no longer archive text communications and rely on individual officials to manually capture and retain their own messages.[7] Defendants' silence on preservation efforts in this case is troubling.[8] *See also*

---

[5] Minho Kim, "Judge Orders White House to Preserve Officials' Text Messages," *The New York Times* (May 20, 2026) (available at https://www.nytimes.com/2026/05/20/us/politics/trump-court-text-messages.html)

[6] Tara Copp, "Pentagon watchdog investigates if Hegseth's staff were told to delete Signal messages." *PBS News* (June 6, 2025) (available at https://www.pbs.org/newshour/politics/pentagon-watchdog-investigates-if-hegseths-staff-were-told-to-delete-signal-messages).

[7] *See* https://americanoversight.org/investigation/dhs-text-message-preservation-policy/

[8] The Associated Press recently reported that in the second Trump administration's first 15 months in office, district court judges ruled it was violating an order in at least thirty-one lawsuits over a wide range of issues, including mass layoffs, deportations, spending cuts and immigration practices. Sudhin Thanawala, "Trump flexes executive power with unprecedented flouting of lower court rulings," *Associated Press*, (May 2.

*C.R.R. v. Bondi*, No. CV 26-01282 (MJD/DJF), 2026 WL 752462, at *9 (D. Minn. Mar. 17, 2026) (detailing significant doubt regarding presumption of regularity typically afforded to the federal government). Plaintiffs also note that third parties (including two former Defendants, Kristi Noem and Gregory Bovino) are likely to possess a lot of relevant discovery. While a party to a lawsuit is presumably aware of its duties to preserve evidence, without being able to avail themselves to subpoenas, Plaintiffs cannot be sure that third parties will preserve relevant evidence. Plaintiffs note, finally, that a discovery stay will also lead to the degradation of witness memories.

For the reasons stated above, a stay will prejudice Plaintiffs.

## IV. THE PARTIES' AND COURT'S RESOURCES DO NOT WEIGH IN FAVOR OF A STAY.

The Parties' resources do not support a stay. The federal government has vast resources at its disposal—especially in light of the limited scope of discovery sought by Plaintiffs while the motion to dismiss is pending. And there is no question that the three-Plaintiff coalition of state and local governments pursuing this lawsuit have the resources to manage discovery while the motion to dismiss is pending.

Judicial economy does not favor a stay in this case because it is unlikely to be dismissed without at least some discovery. Promptly starting that discovery will help to ensure a prompt judgment. Defendants threaten that if discovery is allowed to go forward, the Court would become "mired in disputes over the scope of discovery, motions to compel, and the terms and scope of protective order." (Dkt. 187 at 9.) Given that

---

2026) (available at https://apnews.com/article/trump-courts-contempt-defiance-7b94b24901d42961afe323d02e352733).

35

Defendants would neither discuss nor consider Plaintiffs' repeated suggestion of limited, staged discovery, to the extent discovery here would lead to motion practice, it is because of Defendants' recalcitrance. The Court should not reward that behavior by allowing Defendants to use the specter of motion practice to justify their motion for a stay.

Further, the arguments regarding the scope of discovery articulated in Defendants' memorandum are easily rejected. Consider Defendants' assertion that discovery Plaintiffs seek regarding agency action are only available upon a "strong showing that [Defendants] acted in bad faith." (*Id.* at 10.) Again, Defendants misconstrue the law. Where, as here, the defendants deny the existence of an agency action, where the plaintiffs allege a change in longstanding policy, or where plaintiffs allege agency action with the existence of unwritten or informal policy, courts permit extra-record discovery. *See, e.g.*, *CASA, Inc. v. Noem*, 2025 WL 3514378, at *16 (D. Md. 2025) ("Courts have permitted extra record discovery on APA claims challenging such a policy or practice."); *Amica Ctr. for Immigrant Rts. v. U.S. Dep't of Just.*, 2025 WL 1852762, at *10 (D.D.C. 2025) (considering extra-record evidence to "elucidate what the agency decided") (quotation omitted); *All. for Retired Americans v. Bessent*, 2025 WL 1114350, at *3 (D.D.C. 2025) (permitting discovery into specific actions taken by agency); *Florida v. United States*, 2022 WL 2431442, at *2 (N.D. Fla. June 6, 2022) ("[B]ecause Defendants deny the existence of the non-detention policy, Florida cannot be constrained by an administrative record as to that alleged policy."); *Manker v. Spencer*, 2019 WL 5846828, at *19 (D. Conn. 2019) ("[L]imited discovery outside of the administrative record may be necessary where the administrative record does not contain evidence of the challenged action.") (quotation

omitted); *Doe 1 v. Nielsen*, 2018 WL 4266870, at \*2 (N.D. Cal. Sept. 7, 2018) (permitting "jurisdictional discovery" into the "nature of the agency action"); *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 149 (D.D.C. 2018) (finding that plaintiffs had sufficiently alleged existence of policy, although "[d]iscovery may show otherwise"); *cf. United Student Aid Funds, Inc. v. Devos*, 237 F. Supp. 3d 1, 5-6 (D.D.C. 2017) (permitting extra-record evidence regarding whether agency document announced a "new rule").

Defendants' threats of discovery disputes stem from their own unreasonableness and misapplication of the case law. Should the Court need to address them, Plaintiffs are confident that resolving the disputes would be light work for the Court. In any event, Defendants should not be allowed to use their unreasonableness to justify a stay. Therefore, this factor weighs in favor of denying a stay of discovery.

## V.    THE PUBLIC INTEREST CRIES OUT FOR IMMEDIATE TRANSPARENCY AND THEREFORE WEIGHS AGAINST A STAY.

As the Court has already noted, "the circumstances presented at this moment in history are unprecedented and the need for a public accounting of what has happened is great." (Feb. 16, 2026, Order at 9, Dkt. No. 147.) The public interest in seeing discovery go forward in the staged manner anticipated above is especially acute considering the nature of Plaintiffs' claims and the arguments brought to bear against them by Defendants.

Consider again Plaintiffs' APA claims, which allege the existence of multiple informal agency actions. Defendants assert that ten of the APA claims must be dismissed because there is, according to them, no agency action. Defendants argue that "Plaintiffs point to no document, order, regulation, statement, or any other concrete expression

indicating that these purported policies exist." (Dkt. 175 at 37.) Setting aside the fact that Plaintiffs, as explained above, have plausibly alleged discrete agency actions, Defendants' motion to stay discovery would prevent discovery of the very documents and information that would defeat Defendants' assertions.[9] Defendants made these same arguments in the motion to dismiss the original complaint, making the identical assertion that "Plaintiffs point to no document, order, regulation, statement, or any other concrete expression" to support the allegation of a discrete agency action. (Dkt. 158 at 28.) But, contrary to Defendants' assertions in their motions to dismiss, since the original complaint was filed, Plaintiffs have been made aware of relevant documents, statements, and concrete expressions. (*See, e.g.*, Am. Compl. ¶ 367 (leaked memorandum setting forth unlawful warrantless entry policy); ¶ 404 (Lyons memorandum regarding warrantless arrests); ¶ 423 (Fall 2025 guidance regarding the use of race and apparent national origin to justify detentions); ¶ 474 (whistleblower reports that Defendants approved a dramatic decrease in training of new immigration agents).)

The public interest demands a federal government that shoots straight, not one that claims that evidence does not exist, is shown to be wrong, and then asks the Court for a stay of discovery. The public interest strongly weighs against a stay; the Court should look skeptically at Defendants' assertions; and it should deny the motion.

---

[9]    Again, Plaintiffs do not need the discovery to defeat Defendants' motion to dismiss, because they have plausibly alleged sufficient facts and claims.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny

Defendants' motion for a stay of discovery.

Dated: June 10, 2026

KEITH ELLISON
Attorney General
State of Minnesota

By: s/ Brian S. Carter
BRIAN S. CARTER (#0390613)
Special Counsel
LIZ KRAMER (#0325089)
Solicitor General
LINDSEY MIDDLECAMP (#0392589)
Special Counsel
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 300-7403 (Voice)
(651) 282-5832 (Fax)
liz.kramer@ag.state.mn.us
brian.carter@ag.state.mn.us
joseph.richie@ag.state.mn.us
lindsey.middlecamp@ag.state.mn.us

Attorneys for Plaintiff State of Minnesota

MINNEAPOLIS CITY ATTORNEY'S OFFICE

KRISTYN ANDERSON
City Attorney

Dated: June 10, 2026

By: s/ Sara J. Lathrop
KRISTYN ANDERSON (0267752)

HEATHER P. ROBERTSON (0390470)
Assistant City Attorney
SARA J. LATHROP (0310232)
Assistant City Attorney

39

KIRSTEN H. PAGEL (0399114)
Assistant City Attorney
ADAM E. SZYMANSKI (0397704)
Assistant City Attorney
MICHEL A. BREY (0398620)
Assistant City Attorney
350 South Fifth Street
Minneapolis, Minnesota 55415
Tel: 612-673-3000
kristyn.anderson@minneapolismn.gov
sara.lathrop@minneapolismn.gov
heather.robertson@minneapolismn.gov
kirsten.pagel@minneapolismn.gov
adam.szymanski@minneapolismn.gov
michael.brey@minneapolismn.gov


*Attorneys for Plaintiff City of Minneapolis*


SAINT PAUL CITY ATTORNEY'S OFFICE

IRENE KAO
City Attorney

Dated: June 10, 2026

*By: s/ Kelsey McElveen*
IRENE KAO (0392282)
KELSEY MCELVEEN (0396744)
Assistant City Attorney
ALEXANDER HSU (0399275)
Assistant City Attorney
15 W. Kellogg Blvd., #400
Saint Paul, Minnesota 55102
Tel: 651-266-8710
Irene.kao@ci.stpaul.mn.us
Kelsey.mcelveen@ci.stpaul.mn.us
Alexander.hsu@ci.stpaul.mn.us

*Attorneys for Plaintiff City of Saint Paul*

40