UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

STATE OF MINNESOTA, *by and through its Attorney General Keith Ellison*, CITY OF MINNEAPOLIS, and CITY OF ST. PAUL,

      Plaintiffs,

      v.

MARKWAYNE MULLIN, *in his official capacity as Secretary of the U.S. Department of Homeland Security*; JOHN CONDON, *in his official capacity as Acting Executive Associate Director of Homeland Security Investigations*; U.S. Department of Homeland Security; TODD LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; MARCOS CHARLES, *in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations;* U.S. Immigration and Customs Enforcement; RODNEY SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection;* U.S. Customs and Border Protection; GREGORY BOVINO, *in his official capacity as Commander of the U.S. Border Patrol*; U.S. Border Patrol; DAVID EASTERWOOD, *in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement*,

      Defendants.

Civ. No.: 26-190 (KMM/DJF)

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

INTRODUCTION ........................................................................................................ 1

   I.    The Surge and the Damage it Caused .................................................. 2

   II.   Defendants' Twelve Agency Actions ................................................. 4

   III.  Procedural History ............................................................................. 6

LEGAL STANDARD ................................................................................................. 7

ARGUMENT .............................................................................................................. 8

   I.    Plaintiffs Have Standing. ................................................................... 8

       A.     Defendants caused increased costs and more than half a billion dollars in damage to Plaintiffs' economy. ................................ 9

       B.     Defendants' policies have injured Plaintiffs' sovereign interests. ......... 12

       C.     Defendants caused cognizable intangible injuries to Plaintiffs. ............ 15

           1.     Defendants' agents have caused Plaintiffs' residents to distrust Plaintiffs' law enforcement agencies and agents. .......... 16

           2.     Plaintiffs' reputational harms bear a close relationship to analogous harms long recognized in American courts. .............. 17

           3.     Plaintiffs' reputational harms are well-supported. ...................... 18

           4.     Defendants' cases are inapposite. ............................................... 19

       D.     Plaintiffs' injuries are fairly traceable to the Defendant's sensitive locations and unlawful arrest policies and would be redressed by having those policies vacated. ................................ 20

   II.   The "Conclusion" of OMS Does Not Require Dismissal. ............................... 24

       A.     Standing is assessed as of the date the case was filed, not on the date of the amended complaint. .......................................... 25

           1.     Even if the Court were to assess standing as of the filing of the Amended Complaint Defendants' arguments fail. ............. 27

       B.     Because Plaintiffs had standing at the time the lawsuit was filed, Defendants can only argue the lawsuit is moot, but that argument fails. .......................................................................... 28

i

III.    Plaintiffs Have Stated a Plausible Tenth Amendment Claim for Count I.........31

    A.    Defendants' arguments would require the Court to resolve factual disputes in Defendants' favor..................................................31

    B.    Defendants' power under the INA is not unlimited. .............................33

    C.    Defendants' argument that Plaintiffs' Amended Complaint necessarily requires supervision by the Court fails. ..............................36

    D.    Plaintiffs plausibly allege several Tenth Amendment theories for Count I. ......................................................................37

IV.    Plaintiff State of Minnesota Alleges a Plausible Equal Sovereignty Claim..........................................................................40

V.    Plaintiffs State Plausible First Amendment Claims. ........................................41

    A.    Defendants' assertion that Plaintiffs do not have First Amendment rights is contrary to First Amendment principles..............41

    B.    Plaintiffs Minneapolis and Saint Paul have First Amendment rights as corporations. ..............................................44

    C.    Plaintiffs plausibly allege retaliatory animus was the but-for cause of the Defendants' actions.............................................47

VI.    Plaintiffs Plausibly Plead APA Claims................................................47

    A.    Applicable APA standards.................................................48

        1.    The APA defines "final agency action" broadly with a pragmatic and flexible framework..............................................48

            i.    Agency action is defined broadly to capture both formal and informal actions..........................................48

            ii.    Finality is pragmatically determined by the quality of the agency's decisionmaking and the effect of the action.........................................................51

    B.    Defendants' motion to dismiss Count V fails because Count V alleges a discrete agency action and ample law that provides a meaningful standard against which to judge the agency action. ...........54

        1.    Count V challenges OMS as a discrete agency action. .............54

ii

2.    Whether Defendants had clear congressional authority to conduct OMS is not an issue beyond judicial review. ............... 55

C.    Count VI Plausibly Alleges a Discrete Final Agency Action Authorizing Federal Agents to Violate Minnesota's Anti-Masking Law ........................................................................................ 58

D.    Count VIII alleges a discrete agency action of using force against passively resisting individuals that would only be appropriately deployed against individuals displaying active resistance. ................... 59

E.    Defendants' motion to dismiss Count IX fails because the Unlawful Arrest Policy is a final agency action that creates legal consequences and because the lawfulness of arrests by immigration agents is not an issue committed to agency discretion. ............................................................................. 60

F.    Count X, alleging that Defendants' Unlawful Racial and National-Origin Profiling Policy is Contrary to Constitutional Right, Exceeds Statutory Authority, and is Arbitrary and Capricious, plausibly alleges a discrete agency action. ......................... 63

G.    The Revocation of 2021 Sensitive Locations Policy and Adoption of 2025 Sensitive Locations Policy alleged in Count XI is a final agency action and not something committed to agency discretion. ...... 65

H.    Count XII, challenging the Roving Patrols Policy, plausibly alleges is a discrete agency action. ....................................... 68

I.    Count XIII, challenging Defendants' Biometric Scanning Policy, plausibly alleges  a discrete agency action. .......................... 70

J.    Count XIV plausibly alleges a discrete agency action that drastically reduced training of new immigration enforcement agents. ...................................................................... 72

K.    Count XV, challenging Defendants' deployment of disproportionate and overwhelming force, plausibly alleges a discrete agency action. ............................................................ 72

L.    Plaintiffs plausibly allege  an Illegal Trespass and Warrantless Entry Policy in Count XVI that is contrary to law and the Constitution. ..................................................................... 74

iii

M.      Count XVII plausibly alleges a discrete agency action to hide, remove, and swap license plates in violation of state and federal law. ............................................................................................. 75

VII.    The Court Should Deny Defendant's Motion to Dismiss Count VII. ............... 76

A.      Federal agents do not have blanket immunity from state law. .............. 76

B.      Minn. Stat. § 609.735 does not violate the intergovernmental immunity doctrine and therefore applies to federal agents ................... 78

VIII.   Count XVIII, Ultra Vires Agency Action Not Authorized by Congress: Use of Military Force, Is Plausibly Alleged. ...................................................... 81

IX.     Count XIX, Ultra Vires Executive Action Not Authorized by Congress, Is Plausibly Alleged. ....................................................................................... 81

X.      This Court Has Authority to Issue Injunctive Relief. ..................................... 82

CONCLUSION ............................................................................................................. 83

iv

**INTRODUCTION**

At the end of 2025, the Trump administration began an illegal paramilitary operation in Minnesota, the likes of which have never been seen in our Republic's 250-year history. The operation, dubbed Operation Metro Surge ("OMS"), peaked with approximately 4,000 heavily armed and militarized agents invading the streets of Minneapolis and Saint Paul. Defendants' justifications for OMS were as shifting as they were untrue. In actuality, Defendants executed OMS to punish the Trump administration's perceived political enemies; to coerce Plaintiffs to adopt Defendants' desired immigration policies; and to commandeer Plaintiffs' resources to enforce federal immigration law. Defendants further weaponized OMS with a series of unlawful policies and agency actions that maximized chaos, fear, and physical as well as economic harm. These policies remain in place and implemented in Minnesota, and, especially given Plaintiffs' refusal to bow to Defendants' wishes, the threat of coercion likewise remains.

The Amended Complaint describes in vivid and shocking detail how Defendants' widespread and overwhelming unlawful actions during OMS violated Plaintiffs' rights. The allegations, which must be accepted as true, state legal claims that are more than plausible. Defendants' arguments to the contrary misconstrue the law and invite the Court to resolve disputed facts on a motion to dismiss. To give just a few examples, (1) Defendants assert that standing is assessed as of the Amended Complaint's date, but controlling Eighth Circuit precedent requires that standing be assessed as of the original Complaint; (2) Defendants' arguments regarding the Tenth Amendment are improper under the 12(b)(6) standard because they ask the Court to resolve issues of fact concerning the

1

purposes of OMS; and (3) Defendants move to dismiss eight of Plaintiffs' twelve Administrative Procedures Act ("APA") claims based on solely on an argument that Plaintiffs have not pled discrete agency actions, but Defendants ignore the wealth of case law holding that informal agency actions are justiciable and they ignore the detailed factual allegations in the Amended Complaint that support the alleged agency actions. As explained below, Defendants' other arguments for dismissal likewise founder, and the motion to dismiss should be denied in its entirety.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.    The Surge and the Damage it Caused**

In December 2025, the federal government—motivated by unlawful goals of retaliation, discrimination, commandeering, and coercion—initiated OMS and invaded the Twin Cities metro area with thousands of armed and masked DHS agents. (Dkt. 167 ¶¶ 1-4.) The harms of OMS are profound and ongoing: members of Plaintiffs' communities have been left afraid to leave home, go to work, attend school or religious services, access health care, access government services, or otherwise live their lives for fear of facing violence, unjustified detention, or other violations of their constitutional rights. (*Id.* ¶¶ 9, 120, 125, 298, 436, 437.)

The community fear was cultivated intentionally. Defendants went to great lengths to publicize the overwhelming and unprecedented scale of OMS, both in how they characterized the operation and how they publicized it (including by enlisting social media influencers and war-zone videographers to foment "shock and awe.") (*Id.* ¶¶ 69-75, 111-114.)

2

The tactics were designed to be brutal, including: widespread racial profiling, (*Id.* ¶¶ 86-94); aggression by DHS agents (both in driving maneuvers and arrests) (*Id.* ¶¶ 95, 98-101); enforcement at sensitive locations such as schools, churches, hospitals, courthouses (*Id.* ¶¶ 66, 125, 298-300, 492); retaliation against observers and lawful protestors (*Id.* ¶¶ 105-10)); and excessive force, including use of fatal force in two separate incidents, followed by an increase in violence and rhetoric attempting to justifying the killings. (*Id.* ¶¶ 115-139.)

Predictably, the unlawful tactics used by Defendants eroded public trust in law enforcement, and necessitated state and local resources be directed to responding to incidents caused by Defendants' agents. (*E.g.*, *id.* ¶¶ 10, 130, 133-38.) The harm also took a significant financial toll, with surveys showing that OMS caused more than $600 million in damage to Plaintiffs' economies which will have lasting impacts throughout the State. (*See* Dkt. 167-2, 167-3.)

Although Defendants have announced a claimed reduction in the number of agents within the state and have publicly stated they "ended" OMS, Plaintiffs remain under coercive and retaliatory threats that the overwhelming forces will return "if we need to," including threats to deploy immigration agents at polling places. (*Id.* ¶¶ 478-482.) Defendants have never provided complete transparency into staffing numbers and hold exclusive control over how and when such information is communicated. The last public reporting estimated close to 650 DHS agents remained active within Minnesota even weeks

3

after a drawdown was announced.[1] Public dockets reflect that immigration-related habeas petitions have continued to be filed at a high volume within the district.[2] And, as recently as mid-June, public reporting highlighted the same unlawful tactics observed during OMS on display in Bemidji, Minnesota, including an incident in which two members of the Leech Lake Band of Ojibwe were reportedly detained by DHS agents who approached with their guns drawn, despite both individuals having their tribal identification on them.[3]

## II.     Defendants' Twelve Agency Actions

The Amended Complaint does not only describe the harmful tactics unleashed during OMS. Plaintiffs also credibly allege that Defendants adopted twelve unlawful agency actions and implemented them in Minnesota. Although many of these actions took the form of written agency policies and directives, Plaintiffs allege that some of the agency actions were made final through informal processes. For example, daily phone briefings involving DHS officials and advisor Stephen Miller involved oral directives regarding the manner and scale of arrests and retaliations expected of Defendants' agents. (*Id.* ¶¶ 20, 64).

The twelve unlawful final agency actions alleged are as follows:

**(1)** OMS itself is a discrete agency action that was executed as a sanction on and to coerce Plaintiffs to adopt Defendants' desired immigration policies and to

---

[1] Louis Krauss, "Close to 650 federal agents remain in Minnesota weeks after border czar announced end of operation," The Star Tribune, Mar. 4, 2026 (available at https://www.startribune.com/close-to-650-federal-agents-remain-in-minnesota-weeks-after-border-czar-announced-end-of-operation/601590007).

[2] Paul Blume, "ICE detainees have already filed more habeas petitions than in all of 2025," FOX 9, Jan. 21, 2026, (available at ICE detainees have already filed more habeas petitions than in all of 2025 | FOX 9 Minneapolis-St. Paul).

[3] Sydney Dick, "Leech Lake Band Member Describes Detainment by ICE during Bemidji Operation," Lakeland PBS, Jun. 17, 2027 (available at https://lptv.org/leech-lake-band-member-describes-detainment-by-ice-during-bemidji-operation/).

4

commandeer Plaintiffs' resources to enforce federal immigration law. (*Id.* ¶¶ 33-62, 79, 141-47.)

**(2)** Defendants issued a binding revocation of a binding 2021 policy that prohibited immigration enforcement at sensitive locations. (*Id.* ¶¶ 285-300.)

**(3)** In contravention of federal law, Defendants adopted "the Roving Patrol Policy" and determined that immigration enforcement agents could conduct roving patrols. (*Id.* ¶¶ 285-300.)

**(4)** Defendants adopted a new Biometric Scanning Policy by rescinding DHS Directive 026-11, issuing a February 2025 DHS Privacy Threshold Analysis, and they began the widespread use of Mobile Fortify, a biometric scanning system, during their roving patrols. (*Id.* ¶¶ 320-40.)

**(5)** Defendants adopted an unlawful and arbitrary "Conceal Plates Policy" allowing immigration agents to conceal, remove, or swap legally required license plates when engaged in enforcement activities in Minnesota. (*Id.* ¶¶ 341-61.)

**(6)** In a May 12, 2025, memorandum, Defendants implemented an illegal Trespass and Warrantless Entry Policy that violates federal and state law. The Policy purports to allow immigration agents to trespass and enter homes without judicial warrants. (*Id.* ¶¶ 362-99.)

**(7)** Defendants adopted the Unlawful Arrest Policy in violation of federal and state law, allowing immigration agents to arrest individuals without the requisite probable cause. (*Id.* ¶¶ 400-15.)

**(8)** Defendants adopted a Fall 2025 Unlawful Racial and National-Origin Profiling Policy, violating federal and state law by allowing immigration agents to racially profile individuals. (*Id.* ¶¶ 400-38.)

**(9)** Defendants adopted the Unlawful Masking Policy, which authorized, implemented, ratified, and maintained a policy and practice under which federal immigration and other federal law-enforcement agents operating in Minnesota were permitted to conceal their identities with masks and similar face coverings while carrying out enforcement actions in public. This is part of a broader final agency action (1) determining that federal agents conducting federal operations are not subject to state masking laws, including Minn. Stat. § 609.735, under the Supremacy Clause related doctrines of federal immunity; and (2) authorizing federal agents to disregard state masking laws ("Unlawful Masking Policy"). (*Id.* ¶¶ 439-52.)

5

**(10)** Defendants adopted the Deployment of Overwhelming Force Policy, whereby they flooded Plaintiffs' streets with an intentionally overwhelming and disproportionate number of immigration agents as a show of force and sanction on Plaintiffs. (*Id.* ¶¶ 453-529.)

**(11)** Defendants took final agency action by adopting an Unlawful Excessive Force Policy that violates federal and state law because it allows immigration agents to use force against non- or passively-resisting individuals that would only be legal against actively resisting individuals. (*Id.* ¶¶ 460-72.)

**(12)** Defendants adopted a Drastic Reduction in Training Policy that reduced immigration agents' training by 40% in violation of federal regulations. (*Id.* ¶¶ 473-77.)

These final agency actions have already been implemented in Minnesota and have already injured and in most cases continue to injure Plaintiffs.

## III.    Procedural History

On January 12, 2026, Plaintiffs filed the original Complaint in this matter along with a motion for a temporary restraining order ("TRO"). The motion for a TRO was based solely on Plaintiffs' Tenth Amendment and Equal Sovereignty claims. On January 31, 2026, after converting the motion to one for a preliminary injunction, the Court denied Plaintiffs' request for preliminary relief.

Defendants moved to dismiss the original Complaint. In lieu of responding to the motion, Plaintiffs filed an Amended Complaint. The Amended Complaint asserts nineteen counts which are shown in Table 1, infra at 87.

Defendants moved to dismiss the Amended Complaint. Defendants' arguments in the motion to dismiss are the following: (1) Plaintiffs lack standing; (2) Defendants' purported "conclusion" of OMS requires dismissal; (3) Plaintiffs fail to state cognizable

6

Tenth Amendment, Equal Sovereignty, First Amendment, and ultra vires claims; and (4) various justiciability arguments against the APA claims.

Given the number of claims and the various arguments that Defendants assert against some or all of the claims, Defendants' arguments are shown on a count-by-count basis in Table 1, which is reproduced below after the signature blocks. For the majority of the APA claims, viz., Counts VI, VII, VIII, X, XII-XVII, the only APA justiciability argument asserted by Defendants is that Plaintiffs do not allege a plausible discrete agency action because "Plaintiffs point to no document, order, regulation, statement, or any other concrete expression" evidencing the alleged policies. As discussed below, Defendants' arguments on this point are easily rejected because they misconstrue case law and ask the Court to resolve fact disputes on a motion to dismiss.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard does not require the inclusion of "detailed factual allegations" in a pleading, but only enough specificity "to raise a right to relief above the speculative level." *Id*. at 555. In applying this standard, the Court must assume the facts in the Complaint to be true and take all reasonable inferences from those facts in the light most favorable to the plaintiff. *Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019).

On a motion to dismiss pursuant to Rule 12(b)(1), courts "must distinguish between a 'facial attack' and a 'factual attack'" on jurisdiction. *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). A facial attack assumes that, even if all the facts alleged in the

7

Complaint are true, the court still lacks subject-matter jurisdiction; a factual attack, on the other hand, "challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, may be considered." *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). When a defendant raises a facial attack, courts apply the same standard as a motion to dismiss under Rule 12(b)(6). *Osborn*, 918 F.2d at 729 n.6.

## ARGUMENT

### I.    Plaintiffs Have Standing.[4]

For standing to exist, a plaintiff must allege an injury in fact, causation, and redressability. *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 602 (8th Cir. 2022). States and cities have standing to sue in their sovereign capacity for injuries to their own interests. *See, e.g.*, *Biden v. Nebraska,* 600 U.S. 477 (2023) (recognizing Missouri's Article III standing to sue the Department of Education over a student loan program which would cause a State instrumentality to incur millions of dollars in fees); s*ee also* *Massachusetts v. EPA,* 549 U.S. 497, 516–20 (2007); *Wyoming v. Oklahoma*, 502 U.S. 437, 440 (1992); *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 153 (1981); *Maryland v. Louisiana*, 451 U.S. 725, 736 (1981).

States and cities can suffer a wide range of threatened injuries sufficient to confer standing. The three principal categories are injuries to (1) nonsovereign interests, (2)

---

[4] Defendants characterize their argument that Plaintiffs have made improper programmatic challenges as a standing issue. (Dkt. 175, at 28-29.) The issue is not standing but rather concerns the existence of final agency action and is discussed below.

sovereign interests, and (3) quasi-sovereign interests. *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, *ex rel. Barenz*, 458 U.S. 592, 601-02 (1982). Nonsovereign interests include financial harm. *See id.* Sovereign interests include a state's and its cities' power to create and enforce their own legal code. *Id.* at 601. Quasi-sovereign interests include the health and well-being of a state's and its cities' residents, plus "not being discriminatorily denied [the state's] rightful status within the federal system." *Id.* at 607. Here, Plaintiffs assert and satisfy all three forms of standing. *See also City of Kennettv. Env't Prot. Agency*, 887 F.3d 424, 431 (8th Cir. 2018) (city demonstrated injury in fact to establish standing to challenge EPA action).

**A.    Defendants caused increased costs and more than half a billion dollars in damage to Plaintiffs' economy.**

As an initial matter, the Court has already considered Plaintiffs' standing and concluded that "the Court finds Plaintiffs' arguments on standing to be well-supported." *Minnesota v. Noem*, 818 F. Supp. 3d 1030, 1040 n.11 (D. Minn. 2026). The Court's remark is unsurprising given controlling Eighth Circuit precedent regarding a state's standing to challenge a federal action that causes even indirect harm to the state. *See Iowa v. Wright*, 154 F.4th 918, 938 (8th Cir. 2025).

In *Iowa*, a group of states challenged the Department of Energy's new method of calculating the petroleum-equivalency factor used in determining the equivalent petroleum-based fuel economy values of electric vehicles. *Id.* at 937. The plaintiff states argued they had standing to challenge the new rule because the rule "will increase the adoption of electric vehicles, [and] increase wear to public roads, increasing costs to the

9

states to maintain their roads." *Id.* at 938. The Eighth Circuit agreed, holding that: "Here, increased costs to maintain public roads is an injury that actually exists and is particular to the states as states. They do not assert 'broad generalities,' nor is the possibility of harm 'too speculative for Article III purposes.'" *Id.* (citation omitted). The Eighth Circuit also held that "[t]he harm to the states is particularized and concrete" and that "even a small amount of money is ordinarily an injury." *Id.* (quotation marks omitted).

The same analysis applies here. The federal government acted, and that action has directly and indirectly caused a financial injury to Plaintiffs. If the "small amount" of increased cost of road maintenance from the extra weight of electric vehicles was enough to give the plaintiff states standing in *Iowa*, then the increased public safety costs incurred by Plaintiffs must suffice for a constitutional injury. (Dkt. 167, *e.g.*, ¶¶ 154, 160.) The Amended Complaint also contains detailed allegations setting forth the increase in cost of Plaintiffs' provision of public services that was caused by Defendants' illegal actions. (Dkt. 167 ¶¶ 148-85.) Like the increase in road maintenance costs in *Iowa*, the cost increases pled here are particularized, concrete, and have already occurred. These cost increases are also cognizable injuries.

Defendants' assertion that *United States v. Texas*, 599 U.S. 670 (2023), holds otherwise misconstrues that case's holding and reasoning. Defendants assert that *Texas* demonstrates the inadequacy of "indirect" or "downstream" injuries. (Dkt. No. 175 at 20-21.) But there, the state lacked standing because it was challenging a prosecutorial policy of *nonenforcement*, not because its injury was supposedly indirect:

> The States have not cited any precedent, history, or tradition of courts ordering the Executive Branch to change its arrest or prosecution policies so that the Executive Branch makes *more* arrests or initiates *more* prosecutions. On the contrary, this Court has previously ruled that a plaintiff lacks standing to bring such a suit.

*Id.* at 677 (emphasis added). The Court, in fact, recognized that the state's monetary loss was "an injury," but found the injury was not "legally and judicially cognizable" because the judiciary could not compel the Executive Branch to make more arrests or initiate more prosecutions. 599 U.S. at 676-77. By contrast, here, Plaintiffs are not seeking more enforcement of federal law, nor challenging the Executive's exercise of investigative or prosecutorial discretion. Plaintiff's financial harms caused by Defendants' unlawful actions, whether those actions are under the guise of "law enforcement" or not, establish a cognizable constitutional injury. *See also Fridley Pub. Sch. Dist., Indep. Sch. Dist. 14 v. Mullin*, No. 26-CV-1023 (LMP/LIB), 2026 WL 1244043, at *12 (D. Minn. May 6, 2026) (holding that increase in absenteeism at plaintiff schools caused by immigration enforcement actions and the potential loss of enrollment-based funding arising therefrom was a cognizable injury).

Defendants' reliance on *Food & Drug Administration v. Alliance for Hippocratic Medicine*, for the proposition that Plaintiffs' use of resources to respond to Defendants' conduct cannot confer standing is also misplaced. There, the Court explained that "abstract social interests" and "strong opposition to the government's conduct," are not concrete injuries, nor can a plaintiff make them so by "expending money to gather information and advocate against the defendant's action." 602 U.S. 367, 394 (2024). Here, Plaintiffs'

11

injuries do not arise from information-gathering or advocacy. They suffered pecuniary injuries and expended financial and human resources to protect services, employees, and property as a direct result of Defendants' unlawful conduct. (Dkt. 167 ¶¶ 148-85.) *Hippocratic Medicine* recognized that these types of injuries confer standing. 602 U.S. at 390-91 (identifying diversion of resources and increasing insurance costs as injuries but finding plaintiffs "lack[] record support" that they have incurred or will incur such injuries in the future). *See also Washington v. U.S. Dep't of Educ.*, No. C 25-1228, 2025 WL 2966255, at *6-7 (W.D. Wash. Oct. 21, 2025) (states had standing to challenge revocation of grants to third parties based on fiscal harm because discontinuation of the grants would decrease student access to school-based services and lead students to seek needed mental health services from the states). In short, Plaintiffs allege significant economic harm, with particularized allegations and data-based surveys, (*See* Dkt. 167 Exs. A-C), tied directly to specific actions taken by Defendants. This is more than sufficient to establish Plaintiffs' standing.[5]

### B.    Defendants' policies have injured Plaintiffs' sovereign interests.

Defendants contend that Plaintiffs' sovereign interests in creating and enforcing their own laws cannot support standing for Counts VI and VII (challenging policy to violate state anti-masking law); Count XII (challenging biometric scanning policy); Count XVI (challenging use of St. Paul property without consent and in violation of City ordinance);

---

[5] Defendants suggest that Plaintiffs assert a *parens patriae* theory of standing based on behalf of their residents. Plaintiffs are not asserting *parens patriae*—Plaintiffs allege concrete, particularized injuries suffered by Plaintiffs themselves.

12

and Count XVII (challenging concealed license plates policy). (Dkt. 175 at 23-25.[6])

Defendants are wrong: Plaintiffs' sovereign interests—alone and in combination with their proprietary interests—give them standing to pursue these counts.

States and localities have standing to vindicate injuries to their sovereign interests. *Snapp*, 458 U.S. at 601. The most "easily identified" sovereign interest is the ability "to create and enforce a legal code, both civil and criminal." *Id*. That principle has been repeatedly reaffirmed. *See, e.g., Tennessee v. Dep't of Educ.,* 104 F.4th 577, 591-95 & n.11 (6th Cir. 2024) (collecting cases and recognizing state standing based on injury to the state's ability to enforce its laws "without contradiction from the federal government"). Defendants argue that Plaintiffs must allege "'some tangible interference with [their] authority to regulate or to enforce [their] laws.'" (Dkt. 175, at 24 (quoting *Saginaw County v. STAT Emergency Med. Servs., Inc.,* 946 F.3d 951, 957 (6th Cir. 2020)). Plaintiffs do exactly that.

For Counts VI and VII, Plaintiffs allege that the Unlawful Masking Policy's implementation "interfer[es]" with Minnesota's "sovereign interest in enforcing its own laws" by "mak[ing] it harder for state and local law enforcement to identify, investigate, and prosecute DHS agents who are acting unlawfully." (*Id.* ¶¶ 550, 558.) That harm is not abstract: Minnesota's anti-masking statute was enacted to facilitate enforcement of other criminal and civil laws against groups like the Ku Klux Klan who wore masks to evade the authorities. *Minn. Voters All. v. Walz*, 492 F. Supp. 3d 822, 834 (D. Minn. 2020). The state's

---

[6] Plaintiffs refer to the Dkt. pagination.

license-plate requirements likewise exist to support law-enforcement investigations and promote public safety. (*See* Dkt. 167 ¶ 360.) When federal agents violate these statutes pursuant to the challenged policies, they directly undermine Plaintiffs' law enforcement activities and cause a "tangible interference" with Plaintiffs' sovereign interests. *Saginaw Cnty.,* 946 F.3d at 957.

Additionally, where local law enforcement are faced with lawless conduct by federal agents and are less able to distinguish between bad actors who do and do not claim federal authority, Plaintiffs are unable to enforce their duly enacted laws without putting themselves "on a collision course with the federal government." *Tennessee*, 104 F.4th at 595. This unresolved state-federal conflict is itself a cognizable injury. *Id.*; *see also Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008).[7]

Further, unlike the cases Defendants cite, the federal policies and actions challenged here *do* interfere with Plaintiffs' enforcement of state and local law. In *Saginaw County*, the county lacked sovereign-interest standing because there was no "actual or threatened invasion of [the county's] sovereign right *to enforce the law.*" 946 F.3d at 956 (emphasis added). In *Washington v. United States Food & Drug Administration*, Idaho lacked sovereign-interest standing because its theory relied on speculation that third parties would break Idaho law and that Idaho would face greater difficulty policing those third parties.

---

[7] In a footnote, Defendants suggest that municipalities do not have sovereign interest standing. (Dkt. 175, at 9 n.6.) Plaintiffs disagree because localities are ultimately creatures of the state and the primary entities involved in enforcing state law. Regardless, Minneapolis and Saint Paul nonetheless have independent grounds for standing based on financial injury and diversion of resources. (*See, e.g.*, Dkt. 167 ¶¶ 543, 549, 550, 557, 558.)

14

108 F.4th 1163, 1177 (9th Cir. 2024). And in *Virginia ex rel. Cuccinelli v. Sebelius*, Virginia did not have sovereign-interest standing to challenge the Affordable Care Act's individual mandate "because the mandate threaten[ed] no interest in the 'enforceability'" of a conflicting Virginia statute. 656 F.3d 253, 269 (4th Cir. 2011). As described above, Defendants have already interfered with Plaintiffs' law enforcement functions, and Defendants' authorities are therefore inapposite.

Defendants nonetheless insist that no sovereign-interest injury to Plaintiffs exists here because none of the relevant state or local laws could be enforced against federal agents. (Dkt. 175, at 24-25.) From this, they also argue that Plaintiffs' claims are not redressable. (*Id.* at 25.) But those arguments "improperly conflate . . . the merits of [Plaintiffs'] claims with the injury-in-fact prong of the standing inquiry." *Garmai R. v. Petrovich*, No. 24-CV-4125 (KMM/ECW), 2025 WL 1685768, at \*6 (D. Minn. June 16, 2025).

### C.     Defendants caused cognizable intangible injuries to Plaintiffs.

None of Plaintiffs' claims rely solely on intangible injuries, and the Court could rest its jurisdiction on Plaintiffs' claimed tangible injuries without even turning to intangible ones. Even if that were not the case, Defendants' argument that Plaintiffs' intangible injuries are not concrete is easily rejected. (Dkt. No. 175, at 22-25.) It is well settled that concrete injuries can be tangible or intangible, such as "reputational harms" and "harms specified by the Constitution itself." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425, 473 (2021). "Reputational harms, as a general matter, are *classic* Article III injuries." *Bost v.*

*Ill. State Bd. of Elections*, 607 U.S. 71, 78 (2026) (citation modified and emphasis added). Plaintiffs allege classic reputational harms here.

>     1.    *Defendants' agents have caused Plaintiffs' residents to distrust Plaintiffs' law enforcement agencies and agents.*

Reputational harms are generally actionable, where, as here, a challenged action (i) lowers a plaintiff in the estimation of the community or (ii) deters third persons from associating or dealing with the plaintiff. *See McNaught v. Nolen*, 76 F.4th 764, 772 (8th Cir. 2023). When trust in law enforcement decreases, residents are less likely to call police, report crimes, and cooperate with investigations, which, in turn, hinders Plaintiffs' ability to protect their communities. (Dkt. 167 ¶¶ 10, 180, 192.) Reputational harms, like a loss of trust, are "particularly concrete for those whose jobs depend on the support of the people," as Plaintiffs do here. *Bost*, 607 U.S. at 78. Defendants' agents have sown confusion about their identity in Plaintiffs' communities through their interactions with residents (*e.g.*, by concealing their identity, failing to identify themselves, masking, and wearing inconsistent uniforms with inconsistent identification),[8] and their unlawful tactics undermine public trust in state and local law enforcement because individuals confuse or conflate Defendants' agents with Plaintiffs' law enforcement agents. (*Id*. ¶¶ 10, 172, 179, 188, 445, 543.)

---

[8] Defendants concede using such practices. (Dkt. 167 ¶ 445 (providing examples).)

16

       2.      *Plaintiffs' reputational harms bear a close relationship to analogous harms long recognized in American courts.*

"Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC*, 594 U.S. at 414. This inquiry simply asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury. It does *not* require an exact duplicate in American history and tradition. *Id*. Plaintiffs' alleged harm, e.g., parallels the reputational harm in a classic defamation claim,[9] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974) ("impairment of reputation and standing in the community"); as well as harms under the Lanham Act, [10] where a defendant's actions cause or are likely to cause confusion to those that use or may use a plaintiff's services. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974) ("impairment of reputation and standing in the community"); 15 U.S.C. § 1114 (a) & (b) (Lanham Act). Plaintiffs' reputational harms are not meaningfully different than those litigated in run-of-the-mill

---

[9] The Supreme Court recognized the reputational harm associated with the tort of defamation as an analogue for this inquiry. *TransUnion LLC*, 594 U.S. at 432.

[10] Courts have also long recognized and regularly addressed reputational harms arising from the actions of one service provider on another. *See Matal v. Tam*, 582 U.S. 218, 224 (2017) (Lanham Act history); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014) ("reputational injury" as basis for standing for a Lanham-Act claim).

17

defamation or Lanham-Act cases.[11] This Court is well within its authority to adjudicate Plaintiffs' analogous harms in this suit.

> 3.   *Plaintiffs' reputational harms are well-supported.*

Plaintiffs' allegations of reputational harm go well beyond naked assertions of injury devoid of further factual enhancement. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In fact, even at this early stage of litigation, Plaintiffs support their allegations with mixed-mode, probability-based surveys conducted by U.S. Immigration Policy Center (USIPC) at the University of California at San Diego (collectively "the USIPC Surveys"). (Dkt. 167 ¶ 193; Dkt. 167-1 at 1.) The surveys were conducted, evaluated, and interpreted using appropriate and accepted scientific and technical methods, and the results and conclusions are reliable. (Dkt. 167 ¶ 194.)

The USIPC Surveys establish that Defendants' unlawful policies and actions caused Plaintiffs' residents to lose trust in Plaintiffs' law enforcement agencies and agents. (*Id.* ¶ 196; Dkt. 167-1, at 5 (individuals who interacted with Defendants' agents were approximately 20% less likely to trust law enforcement than individuals who had no interaction).) Defendants' unlawful policies and actions also caused Plaintiffs' residents to be less likely to seek help from law enforcement. (Dkt. 167 ¶¶ 198, 201; Dkt. 167-1, at 17, 19 (individuals who interacted with Defendants' agents were 24% and 29.5% less likely to seek help from law enforcement than individuals who had no interaction).)  Moreover, the

---

[11] Courts handling Lanham-Act cases are no stranger to the use of surveys as material evidence, like those Plaintiffs have submitted here. *See Co-Rect Prods., Inc. v. Marvy! Advert. Photography, Inc.*, 780 F.2d 1324, 1333 n.9 (8th Cir. 1985).

USIPC Surveys show that Defendants' illegal actions caused Plaintiffs' residents to be less likely to obey the commands of Plaintiffs' law enforcement agencies and officers. (Dkt. 167 ¶¶ 198, 204; Dkt. 167-1, at 6**.)**.

Finally, the USIPC Surveys tie these reputational harms to the specific policies alleged in the Amended Complaint, such as the Racial and National-Origin Profiling Policy (Dkt. 167-1, at 11-12, 14); the Sensitive Locations Policy (Dkt. 167-1, at 17); and the Roving Patrol Policy (Dkt. 167-1, at 21).

### 4.    Defendants' cases are inapposite.

Defendants cite *Ojogwu v. Rodenburg L. Firm* as support for the proposition that "[t]he intangible injury Plaintiffs allege is 'insufficient to establish concrete injury in fact.'" (Dkt. 175, at 22 (citing 26 F.4th 457 (8th Cir. 2022)).) In *Ojogwu*, a debt collection law firm sent the plaintiff a garnishment summons. 26 F.4th at 460, 462. In a single paragraph in the complaint, the plaintiff alleged that this mailing caused him "actual damages in the form of fear of answering the telephone, nervousness, restlessness, irritability, amongst other negative emotions." *Id*. at 462. Of course, sending a single mailing is nothing like sending thousands of armed and masked agents to the Twin Cities to carry out dangerous, illegal, and unconstitutional stops and arrests. *Compare id*. *with* (Dkt. 167 ¶ 198). And in *Ojogwu*, the plaintiff did not allege any reputational harms whatsoever, much less,

19

reputational harms supported by, among other things, mixed-mode, probability-based surveys. In short, *Ojogwu* is irrelevant here.[12]

> **D.    Plaintiffs' injuries are fairly traceable to the Defendant's sensitive locations and unlawful arrest policies and would be redressed by having those policies vacated.**

Defendants contend that Plaintiffs fail to meet traceability and redressability regarding the APA claims challenging revocation of the previous long-standing sensitive locations policy and the Unlawful Arrest Policy. Defendants present three specific arguments regarding these elements: (1) Plaintiff's injuries arise from the actions of third parties; (2) the 2021 sensitive locations policy did not expressly prohibit enforcement actions in or near sensitive locations; and (3) the enforcement actions taken in or near sensitive locations may also be attributed to the administration's broader immigration agenda and general pattern of misconduct rather than the revocation of the 2021 sensitive locations policy.

Plaintiffs must show that their injuries are "fairly traceable" to the defendant's challenged conduct. *Dep't of Comm. v. New York*, 588 U.S. 752, 767 (2019). Traceability does not require the defendant's actions to be "the very last step in the chain of causation"

---

[12] Defendants also cite *Jones v. Bloomingdales.com, LLC* for the proposition that "[t]he allegations concerning the alleged undermining of public trust in state and local law enforcement do not render plausible any concrete injury to Plaintiffs." (Dkt. 175, at 22-23.) But *Jones* stands for no such proposition—it was, in fact, a case about a retail website invading the plaintiff's privacy and did not involve any reputational harms, and certainly not the well-supported reputational harms asserted here. 124 F.4th 535, 539-40 (8th Cir. 2024) (alleging harm to privacy akin to tort of intrusion upon seclusion, rather than reputational harm).

nor are they required to be the only cause of Plaintiffs' injuries. *Bennett v. Spear*, 520 U.S. 154, 169 (1997); *see Orangeburg v. FERC*, 862 F.3d 1071, 1080 (D.C. Cir. 2017) (finding traceability where there was another "equally important" cause of an injury). "[W]here the plaintiff suffers an injury that is 'produced by [the] determinative or coercive effect' of the defendant's conduct 'upon the action of someone else,'" the traceability requirement is satisfied. *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand & Lansdowne, LLC*, 713 F.3d 187, 197 (4th Cir. 2013). Accordingly, to establish traceability for an injury arising partially from third-party conduct, plaintiffs need only show that third parties will react in predictable ways to defendant's conduct. *Murthy v. Missouri*, 603 U.S. 43, 57 (2024).

A plaintiff satisfies the redressability requirement when it shows that a favorable decision will relieve "at least some of" an injury, and she need not show that every injury would be relieved. *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 114 (2025); *Larson v. Valente*, 456 U.S. 228, 244, n.15 (1982). Causation and redressability are frequently "flip sides of the same coin." *Diamond Alt. Energy*, 606 U.S. at 111. In that regard, "[i]f a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *All. for Hippocratic Med.*, 602 U.S. at 381.

The fact that Plaintiffs' injuries stem partially from the predictable reactions of third parties in response to Defendants' arbitrary policy changes does not preclude Plaintiffs' standing in this case. Plaintiffs directly allege and demonstrate through the USIPC survey that Plaintiffs' residents have suffered statistically significant rates of harm resulting from

21

encounters with DHS in or near sensitive locations. (Dkt. 167 ¶¶ 295–297.) Further, Plaintiffs expressly allege similar impacts on the free exercise of religion arising from residents' documented avoidance of community religious centers previously protected under the 2021 Sensitive Locations Policy. (*Id.* ¶ 298.) Similarly, Plaintiffs allege impacts on public safety and order caused by Defendant's policy changes and irresponsible targeting of enforcement actions within courthouses. (*Id.* ¶ 299.) These impacts are predictable results of Defendants' policy changes and the corresponding heavy-handed behavior of Defendants' agents under the new policy. Because these impacts in turn harm Plaintiffs' sovereign interest in ensuring public safety, health, and education, and impact Plaintiffs' pocketbooks, the causal chain directly connects Defendants' actions and Plaintiffs' cognizable harms. Plaintiffs allege demonstrable impacts from Defendants' unrestrained targeting of sensitive locations. Defendants' misconduct does not need to be the final or only link in the chain of causation, and, at the pleading stage, Plaintiffs have more than adequately alleged traceability.

Defendants also contend that because the 2021 policy still allowed some amount of enforcement actions at sensitive locations under specific circumstances, rescinding the 2025 policy in favor of the 2021 policy would not redress Plaintiffs' injuries. Similarly, Defendants allege that even without the Lyons Memorandum, which codified Defendants' Unlawful Arrests Policy, federal agents are allowed to make warrantless arrests, so recission of that policy would not redress Plaintiffs' injuries. But Plaintiffs need not show that granting the requested relief and rescinding the policies would relieve every injury. *See Valente*, 456 U.S. at 244 n.15. Rather, Plaintiffs need only allege, as they have,

22

sufficient facts to establish that rescinding the policies would relieve "at least some" of their injuries. *Diamond Alt.*, 606 U.S. at 114. Defendants' argument overlooks Plaintiffs' allegations that the revised policies drastically changed how and when Defendants pursued such enforcement actions. The mere fact that *some* actions may have occurred under the previous policies does not absolve Defendants of the predictable results of eliminating the previous policies' restrictions At this early stage, Plaintiffs have plainly alleged sufficient facts to establish that repealing the 2025 Sensitive Locations Policy and the Unlawful Arrest Policy would provide at least some degree of relief, even if it may not resolve all of Plaintiffs' injuries arising from Defendant's misconduct.

Additionally, Plaintiffs here allege and present clear statistical evidence demonstrating the causal relationship between the 2025 policy change and the negative impacts on the Plaintiffs and their residents. (*See* Dkt. 167 ¶¶ 295–97.) Plaintiffs' present allegations go beyond mere guesswork and present clear, traceable impacts from the policy change.[13]

Defendants last argue that Plaintiffs' injuries are not traceable or redressable because they could have been plausibly caused by Defendants' broader agenda of misconduct rather than the specific challenged policy. But Plaintiffs need not show that the policy was the *only* cause of harm. *Orangeburg*, 862 F.3d at 1080 (finding traceability where there was

---

[13] For similar reasons, Defendant's reliance on *Mennonite Church USA v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 1 (D.D.C. 2026), does not help them. A principal issue in that matter was the plaintiff's lack of statistical evidence to support their claimed harm and its relation to the policy at issue. *See id.* at 11–12. Here, explicit statistical evidence supports the harm alleged and its direct connection to the challenged policy. (Dkt. 167, at ¶¶ 295–97.)

another "equally important" cause of an injury); *Larson*, 456 U.S. at 244, n.15 (plaintiff need not show a favorable decision will relieve his *every* injury). These policies are components of Defendants' broader agenda, and their repeal would reduce the scope and frequency of harms by restoring prior protections for sensitive locations and requiring Defendants to use lawful criteria for arrest.

Plaintiffs sufficiently allege traceability and redressability as it relates to Defendants' Sensitive Locations and Unlawful Arrests Policies.

## II.    The "Conclusion" of OMS Does Not Require Dismissal.

Defendants, citing information that is not contained in the Amended Complaint, argue that OMS has "ended" because the Defendants have purportedly reduced the number of agents from over 3,000 to approximately 492 (more than four times the number that were assigned here before OMS), and have changed their enforcement tactics, and that therefore, Plaintiffs lack standing. (Dkt. 175, at 15-17.)

Standing is assessed as of the date the lawsuit was commenced, that is, January 12, 2026,[14] not the date of the amended complaint. *Iowa v. Wright*, 154 F.4th 918, 940 (8th Cir. 2025)). If a plaintiff has standing at the commencement of a lawsuit, a defendant cannot render the lawsuit moot (that is deprive the plaintiff of an actual case or controversy) by voluntarily ceasing the illegal conduct, only to start it again and force Plaintiffs to play jurisdictional whack-a-mole. *FBI v. Fikre*, 601 U.S. 234, 241 (2024). Plaintiffs have standing and Defendants actions have not mooted this case.

---

[14] *See* Fed. R. Civ. P. 3 ("A civil action is commenced by filing a complaint with the court.") Plaintiffs filed their initial Complaint on January 12, 2026. (Dkt. 1.)

24

**A.      Standing is assessed as of the date the case was filed, not on the date of the amended complaint.**

Defendants attempt to argue that, because an amended complaint becomes the operative complaint, that the jurisdictional question of standing must be assessed as of the date of Plaintiffs' Amended Complaint in April of 2026. (Dkt. 175 at 31.)  However, this is not the law. "[S]tanding is to be determined as of the commencement of suit[.]" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 571 n.13 (1992); *Davis v. FEC*, 554 U.S. 724, 734 (2008) ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*.")(emphasis added); *Steger v. Franco, Inc.*, 228 F.3d 889, 893 (8th Cir. 2000)("[S]tanding is based on the facts as they existed at the time the lawsuit was filed.")

Defendants erroneously rely on *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 32 (2025), as establishing a contrary rule. But that case involved a plaintiff who amended the complaint to remove the federal claims that had provided jurisdiction, leading the Court to decide the amended complaint deprived the federal courts of jurisdiction. *Id.* at 32-33. The case did not involve questions aimed at Article III standing but instead addressed federal question jurisdiction. In the context of Article III standing analysis, district courts evaluate standing at the time the lawsuit was filed. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734, (2008), citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed); *McClain v. Am. Econ. Ins. Co.,* 424 F.3d 728, 732 (8th Cir. 2005)(dismissing a case for lack

25

of standing because at the time the lawsuit was filed, rather than at the time of the amended complaint, Plaintiff did not have standing); *Patton v. Fitzhugh*, 131 F.4th 383, 391–92 (6th Cir. 2025)("when a plaintiff has filed an amended complaint, standing is measured by when the plaintiff initiated the suit, but as explained by allegations in the operative complaint"); *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1152–53 (10th Cir. 2013)("Thus, although we examine the allegations in SUWA's Amended Complaint, our inquiry focuses on whether SUWA had standing when the original complaint was filed in April 2007.") Therefore, the proper analysis of Plaintiffs' standing is assessed as of the date of the filing of the lawsuit, January 12, 2026, which was right in the middle of the ongoing OMS with 3,000 federal immigration agents at large in Minnesota.

Given the fact that standing is assessed as of January 12, 2026, Defendants' reliance on *Lyons* is inapposite. In *Lyons*, Plaintiff sought to enjoin a police department's use of chokeholds because he had been subject to a chokehold by police officers in the past. *City of Los Angeles v. Lyons*, 461 U.S. 95, 97-98 (1983). At the time Lyons brought his suit he had been released from the chokehold and was not imminently likely to experience another one. *Id.* at 101-02. Here, unlike in *Lyons*, the unlawful conduct which is injuring Plaintiffs was occurring at the time the complaint was filed and much is still happening. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000). Therefore,

Plaintiffs have standing to seek prospective relief because the harms were ongoing at the time the lawsuit was filed.[15] *See id.*

> 1. *Even if the Court were to assess standing as of the filing of the Amended Complaint Defendants' arguments fail.*

An injury sufficient for standing must be "actual *or* imminent." *Lujan*, 504 U.S. at 560-61 (emphasis added). Defendants' unlawful policies and actions have caused actual injuries. Because Plaintiffs were already injured, they have standing to challenge and seek vacatur of the unlawful policies and seek the Court's determination of the legality of Defendants' actions. *Brennan v. Dickson*, 45 F.4th 48, 54 (D.C. Cir. 2022) (plaintiff seeking vacatur show that challenged action has "either harmed him or imminently will do so"). Plaintiffs' claim for injunctive relief is still viable because Defendants still have four times the number of agents presence as prior to the initiation of Operation Metro Surge, nor do they claim that any of the unlawful agency policies underlying Plaintiffs' harms have been rescinded. Further, Plaintiffs also seek a declaratory judgment and the fact that Defendants have allegedly ceased causing harm does not defeat standing for declaratory relief: "There is little difficulty in finding an actual controversy if all of the acts that are alleged to create

---

[15] Plaintiffs also rely on *Hussen v. Noem*, No. 26-CV-324 (ECT/ECW), 2026 WL 657936, at *40 (D. Minn. Mar. 9, 2026) for the proposition that a plaintiff lacks standing when the injury is not "actual and imminent", however," but that case is inapposite because *Hussen*, like *Lyons*, was brought by individuals subject to unlawful conduct by law enforcement in one-off incidents that had occurred before the complaint was filed. Here the Plaintiffs are government entities and their harms stem not from any individual past action unlikely to recur, but from the way that Defendants have conducted Operation Metro SurgeOMS, in violation of myriad constitutional and statutory provisions., and continue to operate in Plaintiffs' communities under the same unlawful policies in place during OMS. The harms were ongoing at the time the lawsuit commenced and therefore Plaintiffs have standing.

27

liability have already occurred. The court is then merely being asked, as in any litigation, to determine the legal consequences of past events." 10B Charles Alan Wright et al., Federal Practice and Procedure § 2757, at 475 (1998). So, regardless of Defendants' allegations of cessation, Plaintiffs' standing remains.  However, because standing is assessed at the commencement of the lawsuit, the issue becomes whether Defendants can moot the case by voluntarily ceasing the illegal conduct.  They cannot.

> **B.     Because Plaintiffs had standing at the time the lawsuit was filed, Defendants can only argue the lawsuit is moot, but that argument fails.**

The argument Defendants are actually making is not a standing argument, but a mootness argument. They argue that circumstances they claim occurred after the filing of the lawsuit have extinguished the controversy. But as the Supreme Court has said, "[i]t is the doctrine of *mootness*, not standing, that addresses whether 'an intervening circumstance [has] deprive[d] the plaintiff of a personal stake in the outcome of the lawsuit.'" *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 719 (2022) (quoting *Genesis HealthCare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013)); *Wright*, 154 F.4th at 940 (government changing challenged regulation after original complaint was filed was mootness question not standing question). "The distinction matters because the [defendant], not [the plaintiff], bears the burden to establish that a once-live case has become moot." *West Virginia*, 597 U.S. at 719.

Where the only basis for finding mootness is the voluntarily announced change (even when framed as "cessation") of conduct by the defendants, the burden of demonstrating mootness is "heavy." *Id.* (citing *Friends of the Earth, Inc. v. Laidlaw Env't*

28

*Servs.* 528 U.S. 167, 189 (2000).) That is the case here. Defendants' entire argument is that the case is no longer a live controversy because OMS has purportedly ended. (Dkt. 175, at 29.) The public drawdown, to the extent it is genuine, was based entirely on Defendants' whims. (*Id.*) The party asserting mootness through its own purported cessation of the challenged practices has the burden to demonstrate that "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at 189 (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)).

The case of *F.B.I. v. Fikre* is instructive on what type of evidence is *not* sufficient to support that challenged activity could not be reasonably expected to recur. 601 U.S. 234 (2024). There, the plaintiff commenced a lawsuit in 2015 alleging that he had been placed on the "No Fly" list for illegal reasons, such as his race, national origin, and religious beliefs. *Id.* at 239. In 2016, the government removed Fikre from the "No-Fly" list but provided no explanation of the decision. *Id.* The government then moved to dismiss the lawsuit as moot. *Id.* The Ninth Circuit found the suit was not moot as the government had not met its burden to show that the allegedly wrongful behavior could not be reasonably expected to recur. *Id.* The government later provided a declaration from the relevant official that Fikre would not be placed on the No-Fly List in the future "based on the currently available information" and moved to dismiss the case again. *Id.* at 239-40. The Supreme Court found this also to be insufficient. *Id.* at 242.

The Court reasoned that simply stating that there was currently no intention to place Fikre back on the No-Fly list was insufficient to carry the burden to show that the

29

government would not do so in the future. "In all cases, it is the defendant's 'burden to establish' that it cannot reasonably be expected to resume *its* challenged conduct—whether the suit happens to be new or long lingering, and whether the challenged conduct might recur immediately or later at some more propitious moment." *Id.* at 243. Fikre had alleged that the government had visited him at a mosque and threatened that he would remain on the "No-Fly" list until he agreed to serve as an informant. *Id.* at 242. The Court reasoned that taking Fikre off the No-Fly list now did not in any way guarantee that Fikre would not be placed on the No-Fly list in the future if, for example, he refused future requests that he serve as an informant. *Id.*

The parallels to this situation are clear. Here, Plaintiffs clearly allege that the federal government has taken illegal actions, including attempting to unlawfully coerce Plaintiffs to assist with their draconian immigration enforcement agenda, and to punish Plaintiffs for their political representatives' statements opposing Defendants' policies. However, Defendants' declarations, stating only that their tactics have changed and the forces have been reduced, fail to meet their burden to show there is no longer a live controversy. *Id.* ("the government's sparse declaration falls short of demonstrating that it cannot reasonably be expected to do again in the future what it is alleged to have done in the past.") In fact, Plaintiffs' allegations show the opposite.

First, Defendants do not contest they continue the policies being challenged in Counts VI-XI, XIII-XIV, and XVI-XVII; they only claim they have reduced the number of agents and have stopped randomly stopping people on the street. (Dkt. 175, at 29-30.) Second, Defendants have specifically left the door wide open to sending more agents and

30

resuming their previous tactics. (Dkt. 167 ¶¶ 480-82.)  Defendant Homan stated, "If we need to come back, we'll come back." (*Id.* ¶ 480.) Threatening to resume the contested conduct whenever a defendant sees fit completely fails to meet the Defendants' burden under the voluntary cessation doctrine. As Defendants have not made it "absolutely clear" that the challenged conduct could not recur, and in fact, have threatened the opposite, the case cannot be moot and any attempt by Defendants to end the case based on the supposed end of OMS should be denied.

**III.    Plaintiffs Have Stated a Plausible Tenth Amendment Claim for Count I.**

    **A.    Defendants' arguments would require the Court to resolve factual disputes in Defendants' favor.**

In a motion to dismiss, all reasonable inferences must be drawn in Plaintiffs' favor, *Cook v. George's, Inc.*, 952 F.3d 935, 938 (8th Cir. 2020), but Defendants ask the Court to do the opposite and resolve any factual dispute in favor of Defendants, by accepting their contention that the unprecedented onslaught of brutal and unlawful attacks on Minnesota was an innocent decision aimed at fighting financial fraud or filling gaps in immigration enforcement. This Court, in its order denying Plaintiffs' motion for a temporary restraining order, noted that the record was sufficient to create factual disputes regarding the motivation for OMS, writing "the novelty of Plaintiffs' claims does not necessarily preclude their ultimate success on the merits" on their Tenth Amendment claim. *Id*. at 1044. The Court provided a detailed description of the evidence supporting Plaintiffs' Tenth Amendment coercion theory, all of which is alleged in the Amended Complaint. *Id*. at 1044-1045 (noting that "Plaintiffs certainly have put forth evidence to support this theory"

and concluding it finds "additional support" in statements by executive officials, some of whom are named as defendants).

The Court noted that Defendants also had evidence that "cuts the other way" citing the federal government's claims that government program fraud in Minnesota was the motivation for OMS. *Id.* at 1045. The Court went on to describe a factual dispute: "there is evidence supporting both sides' arguments as to motivation and the relative merits of each side's competing positions are unclear." *Id.* This identification of a factual dispute on the Tenth Amendment claim plainly exceeds the minimum standard of "plausible" in the Rule 12 context. *See, e.g.*, *Boyd v. Target Corp.*, 750 F. Supp. 3d 999, 1012 (D. Minn. 2024) (matters of factual dispute are not amenable for resolution on a motion to dismiss); *Mekhail v. N. Mem'l Health Care*, 726 F. Supp. 3d 916, 926 (D. Minn. 2024) (same).

In the months that followed this Court's ruling at the preliminary injunction stage, Plaintiffs and their agents (as well as several other parties) litigated grand jury subpoenas that the federal government served during OMS. *In re Grand Jury Subpoenas,* No. 26-MC-43 PJS, 2026 WL 1783899 (D. Minn. June 22, 2026) (publication in reporter pending). Chief Judge Schiltz provided the federal government an opportunity to rebut the abundant evidence of retaliatory and coercive animus motivating the grand jury subpoenas and demonstrate that the subpoenas were in furtherance of a good faith criminal investigation. Ultimately, the federal government fell short of that burden, and Chief Judge Schiltz concluded that the series of events surrounding the subpoenas "establishes beyond reasonable dispute that the subpoenas were a part of a broader campaign to coerce state and local officials in Minnesota to assist the Trump administration in its enforcement of

32

immigration laws." *Id.*, *7. Judge Schiltz concluded that the subpoenas "were issued as part of an unconstitutional effort to coerce Minnesota officials into assisting the federal government with enforcing civil immigration laws and to harass and retaliate against them for failing to do so," thereby violating the Tenth Amendment. *Id*., *5. As Judge Schiltz noted, "the public record . . . is replete with direct evidence of the Trump administration . . . threatening and attempting to punish states and localities that have adopted 'sanctuary' policies, as well as attempting to coerce those states and localities to devote resources to assist federal immigration enforcement." *Id.* at *6.

In short: even at the preliminary injunction stage, this Court identified plausible factual disputes that could support Plaintiffs' Tenth Amendment claim, and the record (in particular, the inability of the federal government to demonstrate good faith motivations for its attacks against Plaintiffs) has only become stronger since. But even without *In re Grand Jury Subpoenas*, which resolves fact disputes in a manner consistent with Plaintiffs' Tenth Amendment claim, Defendants are inappropriately attempting to win a fact dispute on Rule 12. Plaintiffs pleaded what is needed and that is enough.

**B.      Defendants' power under the INA is not unlimited.**

Defendants argue that Plaintiffs' Tenth Amendment claim is not cognizable because Plaintiffs do not challenge the constitutionality of the Immigration and Nationality Act, citing *United States v. Louper-Morris*, 672 F.3d 539, 563 (8th Cir. 2012). (Dkt. 175, at 19-20.) But Plaintiffs are not challenging the constitutionality of the INA and do not dispute Defendants' *authority* to enforce immigration law, nor is a challenge to the INA a necessary

33

feature of a cognizable Tenth Amendment claim.[16] Instead, this case challenges the Defendants' unlawful *manner* of enforcing the INA to serve ulterior goals of coercion, commandeering, and retaliation. The Tenth Amendment is a bulwark to protect individuals' "liberties that derive from the diffusion of sovereign power." *New York v. United States*, 505 U.S. 144, 181 (1992). Indeed, "[j]ust as the separation and independence of the coordinate branches of the Federal Government serves to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory v. Ashcroft*, 501 U.S. 452, 458, (1991).

Similarly, Defendants argue that they have "conclusive and preclusive discretion over how, when, and where to enforce federal law." (Dkt. 175, at 42.) But the federal government's powers to enforce immigration law are not unlimited. If it were so, Defendants could deploy so many immigration agents to a state that they would outnumber the population, enough for one to be posted outside every home to question people in "consensual encounters" every moment of every day, to stop traffic, to disrupt schools, to empty hospitals, and ultimately to undermine Plaintiffs' police powers. The Supreme Court has stated that the Tenth Amendment "has been construed as not depriving the national government of authority to resort to all means for the exercise of a granted power which

---

[16] For the same reason, Defendants' citation to *Fernandez v. Wiener*, 326 U.S. 340, 362 (1945), is inapposite. Plaintiffs are not challenging the *powers*, express or implied, delegated to the national government. Plaintiffs are challenging the manner in which Defendants executed those powers in Operation Metro Surge as unconstitutional levers of coercion against Plaintiffs.

34

are *appropriate and plainly adapted to the permitted end.*" *United States v. Darby*, 312 U.S. 100, 124 (1941) (emphasis added). Here, the Amended Complaint alleges that Defendants' actions are *not* appropriate and are *not* adapted to the permitted end of enforcing immigration law, such that Defendants' interference with Plaintiffs' police powers violates the Tenth Amendment. The INA does not empower Defendants to conduct standardless and unconstrained law enforcement; it must be circumscribed by the limits of the Tenth Amendment. In light of the extraordinary departures from regular order detailed in many immigration cases in this district in 2026, Defendants have all but forfeited any entitlement to the presumption of regularity in their enforcement of the INA here. *See, e.g.*, *C.R.R. v. Bondi*, No. CV 26-01282 (MJD/DJF), 2026 WL 752462, at \*9 (D. Minn. Mar. 17, 2026) (detailing significant doubt regarding presumption of regularity typically afforded to the government).

Facing damning allegations, including Attorney General Bondi's letter and copious social media posts that made the aim of OMS perfectly clear, Defendants nonetheless argue that courts may not "interrogate the subjective grounds for facially valid actions." (Dkt. 175, at 39.) Not so, as courts routinely consider the subjective explanation for executive action—and such examination is set forth in the very cases that Defendants cite. In *Hunter v. Underwood*, 471 U.S. 222 (1985), the Supreme Court concluded an Alabama constitution provision violated the Equal Protection clause of the U.S. constitution although it was facially racially neutral. *Id.* at 227. The Supreme Court concluded that the state constitution provision was created with a racially discriminatory motivation. *Id.* at 231. In *Department of Commerce v. New York*, which involved a citizenship question on the census, the

35

Supreme Court ruled that the government's explanation that the question would help enforce the Voting Rights Act was pretextual and vacated the underlying rule. 558 U.S. at 781 (in APA claim, court may inquire into "the mental processes of administrative decisionmakers" upon a "strong showing of bad faith or improper behavior"). And in *Trump v. Hawaii*, while the Court ultimately concluded that the presidential proclamation would likely withstand rational basis review, the court "looked behind the face" of the proclamation and considered extrinsic evidence to determine if the policy could reasonably be understood to result from a justification independent of unconstitutional grounds. 585 U.S. 667, 704-05 (2018).

### C.    Defendants' argument that Plaintiffs' Amended Complaint necessarily requires supervision by the Court fails.

Defendants argue that Plaintiffs' Tenth Amendment claim should be dismissed because it would require the Court to "superintend federal law enforcement in Minnesota" and would be "impossible to administer." (Dkt. 175, at 40). Both arguments fail. First, the argument that the Tenth Amendment must operate as an "on/off" switch ignores Supreme Court precedent that explains that federalism's balance between federal power and state sovereignty occurs along a spectrum, framing the question as whether the federal government's actions are "so coercive as to pass the point at which pressure turns into compulsion." *South Dakota v. Dole*, 483 U.S. 203, 211 (1987); *Nat'l Fed'n of Indep. Bus. ("NFIB") v. Sebelius,* 567 U.S. 519, 520 (2012). Second, the question before the Court at this stage is whether the Tenth Amendment claim is plausible, not how an order for relief would be written. But more fundamentally, courts are constantly asked to apply a legal

36

standard to a set of circumstances, such as whether law enforcement officers have probable cause to search or arrest.  A decision interpreting specific facts and comparing them to legal authority is not unworkable and to assume the same in advance would simply hand the federal government permission to continue its unlawful acts. By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty from arbitrary power. *Bond v. U.S.*, 564 U.S. 211, 222 (2011).

> **D.    Plaintiffs plausibly allege several Tenth Amendment theories for Count I.**

As for whether the Amended Complaint contains sufficient facts, accepted as true, to state a Tenth Amendment claim to relief that is plausible on its face, the Amended Complaint contains several Tenth Amendment theories that are consistent with appliable caselaw.

> *1.    The Amended Complaint plausibly alleges a coercion claim.*

First, the Amended Complaint contains a plausible Tenth Amendment coercion claim and in fact, the allegations describe a level of coercion far more impactful and harmful than those described in prior Tenth Amendment jurisprudence. In *Dole*, the Court concluded that the statute was not unconstitutionally coercive, observing that the restriction of highway dollars amounted to only 5% of federal highway funds, and describing it as a "relatively mild encouragement to the states." 483 U.S. at 211. In this case, this Court described OMS in starkly different terms, stating "It would be difficult to overstate the effect this operation is having on the citizens of Minnesota," noting its "profound and even heartbreaking" consequences to the state. 818 F. Supp. at 1048 (describing shootings of

Minnesota residents by federal immigration enforcement agents, evidence of Defendants' racial profiling, and excessive use of force). Here, as in *NFIB*, the facts in the Amended Complaint go far beyond what the Court held was "much more than 'relatively mild encouragement'—it is a gun to the head." *NFIB*, 567 U.S. at 581. In *NFIB*, the metaphorical gun that "crossed the line distinguishing encouragement from coercion" was a threat to withhold all Medicaid funds from states that did not expand Medicaid coverage. 567 U.S. at 579-80. The impact of the federal government's "inducement" from OMS is far broader and more impactful than a loss of federal Medicaid funds to states. As this Court described, the "negative impacts" of the Operation affected "almost every arena of daily life, from the expenditure of vast resources in police overtime to a plummeting of students' attendance in schools, from a delay in responding to emergency calls to extreme hardship for small businesses." 818 F.Supp. at 1048.

Here, Defendants used not metaphorical guns but actual guns -- threatening, shooting, and killing Plaintiffs' citizens -- as a means of pressuring Plaintiffs to go along with Defendants' desire for Plaintiffs to adopt the executive branch's policy positions on immigration. *See Koog v. United States*, 79 F.3d 452, 457 (5th Cir. 1996) ("the touchstone of this impermissible coercion is whether the States are precluded from rejecting the role envisioned for them by the federal government"). *See also In re Grand Jury Subpoenas,* 2026 WL 1783899. **5-7 (grand jury subpoenas issued amidst OMS were so coercive that they violated the Tenth Amendment). Indeed, Defendants acknowledge that courts examine the proportionality of the federal government's actions in considering whether it violates the Tenth Amendment. (Dkt. 175, at 37-38, 41-42.) Defendants' conduct was anything but

38

a proportional tactic to persuade state politicians to change their stance on a policy issue. The Amended Complaint states a plausible coercion claim.

### 2. The Amended Complaint plausibly alleges a commandeering claim.

Plaintiffs have also asserted a plausible claim that Defendants have interfered with Plaintiffs' police powers, one that goes well beyond increased costs. The police powers reserved to Plaintiffs under the Tenth Amendment are vast and include, without limitation, such critical functions as public health and safety, *R.J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170, 1176 (8th Cir. 2023); law enforcement, *United States v. Morrison*, 529 U.S. 598, 618 (2000); education, *United States v. Lopez*, 514 U.S. 549, 580 (1995) (Kennedy, J., concurring); and the general power of governing, *NFIB*, 567 U.S. at 535-36. The Amended Complaint plausibly asserts that through OMS, Defendants invaded the domain reserved to the states under the Tenth Amendment, including by decreasing trust of local police, decreasing public safety, and imperiling public education and public health with widespread illegal conduct.

Defendants argue that Plaintiffs' Tenth Amendment commandeering claim is not plausible because no other court decision has applied the caselaw to a circumstance like this one. But that is because Defendants' actions in unleashing thousands of heavily armed federal immigration agents is, literally, unprecedented. But the principles underlying the Tenth Amendment jurisprudence are not new and they apply here. *See Printz v. United States*, 521 U.S. 898, 925 (1997) (applying anticommandeering doctrine to "novel" statutory schemes unaddressed by "prior jurisprudence").

39

Defendants also argue that Plaintiffs' Tenth Amendment claims are not plausible because Plaintiffs have not changed their policies. (Dkt. 175, at 41.) But the Tenth Amendment applies to attempts to coerce, not just successful coercion. *See, e.g., NFIB,* 567 U.S. at 579-80.

### 3. Count VII relies upon the Tenth Amendment.

Finally, Count VII explicitly relies on the Tenth Amendment. Because the Court must accept the Amended Complaint's factual allegations as true and draw all reasonable inferences in Plaintiffs' favor, these allegations are sufficient to survive a motion to dismiss.

## IV. Plaintiff State of Minnesota Alleges a Plausible Equal Sovereignty Claim.

The Constitution recognizes a "'fundamental principle of equal sovereignty' among the States." *Shelby Cnty. v. Holder*, 570 U.S. 529, 544 (2013) (quoting *Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009)). This principle is "highly pertinent" to "assessing disparate treatment of States." *Id*. And under this principle, the federal government can treat States differently, but such disparate treatment must be "'sufficiently related to the problem that it targets.'" *Id.* at 542 (quoting *Northwest Austin*, 557 U.S. at 203). Here, Minnesota plausibly alleges that OMS was executed to punish it because Defendants perceive Minnesota and its elected representatives to be enemies of the Trump administration.

But the federal government cannot impose different burdens on States absent "compelling evidence" that the different treatment is warranted. *Id.* at 550-56. And political retribution cannot be "compelling evidence." *Cf. New York*, 588 U.S. at 785(holding agency action unlawful because courts "cannot ignore the disconnect between the decision

40

made and the explanation given"). Finally, Defendants decry Minnesota's theory as novel, but it is akin to the recent conclusion that sending out-of-state National Guard troops to Oregon violated the Equal Sovereignty principle. *See Oregon v. Trump*, 809 F.Supp.3d 1193, 1234-35 (D. Or. 2025); *see also Roe v. Michelin N. Am., Inc.*, 637 F. Supp. 2d 995, 1000 (M.D. Ala. 2009), *aff'd*, 613 F.3d 1058 (11th Cir. 2010) (invoking Equal Sovereignty to guide interpretation of Eleventh Circuit precedent so that "Alabama's wrongful-death cases should not be so singularly shutout and thus treated differently from the other 49 States' wrongful-death cases"). And if Minnesota's Equal Sovereignty claim is novel, it is only because Defendants' actions are unprecedented.

**V.      Plaintiffs State Plausible First Amendment Claims.**

> **A.  Defendants' assertion that Plaintiffs do not have First Amendment rights is contrary to First Amendment principles.**

The Amended Complaint plausibly asserts First Amendment claims against Defendants. Contrary to Defendants' implication, no binding authority conclusively states whether the First Amendment's protections extend to governmental entities. (Dkt. 175 at 45.) The question remains unresolved by both the Supreme Court and the Eighth Circuit; in fact, the Supreme Court has specifically declined to decide the issue. *See, e.g., United States v. Am. Library Ass'n*, 539 U.S. 194, 211 (2003).[17] The legal landscape is unsettled, and the caselaw cited by Defendants only illuminates the judicial uncertainty on the issue.

---

[17] *But see, Am. Library Ass'n*, 539 U.S. at 225 (2003) (Stevens, J., dissenting) (asserting that municipal libraries should have constitutional speech rights).

(Dkt. 175 at 45-46.)  On a Rule 12 motion, this uncertain legal landscape does not support dismissal.

Each of the cases cited by Defendants in support of their position rely at least in part on dicta from Justice Potter Stewart's concurrence in *Columbia Broadcasting System, Inc. v. Democratic National Committee ("CBS")*, 412 U.S. 94 (1973). Justice Stewart opined "[t]he First Amendment protects the press from governmental interference; it confers no analogous protection on the Government." *Id.* at 139. He reasoned the "purpose of the First Amendment is to protect private expression." *Id.* n.7. Crucially, this limited discussion—*entirely dicta*—is the full extent of his analysis on the issue.

*CBS* did not involve a government entity at all. The case involved a private broadcast company (CBS); and the Court's majority (joined by Justice Stewart) rejected the DNC's argument that CBS should be considered as a government entity. *Id.* at 120-21. Nonetheless, this dictum has been elevated by lower courts, far beyond its origin.

In fact, the Supreme Court has acknowledged the unresolved nature of this issue and has specifically declined to adopt any approach, much less one in line with Justice Stewart's view. *See Am. Library Ass'n*, 539 U.S. at 211. Any assertion that the issue is settled is inaccurate.

Moreover, the rule that Defendants urge this Court to adopt—that the First Amendment protects individuals but never governmental entities—misunderstands the First Amendment. Protecting individual liberty from government oppression is an important part of the First Amendment, but it is not its only purpose. The Supreme Court has repeatedly emphasized that the First Amendment also serves the broader role of

fostering and preserving a wide-ranging system of freedom of expression. *See, e.g.*, *Lamont v. Postmaster General of U.S.*, 381 U.S. 301, 307 (1965) (striking down law as unconstitutional because it was "at war with the 'uninhibited, robust, and wide open' debate and discussion that are contemplated by the First Amendment"); *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367 (1969) (explaining "[i]t is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas.")

Defendants' approach fails to protect this system of freedom of expression where the dispute, as here, centers on the federal government's attempts to discriminate and retaliate against state and municipal governments. Plaintiffs, like any speaker, contribute to the marketplace of ideas. The Amended Complaint alleges that Defendants are targeting Plaintiffs through executive orders, terminated or suspended grant funding, and OMS because Defendants disagree with Plaintiffs' so-called "sanctuary" laws and policies. By doing so they are eroding the "uninhibited, robust, and wide open debate and discussion that are contemplated by the First Amendment" in violation of the First Amendment. *See Red Lion Broadcasting*, 395 U.S. 367.

Defendants' attempt to downplay their actions as nothing more than the result of "political disputes." (Dkt. 175 at 46.) But, as pled, Defendants' conduct is far more severe: it reflects a concerted, punitive campaign of retaliation against Plaintiffs based on their so-called sanctuary policies in violation of Plaintiffs' First Amendment rights.

**B.**   **Plaintiffs Minneapolis and Saint Paul have First Amendment rights as corporations.**

Further, Defendants' arguments do not consider the distinctions between municipalities and other types of governments and whether Plaintiffs Minneapolis and Saint Paul, as municipal corporations, must be afforded the same First Amendment protections as other corporations.

It is well-settled that corporations have First Amendment rights. *Citizens United v. Federal Election Com'n*, 558 U.S. 310 (2010); *Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1 (1986); *First National Bank of Boston v. Bellotti,* 435 U.S. 765 (1978); *NAACP v. Button*, 371 U.S. 415 (1963). And the Supreme Court has never confined First Amendment rights to only *private* corporations. In fact, in two key cases, it has signaled that municipal corporations may enjoy the same First Amendment protection as their private counterparts.

First, in *Citizens United*, the Court grounded corporate speech protections in the principle that corporations are associations of citizens warranting constitutional protections. 558 U.S. at 349. The Court did not limit those protections to associations of citizens only when those associations are specifically private corporations; municipal corporations are fundamentally also associations of citizens. Justice Scalia's concurrence made this point expressly, pointing to cities as long-standing examples of corporations that existed and used speech at the time the Bill of Rights was enacted. *See* 558 U.S. at 388 (Scalia, J. concurring). The concurrence supports Plaintiffs' First Amendment claims here.

44

Second, in *City of Boston v. Anderson*, 439 U.S. 1389 (1978), Justice Brennan, acting as Circuit Judge, considered a request by the City of Boston to stay the Massachusetts Supreme Court's decision to prohibit the City of Boston from funding a ballot campaign on property tax reform. *Id.* The Massachusetts Supreme Court issued this decision without analyzing Boston's arguments that it had First Amendment rights. *See Anderson v. Boston*, 380 N.E.2d 628, 636 (Mass. 1978). Justice Brennan, in a memorandum which was later upheld by the entire Court,[18] granted the application for a stay, using language indicating that he agreed with Boston's legal arguments that funding the ballot campaign was part of its First Amendment-protected political speech as a municipal corporation under the Court's prior *First National Bank of Boston v. Bellotti* decision.[19] *Id.* at 635-36 (outlining Boston's arguments that it has First Amendment rights); 438 U.S. at 1390 (motion to stay order by Brennan, J., as Circuit Justice). Justice Brennan emphasized that without a stay the city would be "forever denied" any opportunity to communicate its views in support of the referendum – language that presumes a municipal corporation's ability to assert First Amendment rights. *Id.*

Lower courts have also concluded that cities, as municipal corporations, should be afforded the same rights as private corporations. In *Creek v. Village of Westhaven*, 80 F.3d 186 (7th Cir. 1996), Judge Posner posited that it is "[not] out of the question that a municipality could have First Amendment rights." He reasoned that there "is at least an

---

[18] 439 U.S. 951 (1978) (motion to vacate stay order denied).

[19] 435 U.S. 765 (1978) (recognizing corporations have First Amendment speech protections extending beyond material commercial interests).

argument that the marketplace of ideas would be unduly curtailed if municipalities could not freely express themselves on matters of public concern." *Id.* at 193. "To the extent, moreover, that a municipality is the voice of its residents – is, indeed, a megaphone amplifying voices that might not otherwise be audible – a curtailment of its right to speak might be thought a curtailment of the unquestioned First Amendment rights of those residents." *Id.* He provided, by way of example: "if federal law imposed a fine on municipalities that passed resolutions condemning abortion, one might suppose that a genuine First Amendment issue would be presented." *Id.*

Federal district courts in New York have made similar conclusions. *See, e.g., County of Suffolk v. Long Island Lighting Co.*, 710 F. Supp. 1387 (E.D.N.Y. 1989) ("[a] municipal corporation, like any corporation, is protected under the First Amendment in the same manner as an individual")[20]; *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 701 F. Supp. 2d 568, 598-99 (S.D.N.Y. 2010) (treating city as potential First Amendment right holder).

And as scholars have observed, cities "enjoy a separate corporate and associational status in American law, and they possess rights." Yishai Blank, *City Speech*, 54 Harv. C.R. C.L. L. Rev. 365, 430 (2019); *see also* (Hannah J. Wiseman, *Rethinking Municipal Corporate Rights*, 61 B.C. L. Rev. 591, 632-39 (2020) (explaining that cities fit neatly into many of the various theories and doctrines courts use to define the purpose and role of the

---

[20] The Second Circuit mostly affirmed the district court's decision, but it did not address the question of the county's First Amendment rights. *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1326–28 (2d Cir. 1990).

corporation). It is therefore both theoretically and legally inconsistent to deprive municipal corporations of the same constitutional protection private corporations enjoy. As municipal corporations, Plaintiffs Minneapolis and Saint Paul possess the same First Amendment rights as private corporations—rights that have been infringed upon by Defendants' actions.

### C. Plaintiffs plausibly allege retaliatory animus was the but-for cause of the Defendants' actions.

Defendants wrongly assert that Plaintiffs do not allege retaliatory animus was the but-for cause for the Defendants' actions. (Dkt. 175 at 47.) The Amended Complaint, however, makes that allegation repeatedly: "Defendants targeted Minnesota and the Twin Cities . . . to retaliate against Minnesota and its subdivisions for disfavored speech". (Dkt. 167 ¶ 34; *see also* Dkt. 167 ¶¶ 4, 85, 516, 517.)

The Court must accept the factual allegations in the Amended Complaint as true and draw all reasonable inferences in Plaintiffs' favor. *Cook,* 952 F.3d at 938. Plaintiffs' detailed allegations of retaliatory animus and retaliatory-motivated actions far exceed the detail required to survive a motion to dismiss.

## VI. Plaintiffs Plausibly Plead APA Claims.

Defendants raise four different issues regarding the APA claims: (1) whether an agency action was pled; (2) whether the APA claim is a programmatic challenge; (3) whether there was finality; and (4) whether the agency action is committed to agency

47

discretion. Table 1 shows which issues were raised against which claims.[21] Section A sets forth the relevant APA law, and Sections B-M go through the APA counts in order and explain why Defendants' arguments fail for each of them.

## A. Applicable APA standards.

"The APA establishes a basic presumption of judicial review." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (citation modified). Set forth below is the framework for APA claims, followed by a detailed analysis for each APA claim.

### 1. The APA defines "final agency action" broadly with a pragmatic and flexible framework.

The APA permits judicial review of only "final agency action," 5 U.S.C. § 704, but the legal framework defining final agency actions is pragmatic, flexible, and ensures a broad scope of judicial review. Under this framework, a final agency action must be (1) an *action* and (2) it must be *final*—these two elements are discussed in turn next.

#### i. Agency action is defined broadly to capture both formal and informal actions.

Under the APA, "'agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof.]" 5 U.S.C. § 551(13). The "central purpose" of the APA is to permit a "broad spectrum of judicial review of

---

[21] Indeed, for eight of the twelve APA claims (Counts VI, VIII, X, XII-XVI) the only argument raised by Defendants is that the Amended Complaint does not plausibly allege a discrete agency action. Further, for these claims Defendants only present generalities and statements of law—they do not actually analyze the pled facts. This is reason enough to deny the motion to dismiss with respect to these counts.

agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). The word "action" in § 551(13) encompasses "comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001).

This expansive statutory definition reaches situations in which agencies adopt an "equivalent" of rules or orders, 5 U.S.C. § 551(13), without producing a formal and final statement. An "agency action need not be in writing to be judicially reviewable as a final action." *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138 (D.D.C. 2018) (citing *Venetian Casino Resort LLC v. Equal Emp't Opportunity Comm'n*, 530 F.3d 925, 929 (D.C. Cir. 2008) (adjudicating challenge to agency's "decision . . . to adopt [an unwritten] policy of disclosing confidential information without notice")); *see also, e.g.*, *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (court can review an unwritten agency policy).

In *New York v. Trump,* for example, the plaintiffs challenged an OMB funding freeze that was evidenced by a memorandum. 171 F.4th 1 (1st Cir. 2026). The government withdrew the memorandum and argued there was no longer an "agency action" subject to review. *Id.* at 11. But the court rejected this ploy, explaining, "[t]he States are challenging the OMB Directive, not the piece of paper that contained it." *Id.* at 16; *see also Venetian Casino Resort*, 530 F.3d at 931 ("The Manual is relevant insofar as it illuminates the nature of the policy, but the agency took final action by adopting the policy, not by including it in the Manual."); *Illinois v. Vought*, No. 26 CV 1566, 2026 WL 962287, *2, *4 (N.D. Ill. Mar. 12, 2026) (finding reviewable agency action despite "no formal, official memo" based on "circumstantial" evidence).

49

Accordingly, whether an agency has taken a reviewable "action" depends on questions of fact, which can be proved through evidence other than an express written agency policy statement. *New York*, 171 F.4th at 16 (citing *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 386 (D.C. Cir. 2018)). Courts have relied on all manner of evidence to find agency action, including (a) statements by agency decision makers describing an agency policy; (b) a pervasive practice amongst agency employees consistent with a policy; (c) ratification of agency conduct by those with decision-making authority; and (d) whether the alleged action is inconsistent with established agency policies or rules.[22] Plaintiffs' allegations fall within each of these categories, easily surpassing the plausibility standard for alleging a series of discrete and reviewable policies subject to APA review.

The "principal purpose" of the APA's limits on judicial review is "to protect agencies from undue judicial interference . . . and to avoid judicial entanglement in abstract policy disagreements." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004). As such,

___

[22] *Xirum v. U.S. Immigr. & Customs Enf't*, No. 1:22-CV-00801-TWP-KMB, 2024 WL 3718145, at *10 (S.D. Ind. Aug. 8, 2024) (relying on statements by ICE Director to find agency action via adoption of general policy); *Nava v. Dep't Homeland Security*, 435 F. Supp. 3d 880, 903 (N.D.Ill 2020) (finding reviewable agency action where the plaintiffs "allege that ICE applied the policy in five specific cases, and likely in numerous others"); *New York v. U.S. Immigr. & Customs Enf't*, 431 F. Supp. 3d 377, 387 (S.D.N.Y. 2019) (change in number of courthouse arrests "suggests that the Directive embodies ICE's novel interpretation of its statutory authority to conduct courthouse arrests, and not merely case-by-case guidance to individual officers"); *Washington v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 3d 863, 871-73 (W.D. Wash. 2020) (rejecting argument that courthouse arrest policy was not agency action "because CBP has done nothing to disassociate itself from its agents' behavior"); *AAUP v. Rubio*, 802 F. Supp. 3d 120, 191 (D. Mass. Sept. 30, 2025) (finding enforcement initiative used in "unprecedented way" and "new use of the invoked statutes" was final agency action).

plaintiffs "cannot seek wholesale improvement of [an agency] program," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990), but instead must "challenge only those circumscribed and discrete actions within a program—not the entire program and every decision made under it," *Wilderness Watch v. Hall*, No. 23-CV-284 (NEB/LIB), 2025 WL 3515520, at *5 (D. Minn. Sept. 29, 2025) (citation modified) (appeal docketed). As discussed below, all Plaintiffs' APA claims challenge discrete agency actions.

                ii.           Finality is pragmatically determined by the quality of the agency's decisionmaking and the effect of the action.

Finality is determined by the two-prong *Bennett* test, which states that the agency action must: (1) mark the consummation of the agency's decisionmaking process; and (2) be one by which rights or obligations *have been* determined *or* from which legal consequences *will flow*. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) (citing *Bennett v. Spear*, 520 U.S. 154 (1997)).

The first prong assesses whether the action is "merely tentative or interlocutory [in] nature." *Hawkes*, 578 U.S. at 597; *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 56 (D.C. Cir. 2016).

The second prong is a "pragmatic" inquiry, based on the concrete consequences an agency action has or does not have because of the specific governing statutes and regulations. 578 U.S. at 599. Thus, in *Hawkes*, the agency action at issue had direct and appreciable legal consequences because petitioners faced a risk of criminal and civil penalties. *Id.* An agency's action that withdraws an entity's previously held discretion

51

"alter[s] the legal regime," "binds" the entity, "and thus qualifies as final agency action." *NRDC, Inc. v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011).

> 2. *Section 701(a)(2) defines a narrow exception to judicial review where agency action is committed to agency discretion.*

The exception to judicial review in § 701(a)(2), that the "agency action is committed to agency discretion by law," is to be construed "quite narrowly" and applies only in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22 (2018) (citation modified); *see also U.H.A. v. Bondi*, 822 F. Supp. 3d 1007, 1040 (D. Minn. 2026). In other words, section 701(a)(2) is limited to those "rare instances" when "there is no law to apply." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (citation omitted).

Defendants attempt to turn § 701(a)(2)'s "very narrow" exception into a broad rule that all immigration "enforcement decisions" are immune from review. But courts regularly review immigration enforcement policies under the APA. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 19 (2020) (DHS deferred enforcement program reviewable); *Perez Perez v. Wolf*, 943 F.3d 853, 861 (9th Cir. 2019) ("In several immigration cases, we have held that there are meaningful standards of review and have declined to apply § 701(a)(2)").

Wide—and even complete—discretion does not equate to an absence of a meaningful standard. "Even where statutory language grants an agency unfettered discretion, its decision may nonetheless be reviewed if regulations or agency practice

provide a meaningful standard by which this court may review its exercise of discretion." *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1069 (9th Cir. 2015) (citation modified); *see also Natural Resources Defense Council v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011) (concluding that agency withdrawal of previously-held discretion is reviewable agency action); *Franklin v. Massachusetts*, 505 U.S. 788, 819-20 (1992) (Stevens, J., concurring in part) ("[t]he statutory framework and the long-held administrative tradition provide a judicially administrable standard of review."). "Prior policies" can "provide a benchmark against which to measure whether [each] agency justified its choice on specious grounds, failed to satisfy the general requirements of reasoned agency decisionmaking, or failed to comply with its own regulations." *Sequen v. Albarran*, 814 F. Supp. 3d 1005, 1027 (N.D. Ca. 2025).

Furthermore, courts must distinguish between "single-shot []enforcement decision[s]," which may be within the agency's discretion, and "an agency's adoption of a general enforcement policy, [which] is subject to review." *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998); *see also Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 699 (4th Cir. 2019). Although the "rescission [of a policy] may lead to increased enforcement, it does not, by itself, constitute a particular enforcement action" committed to agency discretion. *Regents*, 591 U.S. at 18; *see also Texas v. United States*, 40 F.4th 205, 221-22 (5th Cir. 2022) (finding reviewable agency action because it "does not represent a one-off enforcement decision, but rather a calculated, agency-wide rule limiting ICE officials' abilities to enforce statutory law").

Next, we will apply these standards to the APA counts in the Amended Complaint to show why Defendants' arguments fail.

**B.**    **Defendants' motion to dismiss Count V fails because Count V alleges a discrete agency action and ample law that provides a meaningful standard against which to judge the agency action.**

Count V asserts that OMS should be declared unlawful under the APA because it exceeds Defendants' statutory authority and was arbitrary and capricious. Defendants assert that Count V should be dismissed for two reasons: first, that it is an impermissible programmatic attack; and second, that it is beyond judicial review and committed to agency discretion. Both arguments fail under the law and the facts alleged.

### 1.    *Count V challenges OMS as a discrete agency action.*

In Count V of the Amended Complaint, Plaintiffs challenge a single action by the federal government: the Surge itself. Defendants tacitly concede that OMS was a single, discrete action when they assert that it has concluded and was part of the administration's overall immigration program. Plaintiffs are not mounting a wholesale challenge to Defendants' immigration enforcement program—instead, Plaintiffs are challenging a discrete action within that program.

Further, the Amended Complaint alleges that OMS was executed to punish and coerce Plaintiffs. In other words, Plaintiffs allege that OMS was a sanction, and sanctions are in the heartland of APA review. *See* 5 U.S.C. § 551(13) (explicitly defining agency action to include sanctions). Sending a domestic military force comprised of more than 3,000 immigration enforcement agents to occupy a large metro area with "at-large" activity is not something that the law gives Defendants the authority to do. This is a challenge to a discrete agency action, viz., the invasion of Minnesota with 3,000 to 4,000 federal agents to punish and coerce Plaintiffs.

54

This Court's analysis in *Wilderness Watch* is especially instructive on this point. *Wilderness Watch* involved the issuance of special-use-permits to commercial towboats that allowed them to operate in the Boundary Waters Canoe Wilderness Area. 2025 WL 3515520, at *7. The parties and the Court agreed that the issuance of a special-use-permit was a final agency action. *Id.* at *6. But the plaintiff also asserted that the issuance of all of the special-use-permits—in aggregate—was a final agency action that was contrary to statutory law. *Id.* Like Defendants here, the defendants asserted that this was an impermissible, broad programmatic challenge because it combined multiple agency actions into one. This Court disagreed: "Because Wilderness Watch asserts that the Forest Service's issuance of special-use permits—in aggregate—violated the limits of the Wilderness Plan and the BWCWA Act, the Court concludes that it maintains subject-matter jurisdiction over Counts One and Two." *Id.* at 7. The same analysis holds here: Plaintiffs allege the discrete whole of OMS—comprised as it may be of individual agency policies and activities— exceeds statutory authority and is arbitrary and capricious.

> 2. *Whether Defendants had clear congressional authority to conduct OMS is not an issue beyond judicial review.*

Defendants' agency-discretion attack on Count V also fails because Plaintiffs have identified numerous legal provisions against which the Court may judge the legality of OMS. Defendants' authority to utilize federal immigration agents is limited and defined by statute and regulation. *See, e.g.*, 6 U.S.C. § 211; 8 U.S.C. §§ 1103, 1357. These statutes and laws quite simply do not provide the clear congressional authorization that is required

for Defendants to use immigration enforcement agents in the expansive and novel way that characterizes OMS and that caused major economic and political consequences.

"Agencies have only those powers given to them by Congress" and when an agency asserts its statutory authority (1) in a broad or novel way that (2) has major "economic and political significance," courts must "hesitate before concluding that Congress meant to confer such authority." *W. Virginia v. EPA*, 597 U.S. 697, 721, 723 (2022) (citation modified). Because courts must "presume" that Congress "intends to make major policy decisions itself, not leave those decisions to agencies," courts must apply "common sense" and assume Congress did not provide extraordinary authority through implicit grants or vague language. *Id.* at 723.

When an agency exercises its authority in a novel way that will have significant social and economic consequences, a "colorable" or "plausible textual basis for the agency action" is not enough—the agency must instead show a "clear congressional authorization" for the power it claims. *Id.* at 722-23. *See also DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 51 (2020) (Thomas, J., concurring) (noting "DHS could not appeal to general grants of authority" like the authority to establish "national immigration enforcement policies" because "adopting a broad interpretation of these general grants of authority would run afoul of" various rules of statutory interpretation, including the "expectation that Congress speaks clearly when it delegates the power" to make decisions with major economic and political significance).

The Amended Complaint alleges that OMS was completely novel and unprecedented in size, scope, and character as compared to the federal government's

historical use of immigration enforcement agents. (Dkt. 167 ¶¶ 259-60.) In fact, the Amended Complaint names more than a dozen discrete immigration enforcement operations spanning two decades and four administrations, and it alleges that these historical operations "were nothing like the paramilitary invasion and tactics that characterized [OMS]." The federal government's historical use of immigration agents establishes "the contemporaneous construction" of statutory authority to use immigration enforcement agents by "those who were called upon to act under the law, and were appointed to carry its provisions into effect." The Supreme Court has reasoned that such an interpretation carries great weight, especially where it has been "the longstanding practice of the government." *Loper Bright*, 603 U.S. at 386; *see also id.* at 394 ("interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning").

Further, the Amended Complaint also alleges that OMS had major economic and political impacts. OMS caused more than $600 million in damage to Plaintiffs' economies. It caused mass protests as Plaintiffs' residents exercised their political and Free Speech rights to express their disapproval of Defendants' actions. The Amended Complaint also details how OMS was used to attack disfavored politicians and political entities. In short, OMS was not only novel, but it caused major political and economic ramifications. As such, Defendants have exercised their authority in a novel way that had significant social, political, and economic consequences. A "colorable" or "plausible textual basis for the

57

agency action" is not enough—Defendants instead must show a "clear congressional authorization" for the power they claim. *See W. Virginia,* 597 U.S. at 722-23.

Plaintiffs have identified the statutes that authorize Defendants' employ and use of federal immigration agents; those statutes provide a standard against which to judge the legality of OMS under the precedent discussed above; and, further, no statutory authority gives Defendants the requisite "clear congressional authorization[23]" to conduct a paramilitary invasion of Minnesota and employ the tactics that characterized OMS.

### C.      Count VI Plausibly Alleges a Discrete Final Agency Action Authorizing Federal Agents to Violate Minnesota's Anti-Masking Law

Count VI challenges Defendants' Unlawful Masking Policy, Dkt. 167 ¶ 538, which is Defendants' policy determination that federal agents—unlike everyone else in Minnesota—are exempt from Minnesota's anti-masking statute, Minn. Stat. § 609.73, and authorizes federal agents to wear masks in violation of Minnesota law. In their motion to dismiss, Defendants assert that Plaintiffs allege "no factual matter" showing the Unlawful Masking Policy "even exist[s]." (Dkt. 175 at 50–51.) But Plaintiffs devote over four pages of factual allegations to the challenged Unlawful Masking Policy, Dkt. 167 at 120–24, showing the Policy exists through statements by the United States in other litigation, *id.* ¶¶

---

[23] Defendants do not argue in their motion to dismiss that Count V fails because there is "clear congressional authority" to conduct Operation Metro Surge, as that operation is alleged and described in the Amended Complaint. Because Defendants did not raise the argument, Plaintiffs will not address it here.

442–43[24], statements in this litigation, *id.* ¶ 444, the public statements of Defendants and other senior leaders, *id.* ¶ 445, and the widespread use of masks by DHS agents, *id.* ¶ 446–50. Courts routinely infer policies from such circumstantial evidence. *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184–85 (D.D.C. 2015). The Unlawful Masking Policy, moreover, is discrete. (Dkt. 175 at 36.) It concerns one thing: Defendants' authorizing federal agents to wear masks in public despite state law. Count VI plausibly alleges and challenges a final agency action under the APA.

> **D.  Count VIII alleges a discrete agency action of using force against passively resisting individuals that would only be appropriately deployed against individuals displaying active resistance.**

Count VIII alleges that Defendants implemented a policy of using excessive force

---

[24] The United States filed suit to enjoin, among other laws, California's masking law as applied to federal agents, stating that "the Federal Government does not intend to comply with the challenged [masking] law." *See United States v. California*, No. 2:25-cv-10999 (C.D. Cal. Nov. 17, 2025) (Dkt. 1, ¶11); *see also id.* ¶¶ 15, 51; *id.* at Dkt. 11-2, ¶ 38 ("The inability to conceal officers' identities during enforcement actions thus compromises DHS's mission . . .") *id.* at Dkt. 11-3, ¶ 18 ("USBP leadership has authorized its personnel when wearing Class C uniforms and plain-clothes undercover uniforms, to wear facial coverings, which may include eye protection, facial masks, or a combination of both."). The United States also recently filed suits against the City of Philadelphia, New York, and New Jersey to enjoin laws that purport to regulate federal agents' use of facial coverings. *United States v. City of Philadelphia*, Case No. 26-cv-4208 (E.D. Penn. June 18, 2026), Dkt. 1, ¶¶ 4,5, 64 ("The United States has standing to bring this lawsuit because it intends to engage in conduct proscribed by the City's ordinance…"); *United States v. Russo*, No. 26-CV-1283 (W.D.N.Y. June 22, 2026); *United States v. New Jersey*, No. 26-CV-04755 (D.N.J. Apr. 26, 2026). Although Plaintiffs in this case cite to these other suits to evidence the existence of final agency action on masking in violation of state laws, Minnesota's anti-masking statute differs materially from the laws the United States challenges in the other suits, as explained in more detail below.

59

against non-resisting or passively resisting protesters. (Dkt. 167 ¶ 468.) The only argument Defendants raise concerning this Count is a generalized and vague assertion that it does not allege a discrete agency action. The Amended Complaint alleges that Defendants' agents have consistently deployed force against non-resisting or passively resisting individuals that would only be lawful under the statutes and applicable use-of-force regulations against individuals engaged in active resistance or assaultive resistance. (Dkt. 167 ¶ 469.) It further specifies that Defendants' agents consistently deployed tear gas and other non-lethal crowd control measures against non-resisting or passively resisting protesters. (Dkt. 167 ¶ 470.) And it alleges that Defendants have not disciplined any of their agents for this consistent use of excessive force. (Dkt. 167 ¶ 471.) Further, the Amended Complaint describes myriad incidents of excessive force. (Dkt. 167 ¶¶ 84-140.) These allegations are more than enough to plausibly allege a discrete agency action based on a pattern of conduct, as discussed above

> **E.    Defendants' motion to dismiss Count IX fails because the Unlawful Arrest Policy is a final agency action that creates legal consequences and because the lawfulness of arrests by immigration agents is not an issue committed to agency discretion.**

Count IX alleges that Defendants implemented an Unlawful Arrest Policy. Defendants make two arguments in support of dismissal of Count IX: (1) that the Unlawful Arrest Policy is not a final agency action; and (2) that its prescriptions are subject only to the sound discretion of the agency. Both arguments are easily rejected.

As to final agency action, Defendants do not contest that the Unlawful Arrest Policy satisfies the first prong of *Bennett* and instead focus on the second prong: legal

consequences. (Dkt. 175 at 57). Defendants specifically argue the Lyons Memorandum[25]

cannot be final agency action because, Defendants contend, it does not determine rights or

obligations and does not create direct and appreciable legal consequences for *Plaintiffs*.

However, that was not at issue in any of the cases that Defendants cite for this proposition;

in all those cases, the plaintiff also happened to be the party whose legal rights were

determined. *See Firearms Regul. Account. Coal., Inc. v. Garland*, 112 F.4th 507, 518 (8th

Cir. 2024); *Sisseton–Wahpeton Oyate of Lake Traverse Rsrv. v. U.S. Corps of Eng'rs*, 888

F.3d 906, 915 (8th Cir. 2018).

Defendant's *Bennett* argument is also excessively narrow. It is enough if the final

agency action determines obligations as to *someone*, not necessarily the party before the

court and not necessarily the plaintiff. *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015,

1021 (D.C. Cir. 2000) (legal consequences because non-party State regulators affected).

---

[25] Defendants suggest that Plaintiffs' challenge to the Unlawful Arrest Policy is based entirely on the Lyons Memorandum. (Dkt. 175 at 56). Although the Lyons Memorandum is certainly helpful to Plaintiffs' claim, Plaintiffs contend the Unlawful Arrest Policy existed before the Lyons Memorandum and that the Lyons Memorandum is not necessary to Plaintiffs' claim. Should the Defendants claim that the Unlawful Arrest policy as it existed before the issuance of the Lyons memorandum is not a plausibly alleged final agency action this argument is unavailing. *See supra*, section IVI(A)(1)(i)(discussing unwritten policy as final agency action); *See also Hussen v. Noem*, 822 F. Supp. 3d 944, 998 (D. Minn. 2026)(Defendants "adopted a policy authorizing federal immigration officers to conduct warrantless arrests without probable cause that the arrestees were violating immigration laws, and without probable cause that the arrestees were likely to escape before a warrant for their arrest could be obtained, in Minnesota from mid-December 2025 to mid-January 2026."); *Nava v. Dep''t of Homeland Sec.*, 435 F. Supp. 3d at 901–02 (finding that plaintiffs had, by alleging a policy they inferred from agents' actions in the field during a geographically-focused large immigration enforcement action, sufficiently alleged ICE's policy of warrantless arrests without individualized flight risk analysis required by 8 U.S.C. § 1357(a)(2)).

*Bennett* itself found the second prong satisfied when the challenged action "alter[ed] the legal regime to which the action agency is subject." *Bennett*, 520 U.S. at 178. Here, the rights that are being determined by the Lyons Memorandum are the rights of individuals subject to immigration enforcement. Further the "legal regime" to which the agents are subject is also affected. *Id.*; *see also Philadelphia Yearly Meeting of the Religious Society of Friends v. DHS*, No. CV 25-0243-TDC, 2026 WL 280089, at *3-5 (D. Md. Feb. 3, 2026). Either is sufficient to meet the second *Bennet* prong of final agency action and so the Lyons Memorandum, though not necessary for the Court to rely on to determine there has been final agency action, meets the test.

Defendants' argument that the Unlawful Arrest Policy is committed to agency discretion likewise fails. The authority and limits of immigration officers to make warrantless arrests are contained in 8 U.S.C. § 1357 and are further limited by the Fourth Amendment. Defendants do not have "discretion" to promulgate policies like the Unlawful Arrest Policy exceeding the limits of section 1357. Section 1357, moreover, provides a meaningful standard for this court to apply. *See Weyerhaeuser Co.*, 586 U.S. at 22. That statute provides, in relevant part, that an immigration agent is authorized to make an arrest without a warrant if the agent "has reason to believe" an alien is in violation of immigration law and "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2). "Because the Fourth Amendment applies to arrests of illegal aliens, the term 'reason to believe' in § 1357(a)(2) means constitutionally required probable cause." *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010). Therefore, an individual suspected of being unlawfully present in the United States cannot be arrested without a warrant unless

62

the officer has probable cause to believe both that the individual is here unlawfully and that they are likely to escape before a warrant can be obtained. Under these familiar and manageable standards, Plaintiffs' Count IX asks this court to review the Unlawful Arrest Policy. The committed-to-agency-discretion exception does not apply.

Count IX plausibly alleges final agency action not committed Defendants' discretion. The court should deny Defendants' motion to dismiss Count IX.

**F.      Count X, alleging that Defendants' Unlawful Racial and National-Origin Profiling Policy is Contrary to Constitutional Right, Exceeds Statutory Authority, and is Arbitrary and Capricious, plausibly alleges a discrete agency action.**

Count X is an APA claim asserting that Defendants' have an Unlawful Racial and National-Origin Profiling Policy that violates the constitution, exceeds statutory authority, and is arbitrary and capricious. Defendants make only one argument against Count X: the generalized and vague assertion that Plaintiffs failed to plausibly allege a discrete agency action.

Defendants barely mention Count X, except to include it in a serial list of claims they assert do not challenge discrete agency action. Defendants argue that the Amended Complaint contains no factual matter that suggests that these policies exist or are embodied in discrete agency actions capable of review. (Dkt. 175 at 50.) Defendants further argue that a pattern or practice of misconduct does not amount to a discrete agency action.

But the Amended Complaint alleges far more than what Defendants describe. The Amended Complaint alleges that in Fall 2025, DHS issued guidance on the use of race and apparent national origin to justify detaining individuals without the existence of other

63

factors, unlawfully extending language from the Supreme Court's order granting a stay of the district court's temporary restraining order in *Noem v. Vasquez Perdomo,* 146 S. Ct. 1, 3, (2025). (Dkt. 167 ¶¶ 423-26.)

The Amended Complaint further alleges that Defendants have engaged in a widespread practice of racial profiling in OMS. *Id.*, ¶¶ 427-30. Several courts have concluded that patterns of unlawful arrests by ICE amount to final agency actions. *See, e.g., Ramirez Ovando v. Noem*, 810 F. Supp. 3d 1209, 1235-37 (D. Colo. 2025) (pattern of warrantless arrests sufficiently established for APA review); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 43 (D.D.C. 2025) (statements by officials corroborated by examples on the ground). Here, the Amended Complaint is brimming with evidence of a widespread practice of racial and national origin profiling. (Dkt. 167 at ¶¶ 64, 82, 83, 87-92, 163, 427-430.)

In addition, in *Hussen v. Noem*, No. 26-CV-324 (ECT/ECW), 2026 WL 657936 (D. Minn. Mar. 9, 2026), the Court concluded that "Defendants have adopted a policy authorizing federal immigration officers to conduct investigatory stops based on ethnicity or race without reasonable suspicion that the individuals were violating immigration laws." (Dkt. 167 ¶ 431.) Plaintiffs adopted and incorporated into the Amended Complaint *Hussen*'s findings of fact. *Id.*[26]

---

[26] In *Hussen*, the Court noted that the APA claims had received minimal briefing and had not been initially raised in the preliminary injunction motion, and in that context it was not able to conclude that there had been final agency actions. 822 F. Supp. 3d 944 at 1003.

G.    **The Revocation of 2021 Sensitive Locations Policy and Adoption of 2025 Sensitive Locations Policy alleged in Count XI is a final agency action and not something committed to agency discretion.**

Count XI alleges that Defendants' Revocation of a 2021 Sensitive Locations Policy and adoption of a new one violated the APA. Defendants make two arguments in support of dismissal of Count XI: (1) a lack of finality; and (2) that the policy change is committed to agency discretion. Both arguments are easily rejected.

Whether the 2021 Mayorkas and 2025 Huffman policies at the heart of Count XI constitute reviewable final agency actions was squarely and correctly decided in *Philadelphia Yearly Meeting of the Religious Society of Friends v. DHS*, No. CV 25-0243-TDC, 2026 WL 280089, at *3-5 (D. Md. Feb. 3, 2026). There, the court decided that those policies were each "final agency actions." The Court should conclude the same here.

As in *Philadelphia Yearly*, Defendants concede the first *Bennett* prong and focus their argument on the second *Bennett* prong: whether the agency actions determined rights or obligations or created legal consequences. (Dkt. 175 at 56.) After conducting an expansive analysis, the *Philadelphia Yearly* court found that both the 2021 Policy and the 2025 Policy met the second *Bennett* prong. 2026 WL 280089 at * 3-5. Joining multiple other district and circuit courts, the court ruled that an agency action can meet the second Bennett prong if it "determines an agency's own 'rights or obligations' or those of its personnel." *Id.* (citing *Bennett*, 520 U.S. at 178); *see also Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) ("[A]n agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations, thus meeting the second prong of *Bennett*."); *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of the Air Force*,

65

128 F.4th 1089, 1111–12 (9th Cir. 2025). The court went on to note that "'where agency action withdraws an entity's previously-held discretion' in an area subject to its coverage, it effectively binds the entity and thus constitutes a final agency action." *Philadelphia Yearly,* 2026 WL 280089, at *4 (quoting *Texas*, 933 F.3d at 442).

Applying that standard, the court held that both the 2021 Policy and the 2025 Policy are final agency actions because they each "redetermined the rights and obligations of DHS personnel, specifically immigration officers considering whether to conduct immigration enforcement actions at or near protected areas." *Id.* This sound logic remains true here. The 2021 Policy placed specific mandatory restrictions on immigration officers. These specific, mandatory limitations and guidelines "determined the rights and obligations of DHS personnel by placing specific restrictions on their ability to conduct immigration enforcement actions at or near protected areas." *Philadelphia Yearly*, 2026 WL 280089, at *4. The mere fact that the policy preserved some discretion at the margins, such as in deciding whether a location qualified as "near" a protected area, or whether exigent circumstances applied, did not strip the policy of its binding force. As the *Philadelphia Yearly* court correctly noted, even policies that require interpretive judgment by agency personnel can constitute final agency actions if they impose meaningful constraints on discretion. *Id.* (citing *Texas v. EEOC*, 933 F.3d 433, 433 (5th Cir. 2019)).

Defendants argue that the Court should follow the reasoning in *New England Synod*. In that decision, the court reasoned that because the 2021 Policy did not entirely bar enforcement at sensitive locations, it lacked sufficiently "concrete consequences" for either the plaintiffs or immigration-enforcement agents. *New England Synod v. Dep't of*

66

*Homeland Sec.*, No. CV 25-40102-FDS, 2026 WL 412329, at *26 (D. Mass. Feb. 13, 2026).

Under that logic, however, virtually any enforcement policy with exceptions would escape

APA review—a result inconsistent with the "strong presumption" in favor of judicial

review and the Supreme Court's instruction to take a "pragmatic approach" to finality under

*Hawkes*. *See* 578 U.S. at 599; *see also CASA de Maryland v. DHS*, 924 F.3d 684 (4th Cir.

2019); The *New England Synod* court ignored that the *Bennett* court itself found that the

second prong was satisfied because the agency action at issue "alter[ed] the legal regime

to which the action agency is subject."  *See* 520 U.S. at 178. The court's analysis in

*Philadelphia Yearly Meeting* better synthesizes and applies leading final agency action

cases like *Bennett* and *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019).

Also, it is particularly telling that DHS's own spokesperson described the 2021

Policy as having thwarted law enforcement and "tied the hands" of officers. (Dkt. 167 ¶

291.) If the 2021 Policy truly imposed no obligations and was just, in fact, a "nonbinding

policy statement," the revocation and implementation of the 2025 Policy would not have

been needed to untie officers' hands. "Such contemporaneous statements show that DHS

understood that the 2021 Policy imposed obligations on immigration officers, and that the

purpose of the 2025 Policy was to redetermine those obligations." *Philadelphia Yearly*,

2026 WL 280089, at *5.

As for the 2025 Policy, it meets the second *Bennett* prong for two reasons. First,

because the 2021 Policy is final agency action, rescinding it and adopting the 2025 Policy

was also a final agency action as it "materially redetermined the rights and obligations of

immigration officers by removing the restrictions and limitations of the 2021 Policy." *Id.*

67

at *5. Second, the 2025 Policy was final agency action because "it withdrew the effective safe harbor provided in the 2021 Policy. . . . [and] [a]n agency action that withdraws a regulatory 'safe harbor' meets the second prong of *Bennett*." *Id.* (citing *Hawkes*, 578 U.S. at 599; *Frozen Food Express v. United States*, 351 U.S. 40, 44–45 (1956); *Texas*, 933 F.3d at 445; and *Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 500–01 (D. Md. 2019)).

The *Philadelphia Yearly* court also dismissed Defendants' reliance on the language in the 2021 and 2025 Policies stating that the memos did not create any rights or benefits because "such boilerplate language is not dispositive if the action, in fact, determines rights or obligations." *Philadelphia Yearly*, 2026 WL 280089, at *6 (citing *Appalachian Power Co. v. Env't Prot. Agency*, 208 F.3d 1015, 1022–23 (D.C. Cir. 2000)). This Court should do the same. An agency cannot immunize its binding internal directives from judicial review simply by appending a disclaimer.

Defendants' final argument fails because Defendants may have, that discretion cannot be exercised arbitrarily and capriciously. (Dkt. 167 ¶ 597 (describing nine different ways the actions are arbitrary and capricious)). Arbitrary-and-capricious review under the APA is a meaningful and familiar standard by which this Court may review the revocation and adoption of the Sensitive Locations Policies under the APA. Prior policies and agency practice likewise provide meaningful standards, as described in Section VI.A.2, *supra.* Defendants' arguments against Count XI fail.

> **H.      Count XII, challenging the Roving Patrols Policy, plausibly alleges is a discrete agency action.**

Count XII alleges that Defendants' Roving Patrol Policy violates the APA. The only argument Defendants raise concerning this Count is a generalized and vague assertion that it does not sufficiently allege policy or a discrete agency action. The attack is groundless.

The Roving Patrol Policy is fully alleged to be a discrete agency action through Defendants' statements and Defendants' agents' pattern of conduct. First, Defendants have asserted a plenary authority to question anyone anytime about their citizenship status and that Defendants' agents "are trained to do that." (Dkt. 167 ¶ 309; *see also* id. ¶¶ 77, 308-310.) That both Defendants Charles and Bovino made public statements that Defendants' agents would be questioning anyone is evidence that this was the policy. *Hussen v. Noem*, 822 F. Supp. 3d 944, 998 (D. Minn. 2026) (citing *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 16 (D.D.C. 2025)). These random encounters are plainly illegal under 8 U.S.C. § 1357, which authorizes interrogations only of "any alien or person believed to be an alien." *United States v. Flores-Sandoval*, 422 F.3d 711, 714 (8th Cir. 2005) ("A plain reading of [§ 1357(a)(1)] requires the government to show that immigration officials *believed* Flores–Sandoval was an alien before questioning him."). Second, the Roving Patrol Policy is supported by the allegations of numerous incidents of Defendants' agents implementing the policy, including in instances where they detain individuals for questioning. (Dkt. 167 ¶¶ 305-315, 319, 431[27].) In fact, Defendants' agents

---

[27] Again, the facts in *Hussen* are incorporated in the Amended Complaint. The relevant declarations from *Hussen v. Noem* are also in the record in this case *see* Dkt. 89-4 (agents asked man on street if he was a citizen, he said he was legal to be here, agents started trying to pull him into their car); Dkt. 89-5 (agent in his apartment building stated "I need to talk to you" and then asked for identification); Dkt. 89-6 (individual outside his place of work

engaged in so many instances of stopping and interrogating Minnesotans that a judge in this district has already found that Defendants "have adopted a policy authorizing federal immigration officers to conduct investigatory stops . . . without reasonable suspicion that the individuals were violating immigration laws." *Hussen v. Noem*, 822 F.Supp.3d at 994. The Amended Complaint plausibly alleges the Roving Patrol Policy as a discrete agency action.

## I.    Count XIII, challenging Defendants' Biometric Scanning Policy, plausibly alleges a discrete agency action.

Count XIII alleges that Defendants violated the APA by implementing a policy to collect the biometric data of Minnesota residents during OMS in a manner that exceeded Defendant's authority under federal law. (Dkt. 167 ¶¶ 320-340; 618-632.) The only argument that Defendants make regarding Count XIII is a vague and generalized assertion that the biometric-scanning-policy claim fails to allege a "discrete agency action." (Dkt. 175 at 48-49.) This argument can be readily rejected.

Plaintiffs allege that Defendants created a policy that allows immigration agents to use mobile facial and fingerprint capture applications to collect biometric data of any person encountered by immigration agents, and retain that data for 15 years. (Dkt. 167, ¶¶

---

physically grabbed by ICE agent); Dkt. 89-9 (bringing groceries to car grabbed by ICE agents and searched for wallet); Dkt. 89-10 (several vehicles boxing in a parked car and demanding ID from occupants); Dkt. 89-11 (two agents got extremely close to individual and asked multiple times where he was born); Dkt. 89-12 (vehicle pulled over); Dkt. 89-13 (vehicle pulled over); Dkt. 89-14 (surrounded by 6-8 agents who said they wanted to confirm he was "not illegal"); Dkt. 89-15 (man taking out garbage surrounded by four ICE vehicles and asked for a birth certificate); Dkt. 89-16 (agents asked for documentation, provided his green card but agents declared it fake and placed him in handcuffs); Dkt. 89-17 (stopping vehicle because registered to a man and driven by woman).

333, 337-38.) This policy came after Defendants rescinded a prior policy, detailed in Directive 026-11, that limited the use of biometric scanning technology and data retention. (*Id.* ¶¶ 326-330.) The new policy was summarized in the February 2025 Privacy Threshold Analysis, which authorized collection of biometric data "regardless of citizenship or immigration status." (*Id.* ¶ 331.) Defendants' change of policy, as evidenced by this series of events, is a final and discrete agency decision under the APA. *See Am. Fed. of State, Cnty. and Muni. Emps., AFL-CIO, v. Soc. Sec. Admin.*, 778 F.Supp. 685, 750-51 (D. Md. 2025) (decision by an agency to change past policy and practice regarding disclosure of personal information was a reviewable agency action); *Nava v. Dep't of Homeland Sec.*, 435 F.Supp. 3d 880, 902 (N.D.Ill. 2020) (noting an "agency action need not be in writing to be judicially reviewable as a final action").

The policy was put into practice in Minnesota during OMS. During January, Defendants captured facial scans of at least seven individuals in Minnesota, and Minnesotans have reported that their expedited airport security privileges had been revoked due to their involvement in observing operation activities. (Dkt. 167 ¶¶ 337-38.) Given this policy appears to have been effectuated nationwide, these allegations likely vastly understate the magnitude of Defendants collection of biometric data.[28] Regardless,

---

[28] *See* Compl., Dkt. 1, at ¶¶ 109-18, *Illinois v. Dep't. Homeland Sec.*, Case No. 26-cv-00321(N.D. Ill.) (alleging facial scanning was deployed in the field more than 100,000 times); *see also M-J-M-A v. Hermosillo*, No. 6:25-CV-02011, 2026-WL562063, at *3 (D.Or. Feb. 27, 2026) (documenting use of facial recognition application in Oregon). This policy, which purports to allow seizure of information regardless of whether there is a reasonable belief that an individual is subject to removal, is well beyond any statutory authority DHS has been given by Congress.

Plaintiffs allegations are more than sufficient allege a reviewable agency action. *See Nava*, 435 F.Supp. 3d at 903 (finding reviewable agency action on allegations that "ICE applied the policy in five specific cases, and likely in numerous others").

J.   **Count XIV plausibly alleges a discrete agency action that drastically reduced training of new immigration enforcement agents.**

Count XIV alleges that Defendants violated the APA by cutting training of new agents by 40 percent. Before the Trump administration retook office, newly hired ICE officers received over 580 hours of training over the course of five months through the nation's Federal Law Enforcement Training Center (FLETC). (Dkt. 167 ¶ 473.) This amount of training was consistent with regulatory guidelines. *See* 8 C.F.R. § 287(g). In or around August 2025, Defendant DHS and its leadership approved a drastic reduction in its training program requirements in order to boost the number of officers it could deploy against its targeted jurisdictions. (Dkt. 167 ¶ 474.) This Reduction in Training Policy resulted in Defendants cutting training programs by 240 hours from its existing program. (Dkt. 167 ¶ 475.)  The cuts included training on critical topics such as firearms training, lawful use of force, lawful arrests, detention practices, rights of protestors and the limits of ICE officer authority. (*Id.*) The training cut amounted to an approximately 40 percent decrease in the training time for new ICE officers. (*Id.*) These allegations suffice to define a discrete agency action, and Defendants do not explain why cutting training by 40 percent in contravention of regulatory guidelines is not a discrete agency action.

K.   **Count XV, challenging Defendants' deployment of disproportionate and overwhelming force, plausibly alleges a discrete agency action.**

72

Count XV alleges that Defendants violated the APA by deploying a disproportionate and overwhelming number of agents in Minnesota. Defendants repeat their general argument that Plaintiffs have failed to set forth facts to support a discrete agency action. (Dkt. 175 at 50.) This argument fails because the Amended Complaint more than adequately sets out the facts underlying this claim.

As an initial matter, the Amended Complaint directly cites to Kristi Noem's characterization that law enforcement had been "surged" to Minneapolis (Dkt. 167 ¶ 69) and Todd Lyon's statement (shared on DHS' official social media account) bragging that the scale of the forces was unprecedented and constituted the "largest immigration operation ever taking place." (*Id.* ¶ 75.) The Amended Complaint also alleges the standard staffing for the Twin Cities area is approximately 80 officers, and identifies a number of historic operations which contrast significantly with the size and scale of OMS. (*Id.* at ¶¶ 259, 454.) Plaintiffs also allege that the deployment was "disproportionate" not as an accident, but by design, intended to be an overwhelming show of force in part to generate media images of chaotic, war-like visuals to coerce, commandeer, and retaliate against Plaintiffs. (*Id.* at ¶¶ 69, 456.) On social media, the Trump administration described the deployment as "unleashing a relentless assault" while claiming a pretextual connection to fraud enforcement that clearly did not align with the actual conduct carried out. (*Id.* at ¶¶ 30, 78, 113.)

Accepting the Plaintiffs' allegations that OMS indeed represented a consummated agency decision to send an unprecedented increase in forces, and that it was intended to be disproportionate and evoke a feeling of relentlessness in communities targeted for their

73

protected political speech, the Court is entitled to draw reasonable inferences that this was not an accident, but was the result of an intentional decision to coerce, commandeer, and retaliate.

As to whether that decision was sufficiently discrete and carried sufficient legal consequences to be reviewable under the APA, the Amended Complaint contains adequate allegations to satisfy those standards and survive a motion to dismiss. For one thing, the Amended Complaint describes how the deployment of overwhelming forces had a discrete rollout period, and a drawdown period, both of which were publicly announced by the agency. (*Id.* at ¶¶ 71-74, 76 480.) And, unlike the sweeping programmatic challenge at issue in *Lujan,* this deployment of overwhelming forces decision impacting Plaintiffs' legal rights was discretely focused on a particular timeframe and geographic area. Defendants may deny that they acted in an arbitrary and capricious manner, or they may argue the law grants the agency discretion to overwhelm a jurisdiction with a surge of agents, but these defenses ultimately require a fact-finder to evaluate Plaintiffs' allegation that Defendants devised the deployment with illegal purposes to retaliate, coerce, and commandeer. Those defenses may only be resolved, at the earliest, after discovery into the purposes and goals Plaintiffs clearly allege.

### L.    Plaintiffs plausibly allege  an Illegal Trespass and Warrantless Entry Policy in Count XVI that is contrary to law and the Constitution.

Count XVI asserts that Defendants violated the APA by enacting an Illegal Trespass and Warrantless Entry Policy. As with their other attacks to Plaintiffs' APA claims,

74

Defendants make only general arguments against Count XVI without specific discussion of the factual allegations Plaintiffs make in support of this claim. (*See* Dkt. 175 at 50–52.)

Defendants offer little argument because they cannot reasonably dispute that the facts alleged plainly identify a reviewable agency decision regarding Defendant's unlawful policy of illegal trespass and warrantless entry. Defendants issued a written memorandum in May 2025 outlining the process by which ICE agents may rely upon administrative warrants, rather than judicial warrants, to enter private residences to effectuate civil immigration arrests. (Dkt. 167, ¶¶ 368–71.) This policy clearly reflects a final agency decision impacting legal rights and obligations as Defendants have consistently applied this policy and instructed their agents to arrest individuals in their homes without consent and without a judicial warrant. (*Id.* ¶ 371.)

Similarly, Defendants have engaged in a pervasive, documented practice of trespassing on property through the commandeering and unlawful use of Saint Paul's parking lots for parks. (*Id.* ¶¶ 372–89.) Such widespread pattern and practice, despite repeated efforts by Saint Paul requesting Defendants to cease and desist, reflect an ongoing and concerted policy of commandeering Saint Paul's property for use in Defendants' unlawful operations. Defendants offer no rebuttal to these plain factual allegations. Accordingly, Defendants' motion to dismiss should be denied as to Count XVI.

### M. Count XVII plausibly alleges a discrete agency action to hide, remove, and swap license plates in violation of state and federal law.

Count XVII alleges that Defendants have implemented a policy to conceal, remove, or swap license plates in violation of federal and state law and contrary to Defendants' own

regulations. (Dkt. 167 ¶¶ 341-44.) Again, the only argument that Defendants make regarding this Count is the generalized and vague assertion that there is no discrete agency action. The Conceal Plates Policy is supported by specific allegations of pervasive and widespread conduct (Dkt. 167 ¶¶ 345-55); Defendants' admissions that they were following such a policy (Dkt. 167 ¶ 356); and their continuation of the policy after they were advised it was unlawful (Dkt. 167 ¶ 354). Thus, Defendants established a Conceal Plates Policy to conceal agents' locations and identities. (Dkt. 167 ¶¶ 345-56.)

## VII.      The Court Should Deny Defendant's Motion to Dismiss Count VII.

In seeking dismissal of Count VII, Defendants in effect argue that federal agents enjoy blanket immunity from all generally applicable state laws. That sweeping position has no historical, doctrinal, or practical support. The Supremacy Clause does not grant federal agents carte blanche to violate state law without showing such violations are necessary to their federal duties. The motion to dismiss Count VII should be denied.[29]

### A.      Federal agents do not have blanket immunity from state law.

"Of course an employee of the United States does not secure a general immunity from state law while acting in the course of his employment." *Johnson v. Maryland,* 254 U.S. 51, 56 (1920) (Holmes, J.) (citing *United States v. Hart*, 3 Wheeler C.C. 304 (D. Pa. 1817)). This principle dates nearly back to the Founding when Justice Washington, riding circuit, issued a decision in *United States v. Hart* and considered whether a U.S. mail

---

[29] Defendants contend that Count VII does not identify a proper underlying "cause of action" to seek declaratory relief. (Dkt. 175 at 52.) Count VII, like much of Plaintiffs' Amended Complaint, is predicated on Plaintiffs' Tenth Amendment rights and thus should be construed as a claim under the Tenth Amendment. (*See* Dkt. 167 ¶¶ 545, 558, 559.)

carrier, in the course of his official duties and "driving a carriage through a crowded or populous street, at such a rate or in such a manner as to endanger the safety of the inhabitants," could be stopped and punished for a breach of the peace under state law. 3 Wheeler C.C. at 304. Even in light of the "supreme law of the land," Justice Washington concluded he could be stopped and punished. *Id.*

The Supreme Court later endorsed Justice Washington's view in *Johnson*. 254 U.S. at 56 (citing *Hart*, 3 Wheeler C.C. 304). There, the Court acknowledged that, "when the United States has not spoken," *i.e.*, through statutory or regulatory preemption, federal officers may be subject to local laws "that might affect incidentally the mode of carrying out the employment—as, for instance, a statute or ordinance regulating the mode of turning at the corners of streets." 254 U.S. at 56 (citing *Commonwealth v. Closson*, 118 N.E. 653 (Mass.1918)). The Court continued that immunity would only extend where a local law "does not merely touch the Government servants remotely by a general rule of conduct; it lays hold of them in their specific attempt to obey orders and requires qualifications in addition to those that the Government has pronounced sufficient." *Id.* at 57.

Even *In re Neagle*, 135 U.S. 1, 75 (1890), a foundational case on federal-official immunity, describes Supremacy Clause immunity much narrower than Defendants' assertion of blanket immunity. In that case, the Supreme Court held that a United States marshal was immune from state murder charges for shooting an individual who was assaulting the marshal's protectee. 135 U.S. 1, 75 (1890). The Court emphasized the marshal was immune because the shooting was his "*duty* as a marshal of the United States"

77

and because "he did no more than was *necessary* and *proper*." *Id.* (emphasis added). Only "[w]hen these things are shown," the Court held, does the immunity apply. *Id.*

**B.** **Minn. Stat. § 609.735 does not violate the intergovernmental immunity doctrine and therefore applies to federal agents**

Consistent with the foregoing history, the doctrine governing Supremacy Clause immunity, "often called the intergovernmental immunity doctrine," is now understood as only prohibiting the application of state laws that "*either* [1] regulate the United States directly *or* [2] discriminate against the Federal Government or those with whom it deals (*e.g.,* contractors)." *United States v. Washington*, 596 U.S. 832, 838 (2022) (citation modified). The anti-masking statute, Minn. Stat. § 609.735, at issue in Counts VI and VII does neither and therefore generally applies to federal agents.

Defendants make no argument that Minnesota's anti-masking statute discriminates against the federal government. (Dkt. 175 at 52–54.) Nor could they. "A state law or regulation impermissibly discriminates against the federal government if it treats a state entity more favorably than it treats a comparable federal entity." *Geo Grp., Inc. v. Inslee*, 151 F.4th 1107, 1118 (9th Cir. 2025). And here, by its terms, the anti-masking statute applies to all individuals equally. *See* Minn. Stat. § 609.735. It makes no distinction between government employees and private individuals, let alone any distinction between state and federal law enforcement agents. *Id.* This non-discrimination distinguishes Minn. Stat. § 609.735 from the No Secret Police Act enjoined by the district court in California. *United States v. California,* 819 F. Supp. 3d 1109, 1131 (C.D. Cal. 2026).

Defendants instead argue that applying Minn. Stat. § 609.735 to federal agents—as it applies to everyone else in Minnesota—would "directly regulate" the United States. (Dkt. 175 at 53–54.) Defendants misunderstand direct regulation. "A direct regulation regulates the government *qua* government; it controls how the government conducts specifically governmental functions." *United States v. California*, 173 F.4th 1060, 1067 (9th Cir. 2026). For example, when California passed the No Vigilantes Act—expressly requiring law enforcement, including federal law enforcement, to display identification (among other things)—the Ninth Circuit deemed that a direct regulation of the United States. As the Ninth Circuit reasoned, "the Act does not regulate conduct that any ordinary citizen could perform. Rather, it applies exclusively to law enforcement agencies and their officers, including federal law enforcement agencies and federal law enforcement officers. The Act thus directly regulates conduct reserved to sovereigns." *Id.* at 1068. For that reason, the Ninth Circuit held, the No Vigilantes Act is barred by intergovernmental immunity. *Id.*

Minnesota's anti-masking statute, by contrast, does not attempt to directly regulate or control the United States. Unlike the No Vigilantes Act in *California*, it does not attempt to regulate any governmental functions and applies to all citizens equally. 173 F.4th at 1068. Minnesota's anti-masking statute also differs greatly from the laws at issue in the other cases cited by Defendants. (Dkt. 175 at 67.) Unlike the drivers' license statute in *Johnson*, it does not impose qualifications on federal employees before they can perform their duties. 254 U.S. at 57. Unlike the state permitting requirements in *Hancock v. Train*, it does not effectively prohibit the operations of federal installations. 426 U.S. 167, 180 (1976). Unlike in *Ohio v. Thomas*, Plaintiffs do not seek to apply a state statute to how a federal agent

serves oleomargarine entirely within a federal institution on federal property pursuant to congressional appropriations. 173 U.S. 276, 283 (1899). Unlike in *M'Culloch v. Maryland*, the anti-masking statute does not attempt to tax the United States directly. 17 U.S. 316, 427 (1819). And unlike the state hazardous substances cleanup statute in *Boeing Co. v. Movassaghie*, the anti-masking statute does not "affect nearly all of [a federal agency's] decisions" with respect to a federal project and it does not impose heightened standards and procedures for that project. 768 F.3d 832, 839 (9th Cir. 2014).[30]

Rather, like a statute regulating "the mode of turning at the corners of the street," Minnesota's anti-masking statute only "incidentally [affects] the mode of carrying out the employment" for federal agents. *Johnson*, 254 U.S. at 56. In fact, Defendants do not even require their agents to wear masks in public to carry out their federal duties and appear to merely want to preserve *the option* for their agents to wear masks. (*See, e.g.*, Dkt. 167 ¶¶ 440, 445(b), (d), 446, 448.) That is not sufficient for intergovernmental immunity, particularly where the federal government wishes to ignore public safety laws like Minn. Stat. § 609.735 at the core of a state's sovereign powers reserved under the Tenth Amendment. To hold otherwise would dramatically expand the scope of Supremacy Clause immunity and greenlight federal violations of state law whenever a federal agency finds such violations convenient or politically useful.

The Court should deny Defendants' motion to dismiss Count VII.

---

[30] Defendants also rely significantly on *Trump v. Vance*, 591 U.S. 786 (2020), but that case turned on doctrines and considerations unique to the President and is patently inapplicable here.

**VIII.**   **Count XVIII, Ultra Vires Agency Action Not Authorized by Congress: Use of Military Force, Is Plausibly Alleged.**

Plaintiffs have pled a viable ultra vires claim that OMS was an illegal domestic use of military force. An ultra vires theory of relief succeeds if a plaintiff can show that "an agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute." *NRC v. Texas*, 605 U.S. 665, 681 (2025) (emphasis in original) (citation modified). "Ultra vires review is also unavailable if . . . a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review,' or if a statutory review scheme forecloses all other forms of judicial review." *Id.* (citation omitted).

Defendants make much of how limited ultra vires review is, but emphasizing the narrowness of the theory of relief does not answer whether Plaintiffs have asserted a claim that fits within that theory. As explained above regarding Count V, Plaintiffs have pled that OMS exceeded Defendants' statutory authority. In Count XVIII, Plaintiffs have additionally pled how OMS's size, scope, and character was military in nature. And OMS came right on the heels of the Supreme Court's rejection of the Trump administration's attempts to federalize and deploy the National Guard in a similar manner. As such, OMS violated the Posee Comitatus Act's prohibition of using military force domestically. To hold otherwise would allow the Executive Branch to do an end run around the Posse Comitatus Act.

**IX.**   **Count XIX, Ultra Vires Executive Action Not Authorized by Congress, Is**

81

**Plausibly Alleged.**

Plaintiffs plead their ultra vires claim as an alternative to the APA claims in the event that one or more of the policies do not constitute "final agency action" or are otherwise not subject to review under the APA. Defendants argue that if the APA claims fail because the alleged policies do not constitute final agency actions they must also fail as an ultra vires claim. (Dkt. 175 at 70.) This argument is contrary to law. In fact, agency action can be challenged as ultra vires even if it does not constitute final agency action. *Leedom v. Kyne*, 358 U.S. 184, 190-91 (1958) (allowing the exercise of *ultra vires* over a non-final collective bargaining certification action); *Nat'l Bus. Aviation Ass'n, Inc. v. Fed. Aviation Admin.*, 496 F. Supp. 3d 102, 110 (D.D.C. 2020) ("In fact, the exercise of *Leedom* jurisdiction permits review of agency action even when that agency action is non-final"); *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 778 F. Supp. 3d 685, 746 n. 43 (D. Md. 2025) ("The requirement of final agency action applies to plaintiffs' APA claims, but not to their *ultra vires* claim.") *Heinl v. Godici*, 143 F. Supp. 2d 593, 601 (E.D. Va. 2001) ("when an agency acts in 'brazen defiance' of its statutory authorization, courts need not await the conclusion of the underlying proceedings"). As such, the motion to dismiss Claim XIX should be denied.

## X.      This Court Has Authority to Issue Injunctive Relief.

Finally, Defendants' argument that 8 U.S.C. § 1252(f)(1) is a "jurisdictional impediment to injunctive relief" is incorrect. (Dkt. 175 at 71.) While §1252(f)(1) prohibits "enjoin[ing] . . . the operation of the provisions of part IV of this subchapter," which includes 8 U.S.C. §§ 1221-32, Plaintiffs' Amended Complaint does not invoke those

82

statutes. Plaintiffs invoke other statutes as they relate to Defendants' actions in OMS. (*See, e.g.*, Dkt. 175 at 62 (invoking 8 U.S.C. 1357); Dkt. 33 at 3 (invoking 8 U.S.C. 1357), at 6 (invoking 8 U.S.C. §§ 1103, 1325, 1326.) The prohibition on injunctive relief does not extend to those statutes. In *Castañon-Nava v. U.S. Dep't of Homeland Sec.*, 161 F.4th 1048, 1058-59 (7th Cir. 2025), the Seventh Circuit held that §1252(f)(1) does not limit courts' ability to enjoin conduct that implicates other sections of the INA, like §1357, and thus did not bar an injunction that "focused squarely on Defendants' compliance with § 1357(a)(2)" even if the order had "collateral effects" on activity governed by the provisions identified in § 1252(f)(1). *Id.*

Moreover, assuming *arguendo* there was a claim arising under Part IV, this Court still has jurisdiction to adjudicate the claims and award declaratory relief and vacatur of unlawful policies. *Brito v. Garland*, 22 F.4th 240, 252 (1st Cir. 2021) ("[D]eclaratory relief remains available under section 1252(f)(1)."); *Texas v. United States*, 50 F.4th 498, 528 (5th Cir. 2022) ("[Section] 1252(f)(1) does not apply to vacatur."). Section 1252(f)(1) does not support dismissal.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

KEITH ELLISON
Attorney General
State of Minnesota

Dated: July 1, 2026

*By: /s/ Brian S. Carter*
BRIAN S. CARTER (#0390613)

83

Special Counsel
LIZ KRAMER (#0325089)
Solicitor General
LINDSEY MIDDLECAMP (#0392589)
Special Counsel
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 300-7403 (Voice)
(651) 282-5832 (Fax)
liz.kramer@ag.state.mn.us
brian.carter@ag.state.mn.us
lindsey.middlecamp@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

MINNEAPOLIS CITY ATTORNEY'S OFFICE
KRISTYN ANDERSON
City Attorney

Dated: July 1, 2026

*/s/ Kristyn Anderson*
KRISTYN ANDERSON (0267752)
HEATHER P. ROBERTSON (0390470)
Assistant City Attorney
SARA J. LATHROP (0310232)
Assistant City Attorney
KIRSTEN H. PAGEL (0399114)
Assistant City Attorney
ADAM E. SZYMANSKI (0397704)
Assistant City Attorney
MICHEL A. BREY (0398620)
Assistant City Attorney
350 South Fifth Street
Minneapolis, Minnesota 55415
Tel: 612-673-3000
kristyn.anderson@minneapolismn.gov
sara.lathrop@minneapolismn.gov
heather.robertson@minneapolismn.gov
kirsten.pagel@minneapolismn.gov
adam.szymanski@minneapolismn.gov
michael.brey@minneapolismn.gov
*Attorneys for Plaintiff City of Minneapolis*

84

SAINT PAUL CITY ATTORNEY'S
OFFICE
IRENE KAO
City Attorney

Dated: July 1, 2026

*By: /s/ Irene Kao*
IRENE KAO (0392282)
KELSEY MCELVEEN (0396744)
Assistant City Attorney
ALEXANDER HSU (0399275)
Assistant City Attorney
15 W. Kellogg Blvd., #400
Saint Paul, Minnesota 55102
Tel: 651-266-8710
Irene.kao@ci.stpaul.mn.us
Kelsey.mcelveen@ci.stpaul.mn.us
Alexander.hsu@ci.stpaul.mn.us
*Attorneys for Plaintiff City of Saint Paul*

**TABLE 1**

| Count | *Cause of Action* | *Final Agency Action* | *Arguments made by Defendants and citation to bulk of Plaintiffs' Response* | | |
|-------|-------------------|------------------------|------------|---------------|---------------------|
| | | | *Standing* | *Cognizability* | *APA Justiciability* |
| **I** | Tenth Amendment | not applicable | (1) Injury in fact<br><br>(2) "Conclusion" of OMS requires dismissal;<br><br>**Plaintiffs' response at supra 8-30** | Defendants assert that no actionable claim is pled<br><br>**Plaintiffs' response at supra 30-39** | not applicable |
| **II** | Equal Sovereignty | not applicable | same as above | Defendants assert that no actionable claim is pled<br><br>**Plaintiffs' response at supra 39-40** | not applicable |
| **III** | First Amendment | not applicable | same as above | Defendants assert that no actionable claim is pled<br><br>**Plaintiffs' response at supra 41-46** | not applicable |

86

| Count | Cause of Action | Final Agency Action | Arguments made by Defendants and citation to bulk of Plaintiffs' Response | | |
|---|---|---|---|---|---|
| | | | *Standing* | *Cognizability* | *APA Justiciability* |
| IV | First Amendment | not applicable | same as above | Defendants assert that no actionable claim is pled<br><br>**Plaintiffs' response at supra 41-46** | not applicable |
| V | APA | Operation Metro Surge | same as above | no argument asserted by Defendants | (1) programmatic challenge (2) committed to agency discretion<br><br>**Plaintiffs' response at supra 47-57** |
| VI | APA | Unlawful Masking Policy | same as above | no argument asserted by Defendants | (1) generalized and conclusory assertion of no plausible discrete agency action<br><br>**Plaintiffs' response at supra 47-53, 57-59** |
| VII | Declaratory Judgment | not applicable | same as above | Defendants assert that no actionable claim is pled<br><br>**Plaintiffs' response at supra 75-80** | not applicable |

87

| Count | *Cause of Action* | *Final Agency Action* | *Arguments made by Defendants and citation to bulk of Plaintiffs' Response* | | |
|---|---|---|---|---|---|
| | | | *Standing* | *Cognizability* | *APA Justiciability* |
| **VIII** | APA | Excessive Force Policy | same as above | no argument asserted by Defendants | (1) generalized and conclusory assertion of no plausible discrete agency action<br><br>***Plaintiffs' response at supra 47-53, 59*** |
| **IX** | APA | Unlawful Arrest Policy | (1) Injury in fact<br><br>(2) "Conclusion" of OMS<br><br>(3) Redressability and traceability<br><br>***Plaintiffs' response at supra 8-30*** | no argument asserted by Defendants | (1) finality<br>(2) committed to agency discretion<br><br>***Plaintiffs' response at supra 47-53, 60-62*** |
| **X** | APA | Unlawful Racial and National-Origin Profiling Policy | (1) Injury in fact<br><br>(2) "Conclusion" of OMS requires dismissal;<br><br>***Plaintiffs' response at supra 8-30*** | no argument asserted by Defendants | (1) generalized and conclusory assertion of no plausible discrete agency action<br><br>***Plaintiffs' response at supra 47-53, 62-64*** |

| Count | Cause of Action | Final Agency Action | Arguments made by Defendants and citation to bulk of Plaintiffs' Response | | |
|---|---|---|---|---|---|
| | | | Standing | Cognizability | APA Justiciability |
| XI | APA | Sensitive Location Policy | (1) Injury in fact<br><br>(2) "Conclusion" of OMS<br><br>(3) Redressability and traceability<br><br>**Plaintiffs' response at supra 8-30** | no argument asserted by Defendants | (1) finality<br>(2) committed to agency discretion<br><br>**Plaintiffs' response at supra 47-53, 64-68** |
| XII | APA | Roving Patrol Policy | (1) Injury in fact<br><br>(2) "Conclusion" of OMS requires dismissal;<br><br>**Plaintiffs' response at supra 8-30** | no argument asserted by Defendants | (1) generalized and conclusory assertion of no plausible discrete agency action<br><br>**Plaintiffs' response at supra 47-53, 68-69** |
| XIII | APA | Biometric Scanning Policy | same as above | no argument asserted by Defendants | (1) generalized and conclusory assertion of no plausible discrete agency action<br><br>**Plaintiffs' response at supra 47-53, 70-71** |

| Count | *Cause of Action* | *Final Agency Action* | *Arguments made by Defendants and citation to bulk of Plaintiffs' Response* | | |
|---|---|---|---|---|---|
| | | | *Standing* | *Cognizability* | *APA Justiciability* |
| **XIV** | APA | Reduction in Training Requirements | same as above | no argument asserted by Defendants | (1) generalized and conclusory assertion of no plausible discrete agency action<br><br>*Plaintiffs' response at supra 47-53, 71-72* |
| **XV** | APA | Overwhelming Forces | same as above | no argument asserted by Defendants | (1) generalized and conclusory assertion of no plausible discrete agency action<br><br>*Plaintiffs' response at supra 47-53, 72-74* |
| **XVI** | APA | Illegal Trespass and Warrantless Entry Policy | same as above | no argument asserted by Defendants | (1) generalized and conclusory assertion of no plausible discrete agency action<br><br>*Plaintiffs' response at supra 47-53, 74-75* |
| **XVII** | APA | Conceal Plates Policy | same as above | no argument asserted by Defendants | (1)  generalized and conclusory assertion of no plausible discrete agency action<br><br>*Plaintiffs' response at supra 47-53, 75* |

90

| Count | *Cause of Action* | *Final Agency Action* | *Arguments made by Defendants and citation to bulk of Plaintiffs' Response* | | |
|---|---|---|---|---|---|
| | | | *Standing* | *Cognizability* | *APA Justiciability* |
| **XVIII** | ultra vires | not applicable | same as above | Defendants assert that no actionable claim is pled<br><br>**Plaintiffs' response at supra 80-81** | not applicable |
| **XIX** | ultra vires | not applicable | same as above | Defendants assert that no actionable claim is pled<br><br>**Plaintiffs' response at supra 81-82** | not applicable |