# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

STATE OF MINNESOTA, by and through its Attorney General Keith Ellison, CITY OF MINNEAPOLIS, and CITY OF ST. PAUL,
Plaintiffs,
v.

MARKWAYNE MULLIN, in his official capacity as Secretary of the U.S. Department of Homeland Security; JOHN CONDON, in his official capacity as Acting Executive Associate Director of Homeland Security Investigations; U.S. Department of Homeland Security; TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; MARCOS CHARLES, in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations; U.S. Immigration and Customs Enforcement; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. Customs and Border Protection; GREGORY BOVINO, in his official capacity as Commander of the U.S. Border Patrol; U.S. Border Patrol; DAVID EASTERWOOD, in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement,
Defendants.

Case No. 0:26-cv-00190-KMM-DJF

**AMICUS BRIEF OF THE CITY OF MANKATO AND CITY OF ROCHESTER IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**INTRODUCTION**

Amici City of Mankato ("Mankato") and City of Rochester ("Rochester") submit this brief in support of Plaintiffs State of Minnesota, City of Minneapolis, and City of St. Paul ("Plaintiffs") in their opposition to Defendants' motion to dismiss the amended complaint. Mankato's and Rochester's experiences with Operation Metro Surge (as defined in Plaintiffs' Amended Complaint,[1] and hereinafter referred to as the "Surge") add support and context for the injuries Plaintiffs have alleged in the Amended Complaint, and help to illustrate why Plaintiffs have standing to pursue this case and why the case remains live.

**IDENTITY OF AMICI AND STATEMENT OF INTEREST**

Amici Mankato and Rochester are regional hub cities in greater Minnesota which each experienced drastic increases in immigration enforcement activity, and attendant harms as described herein and in accompanying declarations, in connection with the Surge. Amici's city councils have each directed the submission of an amicus brief in this case to document local impacts from the Surge.

**SUMMARY OF POSITION**

Although the Surge was nominally directed at the Twin Cities metropolitan area, both Mankato and Rochester experienced increased immigration enforcement activity, the aggressive and unlawful nature of which contributed to serious harms including decreased school and work attendance, business closures, and disruptions to core local government

---

[1] Doc. 167, at ¶ 1.

work. Amici respectfully submit that these injuries, and the broadly similar ones alleged by Plaintiffs, are more than sufficient to establish standing and a live case which deserves to be adjudicated after consideration of all the evidence, rather than being cut off by a motion to dismiss.

### ARGUMENT

By this brief, Amici respectfully advise the Court that the harm caused by Operation Metro Surge to cities in Minnesota (including Amici) is real, not "abstract";[2] it is ongoing, not "ended";[3] and it is a direct, not a "downstream,"[4] result of what Defendants have done in Minnesota. The Court need not do anything like tracing the cause of a hurricane to the flap of a butterfly's wings to conclude that Defendants caused cognizable injuries to Plaintiffs in this case. It need only trace the cause of pervasive upheaval in Minnesota cities to the policies and actions of federal agencies with an all-but-explicit goal of causing pervasive upheaval in Minnesota cities.[5] And, as Plaintiffs have explained, Defendants have made no real commitment to cease the challenged actions and policies.[6] Amici respectfully submit that Defendants' motion to dismiss should be denied and the merits of Plaintiffs' claims should be addressed on the evidence.

---

[2] Doc. 175, at 8 (ECF page 22).
[3] Doc. 175, at 17 (ECF page 31).
[4] Doc. 175, at 17 (ECF page 31).
[5] *See, e.g.*, Doc. 167, at ¶¶ 2, 4, 41, 64-83, 85, 114, 121-25, 131, 139-40, 252, 305-10, 318, 438.
[6] Doc. 202, at 30-31 (ECF page 35-36).

## I.      Mankato's Experience with the Surge.

Mankato is a city of approximately 46,000 residents located in Blue Earth County, 75 miles southwest of the Twin Cities metro area. Around 20% of Mankato residents identify as persons of color. (Arntz Dec., ¶ 1.) Following the implementation of the federal government's Operation Metro Surge, Mankato experienced a significant increase in Federal immigration enforcement by the U.S. Department of Homeland Security, U.S. Immigrations and Customs Enforcement, U.S. Customs and Border Protection, and U.S. Border Patrol (commonly and collectively referred to as "ICE"), notwithstanding Mankato's location well outside the Metro area. (*Id.* ¶¶ 2-3.)

The presence of ICE in Mankato during the height of the Surge was intermittent. ICE's presence and activity outside of what used to be its normal operations, nevertheless, caused disruption to Mankato's ability conduct regular business, strained its resources (including staff time and law enforcement capacity), negatively impacted businesses, schools and health care facilities, and created an overall sense of fear among residents. (*Id.* ¶ 4.) Residents appeared before the Council on numerous occasions to report unlawful or otherwise concerning behavior by ICE, asking Mankato to help ensure public safety for its immigrant community, local businesses, schools, and health care facilities. The public forum portions of the first five Council meetings of the year were dominated by residents raising concerns and complaints about ICE activity in the City. The commenters repeatedly asked the Council to do more to prevent ongoing ICE activity in Mankato. (*Id.* ¶ 5.)

Specific reported incidents in Mankato lent credence to residents' concerns. At the January 12, 2026 City Council Meeting, a resident spoke to the Council about an incident

4

earlier that day in which she was maced by an ICE agent while legally observing ICE activity in Old Town Mankato. The ICE agents then immediately fled the scene, without arrest, citation, or the offer of medical assistance to the resident, as would be typical if following standard law enforcement protocol. (*Id.* ¶ 6; Clifton Dec. ¶ 4.) It took several weeks for Mankato law enforcement to be able to confirm that the resident had, in fact, been pepper sprayed by a federal agent. (Clifton Dec. ¶ 4.) In another incident, a resident was detained by ICE, and Mankato police were able to speak with the person in custody to confirm that they were safe. ICE, however, did not address left-behind personal property during the detention and abandoned the person's unsecured vehicle in the middle of the public roadway. (*Id.* ¶ 5.)

Mankato public schools reported a noticeable drop in student attendance after the start of Operation Metro Surge. In at least one incident, ICE agents sat outside Kennedy Elementary School, causing concern among school staff and residents, and high school students stated that they were afraid to attend school. In order to protect students and their families, Mankato's local school district has not publicly shared data regarding the impacts of ICE activities on public school attendance. (Arntz Dec. ¶ 7.)

Similarly, Minnesota State University – Mankato has reported that hundreds of students expressed fear to leave their homes, apartments, dorms and have reported concern for participating in gatherings on campus due to ICE enforcement activities happening in Mankato and the surrounding areas. The University has indicated that they have had a dramatic increase in counseling appointments, have doubled the amount of time spent on immigration advising meetings, have had an increase in use of their student food pantry,

an increase in virtual advising appointments, and have provided emergency assistance to students to cover housing and education costs due to lost jobs and income. The University reported a current drop in 2026-27 enrollment of more than 1,400 students. They have received notification from international program partners at Osaka Global High School Program, Meijiro University, Chosun University, and Daejeon University that they are not comfortable sending students to Minnesota due to concern over the student's safety in our community and state. Mankato learned that at least seven students who were/are enrolled in the university were detained and sent to detention facilities outside of Minnesota. (*Id.* ¶ 8.)

As a result of ICE activity, Mankato City Council's regular business has been disrupted. To have time to address the concerns of residents raised at Council meetings, the city had to postpone its feasibility review for an upcoming road project and work sessions had to be continued to later dates. The Council had to postpone certain hearings on January 12, 2026, and ultimately conduct nine public hearings at the February 9, 2026, Council meeting to meet review deadlines and ensure regular city business could continue. (*Id.* ¶ 9.) Public attendance at Council meetings increased to the point where people were sometimes turned away due to building capacity limitations, and meetings required additional police staffing and overtime. (Clifton Dec. ¶ 3.)

A few city transit employees expressed angst regarding ICE activity in Mankato. One employee quit on short notice because a family member chose to self-deport, and although the employee had legal status, they felt compelled to relocate. This incident, while

seemingly minor, was directly related to Operation Metro Surge and caused concerns about Mankato's ability to adequately service public transit needs. (*Id.* ¶ 10.)

Mankato has had to develop new, specific protocols for addressing ICE activity. Police presence was increased at all Council meetings from the beginning of the year through the May 11 meeting, and the city developed protocols for its hockey arenas, event center, and airport, where aeronautics is taught through the University. Mankato has also had to adjust how Blue Earth County dispatches calls to city staff. (*Id.* ¶ 11.) City leadership has worked with staff to ensure they are knowledgeable about the city's right to restrict ICE from non-public spaces, and instructed staff to involve a supervisor or the public safety team if ICE is present on city property, adding to staff responsibilities and stress. (*Id.* ¶ 12.)

After the stated end of Operation Metro Surge, ICE remained active in and around Mankato; recently, things have appeared to quiet down, although there have been a few incidents requiring police attention. (Arntz Dec. ¶ 13; Clifton Dec. ¶ 9.) On February 17, 2026, Mankato law enforcement responded to a traffic collision involving a resident and federal agents. The incident required significant efforts far exceeding the routine response to car accident without serious injury, and has taken up significant time for investigation, responding to data requests, and reporting to the City Council. (Clifton Dec. ¶ 10.)

The local law enforcement response to the Surge has been made more difficult by ICE's policies and actions. In contrast to the past practice of federal agencies, DHS and ICE would not give notice to local police of planned operations. Such advance notice is customary to help avoid conflicting law enforcement activities. (*Id.* ¶ 6.)

Additionally, Mankato has encouraged residents to contact police to confirm whether individuals purporting to be law enforcement are, in fact, law enforcement, especially after the 2025 killing of State Speaker of the House Melissa Hortman and her husband by a person purporting to be law enforcement. Operation Metro Surge made that confirmation difficult. Local law enforcement is required to wear uniforms and identification unless undercover. Many of the actions of ICE have not been consistent with commonly accepted protocols of law enforcement. Specifically, when taking enforcement actions, including physical arrest or using force, law enforcement should properly identify themselves. And when using force, law enforcement should provide appropriate medical considerations and stay with the subject after using force. (*Id.* ¶ 7.)

Mankato's public safety team has had to devote significant resources to addressing ICE activity in the City. In addition to the overtime costs, significant administrative time has been devoted to communication with residents, responding to people in crisis, responding to calls reporting unmarked cars or armed individuals, addressing additional data requests related to local law enforcement interactions with ICE (which take significant time to handle due to data protection required for ongoing investigations and personal data acquired during investigations) and additional staff education. Of course, normal day-to-day operational needs have continued alongside this increased workload. (*Id.* ¶¶ 8, 11.)

Mankato's City Council asked to join this case as an amicus because of the importance of ensuring that residents' basic constitutional rights, including due process and First Amendment rights, are protected. There is ongoing concern among residents that

8

federal immigration enforcement activities could continue indefinitely or that they could increase again without warning. (Arntz Dec. ¶ 13.)

To address residents' concerns in the short-term, the Council passed an emergency ordinance on February 23, 2026, which has since been extended through August 24, 2026. The key components of the emergency ordinance are as follows:

a. Any law enforcement agency intending to perform law enforcement activities within Mankato shall make good faith efforts to notify Mankato Public Safety before engaging in said law enforcement activities;

b. Masking is not allowed by law enforcement when performing law enforcement activities;

c. If asked to identify one's self during law enforcement activity, law enforcement must provide official identification upon inquiry; and

d. Law enforcement must wear and use body cameras if provided by the agency and in accordance with that agency's policy.

Violation of the ordinance is a misdemeanor. (*Id.* ¶ 14.) To this point, Mankato police have not had to enforce violations of this ordinance. (Clifton Dec. ¶ 12.)

## II.    Rochester's Experience with the Surge.

The City of Rochester is approximately 85 miles southeast of the Minneapolis-St. Paul metropolitan area, in Olmsted County. There are approximately 124,000 residents in Rochester. The estimated percentage of City residents who identify as persons of color is around 29%. Rochester is the third-largest city in Minnesota and commonly known for being the home to Mayo Clinic. (Norton Dec. ¶ 2.)

Following the implementation of the federal government's Operation Metro Surge, like Mankato, Rochester experienced a significant increase in ICE activity, notwithstanding Rochester's location well outside the Metro area. (*Id.* ¶ 3.)

During the Surge, the City received reports of ICE agents going door-to-door in predominantly Latino and Somali neighborhoods, and of racial profiling by ICE agents in following and stopping residents. It is not clear whether agents had warrants or other legal authorization to conduct those operations. Regardless, the fact that such operations were occurring and being reported in Rochester, together with the highly publicized violent tactics being used by ICE in the Twin Cities, created a real climate of fear locally, especially among residents of color. (*Id.* ¶ 4.)

The Surge coincided with numerous indicators of disruptions to ordinary life in Rochester. The increased ICE activity and the attendant public reaction had, and will continue to have, a significant impact, economic and otherwise, on the City. Observed disruptions included:

    a. City efforts at public engagement with immigrants and communities of color became more difficult for the City during the Surge, skewing the perspectives that the City receives from its citizens.

    b. Residents increasingly used small, grassroots organizations for services, rather than risking a trip to City Hall.

    c. The City heard of concerns with residents' ability to comply with alternate-side parking rules, which City staff infer was caused at least in part by residents' fears of leaving their homes due to the Surge.

    d. Numerous businesses in the City were closed for periods of time. Others began paying for their employees to stay in hotels close to work rather than having them go home to reduce the risk of encountering ICE or exposing other family members to ICE activity.

e. The City's municipally-owned electric and water utility, Rochester Public Utilities, reported a significant increase in utility bill arrearages, for both residential and commercial customers, in February 2026. The City understands that business closures, income disruptions, or other economic impacts associated with the Surge may have contributed to those arrearages.

f. There was a huge increase in demand for assistance with food, rent, and childcare. One food pantry reported that it went from serving 50 clients per week to more than 500, and that it went from making one or two food deliveries per week to more than half of its clients requesting delivery of their food.

g. Rochester is home to a large population of immigrant healthcare workers, including registered nurses and certified nursing assistants. Medical facilities in the City reported being short-staffed during the Surge, reportedly because of workers' fear of coming to work.

h. The Mayo Clinic campus hired additional security.

i. Increasingly, citizen residents without travel plans began incurring the time and expense to obtain passports, apparently because of fear that ICE personnel would demand to inspect their documents.

j. Rochester Public Schools reported increases in excused absences, including increases of 81 percent overall and of 417 percent among students whose first language was not English, for a two-week period in January 2026 during the height of the surge.

k. City staff received reports that some students dropped out of school to work because their parents could not, due to fear of potential ICE apprehension.

l. City staff learned that there was an increase in requests for rental assistance in Southeast Minnesota, totaling approximately $425,000. Those needs were met by donations.

(*Id.* ¶ 5.)

City residents raised concerns at public Council meetings, with comments largely focused on the sense of fear caused by the menacing nature of immigration enforcement activities by ICE in Minnesota. (*Id.* ¶ 6.)

11

ICE continued to be present in Rochester after the announced end of the Surge and drawdown of federal immigration enforcement agents in Minnesota. The City received post-drawdown reports of enforcement activity in restaurants and people being taken into custody. City staff observed ICE personnel near the Government Center in Rochester several days after the drawdown was announced. (*Id.* ¶ 7.)

The City has also heard of residents in Rochester targeted by DHS' Operation PARRIS (Post-Admission Refugee Reverification and Integrity Strengthening) having their immigration status reviewed randomly and without connection to any violation of immigration law. This has likewise contributed to the fear and behavior changes among BIPOC and immigrant residents. (*Id.* ¶ 8.)

There will be continuing effects on the City even if ICE presence and activity does decrease to what were previously normal levels. The federal government's actions in Rochester, and in Minnesota more broadly, damaged residents' trust in not only the federal government but also government institutions in general. The City depends on the trust of its residents to effectively provide the basic services for which local governments are relied on. (*Id.* ¶ 9.)

It is hard to quantify the long-term economic and social impacts of ICE enforcement. The City has concerns about impacts to resident participation in City events and use of City services due to fear that ICE activity could return and due to the general loss of faith in adherence to constitutional norms. (*Id.* ¶ 10.)

### III.    Cities, and the State, Are Injured by the Surge

In short, like all three Plaintiffs, Amici have experienced firsthand the damage and disruption resulting from the Surge and the climate of fear created within their respective jurisdictions by ICE activity—especially, though far from exclusively, among immigrants and residents of color, who are most likely to be affected by the activity. These harms (and the broadly similar harms alleged by Plaintiffs)[7]—are real, and are more than sufficient injuries for Article III standing purposes. *See, e.g.*, *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 196 (2017) (city had standing to sue based on allegation that bank's discriminatory foreclosure practices led to reduced property values, reduced tax revenue, and increased spending on city services); *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 109-110 & n.24 (1979) (village was cognizably injured by a real estate brokerage's racial steering practices, which allegedly affected the village's racial composition, replacing an integrated neighborhood with a segregated one, and would plausibly lead to a reduction in property values, increases in school segregation, and diminishment of the village's tax base). Similarly here, Plaintiffs have plausibly alleged (and Amici's experiences support) that Defendants' policies and actions have, among other things, increased state and local government costs and decreased their revenues. These are classic Article III injuries.

There is more than one step in the process as to some of these injuries, but Plaintiffs' and Amici's injuries are nonetheless easily constitutionally traceable to Defendants'

---

[7] *E.g.*, Doc. 167, at ¶¶ 69-70, 114, 140, 148-180, 214-18, 222-26, 231, 238, 432-38, 491-92, 570, 581, 589.

policies and actions. True, ICE itself did not (for example) pack Mankato City Council meetings to the point that the room was at capacity and additional police staffing was required; Mankato residents did. ICE did not decide that a Mankato transit employee's family member would self-deport and that the employee would decide to follow; those individuals did. But in doing so, they were not breaking the chain of causation that began with Defendants' actions (including indiscriminate stops, warrantless searches, racial profiling, targeting of observers, and disproportionate use of force); instead, they were "react[ing] in predictable ways," *Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019), to those things by, for example, demanding a local government response to Defendants' unprecedented aggression, or by taking reasonably necessary steps to protect themselves and their families. Standing exists in these circumstances. *See id.*

Finally, it is worth emphasizing that the more direct economic injuries to Plaintiffs and Amici are far from the only ones caused by the Surge. Enormous numbers of children and adults missed school and work; businesses closed; people were stopped seemingly at random, detained, and whisked to detention centers out of state; residents were shot and killed. Cities and states have an obvious stake in the education of their children, gainful employment of their adult residents, economic viability of local businesses, and safety of their communities. They also are clearly injured when their residents lose trust in government and law enforcement.[8]

---

[8] *See* Doc. 202, at 15-19 (ECF pages 21-25).

14

In addition to being brought by proper parties, Amici respectfully submit that the case before the Court remains live and is not moot, despite the nominal end of the Surge. As Plaintiffs explain, Defendants cannot render a lawsuit moot by "voluntarily ceasing the illegal conduct, only to start it again and force Plaintiffs to play jurisdictional whack-a-mole."[9] Defendants have made no binding commitment to Plaintiffs, to Amici, or to other Minnesota communities that they will not resume their illegal conduct being challenged here. And Amici must emphasize that many of their injuries described above are ongoing, and that any recurrence of the Surge (or of similar activity) would reopen wounds that have not yet fully healed, and would likely cause even more significant harm.

## CONCLUSION

Amici respectfully submit that the Court should deny the motion to dismiss and that this important case should be resolved on the evidence and the merits.

## CERTIFICATE OF COMPLIANCE

The undersigned attorney certifies that the Amicus Brief of the City of Mankato and City of Rochester in Support of Plaintiffs' Opposition to Motion to Dismiss complies with Local Rule 7.1(f) and (h), and further certifies this memorandum was prepared using Microsoft Office 365 MSO Version 2602; and that this word processing program has been applied specifically to include all text, including headings, footnotes, and quotations, in determining that this document contains 3,600 words.

---

[9] Doc. 202, at 24 (ECF page 29).

Dated: August 10, 2026                    KENNEDY & GRAVEN, CHARTERED


By: */s/ Zachary T. Brennan DesAutels*
    Michelle E. Weinberg (#0388771)
    Zachary T. Brennan DesAutels (#0392151)
    700 Fifth Street Towers
    150 South Fifth Street
    Minneapolis, MN 55402
    Telephone: (612) 337-9300
    mweinberg@kennedy-graven.com
    zdesautels@kennedy-graven.com
    *Attorneys for City of Rochester and*
   *City of Mankato*

16