UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

STATE OF MINNESOTA, *by and through its Attorney General Keith Ellison*, CITY OF MINNEAPOLIS, and CITY OF ST. PAUL,

Plaintiffs,

v.

Case No. 0:26-cv-00190-KMM-DJF

MARKWAYNE MULLIN, *in his official capacity as Secretary of the U.S. Department of Homeland Security*; STEPHEN MILLER, *in his official capacity as Homeland Security Advisor*; JOHN CONDON, *in his official capacity as Acting Executive Associate Director of Homeland Security Investigations*; U.S. Department of Homeland Security; TODD LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; MARCOS CHARLES, *in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations;* U.S. Immigration and Customs Enforcement; RODNEY SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection;* U.S. Customs and Border Protection; TOM HOMAN, *in his official capacity as Border Czar*; GREGORY BOVINO, *in his official capacity as Commander of the U.S. Border Patrol*; U.S. Border Patrol; DAVID EASTERWOOD, *in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement*, *in their official capacities*,

Defendants.

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT**

---

# TABLE OF CONTENTS


INTRODUCTION .......... 1

ARGUMENT .......... 1

I. Plaintiffs Lack Standing. .......... 1

A. Plaintiffs' alleged financial injuries are insufficient. .......... 2

B. Plaintiffs' alleged sovereign injuries do not give rise to standing. .......... 3

C. Plaintiffs' alleged intangible injuries do not give rise to standing. .......... 6

D. Plaintiffs' challenges to the revocation of the so-called sensitive locations policy and the Lyons Memo fail for a lack of traceability and redressability. .......... 7

II. The Conclusion of Operation Metro Surge Requires Dismissal. .......... 9

III. Plaintiffs Fail to State a Tenth Amendment Claim. .......... 12

IV. Minnesota Fails to State an Equal Sovereignty Claim. .......... 16

V. Plaintiffs Fail to State First Amendment Claims. .......... 16

VI. Plaintiffs' APA claims are not justiciable. .......... 19

A. Most of Plaintiffs' APA claims fail to plausibly allege discrete agency action. .......... 19

B. Counts IX and XI fail to plausibly allege final agency action. .......... 25

C. Counts IX and XI challenge actions that are committed to agency discretion. .......... 29

VII. The Court Should Dismiss Count VII. .......... 31

VIII. Count XVIII Fails to State a Valid Claim For Relief. .......... 34

IX. Plaintiffs' Other *Ultra Vires* Claim (Count XIX) Should Be Dismissed. .......... 35

X. This Court Lacks Jurisdiction to Issue Injunctive Relief. .......... 35

CONCLUSION .......... 37

## TABLE OF AUTHORITIES

### CASES

*281 Care Comm. v. Arneson*,
638 F.3d 621 (8th Cir. 2011) .......... 6

*Al Otro Lado, Inc. v. McAleenan*,
394 F. Supp. 3d 1168 (S.D. Cal. 2019) .......... 20

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
458 U.S. 592 (1982) .......... 5

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022) .......... 25, 26, 27

*Arizona v. California*,
283 U.S. 423 (1931) .......... 32

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 19, 34

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*,
785 F.3d 710 (D.C. Cir. 2015) .......... 29

*Bark v. U.S. Forest Serv.*,
37 F. Supp. 3d 41 (D.D.C. 2014) .......... 21

*Bedford v. Missouri Dep't of Soc. Servs., Fam. Support Div.*,
179 F.4th 611 (8th Cir. 2026) .......... 11

*Biden v. Texas*,
597 U.S. 785 (2022) .......... 20, 25

*Bost v. Illinois State Bd. of Elections*,
607 U.S. 71 (2026) .......... 3

*Brennan v. Dickson*,
45 F.4th 48 (D.C. Cir. 2022) .......... 10

*Briscoe v. St. Louis County*,
172 F.4th 996 (8th Cir. 2026) .......... 23

*Brown v. Medtronic, Inc.*,
628 F.3d 451 (8th Cir. 2010) .......... 22

*Burke v. 401 N. Wabash Venture, LLC*,
714 F.3d 501 (7th Cir. 2013) .......... 28

*Citizens United v. FEC*,
558 U.S. 310 (2010) .......... 17

*City of Boston v. Anderson*,
439 U.S. 951 (1978) .......... 18

*City of Boston v. Anderson,*
439 U.S. 1389 (1978) .......... 18

*City of Boston v. Anderson*,
439 U.S. 1060 (1979) .......... 18

*City of Safety Harbor v. Birchfield*,
529 F.2d 1251 (5th Cir. 1976) .......... 17

*Coal. for Humane Immigrant Rts. v. Mullin*,
2026 WL 2317908 (D.C. Cir. Aug. 11, 2026) .......... 8

*Conservation L. Found., Inc. v. Acad. Express, LLC*,
129 F.4th 78 (1st Cir. 2025) .......... 9

*CoreCivic, Inc. v. Governor of New Jersey*,
145 F.4th 315 (3d Cir. 2025) .......... 32

*Corner Post, Inc v. Bd. of Govs. of Fed. Reserve Sys.*,
603 U.S. 799 (2024) .......... 19, 25

*County of Riverside v. McLaughlin*,
500 U.S. 44 (1991) .......... 9

*County of Suffolk v. Long Island Lighting Co.*,
710 F. Supp. 1387 (E.D.N.Y. 1989) .......... 18

*Creek v. Village of Westhaven*,
80 F.3d 186 (7th Cir. 1996) .......... 18

*Davis v. FEC*,
554 U.S. 724 (2008) .......... 9

*FBI v. Fikre*,
601 U.S. 234 (2024) .......... 11, 12

*Feldmann Imports Inc. v. Mercedes-Benz USA, LLC*,
506 F. Supp. 3d 687 (D. Minn. 2020) .......... 22

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 3, 6, 7

*Firearms Regul. Account. Coal., Inc. v. Garland ("FRAC")*,
112 F.4th 507 (8th Cir. 2024) .......... 26, 27

*Fridley Pub. Sch. Dist., Indep. Sch. Dist. 14 v. Mullin*,
No. 26-CV-1023 (LMP/LIB), 2026 WL 1244043 (D. Minn. May 6, 2026) .......... 2, 3, 8, 30

*G.B. ex rel. G.P. v. United States E.P.A.*,
172 F.4th 1042 (9th Cir. 2026) .......... 7

*Haaland v. Brackeen*,
599 U.S. 255 (2023) .......... 15

*Hancock v. Train*,
426 U.S. 167 (1976) .......... 32

*Heckler v. Chaney*,
470 U.S. 821 (1985) .......... 29, 30

*Houston Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022) .......... 19

*Hunter v. Page County*,
102 F.4th 853 (8th Cir. 2024) .......... 21

*Hussen v. Noem*,
822 F. Supp. 3d 944 (D. Minn. 2026) .......... 20

*In re Grand Jury Subpoenas*,
No. 26-MC-43 PJS, 2026 WL 1783899 (D. Minn. June 22, 2026) .......... 13

*In re Neagle*,
135 U.S. 1 (1890) .......... 33

*Johnson v. Maryland*,
254 U.S. 51 (1920) .......... 31, 33

*Koog v. United States*,
79 F.3d 452 (5th Cir. 1996) .......... 15

*Laney v. City of St. Louis*,
56 F.4th 1153 (8th Cir. 2023) .......... 19

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) .......... 20, 21, 23, 24

*Lunney v. United States*,
319 F.3d 550 (2d Cir. 2003) .......... 31

*Maryland v. U.S. Dep't of Agric.*,
151 F.4th 197 (4th Cir. 2025) .......... 2

*McClain v. American Economy Insurance Co.*,
424 F.3d 728 (8th Cir. 2005) .......... 10

*McNaught v. Nolen*,
76 F.4th 764 (8th Cir. 2023) .......... 7

*Mennonite Church USA v. U.S. Dep't of Homeland Sec.*,
778 F. Supp. 3d 1 (D.D.C. 2025) .......... 8, 28, 29

*Minnesota v. Noem*,
818 F. Supp. 3d 1030 (D. Minn. 2026) .......... *passim*

*Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*,
701 F. Supp. 2d 568 (S.D.N.Y. 2010) .......... 18

*Mullin v. Doe*,
146 S. Ct. 2121 (2026) .......... 14

*N.E. Synod v. DHS*,
824 F. Supp. 3d 118 (D. Mass. 2026) .......... 25, 28, 29

*New Mexico v. McAleenan*,
450 F. Supp. 3d 1130 (D.N.M. 2020) .......... 17

*NFIB v. Sebelius*,
567 U.S. 519 (2012) .......... 15

*Norton v. S. Utah Wilderness All. ("SUWA")*,
542 U.S. 55 (2004) .......... 20, 23, 24

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) .......... 34, 35

*Nw. Ctr. for Alternatives to Pesticides v. DHS*,
552 F. Supp. 3d 1078 (D. Or. 2021) .......... 24

*Ohio v. Thomas*,
173 U.S. 276 (1899) .......... 32

*Olenga v. Gacki*,
507 F. Supp. 3d 260 (D.D.C. 2020) .......... 31

*Oregon v. Trump,*
809 F. Supp. 3d 1193 (D. Or. 2025) .......... 16

*Pennsylvania v. Trump*,
795 F. Supp. 3d 607 (E.D. Pa. 2025) .......... 10

*Prowse v. Payne*,
984 F.3d 700 (8th Cir. 2021) .......... 11

*Rockwell Int'l Corp. v. United States*,
549 U.S. 457 (2007) .......... 9

*Roe v. Michelin North America, Inc.*,
637 F. Supp. 2d 995 (M.D. Ala. 2009) .......... 16

*Royal Canin U. S. A., Inc. v. Wullschleger*,
604 U.S. 22 (2025) .......... 9

*S. Dakota v. Dole*,
483 U.S. 203 (1987) .......... 14

*Sarasota Wine Mkt., LLC v. Schmitt*,
987 F.3d 1171 (8th Cir. 2021) .......... 8

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......... 1

*Steger v. Franco, Inc.*,
228 F.3d 889 (8th Cir. 2000) .......... 10

*Tamenut v. Mukasey*,
521 F.3d 1000 (8th Cir. 2008) .......... 29, 30

*Tennessee v. Davis*,
100 U.S. 257 (1879) .......... 33

*Tennessee v. Dep't of Educ.*,
104 F.4th 577 (6th Cir. 2024) .......... 4

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 6

*Trump v. United States*,
603 U.S. 593 (2024) .......... 14

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) .......... 27, 28, 29

*United States v. California*,
173 F.4th 1060 (9th Cir. 2026) .......... 31, 32

*United States v. California*,
819 F. Supp. 3d 1109 (C.D. Cal. 2026) .......... 33

*United States v. Darby*,
312 U.S. 100 (1941) .......... 13

*United States v. Louper-Morris*,
672 F.3d 539 (8th Cir. 2012) .......... 13

*United States v. New York*,
No. 1:26-CV-1360 (MAD/ML), 2026 WL 2225423 (N.D.N.Y. Aug. 3, 2026) .......... 33

*United States v. Texas*,
599 U.S. 670 (2023) .......... 2, 6, 11, 14

*United States v. Washington*,
596 U.S. 832 (2022) .......... 33

*Uzuegbunam v. Preczewski*,
592 U.S. 279 (2021) .......... 9

*Walmart Inc. v. U.S. DOJ*,
21 F.4th 300 (5th Cir. 2021) .......... 25

*Washington v. Glucksberg*,
521 U.S. 702 (1997) .......... 17

*Washington v. U.S. FDA.*,
108 F.4th 1163 (9th Cir. 2024) .......... 5

*Wilderness Watch v. Hall*,
2025 WL 3515520 (D. Minn. Sept. 29, 2025) .......... 25

*Virginia ex rel. Cuccinelli v. Sebelius*,
656 F.3d 253 (4th Cir. 2011) .......... 4

*Zen Grp., Inc. v. Agency for Health Care Admin.*,
80 F.4th 1319 (11th Cir. 2023) .......... 9

**STATUTES**

5 U.S.C. § 551 .......... 20, 24

5 U.S.C. § 701 .......... 29, 31

8 U.S.C. §§ 1221-1232 .......... 35, 36

8 U.S.C. § 1252 .......... 35

8 U.S.C. § 1357 .......... 26, 27, 30

**OTHER AUTHORITIES**

John Harrison, *Vacatur of Rules Under the Administrative Procedure Act*,
40 Yale J. on Reg. Bull. 119 (2023) .......... 10

## INTRODUCTION

Operation Metro Surge has ended, and this case should too. Plaintiffs' response does not persuade otherwise.

Plaintiffs fail each element of Article III standing, alleging injuries that are not cognizable, not traceable to Defendants' actions, and not redressable by this Court. Additionally, Plaintiffs cannot establish standing to obtain prospective relief based on alleged conduct that occurred months before the filing of the Amended Complaint. Beyond these threshold issues, Plaintiffs ask the Court to adopt novel readings of the First and Tenth Amendments and to endorse their attempt to apply state law to federal officers. And they seek to challenge disparate actions by law enforcement officers as purported hypothetical policies under the Administrative Procedure Act, contrary to the requirements of final agency action and the limitation on judicial review of actions that are committed to agency discretion. The Court should dismiss the Amended Complaint in full.

## ARGUMENT

### I. Plaintiffs Lack Standing.

In the Amended Complaint, Plaintiffs failed to "clearly allege" the facts necessary for standing, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *see* Doc. 175 (Mot.) at 5-15, and their response provides no reason to conclude otherwise.[1]

[1] The Court previously found "Plaintiffs' arguments on standing to be well-supported," *Minnesota v. Noem*, 818 F. Supp. 3d 1030, 1040 n.11 (D. Minn. 2026), but that finding is not dispositive now. Plaintiffs amended their complaint after Operation Metro Surge concluded and the Court's prior conclusion concerned only the Tenth Amendment and Equal Sovereignty Claims.

**A. Plaintiffs' alleged financial injuries are insufficient.**

Plaintiffs start with their theories of economic harm. Doc. 202 (Resp.) at 9-12. But not every allegation of a pocketbook injury suffices for Article III standing. Instead, when viewing "the injuries of states" and localities, it is necessary to "consider the context in which the alleged injuries arose." *Maryland v. U.S. Dep't of Agric.*, 151 F.4th 197, 209 (4th Cir. 2025). Thus, the fact that "increased costs to maintain public roads" may be enough to challenge a Department of Energy rule (Resp.9-10) does not mean that increased costs are enough to challenge a law enforcement operation. *See United States v. Texas*, 599 U.S. 670 (2023). Plaintiffs' attempt to distinguish *Texas*—as a case about a request for "more enforcement of federal law" (Resp.11)—confuses the application of a rule for the rule itself. The Supreme Court made clear that the standing issue in *Texas* animated from the "principle of enforcement discretion over arrests and prosecutions," which "extends to the immigration context." 599 U.S. at 679. And, as this Court already recognized, this principle is a "jurisprudential barrier" regardless of whether a plaintiff thinks the Executive Branch is enforcing too much or too little. *Noem*, 818 F. Supp. 3d at 1046.

Plaintiffs' attempt to defend their expenditure-of-resources theory is similarly unavailing. A case on which Plaintiffs rely—*Fridley Pub. Sch. Dist., Indep. Sch. Dist. 14 v. Mullin*, No. 26-CV-1023 (LMP/LIB), 2026 WL 1244043 (D. Minn. May 6, 2026)—explains why. In *Fridley*, school districts argued they had standing to challenge the sensitive locations policy based on the expenditure or diversion of resources "to 'mitigate the disruption' caused by increased immigration enforcement activity at or near their

schools." *Id.* at *13. The court rejected this theory because the school districts "*chose* to implement these measures," and precedent confirms that plaintiffs "cannot manufacture standing by voluntarily incurring costs." *Id.* (quoting *Bost v. Illinois State Bd. of Elections*, 607 U.S. 71, 82 (2026)). The same principle applies here. Even if a plaintiff has standing to challenge a federal policy that legally "require[s]" a diversion of resources, *id.*, Plaintiffs cannot predicate standing on a voluntary decision to expend such resources by, for example, ordering "magnetic badges," hiring "a full time Commander in charge of Operation Metro Surge-related incidents," or assigning "staff and supervisory resources to monitor, respond, and communicate with families and the public about safety conditions." Doc. 167 (Am. Compl.) ¶¶ 159, 173, 390.

*Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), does not hold otherwise. There, the Supreme Court concluded that doctors failed to demonstrate the challenged actions caused a diversion of resources. *Id.* at 391-92. In saying so, the Supreme Court in no way ratified the proposition that the voluntary "diversion of resources" gives rise to Article III standing. Indeed, the Court has since confirmed the opposite is true. *See Bost*, 607 U.S. at 82.

**B. Plaintiffs' alleged sovereign injuries do not give rise to standing.**

The alleged sovereign injuries do not fare any better. Plaintiffs concede that they must allege "some tangible interference with [their] authority to regulate or to enforce [their] laws,'" Resp.13, but did not allege any in their Amended Complaint.

The focus of Plaintiffs' response is Counts VI and VII, which concerns Minnesota's anti-masking statute, and Count XVII, which concerns Minnesota's license-plate requirements.[2] Plaintiffs contend that the alleged failure of federal officers to comply with these laws causes sovereign injury because (1) it prevents Plaintiffs from enforcing their laws against the officers and (2) makes it harder to enforce their laws against others. Resp.13-15. Neither argument works.

*First*, Plaintiffs do not have the authority to enforce their laws against federal officers. *See* Mot.9-11. This case is therefore distinct from those on which Plaintiffs rely, such as *Tennessee v. Department of Education*, which concerned the states' undisputed "ability to regulate the education of their citizens." 104 F.4th 577, 593 (6th Cir. 2024). Instead, this case is much more like *Virginia ex rel. Cuccinelli v. Sebelius*, where the Fourth Circuit held Virginia lacked standing despite an asserted conflict between a state statute and the Affordable Care Act's Individual Mandate because Virginia lacked the "sovereign power" to "nullify federal law," and thus it lacked any injury to its sovereign interest in "enforc[ing] a legal code." 656 F.3d 253, 269-70 (4th Cir. 2011) (emphasis omitted). In the same way, the alleged federal policies here do "not affect [Plaintiffs'] ability to enforce [their laws]," because the "Constitution itself withholds from [Plaintiffs] the power to enforce [the relevant state laws] against the federal government." *Id.* at 270.

[2] Plaintiffs do not defend their standing to press their claim related to the alleged "Biometric Scanning Policy" (Count XIII).

Plaintiffs' fallback argument—that Defendants conflate standing with the merits, *see* Resp.15—is not right either. Plaintiffs must plausibly allege an interference with their "sovereign power over individuals and entities within the relevant jurisdiction." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982). Because federal officers are not among the "individuals" that Plaintiffs have a valid interest in regulating, they have failed to plausibly allege a cognizable sovereign injury.

*Second*, any added "logistical burden on [Plaintiffs'] law enforcement" officers is not "a cognizable Article III injury." *Washington v. U.S. Food & Drug Admin.*, 108 F.4th 1163, 1177 (9th Cir. 2024); *see* Mot.11. Plaintiffs argue that *Washington* is irrelevant because, in that case, Idaho's "theory relied on speculation that third parties would break Idaho law and that Idaho would face greater difficulty policing those third parties." Resp.14. But Idaho and Plaintiffs assert the same theory. Idaho, much like Plaintiffs here, failed to allege that the federal action at issue "preempts or otherwise interferes with the state's *authority* to enact or enforce restrictions." *Washington*, 108 F.4th at 1177. Instead, Plaintiffs allege downstream consequences of alleged federal action, such as an impediment in "tracking and recording violations of state traffic laws, locating stolen vehicles, and identifying vehicles involved in criminal activities," Am. Compl, ¶ 360, and in "distinguish[ing] between bad actors who do and do not claim federal authority," Resp.14. In other words, Plaintiffs claim a "greater difficulty" in "policing . . . third parties." *Id.* This theory of injury-in-fact—which "would greatly expand state standing to challenge any federal action," *Washington*, 108 F.4th at 1177—is not valid.

**C. Plaintiffs' alleged intangible injuries do not give rise to standing.**

Plaintiffs argue that the alleged distrust in their law enforcement agencies and agents is a concrete injury because it constitutes a "classic reputational harm[]." Resp.16. This is an incredibly broad theory—it would seemingly allow a state or locality to challenge any federal act that affects the public's view of law enforcement—and thus is "flatly inconsistent with Article III." *All. for Hippocratic Med.*, 602 U.S. at 392. It fails for three other reasons too.

*First*, Plaintiffs' reading of *TransUnion* is incomplete. Consideration of whether an alleged injury "has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts," must be done with an eye on whether the case at hand is one "that Article III empowers federal courts to consider." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (citations omitted). And Plaintiffs provide no precedent supporting the proposition that a state or municipality has standing to sue based on reputational injury. Instead, history suggests the opposite answer. *See, e.g.*, *281 Care Comm. v. Arneson*, 638 F.3d 621, 634 (8th Cir. 2011) ("A government entity cannot bring a libel or defamation action."). A local government's purported reputational injury that results from a policy disagreement with the federal government is not one "traditionally redressable in federal court." *Texas*, 599 U.S. at 676.

*Second*, Plaintiffs overread the surveys on which they rely. Although those surveys suggest that interactions with federal law enforcement during Operation Metro Surge may have resulted in a group of respondents less likely to (1) trust law enforcement; (2) seek

help from law enforcement; and (3) obey law enforcement, none of these survey questions ask specifically about state and local law enforcement. Am. Compl. ¶¶ 196-98. Therefore, rather than "show *how* [Defendants' alleged] actions harm [Plaintiffs'] reputation," *McNaught v. Nolen*, 76 F.4th 764, 771-72 (8th Cir. 2023), Plaintiffs ask this Court to infer reputational harm from a broadly worded prompt about interactions with federal law enforcement officers. Without more, such an inference is not "reasonable." *Id.* (citation omitted).

*Third*, this theory suffers from fatal causation and redressability flaws. The "line of causation" between the alleged reputational injury and the challenged actions is far "too attenuated," especially because it largely rests on unpredictable conflation between federal, state, and local law enforcement. *All. for Hippocratic Med.*, 602 U.S. at 383. It is entirely speculative that the requested relief will increase trust in state and local law enforcement. Plaintiffs do not explain how forward-looking relief regarding certain alleged policies (Resp.19) will positively affect their relationship with their constituents. And, at most, all they could offer is "guesswork." *G.B. ex rel. G.P. v. United States E.P.A.*, 172 F.4th 1042, 1064 (9th Cir. 2026). Redressability is therefore absent.

**D. Plaintiffs' challenges to the revocation of the so-called sensitive locations policy and the Lyons Memo fail for a lack of traceability and redressability.**

Even if Plaintiffs plausibly allege injuries-in-fact, they still lack standing to challenge the revocation of the so-called sensitive locations policy and the Lyons Memo because both causation and redressability are lacking. *See* Mot.13-14.

Plaintiffs' response on traceability relies on allegations stemming from increased enforcement at sensitive locations. Resp.21-22; *see* Am. Compl. ¶¶ 295-99. But these allegations "do not delineate between the effects of broader immigration enforcement priorities and the policy rescission specifically." *Mennonite Church USA v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 1, 11 (D.D.C. 2025). In other words, although these allegations set forth statistics regarding increased interactions at sensitive places, they fail to clearly allege facts demonstrating a "causal connection" between these alleged injuries and the 2025 Huffman Memo concerning sensitive locations, given the general increase in enforcement during Operation Metro Surge. *Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171, 1178 (8th Cir. 2021) (quotation omitted). Even though Plaintiffs need not allege that the Huffman Memo was the only cause, Resp.23-24, they do need to allege that it was one cause, and they fail to do so.

This is especially the case given that the Huffman Memo "did not change DHS's ability or authority to engage in enforcement activity at or near protected areas." *Fridley*, 2026 WL 1244043, at *9. And the same is true for the Lyons Memo concerning warrantless arrests, which did not alter officers' "statutory discretion to carry out warrantless arrests." Mot.14. Instead, both memos provide federal agents with guidance as to how to exercise their authority. It follows that, even if the two Memos were vacated, federal agents would possess the same amount of statutory discretion to perform the acts Plaintiffs challenge. This reality means that redressability is lacking. *See Coal. for Humane Immigrant Rts. v. Mullin*, 2026 WL 2317908, at *5-6 (D.C. Cir. Aug. 11, 2026)

Plaintiffs respond that, as a practical matter, a judicial remedy "would provide at least some degree of relief." Resp.23. But regardless of whether a court's opinion influences behavior, redressability is lacking when the court's *judgment* does not "affect the behavior of the defendant towards the plaintiff." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) (alteration adopted). Such is the case here. Even if the Court vacates the memo, federal officers will remain able to do the very things that Plaintiffs find objectionable.

## II. The Conclusion of Operation Metro Surge Requires Dismissal.

The end of Operation Metro Surge provides an independent basis to dismiss all of Plaintiffs' claims. Mot.15-19. Plaintiffs disagree, arguing that standing is present because (1) Operation Metro Surge had not yet ended when this litigation started and (2) they still possess the requisite injuries to seek forward-looking relief. Neither argument works.

**A.** Although standing is normally keyed to the facts that existed "when the suit was filed," *Davis v. FEC*, 554 U.S. 724, 734 (2008), this focus changes when a plaintiff files an amended complaint. At that point, "courts look to the amended complaint to determine jurisdiction." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474 (2007); *see Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 32 (2025) (quoting this rule); *County of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991) (evaluating standing "at the time the second amended complaint was filed"); *Conservation L. Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 85-86 (1st Cir. 2025); *Zen Grp., Inc. v. Agency for Health Care Admin.*, 80 F.4th 1319, 1334 (11th Cir. 2023).

Even though some courts have focused on standing at the time of the original rather than the amended complaint, Resp.26, Eighth Circuit precedent does not support doing so here. In *McClain v. American Economy Insurance Co.*, a pre-*Rockwell* case, the Eighth Circuit concluded that allegations in a second amended complaint were insufficient for standing purposes and, alternatively, agreed with the district court that the allegations came too late in the game. 424 F.3d 728, 733 (8th Cir. 2005). For support on the second point, the Eighth Circuit quoted *Steger v. Franco, Inc.*, in which the court said that standing is "determined as of the lawsuit's commencement." 228 F.3d 889, 892 (8th Cir. 2000). But *Steger* was not a case about an amended complaint. And *McClain* did not conclude, as Plaintiffs ask this court to conclude here, that a plaintiff has standing despite an operative complaint devoid of the allegations necessary to establish standing for forward-looking relief. Current precedent, as far as Defendants are aware, does not support such a result.

**B.** Plaintiffs fail to plausibly allege any forward-looking injury in the Amended Complaint. None of Plaintiffs' three counterarguments demonstrate otherwise.

*First*, Plaintiffs claim that they can seek vacatur based on past injury alone. Resp.27. But because vacatur operates as "a prospective remedy, which eliminates the binding effect of regulations for the future," John Harrison, *Vacatur of Rules Under the Administrative Procedure Act*, 40 Yale J. on Reg. Bull. 119, 129 (2023), it "requires a showing that the plaintiff faces imminent harm in the future," *Pennsylvania v. Trump*, 795 F. Supp. 3d 607, 628 (E.D. Pa. 2025). *Brennan v. Dickson*, 45 F.4th 48 (D.C. Cir. 2022), does not hold otherwise. Resp.27. The D.C. Circuit did not address whether vacatur could redress a past

injury (it cannot) and simply noted in a single sentence that that the petitioner had not shown that the challenged rule "either harmed him or imminently will do so." *Id.*

*Second*, Plaintiffs claim that they still have standing to seek injunctive relief because many agents remain in Minnesota and Defendants have not rescinded any challenged policies. Resp.27. But Plaintiffs do not explain how the presence of agents alone causes imminent harm. And Plaintiffs' reliance on the alleged policies is unavailing because (1) Plaintiffs have failed to plausibly allege the existence of most of them and (2) most, if not all, do not directly operate on Plaintiffs. *Cf. Texas*, 599 U.S. at 680 n.3.

*Third*, Plaintiffs suggest that past harm is sufficient for standing to seek declaratory relief. Resp.27-28. But precedent makes clear that "Plaintiffs must show that they are suffering an ongoing injury or facing an immediate threat of injury" to "establish standing for declaratory relief." *Bedford v. Missouri Dep't of Soc. Servs., Fam. Support Div.*, 179 F.4th 611, 616 (8th Cir. 2026) (citation modified).

**C.** For similar reasons, Plaintiffs' mootness arguments lack merit. *See* Resp.28-31. Plaintiffs' allegations arise in connection with Operation Metro Surge, which is now over. And "when it is the government that has voluntarily ceased the challenged conduct[,]" courts often afford government entities "more leeway than private parties in the presumption that they are unlikely to resume [allegedly] illegal activities." *Prowse v. Payne*, 984 F.3d 700, 703 (8th Cir. 2021). Plaintiffs' speculation about a future resumption of additional enforcement actions cannot save this case from dismissal. The Supreme Court's decision in *FBI v. Fikre*, 601 U.S. 234 (2024), did not alter the longstanding

presumption that the Government is unlikely to resume ceased challenged conduct. The context-specific reasons that the Supreme Court found mootness lacking in *Fikre* turned on the Government's inability, due to the secrecy inherent in national security matters, to explain why it had taken the challenged action. *Id.* at 242-45. Here, in contrast, the mootness issue is straightforward given the public and transparent end to Operation Metro Surge.

### III. Plaintiffs Fail to State a Tenth Amendment Claim.

Plaintiffs' unprecedented Tenth Amendment theories are meritless. *See* Mot.19-28. Plaintiffs' response fails to show otherwise.

**A.** Plaintiffs start by noting disagreement as to the intent behind Operation Metro Surge. Resp.31-33. But because Plaintiffs fail to plausibly allege that Defendants lacked *any* legitimate motive in increasing immigration enforcement in Minnesota, the same issues exist now that existed at the preliminary-injunction stage. *Noem*, 818 F. Supp. 3d at 1045-46. And Plaintiffs remain unable to address them—Plaintiffs "cannot point to what number of federal officers would demonstrate a de facto Tenth Amendment anticommandeering violation" and fail to provide a "metric by which to determine when lawful law enforcement becomes unlawful commandeering." *Id.* Plaintiffs' theory also faces the same "doctrinal challenge" given the lack of precedential guidance and offers the same invitation for judicial overstepping. *Id.* at 1046.

Accordingly, this Court need not adjudicate any disputes of fact to conclude, as a matter of law, that this claim should be dismissed.[3]

**B.** Next, Plaintiffs mix up their own theories. As alleged, Plaintiffs appear to raise three separate Tenth Amendment theories—an infringement on police powers, coercion, and commandeering. Am. Compl. ¶¶ 486, 493-95. Defendants relied on *United States v. Louper-Morris*, 672 F.3d 539 (8th Cir. 2012) in arguing that Plaintiffs' police-power theory failed because Plaintiffs failed to identify an infringement. *See* Mot.19-20. Plaintiffs confuse matters by framing this argument as one against the second and/or third theories. *See* Resp.33-34. And they otherwise fail to identify any cognizable infringement.

Instead of challenging the substance of any federal law, Plaintiffs insist the Tenth Amendment imposes a judicially administrable limit on federal enforcement decisions. Resp.34-35. Plaintiffs do not substantiate this claim with any precedent. Indeed, *United States v. Darby*, the key case on which Plaintiffs rely, concerns legislative not executive power. 312 U.S. 100, 124 (1941). And even if Plaintiffs were right in theory, the facts as alleged do not give rise to any Tenth Amendment violation here. *See* Mot.27-28.

Plaintiffs also attempt to downplay the Supreme Court's direction that the judiciary should "normally" avoid inquiry into executive motivations by noting that federal courts do, sometimes, inquire into executive motivations. Resp.35. But none of these cases "run

---

[3] *In re Grand Jury Subpoenas*, No. 26-MC-43 PJS, 2026 WL 1783899 (D. Minn. June 22, 2026), is inapposite. There, the court did not find a "single plausible investigatory justification." *Id.* at *6. Here, Plaintiffs fail to plausibly allege that no permissible law enforcement justification existed.

up against the Executive's Article II authority to enforce federal law" like this one does. *Texas*, 599 U.S. at 678. Given the President's "conclusive and preclusive" authority in this area, judicial interrogation is especially inappropriate. *Trump v. United States*, 603 U.S. 593, 620 (2024). In any event, Plaintiffs' evidence of alleged malintent, such as Attorney General Bondi's letter, is "entirely consistent with the federal government's desire to enforce immigration law." Mot.25; *cf. Mullin v. Doe*, 146 S. Ct. 2121, 2138-40 (2026) (rejecting argument that statements by the President and former Secretary Noem tainted termination of TPS program).

**C.** Plaintiffs then try to defend the propriety and administrability of their requested relief. Resp.36-37. But Plaintiffs fail to address the Court's concerns at the preliminary-injunction stage. Even if, in some circumstances, a court can determine when a "financial inducement offered by Congress might be so coercive as to pass the point at which pressure turns into compulsion," *S. Dakota v. Dole*, 483 U.S. 203, 211 (1987), precedent provides no "guidance on how the Court should make that determination as to a broad immigration law enforcement initiative," *Noem*, 818 F. Supp. 3d at 1046, even if it provides such guidance in other circumstances, *see* Resp.37. This lack of guidance is exacerbated by the fact that the relief sought would place the Court in the position of superintending state-wide law enforcement efforts. *Id.* Such an extraordinary task is hardly equivalent to evaluating the propriety of a routine search or arrest. *Contra id.*

**D.** Plaintiffs argue that they have pleaded a plausible coercion claim. Resp.37-39. But like before, *see supra* at 12, Plaintiffs fail to answer questions essential to their claim's

legal viability. As this Court has explained, caselaw does not provide guidance about when "permissible pressure" becomes "impermissible compulsion." *Noem*, 818 F. Supp. 3d at 1046. And Plaintiffs, both at the preliminary-injunction stage and now, fail to provide a metric that would help the Court sort between the two. *See id.* Plaintiffs argue that the facts alleged here, like in *NFIB v. Sebelius*, constitute "a gun to the head." 567 U.S. 519, 581 (2012). But Plaintiffs fail to identify any standard that leads to this conclusion in the enforcement context. *Cf. Haaland v. Brackeen*, 599 U.S. 255, 279 (2023) (faulting petitioners for failing to give the court "something to work with"). And Plaintiffs fail to convince that the allegations here are equivalent to the loss of "over 10 percent of a State's overall budget," *NFIB*, 567 U.S. at 582, especially when many of the alleged harms are self-inflicted (diversion of resources) or result from the decision of non-parties (staying home from school). Although Plaintiffs respond that allegations of alleged coercion are enough to state a claim under the Tenth Amendment, Resp.40, a refusal to heed to the federal government's alleged wishes is evidence that Plaintiffs had no "gun to the head," in the first place, and that Plaintiffs in fact "reject[ed] the role" they allege Defendants wanted them to play, *Koog v. United States*, 79 F.3d 452, 457 (5th Cir. 1996).

**E.** Finally, under the guise of a "commandeering claim," Plaintiffs contend that they have plausibly alleged an infringement of their police powers. But they fail to allege any such infringement. *See* Mot.19-20; *supra* at 13. And they fail to allege any commandeering, as that term is defined in precedent. *See* Mot.20-23. Even if the facts here are "unprecedented," Resp.39, that does not excuse Plaintiffs' failures, especially when they

seek to extend this line of cases to this context for the first time, *see Noem*, 818 F. Supp. 3d at 1046.

## IV. Minnesota Fails to State an Equal Sovereignty Claim.

Minnesota's Equal Sovereignty claim fails as a matter of law because this case does not involve a "sensitive area[] of state and local policymaking," but rather immigration, an area over which the Constitution vests the federal government with broad powers. Mot.28-31. Plaintiffs do not provide any meaningful response to Defendants' arguments and instead rely on two district court decisions, neither of which helps their case. *Oregon v. Trump* concerned "the intrusion of California and Texas National Guardsmen in their capacity as militiamen of those States," which allegedly injured Oregon's "sovereignty under the Constitution." 809 F. Supp. 3d 1193, 1234 (D. Or. 2025). And *Roe v. Michelin North America, Inc.*, concerned the removability of wrongful-death cases in Alabama. 637 F. Supp. 2d 995, 1000 (M.D. Ala. 2009). Neither one supports the proposition that the Executive must present "compelling evidence" when prioritizing immigration enforcement in one state over another. *See Noem*, 818 F. Supp. 3d at 1048.

## V. Plaintiffs Fail to State First Amendment Claims.

**A.** Because Plaintiffs lack First Amendment rights against the federal government, they fail to state First Amendment claims. *See* Mot.31-33. In response, Plaintiffs reluctantly concede that lower courts agree with Defendants, but rest on the fact that the question "remains unresolved by both the Supreme Court and the Eighth Circuit," Resp.41-42. The fact, though, that a federal court has never resolved the question in Plaintiffs' favor—

despite scores of disagreements between federal, state, and city governments—is reason for great skepticism and judicial hesitation. *Cf. Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

Plaintiffs give this Court no reason to greatly expand the First Amendment's scope. They first claim that Defendants "misunderstand" the First Amendment because the "marketplace of ideas" would benefit from state and local governments having speech rights. Resp.42-43. But there is reason to doubt that this would be true. *See New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1212 (D.N.M. 2020) ("Government speech . . . could not just dominate the market but rather override it."). And the implications would be especially odd here, given that Plaintiffs seek to wield the First Amendment against the federal government based on ideas about immigration enforcement that the federal government has placed in the market. In any case, history provides no support for Plaintiffs' novel theory. *See* Mot.31-33.

Next, Minneapolis and Saint Paul argue that, because private corporations have First Amendment rights, municipal corporations must have them too. Resp.44-47. But municipalities, as "creatures of the state," do not "possess constitutional rights . . . in the same sense as private corporations or individuals." *City of Safety Harbor v. Birchfield*, 529 F.2d 1251, 1254 (5th Cir. 1976). And no court in a case like this one has extended a speech right to a municipality in relation to the federal government. In his *Citizens United* concurrence, Justice Scalia merely noted that "towns and cities" existed at the Founding. *Citizens United v. FEC*, 558 U.S. 310, 388 (2010) (Scalia, J., concurring). He did not

conclude that municipal corporations had the same rights as private ones. And even if Justice Brennan's language in *City of Boston v. Anderson* can be read to suggest that he agreed with Plaintiffs' position, 439 U.S. 1389, 1389 (1978) (Brennan, J., granting stay motion), three Justices disagreed with him, *see City of Boston v. Anderson*, 439 U.S. 951, 951 (1978) (Stevens, J., joined by Stewart and Rehnquist, JJ., dissenting from denial of motion to vacate stay), and six justices ended up voting to dismiss the appeal for "want of a substantial federal question," *City of Boston v. Anderson*, 439 U.S. 1060 (1979).

The lower court cases do not provide any more support. The Seventh Circuit did "not decide" the question of whether municipalities have First Amendment rights. *Creek v. Village of Westhaven*, 80 F.3d 186, 193 (7th Cir. 1996). *County of Suffolk v. Long Island Lighting Co.* is equally far afield, as it concerned a RICO case brought by a county against a power company. 710 F. Supp. 1387, 1389 (E.D.N.Y. 1989). Similarly, in *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, the court concluded that the First Amendment shielded municipalities from liability for the pursuit of a legal action, at least on the facts alleged. 701 F. Supp. 2d 568, 602 (S.D.N.Y. 2010). Again, the facts alleged here are not remotely similar. And the scholarship on which Plaintiffs rely (Resp.46-47) provides no analogous precedent either. Plaintiffs also claim that, because "a municipality is the voice of its residents," curtailment of its speech would be a curtailment of its residents' rights. Resp.46 (quoting *Creek*, 80 F.3d at 193). But precedent is clear that a state or municipality cannot sue the federal government to protect its citizens' rights. *See* Mot.11-12.

**B.** Even if the Court disagrees, Plaintiffs' retaliation claim should still be dismissed because Plaintiffs fail to plausibly allege but-for causation. Mot.33. Plaintiffs disagree, pointing to their conclusory allegations about Operation Metro Surge's purpose. Resp.47. But "mere conclusory statements" do not suffice, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and Plaintiffs fail to allege facts negating the stated and manifestly constitutional "obvious alternative explanation" of enforcing federal law, *Laney v. City of St. Louis*, 56 F.4th 1153, 1158 (8th Cir. 2023). Accordingly, Plaintiffs cannot show that Defendants' actions "would not have been taken absent the retaliatory motive," *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022) (quotation omitted), and their claim must be dismissed.

## VI. Plaintiffs' APA claims are not justiciable.

### A. Most of Plaintiffs' APA claims fail to plausibly allege discrete agency action.

Plaintiffs claim in twelve separate counts that Defendants are operating in Minnesota under certain "policies" that violate the APA. For most of these claims, *see* Am. Compl. ¶¶ 537-51, 560-74, 583-91, 605-64, Plaintiffs do not plausibly allege that the challenged "policy" even exists, much less that it is reflected in a discrete agency action susceptible to APA review. *See* Mot.34-41. Plaintiffs' opposition does not meaningfully grapple with this shortcoming.

Most glaringly, Plaintiffs never seriously claim to allege that these imagined policies are embodied in specific, discrete agency actions—a threshold requirement for stating an APA claim. *Corner Post, Inc v. Bd. of Govs. of Fed. Reserve Sys.*, 603 U.S. 799,

808 (2024). Instead, Plaintiffs try to shrug off this requirement, arguing that a "formal," "written" statement is not a prerequisite to APA review. *See* Resp.49-50.[4] But that's beside the point. Plaintiffs identify no statements of any kind, formal or informal, written or unwritten, that remotely resemble an "agency action"—*i.e.*, a "rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U.S.C. § 551(13)—that reflects any of these alleged policies. Therefore, at best, the above-mentioned claims allege and seek to challenge abstract law enforcement policies divorced from discrete agency action. They are thus unreviewable under the APA. *See Biden v. Texas*, 597 U.S. 785, 809 (2022) (finding it an "error" to "review[] an abstract decision apart from specific agency action, as defined in the APA"); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882, 890, 893 (1990); *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 62 (2004).[5]

While the lack of discrete agency action is decisive, Plaintiffs also fall short of plausibly alleging that these challenged "policies" exist. *See* Mot.35-39. For most of them, Plaintiffs largely rely on allegations regarding on-the-ground conduct of individual DHS agents. *See* Resp.58-60, 63-64, 69-76. But as already explained, *see* Mot.38-39, Plaintiffs cannot "simply attach a policy label to disparate agency practices or conduct" to plausibly allege the existence of a policy. *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168,

---

[4] Plaintiffs cite a handful of out-of-circuit and district court cases for this proposition, but none of them apply the APA's definition of "agency action," as *Biden* and *Lujan* both instruct.

[5] For this reason, plaintiffs' reliance on *Hussen v. Noem*, 822 F. Supp. 3d 944 (D. Minn. 2026), is misplaced. There, the district court explicitly did *not* find the existence of a reviewable agency action embodying the challenged policies. *Id.* at 1003.

1207 (S.D. Cal. 2019); *accord Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014). Nor do Plaintiffs get anywhere by repeatedly speculating, through vague and conclusory assertions, that DHS agents engaged in alleged conduct pursuant to an alleged policy. *See, e.g.*, Resp.69, 71, 75-76; *see also Hunter v. Page County*, 102 F.4th 853, 874–75 (8th Cir. 2024) ("speculative," "conclusory," and "barebones allegations … are insufficient to state a claim" (citation modified)). In short, Plaintiffs cannot dress up the "many individual actions" of law enforcement officers as representative of a purported "policy" to challenge all of those actions at once. That's exactly what *Lujan* prohibits. *See* 497 U.S. at 893.

Plaintiffs also rely on vague statements from individual DHS employees, *see* Resp.36, 38-39, none of which acknowledge the policies that Plaintiffs allege. For example, Plaintiffs infer the existence of a policy that they describe as "flood[ing] Minnesota and the Twin Cities with an intentionally overwhelming show of force, disproportionate to the needs within the area," and intended to "maximiz[e] fear and overrid[e] Plaintiffs' sovereign interests," *see* Am. Compl. ¶ 644, based on former Secretary Noem's use of the word "surged" to describe the deployment of law enforcement to Minnesota, *id.* ¶ 71, and former Acting ICE Director Lyons's statement that Operation Metro Surge was "the largest immigration operation ever," *id.* ¶ 75; *see also* Resp.73. Similarly, Plaintiffs infer the existence of a policy that DHS agents are to remove, obscure, and change license plates on DHS vehicles, *see* Am. Compl. ¶ 662, based on Assistant Secretary McLaughlin's statement that "DHS is not going to confirm our vehicles," *id.* ¶ 356; *see* Resp.76. Neither

alleged policy—nor any of the others—can be reasonably inferred from the general statements on which Plaintiffs rely. *See Brown v. Medtronic, Inc.*, 628 F.3d 451, 461 (8th Cir. 2010) (courts do not draw "unreasonable inferences" to sustain a complaint).

That leaves two documents that Plaintiffs cite, neither of which help them. As already explained, *see* Mot.37 n.13, the Privacy Threshold Analysis for the Mobile Fortify Mobile App does not suggest the existence of a policy of unrestricted scanning of Minnesota residents' biometric information. Nothing in that document purports to create or fully reflect DHS's policy regarding the collection and use of biometric information during immigration enforcement operations. *See* Doc. 176-4 at 1. Nor does it suggest that DHS has rescinded any prior policy on the collection and use of biometric information, including Directive 026-11. *Contra* Resp.71. Plaintiffs' so-called "Biometric Scanning Policy" thus rests on sheer speculation and unsupportable inferences.

Even more puzzling is Plaintiffs' reliance on a May 12, 2025, memorandum that addresses the topic of administrative arrest warrants. *See* Resp.75. Plaintiffs cite this document to support their claim that DHS is operating under a policy of entering private property without a judicial warrant or consent to conduct searches for unlawfully present immigrants. *See* Am. Compl. ¶ 652. But this document *belies* the policy that Plaintiffs allege. *See Feldmann Imports Inc. v. Mercedes-Benz USA, LLC*, 506 F. Supp. 3d 687, 694 (D. Minn. 2020) ("[I]f a written instrument contradicts allegations in the complaint[,] the exhibit trumps the allegations." (cleaned up)). As the document makes clear, while a DHS agent may rely on an administrative warrant "for the *arrest*" of a specified "alien with

a final order of removal," such a warrant "is *not a search warrant* and should *only* be used to enter the residence of the subject alien to conduct an administrative immigration *arrest*"—*not* a search. *See* Exhibit A, Mem. from Todd Lyons, Acting ICE Director, "Utilizing Form I-205, Warrant of Removal" (May 12, 2025) (emphasis added).[6] Indeed, nowhere does this document say anything about entering private property under any circumstances to conduct searches for unlawfully present immigrants. It thus in no way supports the existence of the specific policy that Plaintiffs allege.[7]

Finally, as already explained, *see* Mot.39-41, in attacking the entirety of Operation Metro Surge, Plaintiffs do not challenge a discrete agency action susceptible to APA review, but rather assert *precisely* the type of broad programmatic challenge to an agency "operation" that the APA prohibits, *see Lujan*, 497 U.S. at 894; *accord SUWA*, 542 U.S. at 64. Plaintiffs offer no serious argument in response. At first, they reason that they *must* be challenging a discrete agency action because they are not challenging, as they put it, "the administration's overall immigration program." *See* Resp.54. But that's a non sequitur.

---

[6] The Secretary of Homeland Security has "paused the practice of entering an illegal alien's residence who is subject to a final order of removal with an I-205, *Warrant of Removal/Deportation*, while [he] assess[es] the policy." *See* Exhibit B, Letter from Secretary Markwayne Mullin to Senator Richard Blumenthal (May 8, 2026).

[7] Plaintiffs also allege, based solely on "information and belief," that DHS issued guidance at some indefinite point in 2025 that established a "policy" that directed immigration agents to "unlawfully seiz[e]" Minnesotans based on their "race and apparent national origin." *See* Am. Compl. ¶¶ 423-24, 584. But that allegation, without more, is facially insufficient to plausibly allege that Defendants issued any such guidance, much less that it was embodied in a discrete agency action. *See Briscoe v. St. Louis County*, 172 F.4th 996, 997 (8th Cir. 2026) (conclusory "allegations pled on information and belief are" generally "insufficient to state a claim for relief").

Simply because an agency operation is part of a broader program, regulatory scheme, or agency mission does not make it a discrete agency action, as the APA defines that term. *See* 5 U.S.C. § 551(13) (*e.g.*, "rule," "order," "license"). Indeed, under Plaintiffs' logic, a plaintiff could challenge a Drug Enforcement Administration ("DEA") "drug interdiction program" under the APA, so long as it did not challenge the DEA's overall enforcement of the nation's drug laws. *See Lujan*, 497 U.S. at 890. But that's exactly what *Lujan* says a plaintiff cannot do under the APA. *Id.*

As a last-ditch effort, Plaintiffs try to cram the entirety of Operation Metro Surge into the APA's definition of an "agency action," claiming that the entire operation is a "sanction" under § 551(13) because it was intended to "punish and coerce" Plaintiffs. *See* Resp.54. But that can't work. While Defendants certainly dispute Plaintiffs' characterization of Operation Metro Surge, the bottom line is that the entire operation is not, by any estimation, a "*circumscribed*, *discrete*" action. *See SUWA*, 542 U.S. at 62; *see also Nw. Ctr. for Alternatives to Pesticides v. DHS*, 552 F. Supp. 3d 1078, 1087 (D. Or. 2021). And even putting that aside, Plaintiffs evidently overlook that the APA further defines "sanction," *see* 5 U.S.C. § 551(10), and nowhere do they explain how an entire law enforcement operation can plausibly satisfy that statutory definition, which includes specific, discrete actions like the "suspension of a license," "restitution," or a "fine," *id.*;

*see also Walmart Inc. v. U.S. DOJ*, 21 F.4th 300, 310 (5th Cir. 2021) (properly interpreting the APA's definition of "sanction" according to the canon of *ejusdem generis*).[8]

**B. Counts IX and XI fail to plausibly allege final agency action.**

In Counts IX and XI, Plaintiffs seek to challenge the Lyons Memo regarding the exercise of warrantless-arrest authority and the Huffman Memo regarding enforcement operations in certain sensitive locations. *See* Mot.42. As explained, these routine policy statements are not *final* agency actions under the APA, as they impose no legally binding obligations or prohibitions on the general public or regulated parties. Indeed, they have no legal effect whatsoever. *Id.* at 43-45.[9]

Plaintiffs dispute very little of what Defendants argue. They don't dispute that the Lyons and Huffman Memos are general policy statements that explain "how the agency will exercise its broad enforcement discretion," *N.E. Synod v. DHS*, 824 F. Supp. 3d 118, 162 (D. Mass. 2026), nor do they dispute that policy statements like these rarely constitute final agency action, *id.*; *see, e.g.*, *Arizona v. Biden*, 40 F.4th 375, 387-89 (6th Cir. 2022)

[8] *Wilderness Watch v. Hall*, 2025 WL 3515520 (D. Minn. Sept. 29, 2025), does not advance Plaintiffs' claims, *contra* Resp.55, as it does not apply the APA's definition of "agency action," as *Biden* and *Lujan* instruct.

[9] In a footnote, *see* Resp.61 n.25, Plaintiffs claim that Count IX does not challenge the Lyons Memo specifically, but rather some pre-existing alleged policy that instructs immigration agents to make "warrantless arrests" in Minnesota "without making" a determination "whether the arrested individual is likely to escape." *See* Am. Compl. ¶ 576. But to suggest that this Court should review an "abstract" policy "apart from specific agency action" is squarely contrary to *Biden*. *See* 597 U.S. at 809. So, either Count IX challenges the Lyons Memo as a discrete agency action (though not a final one), or it challenges an abstract alleged policy divorced from discrete agency action. Either way, Count IX does not challenge a reviewable agency action, and thus does not state an APA claim. *Corner Post*, 603 U.S. at 808.

(policy statement that created guidelines for the exercise of agency discretion was not final agency action). They also don't dispute that the Lyons and Huffman Memos impose no legally binding obligations or prohibitions on the general public or regulated parties, do not constrain the agency's authority or discretion, and create no specific rights or benefits—all "telltale signs" of nonfinality. *Arizona*, 40 F.4th at 388. More still, Plaintiffs do not claim that *they* have suffered any injury, much less a *legal* injury, or any other *legal* consequences directly from the Lyons and Huffman Memos—a necessary element of finality. *Firearms Regul. Account. Coal., Inc. v. Garland* ("*FRAC*"), 112 F.4th 507, 518 (8th Cir. 2024). Given all of this, Plaintiffs have virtually conceded that these memoranda are not final agency action.

Plaintiffs' counterarguments do not change that calculus.

*First*, regarding the Lyons Memo, Plaintiffs contend that the memorandum is sufficiently consequential to satisfy finality's second prong because it determined "the rights of individuals subject to immigration enforcement." *See* Resp.62. But they never explain what "rights" those could possibly be. The Lyons Memo is a guidance document that provides DHS agents with a non-exhaustive list of factors that may be relevant in determining whether an individual is "likely to escape" before an arrest warrant can be obtained, and thus whether exercising warrantless-arrest authority under 8 U.S.C. § 1357(a)(2) would be proper. *See* Doc. 176-3. That guidance determines no rights whatsoever.

Insofar as Plaintiffs mean to suggest that an individual's rights are affected when he or she is subject to a warrantless arrest under § 1357(a)(2), that would, at most, be the result of DHS agents exercising discretion that the INA delegated to them and that the Lyons Memos merely preserves, *not* because of any legal requirement imposed by that memorandum. Indeed, the Lyons Memo does not obligate DHS agents to make any arrests, take any other enforcement actions, or make any particular decisions, and therefore any warrantless arrest of an individual would not be the "direct and appreciable legal consequence" of that memorandum. *See Arizona*, 40 F.4th at 387 ("downstream" consequences that "arise only from officials who exercise their [statutory] discretion" are not a policy statement's "direct or appreciable legal consequences" (cleaned up)).

In any event, Plaintiffs cannot rely on how *others* could be indirectly impacted by an agency action. Finality's second prong asks whether an agency action has any "direct and appreciable legal consequences" for the *plaintiff*, not whether the action has any conceivable consequences, no matter how tangential. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597-98 (2016); *see also FRAC*, 112 F.4th at 518 ("Under [the second finality] prong," an agency action "must inflict some legal injury *upon the party seeking judicial review*." (cleaned up with emphasis added)).

*Second*, regarding the Huffman Memo, Plaintiffs misrely on *Hawkes* in arguing that the recission of a "safe harbor" satisfies finality's second prong. *See* Resp.67-68. For one thing, Plaintiffs are simply wrong that certain sensitive locations were considered "safe harbors" under 2021 Mayorkas Memo, which the Huffman Memo rescinded, *id.* at 68; *see*

Mot.44-45. The Mayorkas Memo did not prohibit DHS agents from conducting enforcement operations at sensitive locations, *contra* Resp.66; rather, like the Huffman Memo, the Mayorkas Memo permitted operations in sensitive locations and provided agents with guidance for determining whether to conduct such an operation, *see Mennonite Church*, 778 F. Supp. 3d at 12. This Court is not bound by Plaintiffs' contrary and incorrect reading of the Mayorkas Memo. *See Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501, 505 (7th Cir. 2013) (a court is to "independently examine" any documents considered at the pleading stage and "form its own conclusion" regarding the documents' "proper construction and meaning"). At any rate, Plaintiffs (and the district court decision they rely upon) misread *Hawkes*, which used the term "safe harbor" to describe the legal effect of a final agency action that protected regulated parties from liability by prospectively binding the agency to a particular legal position. *See* 578 U.S. at 598-99. The Huffman Memo does not have a similar effect on either regulated parties or the agency, and thus *Hawkes*'s safe-harbor analysis has no application here. *N.E. Synod*, 824 F. Supp. 3d at 162 (rejecting an identical "safe harbor" argument in holding that the Huffman Memo was not final agency action).

Moreover, it's immaterial that the Mayorkas Memo said that DHS agents had an "obligation" to follow its guidance and were to seek supervisory approval before conducting enforcement operations at sensitive locations. While that general policy statement expresses the agency's internal expectations for agents, it did not create a legally binding requirement of any sort, nor did it restrain the agency's authority or discretion to

change its position in any given case. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 716-17 (D.C. Cir. 2015); *Mennonite Church*, 778 F. Supp. 3d at 12. So, although the Mayorkas Memo may have been intended to influence how DHS agents were to conduct themselves on the job, it did not have any *legal* consequences, as necessary for finality. *See Hawkes*, 578 U.S. at 597-98. Its rescission was thus legally inconsequential, too. *N.E. Synod*, 824 F. Supp. 3d at 162.

**C. Counts IX and XI challenge actions that are committed to agency discretion.**

The APA also precludes review of the Lyons and Huffman Memos because they reflect decisions that the law commits to the agency's discretion. *See* 5 U.S.C. § 701(a)(2); *see also* Mot.46-52. Although Plaintiffs suggest that meaningful standards exist for reviewing these memoranda, *see* Resp.42, 68, Plaintiffs point to no statutory standard by which this Court could judge the reasonableness of those actions. Whether the law commits an action to agency discretion turns on whether it is possible to discern a meaningful standard of review from the *statute that confers the relevant decisionmaking authority* to the agency. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). If, after examining the authorizing statute's language and structure, *Tamenut v. Mukasey*, 521 F.3d 1000, 1003-04 (8th Cir. 2008) (en banc), no such standard can be discerned, then "the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely," *Heckler*, 470 U.S. at 830, as is the case here. As explained, *see* Mot.47-48, the INA is silent regarding what factors an immigration agent should reasonably consider when determining whether an individual "is likely to escape" (which is the subject of the Lyons Memo) or

whether or when it is appropriate for immigration agents to enter or approach sensitive locations in exercising DHS's broad discretion in enforcing federal immigration laws (which is the subject of the Huffman Memo), *see Fridley*, 2026 WL 1244043 at *2. The INA thus provides no discernable standard that this Court could apply in reviewing the Lyons or Huffman Memos, and Plaintiffs—who cite no statutory language or structure, *contra Tamenut*, 521 F.3d at 1003–04—argue nothing to the contrary.

Instead, Plaintiffs offer two standards they suggest this Court should apply in evaluating the reasonableness of the Lyons and Huffman Memos, neither of which helps them. *First*, for the Lyons Memo, Plaintiffs cite federal courts that have interpreted 8 U.S.C. § 1357(a)(2)'s use of the term "reason to believe" to mean "probable cause," which they say is a meaningful standard of review. *See* Resp.62. But the Lyons Memo doesn't focus on the statute's "reason to believe" prong;[10] rather, it provides guidance regarding the statute's "likely to escape" prong. *See supra* at 26. As explained, *see* Mot.48, the INA contains no meaningful standard for reviewing the reasonableness of *that* guidance.

*Second*, for the Huffman Memo, Plaintiffs suggest that the APA's arbitrary-and-capricious standard provides a meaningful standard of review. But as explained, *supra* at 29, an action is committed to agency discretion unless there's a meaningful standard of review discernible from the *statute that confers the relevant decisionmaking authority* to the agency. *Heckler*, 470 U.S. at 830. Here, that's the INA, not the APA. Moreover, if the

---

[10] Indeed, the Lyons Memo acknowledges and doesn't dispute the judicial interpretation of § 1357(a)(2)'s "reason to believe" prong that Plaintiffs cite. *See* Doc. 176-3 at 1 n.5.

APA's own substantive standards could satisfy *Heckler*'s meaningful-standard requirement, that would effectively swallow § 701(a)(2)'s exception to APA review. That cannot possibly be correct, as other courts have held. *See, e.g.*, *Lunney v. United States*, 319 F.3d 550, 559 n.5 (2d Cir. 2003).[11]

## VII. The Court Should Dismiss Count VII.

With Count VII, Plaintiffs seek a declaration that Minnesota's anti-masking statute applies to federal officers engaged in federal enforcement efforts. *See* Am. Compl. ¶ 559. Because this represents an attempt to control the operations of federal officers, dismissal is required under the intergovernmental immunity doctrine. *See* Mot.52-54. None of Plaintiffs' arguments show otherwise.

*First*, Plaintiffs contend that application of federal law in this context would not constitute a "direct regulation" on federal officers, because it (1) "applies to all citizens equally" and (2) only "incidentally" affects "the mode of carrying out the employment" for federal officers. Resp.79-80. On these bases, Plaintiffs attempt to distinguish other cases—like *United States v. California*, 173 F.4th 1060 (9th Cir. 2026)—that dealt with state statutes focused on law enforcement. Resp.79.

Plaintiffs come up empty. Although a textual focus on federal law enforcement certainly evidences a direct regulation, it is by no means necessary. After all, the drivers'

[11] At one point, Plaintiffs suggest that the merits of their APA claims must be resolved by "a fact-finder" after discovery. *See* Resp.74. Though irrelevant to whether Plaintiffs' claims are justiciable, this assertion displays a fundamental misunderstanding of basic APA record-review principles. *See, e.g.*, *Olenga v. Gacki*, 507 F. Supp. 3d 260, 272 (D.D.C. 2020).

license statute in *Johnson v. Maryland*, 254 U.S. 51 (1920), does not appear to have had any such textual focus, and the oleomargarine statute in *Ohio v. Thomas*, 173 U.S. 276 (1899), did not either. Yet in both, the Supreme Court concluded that the statutes at issue did not apply to federal officers. *Johnson*, 254 U.S. at 57; *Thomas*, 173 U.S. at 283.

And the nature of the state's interference in those cases, along with others, is not materially different than Plaintiffs' attempted interference here. Under Plaintiffs' view, a federal officer's ability to enforce federal law in Minnesota is contingent on the officer's adherence to Minnesota's anti-masking statute. If an officer does not comply with that statute, Plaintiffs claim an intent to prosecute. *See* Am. Compl. ¶ 557. In other words, Plaintiffs interpret their state law to place a "prohibition" on federal officers. *Hancock v. Train*, 426 U.S. 167, 180 (1976). Unless they "conform[] to the police regulations of [Minnesota]," *Arizona v. California*, 283 U.S. 423, 451 (1931), federal officers are unable to enforce federal law.

This is a direct regulation of the United States, *see CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 321 (3d Cir. 2025) ("A state law regulates the United States directly when it places either a prohibition or mandate on the federal government." (alteration adopted and quotation omitted)), for it attempts to "control[] how the government conducts specifically governmental functions." *California*, 173 F.4th at 1067. At the least, this case is materially similar to *Johnson*, as Plaintiffs do in fact read Minnesota's statute to "require[] qualifications in addition to those that the [federal]

Government has pronounced sufficient," *Johnson*, 254 U.S. at 57.[12] This is no incidental regulation.

Plaintiffs also contend that *In re Neagle*'s articulation of "Supremacy Clause immunity"—which requires a showing of "necessary and proper" action—cuts against dismissal. 135 U.S. 1, 75 (1890); *see* Resp.77-78. But although they both arise from the Supremacy Clause, Supremacy Clause immunity and intergovernmental immunity are different doctrines "applied at different stages of enforcement, by different parties, and require different inquiries." *United States v. California*, 819 F. Supp. 3d 1109, 1122 (C.D. Cal. 2026). The former can be raised by a federal officer facing a prosecution for a violation of state law, *see, e.g.*, *Tennessee v. Davis*, 100 U.S. 257 (1879) (murder charge), while the latter can be raised by the federal government when facing state regulation, *see, e.g.*, *United States v. Washington*, 596 U.S. 832, 838-39 (2022).

Owing to these differences, a state law is subject to challenge "as potentially violating the intergovernmental immunity doctrine, irrespective of whether Supremacy Clause immunity would bar state prosecutions of federal officers for violating the Acts in only some or in all circumstances." *United States v. New York*, No. 1:26-CV-1360 (MAD/ML), 2026 WL 2225423, at *15 (N.D.N.Y. Aug. 3, 2026) (quotation omitted). And because Defendants' argument is based on the intergovernmental immunity doctrine,

[12] This language from *Johnson* refutes Plaintiffs' suggestion that intergovernmental immunity does not apply here because "Defendants do not even require their agents to wear masks in public to carry out their federal duties." Resp.80. The key point is that states cannot add additional requirements, even if the federal government does not have a contradictory policy.

Defendants need not meet the *In re Neagle* standard. Minnesota's law, as described by Plaintiffs, regulates federal officers when enforcing federal law, and that is enough for dismissal.[13]

## VIII. Count XVIII Fails to State a Valid Claim For Relief.

Plaintiffs allege in Count XVIII that Operation Metro Surge constituted an unlawful "use of military troops for law enforcement." Am. Compl. ¶ 666. Plaintiffs do not identify the APA or any other express statutory cause of action to assert this claim; they therefore appear to assert an implied equitable *ultra vires* theory. Although Plaintiffs correctly concede the narrowness of *ultra vires* review, *see Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025), they protest that "the narrowness of the theory of relief does not answer whether Plaintiffs have asserted a claim that fits within the theory," Resp.81. What does answer that question is the absence of any factual support that any members of the United States military participated in Operation Metro Surge, or that the United States military was involved in any facet of the planning or execution or Operation Metro Surge. Plaintiffs' conclusory assertions about "how OMS's size, scope, and character was military in nature" are quintessentially conclusory in nature, *id.*, and therefore cannot support a valid *ultra vires* cause of action, *see Iqbal*, 556 U.S. at 686 ("[T]the Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context."). Count XVIII should be dismissed.

---

[13] That this claim might rely on the Tenth Amendment (Resp.40) is irrelevant to its viability in the light of the intergovernmental immunity doctrine.

## IX. Plaintiffs' Other *Ultra Vires* Claim (Count XIX) Should Be Dismissed.

Plaintiffs' other *ultra vires* claim (Count XIX) is a restatement of their APA challenges to Defendants' various alleged policies as well as OMS more broadly. *See* Resp.82. Those claims fail for the reasons explained above. Plaintiffs cannot evade their myriad deficiencies by relabeling those same challenges as *ultra vires*.

The entirety of Plaintiffs' argument is that "agency action can be challenged as ultra vires even if it does not constitute final agency action." Resp.82. The Supreme Court has "strictly limited" the scope of *ultra vires* review, reasoning that "ultra vires review could become an easy end-run around the limitations of . . . judicial-review statutes." *Nuclear Regul. Comm'n*, 605 U.S. at 681. Thus, the Supreme Court has held that ultra vires claims must fit within "painstakingly delineated procedural boundaries"; such review "applies only when an agency has taken action entirely in excess of its delegated powers and contrary to a specific prohibition" in a statute. *Id.* (quotations omitted). Plaintiffs make no attempt to explain how any of their APA claims involve Defendants acting "contrary to a *specific prohibition* in a statute." *Id.* (emphasis in original). Plaintiffs cannot "dress up a typical statutory-authority argument as an ultra vires claim." *Id.* Count XIX must therefore be dismissed.

## X. This Court Lacks Jurisdiction to Issue Injunctive Relief.

Finally, an independent jurisdictional impediment to injunctive relief exists in 8 U.S.C. § 1252(f)(1). Plaintiffs do not dispute the basic proposition that § 1252(f)(1) deprives lower courts of jurisdiction to enjoin or restrain immigration-enforcement

operations set forth in §§ 1221-1232. Rather, they assert that § 1252(f)(1)'s prohibition on injunctive relief does not extend to other INA provisions that Plaintiffs have also invoked as part of their challenges to Operation Metro Surge. *See* Resp.83. But that fact neither narrows the breadth of their challenge nor renders § 1252(f)(1) a nullity. Plaintiffs' proffered distinction cannot be reconciled with the text of § 1252(f)(1), which applies "*[r]egardless of the nature of the action or claim* or of the identity of the party or parties bringing the action." (emphasis added).

Given the expansive scope of the authorities collectively set out in 8 U.S.C. §§ 1221-1232 and the broad sweep of Plaintiffs' 19-count complaint, there can be no serious question that the injunctive relief that Plaintiffs seek would require the Court commit the very interference that § 1252(f)(1) forbids. Section 1252(f) therefore requires dismissal of Plaintiffs' claims that would effectively "enjoin or restrain the operation" of immigration enforcement efforts specified in 8 U.S.C. §§ 1221-1231.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Amended Complaint without leave to re-file.

Dated: August 14, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

*/s/ Brantley T. Mayers*
BRANTLEY T. MAYERS (FL#1039996)
Counsel to the Assistant Attorney General
ANDREW WARDEN
Assistant Director
LEE REEVES
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: 202-353-8679
Fax: (202) 616-8470
Brantley.T.Mayers@usdoj.gov

*Counsel for Defendants*